**LAKESHORE LAW CENTER**
**Jeffrey Wilens, Esq. (State Bar No. 120371)**
**18340 Yorba Linda Blvd., Suite 107-610**
**Yorba Linda, CA 92886**
**714-854-7205**
**714-854-7206 (fax)**
**jeff@lakeshorelaw.org**

**THE SPENCER LAW FIRM**
**Jeffrey P. Spencer, Esq. (State Bar No. 182440)**
**903 Calle Amanecer, Suite 220**
**San Clemente, CA 92673**
**949-240-8595**
**949-240-8515 (fax)**
**jps@spencerlaw.net**

**Attorneys for Plaintiffs**

# UNITED STATES DISTRICT COURT,

## NORTHERN DISTRICT OF CALIFORNIA,

### SAN FRANCISCO DIVISION

| | |
|---|---|
| SEAN L. GILBERT,<br>KEEYA MALONE,<br>KIMBERLY BILBREW,<br>CHARMAINE B. AQUINO,<br>on behalf of themselves and all<br>persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA, N.A.,<br>MONEYMUTUAL, LLC,<br>SELLING SOURCE, LLC,<br>EFFECTIVE MARKETING<br>SOLUTIONS, LLC,<br>LONDON BAY CAPITAL, LLC,<br>MONTEL BRIAN ANTHONY<br>WILLIAMS,<br>AARON SHOAF, | ) Case No. CV-13-01171-JSW<br>) Complaint filed February 11, 2013<br>)<br>)<br>)<br>)    **UNREDACTED**<br>)<br>)<br>) <u>CLASS ACTION</u><br>)<br>) **FIRST AMENDED COMPLAINT FOR**<br>)<br>)**1. Assisting in the Origination of**<br>) **Payday Loans Without a License in**<br>) **violation of Financial Code § 23005**<br>) **2. Violation of Racketeer Influenced**<br>) **and Corrupt Organization Act of 1970**<br>) **("RICO"), 18 U.S.C. § 1961**<br>) **3. Violation of Unfair Competition Law**<br>) **(Business and Professions Code § 17200**<br>) **et. seq.)** |

1

| | |
|---|---|
| GLENN MCKAY, | ) **4. Violation of Unfair Competition Law** |
| PARTNER WEEKLY, LLC, | ) **(Business and Professions Code § 17200** |
| PREVIOUSLY SUED AS DOE NO. 1, | ) **et. seq.)** |
| BRIAN RAUCH, PREVIOUSLY | ) **5. Violation of Unfair Competition Law** |
| SUED AS DOE NO. 2, | ) **(Business and Professions Code § 17200** |
| JOHN HASHMAN, PREVIOUSLY | ) **et. seq.)** |
| SUED AS DOE NO. 3, | ) **6. Negligence** |
| TSS ACQUISITION COMPANY, LLC | ) |
| PREVIOUSLY SUED AS DOE NO. 4, | ) |
| RARE MOON MEDIA, LLC, | ) |
| PREVIOUSLY SUED AS DOE NO. 5, | ) |
| JEREMY SHAFFER, PREVIOUSLY | ) |
| SUED AS DOE NO. 6, | ) |
| BRAD LEVENE, PREVIOUSLY | ) |
| SUED AS DOE NO. 7, | ) |
| LINDSEY COKER, PREVIOUSLY | ) |
| SUED AS DOE NO. 8, | ) |
| JOSH MITCHEM, PREVIOUSLY | ) |
| SUED AS DOE NO. 9, | ) |
| M. MARK HIGH, LTD., | ) |
| PREVIOUSLY SUED AS DOE NO. 10, | ) |
| ISG INTERNATIONAL, | ) |
| PREVIOUSLY SUED AS DOE NO. 11, | ) |
| CANE BAY PARTNERS, VI LLLP, | ) |
| PREVIOUSLY SUED AS DOE NO. 12, | ) |
| CANE BAY PARTNERS, LLC, | ) |
| PREVIOUSLY SUED AS DOE NO. 13, | ) |
| INTERACTIVE SERVICES GROUP, | ) |
| PREVIOUSLY SUED AS DOE NO. 14, | ) |
| DAVID A. JOHNSON PREVIOUSLY | ) |
| SUED AS DOE NO. 15, | ) |
| SARAH REARDON PREVIOUSLY | ) |
| SUED AS DOE NO. 16, | ) |
| and Does 17 through 100 inclusive, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiffs allege as follows:

## <u>PARTIES</u>

1. Plaintiffs SEAN L. GILBERT, KEEYA MALONE, KIMBERLY BILBREW and CHARMAINE B. AQUINO, individuals, bring this action on behalf of themselves, and on behalf of a class of similarly situated persons pursuant to Federal Rule of

Civil Procedure 23.  Plaintiffs are residents of the State of California and competent adults.

2.  Plaintiffs are informed and believe, and thereupon alleges, that Defendant BANK OF AMERICA, N.A. is now, and at all times mentioned in this Complaint was, a national association based in North Carolina and doing business in the County of Alameda, State of California, and throughout the State of California and United States.  It has not designated a principle place of business in California.

3.  Plaintiffs are informed and believe, and thereupon allege, that Defendant MONEYMUTUAL, LLC is now, and at all times mentioned in this Complaint was, a business of unknown form based in Silver Springs, Nevada and doing business in the County of Alameda, State of California, and throughout the State of California and United States.  It has not designated a principle place of business in California.

4.  Plaintiffs are informed and believe, and thereupon allege, that Defendant SELLING SOURCE, LLC is now, and at all times mentioned in this Complaint was, a business of unknown form based in Las Vegas, Nevada and doing business in the County of Alameda, State of California, and throughout the State of California and United States.  It has not designated a principle place of business in California.

5.  Plaintiffs are informed and believe, and thereupon allege, that Defendant EFFECTIVE MARKETING SOLUTIONS, LLC., is now, and at all times mentioned in this Complaint was, a corporation based in Silver Springs, Nevada and doing business in the County of Alameda, State of California, and throughout the State of California and United States.  It has not designated a principle place of business in California.

6.  Plaintiffs are informed and believe, and thereupon allege, that Defendant LONDON

BAY CAPITAL, LLC., is now, and at all times mentioned in this Complaint was, a corporation based in San Francisco, California and doing business in the County of Alameda, State of California, and throughout the State of California and United States. It has designated a principle place of business in San Francisco, California.

7. Plaintiffs are informed and believe, and thereupon allege, that Defendant MONTEL BRIAN ANTHONY WILLIAMS, is now, and at all times mentioned in this Complaint was, a natural person residing in Jackson, Tennessee and doing business in the County of Alameda, State of California, and throughout the State of California and United States.

8. Plaintiffs are informed and believe, and thereupon allege, that Defendant AARON SHOAF, is now, and at all times mentioned in this Complaint was, a natural person residing in the State of Nevada and doing business in the County of Alameda, State of California, and throughout the State of California and United States.

9. Plaintiffs are informed and believe, and thereupon allege, that Defendant GLENN MCKAY, is now, and at all times mentioned in this Complaint was, a natural person residing in the State of Nevada and doing business in the County of Alameda, State of California, and throughout the State of California and United States. McKay is the President and Chief Operating Officer of Selling Source, LLC.

10. Plaintiffs are informed and believe, and thereupon allege, that Defendant Partner Weekly, LLC, is now, and at all times mentioned in this Complaint was, a business of unknown form based in Las Vegas, Nevada and doing business in the County of Alameda, State of California, and throughout the State of California and United States. It has not designated a principle place of business in California.

11. Plaintiffs are informed and believe, and thereupon allege, that Defendant BRIAN

RAUCH, is now, and at all times mentioned in this Complaint was, a natural person residing in San Diego, California and doing business in the County of Alameda, State of California, and throughout the State of California and United States. Rauch was Vice President of Marketing for Partner Weekly during parts of the Class Period.

12. Plaintiffs are informed and believe, and thereupon allege, that Defendant John Hashman, is now, and at all times mentioned in this Complaint was, a natural person residing in the State of Nevada and doing business in the County of Alameda, State of California, and throughout the State of California and United States. Hashman is the President of Partner Weekly.

13. Plaintiffs are informed and believe, and thereupon allege, that Defendant TSS Acquisition Company, LLC is now, and at all times mentioned in this Complaint was, a business of unknown form based in San Francisco, California and doing business in the County of Alameda, State of California, and throughout the State of California and United States. It has not designated a principle place of business in California.

14. Plaintiffs are informed and believe, and thereupon allege, that Defendant Rare Moon Media, LLC is now, and at all times mentioned in this Complaint was, a business of unknown form based in Lenexa, Kansas and doing business in the County of Alameda, State of California, and throughout the State of California and United States. It has not designated a principle place of business in California.

15. Plaintiffs are informed and believe, and thereupon allege, that Defendant Jeremy Shaffer is now, and at all times mentioned in this Complaint was, an individual residing in the State of Kansas. He is the President and owner of Rare Moon Media.

16. Plaintiffs are informed and believe, and thereupon allege, that Defendant Brad Levene is now, and at all times mentioned in this Complaint was, an individual

residing in the State of Kansas.  He is the Vice President of Marketing for Rare Moon Media.

17. Plaintiffs are informed and believe, and thereupon allege, that Defendant Lindsey Coker is now, and at all times mentioned in this Complaint was, an individual residing in the State of Kansas.  She is an account executive for Rare Moon Media.

18. Plaintiffs are informed and believe, and thereupon allege, that Defendant Josh Mitchem is now, and at all times mentioned in this Complaint was, an individual residing in the State of Kansas.  He is the founder of Rare Moon Media and was its President for part of the class period.

19. Plaintiffs are informed and believe, and thereupon allege, that Defendant M. Mark High, Ltd., is now, and at all times mentioned in this Complaint was, a business of unknown form based in Christiansted, Virgin Islands, and doing business in the County of Alameda, State of California, and throughout the State of California and United States.  It has not designated a principle place of business in California.

20. Plaintiffs are informed and believe, and thereupon allege, that Defendant ISG International, is now, and at all times mentioned in this Complaint was, a business of unknown form based in Christiansted, Virgin Islands, and doing business in the County of Alameda, State of California, and throughout the State of California and United States.  It has not designated a principle place of business in California.

21. Plaintiffs are informed and believe, and thereupon allege, that Defendant Cane Bay Partners, VI LLLP, is now, and at all times mentioned in this Complaint was, a business of unknown form based in Christiansted, Virgin Islands, and doing business in the County of Alameda, State of California, and throughout the State of California and United States.  It has not designated a principle place of business in California.

22. Plaintiffs are informed and believe, and thereupon allege, that Defendant Cane Bay Partners, LLC, is now, and at all times mentioned in this Complaint was, a business of unknown form based in Christiansted, Virgin Islands, and doing business in the County of Alameda, State of California, and throughout the State of California and United States. It has not designated a principle place of business in California.

23. Plaintiffs are informed and believe, and thereupon allege, that Defendant Interactive Services Group, is now, and at all times mentioned in this Complaint was, a business of unknown form based in Atlanta, Georgia, and doing business in the County of Alameda, State of California, and throughout the State of California and United States. It has not designated a principle place of business in California.

24. Plaintiffs are informed and believe, and thereupon allege, that Defendant David A. Johnson, is now, and at all times mentioned in this Complaint was, an individual residing in Atlanta, Georgia. He is the President and owner of Cane Bay Partners, VI LLLP and Cane Bay Partners, LLC. He is also believed to be the owner and President of Interactive Services Group.

25. Plaintiffs are informed and believe, and thereupon allege, that Defendant Sarah Reardon, is now, and at all times mentioned in this Complaint was, an individual residing in Chicago, Illinois. She is a Marketing Manager for Cane Bay Partners, VI LLLP and Cane Bay Partners, LLC.

26. Plaintiffs do not know the true names or capacities of the Defendants sued herein as DOES 17 through 100 inclusive, and therefore sue these Defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe, and thereon allege, that each of these fictitiously named Defendants is responsible in some manner for

the occurrences herein alleged, and that Plaintiffs' damages as herein alleged were proximately caused by those Defendants. Each reference in this complaint to "Defendant" or "Defendants" or to a specifically named Defendant refers also to all Defendants sued under fictitious names.

27. Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned each of the Defendants, including all Defendants sued under fictitious names, and each of the persons who are not parties to this action but are identified by name or otherwise throughout this complaint, was the alter ego of each of the remaining Defendants, was the successor in interest or predecessor in interest, and was the agent and employee of each of the remaining Defendants and in doing the things herein alleged was acting within the course and scope of this agency and employment.

## CLASS ALLEGATIONS

28. Plaintiffs are members of a class of persons, the members of which are similarly situated to each other member of that class. The class is defined as follows:

> All California residents who received a "payday loan" from an UNLICENSED LENDER on or after February 11, 2009 by using any website affiliated with or in response to an email from Selling Source, LLC or one of its subsidiaries. Any lender owned by an American Indian tribe during the entire Class Period is excluded.

29. Plaintiffs are also members of a subclass which is comprised of:

> All California residents who obtained a "payday loan" from an UNLICENSED LENDER on or after February 11, 2009 by using the MoneyMutual website. Any lender owned by an American Indian tribe during the entire Class Period is excluded.

30. Plaintiffs are informed and believe, and thereupon allege, that the classes Plaintiffs

represent include at least 100 persons who were referred through a Selling Source website or in response to a Selling Source email or from the MoneyMutual website to UNLICENSED LENDERS and subsequently obtained payday loans from them during the specified time frame.

31. The identity of the members of the class is ascertainable from Defendants' own business records or those of their agents because Selling Source and its subsidiaries were paid a fee for each payday loan referral and documented the identify of each such borrower.

32. The Plaintiffs and Class Members' claims against Defendants involve questions of law or fact common to the class that are substantially similar and predominate over questions affecting individual Class Members in that all Class Members were solicited by one of the Selling Source websites or emails to obtain a payday loan from an illegal lender. With respect to the subclass, all class members were exposed to the same representations on the MoneyMutual website, were referred to and obtained payday loans from the illegal lenders. The same legal questions arise as to the illegality of the loans and the legal effect of the representations on the MoneyMutual website.

33. The claims of Plaintiffs are typical of the claims of the members of the Class.

34. Plaintiffs can fairly and adequately represent the interests of the Class.

35. A class action is the superior method of adjudicating the claims of the Class Members.

**FIRST CAUSE OF ACTION FOR VIOLATION OF THE CALIFORNIA DEFERRED DEPOSIT TRANSACTION LAW (FINANCIAL CODE § 23005) BY ASSISTING IN THE ORIGINATION OF PAYDAY LOANS WITHOUT A**

**LICENSE AGAINST ALL DEFENDANTS EXCEPT BANK OF AMERICA (BROUGHT AS INDIVIDUAL ACTIONS AND CLASS ACTION) BY PLAINTIFFS**

36. Plaintiffs incorporate in this cause of action the allegations contained in paragraphs 1 through 35, inclusive.

37. Financial Code § 23000, et. seq., the California Deferred Deposit Transaction Law (CDDTL), regulates the making of Deferred Deposit Transactions, more commonly known as "payday loans."

38. In a payday loan, the borrower receives a cash advance of a specified amount secured by a check (or electronic draft) to repay a larger amount of money in a short period of time.

39. Payday loans made to California residents by companies located in California or elsewhere are legal under certain circumstances and the industry is heavily regulated.

40. Financial Code § 23001 (a) defines a "Deferred Deposit Transaction" as a "transaction whereby a person defers depositing a customer's personal check until a specific date, pursuant to a written agreement for a fee or other charge, as provided in Section 23035." There is no requirement that the "personal check" be a "paper check" and commonly the borrower provides an entirely electronic version of a check or other form of authorization as security for the loan and the actual repayment is obtained by the lender by electronically withdrawing funds from the borrower's bank account.

41. Financial Code § 23005 provides that "**no person shall** offer, originate, or make a deferred deposit transaction, arrange a deferred deposit transaction for a deferred

deposit originator, act as an agent for a deferred deposit originator, or **assist a deferred deposit originator in the origination of a deferred deposit transaction** without first obtaining a license from the commissioner and complying with the provisions of this division."

42. A "Deferred Deposit Originator" is "a person who offers, originates, or makes a deferred deposit transaction." (Financial Code § 23001 (f).)

43. Financial Code § 23035 authorizes **licensed** payday lenders to make payday loans that meet certain requirements, one of which is a cap on finance charges that is much greater than California's usury law permits (10% APR). For example, California law permits a $45 finance charge on a $255 loan that must be repaid within 31 days (and no additional finance charges are allowed). Still, this would equate to an APR of more than 700% if the loan is paid back on time.

### The Lenders

44. This lawsuit will refer to UNLICENSED LENDERS, meaning persons or companies offering loans to California residents but which do not have licenses issued by the State of California to make a payday loan **or** any other type of loan to a California resident. This includes lenders specifically identified in this lawsuit as well as others who can be identified from Defendants' records but are not currently identified in the pleadings.

45. All of the UNLICENSED LENDERS identified herein or as otherwise will be identified during the course of this litigation are "deferred deposit originators" in that they offer and make deferred deposit transactions.

46. Every loan made by the UNLICENSED LENDERS was illegal under California law for numerous reasons but most importantly because the lender was not licensed by

the State of California to make a payday loan or any other type of loan for that matter. Accordingly, even if the loans had not met the definition of a payday loan the loan would still be illegal under California law because the lender was not licensed which all companies in the business of making loans must be.

47. There have been many government actions against these lenders. A sampling of enforcement actions against some of the lenders pertinent to this lawsuit is **attached hereto as Exhibit 1.**

48. Some of the UNLICENSED LENDERS are identified below. However, it should be kept in mind that the names of the lenders are often transitory if not utterly meaningless. Lenders frequently change the names of their "companies." One of the lenders' ploys is to change the name of the lender once the "heat" (government action) becomes too intense and continue operations under the new name.

49. For example, a mysterious company known as Hong Kong Partners, Ltd. operated both as "Cash Yes" and "Cash Jar" and may have used other names. However, at other times "Cash Yes" loans were made under the name "Cash Yes" with no reference to Hong Kong Partners. These lenders used a fake address in Belize. Another lender, whose true identity is not certain, operated as SCS Processing, LLC and Everest Cash Advance, while a third lender operated as VIP PDL Services, LLC and VIP Loan Shop. These lenders used a fake address in the West Indies. A fourth lender used the names Payday Valet and Payday Mobility. These lenders used a fake address on the Isle of Man. Another lender used the name Bottom Dollar Payday. This lender used a fake address in the West Indies. Another lender used Action PDF Services, LLC or Action Payday. This lender used a fake address in the West Indies. Another lender is ABJT Funding LLC dba Dollar Premier. This lender is a little

atypical because it used a fake address in the State of Utah. Another unidentified lender used the names OPD Solutions, SGQ Processing. Gateway Holdings Group, LLC, and Horizon Opportunities, LLC. These lenders used a fake address in the West Indies.

50. As indicated above, most but not all of these lenders created fake addresses, often in foreign countries such as Belize, the West Indies and the Isle of Man. The addresses are typically "mail drops" or mail forwarding services and there are no real operations occurring in the foreign countries. The sole purpose for this practice is to avoid compliance with State law, even though the loans are made to residents of the United States and California, and to make it extremely difficult to locate the true owners of the illegal lenders.

51. These companies also typically use "front men" who serve as their agents in marketing the payday loans to the public. Some of those "front men" named as defendants in this lawsuit and discussed in detail below.

**Plaintiffs and Class Members obtain Illegal Loans and then Pay Money**

52. As described in greater detail below, Plaintiffs and Class Members obtained payday loans, technically known as Deferred Deposit Transactions, from various unlicensed lenders.

53. In November and December 2012, Plaintiff Gilbert obtained payday loans from "Cash Yes" (i.e., Hong Kong Partners, Ltd.), VIP Loan Shop (i.e., VIP PDL Services), Action PDL Loan Services, LLC, Payday Mobility (i.e., Payday Valet), and OPD Solutions, LLC. He paid at least $120 to VIP Loan Shop, at least $180 to Action PDL Loan, at least $145 to Payday Mobility, and at least $90 to OPD Solutions. He also paid at least $105 in bank fees charged when Cash Yes tried to withdraw money from

his bank account.

54. In February 2013, Plaintiff Bilbrew obtained payday loans from "Cash Yes" (i.e., Hong Kong Partners, Ltd.) and paid at least $450 on those loans.

55. In November 2012, Plaintiff Malone obtained a payday loan from Bottom Dollar Payday and paid at least $575.

56. In February 2013, Plaintiff Aquino obtained payday loans from Dollar Premier (ABJT Funding, LLC) and VIP PDL Services, LLC and paid at least $650 on the first loan and at least $300 on the second loan.

57. On each of these occasions, Plaintiffs provided the lenders the electronic equivalent of a personal check or draft which was "postdated" to the repayment date and the respective lender agreed not to attempt to "deposit" that electronic draft prior to the scheduled repayment date.

58. During the Class Period many of the payday loans made to Class Members were made by the foregoing lenders, but some of them were made by other unlicensed lenders, not currently identified. The term "unlicensed lenders" as used in this Complaint refers to the foregoing companies as well as other companies not currently identified but which are also not licensed by the State of California to make any kind of loan.

59. As set forth above, because all of the foregoing loans were made by unlicensed lenders, they were all illegal. The APR on each of the foregoing loans was much greater than 100%. For example, the APR on Bilbrew's Cash Yes loan was more than 500% and the APR on another Cash Yes loan obtained by a class member, Paula Bernal, was more than 1,000%.

**Selling Source/MoneyMutual General Marketing of Illegal Payday Loans**

60. As explained in greater detail below, all of the Defendants except Bank of America, assisted one or more payday lenders (deferred deposit originators) in the origination of payday loans even though neither the lenders nor any of the Defendants on this cause of action had the required license from the State of California. Therefore, these Defendants violated Financial Code § 23005.

61. During the Class Period, Defendants London Bay Capital, LLC and TSS Acquisition Company, LLC (the latter of which existed solely to acquire and/or hold assets of London Bay), owned a controlling interest in Defendant Selling Source, LLC and directly ordered, authorized or participated in the tortious conduct described below including the decision to promote and faciiate payday loans by unlicensed lenders to California residents.

62. During the Class Period, Defendant Selling Source was engaged in the business of promoting and facilitating payday loans by unlicensed lenders to California residents. Selling Source did this by aggressively marketing of the loans on the Internet and to a lesser extent radio and television. Selling Source obtained leads in part by creating branded websites. But Selling Source also sent "spam" emails to California residents and displayed advertisements on websites visited by California residents.

63. During the Class Period, Defendant Glen McKay was President and Chief Executive Officer of Defendant Selling Source, LLC. He directly ordered, authorized or participated in the tortious conduct described below including the decision to promote and facilitate payday loans by unlicensed lenders to California residents.

64. One of the branded websites created by Selling Source to promote payday loans to California residents is www.moneymutual.com. It has operated during the entire

Class Period.

65. To conceal its involvement with this website, Selling Source uses a network of "shell companies" and fake principals.

66. For example, Selling Source arranged for the creation of Defendant Effective Marketing Solutions, LLC in June 2007 in order to "hold" the domain name for www.moneymutual.com.  The purpose was to prevent the true identity of the owners of MoneyMutual from being known to public, including potential victims.

67. Another layer of obfuscation was provided by Defendant Aaron Shoaf, who incorporated Effective Marketing Solutions, LLC in June 2007.  Shoaf created another business entity (Tailored Business Solutions) to be the "nominee manager" of Effective Marketing Solutions.  That way there would be no apparent connection between Selling Source and the MoneyMutual website.

68. Shoaf has admitted that the service he provides is intended to protect the true owners of a business engaged in fraudulent or other illegal conduct from personal liability.  His website explains:

> There are two major reasons why someone from another state would establish a Nevada corporation: 1. To reduce your home state taxes. 2. To protect your assets. We are sure you will agree that the **best way to assure that you are judgment-proof is to appear to be poverty-stricken and destitute.** Even if you are sued and a judgment is obtained against you, you have nothing to lose. Although none of us want to be poverty-stricken, we can arrange our affairs to appear so. One of the best asset protection strategies you have is to be dirt poor. Do not own anything. (At least make it appear that you do not own anything.) You then will be free from encumbrance.

69. During the Class Period, two subsidiaries of Selling Source, were Defendants MoneyMutual, LLC and Partner Weekly, LLC.  These defendants executed the

policies set forth by Selling Source with respect to the promotion of payday loans to California residents.

70. Defendant MoneyMutual was set up to run the MoneyMutual website subject to the foregoing control by Selling Source.

71. Defendant Partner Weekly was set up for the purpose of negotiating with and signing marketing contracts with payday lenders.

72. Most of these marketing contracts are signed by Defendant John Hashman, an executive Vice President of Selling Source who signs as an officer of Partner Weekly, or Defendant Brian Rauch, a former executive with Selling Source. The marketing contracts are usually signed by some "front man" for the lender but in reality the "front man" could be the lender or some affiliated company.

73. For example, marketing contracts between Partner Weekly and Cash Yes and Cash Jar contracts were negotiated by and often signed by Defendants David A. Johnson and Sarah Reardon on behalf of Cash Yes or Cash Jar. Johnson is an owner of Defendants Cane Bay Partners, VI LLLP and Cane Bay Partners, LLC, and Reardon is a Marketing Manager for these companies. Johnson and Reardon were acting in the scope and course of their employment with the Cane Bay companies when they negotiated and signed the contracts. Principals of the supposed Cash Yes and Cash Jar companies are not identified in the marketing contracts, with the only person not employed by the Cane Bay companies and who is often identified in the marketing agreements being "Shirlee Cornejo." Ms. Cornejo is the general manager of Fidelity Overseas, Ltd., a company based in Belize which assists persons from other countries such as the United States with assistance in setting up Belize international business companies for tax avoidance and asset protection purposes. In other words, Cornejo

(like Aaron Shoaf described previously) simply acts as fake officer of a fake company.

74. Other companies affiliated with or aka's of the Cane Bay Partners entities include Interactive Services Group, ISG International and more recently M. Mark High, Ltd.

75. Similarly, marketing contracts between Partner Weekly and SCS Processing, LLC or between Partner Weekly and VIP PDL Services, LLC were negotiated by and often signed by Defendants Jeremy Shaffer, Brad Levene, Lindsey Coker, and Josh Mitchem, all of whom were employed by and acting in the scope and course of their employment with Defendant Rare Moon Media, LLC when they negotiated and signed the agreements. Defendants Shaffer and Mitchem were the founders of Rare Moon Media, LLC in 2009. Shaffer is currently the owner and Mitchem is believed to have left the company sometime in 2010. Levene is the Vice President of Marketing and Coker is an account executive.

76. On its website, Rare Moon Media lists its contact address as PO Box 14065, Lenexa, KS 66285. The addresses listed for these lenders on the marketing contracts is often the PO Box or a virtual office used by Rare Moon Media on Renner Blvd. in Lenexa, KS. Shaffer and Mitchem are listed as the President of the lenders in various contracts.

77. The contracts provide that payday loan leads will be sold by Partner Weekly to the UNLICENSED LENDERS including but not limited to the ones identified in the preceding paragraphs. Some of these leads are generated by the Money Mutual website as described in greater detail below but leads are also generated by other advertising, websites, spam email, etc. Leads generated through the MoneyMutual website are tracked by Partner Weekly, charged accordingly and leads generated by other means are also tracked by Partner Weekly, and charged accordingly.

## **Selling Source/MoneyMutual Marketing of Illegal Payday Loans through the MoneyMutual website**

78. As alluded to earlier, Defendants London Bay Capital, LLC, TSS Acquisition Company, LLC, Selling Source, LLC, Glen McKay, Effective Marketing Solutions, LLC, Aaron Shoaf, MoneyMutual, LLC, Partner Weekly, LLC, John Hashman, and Brian Rauch [Collectively, the "MoneyMutual Defendants"] generated much of their revenue by selling payday loan leads through the MoneyMutual website (www.moneymutual.com), which was widely advertised on television, radio and the Internet.

79. The MoneyMutual website contains many pages promoting its network of payday lenders. The website explains: "A cash advance is a signature loan backed by a future source of income, usually your paycheck. That's why they are also known as 'payday loans.' A cash advance is designed to help you out through a temporary loss of cash or an unforeseen emergency. You can use the cash for car repair, food, credit card bills, other bills, rent, travel or whatever you need. Payday loans, short term loans, cash advance loans and installment loans are growing in popularity because they are easy to obtain and can be an excellent alternative to exorbitant late fees, reconnect fees and other penalties creditors can charge against your accounts."

80. It further explains: "Getting your cash is as easy as 1-2-3. MoneyMutual is not a lender. Instead, we have built one of the nation's largest networks of online short-term lenders. After submitting your information, if you are matched with a lender, MoneyMutual will redirect to the lender's web site where you will be able to review loan terms and conditions. In many cases, the lender will then contact you to confirm your personal information and finalize the loan. They may contact you via

telephone, email, text messages, etc. Please make sure that you respond in a timely manner to ensure that funds are deposited as quickly as possible."

81. The website assures consumers that all lenders on the MoneyMutual Network are required to adhere to a Code of Conduct, which includes the requirement that lenders "comply with any and all applicable federal and state collection practices laws and regulations." The website claims that "MoneyMutual regularly monitors lender practices for compliance with this Code of Lender Conduct. In the event that MoneyMutual determines that a lender is not acting in accordance with this Code of Lender Conduct, that lender's participation in the MoneyMutual program is subject to suspension and/or possible termination."

82. During the same period, television celebrity Montel Brian Anthony Williams, promoted and highly recommended the www.moneymutual.com website and the payday loan referral services provided therein by means of radio, television and Internet advertising. He continues to do so today.

83. For example, during the Class Period, on the homepage of www.moneymutual.com, there was a large picture of a smiling Montel Williams and a quote from him saying "Money Mutual's online lending network is a cash source you can trust for finding a short term cash loan quickly and easily." There is also a logo "As seen on TV." Mr. Williams has appeared in numerous television and radio commercials during the Class Period for the purpose of promoting www.moneymutual.com.

84. On YouTube, at www.youtube.com/user/moneymutual?feature=results_main, many of these commercials can be found on the "channel" dedicated to MoneyMutual. In one of the commercials, Mr. Williams assures the viewers or listeners that MoneyMutual can connect consumers to over 100 lenders, who can lend up to

$1,000 fast and "no worries."  In another commercial, he describes some financial emergencies that might befall the consumer and then says "I am here to offer you a backup plan—MoneyMutual."  In another commercial, Mr. Williams, in referring to MoneyMutual, states "We have helped people all across America."  In another commercial, Mr. Williams again refers to MoneyMutual when he states "We have the largest network of short-term lenders who can get you up to $1,000...."  In another commercial, Mr. Williams states "Hi, I'm Montel Williams from MoneyMutual, your trusted source of over 60 lenders to get you short-term cash.. . . . .Look for me and you will know it's MoneyMutual." Finally, in a commercial dating back to December 2009, Mr. Williams states "Hi, I'm Montel Williams, would an extra $1,000 come in handy right now?  Then I would like to talk to you about MoneyMutual.  It's your trusted source to over 60 lenders to get you up to $1,000 fast....."

85. On the MoneyMutual website, during the Class Period there was a frequently asked questions page that contains the following information:  "Q.  Why is Montel Williams endorsing this site?  A.  Montel Williams has endorsed MoneyMutual to provide access to short term cash loans to people who have no other alternatives. Montel takes pride in being able to provide people with information to help them live better physically, spiritually, financially, and emotionally. Montel understands that people have unexpected and needed expenses and sometimes difficult to pay due to lack of funds or credit. Rather than bounce a check, or receive late payment penalties, Montel believes that a short term loan from MoneyMutual's network of participating lenders can provide the immediate assistance to avoid costly fees. According to Williams, "MoneyMutual's online lending network is the only source you can trust for finding a short term loan quickly and easily." MoneyMutual allows people to

receive instant approval on getting a cash loan of up to $1,000*. Restrictions do apply. See Moneymutual.com for details."

86. On a different page of the MoneyMutual website, during the Class Period, this statement was displayed: "Why does Montel Williams endorse MoneyMutual? Celebrated talk show host and Daytime Emmy Award winner Montel Williams associates himself only with products that help people live better physically, spiritually, financially and emotionally. He understands that people will find themselves with difficult to pay expenses due to lack of funds or credit and agrees that a cash advance can provide the needed quick assistance and help avoid more costly fees."

87. As indicated above, Mr. Williams did not simply act as a celebrity endorser of a product, but repeatedly personally vouched for the integrity of the MoneyMutual lending network and repeatedly stated or implied that he personally was part of MoneyMutual.

88. The MoneyMutual Defendants pay Mr. Williams a substantial fee for his services in "endorsing" the website.

89. Notwithstanding the foregoing assurances and the Lender's Code of Conduct, in reality, the MoneyMutual Network has been comprised of many, if not mostly, illegal and criminal lenders, some of which are identified here as the unlicensed lenders.

90. The MoneyMutual Defendants and Montel Williams decided which lenders would be added to the MoneyMutual Lending Network. They considered applications submitted by the lenders including any proof of licensing as well as the lender's websites. They knew from these information sources that many of the lenders were not licensed to make payday loans. They further knew that since those

UNLICENSED LENDERS could not legally make any payday loans, they could not legally collect payments on the loans. They further knew that the lenders were violating the MoneyMutual website Lender's Code of Conduct by not being licensed and collecting and trying to collect payments on these illegal loans. Nevertheless, the MoneyMutual Defendants and Montel Williams permitted these lenders to join and to continue to participate in the Lending Network during the Class Period and represented that they were legally authorized to make the loans and to collect payment.

91. During the Class Period, the Departments of Corporations and Attorneys General for numerous States issued cease and desist notices against many of the UNLICENSED LENDERS affiliated with the MoneyMutual website. The MoneyMutual Defendants and Montel Williams knew of these various State law enforcement actions but continued to recommend these lenders to consumers and to represent that they were in compliance with all applicable laws.

92. At no time during the Class Period, did Mr. Williams or the MoneyMutual Defendants disclose that many of the "approved lenders" were illegal or unlicensed.

93. In allowing these illegal lenders to join the Lending Network and in recommending the services of these illegal lenders to consumers, and in concealing the illegal status of the lenders, and by representing they were in compliance with all applicable laws, MoneyMutual Defendants and Montel Williams intended to provide and did provide substantial assistance and encouragement to the illegal lenders.

94. They did so knowingly because the MoneyMutual Defendants and Montel Williams were paid a significant amount of money, often between $100 and $170 per accepted lead, by the lenders. They intended to have the MoneyMutual website lend an aura

of respectability and further encourage consumers to take loans from the illegal lenders in the Lending Network.

95. All of the loans referenced in paragraphs 53 to 56 were obtained by Plaintiffs by using the MoneyMutual website. On the same day or in the immediate days leading up to the loan dates, the Plaintiffs read the website, believed it and Montel Williams to be trustworthy and reliable and applied for loans through the website. After they submitted their applications, there were notified of the name or names of lenders who were willing to make loans to them.

96. Similarly, during the Class Period, the Class Members were referred through the MoneyMutual website to the UNLICENSED LENDERS which offered, originated or made Deferred Deposit Transactions. The MoneyMutual website continues to operate in this manner today.

97. Additionally, through other websites, advertising and spam email, Defendants referred Class Members to UNLICENSED LENDERS even though Defendants knew the lenders had no license. Defendants continue to make these referrals today.

98. Additionally, Defendants Cane Bay Partners, VI LLLP, Cane Bay Partners, LLC, Interactive Services Group, ISG International, M. Mark High, Ltd., David A. Johnson and Sarah Reardon, and Defendants Rare Moon Media, LLC, Jeremy Shaffer, Brad Levene, Lindsey Coker, and Josh Mitchem, negotiated and signed marketing contracts on behalf of UNLICENSED LENDERS even though they knew the lenders were not legally able to offer loans to California residents, or otherwise assisted in the processing of the leads. Some or all of these individuals or entities continue to commit these acts today.

99. In the foregoing manners, whether through the MoneyMutual website or by other

means, Defendants assisted the UNLICENSED LENDERS in the origination of payday loans even though neither the lenders nor any of the Defendants on this cause of action had the required license from the State of California, and continue to do so today even though they have been on notice of the illegality of their conduct for about a year. Therefore, these Defendants violated Financial Code § 23005.

100. Financial Code § 23060 (a) provides "If any amount other than, or in excess of, the charges or fees permitted by this division is willfully charged, contracted for, or received, a deferred deposit transaction contract shall be void, and no person shall have any right to collect or receive the principal amount provided in the deferred deposit transaction, any charges, or fees in connection with the transaction."

101. Financial Code § 23060 (b) provides "If any provision of this division is willfully violated in the making or collection of a deferred deposit transaction, the deferred deposit transaction contract shall be void, and no person shall have any right to collect or receive any amount provided in the deferred deposit transaction, any charges, or fees in connection with the transaction."

102. Moreover, pursuant to Financial Code § 23065, the knowing and willful violation of any provision of the CDDTL by a lender is punishable as a criminal offense carrying up to one year in and payment of a $10,000 fine.

103. As a result of the aforementioned willful violations of provisions of the CDDTL, Plaintiffs' and each of the Class Member's Loan Agreements is void as a matter of law and no person shall have any right to collect or receive the principal amount (or any amount) provided in the deferred deposit transaction, any charges, or fees in connection with the transaction."

104. Additionally, pursuant to Financial Code § 23064, Plaintiffs and the Class

Members may recover from the Defendants up to three times the damages actually incurred but in no event less that the amount paid by them to the UNLICENSED LENDERS.

105. Further, pursuant to Financial Code § 23064, upon a determination that Defendants' violations were willful, the Court may award punitive damages in addition to the amounts set forth above.

106. Further, pursuant to Financial Code § 23064, the Court should order Defendants to make restitution and disgorge all money obtained by the UNLICENSED LENDERS in these illegal transactions and shall further enjoin Defendants from assisting the UNLICENSED LENDERS in originating or making payday loans.

**SECOND CAUSE OF ACTION FOR VIOLATIONS OF RICO, 18 U.S.C. § 1962 (c), OPERATION OF AN ENTERPRISE THROUGH RACKETEERING ACTIVITY OR THROUGH COLLECTION OF UNLAWFUL DEBT AGAINST ALL DEFENDANTS EXCEPT BANK OF AMERICA (BROUGHT AS AN INDIVIDUAL ACTION AND CLASS ACTION) BY PLAINTIFFS**

107. Plaintiffs incorporate in this cause of action the allegations contained in paragraphs 1 through 106, inclusive.

108. During the Class Period each of the Defendants (except Bank of America) and each of the UNLICENSED LENDERS who are not currently named as parties were "RICO" PERSONS and were organized and associated with each other in an unnamed entity constituting an "association in fact" that constituted a RICO enterprise as that term is defined in 18 U.S.C. § 1961 (4). Defendants and the unnamed UNLICENSED LENDERS were associated together for the common purpose of marketing services to the general public for their mutual profit.

109. This association had a distinct division of labor and was and is organized and maintained by and through a consensual hierarchy of partners, managers, directors, officers, supervisors, and/or representatives from all RICO PERSONS that formulated and implemented policies relative to the advertising and marketing of services to the general public. It continued as a unit, with a core membership, over a substantial period of time and was an ongoing organization established for an economic motive. The association in fact remains viable and active at the time of filing of this First Amended Complaint.

110. This association is and was separate and distinct from the pattern of racketeering activity described in the Complaint in that the association also engaged in conduct unrelated to the racketeering activity and would still exist even if the racketeering activity did not exist.

111. The aforementioned enterprise engaged in or affected interstate commerce by using the interstate telephone networks and Internet, interstate telecommunication lines and the United States Mail to advertise and market payday loans, to originate and execute payday loan agreements, to distribute funds and collect payments from persons obtaining these loans, and to engage in debt collection efforts with respect to these loans.

112. Defendants, acting through the aforementioned enterprise, and during the Class Period and continuing, engaged in the collection of unlawful debt within the meaning of 18 USC § 1961 (6) in that the debt incurred by Plaintiffs and the Class Members is unenforceable under California law because of laws relating to usury including California Constitution, Article 15, Section 1 and the annual percentage rate charged by all the UNLICENSED LENDERS, who are all engaged in the

business of lending money, was more than twice the enforceable rate (10%) under California law. In every instances, the APR on the payday loans obtained by Plaintiffs and the Class Members was more than 100%.

113. Defendants, acting through the aforementioned enterprise, and during the Class Period and continuing thereafter, engaged in "racketeering activity" within the meaning of 18 USC § 1961 (1) by engaging in the acts set forth herein, aiding and abetting the commission of the foregoing acts, and conspiring to commit the foregoing acts, and directly or indirectly conducting the RICO enterprise's affairs, which constituted numerous violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wife fraud).

114. 18 U.S.C. § 1343 (wire fraud) states in relevant part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

115. 18 U.S.C. § 1341 (mail fraud) states in relevant part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . ., for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or

commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both."

116.     Plaintiffs allege that the aforementioned activities and/or conduct engaged in by Defendants constituted a "pattern of racketeering activity," as that term is defined in 18 U.S.C. § 1961 (5) in that Defendants committed acts indictable under 18 U.S.C. § 1341 and 18 U.S.C. § 1343, on two or more occasions where Plaintiffs and the Class Members personally lost money as a result of the racketeering activity.

117.     As a proximate result of Defendants' violations of RICO, Plaintiffs and Class Members have suffered damages and/or injuries to their interests in business and/or property through the payment of sums of money as previously alleged.

118.     Defendants' conduct was intentional, malicious and intended to harm Plaintiffs and the Class Members.  Consequently, Plaintiffs and Class Members are entitled to recover an award of exemplary and punitive damages.

### THIRD CAUSE OF ACTION FOR VIOLATION OF THE UNFAIR COMPETITION LAW AGAINST ALL DEFENDANTS EXCEPT BANK OF AMERICA (BROUGHT AS INDIVIDUAL ACTION AND CLASS ACTION) BY PLAINTIFFS

119.     Plaintiffs incorporate in this cause of action the allegations contained in paragraphs 1 through 118, inclusive.

120.     The Unfair Competition Law prohibits any person from engaging in unfair competition as that term is defined in Business and Professions Code § 17200, which

includes any "unlawful, unfair or fraudulent business act or practice," "unfair, deceptive, untrue or misleading advertising," and any act prohibited by Chapter 1 (commencing with section 17500) of Part 3 of Division 7 of the Business and Professions Code.

121.    During the Class Period, Defendants (except Bank of America) violated various sections of the Financial Code as set forth above, which constituted an unlawful business practice.

122.    As a proximate result of the violation of the UCL as set forth above, Plaintiffs suffered injury in fact and sustained monetary loss (hundreds of dollars) according to proof.

123.    Similarly, during the class period, Class Members also lost money as a result of the illegal Deferred Deposit Transactions.

124.    Pursuant to Business and Professions Code § 17203 and § 17204, Plaintiffs are empowered to compel Defendants to restore to Plaintiffs and the Class Members the money or property that the UNLICENSED LENDERS acquired as a result of any act which constitutes unfair competition.

125.    The conduct of Defendants will continue to harm the general public unless it is enjoined.

**<u>FOURTH CAUSE OF ACTION FOR VIOLATION OF THE UNFAIR COMPETITION LAW—FRAUD-- AGAINST DEFENDANTS LONDON BAY CAPITAL, LLC, TSS ACQUISITION COMPANY, LLC, SELLING SOURCE, LLC, GLEN MCKAY, EFFECTIVE MARKETING SOLUTIONS, LLC, AARON SHOAF, MONEYMUTUAL, LLC, PARTNER WEEKLY, LLC, JOHN HASHMAN, BRIAN RAUCH, AND MONTEL BRIAN ANTHONY WILLIAMS</u>**

**(BROUGHT AS INDIVIDUAL ACTION AND CLASS ACTION) BY**

**PLAINTIFFS**

126.  Plaintiffs incorporate in this cause of action the allegations contained in paragraphs 1 through 125, inclusive.

127.  As previously alleged, the MoneyMutual Defendants and Montel Williams made false, misleading and deceptive statements about the reliability and trustworthiness and legal status of the lenders in the Lending Network including the UNLICENSED LENDERS.  This constituted a fraudulent business practice in violation of the UCL.

128.  As a proximate result of the violation of the UCL as set forth above, Plaintiffs suffered injury in fact and sustained monetary loss (hundreds of dollars) according to proof.

129.  Similarly, during the class period, thousands of Class Members also lost money to Defendants as a result of the violation of the Unfair Competition Law.

130.  Pursuant to Business and Professions Code § 17203 and § 17204, Plaintiffs are empowered to compel Defendants to restore to Plaintiffs and the Class Members the money or property that Defendants acquired as a result of any act which constitutes unfair competition.

131.  The conduct of Defendants will continue to harm the general public unless it is enjoined.

**FIFTH CAUSE OF ACTION FOR VIOLATION OF THE UNFAIR COMPETITION LAW—UNLAWFUL OR UNFAIR ACT--AGAINST DEFENDANT BANK OF AMERICA, N.A. ONLY (BROUGHT AS INDIVIDUAL ACTION AND CLASS ACTION) BY PLAINTIFFS GILBERT AND BILBREW**

132.  Plaintiffs incorporate in this cause of action the allegations contained in

paragraphs 1 through 131, inclusive.

133.    During the Class Period, Plaintiffs Gilbert and Bilbrew had checking accounts with Defendant Bank of America that were used in connection with the aforementioned payday loans.  On the approximate dates previously alleged, Bank of America withdrew money from Plaintiffs' checking accounts and electronically transmitted it to bank accounts belonging to the UNLICENSED LENDERS. Similarly, during the Class Period, many of the Class Members also had checking accounts with Bank of America, which withdrew money from those Class Members' accounts and transmitted the money to the bank accounts of the UNLICENSED LENDERS.

134.    Each of these transfers was governed by 15 U.S.C. § 1693 et. seq., the Electronic Funds Transfer Act (EFTA) and Regulation E which was adopted to enforce it.

135.    15 U.S.C. § 1693g (e) provides that "Except as provided in this section, a consumer incurs no liability from an unauthorized electronic fund transfer."  Section 1693g (a) provides a consumer's liability for an unauthorized transfer shall not exceed the lesser of $50 or the value of the product/services received by the consumer prior to his notifying the bank of the unauthorized transfer.

136.    Section 1693g (a) also provides: "Notwithstanding the foregoing, reimbursement need not be made to the consumer for losses the financial institution establishes would not have occurred but for the failure of the consumer to report within sixty days of transmittal of the statement (or in extenuating circumstances such as extended travel or hospitalization, within a reasonable time under the circumstances) any unauthorized electronic fund transfer or account error which appears on the periodic statement provided to the consumer under section 1693d of

this title." However, Plaintiffs and the Class Members could not have prevented the losses by reporting the unauthorized transfers within 60 days after the periodic statements are provided because they losses were typically caused by one or a few transfers that occurred well before the 60 day deadline and therefore there were no "future" losses that could have been blocked.

137. Regulation E, similarly, provides: "(b) Limitations on amount of liability. A consumer's liability for an unauthorized electronic fund transfer or a series of related unauthorized transfers shall be determined as follows: . . . .(3) Periodic statement; timely notice not given. A consumer must report an unauthorized electronic fund transfer that appears on a periodic statement within 60 days of the financial institution's transmittal of the statement to avoid liability for subsequent transfers. If the consumer fails to do so, the consumer's liability shall not exceed the amount of the unauthorized transfers that occur after the close of the 60 days and before notice to the institution, and that the institution establishes would not have occurred had the consumer notified the institution within the 60-day period. . . ."

138. Under these provisions, Plaintiffs and Class Members were not liable for any unauthorized electronic fund transfers except that if the transfer appears on a monthly statement and the accountholder failed to report it within 60 days, in which case the accountholder is only liable for new unauthorized transfers occurring after that 60 day period.

139. At the time Bank of America made these electronic withdrawals and transfers, it knew the identity of the UNLICENSED LENDERS, it knew the many of the UNLICENSED LENDERS were engaged in the business of making payday loans from the Caribbean, Central America or similar locations to California residents, it

knew that many of the UNLICENSED LENDERS were not licensed to make payday loans to California or United States residents, and therefore it knew the loan transactions were illegal under California and United States law and that the loan transactions were void.

140.    Bank of America knew these facts because when the UNLICENSED LENDERS attempted to initiate debits from Plaintiffs' bank accounts, they were required to provide written ACH Authorization Forms that had purportedly been signed by the Plaintiffs and Class Members and Bank of America was prohibited by Clearing House rules from honoring the ACH debit requests without verifying that the Plaintiffs and Class Members had authorized the debits to be made.  The information present in the purported ACH Authorization forms provided this knowledge to Bank of America.

141.    Bank of America also was aware of the illegal nature of the lending activities of the UNLICENSED LENDERS through its own internal compliance procedures as well as from public actions taken by various States against the UNLICENSED LENDERS, including cease and desist orders.

142.    Along the same lines, the Office of the Comptroller of the Currency (OCC) issued an advisory to national banks including Bank of America in November 2000 warning it against establishing business relationships with third party payday lenders.  The OCC took public actions against some national banks in 2003 because of their improper relationship with third party payday loan vendors.  Eventually, the OCC forced national banks to stop partnering with payday lenders.

143.    During the Class Period, Bank of America removed money from Plaintiffs' checking accounts and those of certain Class Members in violation of 15 USC §

1693(g) and Regulation E because the electronic fund transfers to the UNLICENSED

LENDERS were not "authorized."

144.    15 U.S.C. §1693a and Regulation E defines an "unauthorized electronic funds

transfer" as "an electronic fund transfer from a consumer's account initiated by a

person other than the consumer without actual authority to initiate such transfer and

from which the consumer receives no benefit. . . ."

145.    The UNLICENSED LENDERS did not have "actual authority" to initiate transfers

from Plaintiffs and Class Members' bank accounts at Bank of America.

146.    Plaintiffs and Class members did not "benefit" from the transfer of funds from

their bank accounts to the UNLICENSED LENDERS because they had no legal

obligation to pay any money to the UNLICENSED LENDERS and therefore were

legally entitled to keep the initial loan as a "gift."  Hence there could be no benefit by

repaying money they were not obligated to repay.

147.    In most cases, it would have done Plaintiffs and Class Members no good to have

reported the unauthorized transfer to a particular Offshore Lender because by the

time of 60 days after the issuance of the monthly bank statement listing the first

debit to the particular accountholder's account, all of the money related to a

particular Loan Agreement had already been debited and transferred to the

Unlicensed Lenders.   In other words, in most instances the Plaintiffs and Class

Members suffered a total loss from a single or series of related or unauthorized

transfers long before the 60 days deadline occurred.

148.    Pursuant to Business and Professions Code § 17203 and § 17204, Plaintiffs is

empowered to compel Bank of America to restore to Plaintiffs and the Class

Members the money or property that Bank of America took out of their accounts and

transferred to the UNLICENSED LENDERS.

**SIXTH CAUSE OF ACTION FOR NEGLIGENCE AGAINST DEFENDANT**

**BANK OF AMERICA, N.A. (BROUGHT AS INDIVIDUAL ACTION AND**

**CLASS ACTION) BY PLAINTIFFS GILBERT AND BILBREW**

149.    Plaintiffs incorporate in this cause of action the allegations contained in paragraphs 1 through 148, inclusive.

150.    Defendant Bank of America owed a duty of care to Plaintiffs and those Class Members who had bank accounts and therefore were its customers.

151.    This duty of care required Bank of America to exercise reasonable care and due diligence in general and, for our purposes, in particular with respect to suspicious transfers <u>from</u> its customers' accounts to foreign entities, previously associated with fraud and criminal conduct.  This would include transactions involving certain types of businesses located in Belize, certain Caribbean Islands and the Isle of Man.

152.    To the extent Bank of America maintains it did not know the UNLICENSED LENDERS were illegal and criminal lenders, it should have known based upon the information available to it in the diligent exercise of its responsibilities under the Bank Secrecy Act, 31 CFR § 1020.320 and similar laws and regulations.

153.    For example, the Bank Secrecy Act/Anti-Money Laundering Examination Manual published by the Federal Reserve System, Office of the Comptroller of the Currency and similar agencies warns banks that offshore companies, including those involved in gambling, online payday lending and adult entertainment are high risk businesses requiring additional risk mitigation steps and banks dealing with payment processors associated with these high risk businesses should scrutinize the businesses.  It is even recommended that banks consider restricting transactions

with payment processors involved with online payday lenders.

154.    Bank of America should also have known the UNLICENSED LENDERS were operating illegal businesses because of the significant number of cease and desist orders issued by various States against the Lenders on the grounds they were operating illegal lending services.

155.    Bank of America breached its duty of care owed to the Plaintiffs and Class Members by approving the withdrawal of funds from their accounts to the suspicious overseas lenders without even providing a warning to the bank's accountholders.

156.    As a direct and proximate result of Bank of America's breach of the duty of care, Plaintiffs and Class Members suffered damages in the form of the loss of money transferred to the UNLICENSED LENDERS.

## <u>REQUEST FOR JURY TRIAL</u>

WHEREFORE, Plaintiffs requests trial by jury.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs prays for judgment on all causes of action against Defendants as follows:

1.  For an order certifying this matter as a class action;

2.  For preliminary and permanent injunctive relief pursuant to Financial Code § 23064 and Business and Professions Code § 17203 restraining and enjoining Defendants from continuing the acts of unlawful competition set forth above, requiring Defendants to take any acts needed to prevent further violations, and requiring Defendants to take affirmative measures to redress past wrongdoings;

3.  For an order requiring Defendants to provide an accounting of all moneys which they may have received as a result of the acts and practices found to constitute unfair

competition under Business and Professions Code § 17200;

4. For an order that Defendants identify, locate and make restitution to affected members of the general public, and specifically the members of the Class, and all additional orders necessary to accomplish this purpose, pursuant to Business and Professions Code § 17203;

5. For distribution of any moneys recovered on behalf of members of the Class, via fluid recovery or cy pres recovery where necessary to prevent Defendant from retaining the benefits of their wrongful conduct as provided in <u>California</u> v. <u>Levi</u> <u>Strauss</u> <u>&</u> <u>Co</u>. (1986) 41 Cal.3d 460 and <u>People</u> v. <u>Thomas</u> <u>Shelton</u> <u>Powers</u>, <u>M.D.</u> <u>Inc</u>. (1992) 2 Cal.App.4th 330;

6. For compensatory damages on the first cause of action not to be less than the amount paid by Plaintiffs and each Class Member and not to exceed three times any damages;

7. For compensatory damages, said sum to be trebled pursuant to 18 U.S.C. § 1964 (c), on the third cause of action;

8. For compensatory damages on the sixth cause of action;

9. For punitive or exemplary damages on the first and second causes of action;

10. For prejudgment interest on the sum of money awarded as damages or restitution;

11. For reasonable attorney's fees pursuant to Financial Code § 23064, pursuant to 18 U.S.C. § 1964 (c), pursuant to the Private Attorney General doctrine in Code of Civil Procedure § 1021.5, pursuant to the "common fund" doctrine, and pursuant to the "substantial benefit" doctrine.

12. For costs of suit incurred herein; and

13. For such other and further relief as the court may deem proper.

DATED: October 9, 2013

Respectfully submitted,

By      _/s/_Jeffrey Wilens_____

JEFFREY WILENS
Attorney for Plaintiffs

1  **STATE OF CALIFORNIA**

2  **BUSINESS, TRANSPORTATION AND HOUSING AGENCY**

3  **DEPARTMENT OF CORPORATIONS**

4

5

6  TO:    **VIP PDL Services, LLC, also known as The VIP Loan Shop**
7         **www.theviploanshop.com**
        4 Solomon's Arcade, Charlestown
8        Nevis, West Indies

9

10

11  **DESIST AND REFRAIN ORDER**

12  **(For violations of Financial Code Section 23005**)

13  The California Corporations Commissioner ("Commissioner") finds that:

14         1.      VIP PDL Services, LLC, also known as The VIP Loan Shop ("VIP") is, and was at all

15  relevant times herein, a company of unknown status located outside of the United States.  It has a

16  purported business address of 4 Solomon's Arcade, Charlestown, Nevis, West Indies.  VIP maintains

17  a website at www.theviploanshop.com.

18         2.      Since at least 2009, VIP has engaged in the business of offering, originating, or

19  making deferred deposit transactions in California, as defined by the California Deferred Deposit

20  Transaction Law (Fin. Code, § 23000 et seq.) ("CDDTL") and described below.

21         3.      A deferred deposit transaction is a written transaction whereby one person gives funds

22  to another person upon receipt of a personal check, and it is agreed that the personal check will not be

23  deposited until a later date.  "Personal check" as referenced in Financial Code section 23001 includes,

24  "the electronic equivalent of a personal check," such as an Automated Clearing House ("ACH") or

25  debit card transaction.

26         4.      VIP offers deferred deposit transactions also known as "payday loans" to California

27  residents by way of telephone at (866) 598-1100 and through its website address at

28  www.theviploanshop.com, as described below.

5.     VIP borrowers submit an online loan application through the company's website at www.theviploanshop.com.  The borrowers are required to provide their checking account information from which VIP automatically debits payments, fees, and interest from the borrowers.  VIP, however, then uses the borrowers' bank account information to deduct additional charges, sometimes doubling or tripling the amount of the original loan, beyond what the CDDTL allows.

6.     Financial Code section 23005, subdivision (a) provides that "no person shall offer, originate, or make a deferred deposit transaction, arrange a deferred deposit transaction for a deferred deposit originator, or assist a deferred deposit originator in the origination of a deferred deposit transaction without first obtaining a license from the commissioner."

7.     The Commissioner has not issued a deferred deposit transaction originator license to VIP pursuant to the CDDTL.  As such, VIP is not authorized to engage in payday lending, or to offer, originate, or make deferred deposit transactions, arrange deferred deposit transactions for a deferred deposit originator, act as an agent for a deferred deposit originator, or assist a deferred deposit originator in the origination of deferred deposit transactions in California or to California residents.

Based upon the foregoing, the Commissioner is of the opinion that VIP PDL Services, LLC, also known as The VIP Loan Shop has engaged in the business of deferred deposit transactions without first having applied for and secured a license from the Commissioner, in violation of Financial Code section 23005.

VIP PDL Services, LLC, also known as The VIP Loan Shop is hereby ordered to desist and refrain from engaging in the business of offering, originating, or making a deferred deposit transaction, arranging a deferred deposit transaction for a deferred deposit originator, act as an agent for a deferred originator, or assist a deferred deposit originator in the origination of a deferred deposit transaction in the State of California without a license.

///

///

///

1    This Order is necessary, in the public interest, for the protection of consumers and is

2   consistent with the purposes, policies and provisions of the California Deferred Deposit Transaction

3   Law.

4        This Order shall remain in full force and effect until further order of the Commissioner.

5   Dated: February 14, 2012
        Los Angeles, California

6                                        JAN LYNN OWEN
                                         California Corporations Commissioner
7

8

9                                        By_____
                                            ALAN S. WEINGER
10                                          Deputy Commissioner

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    PRESTON DuFAUCHARD
     California Corporations Commissioner
2    ALAN S. WEINGER
     Deputy Commissioner
3    LINDSAY B. HERRICK (SBN 224986)
     Corporations Counsel
4    Department of Corporations
     1515 K Street, Ste. 200
5    Sacramento, California 95814
     Telephone: (916) 445-3682
6    Facsimile: (916) 445-6985

7    Attorneys for Complainant
     CALIFORNIA CORPORATIONS COMMISSIONER

8

9            BEFORE THE DEPARTMENT OF CORPORATIONS

10              OF THE STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Orders Issued to:<br><br>EVEREST CASH ADVANCE, and EVEREST CASH ADVANCE dba NXT DAY CASH, and dba MY NEXT DAY CASH, and dba WWW.MYNEXTDAYCASH.COM, and dba WWW.EVERESTCASHADVANCE.COM, and dba SCS PROCESSING and dba SCS PROCESSING, LLC,<br><br>          Respondent. | DESIST AND REFRAIN ORDER (FIN CODE § 23050) AND ORDER VOIDING TRANSACTIONS AND TO DISGORGE ALL CHARGES AND FEES (FIN CODE §23060) |

Complainant, the Commissioner of the Department of Corporations ("Commissioner" or "Department"), is informed and believes, and based on such information and belief, finds as follows:

## I

## **FACTUAL BACKGROUND**

Everest Cash Advance, doing business as NXT DAY CASH, My Next Day Cash, located at P.O. Box 636 Charlestown, Nevis, West Indies, and operating on the Internet at www.mynextdaycash.com, using a phone number (877) 355-3915, offers "payday loans" to its

DESIST AND REFRAIN ORDER (FIN CODE § 23050) AND ORDER VOIDING TRANSACTIONS
AND TO DISGORGE ALL CHARGES AND FEES (FIN CODE §23060)

State of California - Department of Corporations

1  customers.

2      Additionally, Everest Cash Advance also offers payday loans to its customers over the

3  Internet operating at www.everestcashadvance.com, using the telephone number of (866) 794-3244

4  and doing business as SCS Processing and SCS Processing, LLC, (hereinafter "Everest") also located

5  at P.O. Box 636, Edith Solomon Bldg., Charleston, Nevis, West Indies.

6      Since at least September 18, 2008, Everest has engaged in the business of offering,

7  originating, or making deferred deposit transactions, as defined by the California Deferred Deposit

8  Transaction Law ("CDDTL", Cal. Fin Code sections 23000 *et seq*.)[1], section 23001(a), whereby

9  Everest defers depositing the customer's personal check until a specific date pursuant to a written

10 agreement for a fee or other charge.

11     Everest describes payday loans as providing cash in advance, between paydays, for those who

12 are facing a financial hardship or a "cash emergency".  Customers submit an application online and

13 are required to provide their checking account information from which Everest automatically deposits

14 loan monies and debits payments.  Everest, however, then uses customers' banking account

15 information to deduct additional fees and charges beyond what customers were told they would have

16 to pay, sometimes in excess of more than double the amount of the original loan.

17     Neither Everest, NXT DAY CASH, My Next Day Cash, www.mynextdaycash.com,

18 www.everestcashadvance.com, SCS Processing nor SCS Processing, LLC have been issued a

19 deferred deposit transaction originator license by the Commissioner pursuant to the CDDTL.  As

20 such, none of them is authorized to engage in payday lending, or to offer, originate, or make a

21 deferred deposit transaction, arrange a deferred deposit transaction for a deferred deposit originator,

22 act as an agent for a deferred deposit originator, or assist a deferred deposit originator in the

23 origination of a deferred deposit transaction.

24 ///

25 ///

26

27 [1] All future references are the California Financial Code unless otherwise indicated.

28

DESIST AND REFRAIN ORDER (FIN CODE § 23050) AND ORDER VOIDING TRANSACTIONS
AND TO DISGORGE ALL CHARGES AND FEES (FIN CODE §23060)

## II

## CDDTL VIOLATIONS AND ORDERS

The Department is responsible for enforcing all provisions of the CDDTL, including the regulation of deferred deposit transactions, which are also commonly referred to as "payday advances" or "payday loans."

### A. Desist and Refrain Order

The Commissioner is statutorily authorized to order any person to desist and refrain from engaging in violations of the CDDTL. Financial Code section 23050 provides:

> Whenever, in the opinion of the commissioner, any person is engaged in the business of deferred deposit transactions, as defined in this division, without a license from the commissioner,…the commissioner may order that person…to desist and to refrain from engaging in the business or further violating this division. If within 30 days, after the order is served, a written request for a hearing is filed and no hearing is held within 30 days thereafter, the order is rescinded.

The foregoing facts establish multiple violations of the CDDTL by Everest. The issuance of a Desist and Refrain Order, therefore, is necessary for the protection of consumers and is consistent with the purposes, policies, and provisions of the CDDTL.

Pursuant to section 23050, Everest Cash Advance, and Everest Cash Advance doing business as NXT DAY CASH, My Next Day Cash, www.mynextdaycash.com, www.everestcashadvance.com, SCS Processing and SCS Processing, LLC, is hereby ordered to desist and refrain from violating California Financial Code section 23036(b). This Order shall remain in full force and effect until further order of the Commissioner.

### B. Order Voiding California Deferred Deposit Transactions

California Financial Code section 23060, subdivision (a), states:

> If any amount other than, or in excess of, the charges or fees permitted by this division is willfully charged, contracted for, or received, a deferred deposit transaction contract shall be void, and no person shall have any right to collect or receive the principal amount provided in the deferred deposit transaction, any charges, or fees in connection with the transaction.

Everest willfully violated provisions of the CDDTL by repeatedly charging California

3

1  customers fees or charges without a license in violation of section 23005(a), including excess fees

2  and charges in violation of section 23036(a), in conjunction with deferred deposit transactions.

3  Because Everest willfully charged its customers unauthorized fees or charges, Everest is not entitled

4  to collect or receive the principal amounts provided in those deferred deposit transactions, nor is it

5  entitled to any of the charges or fees associated with the transactions.

6  　　　Pursuant to California Financial Code sections 23060, any and all deferred deposit

7  transactions contracted with California customers or in this state are therefore void.  Everest Cash

8  Advance, and Everest Cash Advance doing business as NXT DAY CASH, My Next Day Cash,

9  www.mynextdaycash.com, www.everestcashadvance.com, SCS Processing and SCS Processing,

10  LLC, is hereby ordered to immediately return the principal amounts provided in any and all

11  deferred deposit transactions contracted with California customers or in the state, and to disgorge

12  any and all charges or fees received in conjunction with the deferred deposit transactions.

13  Dated: May 13, 2011
   Sacramento, California

14

15  　　　　　　　　　　　PRESTON DuFAUCHARD
   　　　　　　　　　　　California Corporations Commissioner

16

17

18  　　　　　　　　By: _____

19  　　　　　　　　　ALAN S. WEINGER
   　　　　　　　　　Deputy Commissioner

20  　　　　　　　　　Enforcement Division

21

22

23

24

25

26

27

28

---

DESIST AND REFRAIN ORDER (FIN CODE § 23050) AND ORDER VOIDING TRANSACTIONS
AND TO DISGORGE ALL CHARGES AND FEES (FIN CODE §23060)

PRESTON DuFAUCHARD
California Corporations Commissioner
ALAN S. WEINGER
Deputy Commissioner
ERIK BRUNKAL (SBN 166086)
Senior Corporations Counsel
Department of Corporations
1515 K Street, Ste. 200
Sacramento, California 95814
Telephone: (916) 322-8782
Facsimile: (916) 445-6985

Attorneys for Complainant
CALIFORNIA CORPORATIONS COMMISSIONER

BEFORE THE DEPARTMENT OF CORPORATIONS

OF THE STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Orders Issued to:<br><br>Gateway Holdings Group, LLC,<br><br>                Respondent. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>DESIST AND REFRAIN ORDER (FIN CODE § 23050) AND ORDER VOIDING TRANSACTIONS AND TO DISGORGE ALL CHARGES AND FEES (FIN CODE §23060) |

Complainant, the Commissioner of the Department of Corporations ("Commissioner" or "Department"), is informed and believes, and based on such information and belief, finds as follows:

## I

## FACTUAL BACKGROUND

Gateway Holdings Group, LLC, ("Gateway") located at 4 Solomon's Arcade, Charleston, Nevis, West Indies, with a telephone number of (877) 618-5882, a fax number of (888) 241-6841 and an email address of gatewaycs@midlandcompanies.net, offers deferred deposit transactions or

DESIST AND REFRAIN ORDER (FIN CODE § 23050) AND ORDER VOIDING TRANSACTIONS
AND TO DISGORGE ALL CHARGES AND FEES (FIN CODE §23060)

State of California - Department of Corporations

"payday loans" to Californians through internet-based companies that purportedly match borrowers with lenders. Gateway does not have its own website, but accepts referrals from other companies who solicit applications from potential California borrowers over the Internet. Gateway, then, reaches into California, through an initial e-mail to the potential customers e-mail address, and offers these loans to California residents.

A deferred deposit transaction is a written transaction whereby one person gives funds to another person upon receipt of a personal check, and it is agreed that the personal check would not be deposited until a later date. "Personal check" referenced in Financial Code section 23001 includes "the electronic equivalent of a personal check," like an Automated Clearing House ("ACH") or debit card transaction.

Since at least June 1, 2011, Gateway has engaged in the business of offering, originating, or making deferred deposit transactions in California, as defined by the California Deferred Deposit Transaction Law ("CDDTL", Cal. Fin Code sections 23000 *et seq.*)[1], section 23001(a), whereby Gateway either defers depositing the customer's personal check or defers making an agreed upon ACH deduction until a specific date pursuant to a written agreement for a fee or other charge.

Gateway's customers submit an online application through a third party's website. The customers are required to provide their checking account information from which Gateway eventually automatically debits payments, fees, and interest from the borrowers. Gateway, however, then uses customers' banking account information to deduct additional fees and charges beyond what customers were told they would have to pay, sometimes in excess of more than double the amount of the original loan, and far beyond what the CDDTL allows. For instance, Gateway charges over 780% APR in interest in addition to a $90.00 monthly refinance fee that accrues automatically if the entire balance is not paid off in full.

Gateway has not been issued a deferred deposit transaction originator license by the Commissioner pursuant to the CDDTL. As such, Gateway is not authorized to engage in payday

---

[1] All future references are the California Financial Code unless otherwise indicated.

2

lending, or to offer, originate, or make a deferred deposit transaction, arrange a deferred deposit transaction for a deferred deposit originator, act as an agent for a deferred deposit originator, or assist a deferred deposit originator in the origination of a deferred deposit transaction.

## II

## CDDTL VIOLATIONS AND ORDERS

The Department is responsible for enforcing all provisions of the CDDTL, including the regulation of deferred deposit transactions, which are also commonly referred to as "payday advances" or "payday loans."

**A.      Desist and Refrain Order**

The Commissioner is statutorily authorized to order any person to desist and refrain from engaging in violations of the CDDTL.  Financial Code section 23050 provides:

> Whenever, in the opinion of the commissioner, any person is engaged in the business of deferred deposit transactions, as defined in this division, without a license from the commissioner,…the commissioner may order that person…to desist and to refrain from engaging in the business or further violating this division.  If within 30 days, after the order is served, a written request for a hearing is filed and no hearing is held within 30 days thereafter, the order is rescinded.

The foregoing facts establish multiple violations of the CDDTL by Gateway, including engaging in the business of originating or offering to originate deferred deposit transactions without having first obtained a license to do so from the California Corporations Commissioner in violation of section 23005(a).  The issuance of a Desist and Refrain Order, therefore, is necessary for the protection of consumers and is consistent with the purposes, policies, and provisions of the CDDTL.

Pursuant to section 23050, Gateway Holdings Group, LLC, is hereby ordered to desist and refrain from violating California Financial Code section 23005(a).  This Order shall remain in full force and effect until further order of the Commissioner.

/ / /

/ / /

/ / /

DESIST AND REFRAIN ORDER (FIN CODE § 23050) AND ORDER VOIDING TRANSACTIONS
AND TO DISGORGE ALL CHARGES AND FEES (FIN CODE §23060)

1

2 **B.  Order Voiding California Deferred Deposit Transactions**

3    California Financial Code section 23060, subdivision (a), states:

4    If any amount other than, or in excess of, the charges or fees permitted by this
     division is willfully charged, contracted for, or received, a deferred deposit
5    transaction contract shall be void, and no person shall have any right to collect or
     receive the principal amount provided in the deferred deposit transaction, any
6    charges, or fees in connection with the transaction.

7    Gateway willfully violated provisions of the CDDTL by repeatedly charging California

8 customers fees or charges without a license in violation of section 23005(a), including excess fees

9 and charges in violation of section 23036, in conjunction with deferred deposit transactions. Because

10 Gateway willfully charged its customers unauthorized fees or charges, Gateway is not entitled to

11 collect or receive the principal amounts provided in those deferred deposit transactions, nor is it

12 entitled to any of the charges or fees associated with the transactions.

13    Pursuant to California Financial Code sections 23060, any and all deferred deposit

14 transactions contracted with California customers or in this state are therefore void.  Gateway

15 Holdings Group, LLC, is hereby ordered to immediately return the principal amounts provided in

16 any and all deferred deposit transactions contracted with California customers or in the state, and

17 to disgorge any and all charges or fees received in conjunction with the deferred deposit

18 transactions.

19

20 Dated: August 11, 2011
   Sacramento, California
21

22          PRESTON DuFAUCHARD
            California Corporations Commissioner
23

24

25    By: _____
26       ALAN S. WEINGER
         Deputy Commissioner
27       Enforcement Division

28
                            4
   DESIST AND REFRAIN ORDER (FIN CODE § 23050) AND ORDER VOIDING TRANSACTIONS
             AND TO DISGORGE ALL CHARGES AND FEES (FIN CODE §23060)

**DEPARTMENT OF CORPORATIONS**
*Business Services and Consumer and Investor Protection*



**JAN LYNN OWEN**
**California Corporations Commissioner**

# MEDIA RELEASE

**For Immediate Release**                                           **Contact:**
April 15, 2013                                    Mark Leyes (916) 322-7180

# California Department of Corporations Issues Desist and Refrain Order Against Illegal Online Payday Lender

SACRAMENTO, CA (April 15, 2013) – The California Department of Corporations has issued an enforcement order against Northway Financial Corporation Ltd. and Northway Broker Ltd. (collectively, "Northway Financial"), unlicensed online payday lenders doing business as PixyCash.com.

"This type of order is our first step against aggressive and unchecked online solicitations," said Corporations Commissioner Jan Lynn Owen. "The Department is committed to combating this growing menace to consumers, even when the perpetrators are located offshore."

The Desist & Refrain Order was issued against Northway Financial for offering payday loans over the Internet to California residents without a license and exceeding statutory loan limits and fee caps. Citations totaling $32,500 were issued against Northway Financial for 13 specific violations.

The Department also issued an order voiding all illegal transactions made by Northway Financial and PixyCash.com with California borrowers. The defendants are ordered to cease collections of and return all principal amounts from transactions in California. They are also ordered to disgorge any and all charges or fees received in conjunction with those transactions. The order may be viewed and printed at the Department's website, http://www.corp.ca.gov/ENF/pdf/2013/NorthwayFinancial_dr.pdf.

Since the start of the year, the Department has issued orders against six online lenders ordering them to desist and refrain from violations of state law and, in some cases, void transactions and issue citations. To help consumers avoid falling victim to online unlicensed payday lenders, the Department recently issued a Payday Loan Consumer Alert (http://www.corp.ca.gov/Press/news/2012/InternetPaydayLendingAlert_8-13-12.pdf).

The online payday lending companies sanctioned so far this year by the Department (and their locations) are:

- Bottom Dollar Payday – Costa Rica
- CashLine LLC – Malta, European Union
- Cash Yes and Hong Kong Partners – Belize
- Federated Financial Services (dba Payday Nation) – United Kingdom
- Joro Resources LLC (dba IdealGelt) – Texas
- Northway Financial Corporation – Malta, European Union

Orders may be viewed and printed at the Department's website, http://www.corp.ca.gov/ENF/Default.asp.

Consumers are strongly advised to avoid entering personal or financial data on Internet-based application forms until the firm is verified as a lender licensed by the Department of Corporations. Personal financial data can be misused or pirated even before a loan is agreed to by the borrower. Lenders can be verified at the Department's website at http://www.corp.ca.gov/FSD/Licensees/default.asp or by calling toll-free at 1-866-ASK-CORP.

# # #

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF BANKING

| | |
|---|---|
| Commonwealth of Pennsylvania<br>Department of Banking,<br>Bureau of Compliance and Licensing | :<br>:<br>:<br>: |
| | : Docket No.:12 0054 (ENF-C&D) |
| v. | :<br>: |
| Down Under Ventures, Ltd. d/b/a Cash Jar;<br>Hong Kong Partners Ltd. d/b/a Cash Jar;<br>Henderson, Wyatt, Weinstein and Associates;<br>And District Restitution Services,<br>jointly and severally | :<br>:<br>:<br>:<br>: |

## NOTICE OF RIGHT TO APPEAL AND HEARING

You have the right to appeal the attached Order within **10 days** of the date of service. *See* 1 Pa. Code § 35.20. The date of service is the date we deposited the Order in the mail or delivered it to you in person, as the case may be, as set forth in 1 Pa. Code § 33.34. If you appeal the Order, you also have a right to a hearing.

To file an appeal and request a hearing on the Order, you must file a petition with the Secretary of Banking within 10 days of the date of service. The petition must be in writing, state clearly and concisely your grounds of interest in the subject matter, the facts you rely upon, the law you rely upon, and the relief you seek. *See* 1 Pa. Code §35.17. Please deliver your petition to:

> Linnea Freeberg, Docket Clerk
> Office of Executive Deputy Secretary
> Pennsylvania Department of Banking
> 17 North Second Street, Suite 1300
> Harrisburg, PA 17101

The petition must be **received** by the Docket Clerk within the aforementioned 10 day deadline. **If the Docket Clerk does not receive your petition on time, you will waive your right to an appeal and a hearing and the Order will be deemed final.**

You must also serve a copy of the petition on the person who signed the attached Order pursuant to 1 Pa. Code §33.32 by providing a copy to their counsel set forth below:

Linda Carroll, Deputy Chief Counsel
Commonwealth of Pennsylvania
Pennsylvania Department of Banking
17 North Second Street, Suite 1300
Harrisburg, PA 17101

Once you file your petition appealing the Order and requesting a hearing, you will be notified of the hearing date, time, place, the person who will preside at your hearing, and any other pertinent information.

You have the right to be represented by an attorney. Corporations may be required to be represented by an attorney.

The hearing and all other procedural matters will be governed by the Pennsylvania Administrative Agency Law, 2 Pa. C.S. §§501-508, 701-704, and the General Rules of Administrative Practice and Procedure, 1 Pa. Code §§31.1.-35.251.

|  |  |
|---|---|
| Commonwealth of Pennsylvania<br>Department of Banking,<br>Bureau of Compliance and Licensing<br><br>v.<br><br>Down Under Ventures, Ltd. d/b/a Cash Jar;<br>Hong Kong Partners Ltd. d/b/a Cash Jar;<br>Henderson, Wyatt, Weinstein and Associates;<br>and District Restitution Services,<br>     jointly and severally | :<br>:<br>:<br>:<br>: Docket No.:12 0054 (ENF-C&D)<br>:<br>:<br>:<br>:<br>:<br>: |

## ORDER

**WHEREAS**, the Commonwealth of Pennsylvania Department of Banking, ("Department") is a Pennsylvania administrative agency authorized and empowered to administer and enforce the Consumer Discount Company Act ("CDCA") 7 P.S. § 6201 *et seq.*, and the Loan Interest and Protection Law ("LIPL"), 41 P.S. § 101 *et seq.*; and

**WHEREAS**, the Department's Bureau of Compliance and Licensing ("Bureau") is the Bureau within the Department with the primary responsibility of administering and enforcing the CDCA and the LIPL for the Department; and

**WHEREAS**, the Department requires persons who engage in the business of making, negotiating, and collecting, non-mortgage loans in Pennsylvania, of less than $25,000, and charge fees, interest, or other considerations, in excess of 6%, to be licensed as a consumer discount company; and

**WHEREAS**, the Department also requires that persons who solicit, or hold themselves out as willing or able to arrange for, or negotiate non-mortgage loans, in Pennsylvania of less

than $25,000, and charge fees, interest, or other considerations, exceeding 6%, to be licensed as a consumer discount company; and

## BACKGROUND

**WHEREAS**, Hong Kong Partners, Ltd. d/b/a Cash Jar and Down Under Ventures, d/b/a Cash Jar, (collectively "Cash Jar"), are not licensed under Cash Jar, Hong Kong Partners, Down Under Ventures, or any other name, to provide loans for less than $25,000 in Pennsylvania, or authorized to charge fees, interest, or other considerations, exceeding 6% in Pennsylvania; and

**WHEREAS**, on May 24, 2010, Down Under Ventures d/b/a Cash Jar was the subject of a Desist and Refrain Order issued by the State of California, Department of Corporations for engaging in payday lending, otherwise referred to as deferred deposit transactions or short term loans; and

**WHEREAS**, Cash Jar continues to operate a website at www.cashjar.com through which it offers short term loans to residents in Pennsylvania; and

**WHEREAS**, Cash Jar provides short term loans to residents in Pennsylvania by electronically transmitting monies into the residents' bank accounts; and

**WHEREAS**, Pennsylvania residents pay off the short term loans, plus interest, fees and other considerations, by allowing Cash Jar to debit the money from their bank accounts; and

**WHEREAS**, Henderson, Wyatt, Weinstein and Associates is a collection agency located at 5140 Main Street, Suite 303-129, Williamsville, NY 14221-5265; and

**WHEREAS**, Henderson, Wyatt, Weinstein and Associates has engaged in collecting debt from consumers that originated as an illegal short term loan from Cash Jar, including principle, interest and fees on loans; and

**WHEREAS**, Distribution Services is a collection agency located at 6039 Fallsview Blvd. Suite 2000, Niagara Falls, Ontario, Canada; and

**WHEREAS**, Distribution Services is engaging in the collection of illegal debt from consumers that originated as a short term loan from Cash Jar, including principle, interest and fees on loans; and

### Count I

**WHEREAS**, on or about May 16, 2011, the Department received a complaint from regarding Cash Jar; and

**WHEREAS**, Ms.          is a resident of Gettysburg, Pennsylvania; and

**WHEREAS**, in her complaint, Ms.          averred that she secured a short-term loan for $1,000 from Cash Jar for which she paid $750 in interest at the time of her complaint; and

**WHEREAS**, Ms.          further averred that Cash Jar is taking $250 every two weeks despite her express wishes to pay the loan in full; and

**WHEREAS**, 6% interest per year on a $1,000 loan would be approximately $60; and

**WHEREAS**, Ms.          is a Pennsylvania resident that was lent money by Cash Jar in an amount less than $25,000 for which she was charged interest far in excess of 6% in violation of Pennsylvania law; and

### Count II

**WHEREAS**, on or about May 13, 2011,          secured a short loan for $1,000 from Cash Jar; and

**WHEREAS**, on or about May 20, 2011, the          filed a complaint with the Department regarding Cash Jar; and

**WHEREAS**, Mrs.          and her husband are residents of York, Pennsylvania; and

**WHEREAS**, in her complaint, Mrs.          averred that she and her husband were being harassed by Cash Jar for payments on a short-term loan with Cash Jar; and

**WHEREAS**, the          were advised that they would pay $200 per payday beginning May 26, 2011, all of which would be a "finance fee," or interest on the loan; and

**WHEREAS**, the next three payments would also be for $200 all of which would be payment of the "finance fee" or interest on the loan; and

**WHEREAS**, only on the fifth payment date would any money be credited to principal, that amount being $50.00 and the remainder of the payment would again be finance charges or interest; and

**WHEREAS**, 6% interest per year on a $1,000 loan would be approximately $60; and

**WHEREAS**, Cash Jar lent money to the          , Pennsylvania residents, in an amount less than $25,000 and charged interest on the loan far in excess of 6% in violation of Pennsylvania law; and

### Count III

**WHEREAS**, on or about May 27, 2011, the Department received a complaint from          regarding Cash Jar; and

**WHEREAS**, Ms.          resides in Dresher, Pennsylvania; and

**WHEREAS**, Ms.          averred that she obtained a short term loan from Cash Jar; and

**WHEREAS**, Ms.          averred that the interest on her loan exceeded 600%; and

**WHEREAS**, Ms.          was contacted by Henderson, Wyatt, Weinstein and Associates demanding payment on the debt due Cash Jar; and

**WHEREAS,** Ms.        attempted to negotiate with Henderson, Wyatt, Weinstein and Associates for payment of her debt at a rate of interest of $27.99% which offer was refused; and

**WHEREAS,** Cash Jar lent money to Ms.       , a Pennsylvania resident, in an amount less than $25,000 for which she was charged interest far in excess of 6% in violation of Pennsylvania law; and Henderson, Wyatt, Weinstein and Associates has since attempted to collect the illegal loan at the unlawful rate of interest; and

### Count IV

**WHEREAS,** the Department received a complaint from the Bureau of Consumer Protection, Office of Attorney General against Cash Jar filed by       on or about July 13, 2011; and

**WHEREAS,** Ms.      is a resident of Pittston, Pennsylvania; and

**WHEREAS,** in her complaint to the Bureau of Consumer Protection, Ms. alleged that Cash Jar has been withdrawing $60.00 per week from her checking account without authorization; and

**WHEREAS,** Ms.      does not recall securing a short term loan from Cash Jar; and

**WHEREAS,** if Ms.      did secure such a loan, the payments far exceed 6% interest in violation of Pennsylvania law; and

**WHEREAS,** in the alternative, if no short term loan was secured, the withdrawals from Ms.     's account violate the law; and

## Count V

**WHEREAS,** on or about October 17, 2011,                    alleged that he secured a $500 short term loan from Cash Jar; and

**WHEREAS,** on or about April 27, 2012, the Department received a complaint from the Bureau of Consumer Protection, Office of Attorney General against Cash Jar filed by                    , and

**WHEREAS,** Mr.            is a resident of North Wales, Pennsylvania; and

**WHEREAS,** Mr.            was told that he would be required to pay back the $500 plus $150 in interest and fees; and

**WHEREAS,** Mr.            stated he paid $150 every two weeks for a period of 8 weeks, a total $600, when he called Cash Jar shortly after to find out the amount of a final payment; and

**WHEREAS,** Mr.            was advised on or about December 14, 2011 that he still owed $650 in full at that time he would have to pay; and

**WHEREAS,** 6% interest per year on a $500 loan would be approximately $30; and

**WHEREAS,** Mr.            is a Pennsylvania resident that was lent money by Cash Jar in an amount less than $25,000 for which he was charged interest far in excess of 6% in violation of Pennsylvania law; and

## Count V

**WHEREAS,**                    is a Pennsylvania resident; and

**WHEREAS,**                    obtained a short term loan from Cash Jar; and

**WHEREAS,** Ms.            had been contacted repeatedly by an agency attempting to collect the illegal debt and interest originally due to Cash Jar; and

6

WHEREAS, that agency closed its file on Ms.          's short term loan and suspended attempts to collect it when that agency was instructed to do so due to the illegal nature of the debt; and

WHEREAS, a second collection agency, District Restitution located at 6039 Fallsview Boulevard, Suite 2000, Niagara Falls, ON, Canada, began in December of 2011 to attempt to collect the illegal debt and interest; and

WHEREAS, Cash Jar lent money to Ms.          , a Pennsylvania resident, in an amount less than $25,000 for which she was charged interest that far exceeds 6% in violation of Pennsylvania law; and District Restitution has since attempted to collect the illegal loan at the unlawful rate of interest; and

### Count VI

WHEREAS, in and around September of 2011,          obtained a short term loan from Cash Jar of $300 in; and

WHEREAS, Ms.          s a resident of Bedford, Pennsylvania; and

WHEREAS, Ms.          was charged interest far in excess of the legal rate of 6% and Cash Jar has taken out "extreme payments" from Ms.          bank account; and

WHEREAS, Cash Jar lent money to Ms.          ., a Pennsylvania resident, in an amount less than $25,000 for which she was charged interest far in excess of 6% in violation of Pennsylvania law; and

### Count VII

WHEREAS, on or about December 29, 2011,          ', also known as          , secured a $500 short term loan from Cash Jar; and

WHEREAS, Ms.          is a resident of Harrisburg, Pennsylvania; and

**WHEREAS,** on or about May 1, 2012, the Department received a complaint from Ms. ﹐ against Cash Jar; and

**WHEREAS,** Ms.           alleges, and has provided documents that demonstrate, that she was required to pay back $500 plus $75.00 in interest and fees, an interest rate of 684.38 %; and

**WHEREAS,** on March 20, 2012, Ms.           advised Cash Jar that she had paid them $725.00, that the loan was illegal, and that she would not make any further payments; and

**WHEREAS,** on or about March 21, 2012, Cash Jar informed Ms.           , in writing, that her account was marked "settled" and "paid in full;" and

**WHEREAS,** Ms.           is a Pennsylvania resident that was lent money by Cash Jar in an amount less than $25,000 for which she was charged interest far in excess of 6% interest in violation of Pennsylvania law; and

## VIOLATIONS

**WHEREAS,** by engaging in the business of making loans to Pennsylvania residents in amounts less than $25,000 and charging fees, interest, or other considerations in excess of 6%, without being licensed by the Department, Cash Jar has violated and continues to violate Section 3.A of the CDCA, 7 P.S. § 6203.A, and Section 201(a) of the LIPL, 41 P.S. § 201(a); and

**WHEREAS,** by soliciting and holding itself out as willing or able to arrange for or negotiate loans through its website to Pennsylvania residents in amounts of less than $25,000 where the interest, fees, charges, or other considerations exceed 6%, without being licensed by the Department, Cash Jar has violated and continues to violate Section 3.B of the CDCA, 7 P.S. § 6203.B, and Section 201(a) of the LIPA, 41 P.S. § 201(a); and

8

## DEPARTMENT'S AUTHORITY

**WHEREAS,** because Cash Jar engages in unlicensed activity in violation of the CDCA and LIPL, the Department has the authority to, *inter alia*, order it to cease and desist the activity until licensed, require it to pay the costs of the Department's enforcement action, prohibit or permanently remove it from continuing the activity, and to impose such other conditions as the Department deems appropriate, 41 P.S. §§ 506(c)(2)-(5); and

**WHEREAS,** the Department may consider mitigating factors such as cooperation and acts of good faith when determining the conditions to impose; and

**WHEREAS,** this Order shall not preclude the Department from commencing additional enforcement action against Cash Jar and any additional entities, companies, or persons associated with Cash Jar as it deems necessary based on information unknown as of this date; and

**AND NOW THEREFORE,** because Cash Jar engages in the business of lending money in an amount less than $25,000 to Pennsylvania residents and charges in excess of 6% interest for the loan, without a license, and solicits such loans to Pennsylvania residents through its website, and collects on such loans, both directly and through arrangements with collection agencies, the Bureau, under the authority cited above, hereby imposes the following Order. Upon the effective date of this Order:

1.    Cash Jar shall immediately cease and desist from negotiating and making non-mortgage loans or advances of money on credit in an amount of $25,000 or less to Pennsylvania residents and charging interest and fees in excess of 6% until licensed by the Department to do such business.

2. Cash Jar shall immediately cease and desist from advertising, soliciting, and arranging non-mortgage loans for Pennsylvania residents in an amount less than $25,000 and charging interest, fees and other considerations in excess of 6% until licensed by the Department to do such business.

3. Cash Jar shall immediately cease and desist from attempting to collect or collecting, directly or indirectly through third parties such as collection agencies, interest or any other considerations that exceed 6% on non-mortgage loans of less than $25,000 that it made to Pennsylvania residents since February 1, 2009.

4. Cash Jar shall not transfer, assign or sell to any persons, companies or entities any non-mortgage loans of less than $25,000 that it has made to Pennsylvania residents since February 1, 2009 where the interest, fees or other considerations on the loans exceed 6%.

5. Cash Jar shall not purchase any non-mortgage loans of less than $25,000 made to Pennsylvania residents since February 1, 2009 where the interest, fees or other considerations on the loans exceed 6%.

6. Cash Jar shall not directly or indirectly (through third parties or collection agencies) file a negative report with any credit agency regarding any Pennsylvania resident to which it has provided a non-mortgage loan of less than $25,000 since February 1, 2009 if the consumer has paid back an amount equal to the principal amount of the loan plus interest of up to (not in excess of) 6%.

7. Cash Jar shall correct any such negative reports previously filed with any credit agency regarding any Pennsylvania resident to which it has provided a non-mortgage loan of less than $25,000 since February 1, 2009 if the consumer has paid back an amount equal to the principal amount of the loan plus interest of up to (not in excess of) 6%.

8.    Cash Jar shall refund to Pennsylvania residents the amount of monies that the residents paid on loans that exceeded the 6% interest rate cap.

9.    Within 10 days of the effective date of this Order, Cash Jar shall provide to the Department a list of loans and cash advances made to Pennsylvania residents from February 1, 2009 to the present. The list shall include:

   a.    The name, address and phone number of each consumer; and

   b.    The date of the loan; and

   c.    The terms of the loan including the amount financed, any and all charges, interest, fees or other considerations including, but not limited to interest charges, finance charges, renewal fees, and the total amount of payments to be paid by the resident; and

   d.    The status of the loans including total amounts still owed by the resident to Cash Jar, or if the loans have been transferred to a third party such as another lender or collection agency, when such transfer occurred and the contact information for the third party; and

   e.    Any other additional information that the Department shall request relating to these loans as the Department deems necessary.

9.    Cash Jar shall pay a fine to the Department in an amount of $60,000 for the violations of the CDCA and LIPL referenced in this Order. *See* 41 P.S. § 505(b). The Department reserves the right to impose additional fines based on each specific short term loan transaction unknown as of the date of this Order, but uncovered at a later date, in the absence of good faith on the part of Cash Jar.

10.    Cash Jar shall pay the reasonable costs and expenses incurred by the Department to commence and prosecute this enforcement action should Cash Jar challenge this Order

11

without success. To this end, the Department expressly requests a separate hearing to ascertain the amount of monies expended by the Department should we need to prosecute this enforcement action.

11. District Restitution shall cease and desist from engaging in any activity in an attempt to collect any illegal short term loan involving a Pennsylvania resident, including but not limited to, those originating with Cash Jar, the owners of Cash Jar, or any affiliated companies by any name whatsoever; and

12. Henderson, Wyatt, Weinstein and Associates shall cease and desist from engaging in any activity in an attempt to collect any illegal short term loan involving a Pennsylvania resident, including but not limited to, those originating with Cash Jar, the owners of Cash Jar, or any affiliated companies, by any name whatsoever.

It is so **ORDERED**.

FOR THE COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF BANKING, BUREAU OF COMPLIANCE AND LICENSING

Dated: May 21, 2012

_____

Ryan Walsh, Chief of Compliance
Bureau of Compliance and Licensing
Commonwealth of Pennsylvania
Department of Banking
17 North Second Street, Suite 1300
Harrisburg, PA 17101

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF BANKING

FILED

2012 MAY 22 AM 10: 09

PA DEPT OF BANKING

| | |
|---|---|
| Commonwealth of Pennsylvania<br>Department of Banking,<br>Bureau of Compliance and Licensing | :<br>:<br>: |
| v. | : Docket No.:12 0054 (ENF-C&D)<br>:<br>: |
| Down Under Ventures, Ltd. d/b/a Cash Jar;<br>Hong Kong Partners Ltd. d/b/a Cash Jar;<br>Henderson, Wyatt, Weinstein and Associates;<br>And District Restitution Services,<br>jointly and severally | :<br>:<br>:<br>:<br>: |

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing **Order** upon the parties below, who constitute the only parties of record in this proceeding, in accordance with the requirements of 1 Pa. Code §§ 33.35 and 33.36:

### BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED ELECTRONIC MAIL AND FIRST CLASS MAIL:

**Service on Down Under Ventures, Ltd. d/b/a Cash Jar and Hong Kong Partners Ltd. d/b/a Cash Jar:**

Cash Jar, LLC
P.O. Box 1639
Belize City, Belize, C.A.

National Registered Agents, Inc.,
Registered Agent for Cash Jar, LLC
2778 W. Shady Bend Dr.
Lehi, Utah 84043-5676

Cash Jar, LLC
P.O. Box 1639
Rio Hondo, TX 78583

recoveries@cashjar.com
fidelity@incorporatebelize.com

Cash Jar, LLC
P.O. Box 025250 # 150502500
Miami, FL 33102-5250

Down Under Ventures
Wilcrest Suite 201
Houston, TX 77042

Hong Kong Partners, Ltd.
Suite 508 Marina Towers,
Newtown Barracks
Belize City, Belize C.A.

Down Under Ventures, Ltd.
Suite 508 Marina Towers
Newtown Barracks
Belize City, Belize C.A.

**Service on District Restitution Services:**

District Restitution Services
Attn: Legal Department
6039 Fallsview Blvd.
Suite 2000
Niagara Falls, ON, Canada  L2G3V6

**Service on Henderson, Wyatt, Weinstein and Associates:**

Henderson, Wyatt, Weinstein and Associates
5140 Main St Ste 303-129
Williamsville, NY  14221

Dated this 22nd day of May, 2012

Linda Carroll
Deputy Chief Counsel
Attorney I.D. # 35868
Commonwealth of Pennsylvania
Department of Banking
17 N. Second Street, Suite 1300
Harrisburg, PA  17101-2290
Telephone:  (717) 787-1471
Fax:  (717) 783-8427

Before the Commissioner of the Office of Financial and Insurance Regulation

In the matter of:

**Hong Kong Partners LTD**
dba **Cash Yes and Cash Yes.com**

**Enforcement Case No. 12-11605**
**Agency No. 12-033-RL**

Respondent.

_____/

Issued and entered,
this _30th_ day of _November_, 2012
by Stephen R. Hilker
Senior Deputy Commissioner

## FINAL ORDER TO CEASE AND DESIST

1. On October 12, 2012, the Senior Deputy Commissioner issued a Notice of Intention to Issue a Cease and Desist Order (Order) pursuant to Section 9a of the Michigan Regulatory Loan Act (RLA), MCL 493.9a, against Respondent.

2. The Order contained allegations that Respondent violated various sections of the RLA.

3. The Order was mailed to Respondent at its last known addresses of record.

4. The Order advised the Respondent to respond no later than 21 days after the Order was delivered or mailed to the Respondent and advised that failure to respond would constitute a default resulting in a Final Order to Cease and Desist.

5. Respondent failed to timely respond; therefore, the Order is **FINAL**.

By: _Stephen R. Hilker_
Stephen R. Hilker
Senior Deputy Commissioner
Office of Financial and Insurance Regulation

Andrew M. Cuomo                                                  Benjamin M. Lawsky
Governor                                                             Superintendent

**FROM: Benjamin M. Lawsky, Superintendent of Financial Services**
**RE:    Letter to All Debt Collectors Operating in the State of New York**

---

The Department of Financial Services recently sent letters to 35 payday loan companies directing them to cease and desist offering and making usurious payday loans in New York via the Internet or by other means.  The Department's ongoing investigation has shown that these companies have charged New York consumers for payday loans with interest rates many times the legal limit.  Persons and entities collecting on debts in New York should not attempt to collect on payday loan debts from these 35 companies unless they confirm that the original transactions creating the debts were not usurious.

Debt collectors are reminded that subject to the provisions of General Obligations Law § 5-511, loans offered in New York by non-bank lenders, with an interest rate above the statutory maximums, including payday loans, are void and unenforceable.  Attempts to collect on debts that are void or unenforceable violate General Business Law § 601(8) and 15 U.S.C. §§ 1692e(2) and1692f(1) of the Fair Debt Collection Practices Act.

Payday loans are short-term loans, typically an advance on a future paycheck or other income source.  In New York, under General Obligations Law § 5-501 and Banking Law § 14-a, loans or forbearances under $250,000, made by non-bank lenders, with an interest rate exceeding 16 percent per annum, constitute civil usury and are illegal.  Further, under New York Penal Law §§ 190.40-42, loans made in New York with an interest rate exceeding 25 percent per annum constitute criminal usury.

The Department of Financial Services will aggressively enforce the law against any person or entity attempting to collect debts on illegal payday loans made to New York consumers on behalf of the following companies:

> ABJT Funding, LLC d/b/a Dollar Premier
> Advance Me Today
> American Web Loans
> Archer Direct, LLC
> Bayside Loans
> BD PDL Services, LLC d/b/a Bottom Dollar Payday
> Blue Sky Finance, LLC d/b/a ExtraFunds Cash
> BS Financial Group Inc. d/b/a Payday Accelerated
> Cash Jar
> Cash Yes
> Discount Advances

DMA Financial Corp. d/b/a VIP Q-Loot
Eastside Lenders, LLC
Fast Cash Personal Loans
Golden Valley Lending
Government Employees Credit Center, Inc. d/b/a Cash Direct Express
Great Plains Lending, LLC
Horizon Opportunities, LLC d/b/a/ Lifestyle Services
Loan Point USA Online
MNE Services, Inc. d/b/a AmeriLoan, UnitedCashLoans, US Fast Cash, 500 Fast Cash
MobiLoans, LLC
MyCashNow
National Opportunities Unlimited, Inc. d/b/a Itsmypayday.com
Northway Broker Ltd. d/b/a Zip19
PayDayMax Ltd.
Peak 3 Holding, LLC d/b/a iCashLoans
Plain Green, LLC
Red Rock Tribal Lending, LLC d/b/a CastlePayday.com
SCS Processing d/b/a Everest Cash Advance
SFS, Inc. d/b/a One Click Cash, Preferred Cash Loans
Sonic Cash
Sure Advance, LLC
Tribal Credit Line d/b/a Quick Credit 911
United Consumer Financial Services, Inc. d/b/a EZPaydayCash
Western Sky Financial, LLC

Thank you for your attention to this serious matter.

Andrew M. Cuomo                                                    Benjamin M. Lawsky
Governor                                                               Superintendent

**FROM: Benjamin M. Lawsky, Superintendent of Financial Services**
**RE: Illegal Online Payday Loans Offered and Sold to New York Customers**

---

We are writing you in connection with the ongoing investigation being conducted by the New York State Department of Financial Services ("DFS" or "Department") into illegal online payday lending. Payday loans are short-term loans, typically an advance on a future paycheck or other income source. Usurious payday loans are illegal in New York, and such loans are void and unenforceable. Under General Obligations Law § 5-501 and Banking Law § 14-a, loans or forbearances under $250,000, made by non-bank lenders, with an interest rate exceeding 16 percent per annum, constitute civil usury and are illegal. Further, under New York Penal Law §§ 190.40-42, loans made in New York with an interest rate exceeding 25 percent per annum constitute criminal usury.

The Department has uncovered dozens of out-of-state lenders who have used the Internet to solicit and provide illegal payday loans to consumers in New York. Typically, these lenders charge fees that, when annualized, result in interest rates far in excess of the legal limit. New York consumers who take out these supposedly short-term loans quickly get caught in a vicious cycle of long-term debt; the loans become difficult if not impossible to pay off due to the triple- and quadruple-digit interest rates, together with overdraft fees. To address their unlawful activity, DFS today sent letters to 35 payday lenders directing them to cease and desist offering to lend and lending monies at usurious rates in New York. The lenders include:

- ABJT Funding, LLC d/b/a Dollar Premier
- Advance Me Today
- American Web Loans
- Archer Direct, LLC
- Bayside Loans
- BD PDL Services, LLC d/b/a Bottom Dollar Payday
- Blue Sky Finance, LLC d/b/a ExtraFunds Cash
- BS Financial Group Inc. d/b/a Payday Accelerated
- Cash Jar
- Cash Yes
- Discount Advances
- DMA Financial Corp. d/b/a VIP Q-Loot
- Eastside Lenders, LLC
- Fast Cash Personal Loans
- Golden Valley Lending
- Government Employees Credit Center, Inc. d/b/a Cash Direct Express
- Great Plains Lending, LLC

- Horizon Opportunities, LLC d/b/a Lifestyle Services
- Loan Point USA Online
- MNE Services, Inc. d/b/a AmeriLoan, UnitedCashLoans, US Fast Cash, 500 Fast Cash
- MobiLoans, LLC
- MyCashNow.com, Inc.
- National Opportunities Unlimited, Inc. d/b/a Itsmypayday.com, TheCashSpot.com
- Northway Broker Ltd. d/b/a Zip19
- PayDayMax, Ltd.
- Peak 3 Holding, LLC d/b/a iCashLoans
- Plain Green, LLC
- Red Rock Tribal Lending, LLC d/b/a CastlePayday.com
- SCS Processing d/b/a Everest Cash Advance
- SFS, Inc. d/b/a One Click Cash, Preferred Cash Loans
- Sonic Cash
- Sure Advance, LLC
- Tribal Credit Line d/b/a Quick Credit 911
- United Consumer Financial Services, Inc. d/b/a EZPaydayCash
- Western Sky Financial, LLC

DFS will aggressively pursue appropriate enforcement against payday lenders that refuse to cease and desist from their illegal activity in New York.

Illegal payday loans made over the Internet are made possible in New York by credits and debits that must pass through the Automated Clearing House ("ACH") network. The current ACH network appears to allow illegal loans to flow through New York without sufficient mechanisms to prevent or block these debits or credits as they occur. According to the Operational Bulletin released recently by NACHA, the organization that manages the ACH network, the borrower's bank, or the Receiving Depository Financial Institution ("RDFI"), "has no basis or information to make an independent judgment as to whether any specific transaction was properly authorized and relates to a bona fide, legal transaction." ACH Operations Bulletin #2-2013, High-Risk Originators and Questionable Debit Activity, March 14, 2013. The RDFI only becomes aware of the "questionable debit activity when it is contacted by its customer." *Id*. This is deeply concerning to the Department. The RDFIs would be a great asset in preventing their customers from being victimized by these illegal loans if they were aware of questionable activity before such debits were made. As such, changes to the ACH network may be necessary.

NACHA also places the onus on the banks originating the debits, also known as the Originating Depository Financial Institutions ("ODFIs"), as "gatekeepers of the ACH Network," to conduct sufficient due diligence consistent with NACHA Operating Rules. The Department is interested in the steps the ODFIs are taking to monitor compliance among the above-listed and any other loan originators who are using the ACH network to violate New York laws.

Access to the ACH system is the foot in the door that online payday lenders need to prey on vulnerable New Yorkers. And banks have proven to be – even if unintentionally – an essential cog in the vicious machinery that these purveyors of predatory loans use to do an end-run around New York law.

We are requesting that you work with us to create a new set of model safeguards and procedures to choke off ACH access to the 35 illegal lenders DFS's investigation has identified to date, as well as the broader payday lending industry. Doing so is not only in the interest of your customers who will be better protected from these predatory loans. It is also in your bank's long-term interest to take appropriate action to help ensure that it is not serving as a pipeline for illegal conduct.

The Department therefore requests that you inform us of the steps that you are taking, in your capacity as either an ODFI, RDFI or both, as applicable, to stop illegal payday loans from entering into New York through the ACH network. We are interested in the steps you are able to take now, and what changes are necessary both within your bank and at the ACH network level to stop these illegal loans.

Through a cooperative effort with the banking industry, we can work together to stamp out these pernicious, illegal payday loans in New York. To further that cooperative undertaking, we request the opportunity to meet with you and your designees with knowledge of the ACH network and NACHA rules and processes. Please contact at your earliest convenience Executive Deputy Superintendent Joy Feigenbaum, Financial Frauds & Consumer Protection, at (212) 480-6082, to set up a mutually convenient time to meet. We look forward to working with you on this important issue.

## Recipients of Letter

Bank of America Corp.
Capital One Financial Corporation
Citigroup, Inc.
HSBC North America Holdings, Inc.
J.P. Morgan Chase & Co.
Keycorp
M & T Bank Corporation
PNC Financial Services Group
TD Bank
U.S. Bancorp
Wells Fargo & Company
Alpine Capital Bank
Adirondack Bank
Adirondack Trust Company, The
Alden State Bank
Alma Bank
Amalgamated Bank of NY
Amerasia Bank
American Community Bank
AmeriCU Credit Union
Apple Bank for Savings
Banco Popular de Puerto Rico
Banco Popular North America
Bank Hapoalim B.M.
Bank Leumi Le-Israel B.M.
Bank Leumi USA
Bank of Akron
Bank of Castile, The
Bank of Cattaraugus
Bank of Holland
Bank of Millbrook
Bank of Richmondville
Bank of Utica
Berkshire Bank Municipal Bank
Berkshire Bank, The
Branch 6000 NALC Credit Union
Buffalo Service Credit Union
Catskill Hudson Bank
Cattaraugus County Bank
CFCU Community Credit Union

Spring Bank (formerly CheckSpring)
Chemung Canal Trust Company
Citizens Bank of Cape Vincent
Country Bank
CMS Bank
Cross County Savings Bank
Directors Choice Credit Union
Elmira Savings Bank
Emigrant Bank
Emigrant Mercantile Bank
Empire Branch 36 NALC Credit Union
Empire State Bank
Empire State Credit Union
Encompass Niagara Credit Union
Erie County Employees Credit Union
Fairport Savings Bank
First American International Bank
First Central Savings Bank
Five Star Bank
Flushing Bank
Fulton Savings Bank
Genesee Regional Bank
Global Bank
Gold Coast Bank
Greene County Commercial Bank
Habib American Bank
Hanover Community Bank
Hudson River Community Credit Union
Interaudi Bank
Israel Discount Bank of New York
Jamestown Post Office Employees Credit Union
Jeff Bank
Medina Savings and Loan Association
Melrose Credit Union
Montauk Credit Union
Municipal Credit Union
New York Commercial Bank
New York Community Bank
NewBank
Newspaper Employees Credit Union
Niagara Falls Penn Central Employees Credit Union
Niagara Frontier Federal Employees Credit Union

North Country Savings Bank, The
Norton-Troy Employees Credit Union
Oneida Savings Bank
Orange county Trust Company
Pathfinder Bank
Pathfinder Commercial Bank
PCSB Commercial Bank
Pioneer Commercial Bank
Pioneer Savings Bank
Progressive Credit Union
Provident Municipal Bank
Putnam County Savings Bank
Rhinebeck Bank
Ridgewood Savings Bank
Riverside Bank
Rondout Savings Bank
Savoy Bank
Sawyer Savings Bank
Signature Bank
Solvay Bank
State Bank of Chittenango
Steuben Trust Company
The Dime Savings Bank of Williamsburgh
NorthEast Community Bank
Tioga State Bank
Tompkins Trust Company
Ulster Savings Bank
United International Bank
United Orient Bank
USNY Bank
Victory State Bank
Watertown Savings Bank
Westchester Bank, The
WSB Municipal Bank
Yonkers Postal Employees Credit Union


# Washington State Department of
# **Financial Institutions**

# Consumer Alert:
# Action Payday



**May also be doing business as Action PDL Services, LLC**

## Unlicensed Payday Loans

Updated: August 26, 2013

The Washington State Department of Financial Institutions (DFI) received reports alleging the company was withdrawing excessive fees, sending unsolicited loan applications, and refusing to provide the company's location. It was also reported that this company had obtained consumers' personal information without knowledge or consent.

Action Payday is not licensed by DFI, or registered to do business in Washington by either the Department of Revenue or the Secretary of State.

Action Payday has been associated with the following address, website, email, and telephone number: Hunkins Waterfront Plaza, Main Street, Suite 556, Charlestown, Nevis, West Indies; www.actionpayday.com; customerservice@actionpayday.com; and 855-228-4660.

Washington residents are advised that state law provides in RCW 31.45.105(1)(d) and (3) that a small loan made by an unlicensed entity to a person physically located in Washington through use of the internet, facsimile, telephone, kiosk, or other means is uncollectible and unenforceable in Washington.

## Verify Licenses

DFI strongly recommends that consumers deal only with those lenders that are properly licensed to conduct business. Consumers can determine whether lenders are properly licensed using the "Verify a License" feature on DFI's website at www.dfi.wa.gov.

## Payday Loan Debt Collection Laws

Collection activities are subject to the federal Fair Debt Collection Practices Act. Therefore, if you have questions regarding debt collection laws please contact the Federal Trade Commission at 1-877-FTC HELP, or online at www.ftc.gov.

## Report Fraud

**Washington State residents**, if you are suspicious of unlicensed activity by a payday lender please contact the Washington State Department of Financial Institutions at 1-877-RING-DFI (746-4334), or online at www.dfi.wa.gov.

If you live in another state, find your state regulator.

If you feel you have been the victim of a loan scam please contact the Federal Trade Commission at 1-877-FTC-HELP (382-4357) or online at www.ftc.gov; or contact the Consumer Financial Protection Bureau (855) 411-CFPB or online at www.consumerfinance.gov. Because the scammers have access to bank account information and social security numbers, victims should consider themselves victims of identity theft and take appropriate precautions. The Federal Trade Commission has information for victims of identity theft available online at www.ftc.gov.

If you feel you have been the victim of a loan scam involving the Internet please contact the Internet Crime Complaint Center online at www.ic3.gov.

If you feel you have been the victim of a loan scam and are concerned about your personal financial information, contact your banking institution, and the three major credit bureaus.

<< Back to Consumer Alerts