**LAKESHORE LAW CENTER**
**Jeffrey Wilens, Esq. (State Bar No. 120371)**
**18340 Yorba Linda Blvd., Suite 107-610**
**Yorba Linda, CA 92886**
**714-854-7205**
**714-854-7206 (fax)**
jeff@lakeshorelaw.org

**THE SPENCER LAW FIRM**
**Jeffrey P. Spencer, Esq. (State Bar No. 182440)**
**903 Calle Amanecer, Suite 220**
**San Clemente, CA 92673**
**949-240-8595**
**949-240-8515 (fax)**
jps@spencerlaw.net

**Attorneys for Plaintiffs**

# UNITED STATES DISTRICT COURT,

## NORTHERN DISTRICT OF CALIFORNIA,

## OAKLAND DIVISION

| | |
|---|---|
| SEAN L. GILBERT,<br>KEEYA MALONE,<br>KIMBERLY BILBREW,<br>CHARMAINE B. AQUINO,<br>on behalf of themselves and all<br>persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MONEYMUTUAL, LLC,<br>SELLING SOURCE, LLC,<br>MONTEL BRIAN ANTHONY<br>WILLIAMS,<br>GLENN MCKAY,<br>PARTNER WEEKLY, LLC,<br>PREVIOUSLY SUED AS DOE NO. 1, | ) Case No. CV-13-01171-JSW<br>) Complaint filed February 11, 2013<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) CLASS ACTION<br>)<br>) **THIRD AMENDED COMPLAINT FOR**<br>)<br>) **1. Violation of California Deferred**<br>) **Deposit Transaction Law (Financial**<br>) **Code§ 23000 et. seq.) by Making,**<br>) **Offering, Arranging, Assisting in the**<br>) **Origination of Payday Loans without**<br>) **a License in Violation of Financial**<br>) **Code § 23005**<br>) **2. Violation of Racketeer Influenced**<br>) **and Corrupt Organization Act of 1970** |

1

| | |
|---|---|
| BRIAN RAUCH, PREVIOUSLY SUED AS DOE NO. 2, | ("RICO"), 18 U.S.C. § 1961 |
| JOHN HASHMAN, PREVIOUSLY SUED AS DOE NO. 3, | 3.  Violation of Unfair Competition Law (Business and Professions Code § 17200 et. seq.)—Unlawful Act |
| RARE MOON MEDIA, LLC,[1] PREVIOUSLY SUED AS DOE NO. 5, | 4.  Violation of Unfair Competition Law (Business and Professions Code § 17200 et. seq.)—Fraud |
| JEREMY SHAFFER, PREVIOUSLY SUED AS DOE NO. 6, | |
| BRAD LEVENE, PREVIOUSLY SUED AS DOE NO. 7, | |
| LINDSEY COKER, PREVIOUSLY SUED AS DOE NO. 8, | |
| JOSH MITCHEM, PREVIOUSLY SUED AS DOE NO. 9, | |
| DAVID A. JOHNSON PREVIOUSLY SUED AS DOE NO. 15, | |
| VECTOR CAPITAL IV LP, PREVIOUSLY SUED AS DOE NO. 17, | |
| KIRK CHEWNING PREVIOUSLY SUED AS DOE NO. 18, | |
| SAMUEL W. HUMPHREYS PREVIOUSLY SUED AS DOE NO. 19, | |
| DOUGLAS TULLEY PREVIOUSLY SUED AS DOE NO. 20, | |
| ALTON F. IRBY III PREVIOUSLY SUED AS DOE NO. 21 and Does 22 through 100 inclusive, | |
| Defendants. | |

Plaintiffs allege as follows:

## **PARTIES**

1.  Plaintiffs SEAN L. GILBERT, KEEYA MALONE, KIMBERLY BILBREW and

CHARMAINE B. AQUINO, individuals, bring this action on behalf of themselves,

---

[1]The Court has granted an order compelling arbitration as to Defendants David A. Johnson, Vector Capital IV LP and Kirk Chewning and has stayed the civil action against them.  The Court has granted an order compelling arbitration of the claims against Defendants Rare Moon Media, LLC, Jeremy Shaffer, Brad Levene, Lindsey Coker, and Josh Mitchem and has dismissed those claims.  These parties are listed in the caption only because the action is either stayed or no judgment has been entered in their favor.  Other formerly named defendants and claims have been deleted after judgments were entered as to those parties or claims, without waiving any rights preserved on appeal.

and on behalf of a class of similarly situated persons pursuant to Federal Rule of Civil Procedure 23. Plaintiffs are residents of the State of California and competent adults.

2. Plaintiffs are informed and believe, and thereupon allege, that Defendant BANK OF AMERICA, N.A. is now, and at all times mentioned in this Complaint was, a national association based in North Carolina and doing business in the County of Alameda, State of California, and throughout the State of California and United States. It has not designated a principle place of business in California.

3. Plaintiffs are informed and believe, and thereupon allege, that Defendant MONEYMUTUAL, LLC is now, and at all times mentioned in this Complaint was, a business of unknown form based in Silver Springs, Nevada and doing business in the County of Alameda, State of California, and throughout the State of California and United States. It has not designated a principle place of business in California.

4. Plaintiffs are informed and believe, and thereupon allege, that Defendant SELLING SOURCE, LLC is now, and at all times mentioned in this Complaint was, a business of unknown form based in Las Vegas, Nevada and doing business in the County of Alameda, State of California, and throughout the State of California and United States. It has not designated a principle place of business in California.

5. Plaintiffs are informed and believe, and thereupon allege, that Defendant MONTEL BRIAN ANTHONY WILLIAMS, is now, and at all times mentioned in this Complaint was, a natural person residing in Jackson, Tennessee and doing business in the County of Alameda, State of California, and throughout the State of California and United States.

6. Plaintiffs are informed and believe, and thereupon allege, that Defendant GLENN

MCKAY, is now, and at all times mentioned in this Complaint was, a natural person residing in the State of Nevada and doing business in the County of Alameda, State of California, and throughout the State of California and United States. McKay is the President and Chief Operating Officer of Selling Source, LLC.

7. Plaintiffs are informed and believe, and thereupon allege, that Defendant Partner Weekly, LLC, is now, and at all times mentioned in this Complaint was, a business of unknown form based in Las Vegas, Nevada and doing business in the County of Alameda, State of California, and throughout the State of California and United States. It has not designated a principle place of business in California.

8. Plaintiffs are informed and believe, and thereupon allege, that Defendant BRIAN RAUCH, is now, and at all times mentioned in this Complaint was, a natural person residing in San Diego, California and doing business in the County of Alameda, State of California, and throughout the State of California and United States. Rauch was Vice President of Marketing for Partner Weekly during parts of the Class Period.

9. Plaintiffs are informed and believe, and thereupon allege, that Defendant John Hashman, is now, and at all times mentioned in this Complaint was, a natural person residing in the State of Nevada and doing business in the County of Alameda, State of California, and throughout the State of California and United States. Hashman is the President of Partner Weekly.

10. Plaintiffs are informed and believe, and thereupon allege, that Defendant Rare Moon Media, LLC is now, and at all times mentioned in this Complaint was, a business of unknown form based in Lenexa, Kansas and doing business in the County of Alameda, State of California, and throughout the State of California and United States. It has not designated a principle place of business in California.

11. Plaintiffs are informed and believe, and thereupon allege, that Defendant Jeremy Shaffer is now, and at all times mentioned in this Complaint was, an individual residing in the State of Kansas. He is the President and owner of Rare Moon Media.

12. Plaintiffs are informed and believe, and thereupon allege, that Defendant Brad Levene is now, and at all times mentioned in this Complaint was, an individual residing in the State of Kansas. He is the Vice President of Marketing for Rare Moon Media.

13. Plaintiffs are informed and believe, and thereupon allege, that Defendant Lindsey Coker is now, and at all times mentioned in this Complaint was, an individual residing in the State of Kansas. She is an account executive for Rare Moon Media.

14. Plaintiffs are informed and believe, and thereupon allege, that Defendant Josh Mitchem is now, and at all times mentioned in this Complaint was, an individual residing in the State of Kansas. He is the founder of Rare Moon Media and was its President for part of the class period and may still be its President.

15. Plaintiffs are informed and believe, and thereupon allege, that Defendant David A. Johnson, is now, and at all times mentioned in this Complaint was, an individual residing in Atlanta, Georgia.

16. Plaintiffs are informed and believe, and thereupon allege, that Defendant Vector Capital IV LP is now, and at all times mentioned in this Complaint was, a business of unknown form based in San Francisco, California, and doing business in the County of Alameda, State of California, and throughout the State of California and United States.

17. Plaintiffs are informed and believe, and thereupon allege, that Defendant Kirk Chewning, is now, and at all times mentioned in this Complaint was, an individual

residing in St. Croix, American Virgin Islands.

18. Plaintiffs are informed and believe, and thereupon allege, that Defendant Samuel W. Humphreys, is now, and at all times mentioned in this Complaint was, an individual residing in San Francisco, California.

19. Plaintiffs are informed and believe, and thereupon allege, that Defendant Douglas Tulley, is now, and at all times mentioned in this Complaint was, an individual residing in San Francisco, California.

20. Plaintiffs are informed and believe, and thereupon allege, that Defendant Alton F. Irby III, is now, and at all times mentioned in this Complaint was, an individual residing in San Francisco, California.

21. Plaintiffs do not know the true names or capacities of the Defendants sued herein as DOES 22 through 100 inclusive, and therefore sue these Defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe, and thereon allege, that each of these fictitiously named Defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiffs' damages as herein alleged were proximately caused by those Defendants. Each reference in this complaint to "Defendant" or "Defendants" or to a specifically named Defendant refers also to all Defendants sued under fictitious names.

22. Plaintiffs are informed and believe, and thereon allege, that at all times herein mentioned each of the Defendants, including all Defendants sued under fictitious names, and each of the persons who are not parties to this action but are identified by name or otherwise throughout this complaint, was the alter ego of each of the remaining Defendants, was the successor in interest or predecessor in interest, and

was the agent and employee of each of the remaining Defendants and in doing the things herein alleged was acting within the course and scope of this agency and employment.

## CLASS ALLEGATIONS

23. Plaintiffs are members of a class of persons, the members of which are similarly situated to each other member of that class. The Selling Source class is defined as follows:

> All California residents who received a "payday loan" from an UNLICENSED LENDER on or after February 11, 2009 by using any website affiliated with or in response to an email from Selling Source, LLC or one of its subsidiaries. Any lender owned by an American Indian tribe during the entire Class Period is excluded.

24. Plaintiffs are also members of a MoneyMutual subclass which is comprised of:

> All California residents who obtained a "payday loan" from an UNLICENSED LENDER on or after February 11, 2009 by using the MoneyMutual website. Any lender owned by an American Indian tribe during the entire Class Period is excluded.

25. Plaintiffs are also members of a Cash Yes subclass which is comprised of:

> All California residents who obtained a "payday loan" from Cash Yes or Cash Jar on or after February 11, 2009 through any means.

26. Plaintiffs are informed and believe, and thereupon allege, that the classes Plaintiffs represent include at least 100 persons who were referred through a Selling Source website or in response to a Selling Source email or from the MoneyMutual website to UNLICENSED LENDERS and subsequently obtained payday loans from them during the specified time frame. There are approximately 40,000 members of the Cash Yes subclass.

27. The identity of the members of the classes is ascertainable from Defendants' own business records or those of their agents because Selling Source and its subsidiaries were paid a fee for each payday loan referral and documented the identify of each such borrower and because David Johnson, Kirk Chewning and Vector Capital tracked the identity of each Cash Yes or Cash Jar borrower.

28. The Plaintiffs and Class Members' claims against Defendants involve questions of law or fact common to each of the classes that are substantially similar and predominate over questions affecting individual Class Members in each of the Classes. All members of the Selling Source or MoneyMutual classes were solicited by one of the Selling Source websites or emails to obtain a payday loan from an illegal lender. With respect to the MoneyMutual subclass, all class members were exposed to the same representations on the MoneyMutual website, were referred to and obtained payday loans from the illegal lenders. The same legal questions arise as to the illegality of the loans and the legal effect of the representations on the MoneyMutual website. All of the Cash Yes subclass members obtained the same type of illegal loan.

29. The claims of Plaintiffs are typical of the claims of the members of the Classes.

30. Plaintiffs can fairly and adequately represent the interests of the Classes.

31. A class action is the superior method of adjudicating the claims of the Class Members.

## **FIRST CAUSE OF ACTION FOR VIOLATION OF THE CALIFORNIA DEFERRED DEPOSIT TRANSACTION LAW (FINANCIAL CODE § 23005) BY ASSISTING IN THE ORIGINATION OF PAYDAY LOANS WITHOUT A LICENSE AGAINST ALL DEFENDANTS (BROUGHT AS INDIVIDUAL**

8

## ACTIONS AND CLASS ACTION) BY PLAINTIFFS

32. Plaintiffs incorporate in this cause of action the allegations contained in paragraphs 1 through 31, inclusive.

33. Financial Code § 23000, et. seq., the California Deferred Deposit Transaction Law (CDDTL), regulates the making of Deferred Deposit Transactions, more commonly known as "payday loans."

34. In a payday loan, the borrower receives a cash advance of a specified amount secured by a check (or electronic draft) to repay a larger amount of money in a short period of time.

35. Payday loans made to California residents by companies located in California or elsewhere are legal under certain circumstances and the industry is heavily regulated.

36. Financial Code § 23001 (a) defines a "Deferred Deposit Transaction" as a "transaction whereby a person defers depositing a customer's personal check until a specific date, pursuant to a written agreement for a fee or other charge, as provided in Section 23035." There is no requirement that the "personal check" be a "paper check" and commonly the borrower provides an entirely electronic version of a check or other form of authorization as security for the loan and the actual repayment is obtained by the lender by electronically withdrawing funds from the borrower's bank account.

37. Financial Code § 23005 provides that "**no person shall** offer, originate, or make a deferred deposit transaction, arrange a deferred deposit transaction for a deferred deposit originator, act as an agent for a deferred deposit originator, or **assist a deferred deposit originator in the origination of a deferred deposit**

9

**transaction** without first obtaining a license from the commissioner and complying with the provisions of this division."

38. A "Deferred Deposit Originator" is "a person who offers, originates, or makes a deferred deposit transaction." (Financial Code § 23001 (f).)

39. Financial Code § 23035 authorizes **licensed** payday lenders to make payday loans that meet certain requirements, one of which is a cap on finance charges that is much greater than California's usury law permits (10% APR). For example, California law permits a $45 finance charge on a $255 loan that must be repaid within 31 days (and no additional finance charges are allowed). Even legal payday loans can be very profitable.

## The Lenders

40. This lawsuit refers to UNLICENSED LENDERS, meaning persons or companies offering loans to California residents but which do not have licenses issued by the State of California to make a payday loan or any other type of loan to a California resident. In addition to the UNLICENSED LENDERS that are part of the Selling Source network as described in the next paragraph, Defendants Gateway Holdings Group LLC, Horizon Opportunities Group, LLC, and Payday Valet are also UNLICENSED LENDERS.

41. The UNLICENSED LENDERS that are part of the Selling Source network are as follows: (Plaintiffs have excluded some companies which apparently offered a trivial number of loans to California residents, lenders who were licensed the entire Class Period and lenders who were owned by Indian tribes the entire Class Period)

a)     24 Loan Store

b)     3B Financial

c) 7X Services LLC (RTMM Consulting aka Paydaywiz.com)

d) A-1 Premium Acceptance (A-1 Premium Budget, Inc. aka Cash in a Wink)

e) AALM Consulting Services Ltd.

f) ABC Payday Loan

g) ABJT Funding dba Dollar Premier

h) Action Payday LLC

i) Advance Business Systems

j) Allied Finance, LLC

k) Another Fine Mess Limitada (DBA Mambo Cash)

l) Apex 1 (Cash Advance Network)

m) B Financial LLC

n) Baazing Loans LLC

o) BD PDL Services LLC

p) Big Eye Lending

q) Blizzard Interactive

r) Blue Hole Financial LDCI

s) Blue King Inc.

t) Brighton Financial

u) Cactus Lending (WTKBJT Financial)

v) Camel Coin Inc.

w) Capeside Productions, LLC

x) Cash Cure LLC

y) Cash Factory USA (prior to February 14, 2014)

z) Cash Jar (Down Under Ventures)

| | | |
|---|---|---|
| 1 | aa) | Cash Yes (Hong Kong Partners) |
| 2 | bb) | Center Ice Servicing LLC |
| 3 | cc) | Churchill Financial Management |
| 4 | dd) | Clear Loan Solutions LLC (MB Processing, LLC) |
| 5 | ee) | ClickonCash |
| 6 | ff) | Clickspeed Marketing |
| 7 | gg) | Cloud 9 Marketing Inc. |
| 8 | hh) | Coral Keys Ltd. |
| 9 | ii) | Cowboy Productions Limited |
| 10 | jj) | Cyberclick Marketing |
| 11 | kk) | Cyberclick Media |
| 12 | ll) | Devwire Consulting LLC |
| 13 | mm) | Dialing It Up (Flobridge Group LLC) |
| 14 | nn) | Direct Financial Solutions |
| 15 | oo) | Direct ROI LLC |
| 16 | pp) | DMA Financial Corp - VIP Cash |
| 17 | qq) | Dynamic Online Solutions LLC (Seaside Trust LLC) |
| 18 | rr) | Eastside Lenders |
| 19 | ss) | Edata Solutions (BMG, Bahamas Marketing Group) |
| 20 | tt) | ePayday Loan |
| 21 | uu) | Essex Capital |
| 22 | vv) | Fast Cash Advance |
| 23 | ww) | Fast EFENDS |
| 24 | xx) | Fast Pay Day Loans LLC |

12

yy)     Finestra Corporation

zz)     First American Capital Resources LLC

aaa)    Galaxy Marketing (Pluto Marketing, CCMI)

bbb)    Global Process Ventures LLC

ccc)    Government Employees Credit Center (Cash Direct Now, Dollar Financial Group)

ddd)    GR Enterprises Inc.

eee)    Great Falls Processing LLC

fff)    Heritage Marketing (ABC Payday Loan)

ggg)    Horizon Financial

hhh)    IEG, LLC

iii)    Inmarco (ABS)

jjj)    Integrity Advance LLC

kkk)    Integrity PDL Services LLC

lll)    Jet Lending

mmm)        Joro Resources Ltd.

nnn)    Lead Express Inc

ooo)    LeadPile

ppp)    Lend Me Now

qqq)    Lenders International

rrr)    Liquid Ventures

sss)    Loan Pointe LLC

ttt)    MB Marketing, LLC

uuu)    Mexsend S.A.P.I DE C.V. SOFOM E.N.R

vvv)    MK Finance LLC

13

www) MMP Finance LLC

xxx) Money Key

yyy) MyQuickFNDS C.R.L

zzz) Net Pay Advance Inc.

aaaa) Neverland Services SA

bbbb) Online Advance

cccc) Online Lending Service LLC

dddd) OPM LLC

eeee) Orvy LLC

ffff) Overland Financial

gggg) Payday Loan Yes

hhhh) PBT Loan Services LLC

iiii) Platinum Finance Company, LLC (Cashlink, Instant Loan Today)

jjjj) PMI, Inc. (Agean)

kkkk) RBC Servicing LLC

llll) RD STN Financial

mmmm) Red Leaf Ventures

nnnn) Rockhill Consulting Group, LLC dba Green Gate Servicing

oooo) SCS Processing, LLC

pppp) Shanghai Partners LLC

qqqq) Sierra Lending LLC

rrrr) Sonic Cash Processing

ssss) Speedy Servicing Inc

tttt) Star Group LLC

uuuu) Sure Advance LLC

vvvv) TailRev LLC

wwww)    The Cash Line, LLC

xxxx)  The Servicing Company LLC

yyyy)  The Useful

zzzz)  Total Management Inc

aaaaa) Turtle Bay Holdings, LDC dba seaside payday and seaside dollar

bbbbb)    Upfrontpayday LLC

ccccc) VC Funding

ddddd)    VIP PDL Services LLC

eeeee) Vista B LLC (Vista B Loans, Fast Next Day Cash)

fffff)  Western Servicing LLC

ggggg) Worldwide Consumer Group LLC

hhhhh)    Zip Management Services

42. All of the UNLICENSED LENDERS identified herein or as otherwise will be identified during the course of this litigation are "deferred deposit originators" in that they offer and make deferred deposit transactions.

43. Every loan made by the UNLICENSED LENDERS was illegal under California law for numerous reasons but most importantly because the lender was not licensed by the State of California to make a payday loan or any other type of loan for that matter.  Accordingly, even if the loans had not met the definition of a payday loan the loan would still be illegal under California law because the lender was not licensed which is required of all companies in the business of making loans.

44. There have been many government actions against the UNLICENSED LENDERS,

both as to the named Defendants and others. Cease and Desist orders have been issued by the State of California against the named lenders (and other lenders) but they continue to make payday loans in California

45. It should be kept in mind that the names of the lenders are often transitory if not utterly meaningless. Lenders frequently change the names of their "companies." One of the lenders' ploys is to change the name of the lender once the "heat" (government action) becomes too intense and continue operations under the new name.

46. Lenders owned or controlled by the Cane Bay and Rare Moon Defendants will be discussed in later sections of the Complaint. Other lenders used the names Payday Valet and Payday Mobility and used a fake address on the Isle of Man. Their ownership is currently unknown. Another lender is ABJT Funding LLC dba Dollar Premier. This lender is a little atypical because it used a fake address in the State of Utah. Another unidentified lender used the names OPD Solutions, SGQ Processing. Gateway Holdings Group, LLC, and Horizon Opportunities, LLC. These lenders used a fake address in the West Indies.

47. As indicated above, most but not all of these lenders created fake addresses, often in foreign countries such as Belize, the West Indies and the Isle of Man. The addresses are typically "mail drops" or mail forwarding services and there are no real operations occurring in the foreign countries. The sole purpose for this practice is to avoid compliance with State law, even though the loans are made to residents of the United States and California, and to make it extremely difficult to locate the true owners of the illegal lenders.

48. These companies also typically use "front men" who serve as their agents in

marketing the payday loans to the public.  Some of those "front men" are named as defendants in this lawsuit and discussed in detail below

49. The UNLICENSED LENDERS pay the loan money to borrowers from banks in the United States.  Similarly, they use the same banks to extract money from the borrowers' bank accounts.  Typically, the bank accounts of the lenders are under the control of the "front men" described in detail below

**Plaintiffs and Class Members obtain Illegal Loans and then Pay Money**

50. As described in greater detail below, Plaintiffs and Class Members obtained payday loans, from various UNLICENSED LENDERS.

51. In November 2012 Plaintiff Gilbert used the MoneyMutual.com website to obtain a payday loan from unlicensed lender Cash Yes and paid at last $105 when Cash Yes attempted to remove funds from his bank account.  In September 2014, Plaintiff Gilbert used the website of Selling Source affiliate "cashadvance.com" to obtain a payday loan from unlicensed lender Camel Coin and paid at least $100 on that loan.  Plaintiff did not know at the time that cashadvance.com was controlled by Selling Source.  Plaintiff Gilbert has also obtained loans from two lenders controlled by former Defendant Rare Moon Media, LLC, but those claims are subject to this Court's order compelling arbitration.  Plaintiff Gilbert has also obtained loans from other unlicensed lenders but currently we are unable to confirm whether those loans came from members of Selling Source's marketing network.

52. Between January and April 2013, Plaintiff Bilbrew used the MoneyMutual.com website to obtain payday loans from unlicensed lenders Cash Yes, 7x Services, LLC and My Quick Funds and paid at least $450 on these loans.

53. In November 2012, Plaintiff Malone used the MoneyMutual.com website to obtain

payday loans from unlicensed lenders Cash Yes and Bottom Dollar Payday and paid at least $575 on these loans.

54. In February and March 2013, Plaintiff Aquino used websites of Selling Source affiliates to obtain payday loans from unlicensed lenders Liquid Ventures, Devwire Consulting, Vista B and Vivus Servicing and paid money on all of these loans. It is possible the Devwire Consulting loan was obtained through the MoneyMutual.com website because so far all documentation produced by MoneyMutual defendants in discovery suggests only MoneyMutual.com leads were sold to Devwire Consulting. It is also possible the "Vista B" loan was really with VIP PDL Services, which is controlled by former Defendant Rare Moon Media, LLC. In the same time frame, Plaintiff Aquino also obtained a payday loan from Dollar Premier (ABJT Funding, LLC), but it has not yet been determined whether this was obtained from a Selling Source affiliate or not. Plaintiff also paid money on both the VIP PDL and Dollar Premier loans.

55. On each of these occasions, Plaintiffs provided the lenders the electronic equivalent of a personal check or draft which was "postdated" to the repayment date and the respective lender agreed not to attempt to "deposit" that electronic draft prior to the scheduled repayment date.

56. During the Class Period many of the payday loans made to Class Members were made by the foregoing lenders, but many others were made by other UNLICENSED LENDERS.

57. As set forth above, because all of the foregoing loans were made by UNLICENSED LENDERS, they were all illegal.

**Selling Source/MoneyMutual General Marketing of Illegal Payday Loans**

58. As explained in greater detail below, all of the Defendants assisted one or more payday lenders (deferred deposit originators) in the origination of payday loans even though neither the lenders nor any of the Defendants on this cause of action had the required license from the State of California. Therefore, these Defendants violated Financial Code § 23005.

59. During the Class Period, Defendant Selling Source (under the ownership of former Defendant London Bay Capital) was engaged in the business of promoting and facilitating payday loans by unlicensed lenders to California residents. Selling Source did this by aggressively marketing the loans on the Internet and to a lesser extent radio and television. Selling Source obtained leads in part by creating branded websites. But Selling Source also sent "spam" emails to California residents and displayed advertisements on websites visited by California residents.

60. During the Class Period, Defendant Glen McKay was President and Chief Executive Officer of Defendant Selling Source, LLC. Samuel W. Humphreys, Douglas Tulley and Alton F. Irby III, along with McKay, served on and controlled the Board of Directors of Selling Source, LLC. Collectively these four men directly ordered, authorized and participated in the tortious conduct described below including the decision to promote and facilitate payday loans by unlicensed lenders to California residents.

61. In 2007, Humphreys, Tulley and Irby, through London Bay Capital and some other holding/acquisition companies, purchased the preexisting business known as Selling Source from Derek LaFavor and Scott Tucker, the co-owners. At that time, Mr. Tucker was heavily involved in the promotion of illegal payday loans and owned at least two unlicensed payday lenders which made loans to California residents. Glenn

McKay was already working with LaFavor at Selling Source as a senior officer. By the beginning of the Class Period, Tucker and LaFavor had left and McKay had assumed the Presidency and position on the board of directors. Humphreys, Tulley, Irby, and McKay developed the plan of creating the MoneyMutual website described below and hiring celebrity Montel Williams to promote the website as a source of loans by unlicensed lenders to California and other US residents. These four men in conjunction with Montel Williams were responsible for developing the content of the MoneyMutual website and sites like it on the Internet, and the testimonials provided by Mr. Williams. They knew it was illegal for these lenders to make loans to California residents but intentionally promoted the lenders regardless.

62. One of the branded websites created by Selling Source to promote payday loans to California residents is www.moneymutual.com. It has operated during the entire Class Period.

63. To conceal its involvement with this website, Selling Source used a network of "shell companies" and fake principals.

64. For example, Selling Source arranged for the creation of former Defendant Effective Marketing Solutions, LLC in June 2007 in order to "hold" the domain name for www.moneymutual.com. The purpose was to prevent the true identity of the owners of MoneyMutual from being known to the public, including potential victims.

65. Another layer of obfuscation was provided by former Defendant Aaron Shoaf, who incorporated Effective Marketing Solutions, LLC in June 2007. Shoaf created another business entity (Tailored Business Solutions) to be the "nominee manager" of Effective Marketing Solutions. That way there would be no apparent connection between Selling Source and the MoneyMutual website.

66. Shoaf has admitted that the service he provides is intended to protect the true owners of a business engaged in fraudulent or other illegal conduct from personal liability. His website explains:

> There are two major reasons why someone from another state would establish a Nevada corporation: 1. To reduce your home state taxes. 2. To protect your assets. We are sure you will agree that the **best way to assure that you are judgment-proof is to appear to be poverty-stricken and destitute.** Even if you are sued and a judgment is obtained against you, you have nothing to lose. Although none of us want to be poverty-stricken, we can arrange our affairs to appear so. One of the best asset protection strategies you have is to be dirt poor. Do not own anything. (At least make it appear that you do not own anything.) You then will be free from encumbrance.

67. During the Class Period, two subsidiaries of Selling Source, were Defendants MoneyMutual, LLC and Partner Weekly, LLC. These defendants executed the policies set forth by Selling Source with respect to the promotion of payday loans to California residents.

68. Defendant MoneyMutual was set up to run the MoneyMutual website subject to the foregoing control by Selling Source.

69. Defendant Partner Weekly was set up for the purpose of negotiating with and signing marketing contracts with payday lenders.

70. The marketing contracts provide that payday loan leads would be sold by Partner Weekly to the UNLICENSED LENDERS including but not limited to the ones identified by name in this complaint. Some of these leads are generated by the Money Mutual website as described in greater detail below but leads are also generated by other advertising, websites, spam email, etc. Leads generated through the MoneyMutual website are tracked by Partner Weekly, charged accordingly and

leads generated by other means are also tracked by Partner Weekly, and charged accordingly.

71. Most of these marketing contracts were signed by Defendant John Hashman, an executive Vice President of Selling Source who signs as an officer of Partner Weekly, or Defendant Brian Rauch, a former executive with Selling Source.  The marketing contracts are usually signed by some "front man" for the lender but in reality the "front man" is usually also the lender or some affiliated company.

72. The marketing contracts provided that Partner Weekly would be paid a certain amount of money for each potential borrower who met the lender's requirements with respect to state of residence and certain financial parameters and whose online application was forwarded to the lender.  The lenders only accepted leads from residents of certain states and California residents were always targeted in the marketing agreements at issue in this lawsuit.

73. This money for leads was paid whether a loan was ultimately made to the California resident or not.  In this way, the various MoneyMutual Defendants described below profited by many millions of dollars by promoting payday loans from illegal lenders to California residents during the class period

## Role of Cane Bay and Rare Moon Defendants in assisting in origination of Illegal Payday Loans.

74. The "Cane Bay Defendants" refer to current or former Defendants: a) former defendant M. Mark High, Ltd., which used the trade names ISG International and Interactive Services Group (collectively MMH); b) former defendant Cane Bay Partners VI, LLLP which was formerly known as Cane Bay Partners VI, LLC (collectively CBP); c) David A. Johnson; d) newly added Defendant Kirk Chewning;

e) former defendant Sarah Reardon; and f) newly added Defendant Vector Capital IV LP.

75. All of the Cane Bay Defendants knew at all times that it was illegal for loans to be made to California residents with Cash Yes and Cash Jar being the putative lenders because they were not licensed to make loans in California. When they performed their functions and roles described herein, they intended to offer and originate payday loans to California residents and/or to assist the putative lenders in making these loans.

76. During the relevant time frame, David A. Johnson and Kirk Chewning were the owners of MMH and CBP. At all times, they directed, authorized and participated in the conduct of the companies and their employees and at all times they were fully aware of their role in assisting the origination of illegal loans to California residents.

77. The day to day decisions for CBP and MMH were made by David Johnson and Kirk Chewning with some limited-decisions made by former Defendant Sarah Reardon.

78. During the class period, "Cash Yes" and "Cash Jar" were also owned by Defendants David Johnson, Kirk Chewning and (as of approximately 2012[2]) Vector Capital. Cash Yes was a trade name used by Hong Kong Partners, Ltd., which was owned and controlled by those three. Cash Jar was a trade name used by Down Under Ventures, Ltd., which was also owned and controlled by those three. Johnson and Chewning hired a Belize incorporation service to create dummy companies in Belize and hired a local woman to serve as the nominee (figurehead) director.

79. All of the money used by Cash Yes and Cash Jar to lend to consumers was funneled

[2]References to the actions of Vector Capital refer to actions starting when it invested in the payday lending operation, approximately in 2012.

to them by Johnson, Chewning and Vector Capital.  All of revenue generated by Cash Yes and Cash Jar was funneled out by those three.   All policies and procedures followed by Cash Yes and Cash Jar were developed and established by Johnson and Chewning and by Vector Capital as well.  Johnson, Chewning and Vector Capital shut Cash Yes and Cash Jar down in approximately December 2013 and removed any assets remaining in those entities.

80. To conceal their ownership and control of Cash Yes and Cash Jar and to make it appear they were not the actual lenders, Johnson, Chewning and (eventually) Vector Capital created or used a façade of being "consultants" to the lenders, although ultimately David Johnson did not really consult with the lenders because that would be consulting with "himself."

81. In short, Johnson, Chewning and eventually Vector Capital made all of the decisions regarding the lending operations including who would be targeted for the loans, what criteria would have to be satisfied by the borrowers, how the loans would be marketed, how the funds to make the loans would be obtained, what loan processing software would be used, what loan agreements would be used, what customer service and call center assistance was needed, what collections activities would be taken, and perhaps most fundamentally that loans would be offered in the United States including in California even though neither the lenders nor affiliated companies had a license to make loans there.   They were also aware of cease and desist orders by state regulators including in California against unlicensed payday lenders, including Cash Yes and Cash Jar, but chose to disregard those orders.

82. Although David Johnson sometimes signed the marketing agreements between Partner Weekly and "Cash Yes" or "Cash Jar," usually he directed Sarah Reardon or

"Shirlee Cornejo" to do so. Cornejo was the figurehead director Johnson hired to "front" for the MMH and Cash Yes, but she had no actual authority.

83. Typically, Johnson and Chewning and Vector Capital exercised their control over the lending operations by acting though MMH and CBP as part of the aforementioned façade and to suggest that the lenders were independent of the "consultants." Supposedly there was a division of responsibilities between the two companies. MMH was supposed to purchase the marketing leads for potential borrowers. However, MMH did not actually have any staff. All of the work was performed by employees of CBP serving as "consultants" to MMH. Even though MMH was supposed to be the one in charge of signing the marketing agreements, on many occasions David Johnson, Sarah Reardon and others signed the agreements on behalf of CBP not MMH. In her deposition, Sarah Reardon explained she would get confused about which company was doing what.

84. MMH (under the control of Johnson, Chewning and Vector Capital) targeted California residents (among residents of certain other states but not residents of other states) for the payday loan marketing efforts. For example, at their direction, Cash Yes made over 39,000 loans to California residents between January 2011 and December 2013 and many more before January 2011. The loans in that three year period represented at least 20% of the loans made by Cash Yes.

85. Not only were California consumers targeted on the front end but they were targeted on the back end. MMH was tasked by Johnson, Chewning and Vector Capital with trying to sell loans to prior California borrowers. At their direction, during the class period, MMH emailed and called thousands of California residents who had already taken out prior loans from Cash Yes and Cash Jar in an attempt to convince them to

take out another loan. On numerous occasions, MMH was successful and new loans were made to those consumers under the "Cash Yes" or "Cash Jar" lender names.

86. MMH itself did not have any money to pay for the leads. That money was provided by Johnson, Chewning and Vector Capital. MMH was not actually paid any money for recruiting borrowers for Cash Yes and Cash Jar.

87. CBP was tasked by Johnson, Chewning and Vector Capital with managing the day to day operations of Cash Yes and Cash Jar. This included obtaining payday loan leads (supposedly from MMH), analyzing their effectiveness in terms of how many resulted in the making of profitable loans, setting up and maintaining the Cash Yes and Cash Jar websites, and overseeing the loan processing software that operated on that website.

88. The Cane Bay Defendants controlled the bank accounts used to pay the loans from Cash Yes and Cash Jar to consumers and to withdraw and hold the funds taken from the consumers. One of the banks they used was Four Oaks Bank & Trust in North Carolina. This is a small state bank with 14 branches, all in North Carolina. Thus, that bank would appear to be a strange choice for companies supposedly based in the Virgin Islands or Belize to use. The explanation was this bank adopted a "no questions" asked approach to the high-volume questionable transactions that were being processed for the lending operations. Eventually the Bank was sued by the United States Justice Department for routing transactions for unlawful Internet payday lenders through the ACH money transfer system, for which service it received more than $850,000 in bank fees. The Bank paid a $1.2 million civil fine in 2014 and the Cane Bay Defendants were forced to look for another bank to continue their payday loan operations (which by then were being done under new lender names).

89. Vector Capital is a venture capital firm and it was looking for a high-return investment for its funds.  Johnson and Chewning approached Vector Capital in approximately 2012 to raise funds so more loans could be made by Cash Yes and Cash Jar.  They presented the financial books concerning the Cash Yes and Cash Jar lending operations to Vector Capital and truthfully disclosed that the lenders made thousands of loans to California residents but were not licensed in California to do so.  However, they told Vector Capital the loans were extremely profitable.  By the way, Cash Yes and Cash Jar were also making loans in other states where it was also illegal for them to do so because of lack of licensure and excessive finance charges.  So Vector Capital was not just motivated by the prospect of benefiting from the profitable loans made to California residents but by those made illegally in other states as well.

90. After reviewing the financial books and lending operations of Cash Yes and Cash Jar, Vector Capital invested at least $2,000,000 with the express caveat that it be used to make the payday loans (including to California residents).  This money was placed in bank accounts under the control of David Johnson and Kirk Chewning.

91. When Vector Capital invested money with Cash Yes and Cash Jar it did not announce this fact on its website, as it routinely did with other investments nor did it mention that it was involved with payday loans.  The reason for this reticence was that it knew the loans were illegal.

92. By investing this money, Vector Capital acquired ownership and control of Cash Yes and Cash Jar and had complete control over the operations in conjunction with Johnson and Chewning.   This investment was made not just for millions of dollars of revenue from loans made in California but for tens of millions of dollars for loans

made across the United States. Vector Capital invested the money knowing it would be used to fund the illegal payday loans that were being made to California and other state's residents.

93. Before Vector Capital was willing to invest any money in Cash Yes and Cash Jar, it obtained assurances from David Johnson and Kirk Chewning that they intended to continue to offer loans through Cash Yes and Cash Jar for as long as possible because Vector Capital did not have the experience to operate the payday lenders on its own. Thereafter, Vector Capital monitored the payday loan operations on a regular basis, participated in policy decisions about expanding or contracting operations, which decisions as of 2012, were made jointly by Johnson, Chewning and Vector Capital. At some point in time late in 2013, due to ongoing investigations by government authorities as well as lawsuits such as the instant one, Johnson, Chewning and Vector Capital agreed to wind down lending operations through Cash Yes and Cash Jar.

94. All of the Cane Bay Defendants including Vector Capital are still making payday loans but they are just using different websites to do so. For example, they own and control a lender using the website MaxLend.com, which is ostensibly affiliated with an Indian tribe and therefore is not included in the scope of this lawsuit. Just to be clear, however, the Cane Bay Defendants including Vector Capital know those loans are also illegal.

95. The "Rare Moon Defendants" refer to Defendants Rare Moon Media, LLC, Jeremy Shaffer, Brad Levene, Lindsey Coker, and Josh Mitchem. They owned and controlled lenders operating under the names SCS Processing, LLC aka Everest Cash Advance, VIP PDL Services, LLC aka VIP Loan Shop, Action PDL Services, LLC aka

Action Payday, BD PDL Services, LLC aka Bottom Dollar Payday, and Integrity PDL Services, LLC aka Integrity Payday Loans aka IPL Today. In addition, Jeremy Shaffer and Josh Mitchem owned MB Marketing, LLC and IEG, LLC which also offered payday loans through dummy corporations. Plaintiffs are informed and believe these lenders made tens of thousands of loans to California residents during the Class Period. These lenders used fake addresses in Nevis, West Indies and San Jose, Costa Rico. In reality, the lenders' operations were fully controlled from the Kansas City, Missouri metropolitan area by the Rare Moon Defendants

96. Marketing contracts between Partner Weekly and the above Rare Moon controlled lenders identify Rare Moon Media or its agents as the "entity" purchasing leads on behalf of these lenders.

97. The contracts were negotiated by and often signed by Defendants Jeremy Shaffer, Brad Levene, Lindsey Coker, and Josh Mitchem, all of whom were employed by and acting in the scope and course of their employment with Defendant Rare Moon Media, LLC when they negotiated and signed the agreements. During the relevant time frame, Josh Mitchem is listed in the agreements as the President and CEO of the lenders. However, Jeremy Shaffer is also listed as the President of the lenders in the same time frame. Brad Levene is listed as the Director or Vice-President of Marketing for the lenders in the same time frame. Lindsey Coker was in charge of billing services with respect to the leads in the relevant time frame.

98. Defendants Shaffer and Mitchem were the founders of Rare Moon Media, LLC in 2010. This company was set up because previously Josh Mitchem owned two other companies that served as front men for illegal lenders—PDL Support, LLC and Platinum B Services, LLC. Those companies serviced the same two lenders and

other illegal lenders.  Mitchem entered into a consent decree with the Arkansas Attorney General and agreed to pay a fine and shut down operations in that state in August 2012.  Plaintiffs are informed and believe, and thereupon allege, that those companies were facing other government investigations.  Mitchem set up Rare Moon Media to duplicate the services he previously provided with the other companies which were shut down or under investigation.

99. The Rare Moon Defendants also control the bank accounts used to pay the loans to consumers made by the Rare Moon controlled lenders and to withdraw and hold the funds taken from the consumers.  They used Missouri Bank and Trust for this purpose, another small state bank with four branches in the Kansas City area.  They selected this Bank because it is geographically close to their operations center in Kansas City and because it also has a reputation for cooperating with illegal payday lenders.

**Selling Source/MoneyMutual Marketing of Illegal Payday Loans through the MoneyMutual website**

100.   As alluded to earlier, former Defendants London Bay Capital, LLC, TSS Acquisition Company, LLC, Effective Marketing Solutions, LLC, Aaron Shoaf, and remaining Defendants Selling Source, LLC, Glen McKay, MoneyMutual, LLC, Partner Weekly, LLC, John Hashman, Brian Rauch, Samuel W. Humphreys, Douglas Tulley and Alton F. Irby III  [Collectively, the "MoneyMutual Defendants"] generated much of their revenue by selling payday loan leads through the MoneyMutual website (www.moneymutual.com), which was widely advertised on television, radio and the Internet.

101.   The MoneyMutual website contained many pages promoting its network of

payday lenders. The website explains: "A cash advance is a signature loan backed by a future source of income, usually your paycheck. That's why they are also known as 'payday loans.' A cash advance is designed to help you out through a temporary loss of cash or an unforeseen emergency. You can use the cash for car repair, food, credit card bills, other bills, rent, travel or whatever you need. Payday loans, short term loans, cash advance loans and installment loans are growing in popularity because they are easy to obtain and can be an excellent alternative to exorbitant late fees, reconnect fees and other penalties creditors can charge against your accounts."

102.    It further explained: "Getting your cash is as easy as 1-2-3. MoneyMutual is not a lender. Instead, we have built one of the nation's largest networks of online short-term lenders. After submitting your information, if you are matched with a lender, MoneyMutual will redirect to the lender's web site where you will be able to review loan terms and conditions. In many cases, the lender will then contact you to confirm your personal information and finalize the loan. They may contact you via telephone, email, text messages, etc. Please make sure that you respond in a timely manner to ensure that funds are deposited as quickly as possible."

103.    The website assured consumers that all lenders on the MoneyMutual Network are required to adhere to a Code of Lender Conduct, which includes several requirements.  One of the requirements is that the Lenders on the network are prohibited from using the borrower's personal information to market other products or services or give the information to third parties.  However, this requirement was routinely violated by the lenders retained by Plaintiffs and the Class Members.  The Lenders sold or gave the information to other entities so they could "spam" the borrowers in an attempt to sell more loans to them in the future.  The Lenders also

sold Plaintiffs' and Class Members' personal information (including social security numbers) to criminal operations often based in other countries. Those criminals would then make threatening phone calls to Plaintiffs' and Class Members claiming they represented law enforcement agencies and they were going to arrest these borrowers unless the borrowers paid money they supposedly owed.

104. Another requirement of the Code of Lender Conduct was that "Lenders shall not engage in harassing or abusive collections practices and agree to comply with any and all applicable federal and state collections practices laws and regulations." This requirement was also routinely violated by the lenders on the network. As noted above, lenders harassed borrowers including Plaintiffs and Class Members who fell behind in their payments. More importantly, "federal and state collections practices law and regulations" prohibit attempting to collect on an unlawful debt. Yet, all of the lenders on the network tried to collect money from Plaintiffs and the Class Members even though the debts were unlawful (void). They tried to collect the money either by debiting it from Plaintiffs and Class Members' bank accounts or by making written or oral demands for payment. In these demands, the lenders falsely stated that Plaintiffs and Class Members were legally obligated to pay the money. They never told the truth to the borrowers (i.e., that the loans were void and any repayment was purely a voluntary act of charity).

105. The website claimed that "MoneyMutual regularly monitors lender practices for compliance with this Code of Lender Conduct. In the event that MoneyMutual determines that a lender is not acting in accordance with this Code of Lender Conduct, that lender's participation in the MoneyMutual program is subject to suspension and/or possible termination."

106.	In reality, the MoneyMutual Defendants did <u>not</u> monitor the lenders for compliance.  To the contrary, they were aware the lenders did not comply with the Code of Lender Conduct, but took no action to suspend or terminate their membership in the lending network.  The only lenders suspended or terminated were those who did not pay the MoneyMutual Defendants the required fees for the leads.

107.	During the same period, television celebrity Montel Brian Anthony Williams, promoted and highly recommended the www.moneymutual.com website and the payday loan referral services provided therein by means of radio, television and Internet advertising.  He continues to do so today.

108.	For example, during the Class Period, on the homepage of www.moneymutual.com, there was a large picture of a smiling Montel Williams and a quote from him saying "Money Mutual's online lending network is a cash source you can trust for finding a short term cash loan quickly and easily."  There is also a logo "As seen on TV."  Mr. Williams has appeared in numerous television and radio commercials during the Class Period for the purpose of promoting www.moneymutual.com.

109.	On YouTube, at www.youtube.com/user/moneymutual?feature=results_main, many of these commercials can be found on the "channel" dedicated to MoneyMutual.  In one of the commercials, Mr. Williams assured the viewers or listeners that MoneyMutual can connect consumers to over 100 lenders, who can lend up to $1,000 fast and "no worries."  In another commercial, he described some financial emergencies that might befall the consumer and then says "I am here to offer you a backup plan—MoneyMutual."  In another commercial, Mr. Williams, in

referring to MoneyMutual stated "We have helped people all across America."  In another commercial, Mr. Williams again refers to MoneyMutual when he states "We have the largest network of short-term lenders who can get you up to $1,000...."  In another commercial, Mr. Williams stated "Hi, I'm Montel Williams from MoneyMutual, your trusted source of over 60 lenders to get you short-term cash.. . . . . Look for me and you will know it's MoneyMutual." Finally, in a commercial dating back to December 2009, Mr. Williams stated "Hi, I'm Montel Williams, would an extra $1,000 come in handy right now?  Then I would like to talk to you about MoneyMutual.  It's your trusted source to over 60 lenders to get you up to $1,000 fast....."

110.    On the MoneyMutual website, during the Class Period there was a frequently asked questions page that contained the following information:  "Q. Why is Montel Williams endorsing this site?  A.  Montel Williams has endorsed MoneyMutual to provide access to short term cash loans to people who have no other alternatives. Montel takes pride in being able to provide people with information to help them live better physically, spiritually, financially, and emotionally. Montel understands that people have unexpected and needed expenses and sometimes difficult to pay due to lack of funds or credit. Rather than bounce a check, or receive late payment penalties, Montel believes that a short term loan from MoneyMutual's network of participating lenders can provide the immediate assistance to avoid costly fees. According to Williams, "MoneyMutual's online lending network is the only source you can trust for finding a short term loan quickly and easily." MoneyMutual allows people to receive instant approval on getting a cash loan of up to $1,000*. Restrictions do apply. See Moneymutual.com for details."

111.    On a different page of the MoneyMutual website, during the Class Period, this statement was displayed:  "Why does Montel Williams endorse MoneyMutual? Celebrated talk show host and Daytime Emmy Award winner Montel Williams associates himself only with products that help people live better physically, spiritually, financially and emotionally. He understands that people will find themselves with difficult to pay expenses due to lack of funds or credit and agrees that a cash advance can provide the needed quick assistance and help avoid more costly fees."

112.    As indicated above, Mr. Williams did not simply act as a celebrity endorser of a product, but repeatedly personally vouched for the integrity of the MoneyMutual lending network and repeatedly stated or implied that he personally was part of MoneyMutual.

113.    The MoneyMutual Defendants paid Mr. Williams a substantial fee for his services in "endorsing" the website.

114.    Notwithstanding the foregoing assurances and the Lender's Code of Conduct, in reality, the MoneyMutual Network has been comprised of many, if not mostly, illegal and criminal lenders, some of which are identified here as the UNLICENSED LENDERS.

115.    The MoneyMutual Defendants and Montel Williams decided which lenders would be added to the MoneyMutual Lending Network.  They considered applications submitted by the lenders including any proof of licensing as well as the lender's websites.  They knew from these information sources that many of the lenders were not licensed to make payday loans.  They further knew that since those UNLICENSED LENDERS could not legally make any payday loans, they could not

legally collect payments on the loans. It is against federal and California debt collection law to attempt to collect on a debt that is not a lawful debt (i.e., a void loan). They further knew that the lenders were violating the MoneyMutual website Lender's Code of Conduct by not being licensed and collecting and trying to collect payments on these illegal loans. Nevertheless, the MoneyMutual Defendants and Montel Williams permitted these lenders to join and to continue to participate in the Lending Network during the Class Period and represented that they were legally authorized to make the loans and to collect payment.

116. During the Class Period, the Departments of Corporations and Attorneys General for numerous States issued cease and desist notices against many of the UNLICENSED LENDERS affiliated with the MoneyMutual website. The MoneyMutual Defendants and Montel Williams knew of these various State law enforcement actions but continued to recommend these lenders to consumers and to represent that they were in compliance with all applicable laws.

117. At no time during the Class Period, did Mr. Williams or the MoneyMutual Defendants disclose that many of the "approved lenders" were illegal or unlicensed.

118. In allowing these illegal lenders to join the Lending Network and in recommending the services of these illegal lenders to consumers, and in concealing the illegal status of the lenders, and by representing they were in compliance with all applicable laws, MoneyMutual Defendants and Montel Williams intended to provide and did provide substantial assistance and encouragement to the illegal lenders.

119. They did so knowingly because the MoneyMutual Defendants and Montel Williams were paid a significant amount of money, often between $100 and $170 per accepted lead, by the lenders. They intended to have the MoneyMutual website lend

an aura of respectability and further encourage consumers to take loans from the illegal lenders in the Lending Network.

120.    With respect to the specific loans referenced in paragraphs 51 to 54 as being originated through the MoneyMutual website, the Plaintiffs read the website, and believed the representations contained therein and described above.  In reliance on the general representations on the moneymutual.com website and on those made by Montel Williams that the lenders were trustworthy and reliable, and in reliance about the specific representations made in the Lender's Code of Conduct described above, Plaintiffs applied for loans through the MoneyMutual website.  After they submitted their applications, there were notified of the name or names of lenders who were willing to make loans to them.

121.    Specifically, Plaintiffs reasonably believed based on the assurances the "lending network" was trustworthy and reliable, that the lenders on the network were trustworthy and reliable.  Trusting the network is the same as trusting the lenders.  They also reasonably understood the Lender Code of Conduct to be grounds to believe the lenders were lawful companies offering a lawful service.  For example, the assurance the lenders would not (without penalty) violate debt collection laws, reasonably meant to the Plaintiffs that the lenders would not attempt to collect an illegal debt and, therefore, could legally offer the loans in question.

122.    If Plaintiffs had known the truth about the lenders, that they were not trustworthy and reliable as claimed by the MoneyMutual Defendants, that they did not comply with the Lender's Code of Conduct but in fact were making illegal loans and then improperly trying to collect on them, and that they routinely shared personal information with criminals, they would not have trusted or used any of the

lenders on the MoneyMutual network of lenders. They would not have trusted MoneyMutual or the lenders with their personal information including their social security numbers.

123. Similarly, during the Class Period, the Class Members were referred through the MoneyMutual website to the UNLICENSED LENDERS which offered, originated or made Deferred Deposit Transactions. The MoneyMutual website continues to operate in this manner today.

124. Additionally, through other websites, advertising and spam email, Defendants referred Class Members to UNLICENSED LENDERS even though Defendants knew the lenders had no license. Defendants continue to make these referrals today.

**General Allegations against all Defendants**

125. In the foregoing manners, whether as the UNLICENSED LENDERS, as the "front men" for the "UNLICENSED LENDERS" or by advertising for payday loan customers and referring those customers to the UNLICENSED LENDERS, all of the Defendants violated Financial Code § 23005 either by offering, making, arranging or assisting in the origination of illegal payday loans. All of the lenders were required to have a license to make such loans to California residents and none of them had a license. They continue to operate illegally today.

126. Financial Code § 23060 (a) provides "If any amount other than, or in excess of, the charges or fees permitted by this division is willfully charged, contracted for, or received, a deferred deposit transaction contract shall be void, and no person shall have any right to collect or receive the principal amount provided in the deferred deposit transaction, any charges, or fees in connection with the transaction."

127. Financial Code § 23060 (b) provides "If any provision of this division is willfully

violated in the making or collection of a deferred deposit transaction, the deferred deposit transaction contract shall be void, and no person shall have any right to collect or receive any amount provided in the deferred deposit transaction, any charges, or fees in connection with the transaction."

128.     Moreover, pursuant to Financial Code § 23065, the knowing and willful violation of any provision of the CDDTL by a lender is punishable as a criminal offense carrying up to one year in and payment of a $10,000 fine.

129.     As a result of the aforementioned willful violations of provisions of the CDDTL, Plaintiffs and each of the Class Members' Loan Agreements is void as a matter of law and no person shall have any right to collect or receive the principal amount (or any amount) provided in the deferred deposit transaction, any charges, or fees in connection with the transaction."

130.     Additionally, pursuant to Financial Code § 23064, Plaintiffs and the Class Members may recover from the Defendants up to three times the damages actually incurred but in no event less that the amount paid by them to the UNLICENSED LENDERS.

131.     Further, pursuant to Financial Code § 23064, upon a determination that Defendants' violations were willful, the Court may award punitive damages in addition to the amounts set forth above.

132.     Further, pursuant to Financial Code § 23064, the Court should order Defendants to make restitution and disgorge all money obtained by any of the Defendants in connection with these illegal transactions and shall further enjoin Defendants from offering, making, arranging or assisting in the origination of the payday loans.

**SECOND CAUSE OF ACTION FOR VIOLATIONS OF RICO, 18 U.S.C. § 1962**

**(c). OPERATION OF AN ENTERPRISE THROUGH RACKETEERING ACTIVITY OR THROUGH COLLECTION OF UNLAWFUL DEBT AGAINST ALL DEFENDANTS (BROUGHT AS AN INDIVIDUAL ACTION AND CLASS ACTION) BY PLAINTIFFS**

133.    Plaintiffs incorporate in this cause of action the allegations contained in paragraphs 1 through 132, inclusive.

134.    During the Class Period each of the Defendants and each of the UNLICENSED LENDERS who are not currently named as parties was a "RICO" PERSON and was organized and associated with each other in an unnamed entity constituting an "association in fact" that constituted a RICO enterprise as that term is defined in 18 U.S.C. § 1961 (4).  Defendants and the unnamed UNLICENSED LENDERS were associated together for the common purpose of marketing services to the general public for their mutual profit.

135.    This association had a distinct division of labor and was and is organized and maintained by and through a consensual hierarchy of partners, managers, directors, officers, supervisors, and/or representatives from all RICO PERSONS that formulated and implemented policies relative to the advertising and marketing of services to the general public.  It continued as a unit, with a core membership, over a substantial period of time and was an ongoing organization established for an economic motive.  The association in fact remains viable and active at the time of filing of this amended complaint.

136.    This association is and was separate and distinct from the pattern of racketeering activity described in the Complaint in that the association also engaged in conduct unrelated to the racketeering activity and would still exist even if the racketeering

activity did not exist.

137.    The aforementioned enterprise engaged in or affected interstate commerce by using the interstate telephone networks and Internet, interstate telecommunication lines and the United States Mail to advertise and market payday loans, to originate and execute payday loan agreements, to distribute funds and collect payments from persons obtaining these loans, and to engage in debt collection efforts with respect to these loans.

138.    Defendants, acting through the aforementioned enterprise, and during the Class Period and continuing, engaged in the collection of unlawful debt within the meaning of 18 USC § 1961 (6) in that the debt incurred by Plaintiffs and the Class Members is unenforceable under California law because of laws relating to usury including California Constitution, Article 15, Section 1 as well as the requirements of the CDDTL, and the annual percentage rate charged by all the UNLICENSED LENDERS, who are all engaged in the business of lending money, was more than twice the enforceable rate (10%) under California law.  In every instances, the APR on the payday loans obtained by Plaintiffs and the Class Members was more than 100%.

139.    Defendants, acting through the aforementioned enterprise, and during the Class Period and continuing thereafter, engaged in "racketeering activity" within the meaning of 18 USC § 1961 (1) by engaging in the acts set forth herein, aiding and abetting the commission of the foregoing acts, and conspiring to commit the foregoing acts, and directly or indirectly conducting the RICO enterprise's affairs, which constituted numerous violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wife fraud).

140.    18 U.S.C. § 1343 (wire fraud) states in relevant part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

141.    18 U.S.C. § 1341 (mail fraud) states in relevant part: "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . ., for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both."

142.    Plaintiffs allege that the aforementioned activities and/or conduct engaged in by Defendants constituted a "pattern of racketeering activity," as that term is defined in 18 U.S.C. § 1961 (5) in that Defendants committed acts indictable under 18 U.S.C. § 1341 and 18 U.S.C. § 1343, on two or more occasions where Plaintiffs and the Class Members personally lost money as a result of the racketeering activity. The number

of individual violations was more than 40,000.

143.   As a proximate result of Defendants' violations of RICO, Plaintiffs and Class Members have suffered damages and/or injuries to their interests in business and/or property through the payment of sums of money as previously alleged.

144.   Defendants' conduct was intentional, malicious and intended to harm Plaintiffs and the Class Members.  Consequently, Plaintiffs and Class Members are entitled to recover an award of exemplary and punitive damages.

## THIRD CAUSE OF ACTION FOR VIOLATION OF THE UNFAIR COMPETITION LAW AGAINST ALL DEFENDANTS (BROUGHT AS INDIVIDUAL ACTION AND CLASS ACTION) BY PLAINTIFFS

145.   Plaintiffs incorporate in this cause of action the allegations contained in paragraphs 1 through 144, inclusive.

146.   The Unfair Competition Law prohibits any person from engaging in unfair competition as that term is defined in Business and Professions Code § 17200, which includes any "unlawful, unfair or fraudulent business act or practice," "unfair, deceptive, untrue or misleading advertising," and any act prohibited by Chapter 1 (commencing with section 17500) of Part 3 of Division 7 of the Business and Professions Code.

147.   During the Class Period, Defendants violated various sections of the Financial Code as set forth above, which constituted an unlawful business practice.

148.   As a proximate result of the violation of the UCL as set forth above, Plaintiffs suffered injury in fact and sustained monetary loss (hundreds of dollars) according to proof.

149.   Similarly, during the class period, Class Members also lost money as a result of

43

the illegal Deferred Deposit Transactions.

150.     Pursuant to Business and Professions Code § 17203 and § 17204, Plaintiffs are empowered to compel Defendants to restore to Plaintiffs and the Class Members the money or property that the UNLICENSED LENDERS acquired as a result of any act which constitutes unfair competition.

151.     The conduct of Defendants will continue to harm the general public unless it is enjoined.

**FOURTH CAUSE OF ACTION FOR VIOLATION OF THE UNFAIR COMPETITION LAW—FRAUD-- AGAINST DEFENDANTS SELLING SOURCE, LLC, GLEN MCKAY, MONEYMUTUAL, LLC, PARTNER WEEKLY, LLC, JOHN HASHMAN, BRIAN RAUCH, SAMUEL W. HUMPHREYS, DOUGLAS TULLEY AND ALTON F. IRBY III (BROUGHT AS INDIVIDUAL ACTION AND CLASS ACTION) BY PLAINTIFFS[3]**

152.     Plaintiffs incorporate in this cause of action the allegations contained in paragraphs 1 through 151, inclusive.

153.     As previously alleged, the MoneyMutual Defendants and Montel Williams made false, misleading and deceptive statements about the reliability and trustworthiness and legal status of the lenders in the Lending Network including the UNLICENSED LENDERS.  This constituted a fraudulent business practice in violation of the UCL.

154.     As a proximate result of the violation of the UCL as set forth above, Plaintiffs suffered injury in fact and sustained monetary loss (hundreds of dollars) according to proof.

---

[3]Plaintiffs have removed Montel Brian Anthony Williams from this claim in accordance with this Court's order (Doc. 199).

155.    Similarly, during the class period, thousands of Class Members also lost money to Defendants as a result of the violation of the Unfair Competition Law.

156.    Pursuant to Business and Professions Code § 17203 and § 17204, Plaintiffs are empowered to compel Defendants to restore to Plaintiffs and the Class Members the money or property that Defendants acquired as a result of any act which constitutes unfair competition.

157.    The conduct of Defendants will continue to harm the general public unless it is enjoined.

## REQUEST FOR JURY TRIAL

WHEREFORE, Plaintiffs requests trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment on all causes of action against Defendants as follows:

1.  For an order certifying this matter as a class action;

2.  For a declaration of the rights and liabilities of the parties including a declaration that the UNLICENSED LENDERS' payday loans made with the Plaintiffs and Class Members were illegal and that any debt arising from these transactions is void.

3.  For preliminary and permanent injunctive relief pursuant to Financial Code § 23064 and Business and Professions Code § 17203 restraining and enjoining Defendants from continuing the acts of unlawful competition set forth above, requiring Defendants to take any acts needed to prevent further violations, and requiring Defendants to take affirmative measures to redress past wrongdoings;

4.  For an order requiring Defendants to provide an accounting of all moneys which they may have received as a result of the acts and practices found to constitute unfair

competition under Business and Professions Code § 17200;

5. For an order that Defendants identify, locate and make restitution to affected members of the general public, and specifically the members of the Class, and all additional orders necessary to accomplish this purpose, pursuant to Business and Professions Code § 17203;

6. For restitutionary and nonrestitutionary disgorgement of any money obtained by Defendants in connection with the promotion and making of illegal loans

7. For distribution of any moneys recovered on behalf of members of the Class, via fluid recovery or cy pres recovery where necessary to prevent Defendant from retaining the benefits of their wrongful conduct as provided in <u>California</u> v. <u>Levi</u> <u>Strauss</u> <u>& Co</u>. (1986) 41 Cal.3d 460 and <u>People</u> v. <u>Thomas</u> <u>Shelton</u> <u>Powers</u>, <u>M.D.</u> <u>Inc</u>. (1992) 2 Cal.App.4th 330;

8. For compensatory damages on the first cause of action not to be less than the amount paid by Plaintiffs and each Class Member and not to exceed three times any damages;

9. For compensatory damages, said sum to be trebled pursuant to 18 U.S.C. § 1964 (c), on the second cause of action;

10. For punitive or exemplary damages on the first and second causes of action;

11. For prejudgment interest on the sum of money awarded as damages or restitution;

12. For reasonable attorney's fees pursuant to Financial Code § 23064, pursuant to 18 U.S.C. § 1964 (c), pursuant to the Private Attorney General doctrine in Code of Civil Procedure § 1021.5, pursuant to the "common fund" doctrine, and pursuant to the "substantial benefit" doctrine.

13. For costs of suit incurred herein; and

14. For such other and further relief as the court may deem proper.

DATED:  June 17, 2015

Respectfully submitted,

By      _/s/_Jeffrey Wilens_____

JEFFREY WILENS
Attorney for Plaintiffs