1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**LAKESHORE LAW CENTER**
**Jeffrey Wilens, Esq. (State Bar No. 120371)**
**18340 Yorba Linda Blvd., Suite 107-610**
**Yorba Linda, CA 92886**
**714-854-7205**
**714-854-7206 (fax)**
**jeff@lakeshorelaw.org**

**THE SPENCER LAW FIRM**
**Jeffrey P. Spencer, Esq. (State Bar No. 182440)**
**903 Calle Amanecer, Suite 220**
**San Clemente, CA 92673**
**949-240-8595**
**949-240-8515 (fax)**
**jps@spencerlaw.net**

**Attorneys for Plaintiffs**

### UNITED STATES DISTRICT COURT,

### NORTHERN DISTRICT OF CALIFORNIA,

### OAKLAND DIVISION

| | |
|---|---|
| SEAN L. GILBERT, et. al. | ) Case No. CV-13-01171-JSW |
| | ) Complaint filed February 11, 2013 |
| | ) Trial Date: |
| | ) Pre-Trial Date: |
| Plaintiffs, | ) Discovery Cut-Off: |
| | ) |
| v. | ) **Class Action** |
| | ) **PLAINTIFFS' MOTION TO** |
| BANK OF AMERICA, N.A., et. al., | ) **CERTIFY CLASSES, POINTS AND** |
| | ) **AUTHORITIES, DECLARATIONS** |
| | ) **IN SUPPORT THEREOF** |
| | ) |
| | ) Hearing Date: January 8, 2016, 9:00 am |
| | ) Department 5 |
| Defendants. | ) Hon. Jeffrey S. White, District Judge |

TO EACH PARTY AND THEIR ATTORNEY OF RECORD:

PLEASE TAKE NOTICE that on the 8th day of January 2016, at the hour of 9:00 a.m. or as soon thereafter as counsel may be heard in Department 5 of the United States District Court, Northern District of California, 1301 Clay Street, Oakland, California, Plaintiffs Sean L. Gilbert, Keeya Malone, Kimberly Bilbrew and Charmaine B. Aquino will move for an order certifying three classes pursuant to Rule 23.

This motion is directed only against the defendants who are not subject to prior orders of dismissal or stay pending arbitration.  These remaining defendants, who will be referred to generically as "Defendants" are  MoneyMutual, LLC; Selling Source, LLC; Partner Weekly, LLC, Glenn McKay, Brian Rauch, John Hashman, Douglas Tulley, Samuel W. Humphreys, and Alton F. Irby, III and Montel Williams.

Said motion will be made on the grounds set forth in the accompanying memorandum of law.  This motion will be based upon this notice, the points and authorities set forth below, the attached declaration(s), the Compendium of Evidence filed herewith, and the complete files and records in this action.

DATED: December 4, 2015

Respectfully submitted,

By      _/s/_Jeffrey Wilens_____

JEFFREY WILENS
Attorney for Plaintiffs

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................i

TABLE OF AUTHORITIES ..........................................................................ii

SUMMARY OF ARGUMENT .......................................................................1

STATEMENT OF CASE .................................................................................1

   I. LEGAL CLAIMS BROUGHT ON BEHALF OF THE CLASSES. ..............................1

      A. THE CALIFORNIA DEFERRED DEPOSIT TRANSACTION LAW CLAIMS. .........................................................................1

      B. THE RICO CLAIMS. ..........................................................3

      C. THE UCL CLAIMS. ...........................................................4

   II. SIZE AND SCOPE OF THE CLASS. ...............................................4

   III. UNIFORM PRACTICES AND VIOLATIONS. ......................................6

POINTS AND AUTHORITIES ......................................................................7

ARGUMENT ..................................................................................................7

   IV. THE REQUIREMENTS FOR CLASS CERTIFICATION HAVE BEEN MET..........7

      A. THE CLASSES ARE NUMEROUS AND ASCERTAINABLE.............................9

      B. COMMON FACTUAL AND LEGAL ISSUES EXIST.........................................11

      C. PLAINTIFFS' CLAIMS ARE TYPICAL OF THOSE OF THE CLASSES. .........12

      D. PLAINTIFFS AND THEIR COUNSEL ARE ADEQUATE CLASS REPRESENTATIVES. ....................................................12

      E. COMMON FACTUAL AND LEGAL ISSUES PREDOMINATE.......................13

      F. MAINTENANCE OF A CLASS ACTION WILL RESULT IN SUBSTANTIAL BENEFIT TO THE LITIGANTS AND TO THE COURT AND IS THE SUPERIOR METHOD OF RESOLVING THESE CLAIMS........14

CONCLUSION...............................................................................................15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

### Cases

Akaosugi v. Benihana Nat. Corp. (N.D. Cal. 2012) 282 F.R.D. 241 ................................1, 9

Amgen Inc. v. Connecticut Retirement Plans and Trust Funds (2013) 568 U.S. _____, 133 S.Ct. 1184 ........................................................................................................ 9

Armstrong v. Davis (9th Cir. 2001) 275 F.3d 849 ............................................................ 12

Blackie v. Barrack (9th Cir. 1975) 524 F.2d 891 ................................................................ 9

CRLA v. Legal Services Co. (9th Cir. 1990) 917 F2d 1171 ..............................................1, 12

Edwards v. Nat'l Milk Producers Fed'n (N.D. Cal. Sept. 16, 2014) 2014 U.S. Dist. LEXIS 130621 ................................................................................................................ 10

General Tel. Co. of Southwest v. Falcon (1982) 457 US 147 ..........................................1, 12

Hanlon v. Chrysler Corp. (9th Cir. 1998) 150 F.3d 1011 ........................................11, 12, 13

Hofstetter v. Chase Home Finance, LLC (N.D. Cal., Mar. 31, 2011, C 10-01313 WHA) 2011 WL 1225900 .......................................................................................................... 9

In re Cathode Ray Tube (CRT) Antitrust Litig. (N.D.Cal. 2015) 308 F.R.D. 606 .............. 8

Lerwill v. Inflight Motion Picture, Inc. (9th Cir. 1978) 582 F.2d 507 ...........................1, 13

Leyva v. Medline Industries Inc. (9th Cir. 2013) 716 F.3d 510 ........................................ 14

McAdams v. Monier, Inc. (2010) 182 Cal.App.4th 174....................................................... 14

Rosario v. Livaditis (7th Cir. 1992) 963 F.2d 1013 ........................................................... 11

Staton v. Boeing Co. (9th Cir. 2003) 327 F.3d 938 ............................................................ 11

Stearns v. Ticketmaster Corp. (9th Cir. 2011) 655 F.3d 1013 ............................................ 14

Vietnam Veterans of America v. C.I.A. (N.D. Cal. 2012) 288 F.R.D. 192 ........................ 10

Wolph v. Acer Am. Corp. (N.D.Cal. 2011) 272 F.R.D. 477.................................. 9, 10, 13, 15

Zeisel v. Diamond Foods, Inc. (N.D. Cal. June 7, 2011) 2011 U.S. Dist. LEXIS 606089, 10

Zinser v. Accufix Research Institute, Inc. (9th Cir. 2001) 253 F.3d 1180 ..................... 1, 15

### Statutes

18 USC § 1961 ...................................................................................................................... 4

18 USC § 1962 ................................................................................................................. 3

Financial Code § 23005 ................................................................................................ 1

Financial Code § 23060 ................................................................................................ 3

Financial Code § 23064 ................................................................................................ 3

PLAINTIFF'S MOTION TO CERTIFY CLASS—13-CV-1171-JSW

1

2

## SUMMARY OF ARGUMENT

3

The Defendants are accused of working with payday lenders to advertise,

4

promote and make illegal loans to California residents.  Plaintiffs bring claims on behalf

5

of themselves and similarly situated California residents for 1) Violation of the California

6

Deferred Deposit Transaction Law; 2) Violation of RICO; 3) Violations of the Unfair

7

Competition Law (UCL) based on "unlawful" conduct; and 4) Violation of the Unfair

8

Competition Law based on "fraudulent" conduct.  Specifically the role of the Defendants

9

was to promote the benefits of payday loans, market the loans through aggressive

10

advertising, including on the www.moneymutual.com website, and "hook up" potential

11

borrowers with the lenders through an interface on Defendants' websites, all in

12

exchange for a fee of as much as $200 per referral.  The Fourth Amended Complaint

13

explains in detail why the loans were illegal.

14

The requirements for class certification are met.  The class is numerous and the

15

identity of the class members is ascertainable from Defendants' own records.  (Rule 23

16

(a) (1); Akaosugi v. Benihana Nat. Corp. (N.D. Cal. 2012) 282 F.R.D. 241, 253; Wolph v.

17

Acer Am. Corp. (N.D.Cal. 2011) 272 F.R.D. 477, 481.)  What happened to Plaintiffs was

18

typical of what happened to many thousands of other consumers—they used one of

19

Defendants' websites to obtain a payday loan from an illegal lender.  (General Tel. Co. of

20

Southwest v. Falcon (1982) 457 US 147, 156; CRLA v. Legal Services Co. (9th Cir. 1990)

21

917 F2d 1171, 1175.)  Plaintiffs and counsel are adequate class representatives.  (Lerwill

22

v. Inflight Motion Picture, Inc. (9th Cir. 1978) 582 F.2d 507, 512.) The predominating

23

legal issue is common to all Class Members—did Defendants assist illegal lenders in

24

offering or making loans.  (Deitz v. Comcast Corp., supra, 2007 WL 2015440, *6.)

25

Finally, due to the modest recoveries for individual damages and the lack of meaningful

26

alternatives, and the fact liability turns on resolution of a complex legal question, only a

27

class action can provide the relief to which thousands of California consumers are

28

entitled. (Zinser v. Accufix Research Institute, Inc. (9th Cir. 2001) 253 F.3d 1180, 1190.)

1

**STATEMENT OF CASE**

**I.     LEGAL CLAIMS BROUGHT ON BEHALF OF THE CLASSES.**

Plaintiffs bring this class action against Defendants, who promote payday loans through various Internet websites. Plaintiffs bring claims on behalf of themselves and similarly situated California residents for 1) Violation of the California Deferred Deposit Transaction Law; 2) Violation of RICO; 3) Violations of the Unfair Competition Law (UCL) based on "unlawful" conduct; and 4) Violation of the Unfair Competition Law based on "fraudulent" conduct.

**A.     THE CALIFORNIA DEFERRED DEPOSIT TRANSACTION LAW.**

The CDDTL or payday loan law governs the offering and making of payday loans to California residents.  Financial Code § 23005 (a) provides:

> No person shall **offer**, originate, or make a deferred deposit transaction, arrange a deferred deposit transaction for a deferred deposit originator, act as an agent for a deferred deposit originator, or **assist a deferred deposit originator in the origination of a deferred deposit transaction** without first obtaining a license from the commissioner. . . .(emphasis added)

During the Class Period, Defendants aggressively marketed, promoted and facilitated the making of payday loans by unlicensed lenders ("deferred deposit originators") to California residents.  Selling Source obtained leads in part by creating branded websites.  One of the branded websites was www.moneymutual.com. (4AC, ¶¶ 42, 59-62, 67-73) The MoneyMutual website prominently boasted about Defendants' "network" of payday lenders.  The website explained what a payday loan is, the benefits of a payday loan, how easy it was to get a payday loan from Defendants' lending network, and assured consumers that lenders on the network were required to adhere to a Code of Lender Conduct.  The Code prohibited lenders from misusing consumer's personal information and engaging in abusive collection practices or violating any applicable debt collection laws.  Defendants assured consumers that all lenders in the network were routinely monitored for compliance and terminated if violations were found.  (4AC, ¶¶ 101-105.)  In addition, Defendants used television celebrity Montel Williams to promote the payday

1

lending services available on the MoneyMutual website.  He repeatedly assured consumers they could trust the lenders in the lending network, and personally vouched for the lending network as the only source consumer could trust to find payday loans.  (4AC, ¶¶ 108-112.)

Notwithstanding these assurances, Defendants knew many lenders were not licensed and therefore operating illegally by offering loans to California residents.  Defendants also knew many states, including California, issued cease and desist orders against these illegal lenders during the class period.  Defendants did not suspend or terminate any lenders due to this illegality.  Defendants continued to recommend these lenders to consumers and never disclosed the lenders' illegal status.  (4AC, ¶¶ 114-117.)

In allowing these illegal lenders to join the Lending Network and in recommending the services of these illegal lenders to consumers, and in concealing the illegal status of the lenders, and by representing they were in compliance with all applicable laws, Defendants intended to provide and did provide substantial assistance and encouragement to the illegal lenders.  They did so knowingly because the lenders paid Defendants a significant amount of money, often between $100 and $170 per accepted lead.  Therefore, Defendants intended to have the MoneyMutual website lend an aura of respectability and further encourage consumers to take loans from the illegal lenders in the Lending Network.  (4AC, ¶¶ 118-119)

The payday lenders signed marketing contracts with Defendants.  The contracts specified how much money would be paid for referral of each potential borrower who met the lender's requirements with respect to state of residence and certain financial parameters and whose online application was forwarded to the lender.  The money for leads was paid whether a loan was ultimately made to the California resident or not.  (4AC, ¶¶ 72-73.)

During the class period, approximately 112 lenders in Defendants' lending network were never licensed.  (4AC, ¶ 41.) During the class period, each of the Plaintiffs obtained and paid money on payday loans from some lenders in the lending network.  (4AC, ¶¶ 51-54.)  Plaintiff Gilbert submitted an online application through the MoneyMutual.com website to obtain a payday loan from unlicensed lender Cash Yes.  (Gilbert Declaration, ¶¶ 2-3; Exhibit 9.) Plaintiff

2

Bilbrew submitted applications at the MoneyMutual.com website to obtain payday loans from unlicensed lenders Cash Yes, 7x Services, LLC aka Castle Payday and My Quick Funds. (Bilbrew Declaration, ¶¶ 2, 4, 5; Exhibit 10.)   Plaintiff Malone used the MoneyMutual.com website to obtain a payday loan from unlicensed lender Bottom Dollar Payday and also applied for a loan with Cash Yes.  (Malone Declaration, ¶¶ 2, 3, 8.; Exhibit 12.) Plaintiff Aquino used other websites controlled by Defendants to submit applications for payday loans from unlicensed lenders Liquid Ventures, Devwire Consulting, Vista B and Vivus Servicing.   (Aquino Declaration, ¶¶ 3-5; Exhibits 13, 14.)

If these facts are proven at trial, the loans would be void and the lenders would not be entitled to repayment of principal or interest.  (Financial Code § 23060.)  Moreover, Defendants will be liable for violating Financial Code § 23005 insofar as they provided "assistance" in the offering or origination of a payday loan.  Financial Code § 23064 allows Plaintiffs to recover damages not less than the amount paid on the loans, treble damages, punitive damages, and disgorgement of money earned through the illegal scheme.  The Court already ruled that Plaintiff alleged sufficient facts to show their injuries were caused by the Defendants' conduct.  (Doc. 131, p. 6:2-7.)

**B.     THE RICO CLAIMS.**

The elements of the civil RICO claim are as follows:  1) Defendants were employed by or associated with an enterprise; 2) the enterprise was engaged or participated in collection of unlawful debt; 3) these actions damaged the plaintiff.  (18 USC § 1962 (c).)  The complaint identifies the "enterprise" as an unnamed entity constituting an "association in fact" and comprised of each of the Defendants as well as the illegal lenders, and in particular Cash Yes and the lenders owned by Rare Moon Media.  (4AC, ¶¶ 134, 74-99.)

The collection of unlawful debt includes the making of illegal loans and withdrawal of funds from consumer accounts to repay the loans.  Unlawful debt is defined to include a debt which is unenforceable under state laws related to usury where the usurious rate was at least

twice the enforceable rate.   (18 USC § 1961 (6).)   Here, the maximum interest rate under California law is 10% but the loans made to Plaintiffs and the Class Members had APR's of over 100%.  (4AC, ¶ 138; Exhibits 9-10, 12-14.)

The Plaintiffs and class members all suffered damages because they paid money on the loans referred by Defendants.   (4AC, ¶¶ 51-54, 142-143.)   The Court already rejected Defendants' argument that Plaintiffs did not suffer injury due to the lack of licensing.  It was not the lack of licensing alone but the fact the lack of licensing made the loans void, meaning the borrowers were not obligated to pay anything back on the loans.   Hence, when the lenders withdrew money from the borrower's bank accounts they lost money as a result of the illegal lending enterprise.  (Doc. 131, p. 7:3-10.)

### C.      THE UCL CLAIMS.

The UCL prohibits a business from committing unlawful, unfair or deceptive acts.  One of the UCL claims is for unlawful business practices—Defendants' practice of assisting illegal lenders make loans was an unlawful business practice.  This cause of action piggybacks on the CDDTL claim.   The other UCL claim is for deceptive business practices and focuses on the misrepresentations by Defendants on the moneymutual.com website.  In previous rulings, the Court found that some of the representations on the website were actionable as fraud (i.e., that lenders were prohibited from misusing borrower's personal information or using illegal collection methods) and others were mere puffery (i.e., that the lending network was trustworthy and reliable).  (Doc. 199, pp. 3:26-7:2; Doc. 213, p. 3:21-27.)[1]

## II.      SIZE AND SCOPE OF THE CLASS.

As explained in greater detail below, Plaintiffs move to certify a Main Class and two Subclasses against these Defendants.  The Main Class is California residents who applied for a payday loan from certain unlicensed lenders using one of Defendants' affiliated websites.  There

---

[1]The Court also ruled that while statements amounting to puffery may not be actionable as fraud, but they could be evidence of aiding and abetting the illegal lenders.

are subclasses of those persons who actually received a payday loan either using the MoneyMutual website or another Selling Source website.

    As noted above, Plaintiffs have already identified 112 unlicensed lenders who were part of Defendants' lending network.  (4AC, ¶ 41.)  This information was obtained from Defendants' records and by referencing a website maintained by the State of California, Department of Business Oversight (formerly Department of Corporations). (Wilens Declaration, ¶ 2; Exhibit 7.)

    Whether a California borrower was referred to the payday lenders through the MoneyMutual website or through another website affiliated with Selling Source, the Defendants maintained records of the date of the loan application, the name and address of each applicant, the website accessed by the consumer to submit the online application, the identity of the lender who was sent the online application (lead), and how much money the lender paid to Defendants for the lead.  Defendants have produced electronic spreadsheets containing the foregoing information.  A one page exemplar, with some of the columns of information reflecting name and contact information for the customer hidden, is attached as Exhibit 2.  Because the spreadsheets include information about other lenders not pertinent to this lawsuit, Plaintiffs' counsel has used the "filter" command to display only the leads to relevant lenders.  There are more than 200,000 pages of these spreadsheets.  (Wilens Declaration, ¶ 3.)

    According to these spreadsheets, between September 2009 and January 23, 2015, many hundreds of thousands of leads were sold by Defendants to the relevant lenders.  While some class members are identified multiple times in the lists (because over a period of time they obtained more than one loan through Defendants' marketing efforts), there are at least 100,000 unique class members.  Put another way, look at just seven of the largest lenders:  Cash Yes, VIP Loan Shop, Everest Cash Advance, Bottom Dollar Payday, Integrity Payday, Action Payday and My Quick Funds.  Between September 24, 2009 and January 23, 2015, there were 56,769 leads sold by the MoneyMutual Defendants to these seven lenders.  In looking at just 2012 loans and just considering these seven lenders, there were 16,220 transactions of which 8,493 were referred through MoneyMutual website while the rest were initiated through other Selling Source

websites.  (Wilens Declaration, ¶ 4.)

These spreadsheets also reflect how much money was paid to Defendants for each sold lead.  For example, looking at the records pertaining to Kimberly Bilbrew, Defendants were paid $200 for the lead sold to 7x Services on January 30, 2013, $170 for the lead to Cash Yes on February 4, 2013, and $140 for the lead to My Quick Funds on April 1, 2013.  The total amounts paid to Defendants on all of the loans made to Plaintiffs through Defendants' websites were $170 for Gilbert, $360 for Aquino, $280 for Malone and $510 for Bilbrew.  (Wilens Declaration, ¶ 5.)

Looking at just the seven lenders referenced above, Defendants' records reflect they were paid approximately $8,000,000 by the seven lenders for leads on payday loans between September 1, 2009 and January 2015.  Plaintiffs did not make the same calculation for all 113 lenders but the amount paid would obviously be much higher.  Put another way, just looking at leads sold in 2012 to virtually all of the 113 lenders, the total paid to Defendants was $9,256,276. (Wilens Declaration, ¶ 6.)

### III.    UNIFORM PRACTICES AND VIOLATIONS.

Defendants had a uniform practice for marketing the payday loans to unlicensed lenders targeting California residents.  (Wilens Declaration, ¶ 7; Exhibit 5.)

During the class period, the State of California enforced a clear law—online lenders making loans to California residents are required to have a license issued by the State of California.  This requirement was publicized by the State of California in official notices throughout the class period 2009-2015.     (Wilens Declaration, ¶ 8; Exhibit 8, pp. 3, 7, 9, 10.) This policy was enforced in numerous cease and desist orders, such as those in Exhibit 6. Many of these lenders are in Defendants' lending network.  (Wilens Declaration, ¶ 9; Exhibit 6.) These cease and desist orders can be easily found by doing an Internet search under the lenders' names.  (Wilens Declaration, ¶ 10.)

Defendants did <u>not</u> require any lenders in their lending network to produce proof of licensing until September 2013.  There was no concern for whether the lending was legal or not.

Even after that date, lenders based in foreign countries were not required to present proof they had the license required to make loans to California residents. (Wilens Declaration, ¶ 11; Exhibit 3, pp. 2-3, 6.)

Glenn McKay, the President of Selling Source and a member of the Board of Directors, testified but was evasive. Asked whether Defendants discussed among themselves the practice of selling leads to illegal lenders, he asserted attorney-client privilege. (Wilens Declaration, ¶ 12; Exhibit 4, pp. 38:24-39:5, 59:19-60:6, 97:17-25, 110:20-21.) However, ultimately he admitted that Defendants' official policy was to recommend and market any payday lender whether the lender was legally or illegally making loans to California residents. Speaking for Defendants, McKay explained it was "not their responsibility" to enforce the law. In fact, the major concern was whether the lenders would be able to pay the fees owed for the payday loan leads. (Exhibit 4, pp. 75:9-80:1, p. 161:5-9, pp. 197:24-198:24, 202:22-203:1, p. 208:19-24.)

This cavalier, even reckless attitude toward California residents, was further manifested in Defendants' "monitoring" of the lenders' activities. Defendants did not monitor regarding the lack of licensing and ignored the dozens of cease and desist orders that were issued against lenders in their network because it was "not our responsibility." No lender was ever suspended or terminated except for nonpayment. (Exhibit 4, pp. 193:22-194:15; Exhibit 3, pp. 4-5.)

## POINTS AND AUTHORITIES

## ARGUMENT

## IV.     THE REQUIREMENTS FOR CLASS CERTIFICATION HAVE BEEN MET.

By this motion, Plaintiff seeks certification of a Main Class comprising:

> All California residents listed in a spreadsheet produced by Defendants as being persons **who applied for a payday loan** from an UNLICENSED LENDER on or after February 11, 2009 using any website affiliated with or in response to an email from Selling Source, LLC or one of its subsidiaries.[2] (See proposed Fifth Amended Complaint, ¶ 23.)

[2] Loans made by tribal lenders are excluded from all class definitions.

7

The Selling Source subclass is comprised of:

> All California residents who **received** a "payday loan" from an UNLICENSED LENDER on or after February 11, 2009 by using any website affiliated with or in response to an email from Selling Source, LLC or one of its subsidiaries. (4AC, ¶ 20.)

The MoneyMutual subclass is comprised of:

> All California residents who **received** a "payday loan" from an UNLICENSED LENDER on or after February 11, 2009 by using the MoneyMutual website. (4AC, ¶ 21.)

The class definitions deviate slightly from those proposed in the 4AC. Both of the subclasses were present but the Main Class been reformulated to apply to everyone who applied for a loan through Defendants' websites.

There is a split of authority in the Ninth Circuit whether a district court is bound to the class definitions provided in the complaint, absent a motion to amend. (See, e.g., In re Cathode Ray Tube (CRT) Antitrust Litig. (N.D.Cal. 2015) 308 F.R.D. 606, 619 (certifying a class despite a deviation from the pled definition).) Although a motion to amend is not necessary, Plaintiffs are concurrently filing one. For the reasons stated therein, there is no prejudice to Defendants in deciding class certification based on the foregoing definitions. (Wilens Declaration, ¶ 13.) Therefore, the Court should consider the revised class definitions without formal amendment.

To certify a class, Plaintiffs must present evidence that all of the requirements of Rule 23 (a) have been met and that the requirements of at least one of the subdivisions of Rule 23 (b) have been met. Plaintiffs seeks to certify this matter under Rule 23 (b) (3). Under Rule 23 (a), the requirements are: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Under Rule 23 (b) (3), Plaintiffs must also show that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is

superior to other available methods for fairly and efficiently adjudicating the controversy."  As discussed in detail below, all of these requirements have been met.

In <u>Amgen</u> <u>Inc</u>. v. <u>Connecticut</u> <u>Retirement</u> <u>Plans</u> <u>and</u> <u>Trust</u> <u>Funds</u> (2013) 568 U.S. ____, 133 S.Ct. 1184, 1194-95, the United States Supreme Court reaffirmed the question of certification is essentially a procedural one that does not ask whether an action is legally or factually meritorious.  Thus, "neither the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class. . . ." (<u>Blackie</u> v. <u>Barrack</u> (9th Cir. 1975) 524 F.2d 891, 901.)  Moreover, "the allegations in the complaint are accepted as true so long as those allegations are sufficiently specific to permit an informed assessment as to whether the requirements of Rule 23 have been satisfied."  (<u>Hofstetter</u> v. <u>Chase</u> <u>Home</u> <u>Finance</u>, <u>LLC</u> (N.D. Cal., Mar. 31, 2011, C 10-01313 WHA) 2011 WL 1225900, *6 (citations omitted); <u>Wolph</u> v. <u>Acer</u> <u>Am</u>. <u>Corp.</u> (N.D.Cal. 2011) 272 F.R.D. 477, 481.)

### A.     THE CLASSES ARE NUMEROUS AND ASCERTAINABLE.

Rule 23 (a) (1) requires a showing that "the class is so numerous that joinder of all members is impracticable."  The defined classes would number in the many thousands, probably over 100,000.  The Northern District has previously held that the "numerosity requirement is not tied to any fixed numerical threshold, but courts generally find the numerosity requirement satisfied when a class includes at least forty members."  (<u>Akaosugi</u> v. <u>Benihana</u> <u>Nat</u>. <u>Corp.</u> (N.D. Cal. 2012) 282 F.R.D. 241, 253.)  The numerosity requirement is easily met here.  Even if the classes were limited to consumers who obtained loans from seven lenders, only from one of the websites (MoneyMutual), and only during one of the years of the class period, there would still be thousands of class members. (See e.g., <u>Zeisel</u> v. <u>Diamond</u> <u>Foods</u>, <u>Inc</u> (N.D. Cal. June 7, 2011) 2011 U.S. Dist. LEXIS 60608, *23, 2011 WL 2221113 (court could infer from potential number of sales that there were thousands of class members who bought the relevant product).)

Defendants may argue that while the proposed classes are numerous in size, they are not

ascertainable.  This Court has previously explained: "As a threshold matter, and apart from the explicit requirements of Rule 23(a), the party seeking class certification must demonstrate that an identifiable and ascertainable class exists."  (Wolph v. Acer Am. Corp., supra, 272 F.R.D. at p. 489.) "The class definition must be sufficiently definite so that it is administratively feasible to determine whether a particular person is a class member."  (Id.)

Defendants may argue that the previously-referenced spreadsheets merely identify loan applicants that meet certain requirements, but some of the loans were never funded.  However, membership in the Main Class does not turn on whether loan funds were actually obtained.  With respect to membership in the subclasses, the majority of leads most likely resulted in consummated loans. (Wilens Declaration, ¶ 14.)  So leads are a good proxy for originated loans.  However, we do not need at this point to prove class members actually obtained the loans.

The proposed class definitions are objective not subjective or imprecise and that is all that is required at this point.  "A class is ascertainable if it identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover based on the description." (Vietnam Veterans of America v. C.I.A. (N.D. Cal. 2012) 288 F.R.D. 192, 211 (citation omitted).)  For example, in Zeisel v. Diamond Foods, Inc., supra, 2011 U.S. Dist. LEXIS 60608, *20-21, the defendant argued a class of walnut purchasers was not administratively feasible because it did not track purchasers and consumers would be unlikely to remember which particular nuts they bought.  This Court rejected that argument.  It held that class members would be able to identify themselves as members of the proposed class by referring to the objective characteristics described in the class definition.  (Id.; Edwards v. Nat'l Milk Producers Fed'n (N.D. Cal. Sept. 16, 2014) 2014 U.S. Dist. LEXIS 130621, *9-10 (potential class members could identify themselves from information provided about dates of transactions and brand of product).)

So it is in the instant case as well.  Main Class members are identified from Defendants' own records.  Most of those persons will also be subclass members.  Once notified of class certification, they will be able to state whether the lead in question resulted in a funded loan.

10

Moreover, not all subclass members would be required to self-identify.  Plaintiffs anticipate that in many instances it will be possible to cross-check the lists of potential borrowers provided by Defendants with a list of actual borrowers that can be obtained from some of the largest lenders. (4AC, ¶¶ 78, 95, Wilens Declaration, ¶ 15.)   Cash Yes has already provided a declaration confirming that they could identify which persons on the spreadsheets provided by the Defendants received funded loans and how much was paid by the borrowers.  (Declaration of Cherilyn Rodriguez, ¶¶ 7-8.)  The same information was requested for six lenders controlled by Rare Moon, who confirmed they could provide the information but have not agreed to do so.  A motion to compel compliance with a deposition subpoena in currently pending ruling in the Kansas District Court.  (Wilens Declaration, ¶ 16.)

### B.      COMMON FACTUAL AND LEGAL ISSUES EXIST.

A class has sufficient commonality under Rule 23(a)(2) if "there are questions of law or fact common to the class." "The fact that there is some factual variation among the class grievances will not defeat a class action. . .A common nucleus of operative facts is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." (Rosario v. Livaditis (7th Cir. 1992) 963 F.2d 1013, 1017-1018.)   The common question requirement can be satisfied by a shared legal issue with divergent factual predicates or by a common core of salient facts with disparate legal remedies.  (Staton v. Boeing Co. (9th Cir. 2003) 327 F.3d 938, 953; Hanlon v. Chrysler Corp. (9th Cir. 1998) 150 F.3d 1011, 1019.)

Both shared legal issues and a common core of salient facts are present.  The shared legal issues are 1) whether the online lenders promoted through Defendants' lending network were required to be licensed to make loans to California residents and 2) whether Defendants' marketing and promoting these lenders constituted "assistance" in offering or  originating loans or was "deceptive" within the meaning of the UCL.  Both of these questions of law can be resolved on a classwide basis.

The common core of salient facts include: 1) each class member applied for a payday

loan through Defendants' lending network or a website controlled by Defendants; 2) Defendants advertised the payday loans but did not care whether the lenders were licensed and thus legally able to make loans to California residents; 3) the lenders' illegal activities were publicized on the Internet and readily available to Defendants during the class period; 4) Defendants were paid up to $200 for each loan application that was forwarded to the lenders even if the loans were never funded; 5) Defendants made specific uniform representations on the MoneyMutual website that would induce a reasonable consumer to rely on it to obtain a loan; 6) Virtually all of the borrowers who used Defendants' network had money illegally withdrawn from their bank accounts by the lenders, which was a debt collection violation.  There is an ample showing the commonality requirement has been met.

### C.    PLAINTIFFS' CLAIMS ARE TYPICAL OF THOSE OF THE CLASSES.

The claims of the class representative must be typical of but need not be identical to the claims of the class. The class representative "must be part of the class and possess the same interest and suffer the same injury as the class members." (<u>General</u> <u>Tel.</u> <u>Co.</u> <u>of</u> <u>Southwest</u> v. <u>Falcon</u> (1982) 457 US 147, 156; <u>CRLA</u> v. <u>Legal</u> <u>Services</u> <u>Co.</u> (9th Cir. 1990) 917 F2d 1171, 1175.)  "[R]epresentative claims are 'typical' if they are reasonably coextensive with those of absent class members, they need not be substantially identical." (<u>Hanlon</u>, <u>supra</u>, 150 F.3d at 1020.) Typicality is "satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." <u>Armstrong</u> v. <u>Davis</u> (9th Cir. 2001) 275 F.3d 849, 868.)  Plaintiffs all applied for and received payday loans through Defendants' lending network and make the same claims as do the other class members.  Typicality has been demonstrated.

### D.    PLAINTIFFS AND THEIR COUNSEL ARE ADEQUATE CLASS REPRESENTATIVES.

The requirement of fair representation involves two factors.   "First, the named representatives must appear able to prosecute the action vigorously through qualified counsel,

PLAINTIFFS' MOTION TO CERTIFY CLASS--CV-13-01171-JSW

and second, the representatives must not have antagonistic or conflicting interests with the unnamed members of the class." (Lerwill v. Inflight Motion Picture, Inc. (9th Cir. 1978) 582 F.2d 507, 512.)   The inquiry whether the class representative will adequately represent the class focuses on two questions: 1) whether the class representative and its counsel have any conflicts of interest with the class members, and 2) whether the class representative and its counsel will vigorously prosecute the action for the class. (Hanlon, supra, 150 F.3d at p. 1020.)

Plaintiffs' counsel are well qualified based upon their academic credentials and many years of class action experience.  Numerous courts, including the Alameda County Superior Court, where this case was originally filed, have approved them to serve as class counsel. (Wilens Declaration, ¶¶ 18-37; Spencer Declaration, ¶¶ 3-29.) The proposed class representatives have no interests antagonistic to the other class members and desire to serve their interests.  They have actively protected the interests of the classes by hiring legal counsel to sue and are committed to litigating this case for the classes.    (Gilbert Declaration, ¶¶ 12-19; Bilbrew Declaration, ¶¶ 14-21; Malone Declaration, ¶¶ 14-18; Aquino Declaration, ¶¶ 9-15.)

**E.      COMMON FACTUAL AND LEGAL ISSUES PREDOMINATE.**

Under Rule 23 (b) (3), a plaintiff must demonstrate that questions of law or fact common to the class members "predominate over any questions affecting only individual members" and that a class action is "superior to other available methods for the fair and efficient adjudication of the controversy."  As the Northern District has previously explained, in considering the question of predominance, the court must "identify the substantive issues raised by each cause of action and then inquire into the proof relevant to each issue."  (Deitz v. Comcast Corp., supra, 2007 WL 2015440, *6.)  This Court has previously explained plaintiffs need only demonstrate "there are plausible classwide methods of proof available to prove their claims.  (Wolph v. Acer Am. Corp., supra, 272 F.R.D. at p. 487 (citation omitted).)

Plaintiffs can prove liability on a classwide basis with no significant individualized issues.  Common evidence will show that Defendants operated a lending network comprised of

many unlicensed lenders, aggressively marketed those lenders to California residents, made false statements about the lenders on the MoneyMutual website, and were paid a significant fee for each completed loan application even if the loan never funded.  This is sufficient to establish classwide liability on the CDDTL, RICO and UCL (unlawfulness) claims without any consideration of the class members' state of mind. As for the fourth claim for UCL deception, while the named Plaintiffs must ultimately prove reliance, individual class members do not have to prove they relied upon the MoneyMutual website misrepresentations in taking out the loans. (See, e.g., McAdams v. Monier, Inc. (2010) 182 Cal.App.4th 174, 192 ("individualized proof of reliance and injury is not required for nonrepresentative class members").)

Finally, Defendants may argue individual damages may vary from class member to class member.  However, the amount of damages is invariably an individual question that does not defeat class certification.  (Stearns v. Ticketmaster Corp. (9th Cir. 2011) 655 F.3d 1013, 1026; Leyva v. Medline Industries Inc. (9th Cir. 2013) 716 F.3d 510, 514.)  Member of the Main Class will be entitled to disgorgement of the money Defendants obtained by selling their loan applications to the illegal lenders and possibly punitive damages.  The amounts to be disgorged are reflected in Defendants' records.  The subclass members will be entitled to reimbursement of loan payments they made, trebled under the CDDTL and RICO.  The amounts will be documented in the records of the payday lenders or can be supplied by the class members who make claims.  Therefore, common questions predominate over individual questions.

F.    **MAINTENANCE OF A CLASS ACTION WILL RESULT IN SUBSTANTIAL BENEFIT TO THE LITIGANTS AND TO THE COURT AND IS THE SUPERIOR METHOD OF RESOLVING THESE CLAIMS.**

In deciding whether a class action would be superior to individual lawsuits, the court will usually consider four factors set forth in Rule 23 (b) (3).  The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the

14

1   litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class

2   action. All of these factors militate in favor of certifying a class.  (See also, <u>Wolph</u> v. <u>Acer</u> <u>Am</u>.

3   <u>Corp</u>., <u>supra</u>, 272 F.R.D. at p. 488.)

4          Regarding points (A) and (C), it would not be very practical to bring individual lawsuits

5   to challenge the payday loans.  Many thousands of individual lawsuits would be required, and

6   typical payday loan customers would lack the resources or knowledge to bring claims under

7   complicated laws like the CDDTL and RICO.  Moreover, individual damages will likely be

8   modest even if loan payments are trebled and recovered as damages.  "Where damages suffered

9   by each putative class member are not large, this factor weighs in favor of certifying a class

10  action." (<u>Zinser</u> v. <u>Accufix</u> <u>Research</u> <u>Institute</u>, <u>Inc</u>., <u>supra</u>, 253 F.3d at p. 1190.)   Since the

11  proposed class is limited to California residents, it makes sense to concentrate litigation here.

12          Regarding point (B), the only other lawsuit pending against Defendants in California is a

13  related class action in state court that would presumably be stayed.  (Wilens Declaration, ¶ 17.)

14  Finally, regarding point (D), no significant management difficulties are foreseen.  Legal rulings

15  will probably determine whether loans by unlicensed lenders are illegal and the jury will resolve

16  a factual question whether Defendants assisted in the offering or origination of illegal loans.

17  This plan is much more manageable than thousands of lawsuits for under $1,000.  This Court has

18  ruled that manageability concerns must be weighed against the alternatives and will rarely, by

19  itself, be sufficient to deny certification.  (<u>Zeisel</u> v. <u>Diamond</u> <u>Foods</u>, <u>Inc</u>., <u>supra</u>, 2011 U.S. Dist.

20  LEXIS 60608, *36-37, 2011 WL 2221113.)

21                                    <u>**CONCLUSION**</u>

22          Plaintiffs respectfully urge the Court to grant the motion to certify classes.

23  DATED: December 4, 2015

24

25                          Respectfully submitted,
                            By      _/s/_Jeffrey Wilens_____

26

27                          JEFFREY WILENS
                            Attorney for Plaintiffs

28