Case 4:13-cv-01171-JSW  Document 228-4  Filed 12/04/15  Page 1 of 31

DOUGLAS GLENN MCKAY  Non-Confidential Portion                    April 07, 2015
DINAH PHAM vs. JPMORGAN CHASE BANK                                          1

1            ALAMEDA COUNTY SUPERIOR COURT, STATE OF

2      CALIFORNIA (Unlimited Civil), Administration Building,

3            1221 Oak Street, Oakland, California 94612

4

5    DINAH PHAM, et al.,              ) CASE NO.: RG12652919
                                      )
6                    Plaintiffs,      )
                                      )
7       vs.                           )
                                      )
8    JPMORGAN CHASE BANK, N.A.,       )
     et al.,                          )
9                                     )
                     Defendants.      )
10   _____)

11

12

13

14

15

16             DEPOSITION OF DOUGLAS GLENN McKAY

17                 SAN FRANCISCO, CALIFORNIA

18                     APRIL 7, 2015

19

20

21

22

23

24

25   REPORTED BY:  MICHAEL CUNDY, CSR 12271

EXHIBIT 4: TRANSCRIPT OF DEPOSITION OF GLENN MCKAY

Case 4:13-cv-01171-JSW  Document 228-4  Filed 12/04/15  Page 2 of 31

DOUGLAS GLENN MCKAY  Non-Confidential Portion                    April 07, 2015
DINAH PHAM vs. JPMORGAN CHASE BANK                                            2

1          DEPOSITION OF DOUGLAS GLENN McKAY, taken at

2    One Maritime Plaza, Suite 1925, San Francisco, California,

3    on Tuesday, April 7, 2015, at 10:04 A.M., before Michael

4    Cundy, Certified Shorthand Reporter, in and for the State

5    of California.

6

7    APPEARANCES:

8    FOR THE PLAINTIFFS:

9              LAKESHORE LAW CENTER
               BY:  JEFFREY WILENS, ESQ.
10             18340 Yorba Linda Boulevard
               Suite 107-610
11             Yorba Linda, California 92886
               (714) 854-7205
12             jeff@lakeshorelaw.org

13   FOR THE DEFENDANTS, MONEYMUTUAL, LLC; MONTEL WILLIAMS;
     SELLING SOURCE, LLC; GLENN McKAY; LONDON BAY CAPITAL, LLC;
14   TSS ACQUISITION COMPANY, LLC; PARTNER WEEKLY, LLC; JOHN
     HASHMAN; AND BRIAN RAUCH:

15

16             PUTTERMAN LOGAN LLP
               BY:  DONALD J. PUTTERMAN, ESQ.
               One Maritime Plaza
17             300 Clay Street
               Suite 1925
18             San Francisco, California 94111
               (415) 839-8779
19             dputterman@plglawyers.com

20

21

22

23

24

25

EXHIBIT 4: TRANSCRIPT OF DEPOSITION OF GLENN MCKAY

Case 4:13-cv-01171-JSW  Document 228-4  Filed 12/04/15  Page 3 of 31

DOUGLAS GLENN MCKAY  Non-Confidential Portion                April 07, 2015
DINAH PHAM vs. JPMORGAN CHASE BANK                                        3

```
 1                        I N D E X

 2

 3    WITNESS:   Douglas Glenn McKay

 4

 5    EXAMINATION:                                 PAGE

 6    By Mr. Wilens                                   4

 7

 8

 9                     INDEX OF EXHIBITS

10    EXHIBITS                                     MARKED

11    Exhibit 1    Miscellaneous documents           185

12

13

14

15    QUESTIONS MARKED FOR MR. WILENS:

16              PAGE    LINE

17              252     12

18              252     25

19

20

21

22

23

24

25
```

EXHIBIT 4: TRANSCRIPT OF DEPOSITION OF GLENN MCKAY

```
 1            SAN FRANCISCO, CALIFORNIA; TUESDAY, APRIL 7, 2015

 2                        10:04 O'CLOCK A.M.

 3                             -oOo-

 4

 5    Whereupon,

 6                        DOUGLAS GLENN McKAY,

 7    having first been called as a witness, was duly sworn and

 8    testified as follows:

 9

10                            EXAMINATION

11    BY MR. WILENS:

12         Q    Could you state your name, please?

13         A    Douglas Glenn McKay.

14         Q    Date of birth?

15         A    June 15, 1955.

16         Q    Did you receive a notice of this deposition,

17    Mr. McKay?

18         A    A notice?

19         Q    Yes.  Something telling you that the deposition

20    was today and the location.

21         A    Yes.

22         Q    That document also listed some documents you were

23    being asked to produce.  Did you have a chance to review

24    that list of documents?

25         A    It's being worked on.
```

EXHIBIT 4: TRANSCRIPT OF DEPOSITION OF GLENN MCKAY

Case 4:13-cv-01171-JSW   Document 228-4   Filed 12/04/15   Page 5 of 31

DOUGLAS GLENN MCKAY  Non-Confidential Portion                    April 07, 2015
DINAH PHAM vs. JPMORGAN CHASE BANK                                            5

1      Q     Is that a "yes"?

2      A     I didn't look at it personally, no.

3      Q     Okay.

4            MR. PUTTERMAN:  Counsel, let me just note for the

5      record that Mr. McKay is not the custodian of records for

6      the company.

7            We responded to the -- to the document request

8      included in the deposition notice, in any event, as if it

9      were directed to the company, and we're treating it as if

10     it were directed to the company.

11           MR. WILENS:  I appreciate that.  That doesn't

12     relieve the deponent of his obligation to be personally

13     involved in the process, but we will get to that in a

14     moment.

15     BY MR. WILENS:

16     Q     I want to go over some of the documents you were

17     asked to produce, and you can tell me if -- what you know

18     about them.  Okay?

19           Well, let me start by saying, are you producing

20     any documents today?

21     A     No.

22     Q     Nothing?

23           MR. PUTTERMAN:  We've got one document that we

24     will produce to you tomorrow, and the reason for that is,

25     is that Mr. Humphreys has knowledge of it, Mr. McKay does

1       Q    Sir, do you know why you are -- why you are named

2  as a defendant in this lawsuit?

3       A    Yes.

4       Q    Why?

5       A    I'm the CEO of the company.

6       Q    But do you know what the company allegedly did

7  wrong to cause it to be sued?

8       A    In general, yes.

9       Q    What is it?

10      A    I don't know.  I would have to -- I would have to

11  look at my documents.

12      Q    Well, how about, in general, I try to refresh your

13  recollection?  Selling Source owns Partner Weekly; right?

14      A    Correct.

15      Q    Partner Weekly sells or invoices payday loan leads

16  to lenders; correct?

17      A    Yes.

18      Q    Some of those lenders are not licensed by the

19  state where they sell the loans; correct?

20      A    I don't --

21           MR. PUTTERMAN:  Are you referring specifically to

22  California?

23  BY MR. WILENS:

24      Q    Some of those lenders are not licensed in

25  California?

EXHIBIT 4: TRANSCRIPT OF DEPOSITION OF GLENN MCKAY

DOUGLAS GLENN MCKAY  Non-Confidential Portion                    April 07, 2015
DINAH PHAM vs. JPMORGAN CHASE BANK                                         39

```
 1      A     And some of the lenders don't need to be.
 2      Q     That's, obviously, why there's a lawsuit.  Maybe
 3   they do, maybe they don't, but you understand that some of
 4   the lenders are not licensed in the State of California?
 5      A     Because it's not necessary.
 6            MR. PUTTERMAN:  Just answer this one yes or no.
 7            THE WITNESS:  Some of the lenders what?
 8   BY MR. WILENS:
 9      Q     Are not licensed to sell loans in California;
10   correct?
11      A     Correct.
12      Q     All right.  Now, the accusation is that Partner
13   Weekly and Selling Source and, for that matter, London Bay
14   Capital should not have sold leads to unlicensed lenders.
15   That's the accusation.  You understand that?
16            MR. PUTTERMAN:  Objection.  Lacks foundation.
17            You can respond to that.
18            THE WITNESS:  I understand it.
19   BY MR. WILENS:
20      Q     Okay.  So all I'm asking you is, wasn't there
21   communications between London Bay Capital and Selling
22   Source about, gee, should we sell -- we're being sued by a
23   federal court class action, state court class action, State
24   of Illinois, State of Arkansas, State of New York.
25            Are you telling me there were never any
```

1    counsel, just the general question of whether or not you

2    and Mr. Humphreys, together, participated in communications

3    which involved the lawsuit.

4            THE WITNESS:  We wouldn't talk about it unless we

5    were -- had attorneys present.

6    BY MR. WILENS:

7        Q    You don't talk to each other unless you have

8    attorneys present?

9            MR. PUTTERMAN:  That's not what he said, Counsel.

10   Misstates the testimony.  Lacks foundation.  Argumentative.

11   BY MR. WILENS:

12       Q    You are saying, once the lawsuit was served on

13   you, if you had an e-mail conversation with Mr. Humphreys,

14   it was only done if there was an attorney present during

15   the e-mailing?  How would that work?

16           MR. PUTTERMAN:  Or whether it was for the purpose

17   of consulting counsel or passing on the advice of counsel.

18   BY MR. WILENS:

19       Q    Or how about just talking about the business of

20   Selling Source, Hey --

21       A    That's different.

22       Q    -- we're being sued for making payday loans to

23   unlicensed lenders, maybe we should stop doing that?

24       A    We wouldn't -- we wouldn't talk about that.  We

25   would only do it in a privileged conversation.

1     Q    And why is that?  Why would you only do that in a

2     privileged conversation?

3          MR. PUTTERMAN:  Objection.  Argumentative.

4          You can respond.

5          THE WITNESS:  I'm not an attorney, so I would want

6     an attorney present.

7     BY MR. WILENS:

8     Q    You need an attorney to tell you what to do if you

9     are talking to the CEO of London Bay Capital?  Is that what

10    you are saying?

11    A    To ask --

12         MR. PUTTERMAN:  Hold it.  Hold it.  Hold it.

13         Again, misstates the testimony.  Incomplete

14    hypothetical.  Either you are talking about the lawsuits or

15    you are not.

16         MR. WILENS:  Well, this request is about the

17    lawsuits, but --

18         MR. PUTTERMAN:  Well --

19         MR. WILENS:  -- I don't understand why --

20         MR. PUTTERMAN:  Because you are asking

21    argumentative questions, which are vague and ambiguous

22    because you keep hopping back.  I know you think you are

23    very clever in doing that, but you are not.

24         MR. WILENS:  The problem is, you are refusing to

25    produce any documents, and the witness didn't even look for

1          THE WITNESS:  Generally speaking, I -- there may

2    be.

3    BY MR. WILENS:

4          Q    So why didn't you look for them?

5          A    I wasn't asked.

6          Q    You were not asked to look for them, is that what

7    you are saying?

8          A    I don't believe so.

9          Q    Okay.  Let's move on to number five now.

10   Documents reflecting communications during the class period

11   between Partner Weekly and Selling Source regarding whether

12   unlicensed payday lenders should be sold leads, any

13   documents responsive to that?

14         A    No.

15         Q    Did you look for them?

16         A    No.

17         Q    Why not?

18         A    Don't need to.

19         Q    Why not?

20         A    It wouldn't be a discussion point.

21         Q    What do you mean, it wouldn't be a discussion

22   point?

23         A    There's no issue whether unlicensed payday lenders

24   should be sold leads.

25         Q    In other words, Selling Source didn't care about

EXHIBIT 4: TRANSCRIPT OF DEPOSITION OF GLENN MCKAY

Case 4:13-cv-01171-JSW  Document 228-4  Filed 12/04/15  Page 11 of 31

DOUGLAS GLENN MCKAY  Non-Confidential Portion                April 07, 2015
DINAH PHAM vs. JPMORGAN CHASE BANK                                      76

1    the licensed status of the lenders?  Is that what you are

2    saying?

3            MR. PUTTERMAN:  Objection.

4    BY MR. WILENS:

5        Q    Then what are you saying?

6            MR. PUTTERMAN:  Hold it.  Hold it.  Wait for me to

7    object, Mr. McKay.

8            Objection.  Argumentative.  Lacks foundation.

9            Now you can go ahead and answer.

10           MR. WILENS:  Can you read the original question

11   back to him?

12           THE REPORTER:  I can, but I do need an agreement

13   that we quit talking over each.  We need to slow down a

14   little.  Otherwise, I am going to have to get a different

15   reporter here.  I can't sit here all day and have it like

16   this.

17           MR. PUTTERMAN:  On the record, the reporter has

18   made a request that everybody slow down and stop talking

19   over each other, because it is difficult for him to report.

20   I will certainly attempt to do that.

21           Mr. McKay --

22           THE WITNESS:  Yes.

23           MR. PUTTERMAN:  -- let Mr. Wilens finish his

24   questions.

25           And, Mr. Wilens, I will simply ask that you slow

```
 1   down and that we all attempt not to talk over each other.

 2   Okay?

 3            Is that satisfactory, Mr. Reporter?

 4            THE REPORTER:  Yes.

 5            MR. PUTTERMAN:  Okay.

 6            (Whereupon the reporter read the following into

 7   the record:

 8            "QUESTION:  In other words, Selling Source didn't

 9            care about the licensed status of the lenders?  Is

10            that what you are saying?")

11            MR. PUTTERMAN:  And I objected on the grounds it's

12   argumentative and lacks foundation.

13            Mr. McKay can now respond to the question.

14            THE WITNESS:  That's not an issue.

15   BY MR. WILENS:

16      Q    Did Selling Source care whether or not the lenders

17   who received the payday loan leads from Partner Weekly were

18   state licensed?  Yes, they cared, or no, they didn't?

19      A    It is not our job to be a regulator.  It's the

20   lender's responsibility to be properly licensed.

21      Q    So the answer is, Selling Source did not care --

22            MR. PUTTERMAN:  No.

23   BY MR. WILENS:

24      Q    -- correct?

25      A    No.
```

EXHIBIT 4: TRANSCRIPT OF DEPOSITION OF GLENN MCKAY

1    MR. WILENS:  He can answer on his own.

2    MR. PUTTERMAN:  You know what, I get to object.

3    MR. WILENS:  That's not an objection.

4    MR. PUTTERMAN:  I haven't even stated the

5    objection yet, so I don't know what you are talking about.

6    MR. WILENS:  You said no.  In other words, you

7    were trying to coach.

8    MR. PUTTERMAN:  Because you interrupted me in

9    making the objection.  The objection is:  Misstates the

10   testimony, lacks foundation, and argumentative.

11   MR. WILENS:  But you can't start by saying no.

12   MR. PUTTERMAN:  You know what, Counsel, I'll start

13   any way I want.  You have no idea where I'm going with it.

14   MR. WILENS:  You just overspoke me after promising

15   the reporter you would not.

16   MR. PUTTERMAN:  My apologies, Mr. Reporter.

17   BY MR. WILENS:

18      Q    I'm going to ask you the question again, because

19   I'm not sure I got an answer from you.  I got one from the

20   counsel.

21   MR. PUTTERMAN:  No.  You got an objection from his

22   counsel.

23   BY MR. WILENS:

24      Q    The question is:  It did not matter to Selling

25   Source whether the lenders were licensed or not?  Is that a

EXHIBIT 4: TRANSCRIPT OF DEPOSITION OF GLENN MCKAY

DOUGLAS GLENN MCKAY  Non-Confidential Portion          April 07, 2015
DINAH PHAM vs. JPMORGAN CHASE BANK                              79

1   true statement?

2       A    No.

3       Q    So did it matter to Selling Source?

4            MR. PUTTERMAN:  Objection.  Lacks foundation.

5   Argumentative.

6            THE WITNESS:  If they had signed our agreement

7   that they are following the applicable rules.

8   BY MR. WILENS:

9       Q    What do you mean, our agreement?

10      A    The lead purchase agreement.

11      Q    Well, everyone who received leads from Partner

12  Weekly did purchase -- did sign a lead purchase agreement;

13  correct?

14      A    Correct.

15      Q    So given that fact, did it matter to Selling

16  Source that some of those lenders were not licensed by

17  California?

18      A    That's not up to Selling Source to decide.

19      Q    It's up to Selling Source to decide whether it

20  matters or not, so the question is:  Did it matter or not

21  to Selling Source?

22           MR. PUTTERMAN:  Objection.  Argumentative.

23           You can answer.

24           THE WITNESS:  As long as they signed the agreement

25  stating they were following applicable rules, Selling

EXHIBIT 4: TRANSCRIPT OF DEPOSITION OF GLENN MCKAY

Case 4:13-cv-01171-JSW  Document 228-4  Filed 12/04/15  Page 15 of 31

DOUGLAS GLENN MCKAY  Non-Confidential Portion          April 07, 2015
DINAH PHAM vs. JPMORGAN CHASE BANK                                    80

1    Source or Partner Weekly accepts them as a customer.

2    BY MR. WILENS:

3        Q    Move on to number six.  Documents reflecting

4    communications during the class period between Partner

5    Weekly and Selling Source concerning this lawsuit or the

6    Gilbert lawsuit, were there any communications?

7        A    None that weren't attorney/client privileged.

8        Q    Did you have any communications with Mr. Madsen

9    about either of these two lawsuits?

10       A    No.

11       Q    You didn't have any communications at all?

12       A    No.

13       Q    The subject matter never came up?

14            MR. PUTTERMAN:  Objection.  Cumulative and

15    argumentative.

16            You can answer once more.

17            THE WITNESS:  Not unless it was attorney/client

18    privileged.

19    BY MR. WILENS:

20       Q    That's what I'm getting at.  The first time you

21    said, none unless it was attorney/client privileged, but

22    then you said there were no communications at all.

23       A    I meant, that weren't attorney/client privileged.

24       Q    Well, when was the first conversation with

25    Mr. Madsen about either of the two lawsuits?

Case 4:13-cv-01171-JSW  Document 228-4  Filed 12/04/15  Page 16 of 31

DOUGLAS GLENN MCKAY  Non-Confidential Portion                April 07, 2015
DINAH PHAM vs. JPMORGAN CHASE BANK                                       97

1    Q    It came from my mind.

2         MR. PUTTERMAN:  Always dangerous.

3    BY MR. WILENS:

4    Q    Was it Derek Lafavor?

5    A    In 2007?

6    Q    Yes.

7    A    2009 is when we started.

8    Q    I got you.  But I'm just asking you.  In 2007, was

9    Derek Lafavor the --

10        MR. PUTTERMAN:  Do you know?

11        THE WITNESS:  Yes.

12   BY MR. WILENS:

13   Q    Yes, he was?

14   A    Yes.

15   Q    And that's D-e-r-e-k L-a-f-a-v-o-r?

16   A    F-a-v-o-r.

17   Q    F-a-v-o-r, okay.  So, in 2009, are you the CEO of

18   Selling Source, or not?

19   A    No.

20   Q    Who is?

21   A    Until the fall of 2009, it was still Mr. Lafavor.

22   Q    What was your title?

23   A    President.

24   Q    You were the president of Selling Source?

25   A    Correct.

1      Q      Anyone else who reports directly to you?

2      A      Well, I can cut it short.  There's nobody who has

3   any ownership interest other than myself.

4      Q      So Selling Source does have an officer structure.

5   It has a CFO.  It has a CEO.  Does it have any other

6   officers?

7      A      No.

8      Q      Vice presidents?

9      A      It has other C-level executives who are not

10  officers.

11     Q      When you say C-level, what do you mean by that?

12     A      Chief analytics officer, CAO.

13     Q      They are not considered officers, though --

14     A      No.

15     Q      -- in the structure?

16     A      No.

17     Q      And there's also a board of directors of Selling

18  Source?

19     A      Yes.

20     Q      And who is on the board?

21     A      London Bay Capital and myself.

22     Q      So that would be London Bay Capital, LLC?

23     A      Yes.

24     Q      And Glenn McKay.  Now, moving on to number 11,

25  which is documents about the corporate relationship, so

EXHIBIT 4: TRANSCRIPT OF DEPOSITION OF GLENN MCKAY

1   that's completed along with documentation -- oh, articles

2   of incorporation and business license.

3        Q    All right.

4        A    And then it's submitted.

5        Q    Prior to September of 2013, checking to see if a

6   lender was licensed to make loans in the state where it's

7   offering loans was not part of this check of the legitimacy

8   of the lender; is that correct?

9        A    Yes.

10       Q    Didn't you think that being licensed to make loans

11  was part of something that would make someone legitimate --

12  a legitimate lender?

13            MR. PUTTERMAN:  Objection.  Argumentative.

14            You can answer.

15            THE WITNESS:  No, not until we started dealing

16  with lenders -- state-licensed lenders that had brick and

17  mortar locations, with leads ending up in those locations

18  which were not Internet-based transactions, and we made the

19  decision, because of that, we should have a copy of the

20  state license -- licenses by the lender.

21  BY MR. WILENS:

22       Q    Well, why in September 2013 did you make that

23  decision?

24       A    We lost most lenders as result of Operation Choke

25  Point and were left mostly with state-by-state lenders, and

EXHIBIT 4: TRANSCRIPT OF DEPOSITION OF GLENN MCKAY

```
 1              MR. PUTTERMAN:  Yes, you are.

 2   BY MR. WILENS:

 3      Q    I'm trying to talk over your counsel, who is

 4   speaking to me simultaneously.

 5              MR. PUTTERMAN:  Counsel, do you have any evidence

 6   that any of these were served on Selling Source?  No.

 7              MR. WILENS:  Why do they have to be served?

 8              MR. PUTTERMAN:  Why would you assume that they

 9   would know about it?

10              MR. WILENS:  Because they said they checked the

11   legitimacy of the lenders.

12              MR. PUTTERMAN:  No.  Counsel --

13              THE WITNESS:  No.

14              MR. PUTTERMAN:  -- he answer --

15              THE WITNESS:  Sorry.

16              MR. PUTTERMAN:  Let me finish my objection.

17              MR. WILENS:  You are not objecting.  You are

18   arguing.

19              MR. PUTTERMAN:  No.  You are misstating his

20   testimony, because he described exactly what that meant.

21   BY MR. WILENS:

22      Q    Fine.  Does checking the legitimacy of the lender

23   include checking to see if they are in violation of a state

24   law?

25      A    We -- they warrant that they are following all
```

EXHIBIT 4: TRANSCRIPT OF DEPOSITION OF GLENN MCKAY

1   federal and state applicable rules.

2       Q    But they are lying; right?  They are lying?  You

3   don't care?

4       A    It's -- there's no law that says I have to go find

5   these.

6       Q    So these are public record on the Internet.  You

7   are saying, even if you found them, you just don't want to

8   know about it?

9       A    No.  We're not aware of them.

10          MR. PUTTERMAN:  That's an incomplete hypothetical.

11  BY MR. WILENS:

12      Q    All of the cease and desist orders that have been

13  issued against all of these lenders associated with your

14  company, you are not aware of any of them?

15      A    None.

16      Q    You have been aware about them since they were

17  attached to the lawsuit when they --

18          MR. PUTTERMAN:  Objection.  Argumentative.  Lacks

19  foundation.

20  BY MR. WILENS:

21      Q    When the Gilbert lawsuit was filed, which I

22  believe it was in -- around April of 2013, if I'm not

23  mistaken, okay, there were attachments to it, which were a

24  number of cease and desist orders.

25          Did you read them?

EXHIBIT 4: TRANSCRIPT OF DEPOSITION OF GLENN MCKAY

1    from Partner Weekly.  Was anything done after that to

2    monitor the ongoing lawfulness of the lender?

3         A    It's not our responsibility to do that.

4         Q    So the answer is "no"?

5         A    No.

6         Q    The answer to my question is "no"?

7         A    It's not our responsibility.  There's no law that

8    says we're required to do that.

9         Q    Well, there's no law that says you are required to

10   check them out in the first effort, is there?  There's no

11   law requiring you to even have them fill out an application

12   and say anything about their corporation, you could just

13   sell them the leads; right?

14        A    That's not our business decision.

15        Q    So your business decision was to have some level

16   of scrutiny at the beginning and then nothing after that?

17             MR. PUTTERMAN:  You know what, I'm going to

18   object, because it lacks foundation.  The initial scrutiny

19   is for the business reasons of Selling Source, which is

20   what he's testified to, that they need to know who they are

21   doing business with and they are actually going to get paid

22   for what they provide.

23   BY MR. WILENS:

24        Q    Okay.  So let's clarify that.  We used the term

25   "legitimacy" before, but when the response speaks of the

ESQUIRE
SOLUTIONS

EXHIBIT 4: TRANSCRIPT OF DEPOSITION OF GLENN MCKAY

DOUGLAS GLENN MCKAY  Non-Confidential Portion
DINAH PHAM vs. JPMORGAN CHASE BANK

April 07, 2015
198

1   legitimacy of the lender, it was legitimate, as in they are

2   going to be paying Selling Source.  That was the concern,

3   right, not legitimate in the sense of legal?

4        A    It's not our responsibility.

5        Q    I get that.  I'm just asking you a question.  Was

6   legitimacy --

7             MR. PUTTERMAN:  You don't have to answer that

8   question.

9   BY MR. WILENS:

10       Q    Was legitimacy, basically, focused whether it was

11  kind a fly-by-night that might take your leads and not pay

12  for them as opposed to whether they were, quote, actually a

13  legal operation?

14       A    I think any astute business would do the diligent

15  thing to do to ensure they were going to get paid.

16       Q    So that was the only concern, you didn't really

17  care if they legal or illegal?

18       A    It is not our responsibility to do that.

19       Q    You just took their word for it?

20       A    They weren't and they were and the owner signed

21  the agreement.

22       Q    Of course, if they are already breaking a law by

23  making illegal loans, why would they have a problem

24  warranting that they are going to comply with the law?

25            MR. PUTTERMAN:  And how would we know that?

EXHIBIT 4: TRANSCRIPT OF DEPOSITION OF GLENN MCKAY

Case 4:13-cv-01171-JSW   Document 228-4   Filed 12/04/15   Page 23 of 31

DOUGLAS GLENN MCKAY  Non-Confidential Portion              April 07, 2015
DINAH PHAM vs. JPMORGAN CHASE BANK                                      202

```
 1   in Washington, and you were giving them leads for

 2   Washington residents, but you were also giving them leads

 3   for California residents, would you say, well, you are

 4   illegal in Washington, but we will still go ahead and give

 5   you the leads for California?  Would you do that?

 6            MR. PUTTERMAN:  Objection.  Incomplete

 7   hypothetical.  Argumentative.  Lacks foundation, and

 8   nonsensical.

 9            THE WITNESS:  I don't understand the question.

10   BY MR. WILENS:

11       Q    What is it that you don't understand?

12       A    We don't -- they don't sell loans -- I don't know

13   what you are talking about.

14       Q    You have a lender.  It's making loans to residents

15   of the United States, various states.  Okay?

16            Are you with me so far?

17            They want leads from you, from Selling Source, and

18   they are willing to pay for them.  They say, we want leads

19   from California residents and Washington residents.

20            Are you with me so far?

21       A    Yes.

22       Q    Let's just say you even cared whether they are

23   legal or not.

24       A    There's no -- there's no word in our vocabulary

25   about caring.  The issue is, we do not have a
```

1    responsibility in this area whatsoever.

2         Q    Well, saying you don't have a responsibility is

3    the same as saying you don't care.

4              MR. PUTTERMAN:  Oh, hold on.

5    BY MR. WILENS:

6         Q    What's the difference?

7              MR. PUTTERMAN:  Don't even answer that.  That's

8    just pure argument.

9    BY MR. WILENS:

10        Q    What's the difference?

11             MR. PUTTERMAN:  No.  He's not answering that.

12             MR. WILENS:  I'm asking -- giving him a question.

13             MR. PUTTERMAN:  No.  I'm instructing him not to

14   answer that.  That's just pure argument on your part --

15             MR. WILENS:  I'm asking him --

16             MR. PUTTERMAN:  -- and it's simply a rhetorical

17   question.  He's not answering it.

18             MR. WILENS:  I'm asking him to clarify, in his

19   mind, what is the difference between "it is not our

20   responsibility" and "we don't care."

21             MR. PUTTERMAN:  Don't answer it.

22             MR. WILENS:  Are you instructing him not to

23   answer?

24             MR. PUTTERMAN:  I'm instructing him not to answer.

25             MR. WILENS:  Okay.

EXHIBIT 4: TRANSCRIPT OF DEPOSITION OF GLENN MCKAY

1   give an answer.

2        A    What's your question?

3        Q    My question is -- I'm just trying to figure out

4   the state of mind.

5             If I wanted to set up a law office in Florida, and

6   I'm not licensed to practice law in Florida.  I'm not a

7   member of the Florida bar, but I want you to get as many

8   leads, Florida customers, and I will pay you for the leads,

9   would that trouble you, as the president of Selling Source?

10       A    I can't answer it, because there's no agreements.

11  There's no defined agreements.

12       Q    Would it trouble you to even to try to come up

13  with an agreement where what I'm asking you to do is help

14  me do illegal business?

15            MR. PUTTERMAN:  Objection to that

16  characterization.

17            And you are not answering that question.

18  BY MR. WILENS:

19       Q    Don't you think you were helping Everest Cash

20  Advance make loans to Oregon residents in this example,

21  when you sold leads to them?

22       A    It's not our responsibility whatsoever.

23       Q    But don't you think you were helping them?

24       A    It's not our responsibility.

25            MR. PUTTERMAN:  You know what --

EXHIBIT 4: TRANSCRIPT OF DEPOSITION OF GLENN MCKAY

 1  witness, okay, and if he has any changes, he will provide

 2  them through me.

 3          And once the statutory time is passed, we can

 4  assume we can treat the transcript as if it were signed by

 5  the witness.

 6          MR. WILENS:  Well, what statutory time are we

 7  going to use?

 8          MR. PUTTERMAN:  Isn't it 30 days?

 9          MR. WILENS:  Well, for a Northern California

10  deponent depositions, I don't know if they use 30 days or a

11  lesser time, but we will go ahead and stipulate to --

12          MR. PUTTERMAN:  Because this technically was

13  noticed in the Pham case, which is state court.

14          MR. WILENS:  The transcript will be provided to

15  defense counsel, who is ordering a copy anyway, and he will

16  make arrangements for the deponent to review the

17  transcript, to notate any changes on the errata page, and

18  then to sign deposition transcript.

19          And this should be accomplished within 30 days of

20  when the transcript is provided to deponent's counsel.

21          If he fails to sign the transcript within that

22  time period, then a certified copy without a signature may

23  be used in lieu of the original for all purposes.

24          MR. PUTTERMAN:  Correct.

25          MR. WILENS:  So stipulated?

1            MR. PUTTERMAN:  So stipulate.  And my

2    understanding was that this deposition will apply in the

3    Gilbert action as well as the Pham action; correct?

4            MR. WILENS:  That is right.

5            MR. PUTTERMAN:  So stipulated?

6            MR. WILENS:  So stipulated.

7            MR. PUTTERMAN:  Thank you.

8            (Whereupon the deposition of Douglas Glenn McKay

9    concluded at 4:00 P.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT 4: TRANSCRIPT OF DEPOSITION OF GLENN MCKAY

1   STATE OF CALIFORNIA              )
                                    )   SS:
2   CITY AND COUNTY OF SAN FRANCISCO )

3

4              I, Michael Cundy, CSR NO. 12271, a

5   Certified Shorthand Reporter of the State of California,

6   do hereby certify:

7              That the foregoing proceedings were

8   taken before me at the time and place herein set forth;

9   that any witnesses in the foregoing proceedings, prior to

10  testifying, were placed under oath; that a verbatim record

11  of the proceedings was made by me using machine shorthand

12  which was thereafter transcribed under my direction;

13  further, that the foregoing is an accurate transcription

14  thereof.

15             I further certify that I am neither

16  financially interested in the action nor a relative or

17  employee of any attorney or any of the parties.

18             IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20

21  Dated: April 16, 2015

22                          _Michael Cundy_

23                          _____
                            Michael Cundy, CSR NO. 12271
24

25

```
 1     DEPOSITION ERRATA SHEET

 2

 3

 4   Our Assignment No.  313662

 5   Case Caption:  Pham

 6   vs. JPMorgan Chase Bank, N.A.

 7

 8       DECLARATION UNDER PENALTY OF PERJURY

 9        I declare under penalty of perjury

10   that I have read the entire transcript of

11   my Deposition taken in the captioned matter

12   or the same has been read to me, and

13   the same is true and accurate, save and

14   except for changes and/or corrections, if

15   any, as indicated by me on the DEPOSITION

16   ERRATA SHEET hereof, with the understanding

17   that I offer these changes as if still under

18   oath.

19        Signed on the _____ day of

20   _____, 20___.

21

22   _____

23       Douglas Glenn McKay

24

25
```

1               DEPOSITION ERRATA SHEET

2  Page No._____Line No._____Change to:_____

3  _____

4  Reason for change:_____

5  Page No._____Line No._____Change to:_____

6  _____

7  Reason for change:_____

8  Page No._____Line No._____Change to:_____

9  _____

10  Reason for change:_____

11  Page No._____Line No._____Change to:_____

12  _____

13  Reason for change:_____

14  Page No._____Line No._____Change to:_____

15  _____

16  Reason for change:_____

17  Page No._____Line No._____Change to:_____

18  _____

19  Reason for change:_____

20  Page No._____Line No._____Change to:_____

21  _____

22  Reason for change:_____

23

24  SIGNATURE:_____DATE:_____

25       Douglas Glenn McKay

EXHIBIT 4: TRANSCRIPT OF DEPOSITION OF GLENN MCKAY

```
 1              DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23

24   SIGNATURE:_____DATE:_____

25          Douglas Glenn McKay
```