DONALD J. PUTTERMAN (BAR NO. 90822)
MICHELLE L. LANDRY (BAR NO. 190080)
TOBIAS G. SNYDER (BAR NO.289095)
PUTTERMAN LOGAN LLP
One Maritime Plaza
300 Clay Street, Suite 1925
San Francisco, CA 94111
Tel:       (415) 839-8779
Fax:      (415) 376-0956
E-mail:   dputterman@plglawyers.com
          mlandry@plglawyers.com
          tsnyder@plglawyers.com

Attorneys for Defendants
MoneyMutual, LLC, Selling Source, LLC, Montel Brian Anthony Williams, Glenn McKay, PartnerWeekly, LLC, John Hashman, Brian Rauch, Samuel W. Humphreys, Douglas Tulley, and Alton F. Irby III

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

## (OAKLAND DIVISION)

| | |
|---|---|
| SEAN L. GILBERT, KEEYA MALONE, KIMBERLY BILBREW, CHARMAINE B. AQUINO, on behalf of themselves and all persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA, N.A., et al.,<br><br>Defendants. | Case No. 4:13-cv-01171-JSW<br><br>**THE MONEYMUTUAL DEFENDANTS' AND MONTEL WILLIAMS' OPPOSITION TO PLAINTIFFS' MOTION TO CERTIFY CLASSES**<br><br>Date: **January 8, 2016**<br>Time: **9:00 A.M.**<br>Dept. **5**<br>Hon.  **Judge S. White, District Judge** |

**TABLE OF CONTENTS**

I. INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................. 1

II. FACTUAL ALLEGATIONS ......................................................................................................... 1

III. ARGUMENT .................................................................................................................................. 3

    A. Legal Standard for Class Certification ..................................................................................... 3

    B. Plaintiffs' Motion for Class Certification is Based on Definitions Contained in an Amendment to the Complaint that is Improper and Should Not Be Allowed ........................... 4

    C. Plaintiffs Cannot Satisfy the Requirements of Rule 23(b) Because Individual Issues of Law and Fact Predominate Over Common Issues of Law and Fact ......................................... 6

        1. The Class as Defined is Divided by the Legal Issue of Whether a Plaintiff Who Did Not Receive a Loan Can Recover ............................................................................... 6

        2. Individual Issues Predominate Regarding What Alleged Representations, if Any, Were Seen by Which Class Members ............................................................................... 8

        3. Individual Issues Predominate Regarding the Fact and Extent of Any Alleged Harassment or Dissemination of Personal Information ...................................................... 10

        4. Individual Inquiry Would be Necessary to Determine Whether Class Members Have Received Alternate Relief Through Arbitration ...................................................... 12

    D. Plaintiffs Cannot Satisfy the Requirements of Rule 23(a)(1) because the Membership of Plaintiffs' Class is Not Ascertainable ................................................................................... 12

IV. CONCLUSION ............................................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Bee, Denning, Inc. v. Capital Alliance Group*,
  No. 13–cv–2654–BAS–WVG, 2015 WL 5675798 (S.D. Cal. Sept. 24, 2015) ................................7

*Campion v. Old Republic Home Protection Co., Inc.*
  272 F.R.D. 517 (S.D. Cal. 2011) ..............................................................................................13

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  308 F.R.D. 606 (N.D. Cal. 2015) ...............................................................................................7

*In re Conseco Life Ins. Co. Lifetrend Ins. Sales & Mktg. Litig.*,
  270 F.R.D. 521 (N.D.Cal.2010) .................................................................................................7

*Gonzalez v. Proctor and Gamble Co.*,
  247 F.R.D. 616 (S.D. Cal. 2007) ..............................................................................................12

*Jones v. ConAgra Foods, Inc.*
  No. C 12–01633 CRB, 2014 WL 2702726 (N.D. Cal. Jun. 13, 2014) ...........................................14

*Kosta v. Del Monte Foods, Inc.*,
  308 F.R.D. 217 (N.D. Cal. 2015) .................................................................................12, 14, 18

*Ollier v. Sweetwater Union High School Dist.*,
  251 F.R.D. 564 (S.D. Cal. 2008) ................................................................................................5

*Red v. Kraft Foods, Inc.*,
  No. CV 10–1028–GW(AGRx), 2012 WL 8019257 (C.D. Cal. Apr. 12, 2012) ..........................20

*Reddy v. Litton Indus., Inc.*,
  912 F.2d 291 (9th Cir. 1990) ...................................................................................................10

*Rojas v. Marko Zaninovich, Inc.*,
  No. CIV-F-09-0705AWI JLT, 2013 WL 1326582 (E.D. Cal. Mar. 29, 2013) ..........................5, 8

*In re Unioil Secs. Litig.*,
  107 F.R.D. 615 (C.D.Cal.1985) .................................................................................................5

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S.Ct. 2541 (2011) ............................................................................................................8, 17

*Webb v. Carter's Inc.*,
  272 F.R.D 489 (C.D. Cal. 2011) .....................................................................................9, 11, 18

*Wolph v. Acer Am. Corp.*,
  272 F.R.D. 477 (N.D. Cal. 2011) ..........................................................................................5, 18

*Zeisel v. Diamond Foods, Inc.*
   No. C 10–01192 JSW, 2011 WL 2221113 (N.D. Cal. Jun. 7, 2011)............................................20

*Zinser v. Accufix Research Inst.*,
   253 F.3d 1180 (9th Cir.2001).............................................................................................5, 10

**California Cases**

*Brinker Restaurant Corp. v. Sup. Ct.*
   (2012) 53 Cal.4th 1004 ...........................................................................................................8

*In re Tobacco II Cases*
   (2009) 46 Cal.4th 298 ...........................................................................................................11

**Federal Statutes**

18 U.S.C.
   § 1964...................................................................................................................................10

**California Statutes**

California Deferred Deposit Transaction Law, Financial Code
   § 23000 *et seq.* ..................................................................................................................9, 10

California's Unfair Competition Law, Business and Professions Code
   § 17200 *et seq.* .....................................................................................................................10

Racketeer Influenced and Corrupt Practices Act ...............................................................................10

**Other Authorities**

Rule 23(a) and Rule 23(b) of the Federal Rules of Civil Procedure .......................................................5

Rule 23(a)..............................................................................................................................................5

Rule 23(a)(1) ............................................................................................................................5, 18, 22

Rule 23(b) ...................................................................................................................................5, 8, 18

Rule 23(b)(3).........................................................................................................................................5

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs Sean B. Gilbert, Keeya Malone, Kimberly Bilbrew, and Charmain B Aquino ("Plaintiffs") fail to satisfy the standards of Rule 23 in order to certify a class action. Plaintiffs are attempting to certify a class containing a massive number of individuals who have suffered no damages whatever; Plaintiffs simultaneously have moved to amend by filing a Proposed Fifth Amended Complaint ("Proposed 5AC" or "Prop. 5AC"), which expands the Plaintiffs' class definition from individuals who *received* a payday loan after submitting their information to a MoneyMutual Defendant or an affiliate Publisher, to individuals who *applied* for such a loan, regardless of whether or not their lead was acquired by a lender, or whether or not a loan was ultimately consummated. Because such purported class members did not receive a loan, made no payments to anybody and therefore suffered no damages, they lack standing to bring any of the claims alleged in the Proposed 5AC. Even if the standing issue is not resolved now, Plaintiffs' new proposed Main Class incorporates an inherent cleavage within the class that defeats Rule 23(b)'s commonality requirements. Beyond this fundamental flaw, individual issues predominate regarding which representations, if any, may have been viewed by absent class members, and whether absent class members actually experienced harassment and/or private data dissemination traceable to a MoneyMutual Defendant and asserted to form the basis of Plaintiffs' other UCL claims. Finally, and equally problematic, Plaintiffs have offered no administratively feasible method to ascertain which potential class members actually received loans. For all of these reasons, Plaintiffs' class certification motion fails.

## II. FACTUAL ALLEGATIONS

Defendant Selling Source, LLC, through its PartnerWeekly, LLC and MoneyMutual, LLC subsidiaries, is in the business of "lead generation," a direct marketing practice in which a company solicits contact information from potential customers looking for a particular product or service ("leads"), which information is then offered to and sometimes acquired by companies providing that product or service. PartnerWeekly, LLC, receives and markets leads to short-term or "payday" lenders. *See* Declaration of Tim Madsen in Support of the MoneyMutual Defendants' and Montel

Williams' Opposition to Plaintiffs' Motion to Certify Classes ("Madsen Decl.") ¶¶ 2-3. MoneyMutual, LLC, maintains a website that is one source of leads for PartnerWeekly.[1] PartnerWeekly also obtains leads from independent, third-party affiliated "Publishers." Madsen Decl. ¶ 4. Affiliated Publishers may maintain their own websites through which potential borrowers may submit information, or publish web advertisements which, when clicked, redirect customers to a standard form maintained by PartnerWeekly. *Id*. Publishers may sell the same leads or redirect potential borrowers to other lead generators as well. PartnerWeekly consequently may receive leads within the span of a few moments from different Publishers which actually originate from a single submission of information, but there is no assurance a customer initially entered their information on a PartnerWeekly or Publisher-affiliated website. *Id*. For example, ParterWeekly's database in one instance shows that leads for Plaintiff Kimberly Bilbrew were received by PartnerWeekly five times over the course of a few minutes, all likely originating from a single submission by Ms. Bilbrew to one website; but it is impossible from the PartnerWeekly database the identity the website where Ms. Bilbrew initially entered her information. *Id*. ¶ 15, Ex. C.

PartnerWeekly offers leads for review and acquisition *only* to screened lenders who have contracted with PartnerWeekly. Madsen Decl. ¶ 6 and Ex. A. PartnerWeekly imposes numerous obligations on contracting lenders with regard to their use of lead data, including a prohibition on marketing anything other than loans. *Id*. The contracting lender must also make numerous representations and warranties concerning, among other things, the safeguarding and security of lead information and, if acquiring leads generated specifically by MoneyMutual, providing for compliance with the MoneyMutual Code of Lender Conduct. *Id.*

PartnerWeekly maintains an ongoing electronic database which includes all leads which have been offered since September, 2009 to contracting lenders through PartnerWeekly's real-time electronic system. Madsen Decl. ¶ 9. The database reports generated for the parties' use in this case include basic identifying information concerning the lead itself, including the person's name, address,

---

[1] (MoneyMutual, Selling Source, PartnerWeekly, and individual defendants Glenn McKay, Brian Rauch, John Hashman, Douglas Tulley, Samuel Humphreys, Alton F. Irby, III, are collectively referred to as the "MoneyMutual Defendants"). Defendant Montel Williams is the celebrity endorser for MoneyMutual, LLC. See Prop. 5AC, ¶¶ 108-112.

phone numbers and the email address from which the person submitted his or her information; the date and time when the lead is received by PartnerWeekly; information concerning the source of the lead to PartnerWeekly (either MoneyMutual or an affiliated Publisher); and whether the lead "FAILED," meaning that it was not acquired by any lender to whom the lead was circulated, or was "COMPLETED," meaning the lead was acquired by a lender to whom it was circulated and, if so, the identity of the acquiring contracting lender as recorded by PartnerWeekly. *Id*. PartnerWeekly's database does not include information on whether even a "COMPLETED" lead resulted in a consummated loan. That information is not known to PartnerWeekly. Madsen Decl. ¶ 14.

## III. ARGUMENT

### A. Legal Standard for Class Certification

To bring a class action, Plaintiffs must satisfy both Rule 23(a) and Rule 23(b) of the Federal Rules of Civil Procedure. Under Rule 23(a) a class may be certified, with named plaintiffs as representatives, where (1) the class is so numerous that joinder of all members is impractical; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. The so-called "numerosity" requirement of Rule 23(a)(1) requires that the Plaintiffs show both that the class is numerous and that "an identifiable and ascertainable class exists." *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 489 (N.D. Cal. 2011).

To satisfy Rule 23(b), Plaintiffs must meet one of three potential standards. Plaintiffs here seek certification under Rule 23(b)(3), requiring that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." In analyzing this question, a court must consider (1) the class members' interest in individually controlling their separate claims; (2) any existing litigation already begun by class members; (3) the desirability of concentrating litigation in the particular forum; and (4) the likely difficulties in managing a class action." Plaintiffs "bear[] the burden of demonstrating that [they have] met each of

3   CASE NO. 4:13-cv-01171-JSW
MONEYMUTUAL DEFENDANTS' & WILLIAMS' OPP. TO MOTION TO CERTIFY CLASS

the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)." *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1186 (9th Cir.2001).

Although "a court should not conduct a hearing on the merits of the plaintiffs' claims," a court should "ordinarily consider both factual and legal issues of plaintiffs' claims." *Ollier v. Sweetwater Union High School Dist.*, 251 F.R.D. 564, 565 (S.D. Cal. 2008). Thus, "notwithstanding its obligation to take the allegations in the complaint as true, the Court is at liberty to consider evidence which goes to the requirements of Rule 23 even though the evidence may also relate to the underlying merits of the case." *In re Unioil Secs. Litig.*, 107 F.R.D. 615, 618 (C.D.Cal.1985). The underlying merits of the claim may be directly relevant to the certification question, where legal issues surrounding the merits threaten to divide the class and defeat commonality. *See Rojas v. Marko Zaninovich, Inc.*, No. CIV-F-09-0705AWI JLT, 2013 WL 1326582, *3-4 (E.D. Cal. Mar. 29, 2013) (discussing cases, noting that certification could be improper where the claims of a portion of the class rest on an invalid legal theory).

**B.      Plaintiffs' Motion for Class Certification is Based on Definitions Contained in an Amendment to the Complaint that is Improper and Should Not Be Allowed**

Plaintiffs base their motion for class certification on the Proposed 5AC. The proposed complaint looks to amend the Fourth Amended Complaint with, among other things, a major and substantive change to the class definition. The Fourth Amended Complaint describes the following main class:

> All California residents who **received** a "payday loan" from an UNLICENSED LENDER on or after February 11, 2009 by using any website affiliated with or in response to an email from Selling Source, LLC or one of its subsidiaries. Any lender owned by an American Indian tribe during the entire Class Period is excluded.

As well as the following two subclasses:

> All California residents who **received** a "payday loan" from an UNLICENSED LENDER on or after February 11, 2009 by using the MoneyMutual website. Any lender owned by an American Indian tribe during the entire Class Period is excluded. (4AC, ¶ 24.)

And:

> All California residents who **obtained** a "payday loan" from Cash Yes or Cash Jar on or after February 11, 2009 through any means.

Fourth Amended Complaint, ¶¶ 23-25. Emphasis added. The Proposed 5AC would shift the previous main class into a subclass, and introduces a new main class:

> All California residents listed in a spreadsheet produced by Defendants as being persons **who applied for a payday loan** from an UNLICENSED LENDER on or after February 11, 2009 using any website affiliated with or in response to an email from Selling Source, LLC or one of its subsidiaries. Any lender owned by an American Indian tribe during the entire Class Period is excluded.

Prop. 5AC ¶ 23-26. Thus, in their motion for class certification and in the Proposed 5AC, Plaintiffs would vastly expand the proposed class to include individuals who applied for a loan through a Selling Source affiliate, but received no loan. This proposed class therefore now encompasses plaintiffs who stand on the weakest possible footing – plaintiffs who *paid nothing* and therefore suffered no damages, creating obvious standing problems discussed *infra* at Section III(C)(1) and in the opposition to Plaintiffs' motion for leave to amend. If the Court denies Plaintiffs' motion for leave to amend, Plaintiffs would be proposing a class unsupported by a pleading.

Plaintiffs cite *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606, 619 (N.D. Cal. 2015) for the notion that the class in a motion for certification need not match the class in the complaint. That court, however, noted that in the case before it "the parties have all had ample time to consider and respond to the class definition as proposed," and also noted that the case cited to the Court for the proposition that the definitions need not match, *In re Conseco Life Ins. Co. Lifetrend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521, 530 (N.D.Cal.2010), *narrowed* the class definition. *In re Cathode Ray, supra,* 308 F.R.D. at 619-620. Not so in the case at bar: defendants have been told, at the last minute that they must also consider loan applicants *who never received loans and never paid any fees*. It is as if class defendants in a food poisoning case were to suddenly realize that they were defending not just against people allegedly sickened by their food, but anyone who allegedly *ate* the food at all. Given that *In re Cathode Ray* is not even applicable here, the applicable rule is that "[t]he Court is bound to class definitions provided in the complaint and, absent an amended complaint, will not consider certification beyond it." *Bee, Denning, Inc. v. Capital Alliance Group,* No. 13–cv–2654–BAS–WVG, 2015 WL 5675798 (S.D. Cal. Sept. 24, 2015), *citing Costelo v. Chertoff*, 258 F.R.D. 600, 604–05 (C.D.Cal.2009). "The primary exception to this principle is when a

plaintiff proposes a new class definition that is narrower than the class definition originally proposed, and does not involve a new claim for relief." *Id., citing Costelo, supra,* 258 F.R.D. at 604-605.

### C. Plaintiffs Cannot Satisfy the Requirements of Rule 23(b) Because Individual Issues of Law and Fact Predominate Over Common Issues of Law and Fact

#### 1. The Class as Defined is Divided by the Legal Issue of Whether a Plaintiff Who Did Not Receive a Loan Can Recover

Generally, on a certification motion a court does not examine the merits of the Plaintiffs' asserted claims. *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551-2552 (2011). But a court nonetheless must undertake a "rigorous analysis" of relevant facts and law to determine whether the standards of Rule 23 are met, and "[f]requently that 'rigorous analysis' will entail some overlap with the merits of plaintiff's underlying claim. That cannot be helped." *Id*. "Presented with a class certification motion, a trial court must examine the plaintiff's theory of recovery [and] assess the nature of the legal and factual disputes likely to be presented," and while it need not necessarily resolve the disputes at hand, it must determine whether the disputes are amenable to class-wide resolution. *Brinker Restaurant Corp. v. Sup. Ct.* (2012) 53 Cal.4th 1004, 1025 (discussing principles of class certification as stated in both California and federal law). "The key question is whether the proposed class is subject to the same legally significant question in the same way." *Rojas, supra,* 2013 WL 1326582 at *2. Such a question can encompass the ultimate validity of the legal theories presented by the plaintiffs. As stated in *Rojas*, *supra*, discussing the Supreme Court's holding in *Wal-Mart*, *supra*, "certification of a class under an ultimately invalid legal theory may be proper if commonality and predominance of common over individual issues are met," however, "a problem arises if a pertinent legal question divides the proposed class and commonality is destroyed." *Rojas*, *supra*, 2013 WL 1326582 at *4. In *Brinker*, for example, an intervening California Supreme Court decision had invalidated the claims of a large portion of a proposed class, which decision "rendered the class definition adopted by the trial court overinclusive: The definition on its face embraces individuals who now have no claim against Brinker"; while certification might have been proper had all or none of the claims been rendered invalid, the fact that the class straddled the line defeated

commonality. *Rojas*, *supra*, 2013 WL 1326582 at *4, quoting and discussing *Brinker, supra,* 53 Cal.4th at 1050.[2]

The issue discussed in *Rojas* infects this case given the overbreadth of Plaintiffs' proposed class, as the class is sharply divided as to standing. Plaintiffs' First Cause of Action for alleged violation of the California Deferred Deposit Transaction Law ("CDDTL"), Financial Code Section 23000 *et seq.,* charges that the MoneyMutual Defendants and Mr. Williams assisted in "offering" loans from unlicensed lenders. But Section 23064 of the Financial Code creates a private right of action for individuals *harmed* by a violation of that chapter:

> Any person who is injured by any violation of this division may bring an action for the recovery of damages, an equity proceeding to restrain and enjoin those violations, or both. The amount awarded may be up to three times the damages actually incurred, but in no event less than the amount paid by the aggrieved consumer to a person subject to this section. . . .

A clear legal question arises applicable to only *part* of the class: can an individual who applied for, but did not receive, a loan from an unlicensed lender and therefore never paid anything to anybody, be said to have been "harmed" by the alleged CDDTL violation? Section 23064's second sentence necessarily confirms that an "aggrieved customer" is somebody that has paid some amount to the party allegedly violating the CDDTL, by limiting recovery to such "aggrieved customers."

Legal issues regarding standing are likewise implicated by Plaintiffs' Second Cause of Action for alleged violation of the Racketeer Influenced and Corrupt Practices Act ("RICO"). The RICO statutes provide a private right of action for any person "injured in his business or property by reason of a violation" of the RICO laws. 18 U.S.C. § 1964. To have standing to bring a civil RICO claim, the Plaintiffs must identify some actual injury caused by the RICO violation. *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 294 (9th Cir. 1990). Here, however, the only RICO injury alleged by Plaintiffs is that "Plaintiffs and Class Members have suffered damages and/or injuries to their interests in business and/or property **through the payment of sums of money as previously alleged**." Prop.

---

[2] Courts in the Ninth Circuit have also held that "[b]efore considering whether Plaintiffs' proposed classes meet the requirements of Federal Rule of Civil Procedure 23, the Court must determine whether the members of the proposed class have Article III standing." *Webb v. Carter's Inc.*, 272 F.R.D 489, 497-498 (C.D. Cal. 2011), citing *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43 (1993) (federal court may only exercise jurisdiction over absent class members whose claims are ripe).

5AC ¶ 144 (emphasis added). Major standing issue divide the class between those members who received a loan and did "pay[] sums of money," and those who did not.

A different but related issue pertains to Plaintiffs' Third Cause of Action for alleged violation of California's Unfair Competition Law ("UCL"), Business and Professions Code Section 17200 *et seq*. This cause of action is predicated on the alleged unlawful practice of the unlicensed offering or arranging of deferred deposit loans, and states that "[a]s a proximate result of the violation of the UCL as set forth above, Plaintiffs suffered injury in fact and sustained monetary loss (hundreds of dollars) according to proof," and "Class Members also lost money as a result of the illegal Deferred Deposit Transactions."   Prop. 5AC ¶¶ 149-150.  That is, Plaintiffs assert damages under their Third Cause of Action based on the provision of loans to class members, with monetary loss flowing therefrom; class members that did not receive loans would not have suffered these damages. While the UCL contains an "injury-in-fact" requirement that only applies to named plaintiffs, requiring that named plaintiffs have suffered a loss of money or property, *see  In re Tobacco II Cases* (2009) 46 Cal.4th 298, 315–24, in a federal class action based on California UCL claims the plaintiffs must also show that class members will meet Article III standing requirements. *Webb v. Carter's Inc.*, 272 F.R.D 489, 497-498, 503 (C.D. Cal. 2011) (denying motion for class certification on UCL claims; because majority of class members lacked standing, proof of injury-in-fact, and thus standing and ability to recover, was not subject to class-wide proof).

As the foregoing makes clear, serious standing issues are present for those class members who did not receive loans, issues which are not common to a class as a whole.  This alone defeats commonality and precludes class certification.[3]

### 2.  Individual Issues Predominate Regarding What Alleged Representations, if Any, Were Seen by Which Class Members

Plaintiffs Motion to Certify Class describes the Fourth Cause of Action as one "for UCL deception."  Moving Br. at 14:5.[4]  Plaintiffs' UCL fraud claim (at least as presented in the currently-

---

[3] Also, notably, because each of the four named plaintiffs received loans (*see* Prop. 5AC ¶¶ 51-55), if the class were divided to separate individuals who did and did not receive loans, no typical or adequate representative would exist for a class or sub-class consisting of individuals who did not receive loans, and such a class could not be certified.  *See Zinser, supra,* 253 F.3d at 1190 (each subclass must independently meet Rule 23 requirements).

operative Fourth Amended Complaint) is nearly identical to claims that courts in California and the Ninth Circuit have often faced in the class certification context – consumer fraud UCL claims based on representations made in advertising and/or marketing materials. While "[p]roof that statements were material to the plaintiff purchaser class, and that class members relied on those statements in making purchasing decisions, does not always require individualized evidence for each class members . . . . in all but the most unusual case, plaintiffs must offer some means of proving materiality and reliance by a reasonable consumer on a classwide basis in order to certify a class." *Kosta v. Del Monte Foods, Inc.*, 308 F.R.D. 217, 224-225 (N.D. Cal. 2015) (citations omitted). Individualized issues of fact will predominate over common issues of fact where "[c]lass members may have relied on different representations, while some may not have relied on, or even have been exposed to, any of the allegedly false representations." *Gonzalez v. Proctor and Gamble Co.*, 247 F.R.D. 616, 623 (S.D. Cal. 2007).

While the UCL does not require a showing of actual reliance by every class member, and this threshold for standing need only be shown for a representative plaintiff, the UCL does not "authorize an award for injunctive relief and/or restitution on behalf of a consumer who was never exposed in any way to an allegedly wrongful business practice" – thereby making actual reliance an issue for predominance analysis even if not for standing. *Campion v. Old Republic Home Protection Co., Inc.* 272 F.R.D. 517, 535 (S.D. Cal. 2011), *quoting Cohen v. DIRECTV, Inc.,* 178 Cal.App.4th 966, 970 (2009). "When considering class certification, an inference of common reliance is permitted in claims arising under the UCL when a specific material misrepresentation of a particular fact was made to each class member and the claims of all the class members stem from this source. Where a

---

[4] It is not clear to the MoneyMutual Defendants exactly how Plaintiffs currently claim to have been deceived. In the Proposed 5AC, the Fourth Cause of Action, excluding language struck by the Court, reads: "As previously alleged, the MoneyMutual Defendants made false, misleading and deceptive statements about [the] legal status of the lenders in the Lending Network including the UNLICENSED LENDERS. This constituted a fraudulent business practice in violation of the UCL." Prop. 5AC at ¶ 154. This would seem to encompass only alleged representations made by MoneyMutual that the lenders in its network were licensed in California, and it is unclear where such representations are alleged. However, Plaintiffs' motion to certify class seems to follow the Fourth Amended Complaint, which alleges that the MoneyMutual Defendants and Mr. Williams made false representations regarding the misuse of class members' personal information and the debt collection practices of lenders arranged through the MoneyMutual website. See Moving Br. at 4:16-21. While the MoneyMutual Defendants and Mr. Williams do not believe this same allegation is charged in the proposed 5AC, we necessarily have to assume that Plaintiffs are still pursuing this claim.

class of consumers may have seen all, some, or none of the advertisements that form the basis of a plaintiff's suit, an inference of common reliance or liability is not permitted." *Id.* at 536, *citing Gonzalez v. Proctor & Gamble Co.*, 247 F.R.D. 616, 626 (S.D.Cal.2007).

Here, there is a serious question concerning how many class members would have actually *seen* some or any of the representations underlying the Fourth Cause of Action, which representations do not appear on the front page of the moneymutual.com website. As stated above, many leads acquired by PartnerWeekly were not obtained through the moneymutual.com website; indeed, Plaintiff Aquino never submitted her information through moneymutual.com. Putterman Decl., Exs. B (Aquino Dep.) at 12:12-13:5. And, even those Plaintiffs who did use moneymutual.com testified all over the map regarding what, if anything, they saw when they input their information. When asked if she reviewed the MoneyMutual website, Plaintiff Malone testified that she "read the contract part of it but [she] never went on their total website, no." Putterman Decl., Ex. A (Malone Dep.) at 22:12-15. She also testified that she was not aware that MoneyMutual had a toll-free customer service numbers she could call, as he "didn't scroll down far enough." *Id.*, Exs. A (Malone Dep.) at 118:18-119:6, M. Plaintiff Gilbert applied for loans through several websites, and did not review the entire sites, but only "looked for important stuff." *Id.,* Ex. D (Gilbert Dep.) at 71:4-73:1. If named plaintiffs admit to not having reviewed the website, it is a certainty that a wide swath of the proposed class also skipped the allegedly misleading representations – not even considering the individuals in the Main Class who applied for loans through a variety of portals.

Because Plaintiffs have not offered sufficient proof that class members were likely exposed to and relied upon the allegedly deceptive statements, individualized issues of reliance and materiality predominate. Accordingly, any class certification based on these representations is inappropriate.

**3. Individual Issues Predominate Regarding the Fact and Extent of Any Alleged Harassment or Dissemination of Personal Information**

As noted above, it is unclear whether the proposed 5AC's Fourth Cause of Action attacks any representations beyond the alleged *implication* that lenders within the Money Mutual Defendants' lending network were licensed; however, Plaintiffs' moving brief refers to two alleged misrepresentations: "that lenders were prohibited from misusing borrower's personal information or

using illegal collection methods." Moving Br. at 4:18-20. Regarding the first issue, judging whether the MoneyMutual Defendants or lenders within their network misused borrowers' personal information would require a highly difficult individual inquiry.[5] As discussed in the Madsen Declaration and in Section II, *supra,* short-term loan borrowers often submitted information to multiple websites, and PartnerWeekly-affiliated Publishers also distribute leads to other lead generators – not to mention everybody else to whom consumers in the year 2015 routinely submit contact information (and who are hacked just as routinely). Further, information on borrowers with delinquent loans may be provided to collections agencies, who MoneyMutual does not include in the representations challenged by Plaintiffs.

Not surprisingly, not a *single* named plaintiff was able to directly trace any improper dissemination of its personal information to a MoneyMutual Defendant or network lender. Plaintiff Malone had no knowledge of information being sold by a MoneyMutual Defendant or a lender, and in fact did not receive spam communications or any unsolicited contact from anyone besides her lender. Putterman Decl., Ex. A (Malone Dep.) at 23:16-24:17; 26:21-27:15; 105:13-17. Plaintiff Bilbrew could not identify any specific reason to believe that MoneyMutual had disseminated her personal information, outside the fact that she could not recall providing her information to another company (though could not be certain she had not) – and, of course, ignoring the numerous lenders, and ultimately collection agencies, who properly had her information. *Id.*, Ex. C (Bilbrew Dep.) at 48:12-51:13; 54:10-12; 61:11-62:25; 81:4-85:21. Plaintiff Aquino input her information into several websites and could not remember precisely where. *Id.*, Ex. B (Aquino Dep.) at 28:3-37:3. She also had no knowledge of how specifically third parties might have received her information. *Id.* at 77:1-13.[6] An individual inquiry would be necessary to actually trace or reasonably infer any dissemination of personal information to the MoneyMutual Defendants or their lender network.

Similarly, there are significant individual differences regarding whether borrowers experienced harassment at the hands of lenders or collections agencies to whom lenders sent

---

[5] And, of course, debt collection practices would only be an issue for class members who actually took out loans, similarly dividing the class on this claim in the same manner described in Section III(C)(1).
[6] Bilbrew also acknowledged being aware that unpaid loans were often sold by lenders to other companies who then sought to collect them. Putterman Decl., Ex. C (Bilbrew Dep.) at 49:10-14.

delinquent loans – even setting aside the fundamental individual differences between borrowers who did or did not allow their loans to become delinquent. Plaintiff Malone, for instance, received calls from her lender and a collection agency, but not from any person pretending to be law enforcement or threatening arrest. Putterman Decl., Ex. A (Malone Dep.) at 32:8-23. Plaintiff Bilbrew claimed harassment, but could provide no information regarding whether this harassment came at the hands of lenders within MoneyMutual's lending network, or collections agencies to whom the loans had been sent after the loan became delinquent. *Id.*, Ex. C (Bilbrew Dep.) at 106:7-107:9. Plaintiff Aquino could only recall being harassed once, but could not say in connection with which loan it had occurred, let alone whether it was connected to a loan obtained through the MoneyMutual Defendants. *Id.*, Ex. B (Aquino Dep.) at 75:10-76:12.

This composite information confirms that the experience of individual borrowers depended on the lenders from whom they received loans and on the collection agencies to whom these lenders forwarded delinquent loans or to whom unpaid loans were sold. Thus, not only are Plaintiffs unable to direct the Court to any practices or policies of any MoneyMutual Defendant that could be inferred to have resulted in harassment on a classwide basis, but the contrary is true; indeed, many class members would not have been harassed at all. In such a case, individual issues predominate and class certification is inappropriate. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551-2552 (2011).

### 4. Individual Inquiry Would be Necessary to Determine Whether Class Members Have Received Alternate Relief Through Arbitration

Individual issues also exist because class members may have already been made whole from any asserted damages, including through private arbitration with allegedly offending lenders. *See, e.g.* Putterman Decl. Exs. A (Malone Dep.) at 59:12-61:12; C (Bilbrew Dep.) at 56:8-57:2. Individual inquiry of class members would be necessary to ensure that class members do not receive a double recovery for claimed damages.

### D. Plaintiffs Cannot Satisfy the Requirements of Rule 23(a)(1) because the Membership of Plaintiffs' Class is Not Ascertainable

The first prong of Rule 23(a)(1) encompasses not only the requirement that a class be numerous enough to make joinder impractical, but also that membership in the class be ascertainable. *Wolph, supra,* 272 F.R.D. at 489. This requires not only that the class be identifiable from objective,

1  rather than subjective criteria, but also that there be a practical, administratively feasible method for
2  determining who meets these criteria. *Kosta v. Del Monte Foods, Inc.* 308 F.R.D. 217, 226 ( N.D.
3  Cal. 2015), *citing Xavier*, *supra*, 787 F.Supp.2d at 1089.

4  　　　In their proposed main class definition, Plaintiffs have included everyone who submitted
5  information through MoneyMutual or a third-party affiliate Publisher of PartnerWeekly. Simply put,
6  there is no administratively feasible method for identifying those individuals that received a loan
7  through MoneyMutual or another Selling Source-affiliated entity, and as explained in Section
8  III(C)(1), *supra*, no class can survive that combines individuals that did and did not receive loans.
9  This barrier prevents the certification of Plaintiffs' two subclasses, and also prevents any attempt to
10 certify a modified definition of Plaintiffs' main subclass that limits the class to those who received
11 loans (in order to avoid the standing issues that are fatal to the certification of the main class).

12 　　　As discussed above, the PartnerWeekly database relied on by Plaintiffs extends only to
13 showing whether leads were or were not acquired by contracting lenders. Madsen Decl., ¶ 9. It does
14 not show whether a loan ultimately resulted from the acquisition of a lead and, if so, the terms,
15 conditions and subsequent history and repayment of any such loan. *Id.*

16 　　　Plaintiffs assert that potential class members, "[o]nce notified of class certification, [] will be
17 able to state whether the lead in question resulted in a funded loan," citing *Zeisel v. Diamond Foods,*
18 *Inc.* No. C 10–01192 JSW, 2011 WL 2221113 (N.D. Cal. Jun. 7, 2011). However, as noted in *Red v.*
19 *Kraft Foods, Inc.*, No. CV 10–1028–GW(AGRx), 2012 WL 8019257 (C.D. Cal. Apr. 12, 2012) when
20 distinguishing *Zeisel,* cases where self-identification alone has been deemed sufficient to render a
21 class ascertainable "generally involve situations where consumers are likely to have retained receipts,
22 where the relevant purchase was a memorable big ticket item, or where the defendant would have
23 access to a master list of either consumers or retailers who dealt with the items at issue." *Id*. at *5.
24 Such is not the case here, where we have a master list with *some* of the relevant information, but the
25 testimony of the named plaintiffs themselves shows that individual payday loans are not memorable,
26 but memorably jumbled together, and that consumers often lack documentary evidence necessary to
27 show whether an application through a Selling Source-affiliated website resulted in a loan. For
28

example, Plaintiffs' Proposed 5AC states that Plaintiff Kimberly Bilbrew used the moneymutual.com website to obtain loans from three lenders.  Prop. 5AC ¶ 53.  In deposition Ms. Bilbrew received multiple loans from these lenders, and could not recall whether the follow-on loans were obtained through MoneyMutual.com or direct through the lenders: "I don't recall.  I think I may have went directly to them.  I thought I went through MoneyMutual, but I think I may have went directly to CastlePayday."  Putterman Decl., Ex. C (Bilbrew Decl.) at 27:16-24.  Plaintiff Aquino input information with Publishers to obtain loans in February and March 2013.  Prop. 5AC ¶ 55.  In deposition, as Ms. Aquino was walked through the entries bearing her name in the database referenced above, she had significant trouble remembering which specific websites she had entered her information into, which applications had resulted in which loans, and from which lender these loans were received – even when presented with copies of her signed loan agreements, she could not recall exactly how these loans were acquired.  Putterman Decl., Ex. B (Aquino Dep.) at 28:3-37:3; 54:21-57:23. During a period in which Plaintiff Gilbert was desperate for loans, he was applying for loans online once or twice a week through multiple websites, and could not recall whether these applications resulted in loan agreements.  Putterman Decl., Ex. D (Gilbert Dep.) at 66:14-68:23, 71:16-20.  Mr. Gilbert referred to other loans received around the same time those pled in the 5AC, but could not recall from whom he borrowed or how the loan was acquired.  *Id.* at 43:22-44:6.

Thus, even if a person in PartnerWeekly's database remembers receiving a loan, sometimes they cannot even connect a loan proximately received with a lead acquired from PartnerWeekly as opposed to from another source through which they contemporaneously applying for loans. Plaintiffs, certainly, have suggested no reliable method to do so.  Indeed, this problem appears on the face of the declaration of Cherilyn Rodriguez, offered in support of Plaintiffs' ascertainability argument.  This declaration states that Infotel International, Ltd. maintains a database of information for lender Cash Yes, which includes "name and address of the borrower, the email address of the borrower, phone numbers for the borrower, social security number for the borrower, the amount of money borrowed and the amount of money, if any, paid back by the borrower" – but does not mention information regarding *the source of the lead that led to the loan*, the most crucial piece of the chain.  *See* Declaration of Cherilyn Rodriguez, at ¶ 7.  Why should a class of all Cash Yes borrowers

be certified against the MoneyMutual defendants regardless of how the borrowers arrived at Cash Yes?  Further, and by way of example, Plaintiff Bilbrew testified that she received loans directly from Cash Yes (*see* Putterman Decl., Ex. C (Bilbrew Dep.) at 54:15-55:12), and these loans would appear in the Cash Yes data despite not having been arranged through moneymutual.com.  And this is one of the only lenders from whom Plaintiffs have sought discovery; as noted in the Madsen Declaration, since approximately 2013, most of the so-called "offshore lenders" identified in the Proposed 5AC, have gone out of business and no longer exist, and thus cannot be relied on to provide loan data.  Madsen Dec., ¶ 13.

Because there is no administratively feasible method to determine whether a person did or did not receive a loan through an application with Selling Source or an affiliate, and because this information is *central* to the claims sought to be brought by the class, the requirements of Rule 23(a)(1) are not met.

### IV.    CONCLUSION

Because Plaintiffs have failed to satisfy Rule 23, for reasons stated above, class certification should be denied.

Dated: December 18, 2015                                    PUTTERMAN LOGAN LLP

                                                            By   /S/ Donald J. Putterman
                                                                 Donald J. Putterman

                                                            Attorneys for Defendants MoneyMutual, LLC; Montel Williams; Selling Source, LLC; London Bay Capital LLC; and Glenn McKay.