EXHIBIT C

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

(OAKLAND DIVISION)

| | | |
|---|---|---|
| SEAN L. GILBERT, KEEYA MALONE, KIMBERLY BILBREW, CHARMAINE B. AQUINO, on behalf of themselves and all persons similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 4:13-cv-01171-JSW |
| v. | ) ) | |
| BANK OF AMERICA, N.A., et al., | ) ) ) | |
| Defendants. | ) ) | |

Videotaped Deposition of

KIMBERLY YVETTE BILBREW

Tuesday, November 24, 2015


THE SOUZA GROUP

Certified Shorthand Reporters

4615 First Street, Suite 200

Pleasanton, California 94566


Reported by:

LINDSAY PINKHAM, CCRR, CSR

LICENSE NO. 3716

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

Page 14

1  Q   These are with the CFPB?
2  A   Yes, correct.  And a follow-up letter with one
3  debt collector, and I think that's it.
4  Q   Okay, good.  You can lay that aside.
5      I'm going to ask the reporter put in front of
6  you -- actually, here are some of the exhibits from
7  yesterday.  And knowing our reporter, I'll bet they're
8  in nice numerical order.
9      Would you please pull out Exhibit 2, which is
10 the complaint in this matter.  And I'm going to go
11 through some paragraphs with you, and then we may go off
12 on some diversions in the middle, because I'm usually
13 distracted.
14      I'd like you to turn first to paragraph 5;
15 which is on page 3.  Now, you see that that refers to
16 defendant Montel Brian Anthony Williams?
17 A   I do.
18 Q   Commonly known as Montel Williams.  Do you know
19 who Mr. Williams is?
20 A   Yes, I do.
21 Q   And who is he?
22 A   I know him to be a television personality and
23 also a talk show host.
24 Q   Do you watch his talk show?
25 A   No.

Page 15

1  Q   Any reason why not?
2  A   I don't have television at home for the last
3  two years.
4  Q   Is that a good thing or a bad thing?
5  A   Probably good.  I save money.
6  Q   When you still had a television, did you watch
7  his show at all?
8  A   I think when I was younger.
9  Q   But not in recent years?
10 A   No.
11 Q   Do you have any understanding of what his role
12 or relationship is with MoneyMutual?
13 A   I understand that he is the spokesperson for
14 MoneyMutual.
15 Q   And what do you base that understanding on?
16 A   Based on his commercials that I've seen when I
17 did have television.
18 Q   And those were television commercials?
19 A   Yes.
20 Q   Do you remember what was said on any of those
21 commercials?
22 A   He basically -- I don't recall verbatim, but he
23 basically was selling it as a trustworthy source, when
24 you need help with finances, you don't want to be late
25 with your rent, you have car problems, that it's a

Page 16

1  trusted source for --
2  Q   When you say "it," do you mean MoneyMutual?
3  A   MoneyMutual.  MoneyMutual is a trusted source
4  for obtaining short-term loans.
5  Q   All right, would you please go to paragraph 6.
6  Starts at the bottom of the same page.  And you see in
7  paragraph 6 there's a reference to Glenn McKay?
8  A   I do.
9  Q   Now, again, excluding anything that you may
10 have learned from your counsel, do you know who Glenn
11 McKay is?
12 A   I do not.
13 Q   Do you have any knowledge at all of what Glenn
14 McKay's relationship is to any of the other defendants?
15 A   I do not.
16 Q   And I gather, then, you also don't know what
17 his role might be in connection with any of the other
18 defendants?
19 A   No, I do not.
20     MR. PUTTERMAN: And just as an aside, Madam
21 Reporter, have you noted that Ms. Charmaine Aquino is in
22 the room also?
23     THE REPORTER: Yes, I have.
24     MR. PUTTERMAN: Which, frankly, I think will be
25 helpful, because that will enable her to go through this

Page 17

1  faster, because she'll know what to expect.  Or maybe
2  not.
3  Q   Okay, would you please go to paragraph 7 on
4  page 4.  And you see that refers to defendant
5  PartnerWeekly LLC?
6  A   I do.
7  Q   Do you know anything about that company?
8  A   I do not.
9  Q   Do you know anything about that company's
10 relationship with the other defendants?
11 A   No, I do not.
12 Q   And do you know anybody who's affiliated or
13 associated with PartnerWeekly LLC?
14 A   I do not.
15 Q   Have you ever communicated with PartnerWeekly
16 LLC?
17 A   I have not.
18 Q   Have you ever communicated with Mr. McKay?
19 A   I have not.
20 Q   Okay, let's go to paragraph 8.  That refers to
21 a defendant Brian Rauch, spelled R-a-u-c-h, but it's
22 pronounced Rauch.  Do you know who Mr. Rauch is?
23 A   I do not.
24 Q   Have you ever communicated with him?
25 A   I have not.

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

1  Q   Do you know what his relationship is with any
2  of the other defendants?
3  A   I do not.
4  Q   Do you know what role he might have played in
5  connection with any of the events described in this
6  complaint?
7  A   I do not.
8  Q   Okay, same questions as to paragraph 9,
9  referring to John Hashman.  Do you know who he is?
10  A   No.
11  Q   Have you ever communicated with him?
12  A   No.
13  Q   Do you know what his relationship is or was to
14  any of the other defendants?
15  A   No.
16  Q   Do you have any knowledge concerning his role
17  with regard to the other defendants or in connection
18  with what's alleged in this complaint?
19  A   No.
20  Q   Okay, let's skip forward to page 6, please,
21  paragraphs 18, 19, and 20.  You see those paragraphs
22  refer to three individuals, Samuel W. Humphreys, Douglas
23  Tulley, and Alton F. Irby III?
24  A   I do.
25  Q   Do you know who any of those gentlemen are?

1  A   I do not.
2  Q   Have you ever communicated with any of those
3  gentlemen?
4  A   I have not.
5  Q   Do you know what any of their relationships
6  might be with any of the other defendants?
7  A   No.
8  Q   Do you know what role they may have played with
9  regard to the other defendants or with regard to the
10  allegations in the complaint?
11  A   I do not.
12  Q   Let me ask you this.  Do you know what a payday
13  loan is?
14  A   Yes.  A payday loan is a short-term loan.  It's
15  usually -- it's a short-term loan that's usually paid
16  back on the next payday.
17  Q   And how did you learn about payday loans?
18  A   I've had them previously over the years.
19  Q   Starting about when?  Do you know?
20  A   I want to say maybe around 2007.
21  Q   And why have you obtained payday loans in the
22  past?
23  A   Just to either make rent, car issues, maybe pay
24  a bill, not wanting to be late.
25  Q   At any of those times, did you investigate what

1  other alternatives you might have to obtaining payday
2  loans?
3  A   Yeah.  Probably a short-term loan with my bank,
4  but, you know, that didn't work out, so...
5  Q   So when you've obtained a payday loan, has that
6  been what I'll call the funding of last resource for you
7  at the time?
8  A   No, usually I tend to think ahead, so it's
9  usually not like a last minute thing with me, no.
10  Q   Okay, but when you've obtained a payday loan,
11  have you had any alternative financial resource
12  available at that time?
13  A   I probably could have asked my parents, but I
14  didn't want to.
15  Q   That comes with its own baggage.
16  A   Yes.  I was trying to be self-sufficient.
17  Q   Did you find payday loans helpful when you
18  obtained them?
19  A   Yes, I did.
20  Q   Do you remember at any time when you obtained a
21  payday loan whether you inquired as to whether the
22  lender was actually licensed to make loans in
23  California?
24  A   No, not then, no.
25  Q   Why not?

1  A   I wasn't aware of license, you know, the laws
2  regarding payday loans.
3  Q   But you strike me as a person who would have
4  read the loan agreements carefully --
5  A   I skimmed them, yes.
6  Q   So you were aware, for example, typically of
7  the interest that you would be paying?
8  A   Yes, I was.
9  Q   And the fees?
10  A   Yes.
11  Q   And did you understand that at least some of
12  those loans had rollover provisions of some kind?
13  A   Are we --
14  Q   No, I'm just speaking generally.
15  MR. WILENS: I'm going to object to the
16  term "rollovers."  You're going to have to define that.
17  Because rollovers are not legal in California.
18  MR. PUTTERMAN: That's what you're going to be
19  doing in this case.
20  MR. WILENS: Okay, that humor escaped me
21  completely.  But I'm sure you thought it was amazingly
22  clever.
23  MR. PUTTERMAN: No, it was only sort of
24  mediocre clever.
25  MR. WILENS: So define your term, if you would.

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

---

**Page 22**

1   Q    BY MR. PUTTERMAN:  Let me ask you this.  Before
2   we get -- any loans you took, before we get to the loans
3   that are involved with this case, did any of your loans
4   have a provision whereby you could extend the loan?
5   A    No.
6   Q    And do you remember some of the companies from
7   whom you obtained payday loans?
8   A    The only one I do remember was Check 'n Go, and
9   that was in 2007.
10  Q    And was that online or brick and mortar store?
11  A    It was online, directly to their website.
12  Q    Now, at some point, you started submitting
13  information to potentially obtain loans through the
14  MoneyMutual website; correct?
15  A    Yes.
16  Q    And what prompted you to do that generally?
17  A    It was going towards the end of January 2013.
18  My rent was due, it was a lot, and my 14-year-old car
19  had broken down at the same time.  So I was trying to
20  either figure out how to do car repairs or get enough
21  money to get a new car, a down payment, as well as
22  trying to cover my rent.
23  Q    Okay, so you had a lot going on.
24  A    Yes, within that week.
25  Q    And was there some reason in particular that

---

**Page 23**

1   you went to the MoneyMutual website?
2   A    I just remember it from commercials.
3   Q    At that time did you investigate other
4   potential sources of funds?
5   A    Yes, I did.
6   Q    And what sources did you investigate?
7   A    I investigated Cash Call.
8   Q    And what do you recall that Cash Call was?
9   A    Cash Call was a short-term lender, not
10  necessarily a payday loan, but an installment loan.
11  Q    And did you attempt to obtain a loan from Cash
12  Call?
13  A    I went through the process and then I decided
14  against it at that time, because I did not want to take
15  out a full -- I think the minimum was 2600.
16  Q    You wanted less?
17  A    Yes, I wanted less.
18       MR. WILENS: Well, she wanted more, but she
19  didn't want to have to pay back that much.
20       THE WITNESS: Yeah.
21       MR. WILENS: Now we're even.
22  Q    BY MR. PUTTERMAN: Okay, we'll come back to
23  those loans in a little bit.  And I'm going to jump
24  ahead now, back in Exhibit 2.  Well, actually, we're
25  going to come back to those loans in a very little bit.

---

**Page 24**

1   because we're going to go to paragraph 52 on page 17.
2   And that paragraph says:
3            "Between January and April 2013,
4        plaintiff Bilbrew used the
5        moneymutual.com website to obtain payday
6        loans from unlicensed lenders Cash Yes,
7        7X Services, LLC, and My Quick Funds,
8        and paid at least $450 on these loans."
9   A    Yes.
10  Q    And that's all correct?
11  A    Yes, as I recall.
12  Q    Now, why did you obtain loans from those three
13  lenders during that period of time from January to April
14  2013?
15  A    Basically, I was still trying to -- still
16  didn't get enough -- well, between January and April, I
17  was still trying to -- I had had a postdated check for
18  my car.  I had bought a new car, a new used car, so I had
19  a postdated check, so I was just trying to make sure I
20  covered rent and funds.
21  Q    And you were able to obtain funds from these
22  three lenders; correct?
23  A    Yes, I was.
24  Q    And how much total did you get from those
25  three?

---

**Page 25**

1   A    Through that time span?
2   Q    Yes, between January and April 2013.
3   A    There were various loans.  I would probably
4   say --
5        MR. WILENS: You don't need to guess.
6   Q    BY MR. PUTTERMAN:  You can give an estimate,
7   though.
8   A    Maybe under 1500, probably.
9   Q    Now, was there more than one loan with any of
10  these lenders?
11  A    Yes.
12  Q    Can you describe that for me?
13  A    I believe I took out two with Cash Yes, I think
14  possibly two with 7X Services, which I know it to be
15  CastlePayday, and one with My Quick Funds.
16  Q    Let me ask you this.  Was your initial loan
17  with Cash Yes satisfactory?
18  A    The first one was, yes.
19  Q    And that's one that you got after going through
20  the MoneyMutual website?
21  A    Yes, I believe it was the first one.
22  Q    Was the second one in response to a direct
23  offer from Cash Yes?
24  A    The $100 one, yes.
25  Q    And was that satisfactory?

---

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

---

**Page 26**

1  **A   Yes.**
2  **Q   And you knew what the interest rates were?**
3  **A   Yes, for those.**
4  **Q   And you knew what the fees were?**
5  **A   Yes.**
6  **Q   So fair to say you went into it with your eyes**
7  open?
8  **A   Yes.**
9  **Q   Now, was the first loan with 7X satisfactory?**
10 **A   Yes. It was fair. Well, not fair, but --**
11 **MR. WILENS:** He's just using the term
12 "satisfactory." It's kind of vague. It doesn't mean
13 it's legal; just means it's satisfactory.
14 **THE WITNESS:** Yes.
15 **Q   BY MR. PUTTERMAN:** I'm not into that at all.
16 I'm into, you know, did it serve your purposes, did you
17 understand it when you signed up for it --
18 **A   Yes.**
19 **Q   -- and did you feel that that particular loan**
20 was handled properly?
21 **A   Yes.**
22 **Q   Okay. And the same -- and when I**
23 use "satisfactory" with regard to the two Cash Yes
24 loans, do you understand that that's what I was
25 referring to?

---

**Page 27**

1  **A   Yes, I understand.**
2  **Q   And your answer remains "yes" to both of them?**
3  **A   Yes.**
4  **Q   Now, I'm getting from your facial expression**
5  and body language that the second loan with 7X might not
6  have been satisfactory?
7  **A   No.**
8  **Q   Okay. Can you tell me why?**
9  **A   I didn't realize -- when I first went into the**
10 loan, I was able to pay the first one back, everything.
11 And then I didn't realize when I got the second one
12 that -- I didn't know anything about rollovers. I
13 thought I was going to pay just a straight fee and then
14 there was the balance. Then it renewed, and I realized
15 that I'm in a rollover situation, which I didn't like.
16 **Q   Let me step back for one second. The first 7X**
17 loan is one that you got by submitting information
18 through moneymutual.com; correct?
19 **A   I did, yes.**
20 **Q   Was the second one the result of a direct offer**
21 from 7X, or CastlePayday?
22 **A   I don't recall. I think I may have went**
23 directly to them. I thought I went through MoneyMutual,
24 but I think I may have went directly to CastlePayday.
25 **Q   So do you recall how much in fees or other**

---

**Page 28**

1  charges and so on mounted up through the rollovers on
2  the second CastlePayday loan?
3  **A   I don't. I know it was like in excess of,**
4  like -- close to 200. About $175.
5  **Q   Did you communicate about this with**
6  CastlePayday?
7  **A   Towards April I did. In April I did.**
8  **Q   And what did you tell CastlePayday?**
9  **A   I told them that I couldn't afford the**
10 rollovers, I didn't realize that there was rollovers, or
11 "renewals," as they referred to them, and I wanted to
12 negotiate, I wanted to pay them the principal amount I
13 borrowed and just a fee. I could not have this, like,
14 constant rollover in my Bank of America account.
15 **Q   Let me ask you this. How much was the first**
16 CastlePayday loan for; do you remember?
17 **A   I don't remember. I know it was probably about**
18 600, maybe, 700.
19 **Q   And did you pay that one back?**
20 **A   I believe I did.**
21 **Q   And how much was the second one for?**
22 **A   The second one may have been around 700.**
23 **Q   Now, what was Castle Payday's response?**
24 **A   I didn't really -- I can't recall, but I**
25 sent e-mails, exchanged e-mails, and I was constantly

---

**Page 29**

1  being quoted by CastlePayday their terms. There really
2  wasn't any communication. It broke down.
3  **Q   Okay. We'll get back to that and the outcome**
4  of that a little bit later. I have some idea from the
5  documents that have been produced.
6  Now, how much of the original loan of the 700
7  did you pay back?
8  **A   For CastlePayday?**
9  **Q   Yes.**
10 **A   None.**
11 **MR. WILENS:** Of the original loan?
12 **THE WITNESS:** Oh, I'm sorry, the original loan.
13 I paid the original loan back, the first loan back. I
14 think it was like 850, possibly.
15 **Q   BY MR. PUTTERMAN:** When all was said and done.
16 **A   Yes.**
17 **Q   Okay. And the second loan for 700 you did not**
18 pay back.
19 **A   I did not pay that back.**
20 **Q   Okay. And again, we'll get into that a little**
21 bit further down the line.
22 Now, let me ask you this. When you started
23 having this problem with CastlePayday, did you attempt
24 to complain to MoneyMutual?
25 **A   No, I did not.**

---

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

---

Page 30

 1   Q   Why not?
 2   A   I didn't think that was an option.
 3   Q   Why didn't you think that was an option?
 4   A   Because I was dealing directly with
 5   CastlePayday. And I remember something, I think, on the
 6   website about, if you have questions about your loan,
 7   contact the lender.
 8   Q   Does that also tend to support in your mind
 9   that the second loan may have come directly from you
10   dealing with CastlePayday?
11   A   Yes.
12   Q   Let's go to the last loan with My Quick Funds.
13   What can you tell me about it?  How much was it for?
14   A   I believe My Quick Funds was for, I think,
15   $600.
16   Q   And was that loan satisfactory in the sense
17   that we've been discussing?
18   A   Yes.
19   Q   And did you repay that loan?
20   A   No, I didn't.
21   Q   Why not?
22   A   Because at the same time I was dealing with the
23   CastlePayday, I was going through the same
24   thing with My Quick Funds.
25   Q   They did a rollover?

---

Page 31

 1   A   Yes, I believe they did. And I believe they
 2   were both coming due at the same time. So I tried to
 3   negotiate both of them.
 4   Q   You could not afford to pay either of them with
 5   the rollovers started --
 6   A   No. The rollovers, no.
 7   Q   Did you negotiate with My Quick Funds?
 8   A   My Quick Funds, yes. I tried to.
 9   Q   Can you describe those negotiations?
10   A   I wrote a couple of e-mails to them and advised
11   them that I would not be paying the loan back, other
12   than in installments.
13       And they, like CastlePayday, quoted their terms
14   and advised that I would be sent to a collection agency,
15   and I should pay back the loan, and if I didn't, who
16   knows what the collection agency would do.
17   Q   This was just dealing, at that time, dealing
18   with My Quick Funds.
19   A   Yes.
20   Q   Now, let me ask you this.  Did you have loan
21   agreements with both My Quick Funds and, well, what
22   we're calling CastlePayday?
23   A   Yes.
24   Q   And did you read through them when you got
25   them?

---

Page 32

 1   A   I read through most -- some of it, yes.
 2   Q   Was there some reason you didn't read through
 3   all of it?
 4   A   It was a lot of information, but I did read
 5   through. I just did not catch the rollover, the
 6   renewal.
 7   Q   After you start negotiating with both those
 8   companies, did you go back and look at the agreements
 9   again, since they were referring you to the terms?
10   A   I didn't read through them completely, but I
11   just -- I was really stressed out. I didn't read
12   through them completely. I just wanted to negotiate a
13   deal with them.
14   Q   And would I be correct in assuming that you
15   also didn't contact MoneyMutual with your complaints
16   about My Quick Funds?
17   A   No, I didn't. I didn't see a reason at the
18   time, because I was dealing directly with the loans.
19   Q   Okay. Did you consider the possibility, either
20   with regard to My Quick Funds or CastlePayday, that
21   MoneyMutual, if you talked to them, might be able to put
22   some pressure on either of those companies?
23   A   No, I did not.
24   Q   Any reason why not?
25   A   Again, I was negotiating with the loans

---

Page 33

 1   directly. I was really stressed out about having a lot
 2   of money come out of my account, and I just -- was just
 3   focused on negotiating with those two loans.
 4   Q   Okay. Now, did you also obtain some other
 5   payday loans during that period, January through April
 6   2013, other than through MoneyMutual website?
 7   A   I had a Cash Call loan. I eventually took out
 8   a Cash Call loan. And I had, like, a storefront loan.
 9   Q   So the Cash Call loan was online?
10   A   Yes.
11   Q   And about how much was that for?
12   A   That minimum was 2600. I got 2500 or 24.
13   Q   And was that loan satisfactory?
14       MR. WILENS: What did you just say? The
15   minimum was 26 and you got 24?
16       THE WITNESS: Yes. There was a fee.
17       MR. WILENS: Okay. So it was a $2600 loan.
18       THE WITNESS: Yes.
19   Q   BY MR. PUTTERMAN: Okay. And that was like an
20   installment loan?
21   A   Yes.
22   Q   Okay. Was that loan satisfactory?
23   A   Yes.
24   Q   And did you pay that off?
25   A   Not directly to them. I paid it off to a debt

---

Page 34

1  collector.
2     Q   Why did it go to a debt collector?
3     A   I was having a hard timekeeping up with the
4  loans in that period, the rollovers.  And I was in the
5  process of moving.
6     Q   Can you describe your interaction with the debt
7  collector over the Cash Call loan?
8     A   There was just letters.  There wasn't really
9  any interaction.
10    Q   Okay.  But you eventually made arrangements to
11 pay it off?
12    A   Yes, I did.
13    Q   And you did?
14    A   I did.
15    Q   Now, you said you also got a storefront loan.
16 Do you remember who that was from?
17    A   No, it was some loan I had been dealing with
18 off and on the year before in the west of L.A., Santa
19 Monica.  I don't remember the name.  And that was paid
20 off as well.
21    Q   Okay.  Now, I notice that Exhibit 52 says that
22 you, quote, "paid at least $450 dollars on these loans,"
23 close quote, which were the Cash Yes, 7X Services, or
24 CastlePayday --
25    A   Correct.

Page 35

1     Q   -- and My Quick Funds loans.  Now --
2     MR. WILENS:  You mean paragraph 52.
3     MR. PUTTERMAN:  Yes.  I'm sorry.
4     Q   Now, in light of your testimony, there's a -- I
5  just want to clarify which loans exactly, the $450 was
6  paid on, or at least $450.
7        So you had the first Cash Yes loan that you got
8  as a result of submitting information to MoneyMutual,
9  and you paid off, I think you said, about 850 total on
10 that.
11       MR. WILENS:  Well, I'm going to advise the
12 witness not to guess.  There's documents that say these
13 things, and if you need to refresh your recollection --
14       MR. PUTTERMAN:  Well, she already testified on
15 it.  I'm just going through here.
16       MR. WILENS:  That was a wild estimate.  Now
17 you're asking her for a more precise breakdown.
18       MR. PUTTERMAN:  Didn't sound like a wild
19 estimate to me.  Why don't you just let her answer.
20       MR. WILENS:  Well, it is an estimate, because
21 it's not what the documents show.  So I don't know what
22 to tell you.
23    Q   BY MR. PUTTERMAN:  Okay.  Give us your best
24 answer, with the understanding that it might vary from
25 the documents.

Page 36

1     MR. WILENS:  But you're entitled to refresh
2  your recollection if you need to.  You're not going to
3  find it in there.  You're going to have to look at the
4  bank records or loan documents.
5     Q   BY MR. PUTTERMAN:  I'm just asking you, what do
6  you recall, without looking at the documents, about what
7  did you pay back on them?
8     A   Could you specify the period, or just the
9  individual loans?
10    Q   Just the individual loans.
11    A   For Cash Yes?
12    Q   The first loan.
13    A   I believe I paid at least, I'm going to say
14 about 450 for that loan.
15    Q   So you did not pay back the entire first loan?
16    A   I did pay back the entire first loan.
17    Q   Okay.  And the second loan you did not pay --
18 excuse me.  Did you pay that back?
19    A   The second loan for Cash Yes?
20    Q   Yes.
21    Q   Yes, I did.
22    Q   And how much did you pay on that?
23    A   I want to say it was 100.
24    Q   Okay.  But might have been a little bit more
25 with fees?

Page 37

1     A   Yes.  Sorry.  I'm just trying to remember how
2  many I'd taken out with Cash Yes.
3        MR. WILENS:  If you need to refresh your
4  recollection, don't guess.  We have all the loan
5  agreements here.  You don't need to actually -- you just
6  need to say the words.  He'll give you a document if you
7  need to refresh --
8     Q   BY MR. PUTTERMAN:  I'll be showing you the
9  documents a little bit later.
10    A   Okay.
11       MR. WILENS:  So rather than guess, if you need
12 to, just say you would have to refresh your
13 recollection.
14       THE WITNESS:  I have to refresh.  I can't
15 remember.
16    Q   BY MR. PUTTERMAN:  Okay.  And that was the one
17 you got -- the second one was the one you got directly
18 dealing with Cash Yes.
19    A   I'm not sure.  I have to refresh my memory.
20    Q   Okay.  The CastlePayday loan, the first one you
21 paid back?
22    A   Yes.
23    Q   And do you remember how much you paid?
24    A   I believe it may have been 750.
25    Q   And the second one you did not pay because of

Page 38

1  the --
2  **A   I did not --**
3  Q   -- dispute over the rollovers.
4  **A   -- yes, correct.**
5  Q   And the My Quick Funds you did not pay --
6  **A   I did not, because of the dispute.**
7  Q   Do you remember making payments to an entity
8  called United Cash?
9  **A   I do not.**
10     MR. PUTTERMAN: I'm going to ask the reporter
11 to mark as Exhibit 16 a printout from the PartnerWeekly
12 database showing Ms. Bilbrew's applications for loans
13 through either MoneyMutual or through other affiliated
14 publishers.
15     (Defendants' Exhibit 16 was marked
16     for identification.)
17 Q   BY MR. PUTTERMAN: Let me ask you this first.
18 Have you not communicated with MoneyMutual about any of
19 your loans after you obtained the loans?
20 **A   No.**
21 Q   And again, why not?
22 **A   Because I was negotiating directly with the**
23 **loans themselves.**
24     MR. WILENS: The lenders, you mean.
25     THE WITNESS: The lenders. Sorry.

Page 39

1  Q   BY MR. PUTTERMAN: And you understood that the
2  MoneyMutual website had stated that if you had questions
3  or issues about the loans, you should discuss them with
4  the lender?
5  **A   Yes.**
6  Q   Did you understand that MoneyMutual was not the
7  lender?
8  **A   Yes.**
9  Q   Let's take a look at this printout. Now, the
10 first time you submitted information to a website that
11 ended up going through the, I'll call it the
12 PartnerWeekly system, appears to have been on October
13 25, 2010. Do you see that?
14 **A   Yes.**
15 Q   And that was through something called Access
16 Financial Services, but it also says, the URL says
17 checkngo.com. Do you remember applying for that loan?
18 **A   There's a possibility I did. I don't really**
19 **recall, but there's a possibility.**
20 Q   This indicates that the lead was actually
21 acquired by somebody. Do you recall getting a payday
22 loan at about the time?
23 **A   No.**
24 Q   So you might not have?
25 **A   No. I remember going into Check 'n Go at a**

Page 40

1  certain point in and around this period, but I thought
2  the loan was denied, so I did not get any money.
3      MR. WILENS: This doesn't mean the loan was
4  granted or denied. It just means that they accepted it
5  for consideration. It just means the qualifications.
6      THE WITNESS: There's a possibility I did, yes.
7  Q   BY MR. PUTTERMAN: We then have what appears to
8  be likely to be one submission on January 29, 2013. So
9  that's the period in which you're discussing. And it
10 shows four different URLs, but I will represent to you
11 this was likely the result of one submission. You see
12 on January 29?
13 **A   I do.**
14 Q   Now, do you recognize either any of the URLs or
15 the publisher names as one that you submitted an
16 application for a payday loan through?
17 **A   I don't.**
18 Q   Okay. But you indicated you were applying for
19 payday loans during that period.
20 **A   Yes.**
21 Q   Okay. So you believe you quite probably did
22 submit an application?
23 **A   I believe I did.**
24 Q   Okay. Then we come to -- and do you recall, by
25 the way, submitting applications during that period and

Page 41

1  not being approved for loans?
2      MR. WILENS: Are you talking about January 29
3  or January 30?
4      MR. PUTTERMAN: 29.
5      MR. WILENS: Five of them. You said four
6  earlier.
7      MR. PUTTERMAN: Yeah. Could be five.
8  Q   How that works, by the way, is that sometimes
9  an affiliate publisher will also distribute the lead to
10 other publishers who happen to be affiliates of the
11 lead. One submission, one application submission, comes
12 into the system from several sources.
13     All right, let's go to the January 30. And
14 that appears to be a submission of information by you
15 through the MoneyMutual website which resulted in an
16 acquisition of the lead by 7X Services, LLC. Correct?
17 **A   Correct.**
18 Q   Okay. And that turned out to be the loan that
19 you arranged with CastlePayday?
20 **A   I believe so.**
21 Q   Okay. Now, after you were matched up with
22 CastlePayday, did they contact you?
23 **A   Yes.**
24 Q   And how did they do that?
25 **A   I can't remember. There was a possibility, I**

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

---

Page 42

1  believe, it was phone.
2  Q   And at that point, after that point, did you
3  have anything further to do with MoneyMutual in
4  connection with that loan?
5  A   No.
6  Q   Then the next one down the list shows that on
7  or about February 4, 2013, you submitted information to
8  MoneyMutual or to an affiliate, and the lead was
9  acquired by M. Mark High LTD, which I will represent to
10 you is an affiliate of Cash Yes.  So that then would be
11 the Cash Yes loan?
12 A   Correct, yes.
13 Q   The initial Cash Yes loan.
14 A   Yes.
15 Q   Now, do you remember getting the Cash Yes loan
16 as a result of going through the MoneyMutual website, or
17 through another website?
18 A   MoneyMutual.
19 Q   You remember that one as being a MoneyMutual.
20 A   Yes.
21 Q   Okay.  The next one is submission of
22 information on April 1, 2013, and the lead there appears
23 to have been acquired by My Quick Funds.  So that would
24 be what resulted in the My Quick Funds loan.  Correct?
25 A   Correct.

---

Page 43

1  Q   Okay.  Now, with regard to Cash Yes, were you
2  contacted by Cash Yes?
3  A   Yes.
4  Q   And after you were contacted by Cash Yes, did
5  you have any further dealings or interaction with
6  MoneyMutual in connection with that Cash Yes loan?
7  A   No.
8  Q   Same questions with regard to My Quick Funds.
9  Did they contact you?
10 A   Yes.
11 Q   And after they contacted you, did you have any
12 further communications or interactions with MoneyMutual
13 concerning the My Quick Funds loan?
14 A   No.
15 Q   Now, it appears from this printout that on July
16 22, 2013, you again submitted information through the
17 MoneyMutual website.  Do you see that?
18 A   I do.
19 Q   But it says "failed" here, which means that you
20 were not matched up with a lender.  Do you recall going
21 to the MoneyMutual website again?
22 A   I do.
23 Q   Okay.  And was that because you had found the
24 MoneyMutual satisfactory in your prior attempts to be
25 matched up with a lender?

---

Page 44

1  A   I do.
2  Q   And at that time did you believe that the
3  problems with the lender were the result of the lenders,
4  on the second loans with CastlePayday and My Quick
5  Funds, were the result of the lender not doing things
6  properly?
7  A   I do.
8  Q   Okay.  Were you upset in July 2013 that you
9  couldn't get matched up with a lender again through the
10 MoneyMutual website?
11 A   No.
12 Q   And why not?
13 A   Well, the long answer is, I was in the process
14 of moving, and I had a very big deposit, and I did not
15 want to ask my family for money.  But I just sucked it
16 up and asked, and they helped.
17 Q   Good.  Now, we don't have any other record,
18 after July of 2013, of you applying for another payday
19 loan through MoneyMutual.
20 A   No.
21 Q   And is there a reason you did not go back to
22 the MoneyMutual website after that?
23 A   Because of the harassment I was receiving from
24 CastlePayday in August, and just, you know, tightened my
25 belt.  But mostly I was stressed out from the harassment

---

Page 45

1  that I received from various phone calls, other, I
2  guess, lenders that I didn't take loans out with, but
3  people who had my information calling me on my cell
4  phone and at work.
5  Q   And did you blame MoneyMutual for any of that?
6  MR. WILENS: I want to object.  Are you asking
7  her at that time, before she consulted with an attorney?
8  MR. PUTTERMAN: Yes.
9  MR. WILENS: Not legally blame, but blame just
10 in your mind.
11 Q   BY MR. PUTTERMAN: Right.  Call it "assigned
12 fault?"
13 A   Yes.
14 Q   "Blame" is good.  "Blame" is good.
15 MR. WILENS: "Blame" is better.
16 THE WITNESS: Blame?  At the time I blamed the
17 lenders.
18 Q   BY MR. PUTTERMAN: When was the first time you
19 blamed MoneyMutual?
20 A   When I -- after the first one, CastlePayday,
21 and then the second with My Quick Funds.  And then I
22 started getting calls for loans I never took out,
23 constant e-mails, harassment.  I attributed it to it all
24 coming in from MoneyMutual, because I wasn't sticking my
25 information in any other website.

---

The Souza Group
(800) 230-3376

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

Page 46

1  Q  Well, at that point did you call MoneyMutual to
2  complain?
3  A  I did not.
4  Q  And why not?
5  A  Because at that point I didn't know if it was
6  an option. I wasn't versed in the laws of licensed
7  versus unlicensed lenders, and I was looking more for
8  help dealing with the individual lenders at the time.
9  Q  And you didn't call MoneyMutual about that,
10 either?
11 A  No, I didn't.
12 Q  Now, you ultimately complained to the CFPB; is
13 that correct?
14 A  Yes, I did.
15 Q  But at that time, when you complained to the
16 CFPB, you still didn't complain to MoneyMutual?
17 A  No, I didn't. I was focused on the lenders.
18 Q  Did you consider whether or not MoneyMutual
19 might want to know if you were having trouble with
20 lenders with whom MoneyMutual was doing business?
21 A  No, I was too focused on stopping the
22 harassment.
23 Q  Okay.
24    Since July of 2013, have you applied for other
25 payday loans?

Page 47

1  A  Yes, I have.
2  Q  And do you recall through what websites you
3  applied?
4  A  No websites. Storefront.
5  Q  Do you remember which storefronts?
6  A  Just one.
7  Q  Which one?
8  A  I can't remember the name. I think it's Pit
9  Stop.
10 Q  Is that the one in Santa Monica?
11 A  No, this is, I think, West Hollywood.
12 Q  And did you obtain payday loans from that
13 storefront?
14 A  Yes, I have.
15 Q  And for what purposes did you obtain those
16 loans?
17 A  Just general bills, gas, groceries, making it
18 through payday. I get paid twice a month.
19 Q  And did you find the loans satisfactory?
20 A  I did.
21 Q  They basically tided you over?
22 A  Yes. Easy to pay back.
23 Q  Okay. Well, let me ask you this. Would it be
24 fair to say that at least in principle, you support the
25 notion of payday loans being available?

Page 48

1  A  Absolutely, I do.
2  Q  Your particular problem arose with these two
3  lenders.
4  A  Absolutely.
5    MR. PUTTERMAN: All right, we've been going
6  about an hour. Why don't we take a short break.
7    THE VIDEOGRAPHER: The time is 10:28 a.m.
8  We're going off the record.
9    (Recess)
10   THE VIDEOGRAPHER: The time is 10:37 a.m. We
11 are back on the record.
12 Q  BY MR. PUTTERMAN: Do you have, Ms. Bilbrew,
13 any facts or knowledge that MoneyMutual or any of the
14 other MoneyMutual defendants sold or gave your
15 information from leads to anybody but the lenders who
16 contacted you after receiving those leads?
17 A  The only fact I have is that MoneyMutual was
18 the only website I used, and all the problems that I've
19 have have stemmed from using the website, based on the
20 harassment and these lenders.
21 Q  Okay. But you don't know, for example, if the
22 information was sold or given out by MoneyMutual or by
23 the lenders; correct?
24 A  I don't know. I just know that I put my
25 information in MoneyMutual's website, and I've been

Page 49

1  having problems ever since with harassment and scammers.
2  Q  Now, when you dealt with the collection
3  agencies for -- in connection with both the CastlePayday
4  loan and with the My Quick Funds loan, were you told by
5  those agencies that they had actually bought the
6  accounts from the original lenders?
7  A  The original lenders' names were used. They
8  never said they bought the accounts. They just started
9  in with harassment.
10 Q  And did you understand from looking at the
11 agreements that -- or just generally, that if you didn't
12 pay the bills, that lenders reserved the right to send
13 the accounts to collection agencies?
14 A  I do.
15 Q  And you don't know therefore whether or not the
16 collection agencies might have given out or sold your
17 information; is that correct?
18 A  I don't know if they have. I don't know if
19 they were really even collection agencies.
20 Q  Well, whoever it was that was talking to you,
21 they obviously had information about you; correct?
22 A  Yes, they had information about me.
23 Q  Which that much you understood, because of the
24 fact that they were collection agencies on the loans;
25 right?

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

1   **MR. WILENS:** Hold on.  That question doesn't
2   make any sense.  This "collection agencies on the loan"?
3      **MR. PUTTERMAN:** Let me rephrase it.
4      Q   And you understood they had that information
5   because they were trying to collect on the loans.
6      **MR. WILENS:** Objection.  Speculation as to how
7   or why they had it.
8      Q   BY MR. PUTTERMAN:  Well, was that your
9   understanding?
10     **A** I'm sorry.  Could you rephrase that?
11     Q   Yeah.  Did you understand when they contacted
12  you that they had information because of the fact they
13  were collecting on the loans?
14     **A** Whoever they were that contacted me, I knew
15  **they had my information with regards to the loans.**
16     Q   Okay.  And obviously they would have had
17  trouble trying to collect on the loans if they didn't
18  have your information.
19     **A** Correct.
20     Q   Okay.  So you don't know what they may have
21  done with the information --
22     **A** No, I don't.
23     Q   -- whoever they were.
24     **A** Whoever they were.  I don't think that many of
25  **them were real collection agencies.**

1      Q   I don't know one way or another, so...
2      So the point is, you know, and what I'm getting
3   at, which is no great secret, is that while you stopped
4   doing business with the MoneyMutual website because you
5   had provided them information that was eventually used
6   for all kinds of, I'll say, other purposes, sending you
7   e-mails about loans you hadn't taken and things like
8   that, as you described earlier, you don't know what or
9   where that actually -- who was actually responsible for
10  doing that.
11     **A** As far as loans that I didn't take out, I don't
12  **know.  As far as the loans that I put my information and**
13  **got through MoneyMutual, yes.**
14     Q   Okay.  Now, at any time, once it appeared to
15  you that this information was out on the street, did you
16  call MoneyMutual to ask them what they had done with
17  your information?
18     **A** No, I did not, because I, again, I was dealing
19  **directly with the lenders, and at a certain point, with**
20  **the harassment, I just hired a lawyer.**
21     Q   That would be Mr. Wilens?
22     **A** Yes, after -- actually, I also -- forgot to
23  **mention -- I also called, I can't remember, a few state**
24  **agencies, who ran the names of these loans through the**
25  **database and said they were illegal.**

1      Q   You mean the lenders.
2      **A** The lenders, yes.
3      Q   Did they explain to you why they were illegal?
4      **A** That they did not have a license in the State
5   **of California.**
6      Q   After you got that information, did you call up
7   MoneyMutual to ask them why they had put you in touch
8   with lenders who were not licensed to make loans in
9   California?
10     **A** No, I did not.  I hired a lawyer.
11     Q   That again would be Mr. Wilens.
12     **A** Mr. Wilens, uh-huh.
13     Q   Is there any reason you also didn't call
14  MoneyMutual to complain?
15     **A** There was no reason for me to call, because I
16  **was still focused on the lenders.  And again, I remember**
17  **on MoneyMutual's website seeing if you had any questions**
18  **about your loans or application, contact the lender.**
19     Q   Okay.  But what I'm talking about here now is
20  not actually a question about the loan.  It's a question
21  about MoneyMutual, lenders who were not licensed in
22  California acquiring leads from MoneyMutual.  So what
23  I'm asking now is, did you think to complain to
24  MoneyMutual about that, since they apparently had put
25  you in touch with lenders who were not licensed in

1   California?
2      **A** No, I did not.  I was stressed out.  I was just
3   **trying to get the harassment to stop.**
4      Q   Okay.  Now, you did not complain to anybody
5   about the Cash Yes loans; correct?
6      **MR. WILENS:** Objection.  Vague.  She just said
7   she did complain about Cash Yes.  Oh, Cash Yes?
8      **MR. PUTTERMAN:** Cash Yes.
9      **MR. WILENS:** Well, I mean, excluding your
10  attorney.
11     **THE WITNESS:** Yes.  Only to my attorney I did.
12     Q   BY MR. PUTTERMAN:  Okay.  Because you hadn't
13  had any problems with Cash Yes.
14     **A** No.
15     Q   Okay.  Did it then bother you that Cash Yes was
16  not licensed?
17     **A** I wasn't aware of that at the time.  I wasn't
18  aware -- I only ran through who was coming at me at the
19  time.  And then once I called or hired my attorney, only
20  did I learn who was licensed and who was not licensed.
21     Q   So let me ask you this, then.  Since your
22  experience with Cash Yes was satisfactory, what is it
23  about Cash Yes being unlicensed that bothers you, if
24  anything?
25     **A** Going back to satisfactory, I found the loan

The Souza Group
(800) 230-3376

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

1   satisfactory that I applied for it and got the money. I
2   didn't know at the time that they were unlicensed. And
3   as far as what bothered me, it was an unlicensed loan.
4   I was able to pay back the first -- but the rollovers,
5   that's what bothered me. I was unable to basically
6   negotiate with them.
7   Q   Okay. I'm focusing just on Cash Yes.
8   A   Yes. I'm speaking about Cash Yes.
9   Q   But did you have rollovers with Cash Yes?
10  A   I believe I did. I don't believe I paid all of
11  Cash Yes back. I don't think I did.
12  Q   But were you able to negotiate with them?
13  A   No, I was not able to negotiate with any of
14  these loans.
15  Q   Okay, that was unclear to me in your prior
16  testimony. So let's make sure we get that out. So Cash
17  Yes did rollovers also.
18  A   Yes, the last loan I took out.
19  Q   The second loan.
20  A   The second loan.
21  Q   That's the one you did directly --
22      MR. WILENS: There's more than two loans.
23      THE WITNESS: There's more than two loans.
24  That's right. There's about three, I think.
25  Q   BY MR. PUTTERMAN: Okay. Let's find out about

1   the third loan.
2      MR. WILENS: That's why I said, if you need to
3   refresh your recollection, just say so.
4   Q   BY MR. PUTTERMAN: So there was a third loan
5   also.
6   A   Yes.
7   Q   And that was one arranged directly with Cash
8   Yes.
9   A   I believe so.
10  Q   And you did that because the first two loans
11  were satisfactory.
12  A   Yes.
13  Q   Is it the third loan that you had a problem
14  with rollovers?
15  A   Yes. Because the first two were easily paid
16  back. Again, I had no idea, or I didn't understand the
17  rollover situation. I was going to make a payment on
18  the Cash Yes loan, and then I found it was going to be
19  rolling over, so that's when I shut down all three of
20  the loans and tried to negotiate with all three.
21  Q   Did you then ask the state agencies you called
22  about Cash Yes as well as the other two?
23  A   I don't recall. I just remember discussing
24  CastlePayday with one. CastlePayday, I think, was one,
25  and My Quick Funds.

1   Q   And were you contacted by anybody trying to
2   collect on the third Cash Yes loan?
3   A   No. I exchanged e-mails with someone at Cash
4   Yes asking to pay in installments. Other than that, it
5   went silent.
6   Q   So you didn't hear back from them at all?
7   A   No.
8   Q   And you didn't hear from anybody who claimed
9   that they were attempting to collect on that Cash Yes
10  loan?
11  A   No.
12  Q   So you actually, you don't have any complaint
13  about collection practices associated with Cash Yes or
14  anything like that?
15  A   Not collection practices with Cash Yes, no,
16  other than the fact that I couldn't negotiate with them.
17  Q   Right. Although it sounds like you sort of
18  successfully did, if they went silent.
19      MR. WILENS: Not quite.
20      THE WITNESS: Not quite. We're in arbitration.
21  Q   BY MR. PUTTERMAN: Who initiated that
22  arbitration?
23  A   My lawyer, or the court.
24      MR. WILENS: They moved to compel arbitration.
25  They were sued in this case --

1   Q   BY MR. PUTTERMAN: Because you sued them.
2   A   Yes.
3   Q   My point is this. Before you sued them in this
4   case, did they simply stop communicating with you about
5   the loan, the third loan?
6   A   Yes.
7   Q   Okay. And to your knowledge, they didn't make
8   any collection efforts?
9   A   Not that I know of.
10  Q   Okay. So as far as you were concerned, they
11  had dropped it.
12  A   No, I never felt that they dropped it. It was
13  silent. There was a couple weeks of silence, too, with
14  the other loans. So I knew that the loan was still out
15  there.
16  Q   And then you sued them.
17  A   I was in the process of suing them with, well,
18  I hired Jeffrey, and then I joined this lawsuit later
19  on. There was already a lawsuit, I believe.
20  Q   Do you remember when you first contacted
21  Mr. Wilens?
22  A   In April of 2013.
23  Q   And when did you retain him?
24  A   I believe it was in August after CastlePayday,
25  after the problems with CastlePayday.

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

Page 58

1  Q   Did he ever wear a tie when you talked with
2  him?
3      MR. WILENS: On the phone.
4      THE WITNESS: He was on the phone.
5  Q   BY MR. PUTTERMAN:  Do you know if he owns a
6  tie?
7  A   I'm not sure.
8      MR. WILENS: If you ever showed up for court,
9  you'd see me there.
10     MR. PUTTERMAN: I did see you in the Pham case
11 once with a tie, but I thought it was borrowed.
12     MR. WILENS: It was.  I had to give it back.
13 Q   BY MR. PUTTERMAN:  All right.  So with regard
14 to your information potentially getting out there, now,
15 you did give your information to some other websites;
16 correct?
17 A   Could you rephrase -- who?
18 Q   If you go back to paragraph 16, which is the
19 printout of that database, you see that on January 29,
20 2014, you submitted information to at least one other
21 website?
22 A   I don't recall what that website was.
23 Q   Okay, I understand that.  But it was not
24 MoneyMutual.
25     MR. WILENS: But this is -- you're testifying

Page 59

1  to her that this is a website she went to, according to
2  your Selling Source records.
3      MR. PUTTERMAN: And?
4      MR. WILENS: She would have no way of knowing
5  that, because apparently, these people operate all sorts
6  of different names and have different addresses.
7      MR. PUTTERMAN: No, you're missing my point.
8      MR. WILENS: It's the same company.
9      MR. PUTTERMAN: No, it's not.
10     MR. WILENS: Selling Source and MoneyMutual are
11 the same company.
12     MR. PUTTERMAN: We're not talking about Selling
13 Source.  These are not Selling Source websites.
14     MR. WILENS: If they're on this list, they have
15 to be Selling Source.
16     MR. PUTTERMAN: No.  It means that they're
17 publisher affiliates who submitted leads to
18 PartnerWeekly.
19     MR. WILENS: PartnerWeekly is a subsidiary of
20 Selling Source.  MoneyMutual is a sister company.
21 They're all the same for our purposes.
22     MR. PUTTERMAN: Jeff -- Jeff --
23     MR. WILENS: -- in your master database.
24     MR. PUTTERMAN: -- would you try to understand
25 something here?  It's in somebody else's database before

Page 60

1  before we get it.
2      MR. WILENS: But you do get it instantly.
3      MR. PUTTERMAN: Yeah, but why don't you let me
4  ask the question and you'll see what I'm about to ask.
5      MR. WILENS: I know, but you're telling her --
6      MR. PUTTERMAN: Jeff, stop.
7      MR. WILENS: It was obviously your client's
8  database.  Every single thing on this page is your
9  client.
10     MR. PUTTERMAN: Jeff -- every single thing on
11 that page does not originate with my clients.
12     MR. WILENS: No, but the personal information
13 got into your system.
14     MR. PUTTERMAN: Right.  But the personal
15 information got into somebody else's system first,
16 before we get it.  That's what I'm about to --
17     MR. WILENS: Go ahead.  I mean, I don't know
18 how she would know that.  Look, you want to ask her --
19     MR. PUTTERMAN: Jeff, let me just ask the
20 question.
21     MR. WILENS: -- silly question.
22     MR. PUTTERMAN: I don't care about your
23 opinion.
24     MR. WILENS: Well, you should.
25     MR. PUTTERMAN: I don't.

Page 61

1      MR. WILENS: He's asking you to guess, so
2  see what he --
3      MR. PUTTERMAN: No.  And stop coaching the
4  witness, okay?  It's not proper, and you know it.
5  Q   All right.  Now, the point is you submitted it
6  at some point to another website --
7      MR. WILENS: She's not saying she did.  You say
8  that.
9      MR. PUTTERMAN: Yeah, I am saying she did,
10 because that's what this database shows.  Okay?
11 Q   You have from time to time applied for loans
12 through other websites; correct?
13 A   I don't recall.  I only remember going to
14 Check 'n Go and MoneyMutual.
15 Q   Okay.  Do you remember sitting at the computer
16 and applying through other websites but not getting
17 matched up?
18 A   Only in July of 2013.
19 Q   Let me ask you this.  Do you deny that you may
20 have submitted applications for payday loans through
21 other websites?
22 A   No.  But I don't recall.  I only recall
23 Check 'n Go and MoneyMutual.
24 Q   I understand that you don't recall.  I just
25 wanted to make sure that it was that you didn't recall,

The Souza Group
(800) 230-3376

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

---

Page 62

1  not that you didn't do it.

2  **A  Yes.**

3  Q  Okay.  So if you did in fact apply for loans

4  through other websites, you don't know what happened to

5  that information; correct?

6  **MR. WILENS:** I'm going to object.  That's a

7  hypothetical, and it would call for her to speculate.

8  It depends on what the website is.  If it's a legitimate

9  website, I'm sure nothing happened to it.  But if it's a

10  scammy website, then probably something did.  How could

11  she answer that question?

12  Q  BY MR. PUTTERMAN:  Well, do you adopt what your

13  counsel just said?

14  **A  In this time frame, according to these records,**

15  **I only remember going on MoneyMutual's website.**

16  Q  Okay.

17  **A  January 29, January 30, I don't recall going on**

18  **any other.**

19  Q  Well, I can definitely represent to you that

20  there will be testimony as to what these records show

21  about -- and that testimony will be that these records

22  show that you submitted information on January 29 to at

23  least one other website that was not the MoneyMutual

24  website.

25  **A  I don't recall.**

---

Page 63

1  **MR. WILENS:** But it was Selling Source.

2  **MR. PUTTERMAN:** No.

3  **MR. WILENS:** That's disputed.  I know what

4  you're saying, Counsel.  But I just don't believe you.

5  **MR. PUTTERMAN:** Well, I don't care whether you

6  believe me or not.  Your beliefs are tailored by your

7  particular skewed views.  Okay?  And that's fine.

8  They're your beliefs.  Okay?  But the fact that you

9  don't believe me doesn't mean that it doesn't turn out

10  to be true.

11  **MR. WILENS:** Whether it's Selling Source or

12  it's co-conspirators, it doesn't matter.  The point is,

13  it was your websites and your network of websites she

14  went to, and her information was compromised.  Now, if

15  she went to a completely different lender, if she had

16  gone to Cash Yes directly herself, I understand.  But

17  all these records show is that it was something in the

18  network of websites controlled, or affiliated with, as

19  you put it, Selling Source.

20  **MR. PUTTERMAN:** Yeah.  And the bottom line is,

21  though, they are affiliated by contract, okay?  While we

22  have contracts that lay out specifics with regard to

23  them, okay, we did not control them, because they are

24  independent entities.

25  **MR. WILENS:** Well, you're still aiding and

---

Page 64

1  abetting each other.  Whether you claim it's a

2  contractual relationship is irrelevant.

3  **MR. PUTTERMAN:** You know, Jeff, all I can say

4  is this.  You need to read up a little bit on the law of

5  aiding and abetting.

6  **MR. WILENS:** We'll go to trial and see what the

7  jury instructions say.

8  **MR. PUTTERMAN:** I'm not too concerned about

9  that.

10  **MR. WILENS:** Of course not.  Because you're

11  going to settle long before it goes to trial.

12  **MR. PUTTERMAN:** So he says.

13  Q  Getting back to actual substance here instead

14  of our witty repartee with each other.

15  Did you ever complain to any of the, to either

16  My Quick Funds or to CastlePayday, that you believe they

17  had sold or given your information to somebody who was

18  improperly using it?

19  **A  No.**

20  Q  Did you ever ask either of them if they had

21  sold or given away your information to anybody?

22  **A  No.  The only communication I've had with them**

23  **was trying to negotiate.  The harassment came much**

24  **later.**

25  Q  Okay.  When the harassment started, did you

---

Page 65

1  complain to either of them about what they had done with

2  your information?

3  **A  I did not.  I hired a lawyer.**

4  Q  Okay.  So that was your response to that.  You

5  didn't complain to either of them.

6  **A  I did not.  I was seeking legal advice on these**

7  **loans.**

8  Q  Okay.

9  Let's mark as -- what's the next in order?

10  **THE REPORTER:** 17.

11  **MR. PUTTERMAN:** Okay.  I'm going to ask the

12  reporter to mark as Exhibit 17 a document which has been

13  designated as BILBREW066 through 069; and Exhibit 18

14  will be BILBREW073 through 077.

15  (Defendants' Exhibits 17 and 18 was

16  marked for identification.)

17  Q  BY MR. PUTTERMAN:  Okay.  Ms. Bilbrew, while I'm

18  doing this, why don't you take a moment to look through

19  those.

20  **A  Okay (Examining documents).**

21  **MR. PUTTERMAN:** I'm sorry.  Is the last page on

22  18 077 or 078?

23  **THE WITNESS:** 078.

24  **MR. PUTTERMAN:** 078 should not be included with

25  that.

---

The Souza Group
(800) 230-3376

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

Page 66

1    Madam Reporter, would you please note that I'm
2 removing page 078 from Exhibit 18.
3        MR. WILENS: Is the one you gave me 18 or 17?
4        MR. PUTTERMAN: I gave you 17 and about to give
5 you 18. Here's 18.
6    Q   Okay, let's look at Exhibit 17 first. Now, do
7 you recognize this document?
8    A   I do.
9    Q   Can you tell us what it is?
10   A   It's my complaint that I filed with the CFPB
11 regarding harassment regarding CastlePayday.
12   Q   Okay. Now, this was done after you actually
13 had retained Mr. Wilens; correct?
14   A   Yes.
15   Q   Okay. Now, did Mr. Wilens assist you with
16 this?
17   A   Yes. I received harassment while I was at work
18 on my cell phone. I went to another office and I
19 called --
20       MR. WILENS: The question is, did I assist you,
21 yes or no?
22       THE WITNESS: Yes. Sorry.
23   Q   BY MR. PUTTERMAN: Did he actually draft your
24 initial complaint?
25   A   No.

Page 67

1    Q   You drafted it with his assistance?
2    A   No.
3    Q   You drafted it yourself?
4    A   Yes, I did.
5    Q   Okay. And that would be back on page
6 BILBREW069?
7    A   Correct.
8    Q   Dated November 5, 2013?
9    A   Correct.
10   Q   How did you find out about the CFPB?
11   A   I went online to find out how to deal with
12 harassment, consumer harassment.
13   Q   And that's how you found out about the CFPB?
14   A   I did.
15   Q   And they had customer service or complaint
16 information, how to make a complaint or ask for
17 assistance?
18   A   Yes.
19   Q   Which you did.
20   A   I did.
21   Q   And this is about the harassment, the phone
22 calls you were receiving at work from this Humphreys
23 associate?
24   A   Correct.
25   Q   And I see in here that you state that certain

Page 68

1 threats were made to you over the phone.
2    A   Yes.
3    Q   To disclose information to your employer, for
4 example.
5    A   Correct.
6    Q   Did anybody -- in connection with this loan, so
7 now this is with regard to the CastlePayday loan;
8 correct?
9    A   As understood, yes.
10   Q   Did anybody ever threaten to bring criminal
11 charges against you in connection with that loan?
12   A   No. I don't recall -- well, I don't recall.
13   Q   Did anybody tell you -- call you and tell you
14 they were from law enforcement and you were going to be
15 criminally charged in connection with that loan?
16   A   No.
17   Q   Now, I notice here that, about in the fourth
18 sentence, it states, quote:
19       "I called back and she advised her
20       name was 'Brooke Logan' and she was
21       going to send in info to my employers
22       about the 'debt' I allegedly owed a
23       company called Castle Financial per
24       National Credit Adjusters (whom I wrote
25       many weeks ago advising that they BOUGHT

Page 69

1       and are trying to collect on an illegal
2       payday loan in the state of
3       California)."
4    Now, I note that you say that you had had
5 communications with National Credit Adjusters, referring
6 to the fact that they had bought the payday loan from
7 CastlePayday. Do you see that?
8    A   Yes.
9    Q   And what was that, your use of the
10 term "bought," based upon?
11   A   I received letters from them. I can't remember
12 the details, but I understood that they were collecting
13 on the loan for CastlePayday.
14   Q   Why specifically did you use the term "bought"?
15   A   I believe that they buy loans, loans in
16 default.
17   Q   Okay. So that was your understanding, at
18 least.
19   A   Yes.
20   Q   And I understand you don't know what they did
21 or didn't do with CastlePayday, but at least, that's
22 what you were advised by them.
23   A   Yes. Or what I understood.
24   Q   You're familiar with the practice of companies
25 selling bad debts to other companies?

The Souza Group
(800) 230-3376

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

---

Page 70

1  **A   Yes.**

2  **Q   What do you know about that?**

3  **A   I understand that there is an industry where**

4  **companies buy debt, consumer loans.  I understood that,**

5  **It was my understanding or I thought that National**

6  **Credit Adjusters was such a company.**

7  Q   Okay.  And in that regard generally, do you

8  understand that once the lender -- if the lender

9  actually does sell the loan to the collector, they don't

10 necessarily have control over the collector --

11 MR. WILENS: I'm going to object.  It calls for

12 speculation.  She doesn't know what the relationship is

13 between these two fake entities.

14 MR. PUTTERMAN: Okay.  First of all, okay,

15 other than some of the pointless inclusions in that

16 objection, what I'm asking her is purely as to her

17 understanding.

18 MR. WILENS: Her understanding is --

19 MR. PUTTERMAN: Jeff, stop coaching.  She

20 doesn't --

21 MR. WILENS: I'm making an objection.

22 MR. PUTTERMAN: Then just state it.  Calls for

23 speculation.

24 MR. WILENS: I did.  Her understanding of a

25 relationship like that is irrelevant.  She's not here to

---

Page 71

1  testify about anything other than her personal

2  observations and what she did or knows.

3  MR. PUTTERMAN: That's fine.  She can respond

4  to the question.

5  MR. WILENS: But I'm asking you not to guess

6  about things you don't know anything about.

7  Q   BY MR. PUTTERMAN: Did you have any

8  understanding or opinion in that regard?

9  **A   Could you rephrase the question?  I'm sorry.**

10 Q   Did you have any understanding or opinion,

11 regardless of what it might have been based on, that if

12 a lender sold, actually sold a loan to a collection or

13 debt collector, that the lender might not have control

14 anymore over what the collector did?

15 **A   No.**

16 Q   Did you believe the lender retained control

17 over the collector to whom it sold a bad debt?

18 **A   I didn't know who -- no.  I didn't know what**

19 **the relationship was.  I didn't know if they were**

20 **collecting directly for CastlePayday or --**

21 Q   I'm asking generally --

22 **A   Yes.  I didn't know.**

23 Q   Okay.  So you just didn't have an understanding

24 one way or the other.

25 **A   No, I didn't.**

---

Page 72

1  Q   That's a perfectly fine answer, by the way,

2  okay?  Regardless of whatever Mr. Wilens was --

3  MR. WILENS: It is.  But it's irrelevant to

4  this case.

5  MR. PUTTERMAN: So?  Then just state

6  irrelevant.

7  MR. WILENS: I said relevance three times.

8  MR. PUTTERMAN: Yeah, in the course of three

9  paragraphs.

10 **Q   Okay, now, I notice here that while you're**

11 **complaining about Humphreys & Associates, you don't**

12 **actually complain about CastlePayday in this complaint;**

13 **correct?**

14 **A   At the time, when I wrote this, I just knew the**

15 **words "Castle Financial."**

16 **Q   Okay.  Castle Financial, then.**

17 **A   I assumed it was CastlePayday.**

18 **Q   Okay.  So you didn't make any complaint,**

19 **though, about the lender themselves here.**

20 **A   "The lender" being CastlePayday?**

21 **Q   Right.**

22 **A   No, because I understood that the debt was**

23 **either sold off or being collected.  I was more focused**

24 **on what was happening to me through Humphreys &**

25 **Associates, the harassment.**

---

Page 73

1  **Q   Okay.  And -- I think I know what the answer's**

2  **going to be, but what I think doesn't make any**

3  **difference until we have it from you on the record.  You**

4  **did not make any complaint here about MoneyMutual;**

5  **correct?**

6  **A   I did not, because I was focused on Humphreys &**

7  **Associates.**

8  **Q   Okay.  Did you have any belief at this time**

9  **that MoneyMutual was somehow responsible for what**

10 **Humphreys & Associates was doing?**

11 **A   I'm sorry.  Would you rephrase?**

12 **Q   At the time you made this complaint to the**

13 **CFPB, did you believe that MoneyMutual had some sort of**

14 **responsibility for what Humphreys & Associates was doing**

15 **with their behavior?**

16 **A   I did not, because I was focused on Humphreys &**

17 **Associates.  I was focused on the loan and the original**

18 **lender.**

19 MR. WILENS: I'm going to object.  The question

20 calls for a legal conclusion, anyway.

21 MR. PUTTERMAN: You can stop mouthing at her.

22 MR. WILENS: I'm going to consult with my

23 client.

24 MR. PUTTERMAN: That you can do.

25 THE VIDEOGRAPHER: Still on?

---

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

---

Page 74

1    MR. PUTTERMAN: No, stay on the record.
2        (Mr. Wilens and the witness are
3        absent from the room 11:09 to 11:12
4        a.m.)
5    Q   BY MR. PUTTERMAN: Would you turn to the second
6    page from the end of Exhibit 17, BILBREW067. And you
7    see the section that's entitled "Consumer Information"?
8    A   I do.
9    Q   Did you fill out the information in there?
10   A   I did.
11   Q   Okay. So you showed the debt collector as
12   Humphreys & Associates, and you showed the creditor as
13   National Credit Adjusters, LLC?
14       MR. WILENS: What page is this?
15       THE WITNESS: 67.
16   Q   BY MR. PUTTERMAN: Correct?
17   A   Correct.
18   Q   Okay. And where it says "Submit a complaint
19   against a creditor," you said yes.
20   A   Yes.
21   Q   And actually, up at the top of that page, you
22   state that -- there's a question, "What do you think
23   would be a fair resolution to your issue?" Do you see
24   that?
25   A   I do.

---

Page 75

1    Q   And you request an investigation of Humphreys &
2    Associates; correct?
3    A   I do.
4    Q   And then you state, quote:
5        "Also I would advise that you look
6        into National Credit Adjusters, who are
7        selling info to these criminals."
8        Now, did you write that or did Mr. Wilens?
9    A   I wrote it.
10   Q   Now, you had previously seen a copy of the
11   complaint in this action; correct?
12   A   Pardon?
13       MR. WILENS: I'm going to object. What do you
14   mean by "previously"?
15   Q   BY MR. PUTTERMAN: Prior to filling out this
16   information in November of 2013, you had seen a copy of
17   the complaint in the civil action, the Gilbert case;
18   correct?
19   A   I don't recall.
20   Q   Okay. Now, you had already retained Mr. Wilens
21   at this point?
22   A   Yes.
23   Q   And when do you recall you became an actual
24   plaintiff in the case?
25   A   I feel like it was the beginning of January of

---

Page 76

1    2014.
2    Q   But do you remember when you first saw a copy
3    of whatever complaint was on file?
4    A   I feel like it was January 2014.
5    Q   Now, here you don't state that either
6    MoneyMutual or, for that matter, CastlePayday, you
7    thought, was selling info, quote, to these criminals,
8    close quote. Correct?
9    A   I was focused on Humphreys & Associates --
10       MR. WILENS: The answer is no.
11       THE WITNESS: No.
12   Q   BY MR. PUTTERMAN: Okay. But you did state
13   that National Credit Adjusters was selling info to these
14   criminals.
15   A   I did.
16   Q   Okay, now, if you go to the first page, Bilbrew
17   066, once again there's a heading that says, quote,
18   "Describe what happened so we can understand the issue,"
19   close quote. And you wrote what's included after that,
20   Correct?
21   A   I did.
22   Q   Okay. And then up top it says, quote --
23   further up it says "Explanation of Closure." And that
24   states, quote:
25       "Upon receipt of Ms. Bilbrew's

---

Page 77

1        complaint, NCA reviewed the complaint as
2        well as NCA's records. On November 13,
3        2013, NCA communicated directly with
4        Ms. Bilbrew via letter providing a
5        detailed explanation of NCA's actions.
6        Should NCA receive any additional
7        communication from Ms. Bilbrew
8        subsequent to her receipt of our
9        communication, it will take the
10       necessary steps to resolve her
11       concerns."
12       MR. WILENS: That's what Humphreys & Associates
13   said. If you read the sentence before that.
14       MR. PUTTERMAN: Okay, yes. Thank you.
15   Q   You see that?
16   A   I do.
17   Q   Now, did you get a letter from NCA on November
18   13, 2013?
19   A   I received a letter, yes.
20   Q   And has that been produced to us?
21   A   It has.
22   Q   And I'm going to then mark as Exhibit 19 what's
23   been designated BILBREW078.
24       (Defendants' Exhibit 19 was marked
25       for identification.)

---

The Souza Group
(800) 230-3376

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

Page 78

1   Q   BY MR. PUTTERMAN:  And is that the letter you
2   received from National Credit Adjusters?
3   A   It is.
4   Q   And was this a satisfactory outcome for you?
5   A   Yes.
6   Q   And that was the end of any contacts you
7   received from anybody concerning any kind of collection
8   on the original CastlePayday loan?
9   A   Correct.
10  Q   Okay.  It states, specifically, quote, in part:
11      "NCA has reviewed your
12      correspondence as well as our records.
13      In order to resolve your complaint, NCA
14      has recalled the account from Humphreys
15      & Associates and terminated it.  The
16      account balance has been zeroed out, the
17      account will not be sold or transferred,
18      and all collection activity on the
19      account has been terminated."
20      And insofar as you know, that's what has
21  occurred?
22  A   So far.
23  Q   Well, you haven't heard anything further from
24  them; correct?
25  A   Not that I recall.

Page 79

1   Q   Okay.  Let's turn to Exhibit 18.  And let's go
2   to the last page, which is BILBREW077.  Did you make the
3   complaint that appears on this page on or about April
4   30, 2014, to the CFPB?
5   A   I did.
6   Q   And did you write this yourself or did you
7   receive assistance on this from Mr. Wilens?
8   A   I wrote this myself.
9   Q   And you refer to Searay Portfolio Management.
10  Why don't you describe to us here what Searay Portfolio
11  Management did in connection with attempting to collect
12  on the My Quick Funds loan.
13  A   Well, Searay Portfolio left a couple messages
14  on my cell phone while I was at work, basically, a
15  couple messages claiming that there were two claims or
16  complaints filed against me in my local county court for
17  wire fraud and, I don't know, other issues, failing to
18  pay a debt, and that if I didn't get back to them, they
19  would go ahead and file, press charges or file charges
20  against me.
21      So I called back and I spoke to someone, I
22  believe it was David Moore, and I told him, you know, I
23  asked him what the loan was for, and he said that "We
24  now own My Quick Funds and" --
25  Q   Let me interrupt you for just one second.  That

Page 80

1   they owned My Quick Funds --
2   A   I'm sorry.  Actually, the loan.  Well,
3   actually, they owned the loan that I took out from My
4   Quick Funds -- or actually, I'm sorry -- scratch that.
5   That they are collecting for My Quick Funds, and that I
6   owe about $985.
7   Q   So let me interrupt again.  So let me just
8   clarify.  Did they say they owned the loan, or that they
9   were actually just collecting on the loan?  Do you
10  remember?
11  A   The story kind of like changed.  My
12  understanding is that they were collecting for their
13  client, was the term that they used.  I don't know who
14  that client was, other than that it was the My Quick
15  Funds loan.
16  Q   Okay.  Why don't you continue now, please.
17  Sorry for interrupting.
18  A   No, that's fine.  And I advised that I did take
19  the loan out and I did not owe $985.  It basically
20  ensued with the gentleman on the line yelling at me,
21  telling me that he didn't care how much I owed or not,
22  that he was going to sue me, take me to court, and I
23  need to pay up, I had 24 or, I think, 48 hours to make a
24  decision before they filed charges against me.
25  Q   Or to make a deal or whatever?

Page 81

1   A   Yes.
2   Q   And you then filed the complaint with the CFPB.
3   A   I did.
4   Q   Okay.  Now, if you turn to BILBREW075, there's
5   an auto response from the CFPB on May 15, 2014.  And it
6   says, quote, "We wanted to let you know that the company
7   responded to your complaint," close quote.  And a little
8   bit below that where it says, "What happens next," it
9   says, "Review the company's response," and it gives you
10  a log-in address to read it online.  Correct?
11  A   Correct.
12  Q   Or call them, and we'll talk it over with you.
13      Okay, did you log on to read the actual
14  response?
15  A   I did.
16  Q   Did you print it out?
17  A   No, I didn't.
18  Q   Any reason why not?
19  A   I didn't feel I needed to print it out.
20  Q   Okay.  And above that, do you remember what the
21  response said?
22  A   I remember something about the response saying
23  that they tried to work out with me, they didn't do
24  anything that I said that they did as far as like filing
25  or threatening me with criminal complaints, and that I

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

---

Page 82

1  was the one that became irate.
2  Q   And your response to that is directly above
3  what we've been looking at, on May 15, 2014. Correct?
4  A   Correct.
5  Q   Okay. So it looks like you got the response
6  from the CFPB, the auto response, which was at 12:04,
7  and then within a short period of time you went and
8  looked at Searay's response and then you responded.
9  A   I did.
10 Q   At 1:15 p.m.
11 A   I did.
12 Q   Now, do you recall that in Searay's response,
13 they actually said that they had, quote, purchased the
14 title, close quote, to the loan?
15 A   I see at the top their response that they claim
16 they purchased the chain of title.
17 Q   Okay. And what was the eventual resolution of
18 this?
19 A   I haven't heard back from them.
20 Q   Okay, well, let's go --
21     MR. WILENS: "Them" being the --
22     THE WITNESS: Searay. I have not heard back
23 from Searay. Apparently, according to the explanation
24 of closure, the account's now closed in cease-and-desist
25 status.

---

Page 83

1  Q   BY MR. PUTTERMAN: And you're referring now to
2  the first page --
3  A   First page.
4  Q   Of this document? BILBREW073. Correct?
5  A   Correct.
6  Q   And that's where it says, quote, "Response,"
7  close quote?
8  A   Yes.
9  Q   And since this response, have you heard
10 anything further on attempts to collect on that loan?
11 A   I don't know if I've heard for that specific
12 loan. I just constantly have been called. I don't call
13 people back anymore to find out why they're bothering
14 me.
15 Q   So people have just been leaving messages?
16 A   Yeah. It's been a constant source for two
17 years, ever since I put my information into MoneyMutual.
18 Q   But again, you don't know who got the
19 information, from where. Correct?
20 A   There's no way I could, other than the fact I
21 put my information into MoneyMutual's website, and since
22 then I've been constantly harassed. I don't even bother
23 to even call people back anymore. It's the same
24 harassment over and over.
25 Q   Okay. And again, I have to ask you, have you

---

Page 84

1  ever called MoneyMutual to tell them about this or
2  complain about it?
3  A   No, I didn't. I didn't call them back. But I
4  know the informations come from the website.
5  Q   How do you know that?
6  A   There's no other explanation, other than the
7  fact that these people are constantly calling me,
8  quoting either some loans I've taken out, like My Quick
9  Funds, I haven't heard back from that. But I'm
10 constantly being called with information that I
11 submitted, and a bank account that I no longer have is
12 constantly being quoted, the bank account number.
13 Q   So I understand you attribute this to having
14 first submitted information to the MoneyMutual website.
15 A   Yes.
16 Q   But is it correct that you don't necessarily
17 attribute it to MoneyMutual, providing the information
18 to anybody but the lenders with whom you entered into
19 loans; correct?
20 A   I'm sorry. Could you rephrase that?
21 Q   Yes. It was a little messy. First of all,
22 it's correct that you attribute that to originally
23 having submitted information to MoneyMutual; correct?
24 A   I do.
25 Q   Okay. But you do not know that MoneyMutual

---

Page 85

1  itself turned that information over to anybody but the
2  lenders who contacted you and with whom you entered into
3  loan agreements; correct?
4  A   I don't know. I just know the lenders and the
5  leads that I didn't take loans from all were generated
6  by MoneyMutual. I just -- all I know is I put my
7  information in MoneyMutual -- and by the way, I did not
8  have that Bank of America account very long. It's the
9  only time I've ever submitted my Social Security or that
10 bank account information into one website, MoneyMutual.
11 Q   Okay. My real point here is, you don't know
12 who ultimately turned loose this information --
13 A   No, I have no idea, like, what MoneyMutual's
14 doing, other than I gave MoneyMutual my information.
15 Q   And you have no idea what the lenders are doing
16 or the collection agencies with whom they dealt are
17 doing with that information; correct?
18 A   Only from the trail I could find, you know.
19 CastlePayday, NCA, Humphreys & Associates, that's the
20 only trail I could follow, other than the fact that it
21 just leads back to CastlePayday, MoneyMutual.
22 Q   Okay. Now, I notice on this CFPB complaint
23 there's -- well, let's look on page BILBREW074. And
24 again, there's that whole consumer information heading.
25 See that?

---

The Souza Group
(800) 230-3376

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

---

Page 86

1   **A   Yes, I do.**
2   Q   And you filled that out; correct?
3   **A   I did.**
4   Q   And it says "Company Submitted Against," that's
5   Searay Portfolio Management --
6   **A   Correct.**
7   Q   And it says "Debt Collector Information," and
8   that says "Searay Portfolio Management."
9   **A   Yes.**
10   Q   And then it says "Creditor Information." You
11   see that?
12   **A   Yes.**
13   Q   And you filled out "My Quick Funds."
14   **A   I did.**
15   Q   And then it says "Submitted Complaint Against
16   Creditor," and you filled out "No."
17   **A   Because I didn't know where -- again, I was
18   focused on Searay Portfolio.**
19   Q   And there's no mention anywhere in here of
20   MoneyMutual; correct?
21   **A   There's no mention of MoneyMutual, but again, I
22   know all this started because of MoneyMutual.**
23   Q   Okay. My question simply was -- and let me
24   just say this, I understand you have a position in the
25   case, okay, but this will go faster if you just respond

---

Page 87

1   to the question.
2   **A   Okay. Apologies.**
3   **MR. WILENS:** Wait for the question.
4   Q   BY MR. PUTTERMAN: And the question simply was,
5   this does not mention MoneyMutual at all. Correct?
6   **A   No, it doesn't.**
7   **MR. PUTTERMAN:** Let's let the reporter change
8   the disc. It will just take a minute.
9   **THE VIDEOGRAPHER:** The time is 11:29 a.m. We
10   are going off the record, and this is the end of media
11   No. 1.
12      (Recess)
13      (Defendants' Exhibit 20 was marked
14      for identification.)
15   **THE VIDEOGRAPHER:** The time is 11:39 a.m. We
16   are back on the record and this is the beginning of
17   media No. 2.
18   Q   BY MR. PUTTERMAN: Okay, Ms. Bilbrew, I've
19   asked the reporter to place in front of you what's been
20   marked as Exhibit 20, which has the designations
21   BILBREW064 and 065.
22      Jeff, here's your copy.
23      Now, are these two letters that you received
24   from National Credit Adjusters?
25   **A   Yeah. Yes.**

---

Page 88

1   Q   And the one at the top is dated July 11, 2013.
2   **A   Yes.**
3   Q   And the first sentence states, quote:
4      "This letter is to inform you that
5      National Credit Adjusters LLC (NCA) has
6      purchased the above referenced account.
7      We are not collecting for CastlePayday."
8      Do you see that?
9   **A   Yeah.**
10   Q   So that at least is what you were told;
11   correct?
12   **A   Yes.**
13   Q   That CastlePayday no longer owned the loan; it
14   had been sold to National Credit Adjusters.
15   **A   It appears so.**
16      **MR. WILENS:** That's what it says.
17      **THE WITNESS:** Yes.
18   Q   BY MR. PUTTERMAN: Now, after you received this
19   letter, did you contact CastlePayday to find out what
20   they had done?
21   **A   No, I didn't. I don't recall, no, I don't
22   recall.**
23   Q   So you took this letter at face value so far as
24   that was concerned?
25   **A   I did.**

---

Page 89

1   Q   Now, aside from the amount that it states you
2   owed, was there anything else that you objected to
3   specifically in this letter?
4      **MR. WILENS:** Object to your question as vague.
5   What do you mean, she objected to?
6      **MR. PUTTERMAN:** In other words, okay, let me
7   elaborate on that.
8   Q   Was there anything specific in this letter
9   itself that you considered to be harassing or improper?
10      **MR. WILENS:** I'm going to object to the extent
11   it calls for a legal conclusion as to the many legal
12   violations present in the letter.
13      But you can give a layperson's opinion or your
14   gut reaction to the letter.
15   Q   BY MR. PUTTERMAN: And that's exactly what I'm
16   asking for.
17   **A   No, other than the balance, no.**
18   Q   Okay. And let's turn to the second letter. Is
19   it correct that you received this on or about August 15,
20   2013?
21   **A   Yes.**
22   Q   Okay. And this included a, sort of a, what
23   I'll call a special, today only discount; correct?
24   **A   Correct.**
25   Q   And this was not acceptable to you, I assume?

---

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

---

**Page 90**

1   **A   No, it wasn't.**
2   Q   Again, leaving aside the amounts that the
3   letter claims that you owed, was there anything specific
4   in this letter that you found objectionable or
5   harassing?
6   **A   No.**
7   Q   Okay. So the problem really started with
8   Humphreys & Associates.
9   **MR. WILENS:** I'm going to object. Again --
10   **MR. PUTTERMAN:** Let me rephrase that slightly.
11   Q   So the problem in terms of harassing behavior
12   or objectionable collection behavior really started with
13   Humphreys & Associates; correct?
14   **A   For this loan?**
15   Q   Yes.
16   **A   Yes.**
17   Q   Okay. Let's go back to Exhibit 2, which is the
18   complaint again. And I'm going to ask you to turn to
19   paragraph 59, which is on page 19. And would you please
20   read that to yourself.
21   **A   (Examining document).**
22   Q   Okay. Have you read that?
23   **A   I did.**
24   Q   I'm going to specifically read the last
25   sentence of that paragraph, which says, quote:

---

**Page 91**

1       "But Selling Source also sent spam
2   e-mails to California residents and
3   displayed advertisements on websites
4   visited by California residents."
5   Do you see that?
6   **A   Yes.**
7   Q   Now, have you ever actually heard or know
8   anything about an entity called Selling Source?
9   **A   No.**
10   Q   As far as you understood, you were working
11   through MoneyMutual; correct?
12   **A   Yes.**
13   Q   Now, did you receive any spam e-mails from
14   MoneyMutual?
15   **A   I occasionally saw e-mails from MoneyMutual.**
16   Q   And do you remember what they said?
17   **A   Something like, "Hi, Kimberly" -- I can't**
18   **remember verbatim, but, like, you know, just sort of**
19   **reminders, "We're here if you need another loan," or,**
20   **"Get another loan," sort of thing, with Montel on the**
21   **front.**
22   Q   And did you respond to any of those?
23   **A   I don't recall.**
24   Q   Do you recall anything objectionable in the
25   content of themselves of those e-mails?

---

**Page 92**

1   **A   Could you elaborate as "objectionable"?**
2   Q   Were you offended by anything in the contents
3   of those e-mails?
4   **A   No.**
5   **MR. PUTTERMAN:** I'm going to ask the reporter
6   to mark as Exhibit 21 BILBREW001-002.
7   Jeff, I'm missing one copy of this. Would you
8   mind looking over the witness?
9   **MR. WILENS:** What is it?
10   **MR. PUTTERMAN:** That (indicating).
11   BILBREW001-002.
12   (Defendants' Exhibit 21 was marked
13   for identification.)
14   Q   BY MR. PUTTERMAN: Now, I'm not going to refer,
15   obviously, to the e-mail by which you sent this on to
16   Mr. Wilens, but to the e-mail from MoneyMutual to you
17   dated February 12, 2013.
18   **A   Uh-huh.**
19   Q   Is this one of the e-mails you were just
20   referring to?
21   **A   Yes.**
22   Q   Okay. And do you recall if you responded to
23   this e-mail?
24   **A   I don't recall.**
25   Q   Now, you see that further down it says:

---

**Page 93**

1       "To no longer receive e-mails from
2   Continental Communications, click here
3   to unsubscribe."
4   Do you see this?
5   **A   Yes.**
6   Q   Did you click to unsubscribe to that?
7   **A   No. I didn't read that far down.**
8   Q   You just deleted it or whatever once you saw
9   what it was?
10   **MR. WILENS:** We didn't delete it. We gave it
11   to you.
12   **THE WITNESS:** Or filed it.
13   Q   BY MR. PUTTERMAN: I'm sorry. Okay. It went
14   into an electronic file.
15   **A   Yeah.**
16   Q   Now, back in February 2013, do you recall why
17   you would have saved this to a file?
18   **A   I don't know, maybe because in the process**
19   **of getting loans from January 29 through -- I tend to**
20   **file things later. I don't really read my e-mails. I**
21   **just go through what I want and put it off to the side.**
22   Q   Now, you see where it says, "Kimberly, you may
23   have additional advances available"?
24   **A   Yes.**
25   Q   Below that it reads, quote:

---

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

---

Page 94

1   "The process is quick, easy, and
2   safe. By using the information you
3   provided for your previous matching
4   request with MoneyMutual, you can skip
5   the bulk of the process, get an answer
6   in seconds!"
7   Exclamation point, close quote. You see that?
8   A   Yes.
9   Q   Do you recall if you understood when you read
10  that that you would not be matched with another lender
11  unless you specifically clicked on that MoneyMutual
12  one-step process?
13  A   Yeah. I don't really remember. I just filed
14  the e-mail, pulled it out when I needed it to send to
15  Jeffrey.
16  Q   Okay. So you don't recall actually going and
17  applying for any more loans in response to this --
18  A   I don't recall. I may have went to the website
19  at some point directly, but I don't recall.
20  Q   I understand that there were loans both before
21  and after.
22  A   I don't recall.
23  Q   Okay. But you knew about the website already.
24  A   Yes.
25  Q   Okay. You can lay that aside.

---

Page 95

1   Now I'm going to ask you to look at paragraph
2   60 and read that to yourself.
3   A   (Examining document)
4   Q   Do you have any personal knowledge of any facts
5   concerning the allegations that are stated in paragraph
6   60?
7   A   No.
8   Q   I'm going to ask you the same question with
9   regard to 61. So would you please read that to
10  yourself.
11  A   (Examining document) Okay.
12  Q   Do you have personal knowledge of any facts
13  concerning the allegations made in paragraph 61?
14  A   Could you be more specific with regards to
15  "allegations"?
16  Q   Yes. "Allegations" mean that in paragraph 61,
17  various statements are made. Do you see that?
18  A   Yes.
19  Q   Okay. Do you have personal knowledge of any
20  facts concerning any of those statements?
21  A   Personal knowledge? No.
22  Q   Okay. And again, we're excluding anything you
23  may have heard from your counsel. You understand that?
24  A   Yes, absolutely.
25  Q   Okay.

---

Page 96

1   MR. WILENS: So you don't know who Montel
2   Williams is.
3   THE WITNESS: Well, yeah, I know who Montel
4   Williams is --
5   MR. WILENS: See, you have to go through each
6   sentence, and each sentence may contain multiple facts
7   in it. That's what he really wants to ask you about.
8   MR. PUTTERMAN: But she's already testified
9   that she knows who Montel Williams is. What I'm really
10  talking about here is the statements that are actually
11  made in paragraph 61. And I think the witness
12  understood it that way --
13  MR. WILENS: Well, one of them is that they
14  hired celebrity Montel Williams. She knows they did
15  that.
16  MR. PUTTERMAN: But she's already testified to
17  that.
18  MR. WILENS: I know, but your question didn't
19  say if she's already -- she doesn't have to mention it.
20  MR. PUTTERMAN: Your point's taken.
21  Q   Okay, would you please read to yourself
22  paragraphs 70 to 72. That's on pages 21 to 22.
23  Do you know anything about the, quote,
24  marketing contracts, close quote, that are referenced in
25  those paragraphs?

---

Page 97

1   A   No.
2   MR. PUTTERMAN: Jeff, this would be a good time
3   for you guys to take a lunch break so I can make my
4   call. How long do you think you need?
5   MR. WILENS: I don't know. I mean, are you
6   going to call from here? There's a conference room at
7   the end of the hall you can probably use.
8   MR. PUTTERMAN: That's not the issue. But I'm
9   assuming that you guys may want to get something to eat.
10  MR. WILENS: Some of us may, some of us
11  may just --
12  THE WITNESS: I'm fine.
13  MR. PUTTERMAN: That starts in five minutes for
14  me, and then I will just come back when I'm done and we
15  will continue. Okay? So off the record.
16  THE VIDEOGRAPHER: The time is 11:54 a.m. We
17  are going off the record.
18  (Recess)
19  THE VIDEOGRAPHER: The time is 12:32 p.m. We
20  are back on the record.
21  Q   BY MR. PUTTERMAN: Ms. Bilbrew, I understood
22  from your earlier testimony that when you decided that
23  you needed to get some payday loans in early 2013, that
24  you remembered seeing the MoneyMutual television ads.
25  Correct?

---

The Souza Group
(800) 230-3376

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

Page 98

1   **A   Correct.**
2   Q   And so you went to the MoneyMutual website; is
3   that correct?
4   **A   Correct.**
5   Q   Do you remember how you located the MoneyMutual
6   website? Did you actually remember what the website
7   address was or did you Google it or what?
8   **A   I don't remember.**
9   Q   Okay. However you did, you got to the website;
10  correct?
11  **A   Yes.**
12  Q   Now, at that point you already knew that you
13  wanted at least one payday loan.
14  **A   Yes.**
15  Q   Did you at that time read through the website?
16  **A   MoneyMutual's website?**
17  **A   Yes.**
18  **A   Yes, I went through the website.**
19  Q   What do you remember about it? And I'll be
20  showing you some pages from it, but I'd like to know,
21  just sitting here, as you are today, what you remember
22  about the website.
23  **A   I remember seeing Montel Williams as a**
24  **spokesperson advising that it was a trustworthy source.**
25  Q   The MoneyMutual --

Page 99

1   **A   MoneyMutual being the trustworthy source for**
2   **loans, and that the loans would be helpful for**
3   **short-term cash needs, and that MoneyMutual was**
4   **trustworthy and that the loans -- or the lenders that go**
5   **through the site are basically, you know, are held to a**
6   **high standard of code of conduct.**
7   Q   Okay. Anything else that you remember offhand?
8   And I understand you're not going to have complete
9   recollection of it by any means.
10  **A   No, I just remember that it was just heavily --**
11  **or I remember just constantly seeing that MoneyMutual**
12  **was a trustworthy source for short-term loans.**
13  Q   And the other thing you probably remember is
14  constantly seeing Montel's picture.
15  **A   Of course. Pretty much --**
16  Q   Pretty much. Okay. I am going to ask you to
17  find in that stack of exhibits from yesterday
18  Exhibit 14. And don't worry, you're not going through
19  this whole thing. I'm going to ask you to -- there's
20  first this request for judicial notice. You don't have
21  to look at that. And then underneath there's a
22  "Declaration of Donald J. Putterman."
23  A   I'm sorry. What page?
24  Q   You see there's a stapled-together document?
25  Yeah. And we'll put that back on when we're finished.

Page 100

1   There. You've got the declaration?
2   **A   Yes, I do.**
3   Q   What we're going to go to actually is first
4   Exhibit 8 to that declaration. And so if you leaf down
5   a little bit, you'll come to a page that
6   says "Exhibit A."
7   **A   Okay, I'm there.**
8   Q   Now, after that, are actually one, two, three
9   pages that are actually taken from one website page. In
10  other words, it's divided up here for purposes of
11  copying and printing. Okay?
12  **A   Okay.**
13  Q   So looking at the first page of Exhibit A,
14  which is the top of that website page, okay, do you
15  remember reading the material that's on page 1 of
16  Exhibit A?
17  **A   I do.**
18  Q   And you saw where it states, quote,
19  "MoneyMutual is not a lender," close quote?
20  **A   I do.**
21  Q   And you understood that when you read it?
22  **A   I did.**
23  Q   And it says then, quote:
24      "If you are matched with a lender,
25      MoneyMutual will redirect to the

Page 101

1       lender's website where you will be able
2       to review loan terms and conditions. In
3       many cases, the lender will then contact
4       you to confirm your personal information
5       and finalize the loan."
6       Now, each time you submitted the information to
7   the MoneyMutual website, except for that last time, you
8   in fact were contacted by the lenders; correct?
9   **A   Correct.**
10  Q   And you entered into agreements with the
11  lenders; correct?
12  **A   Correct.**
13  Q   And they provided you with copies of the
14  agreements.
15  **A   Correct.**
16  Q   Okay. And we'll go into those later, because I
17  think you've provided us with a number of those here, or
18  your counsel has.
19  **A   I believe so, yes.**
20  Q   Okay, let's go to the second page of Exhibit A.
21  Do you recall seeing and reading this part of the
22  website page?
23  **A   I don't remember.**
24  Q   Let me direct your attention down toward the
25  bottom of the page, and the statement there actually

1  continues on the following page. You see where it has
2  the triangle and the exclamation point?
3  **A   I do.**
4  **Q**   It starts by saying, quote:
5        "Any questions about loan repayment,
6        schedule, and/or fees should be directed
7        to the lender."
8        Now, you remember seeing that at some point?
9  **A   I remember reading something to that effect.**
10 **Q**   Because I think you referred to it in your
11 testimony earlier today.
12 **A   Yes.**
13 **Q**   It then says, quote:
14       "If you have any questions about
15       applying for a loan, we can be reached
16       at 1-800-809-2138."
17 **A   Uh-huh.**
18 **Q**   So do you recall being generally aware that
19 there was an 800 number for MoneyMutual?
20 **A   I don't recall.**
21 **Q**   Do you believe that you probably read that when
22 you read what it said about contacting the lender if you
23 had a question about the loan?
24 **A   Yes. I do.**
25 **Q**   Okay. Going over to page 3 of Exhibit A. Do

1  you remember seeing this material at the bottom of the
2  webpage?
3  **A   Yes.**
4  **Q**   Okay. Let's go to Exhibit B. And this again
5  is -- now we have two pages which constitute another
6  webpage.
7        MR. WILENS: Why don't you look at my color
8  version.
9        MR. PUTTERMAN: Absolutely.
10       MR. WILENS: The copy he gave you is not as
11 legible.
12       THE WITNESS: Thank you.
13 **Q**   BY MR. PUTTERMAN: Now, do you remember reading
14 about the MoneyMutual Code of Lender Conduct?
15 **A   Yes. I do.**
16 **Q**   And did you have any reaction to that when you
17 read it?
18 **A   I did.**
19 **Q**   And what was that?
20 **A   I felt that MoneyMutual held that the lender**
21 **network was -- I felt that I didn't have anything to**
22 **worry about with anybody that was participating in**
23 **giving loans -- or participating with MoneyMutual or**
24 **distributing loans. I felt that I was in a safe place.**
25 **Q**   Now, did you understand, then, when you looked

1  at this also that MoneyMutual was concerned that its
2  lenders follow these standards?
3        MR. WILENS: I'm going to object. It's
4  speculation as to whether she was -- whether MoneyMutual
5  is or is not concerned. You asked her --
6        MR. PUTTERMAN: Jeff, you're not listening to
7  the question.
8        MR. WILENS: The way you phrased it was, did
9  she understand that MoneyMutual was concerned.
10       MR. PUTTERMAN: Was that her understanding.
11       MR. WILENS: Rephrase it, "is that your
12 interpretation" or something like that.
13       MR. PUTTERMAN: Fine.
14 **Q**   Was it your understanding or interpretation of
15 this that MoneyMutual was concerned that its lenders
16 follow high standards?
17 **A   Yes.**
18 **Q**   Did you understand or interpret this as meaning
19 that MoneyMutual would certainly want to know about it
20 if its lenders were not following these high standards?
21 **A   No.**
22 **Q**   Okay. Why didn't you make that connection?
23 **A   Because when I read this, I figured that since**
24 **MoneyMutual was doing business with these lenders that**
25 **they had already vetted, that these lenders were**

1  **legitimate.**
2  **Q**   Okay, but my question then is this: If a
3  lender has been vetted, okay, and MoneyMutual considered
4  them legitimate, how would MoneyMutual know if the
5  lender then started doing something wrong with regard to
6  individual loans?
7  **A   Well, when I first saw this website with Montel**
8  **endorsing this service, and then what I did read from**
9  **here in my mind, that MoneyMutual was a trustworthy**
10 **source, the people they were doing business with were**
11 **trustworthy.**
12       **I did not interpret it as, like, if you have**
13 **problems, please let us know. I don't see anywhere that**
14 **it's saying if you have problems, call us. The only**
15 **number, as you pointed out before, was basically if you**
16 **had questions about the loan, about your application.**
17 **Q**   Okay. Well, let me ask you this, then. Did
18 you have an understanding or interpretation that
19 MoneyMutual would not want to know if a lender turned
20 out to be somehow untrustworthy or unreliable?
21 **A   I had no understanding that MoneyMutual wanted**
22 **feedback on the lenders. My only understanding is the**
23 **code of lender conduct, is that MoneyMutual only dealt**
24 **with proper lenders, legal lenders.**
25 **Q**   Okay. And you did not extend that thought to

1  think that they would want to know about it if a lender
2  turned out not to be proper.
3      **A    No, when I read this, to me it seems like**
4  **Montel and MoneyMutual were vouching for their service,**
5  **that it was trustworthy.  That's what I read, that it**
6  **was supposed to be trustworthy.**
7      Q    Okay.  Let's look at No. 5, because that's been
8  a particular point with you.  It says, quote:
9          "Lenders shall not engage in
10         harassing or abusive collections
11         practices and agree to comply with any
12         and all applicable federal and state
13         collections practices laws and
14         regulations."
15         Now, here I want to distinguish between the
16 lenders themselves and whoever the loans may have ended
17 up with when you didn't pay them off.
18         MR. WILENS:  I want to object.  We don't know
19 any loans ended up with anyone other than the lenders.
20 So it's a hypothetical question.
21         MR. PUTTERMAN:  Whatever.
22     Q    Do you know, have personal knowledge of whether
23 or not any of the lenders you dealt with engaged in
24 abusive or harassing collection practices, or the other
25 people you dealt with, for example, Searay and Humphreys

1  & Associates, were the ones who were engaging in abusive
2  and harassing collections practices?
3      MR. WILENS:  Objection.  Again, you're making a
4  distinction that may or may not exist.  Or you're asking
5  her to speculate.  There's a difference.
6      MR. PUTTERMAN:  I'm asking her as to what she
7  knows.
8      THE WITNESS:  I only know who's harassed me,
9  Searay and, who was it, Humphreys & Associates.
10     Q    BY MR. PUTTERMAN:  Okay.  "Va bene," as we say
11 in Italian.
12         Let me ask you this.  Point number one in the
13 MoneyMutual Code of Lender Conduct, it says, quote:
14         "Lenders shall not use your
15         information to sell other products or
16         services, or otherwise market your
17         information."
18         Do you see that?
19     A    Yes, I do.
20     Q    Now, to your knowledge, you know, just, again,
21 based on your personal knowledge, did any of the lenders
22 here -- Cash Yes, CastlePayday, or My Quick Funds --
23 market to you any other products or services other than
24 financial services?
25     **A    I know that Cash Yes offered an Amazon gift**

1  **card.  That's the only thing I'm aware of.**
2      Q    Was that in connection with taking out another
3  loan?
4      **A    Yes.**
5      Q    Okay.  So that was like an inducement to do
6  another loan.
7      **A    Yes.**
8      Q    Beyond that, you're not aware of anything?
9      **A    Not that I recall.**
10     Q    Okay.  Now, No. 2 is of interest because that's
11 another issue that we've been discussing with you here
12 today.  Quote:
13         "Lenders should not resell your
14         information to any third party or
15         otherwise use your information other
16         than for the sole purpose of fulfilling
17         the loan and/or communicating with you
18         about your loan."
19         Now, other than either putting the loans out
20 for collection or actually selling the loans to a
21 collector, do you know of any other sales by the lenders
22 themselves of your information?
23     **A    On a personal level?**
24     Q    Yes.
25         **MR. WILENS:  Okay.  Go ahead and answer that**

1  question.
2      **THE WITNESS:  I only know that I've been**
3  **getting constant e-mails and leads that I believe are**
4  **generated through MoneyMutual, and for loans that I**
5  **don't owe, other than My Quick Funds and CastlePayday.**
6      Q    BY MR. PUTTERMAN:  When you say that you
7  believe have been generated by MoneyMutual, you mean
8  that were an ultimate result of you having submitted
9  your information to MoneyMutual?
10     **A    Yes.**
11     Q    Okay.  But you don't know if MoneyMutual or the
12 specific lenders who you got the loans from were
13 responsible for that; correct?
14     **A    No, I don't know.**
15     Q    Okay.  Quote, No. 3:
16         "Lenders shall provide a customer
17         service phone number and shall be
18         responsible and helpful in addressing
19         your concerns.  The lenders shall attend
20         to your questions, issues, and
21         complaints in a reasonable and
22         professional manner within two business
23         days of request."
24         Now, I know that you testified earlier that you
25 were not able to negotiate with the lenders; correct?

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

**Page 110**

1   **A   Correct.**
2   Q   Okay.  Did they communicate with you promptly
3   in response to you?
4   **A   Yes.**
5   Q   Okay.  Were the people you dealt with actually
6   at the lenders polite, courteous?
7   **A   I don't recall them being discourteous, but --**
8   **well, except one, My Quick Funds, other than, sort of, I**
9   **felt, like a veiled threat, was, "If you don't pay,**
10  **we're going to have to send you to collection, and we**
11  **don't know what those collectors are going to do to**
12  **you."**
13  Q   But other than that, nothing stuck out as being
14  discourteous or nonresponsive?
15  **A   No.  I mean, they barely addressed it, didn't**
16  **want to negotiate.  They just kept sending me, like,**
17  **"Here's your contract."**
18  Q   Again, though, you didn't tell MoneyMutual
19  about that; correct?
20  **A   No, I did not.**
21  Q   Okay.  No. 4, quote:
22      "Lenders shall clearly and
23      conspicuously present you with all
24      relevant information about the terms and
25      conditions of the loan before obtaining

**Page 111**

1      your consent, including but not limited
2      to the amount of the loan, the term of
3      the loan, including any renewal
4      policies, schedule of payments,
5      including when funds will be withdrawn,
6      any fees or interest associated with the
7      loan, consequences of late payment or
8      nonpayment."
9      Any fees -- now, you did receive the agreements
10  from all of the lenders; correct?
11  **A   Yes.**
12  Q   And did you see the agreements before you
13  actually entered into the loans?
14      MR. WILENS:  Objection.  Vague as to what you
15  mean by "entered into them."  It's an online process.
16      MR. PUTTERMAN:  Well, I understand that.
17  Q   Before you agreed to take the loan online, did
18  they provide you with the agreements themselves?
19  **A   I don't recall.  I don't think so.  I believe**
20  **the agreements were once we were in the middle of it, or**
21  **I was going through a different, what do you call it,**
22  **different windows.**
23  Q   Okay.  The agreements did show up somewhere
24  along the line.
25  **A   Yes, pretty much toward the end, like, "Sign**

**Page 112**

1   here."
2   Q   But you did have an opportunity -- you could
3   download the agreement; correct?
4   **A   I don't recall.  I believe maybe one or two**
5   **cases I was on the phone with the lender while they were**
6   **walking me through, while I was going through the**
7   **websites.**
8   Q   Did you ask them to actually send you copies of
9   the agreement?
10  **A   The agreements would show up at the end, after**
11  **they walked me through, click here, click here, amount,**
12  **sign, you know, and then at the top.  But it was a lot**
13  **of information.  I don't recall.  But I know it was**
14  **never before.**
15  Q   But you got the agreements, and then you had an
16  opportunity to review them; correct?
17  **A   Not as much time.  It was a very quick process**
18  **in most cases.  I skimmed through.**
19  Q   Okay.  But you did not tell MoneyMutual about
20  your experiences in that regard.
21  **A   No, I didn't.**
22  Q   Okay.  Let's go to Exhibit C, which is -- has
23  four pages.  Do you see that?
24  **A   Yes.**
25  Q   Now, on the second page, you see there's a

**Page 113**

1   heading that says "What kind of lenders can MoneyMutual
2   match me with?"
3   **A   Yes.**
4   Q   And you recall reading that?
5   **A   I don't.**
6   Q   Okay.  You already knew about payday loans,
7   though; correct?
8   **A   Yes.**
9   Q   So you had a general understanding of how they
10  worked.
11  **A   A general.**
12  Q   Turn to the next page, please.  There's a
13  heading that says, quote, "How much do I have to pay
14  back?  What is the APR?"  Do you see that?
15  **A   Yes.**
16  Q   Did you read that?
17  **A   I don't recall reading this.**
18  Q   Did you understand, though, that the actual
19  terms and rates and so on would come from whatever
20  lenders you'd be matched with?
21  **A   Yes, I did.**
22  Q   And that had been your experience with payday
23  loans that you'd taken before; correct?
24  **A   Yes.**
25      MR. WILENS:  Let me reassemble this exhibit

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

---

Page 114

1  here. Where's the official one?
2      MR. PUTTERMAN: You have the official one,
3  didn't you? Oh, I think it's those pages over there.
4      THE WITNESS: Here's the rest of it. Here's
5  all of it. Sorry.
6      MR. WILENS: Hold on. I have two pages of
7  Exhibit B, and then I have the label Exhibit C. So
8  where's --
9      MR. PUTTERMAN: It's presumably the next pages.
10     MR. WILENS: Hand me the front of it. Go
11 ahead.
12  Q   BY MR. PUTTERMAN: Okay. It says here, quote:
13 "What happens if I don't pay the loan back on time or
14 don't pay it back at all?" Did you read what's under
15 that heading?
16  A   I don't believe I did. I had every intention
17 to pay the loans back.
18  Q   Then there's a heading below that that says,
19 quote, "What is the renewal policy for these types of
20 loans?" Did you read that?
21  A   No, I didn't.
22  Q   Would you read under that section now?
23  A   (Examining document.)
24  Q   Do you have any trouble understanding what's
25 stated there?

---

Page 115

1  A   No.
2  Q   And you see that it says quote:
3          "Please make sure to review your
4       lender's renewal policies and make your
5       payment preferences known to your
6       lender."
7       It also says in the sentence before that,
8  quote:
9          "Some options may result in a
10      renewed loan and additional loan fees."
11      And you understand that?
12     MR. WILENS: Hold on. I'm going to object to
13 the question. It's not factually true. So if you're
14 asking her if that's true, the answer's no.
15     MR. PUTTERMAN: I didn't ask her that.
16     MR. WILENS: You said "you understand that."
17 That's not the law. But that's what it says under --
18     MR. PUTTERMAN: I said, do you understand what
19 is stated there.
20     MR. WILENS: That's what it claims.
21     THE WITNESS: I understand how it reads, yes. I
22 understand what they're trying to communicate.
23  Q   BY MR. PUTTERMAN: All I'm asking.
24     MR. WILENS: It also says you comply with
25 federal and applicable law in the same paragraph, which

---

Page 116

1  isn't true.
2      MR. PUTTERMAN: Jeff, we don't need the
3  commentary. It's not an appropriate objection.
4      MR. WILENS: Okay, I'll save that question for
5  when I ask her.
6      MR. PUTTERMAN: You can ask your witness
7  whatever you like, as long as you don't make the
8  questions objectionable, as you did yesterday.
9      MR. WILENS: No, you just didn't like the
10 questions. They were personally objectionable to you.
11 Not legally objectionable.
12     MR. PUTTERMAN: I didn't care about the
13 questions.
14     MR. WILENS: Sure. Are we done with this one?
15     MR. PUTTERMAN: No.
16  Q   Let's take a look at the single page under
17 Exhibit D. Do you recall reading this page?
18  A   I don't recall reading this page.
19  Q   Okay. You can set this exhibit aside, or
20 rather, why don't you get it back from Mr. Wilens and
21 let's clip it all together again.
22     Do you have -- can you tell me the amount that
23 you paid to the lenders on -- collectively now -- Cash
24 Yes, My Quick Funds, and CastlePayday, the amounts you
25 paid to them on the initial loans from each? In other

---

Page 117

1  words, the ones that resulted directly from you
2  submitting information to the MoneyMutual website.
3  A   When you say "initial," are you saying all of
4  them, or just the first?
5  Q   The first.
6  A   The first?
7      MR. WILENS: The question is, can you. Yes or
8  no?
9      THE WITNESS: I can't remember the total
10 amount, no.
11  Q   BY MR. PUTTERMAN: Have you suffered any other
12 damages dealing with these particular payday lenders of
13 which you're aware?
14  A   "Damages" being?
15  Q   Actual financial loss.
16  A   Other than the fees being exorbitant?
17     MR. WILENS: Do you understand what the term
18 "damages" means? If you don't --
19     THE WITNESS: Like other -- no, not that I'm
20 aware of, no.
21  Q   BY MR. PUTTERMAN: All right, I'm just going to
22 go through some more of the documents that were produced
23 to us, and that will enable us, I believe, to finish up.
24 Ms. Aquino can hardly wait.
25     Okay, Madam Reporter, next in order. 22 is

---

EXHIBIT D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

-oOo-

SEAN L. GILBERT, KEEYA        )
MALONE, KIMBERLY BILBREW,     )
CHARMAINE B. AQUINO, on       )
behalf of themselves and all  )
persons similarly situated,   )
                              )
        Plaintiffs,           )
                              )
    -vs-                      )   No. 4:13-cv-01171-JSW
                              )
BANK OF AMERICA, N.A., et     )
al.,                          )
                              )
        Defendants.           )
_____)

Videotaped Deposition of

SEAN L. GILBERT

Tuesday, December 1, 2015

THE SOUZA GROUP
Certified Shorthand Reporters
4615 First Street, Suite 200
Pleasanton, California  94566

Reported by:
KAREN SCOTT, CCRR, CSR
LICENSE NO. 4027

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1   A   Last night.
2   Q   Okay.  And you had seen it before then,
3   correct?
4   A   Yeah.
5   Q   When did you first contact Mr. Wilens about
6   the matters that are involved in this complaint?
7   A   I think in January of 2013.  Maybe
8   January -- somewhere in there.  December,
9   January 2013, '12.
10   Q   That's exactly what I was talking about when
11   I said give us your best recollection.  I mean, that's
12   the perfectly appropriate answer.
13       And what prompted you -- I don't want you to
14   get into any conversations or communications you had
15   with Mr. Wilens, but what prompted you to contact a
16   lawyer?
17   A   Well, I was working for a substance abuse
18   company and it was a residential treatment program,
19   and I was getting calls from Cash Yes to my boss all
20   the time about what was going on and this, that, and
21   so I went to go ahead and look up the OLA, because I
22   remembered that they were supposed to be part of a
23   network, you know, that when I got it from MoneyMutual
24   that I didn't have to worry about none of that or --
25   you know, that they would practice safe lending laws

1   and all that kind of stuff.
2       So I wanted to call and find out why they
3   would do that, you know, and then that's when I found
4   out a lot of other stuff and that's when I contacted
5   Mr. Wilens after that.
6   Q   What was the other stuff you found out?
7   A   Just that they weren't even in this country.
8   There were numerous complaints from people just like
9   me that had fallen into the same trap and were
10   basically -- you know, hadn't got that loan if it
11   hadn't been through MoneyMutual.  I saw it on TV and I
12   called.
13   Q   When you said you saw it on TV and you
14   called, you mean you called MoneyMutual after seeing a
15   MoneyMutual ad --
16   A   Right.
17   Q   -- on television?
18   A   And then I filled out the application like
19   they asked me to.
20       (Court reporter interrupts for clarity of
21       the record.)
22       THE WITNESS: Yes.  And then I filled out
23   the application like they -- I can't really recollect.
24   I guess it was online.  That's what they -- I had to
25   do.  And then I got a thing from -- from them saying I

1   was approved from Cash Yes or thereabouts, or I got
2   loan documents or something like that.
3   BY MR. PUTTERMAN:
4   Q   Okay.  I don't want to get too far ahead of
5   us, but since you had mentioned that I wanted to
6   follow up on it.
7       All right.  I am going to ask you some
8   questions about some of the things that are said in
9   here, and here being Exhibit 2.
10       First of all, when you saw the television
11   ad, had you seen the ad before?
12   A   Yes.
13   Q   Okay.  What do you remember about the
14   television advertising?
15   A   Well, it was Montel Williams.  I mean,
16   that's, you know, the first thing I remembered, but I
17   remember I was sitting -- it was in my room and I was
18   standing next to my dresser.  That's the way I
19   remember it.
20       He was standing there talking, and then he
21   said he had a trusted lender of networks that, you
22   know, you could trust that -- around those lines.
23       So I looked over at my wife and that's -- I
24   asked if I should go forward.  She said yes.
25   Q   Did you know who Montel Williams was at that

1   time?
2   A   Well, I know who he had been or whatever,
3   but I mean I just thought he was -- you know, he
4   worked for MoneyMutual.
5   Q   What did you know about him otherwise?
6   A   He's a talk show host.
7   Q   Okay.  Is that a show you ever watch?
8   A   When I was younger.  Not by choice.
9       I had parents at the time, you know, that
10   would watch him, so I had to sit there and watch it if
11   I wanted to watch it at that time.
12   Q   You were a family captive?
13   A   I was held family captive.  Exactly.  I had
14   seen a few of his shows.
15   Q   Was that the first time you had ever
16   contacted MoneyMutual for a potential referral to a
17   lender?
18   A   Through MoneyMutual?
19   Q   Yeah.
20   A   I believe so, yes.  I'm not sure.  I believe
21   so, but I'm not positive.
22   Q   Okay.  Now, have you ever talked to Montel
23   Williams?
24   A   Personally?
25   Q   Yes.

The Souza Group
(800) 230-3376

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1   A   No.
2   Q   And do you -- other than having seen him as
3   an endorser for MoneyMutual, do you have any knowledge
4   concerning what his relationship with MoneyMutual was
5   or is?
6   A   No.
7   Q   Okay. Would you look at paragraph 6 of
8   Exhibit 2, which is on page 3. Starts on page 3, runs
9   over to page 4.
10  A   Okay.
11  Q   See there is a reference to a Mr. Glenn
12  McKay?
13  A   Yeah.
14  Q   Do you know who Mr. McKay is?
15  A   Now or then?
16  Q   Okay. I should have said this when I was
17  giving you the introductory spiel.
18      When I ask you for your knowledge or
19  information, I want you to exclude whatever you may
20  have learned from your counsel in the course of this
21  case.
22  A   Okay. I've gotcha.
23  Q   I only want your personal knowledge
24  exclusive of that; okay?
25  A   No, I didn't know.

1       MR. WILENS: But that was a yes-or-no
2   question. So if you know because of something I told
3   you, you can still say yes.
4       MR. PUTTERMAN: No, I want him to exclude
5   that.
6       MR. WILENS: No, I feel that will present an
7   inaccurate answer. If you want to ask him what was
8   said, that's one thing; but if your question was do
9   you know this individual and he is going to answer
10  that yes or no --
11      MR. PUTTERMAN: Let me rephrase the
12  question.
13  Q   Aside from what you may have learned from
14  your attorney, do you know anything about Glenn McKay?
15  A   No.
16  Q   Okay. Have you ever communicated with
17  Mr. McKay?
18  A   No.
19  Q   Again, aside from what you may have learned
20  from your attorney, do you know anything about his
21  role or relationship with MoneyMutual?
22  A   No. I do -- no.
23  Q   Would you please look next at paragraph 7.
24  And you see there is a reference there to Partner
25  Weekly, LLC?

1   A   (Witness nods head.)
2   Q   Again, aside from anything you may have
3   learned from your attorney, have you ever previously
4   heard of Partner Weekly, LLC?
5   A   So in the beginning of this I think I might
6   have sent them a letter, because I couldn't find the
7   information from Cash Yes or who Cash Yes was, how to
8   get ahold of them. So I had to go back through where
9   I started, which is MoneyMutual.
10      So I don't know if it was Partner Weekly,
11  but it was whatever phone number I had gotten for
12  MoneyMutual, which I think they were one and the same;
13  but I never talked to anybody. I just kind of sent an
14  email, never got a response.
15  Q   Okay. And you are not sure whether that got
16  sent to Partner Weekly or MoneyMutual?
17  A   I have no idea.
18  Q   Okay. What was the substance of the
19  communication?
20  A   Get the information about Cash Yes.
21  Q   What information was that?
22  A   Address, phone number, somebody I could talk
23  to.
24  Q   This was after you had the loan from Cash
25  Yes?

1   A   Right.
2   Q   Okay. I didn't see it in what was
3   previously produced and I didn't look at what Mr. -- I
4   haven't looked yet at what Mr. Wilens gave me today
5   before I asked that it be copied.
6       But did you retain a copy of that email and
7   produce it here?
8   A   I can't say that I even have it at the
9   moment because it was so in the beginning. However, I
10  know that that's the avenue I took because I needed
11  to --
12      MR. WILENS: You answered the question.
13      THE WITNESS: Okay. Gotcha.
14  BY MR. PUTTERMAN:
15  Q   What were you going to finish saying?
16  A   Nothing.
17  Q   No, I can now ask you that follow-up
18  question.
19  A   Oh. I was just looking for information to
20  be able to get ahold of these people to ask them why
21  they were calling my work, because I went through
22  MoneyMutual. That's where I started.
23  Q   Okay. Do you -- give us your best
24  recollection of what you said in the email.
25  A   Just what I just said.

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

| Page 26 |
| --- |

1  Q   Okay.
2  A   I needed address, phone number, some
3  information --
4  Q   Okay.
5  A   -- because they wouldn't -- they told me I
6  need to go through the lender.
7  Q   And what do you remember that from?
8  A   That it was part of their -- I needed to go
9  through their lender, that they told me the loan --
10 who they had referred the loan to, and so I was right
11 back to where I had started.
12 Q   Okay.  Do you recall seeing that in -- on
13 the MoneyMutual website, or did somebody from
14 MoneyMutual actually communicate with you and tell you
15 to go through the lender?
16 A   I don't recall.  It was a phone call.  No,
17 it was an email.  It was an email.
18 Q   That you got from MoneyMutual?
19 A   Yes.
20 Q   I just want to try and nail down when you
21 got this email.
22     Was this after you submitted your
23 information to MoneyMutual but before you got the
24 loan?
25 A   No.  It was after I had gotten the loan.

| Page 27 |
| --- |

1  Q   Okay.  So -- and do you recall now that that
2  email was in response to something you sent to
3  MoneyMutual?
4  A   Yeah, I was --
5  Q   Okay.  Was that the call or an email or
6  what?
7  A   I'm not sure, because I had gotten calls and
8  emails for a couple different things that I was trying
9  to figure out.  You know, I was trying to locate
10 anything I could find online for an address.
11 Q   For Cash Yes?
12 A   For Cash Yes.
13 Q   Okay.
14 A   But I couldn't find -- nobody would return
15 my calls, so it had to be from MoneyMutual.  I don't
16 know if it was a call or an email.  I don't remember.
17     (Court reporter interrupts for clarity of
18     the record.)
19     THE WITNESS: I don't know if it was a call
20 or an email or both.
21 BY MR. PUTTERMAN:
22 Q   Okay.  So that in turn may be why, if there
23 hasn't been an email produced, because it might have
24 been a call.
25 A   It very well could have or it could have got

| Page 28 |
| --- |

1  erased back then, not thinking that all this was ever
2  going to happen, you know.
3  Q   Bottom line is you communicated one way or
4  another with MoneyMutual --
5  A   Correct.
6  Q   -- and in response you got back an email
7  stating that you had to work through the lender?
8  A   Correct.
9  Q   Okay.  And did they provide you any contact
10 information for Cash Yes?
11 A   No.
12 Q   How did you finally get contact information
13 for Cash Yes?
14 A   I just started sending out certified mail to
15 the address I could find that had anything to do with
16 them.
17 Q   Did that finally provoke a response from
18 Cash Yes?
19 A   It was returned.
20 Q   The mail was returned?
21 A   Yes.
22 Q   Okay.  What did you do next to try and find
23 Cash Yes?
24 A   Started doing research and finally found out
25 that they were in another country, and I think that's

| Page 29 |
| --- |

1  when I got ahold of Mr. Wilens.
2  Q   Okay.  How did you find that out, do you
3  recall?
4  A   Just looking up different websites.  I don't
5  know.  I have to think about it for a minute and come
6  back to it.
7  Q   Sure.  Now, did you happen to have a copy at
8  that time of your agreement with Cash -- your loan
9  agreement with Cash Yes?
10 A   Yes.
11 Q   Did you look at that to see if that had any
12 hints as to how you could reach them?
13 A   Yes.
14 Q   You didn't find anything?
15 A   No.
16 Q   Okay.  Aside from the one communication
17 you've described with MoneyMutual, that you've just
18 testified about, did you have any other communications
19 with MoneyMutual concerning Cash Yes?
20 A   Not Cash Yes, no.
21 Q   Did you have other communications with
22 MoneyMutual on anything other than concerning Cash
23 Yes?
24 A   Yes.
25 Q   Okay.  Please describe that for me.

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 30

1  A   They would call or send me an email saying I
2  had been approved for another loan, that type of
3  thing.
4  Q   Okay.  And did you proceed with any further
5  loans through MoneyMutual?
6  A   No.
7  Q   Okay.  This was after the Cash Yes
8  experience?
9  A   Yes.
10  Q   Okay.  Did you have any other call -- I
11  think you may have answered this already.  Please
12  forgive me if you have.
13      Did you have any other calls with
14  MoneyMutual concerning specifically Cash Yes?
15  A   I don't believe so.
16  Q   Okay.  Did you ever make a call or send an
17  email to MoneyMutual complaining about Cash Yes?
18  A   Yes.
19  Q   Okay.  Was that in the one call or email
20  that you are referring to?
21  A   I think -- believe it was after.
22  Q   Okay.  Was it a call or an email?
23  A   It was an email.
24  Q   Okay.  Have you produced that email?
25  A   I am not sure.

---

Page 31

1  Q   Do you believe you still have it?
2  A   I'm not sure.  See, all this -- I'm not
3  sure.
4      I know that I ended up getting a phone
5  number for them, but they wouldn't give me any more
6  information about Cash Yes at all.  So I ended up
7  getting a phone number, and that's when I was trying
8  to call Cash Yes.
9  Q   Okay.  Wait.  Let's step back.  Did --
10  A   Go ahead.
11  Q   You got a phone number from MoneyMutual for
12  Cash Yes?
13  A   They told -- yes.  They didn't give me the
14  phone number.  They told me to look on my loan
15  documents.
16      So I looked on my loan documents.  I didn't
17  see anything.  I might have overlooked it, but I
18  remember now that there was a phone number.  I called
19  that phone number.
20  Q   And did you get that from MoneyMutual?
21  A   Yes.
22  Q   That was through a phone call with
23  MoneyMutual?
24  A   Right.  But they were very short.
25  Q   What do you mean by that?

---

Page 32

1  A   Well, I remember I was upset because they
2  wouldn't give me any information, but yet they had all
3  my information to give somebody to give me a loan, but
4  they can't give me any information about, you know,
5  how to contact them, but yet I have to contact them to
6  resolve it.
7  Q   Okay.  But they did give you a phone number?
8  A   Yes.
9  Q   Okay.  So they did give you some information
10  so you could contact --
11  A   I believe they gave me a phone number.
12  Q   And did you use that phone number to call or
13  contact Cash Yes?
14  A   Yes.
15  Q   Did you actually reach Cash Yes?
16  A   No.
17  Q   Who did you reach?
18  A   I reached just solely through emails.
19  Q   Well, what happened when you tried to
20  reach --
21  A   Well, they --
22  Q   Remember only one of us can talk.
23  A   Oh, sorry.
24      MR. WILENS:  Just slow down, Sean.  Wait for
25  a question.

---

Page 33

1  BY MR. PUTTERMAN:
2  Q   Okay.  So let's step back.
3      You got a phone number from MoneyMutual to
4  call Cash Yes?
5  A   Yes.
6  Q   Okay.  You then tried to call Cash Yes
7  through that phone number?
8  A   Yes.
9  Q   Okay.  What happened when you tried to call
10  them?
11  A   I got no answer.  I left a message.
12  Q   You got an answering machine?
13  A   A service.
14  Q   Service?
15  A   Correct.
16  Q   Okay.  Now, did Cash Yes communicate with
17  you after you left that message?
18  A   Via emails.
19  Q   Okay.  So you made the call, you got a
20  service, you left a message.
21  A   Correct.
22  Q   That then led to Cash Yes contacting you by
23  email?
24  A   Yes.  But they had been contacting me
25  through my job and all that.

---

The Souza Group
(800) 230-3376

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1    Q   I understand that.  I am just referring to
2  this line of communication.
3    A   Yes.
4    Q   Because my understanding was -- was that --
5  and correct me if I am wrong -- that although they had
6  been contacting you through your work, they were not
7  leaving -- or were they leaving contact information?
8    A   They were not leaving contact information.
9    Q   Okay.  So the point is you had no contact
10  information for Cash Yes until you called MoneyMutual?
11    A   Correct.
12    Q   Okay.  MoneyMutual gave you the phone
13  number?
14    A   Correct.
15    Q   You called the number, left a message with
16  the service, and then Cash Yes got back to you via
17  email?
18    A   Right.
19    Q   Okay.  So I've got the sequence of events
20  right there?
21    A   Yes.
22    Q   Okay.
23    A   In the meantime there were other emails that
24  were being sent from their recovery department or
25  whatever.

1    Q   Right.  Did you try sending any emails back
2  to them at the address, the sender's address?
3    A   They didn't have an address.
4    Q   There was no from line?
5    A   No.  The same phone number that I called
6  them from was the one that was at the bottom of the
7  emails.
8    Q   Wait.  Were these then before or after --
9    A   During.  It was all during that -- they
10  started sending the recovery --
11        (Court reporter interrupts for clarity of
12        the record.)
13        MR. WILENS:  Sean, he asked you something
14  and it was before or after, and you said "during."
15  You could have just stopped right there.  And just
16  wait for another question.
17        THE WITNESS:  All right.
18  BY MR. PUTTERMAN:
19    Q   Getting back to this.
20        When you called MoneyMutual for contact
21  information about Cash Yes, had you already been
22  receiving emails from Cash Yes?
23    A   Yes.
24    Q   Okay.  Now, did those emails -- and we'll
25  look at some of them because you produced documents.

1        Did those emails include an email address on
2  the from line?
3    A   Yes.
4    Q   Okay.  Did you try to email back to any of
5  those email addresses?
6    A   Yes.
7    Q   Okay.  When you did that, what happened?
8    A   I got a reply.
9    Q   Okay.  So you are saying then that you were
10  actually in contact via email with Cash Yes before you
11  called MoneyMutual?
12    A   No.
13    Q   Okay.  Can you describe for me the sequence
14  as best you remember it?
15    A   I was looking for a way to contact Cash Yes.
16    Q   Correct.
17    A   So I couldn't get any information except for
18  through their website, which wasn't going anywhere.  I
19  was not getting a response.
20        So at that point a couple days went by.
21  They kept calling my work with no contact information.
22    Q   Okay.
23    A   I called MoneyMutual to find out how I can
24  get in touch with the lender.  They gave me the phone
25  number, a different phone number than one that was on

1  their website.  I called that.  That's when I got an
2  email, but see, I had an email at work too at the
3  time, so there was -- you know, at my job.  They were
4  sending emails there too.
5    Q   Right, and that's my question then.  Were
6  you getting those emails before you called -- already
7  before you called MoneyMutual?
8    A   Just the way I just explained it is the way
9  I finally got emails from them.
10    Q   Okay.  So you then called, you left a
11  message at the service, and then you started getting
12  emails?
13    A   Correct.
14    Q   And some of those emails came in to work?
15    A   Right.  They came in my personal, and then
16  also I had all my stuff being forwarded from my
17  business -- or, you know, from the treatment program.
18    Q   Right.  So that's how you got them at work.
19  was because you had your personal email forwarded --
20    A   Right.
21    Q   -- to send you to your work email?
22    A   Correct.
23    Q   Got it.
24    A   Okay.
25    Q   When you called MoneyMutual, to the best of

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 38

1  your recollection -- to get the contact information --
2  to the best of your recollection what did you say to
3  whomever you spoke with?
4      **A   I just explained my situation.**
5      Q   Okay.  Did you tell them who you were?
6      **A   Yeah.**
7      Q   In other words, you said my name is Sean
8  Gilbert or something?
9      **A   Yeah.  They asked who -- what my name was.**
10     Q   Okay.
11     **A   And I don't remember much more about, you**
12  **know, to find out who I was or not, but that was about**
13  **it.  I mean, there was no information really given.**
14  **They just told me I had to contact Cash Yes.**
15     Q   Okay.  Now, did you ask them if you could
16  make a complaint to them about Cash Yes?
17     **A   Not at that time.**
18     Q   Okay.  Did you have a communication with
19  MoneyMutual at some point after that time in which you
20  asked if you could make a complaint against Cash Yes?
21     **A   I don't believe so.**
22     Q   Let's go back to Exhibit 2.
23         We were looking at exhibit -- at
24  paragraph 7, which referred to Partner Weekly.
25     A   Okay.  Yeah.

---

Page 39

1      Q   Okay.  So now that we have gone through the
2  sequence of your communication with MoneyMutual and
3  how you got the phone number and so on for Cash Yes,
4  do you remember specifically that you spoke -- you
5  actually called MoneyMutual at that time?
6      **A   Correct.**
7      Q   Okay.  Did anybody at that time say anything
8  to you about Partner Weekly?
9      **A   No.**
10     Q   Okay.  Now, having been through that whole
11  sequence, do you remember if you ever communicated
12  with Partner Weekly specifically?
13     **A   No.**
14     Q   Okay.  You did not communicate?
15     **A   No.**
16     Q   Okay.  You communicated with MoneyMutual?
17     **A   Right.**
18     Q   Got it.  And again leaving aside anything
19  you may have been told by your counsel, do you know
20  anything about Partner Weekly?
21     **A   No.**
22     Q   Okay.  Let's move on to paragraph 8.  You
23  see there is a reference to a gentleman named Brian
24  Rauch.  It's spelled R-A-U-C-H.
25     **A   I do.**

---

Page 40

1      Q   Do you know who -- leaving aside anything
2  you may have been told by your counsel, do you know
3  anything about Mr. Rauch?
4      **A   No.**
5      Q   Do you know who he is?
6      **A   No.**
7      Q   Do you know what his role or relationship
8  might be with any of the other MoneyMutual defendants?
9      **A   No.**
10     Q   Have you ever communicated with him?
11     **A   No.**
12     Q   Okay.  Going to paragraph 9, I am going to
13  ask you the same questions about John Hashman.  Aside
14  from what you may have been told by your counsel, have
15  you ever heard of Mr. Hashman?
16     **A   No.**
17     Q   Do you have any knowledge of who he is?
18     **A   No.**
19     Q   Have you ever communicated with him?
20     **A   No.**
21     Q   Do you have any knowledge of what his role
22  or relationship may have been with the other
23  MoneyMutual defendants?
24     **A   No.**
25     Q   Okay.  Would you please turn to paragraph 18

---

Page 41

1  on page 6.  You see there is a reference there to a
2  Mr. Humphreys?
3      **A   Yes.**
4      Q   Aside from what your counsel may have told
5  you, do you know who Mr. Humphreys is?
6      **A   No.**
7      Q   Have you ever heard of him?
8      **A   No.**
9      Q   Have you ever communicated with him?
10     **A   No.**
11     Q   Do you know what role or relationship he may
12  have had with the other MoneyMutual defendants?
13     **A   No.**
14     Q   Paragraph 19, where there is a reference to
15  Douglas Tulley, do you see that?
16     **A   Yes.**
17     Q   Aside from what your counsel may have told
18  you, have you ever heard of Mr. Tulley?
19     **A   No.**
20     Q   Do you know who he is?
21     **A   No.**
22     Q   Have you ever communicated with Mr. Tulley?
23     **A   No.**
24     Q   Do you have any knowledge concerning what
25  his role or relationship may have been with the other

---

| Page 42 | Page 44 |
|---|---|

**Page 42**

1  MoneyMutual defendants?

2  **A  No.**

3  **Q  Paragraph 20.  Same questions as to Alton F.**

4  **Irby the Third.  Aside from what your counsel may have**

5  **told you, do you know who Mr. Irby is?**

6  **A  No.**

7  **Q  Have you ever heard of him?**

8  **A  No.**

9  **Q  Have you ever communicated with him?**

10  **A  No.**

11  **Q  Do you have any knowledge concerning what**

12  **his role or relationship may have been with the other**

13  **MoneyMutual defendants?**

14  **A  No.**

15  **Q  Okay.  Let's go all the way to**

16  **paragraph 51 -- oh, one more question.**

17  **Have you ever heard of a company called**

18  **Selling Source aside from what your counsel may have**

19  **told you?**

20  **A  No.**

21  **Q  To your knowledge, have you ever**

22  **communicated with anybody from Selling Source?**

23  **A  No.**

24  **Q  Do you have any knowledge of what Selling**

25  **Source's role or relationship may have been with the**

**Page 43**

1  other MoneyMutual defendants?

2  **A  No.**

3  Q  Okay.  Let's go to paragraph 51 on page 17,

4  and you see that this paragraph concerns you.

5  A  Just a second.  Page 17?

6  Q  Yes, please.

7  A  Okay.  51.

8  Q  Okay.  And you see it states in the first

9  sentence of paragraph 51, quote:

10      "In November 2012 Plaintiff Gilbert used

11      the MoneyMutual.com website to obtain a

12      payday loan from unlicensed lender Cash

13      Yes and paid at least $105 when Cash Yes

14      attempted to remove funds from his bank

15      account," period, close quote.

16      Do you see that?

17  A  Yes.

18  Q  Okay.  Now, before you got the Cash Yes

19  loan, which we have already started discussing that a

20  little bit, had you ever obtained a payday loan?

21  **A  Yes.**

22  **Q  And how often before this Cash Yes loan had**

23  **you -- had you obtained payday loans?**

24  **A  It was at the same time.**

25  **Q  Okay.  In other words, at about that time**

**Page 44**

1  you had obtained at least one other payday loan?

2  **A  Yes.**

3  Q  Okay.  Do you recall who that loan was from?

4  **A  I don't.**

5  Q  Do you recall if it was from some company

6  associated with an Indian tribe?

7  **A  I don't.  It might have been brick and**

8  **mortar.**

9  Q  Okay.  Did you have a satisfactory

10  experience with that payday loan?

11      MR. WILENS: Which payday loan?

12      MR. PUTTERMAN: The one that he obtained at

13  about the same time that he just described.

14      MR. WILENS: Do you remember anything about

15  it?

16      THE WITNESS: A little bit.  I mean --

17  BY MR. PUTTERMAN:

18  Q  Tell us what you remember.

19  **A  We'll have to come back.  I've just got to**

20  think about it for a minute.  It wasn't great.  I

21  mean --

22  Q  Do you remember anything at all about it?

23  **A  Yeah.  I mean, I was in the hospital and I**

24  had gotten a couple of (unintelligible) just during

25  the time right then, like what, November, December.

**Page 45**

1  Q  2012?

2  **A  Right.  So I was in -- the problem was I was**

3  in the hospital and there was money being taken in --

4  or out of my account.

5      And I think my wife had tried to get ahold

6  of one of them, and they ended up pulling out more or

7  less, I can't remember, but then they just renewed the

8  loan and so -- and a bunch of NSF fees when I got out

9  of the coma.  So --

10  Q  Oh, what happened to you?

11  **A  I've got bad asthma, so they have to**

12  intubate me once in a while and when they do, they put

13  me down for like seven days.  Well, this --

14      (Court reporter interrupts for clarity of

15      the record.)

16      THE WITNESS: So they put me down for a week

17  or so.

18  BY MR. PUTTERMAN:

19  Q  A medically induced coma?

20  **A  Correct.**

21  Q  Okay.  Now, when you are referring to the

22  money being taken out of your account by one of them,

23  are you referring now to Cash Yes or some other payday

24  lender?

25  **A  Cash Yes --**

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 46

1   Q   Okay.
2   A   -- was one of them.
3   Q   All right. And did you have other payday
4   loans at the time?
5   A   Yes.
6   Q   Do you know about how many?
7   A   Not off the top of my head. It was a few,
8   though.
9   Q   Okay. Were these loans you had obtained
10  online or through brick and mortar or both?
11  A   Online.
12  Q   Do you remember the names of any of the
13  companies from whom you got the online loans at that
14  time?
15  A   VIP Loan Shop, I think. I think OPD
16  Solutions. A couple. I'm not sure.
17  Q   Okay. But you did not get these loans
18  through MoneyMutual, correct?
19  A   No.
20  Q   Do you recall what website you got these
21  loans from, website or websites?
22  A   I don't.
23  Q   Okay. Do you recall if you went directly to
24  the websites of any of these lenders?
25  A   The VIP Loan Shop, I believe I did.

---

Page 47

1   Q   What about the OPD Solutions?
2   A   I think same type of thing. So at that time
3   I didn't know that there was a network and all that
4   stuff, so they just referred. Do you know what I
5   mean? I didn't know all that. I thought I was
6   dealing with the people that you filled out the
7   application with.
8   Q   Okay. But you don't remember who the people
9   were with whom you filled out the applications?
10  A   No.
11  Q   Okay. Now, did you repay these loans or if
12  not, what happened with them?
13  A   It was all at the same time.
14  Q   Right.
15  A   So they were trying to take money out of my
16  account after I contacted them, let them know my
17  situation, and that's when it just got overbearing. I
18  mean the phone calls, all that. Just --
19  Q   Your situation being that you were in the
20  hospital?
21  A   Right. So that -- I hadn't been to work, so
22  I didn't -- I hadn't had my paycheck come in. And I
23  think I called them because -- one of them because
24  they had just renewed my loan after taking out just
25  the bottom line, and they didn't say that in the

---

Page 48

1   beginning.
2   Q   Do you still have any of the documents
3   related to these loans?
4       MR. WILENS: We produced some.
5       THE WITNESS: My attorney's got them.
6   BY MR. PUTTERMAN:
7   Q   Okay. Is there any documents that you have
8   concerning those loans which you haven't produced?
9   A   No.
10  Q   Okay. All right. So around this period, is
11  it correct that you were obtaining payday loans
12  because of the medical problems you were having and
13  your inability to go into work?
14  A   Correct.
15  Q   Okay. So you needed money.
16  A   A little bit. My in-laws were out of town,
17  so normally they would have covered it. However, they
18  were on vacation, so -- out of the country. There was
19  no way that I could contact them or we could contact
20  them. They didn't even know I was in the hospital at
21  the time.
22  Q   All right. Did you have any other
23  alternative sources of funds at that time besides
24  payday loans?
25  A   No.

---

Page 49

1   Q   Okay. No credit cards that you could use?
2   A   No.
3   Q   Did you have medical insurance at that time?
4   A   No. I just got my medical insurance through
5   Kaiser.
6   Q   Okay. So, now, before this episode where
7   you became ill and you needed some extra money, had
8   you used payday loans before?
9   A   No.
10  Q   So this -- how did you learn about payday
11  loans at this time, generally speaking?
12  A   I don't know if it was the commercial, a
13  combination of both. It was something like that,
14  though I think I saw a commercial.
15  Q   Okay. A commercial maybe from other online
16  payday lenders?
17  A   My bank might have referred an option for
18  that, or I applied for a loan from a bank and they
19  denied me.
20  Q   Did the bank tell you why they denied you a
21  loan?
22  A   I didn't have enough creditworthiness at the
23  time.
24  Q   Have you ever taken bankruptcy?
25  A   No.

---

The Souza Group
(800) 230-3376

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

Page 50

1    Q   It was just a question of not having a good
2  enough credit history for the bank?
3    A   Correct.
4    Q   Okay. We'll come back to the Cash Yes loan,
5  but I want to go to the next sentence in paragraph 51.
6  It says, quote:
7        "In September 2014, Plaintiff ... used
8        the website of Selling Source affiliate
9        'cashadvance.com' to obtain a payday
10       loan from unlicensed lender Camel Coin
11       and paid at least $100 on that loan,
12       Plaintiff did not know at the time that
13       cashadvance.com was controlled by
14       Selling Source," period, close quote.
15       My first question is: You didn't know --
16  you yourself did not have personal knowledge of
17  anything concerning Selling Source at the time you got
18  this loan, correct?
19   A   No.
20   Q   Okay. You submitted information through a
21  website called cashadvance.com, correct?
22   A   So I can't be certain on that.
23   Q   Okay. So you yourself don't remember what
24  website you submitted information through?
25   A   Correct.

Page 51

1    Q   But you did submit information through
2  somebody.
3    A   Correct.
4    Q   And you ended up being matched up with a
5  lender called Camel Coin?
6    A   I suppose.
7    Q   Do you remember what the name was of the
8  lender that you understood you were dealing with?
9    A   So I don't understand how that all came -- I
10  don't remember getting a loan from Camel Coin,
11  especially in 2014. I was seeking a loan for a
12  different reason but not for a little amount.
13   Q   Okay. What kind of a loan were you seeking
14  at that time?
15   A   Funding for my business, for my patents.
16   Q   Which was not going to happen with a payday
17  loan, correct?
18   A   No, not at all.
19   Q   Right. Do you recall in September 2014
20  getting a payday loan from anybody?
21   A   No.
22   Q   So would it be fair to say that you didn't
23  have any dealings with a payday lender at that time?
24   A   Yeah.
25   Q   And so of course nobody -- well, let me ask

Page 52

1  you this: Did anybody -- was anybody contacting you
2  about paying back a payday loan at that time?
3    A   That happens now.
4    Q   Okay.
5        MR. WILENS: So the answer is it was
6  happening then too?
7        THE WITNESS: Huh?
8        MR. WILENS: The question was, was it
9  happening in 2014.
10       THE WITNESS: Yes.
11  BY MR. PUTTERMAN:
12   Q   Okay. But you hadn't taken any loan out at
13  the time?
14   A   No.
15   Q   Okay. Did you -- so if you didn't take any
16  loan out, you didn't pay any loan back? I know that
17  sounds obvious, but --
18   A   Well, yeah. I mean --
19   Q   Okay. And was anybody trying to pull money
20  out of your bank account in or after September 2014?
21   A   No. No.
22   Q   So you didn't receive any money from a
23  payday lender in September 2014, and you didn't pay
24  any money to a payday lender in September 2014 or
25  thereafter?

Page 53

1    A   Not that I know of, no.
2    Q   Okay. Do you have any knowledge of why this
3  sentence states that you did obtain a payday loan and
4  you paid at least a hundred dollars on that loan?
5        MR. WILENS: You don't need to answer that
6  question. It's privileged.
7  BY MR. PUTTERMAN:
8    Q   Aside from what you may have discussed with
9  your attorney.
10       MR. WILENS: You can't answer that question.
11  He's asking you why a complaint which was drafted by
12  your attorney says something, so there is no way that
13  the question can be phrased.
14       MR. PUTTERMAN: That's not correct.
15       MR. WILENS: I would point out that it's
16  your records that said he went to that website, so his
17  personal information is being transferred all over the
18  Internet.
19       MR. PUTTERMAN: Nothing like that is
20  obvious.
21       MR. WILENS: Plaintiff --
22       MR. PUTTERMAN: Excuse me. Our records
23  don't say anything about what I specifically asked
24  about here, about payment of at least $100 on a loan
25  allegedly obtained in September 2014.

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 54

1  Q   Do you have any personal knowledge of having
2  made a payment of at least a hundred dollars on a
3  supposed payday loan that you received in
4  September 2014?
5  A   No.
6      MR. WILENS: We are withdrawing that
7  reference. We don't have any support for it at this
8  time.
9      MR. PUTTERMAN: For the payment of the
10 hundred dollars?
11     MR. WILENS: Right. We don't -- it doesn't
12 appear that any bank records could substantiate that,
13 so that loan apparently never went through, whatever
14 it was. There is other loans he can tell you about.
15 Business -- business loans. We have a theory, but --
16     MR. PUTTERMAN: Jeff, I only remind you that
17 the records that we produced that you refer to are our
18 database records, and those only reflect leads sold.
19 They do not -- let me finish. Okay. They do not in
20 any way indicate that a loan was actually completed.
21     So what I am hearing from the witness is
22 that although -- and he doesn't have any knowledge
23 about this -- is that although a loan lead may have
24 been sold to somebody, okay, there was no loan
25 completed at that time in September 2014.

---

Page 55

1      MR. WILENS: We're withdrawing the
2  allegation that there was a loan that was completed or
3  funded with Camel Coin. I know he did apply for other
4  loans and he might have got those. Business loans.
5      MR. PUTTERMAN: Okay. Different issue
6  altogether.
7      MR. WILENS: Not if the information came
8  from the same source.
9  BY MR. PUTTERMAN:
10 Q   Did you apply for business loans in
11 September 2014?
12 A   I did.
13 Q   Did you -- did you obtain any business loans
14 in September 2014?
15 A   I did not.
16 Q   Who do you recall and what were the amounts
17 of these loans that you were seeking?
18 A   25,000 or above.
19 Q   Okay. To whom do you recall applying?
20 A   There were several, so -- there were
21 several.
22     MR. WILENS: Are they on the Internet or --
23     MR. PUTTERMAN: Jeff, I am going to ask that
24 question; okay? My deposition, remember?
25     THE WITNESS: They were on the Internet.

---

Page 56

1  BY MR. PUTTERMAN:
2  Q   Okay. And you don't remember to whom you
3  applied?
4  A   Like Rise, Crediteria, Fundable.
5  Q   Okay.
6  A   Agencies like that.
7  Q   Now, had they initially contacted you or did
8  you look them up?
9  A   No, I would -- I looked them up.
10 Q   Okay. So you looked up lenders from whom
11 you could potentially obtain more substantial business
12 loan funding for your business?
13 A   Correct.
14 Q   Okay. And you submitted information through
15 those, through their websites?
16 A   Correct.
17 Q   And you were turned down?
18 A   Sort of.
19 Q   Okay. Explain what you mean by "sort of."
20 A   I was turned down for the amount that I was
21 seeking.
22 Q   Okay.
23 A   But then I would get an email saying but you
24 have been approved for this amount, click here for
25 that, and it would take me to a payday lender.

---

Page 57

1  Q   Okay. And you don't know how those -- and
2  that occurred after you applied and were turned down
3  for the larger loans?
4  A   Correct.
5  Q   Okay. And you don't know how the
6  information then got to the payday lenders who
7  solicited you for loans?
8  A   Correct.
9  Q   Okay. It just happened?
10 A   Yeah. Hundreds and hundreds of emails.
11 Q   But that was the sequence? You would apply
12 for these larger loans, and then you started
13 getting -- you'd be turned town and you'd start
14 getting solicitations from payday lenders?
15 A   Right.
16 Q   Okay. And this was around September 2014?
17 A   Correct.
18     MR. PUTTERMAN: Okay. All right. So, Jeff,
19 we can treat that Camel Coin allegation as withdrawn,
20 correct?
21     MR. WILENS: The allegation that he got a
22 loan from Camel Coin, I can't verify that, so we're
23 dropping that allegation, but not that his personal
24 information was shared by Selling Source somehow with
25 other lenders. In other words, he was basically

---

Page 58

1   spammed for payday loans as soon as he applied.
2       MR. PUTTERMAN: I am just talking about the
3   second sentence of paragraph 51.
4       MR. WILENS: I don't have that in front of
5   me.
6       THE WITNESS: Page --
7       MR. WILENS: Well, no, not -- we're not
8   withdrawing the allegation that Selling Source
9   affiliate is cashadvance.com. And we are not
10  withdrawing the allegation that he went to that
11  website or somehow went to another website and he got
12  to that website. But he did not obtain a payday loan
13  from unlicensed lender Camel Coin. Well, it is
14  unlicensed, but he did not obtain a payday loan from
15  Camel Coin and did not pay $100 on that loan. So part
16  of that sentence is withdrawn.
17  BY MR. PUTTERMAN:
18      Q    Okay. Now, in the next sentence it states,
19  quote:
20          "Mr. Gilbert has also obtained loans
21          from two lenders controlled by former
22          Defendant Rare Moon Media, LLC, but
23          those claims are subject to this Court's
24          order compelling arbitration," period,
25          close quote.

Page 59

1       Are those the loans that you referred to
2   earlier that you got separate and apart from going
3   through MoneyMutual? I think you said VIP?
4       A    I think so, yeah.
5       Q    And then there was another lender?
6       A    I think so.
7       Q    And I assume that leaving aside whatever you
8   were told by -- you know, you may have been told by
9   your counsel, when you did that you didn't know
10  anything about Rare Moon Media, LLC, correct?
11      A    No.
12      Q    Okay. It then says, quote -- oh, and have
13  you actually settled those arbitrations?
14      A    I think so.
15      Q    Okay. And what I am going to do here is
16  what we did in -- I believe it was the Malone
17  deposition, I am going to ask you how much money you
18  received in those settlements, and pending my
19  providing your counsel, Mr. Wilens, with permission --
20  with the email we got from counsel for Rare Moon Media
21  waiving the confidentiality of that information but
22  asking that it be designated confidential for within
23  this case, the court reporter will just leave your
24  answer blank to be filled in; okay? So my question
25  is --

Page 60

1       A    I didn't understand any of that.
2       Q    I will bet you didn't, so I will make it
3   real simple.
4           My question is this: How much did you
5   receive in settlement of those arbitrations, question
6   mark. You are not going to answer that now. The
7   reporter is going to leave the answer blank; okay?
8   And after Mr. Wilens and I discuss that, that will be
9   filled in as a correction or addition to your
10  testimony; okay?
11      A    Okay.
12          MR. PUTTERMAN: Jeff, agreeable?
13          MR. WILENS: Well, the loan he got from Rare
14  Moon wasn't a Selling Source loan, so I don't see how
15  it's relevant to this case.
16          MR. PUTTERMAN: All right. Do you know
17  what? That is a valid point.
18          Did you -- have you settled any arbitration
19  on behalf of Mr. Gilbert involving any Selling Source
20  loan?
21          MR. WILENS: No. Cash Yes is pending
22  arbitration. That's the only Selling Source.
23          MR. PUTTERMAN: Fine. Then we don't have to
24  worry about that.
25          MR. WILENS: So strike that blank thing.

Page 61

1           MR. PUTTERMAN: Strike the blank. Yeah.
2       Q    Did you repay the loans you obtained from
3   the two lenders you described before VIP and the other
4   one?
5       A    Yes, to a point.
6       Q    Okay. And then it became a problem and you
7   stopped?
8       A    Correct.
9       Q    Okay. The final sentence of that paragraph
10  says, quote:
11          "Plaintiff Gilbert has also obtained
12          loans from other unlicensed lenders but
13          currently we are unable to confirm
14          whether those loans came from members of
15          Selling Source's marketing network,"
16          period, close quote.
17          Do you remember any other lenders from whom
18  you've obtained payday loans at any time?
19      A    That's what it says, yeah. I mean, I just
20  don't -- couldn't find out who or what.
21      Q    So you don't have any records pertaining to
22  those other loans?
23      A    No. I mean there is no -- there is so much
24  going on with this. I don't understand some of it.
25          MR. PUTTERMAN: Okay. Why don't we take a

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 62

1  short break.  We have been going for about an hour.
2  About five minutes or so.  And I will also check on
3  the -- where those --
4       **MR. WILENS:** They're right there.  Can I get
5  my originals back?
6       **THE VIDEOGRAPHER:** We are going off the
7  record.  The time on the video screen is 11:11.
8       (Recess taken, 11:11 to 11:24 a.m.)
9       **THE VIDEOGRAPHER:** We are back on the
10 record.  The time on the video screen is 11:24.
11      **MR. PUTTERMAN:** I am going to ask the
12 reporter to mark as Exhibit 50 a sheaf of printout
13 spreadsheet pages from the Partner Weekly database.
14 But do you know what I am going to going to do is I am
15 going to number the corners of these pages first.
16      I have numbered them in the lower left-hand
17 corner as pages 1 through 15.
18      (Document referred to herein marked for
19 identification Exhibit No. 50)
20      **MR. PUTTERMAN:** Jeff, let me just number the
21 set I am going to give you so that we can easily get
22 to the same pages here.
23      Okay.  Here you go.
24      **MR. WILENS:** Which exhibit was this?
25      **MR. PUTTERMAN:** 50.

---

Page 63

1       Q   Mr. Gilbert, I will represent to you that
2  Exhibit 50 are printouts of a database maintained by
3  Partner Weekly, which is a company affiliated with
4  MoneyMutual, and these all concern the circulation of
5  leads which resulted from you submitting information
6  either to a MoneyMutual website or to another website
7  which is a -- what is called an affiliate of Partner
8  Weekly, meaning that it's independently owned and
9  operated but has a contractual relationship with
10 Partner Weekly.
11      Now, because of the fact -- not each entry
12 here represents an independent submission of
13 information from you because some of these affiliate
14 websites also sell leads to yet other websites, some
15 of which also have contractual relationships with
16 Partner Weekly.  So the information can reach Partner
17 Weekly through a number of sources.
18      In addition, with the Partner Weekly
19 software, if a lead is submitted in realtime to a
20 lender and the lender does not buy the lead, it will
21 then automatically be submitted to another potential
22 lender.
23      So that's why in some cases here there will
24 be a number of line items on the same date very close
25 in time, within seconds of each other.  Each of them

---

Page 64

1  doesn't represent a separate submission of information
2  by you.  I just wanted to give you a little context
3  here so that you have a little better understanding of
4  what we are going to be looking at.
5       Okay.  I'd like you to look at the page
6  which I have marked one in the lower left-hand corner.
7       Do you have that?
8       A   Yes.
9       Q   If you look at the top of that page, the --
10 literally the first line item and the third line
11 item -- well, the first two line items refer to the
12 submissions by somebody apparently living in -- a Sean
13 Gilbert living in Chatsworth, California and having at
14 that time the email address of seang1999@gmail.com.
15      Is that you or a different Sean Gilbert?
16      A   That's not me.
17      Q   Okay.  Just think what kind of shape we'd be
18 in if your name was John Smith.  Okay.
19      Now, the third entry shows a application
20 date of November 5th, 2012.  Do you see that?
21      A   Yes.
22      Q   And that's by Sean Gilbert with the email
23 seang95678@comcast.net with an address in Roseville.
24      Do you see that?
25      A   Yes.

---

Page 65

1       Q   And is that you?
2       A   Yes.
3       Q   Okay.  Good.  Now, that line items indicates
4  that you submitted information at that time looking
5  for a payday loan to an entity called Optimized
6  Contact Solutions, which I am sure you don't remember,
7  but it shows that the lead was acquired by a lender
8  called AMG.
9       Now, as I was discussing with Mr. Wilens
10 earlier, the fact that a lead was acquired by a lender
11 does not mean that you actually completed a loan
12 agreement with that lender.
13      So let me ask you this first:  Back around
14 November 5th, 2012, was that about the time you were
15 having medical issues and were not able to work, or
16 was it a little later?
17      A   It was actually before I was having my
18 medical issues.
19      Q   Okay.  So they were ongoing at this time?
20      A   Yes.  I just found out shortly before then
21 that I had asthma and didn't know what it was and why
22 I was having the problems I was having.
23      Q   Okay.
24      A   But it was a reoccurring issue.
25      Q   Do you recall obtaining a payday loan around

---

The Souza Group
(800) 230-3376

**Page 66**

1  the beginning of November 2012 from anybody?
2  **A  I don't recall.**
3  Q  You don't recall one way or another?
4  **A  I don't recall. I don't recall at that**
5  **point in time the date. I don't even know about the**
6  **beginning of the month.**
7  Q  Okay. You had -- you were having sort of a
8  personal medical crisis at that time?
9  **A  My life was completely flipped upside down.**
10 **There was a lot of issues going on.**
11 Q  Okay.
12 **A  It wasn't just that or financially it was**
13 **just --**
14 Q  After that -- after that November 5th entry,
15 there is a lot of entries -- I will just represent to
16 you there are some for November 16th, which appear to
17 be -- have resulted from one submission of
18 information. November 17th, November 18th, and it
19 continues actually through November, on the next
20 several pages, virtually every day.
21         Do you recall applying for payday loans at
22 that time on an ongoing, perhaps even daily basis?
23 **A  I know that I was looking for -- for money,**
24 **but I wasn't -- I don't think every day. I mean --**
25 **no, not every day.**

**Page 67**

1  Q  Okay. But frequently?
2  **A  What's frequent?**
3  Q  More than once a week.
4  **A  About maybe once or twice a week, I think,**
5  **if that. If even twice, I'd get turned down and get**
6  **depressed.**
7  Q  So you remember being turned down on these
8  applications?
9  **A  Correct.**
10 Q  Excuse me.
11 **A  Bless you.**
12 Q  Thank you. And were you ever told why your
13 applications were being turned down?
14 **A  Just said I didn't fit the requirements.**
15 Q  Okay. And that in turn would depress you?
16 **A  Right, because I think one of them was I**
17 hadn't been employed long enough, but I was employed
18 long enough. I just don't understand where all that
19 was coming from. So it was just that and, you know --
20 that.
21 Q  Were you ever contacted by any lender by
22 telephone to discuss your application during that
23 period, leaving aside Cash Yes for now?
24 **A  No, unless it was the VIP Loan Shop. They**
25 **had to verify information or whatever, hear a voice,**

**Page 68**

1  so it would be that, but that's not nothing like you
2  have been approved for a loan.
3  Q  Okay. Do you remember being approved for
4  loans by anybody in addition to Cash Yes during this
5  period?
6  **A  Yeah. I would get phone calls and messages**
7  **saying I had been approved for a loan.**
8  Q  This is now during approximately November?
9  **A  Right.**
10 Q  Okay. Did you actually complete any loan
11 agreements during that period?
12 **A  I don't know about loan agreements, but I**
13 know that I would call back in the beginning, and then
14 it was even more depressing then because they would
15 tell me, oh, well, no, actually you don't qualify.
16        I was like, what do I do? You tell me I
17 qualified type of thing. You know, get me on the
18 phone. So that made me more angry and I just --
19 Q  Got frustrated?
20 **A  Exactly.**
21 Q  Okay. So I am going to ask you to go all
22 the way to page 3. And I realize this is a little
23 tough to follow and count, but the 22nd line down.
24         **MR. WILENS:** The 22nd?
25         **MR. PUTTERMAN:** The 22nd line down.

**Page 69**

1         **MR. WILENS:** Are you talking about the one
2  that says completed at the --
3         **MR. PUTTERMAN:** Yeah, that's the one.
4         **THE WITNESS:** I see that.
5  BY MR. PUTTERMAN:
6  Q  Yeah. Okay. And that appears to -- it
7  appears from the database that on November 26th, 2014,
8  you submitted your information to moneymutual.com and
9  the lead was acquired by an entity called M. Mark High
10 Ltd.
11        Now, you have never heard of M. Mark High
12 Ltd., correct, other than what you may have been told
13 by your attorney?
14 **A  Correct.**
15 Q  But I can comfortably represent to you that
16 Cash Yes is an affiliate of M. Mark High Ltd.; okay?
17 So this is a lead that would have been -- that I
18 believe would have led to your Cash Yes loan.
19 **A  Okay.**
20 Q  Okay? Was this in fact -- was it on or
21 about that time that you once again saw a
22 moneymutual.com advertisement on television and then
23 called moneymutual.com?
24 **A  Can you repeat that?**
25 Q  Was it around November 26th that you --

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 70

1   **A**   **Yes.**
2   Q   -- actually contacted --
3   **A**   **Yes.**
4   Q   -- moneymutual.com --
5   **A**   **Yes.**
6   Q   -- about a loan?
7       And they told you to go to the website and
8   fill out the information, correct?
9   **A**   **Correct.**
10   Q   And that led you to the Cash Yes loan?
11   **A**   **Correct.**
12   Q   Okay.  Now, how long were you unable to work
13   because of your medical issues at that time?
14   **A**   **Which incident?  So there was a few**
15   **incidents.  One was three weeks.  One was four days,**
16   **intervals of three -- two to five days from**
17   **thereafter.**
18   Q   Were these all asthma related?
19   **A**   **Yes.**
20   Q   Because your asthma was not under control
21   completely yet?
22   **A**   **Correct.  I didn't even know I had asthma at**
23   **that point, so I didn't know what was triggering it or**
24   **anything.**
25   Q   All right.  So did you continue to

---

Page 71

1   periodically apply for payday loans through various
2   websites during December of 2012?
3   **A**   **Yeah.**
4   Q   Okay.  Do you recall receiving other payday
5   loans during that period besides the Cash Yes loan?
6   **A**   **Yeah.  I don't know if those other ones were**
7   **before or after, though.**
8   Q   Okay.  But you got some other ones?
9   **A**   **Yeah.  I am talking about the VIP.  I don't**
10   **know if those were before or after.**
11   Q   Do you recall if there were any payday loans
12   during that period which you paid back completely?
13   **A**   **Yeah.  I mean, I think there was that -- the**
14   **VIP or Action or something like that, and I have those**
15   **documents.  My attorney's got them too, but --**
16   Q   Okay.  Now -- and it's correct that you
17   applied through a number of websites?
18   **A**   **A few, I am sure, yeah.**
19   Q   Okay.
20   **A**   **Couple.**
21   Q   Those websites, those other websites, did
22   not refer to MoneyMutual in any respect, correct?
23   **A**   **Not that I -- I don't know.**
24   Q   Not that you recall?
25   **A**   **I don't -- not that I know of.**

---

Page 72

1   Q   Okay.  Did you as a matter of practice read
2   through the entire website before you submitted your
3   information for a potential payday loan?
4       MR. WILENS: Are you talking about every
5   loan or a particular one?
6       MR. PUTTERMAN: Every.  Every.
7       THE WITNESS: I would read the loan
8   agreement, but I only looked for important stuff.
9   Like I didn't, you know, need nobody banging on my
10   door, Guido banging on my door or anything like that,
11   you know, so I would make sure there was some kind
12   of -- you know, that they were legitimate somehow.
13   BY MR. PUTTERMAN:
14   Q   This is what you were looking for on the
15   websites?
16   **A**   **Right.  Correct.**
17   Q   Okay.
18   **A**   **You know, that was the whole point.**
19   Q   Do you recall any website you decided not to
20   apply through because it didn't look legitimate?
21   **A**   **I can't say.  I don't know.  I mean, some**
22   **looked shady.**
23   Q   For example, if it had been entitled Guido
24   Loans, Inc., you might have thought that was
25   questionable?

---

Page 73

1   **A**   **Right.**
2   Q   Okay.
3       MR. WILENS: Would have been better off with
4   Guido.
5       THE WITNESS: Might have been.
6   BY MR. PUTTERMAN:
7   Q   Did you know that that's actually really
8   Mr. Wilens' first name?
9   **A**   **Guido?**
10   Q   Guido.
11   **A**   **Is it?  I thought it was Jeff.  Jeffco.**
12       MR. WILENS: It's Jeffco.  You're right.
13   BY MR. PUTTERMAN:
14   Q   I am going to ask you to turn to page 14,
15   and about the middle of the page we start seeing a
16   different -- a couple different websites here.  I see
17   one called Sean at --
18       MR. WILENS: An email address.
19   BY MR. PUTTERMAN:
20   Q   Email address.  I'm sorry.
21   Seang@motivtech.com, M-O-T-I-V-T-E-C-H dot-com, with
22   address on Forest Knoll Drive.
23   **A**   **Correct.**
24   Q   Is that you?
25   **A**   **Yes.**

---

---

**Page 74**

1  Q   Okay.  And further down, and I suspect this
2  is you also, there are occasional entries from an
3  email, babyglowz@comcast.net.  B-A-B-Y-G-L-O-W-Z.
4  A   Correct.
5  Q   That was your business email at that time?
6  A   Right.
7  Q   Was Motivtech also a business email?
8  A   No.  It was -- I was actually working --
9  starting to do sales for a guy.  That was -- he set me
10  up with that email address.
11  Q   Okay.  Now, this is the Camel Coin entry
12  that we saw earlier, and it actually shows that you
13  apparently applied or submitted your information to a
14  website called 911paydayadvance.com.
15       Do you have any recollection of such a
16  website?
17  A   No.
18  Q   And you have no recollection --
19       MR. WILENS: I think you are looking at the
20  wrong line.
21       MR. PUTTERMAN: No, I think you maybe were
22  looking at wrong line.
23       MR. WILENS: You earlier said it was
24  cashadvance.com.
25       MR. PUTTERMAN: No, I was reading that from

**Page 75**

1  the complaint.
2       MR. WILENS: It is cashadvance.com.
3       MR. PUTTERMAN: I don't think so.
4       MR. WILENS: I guarantee you it says Guido.
5       THE WITNESS: Guido.
6       MR. WILENS: Cashadvance.com.
7       MR. PUTTERMAN: It looks like
8  911paydayadvance.com.
9       MR. WILENS: Do you have a ruler out there?
10       MR. PUTTERMAN: I am using a piece of paper,
11  so --
12       THE WITNESS: Your glasses are crooked.
13       MR. PUTTERMAN: My glasses are always
14  crooked.
15  Q   In any event, I think you indicated earlier
16  that you have no recollection of applying for a loan
17  at that time?
18  A   Correct.
19       MR. WILENS: He said he applied for lots of
20  loans but they were business loans and then he got
21  bounced down to payday loans.
22  BY MR. PUTTERMAN:
23  Q   Okay.  Now, this is dated September,
24  assuming we have the right line, September 25th, 2014,
25  and at that time, this was when you were looking for

**Page 76**

1  money to fund your business, correct?
2  A   Yes.
3  Q   Were you looking for money to help you with
4  personal expenses at all at that time?
5  A   No.
6  Q   Was there anything going on besides your
7  desire to fund the business for which you might have
8  needed personal money?
9  A   No.
10  Q   Okay.  And --
11       MR. WILENS: So it is cashadvance.com.
12       MR. PUTTERMAN: Is that what you've got?
13       MR. WILENS: Absolutely.  I guarantee it.
14  Line 1147, if you're interested, looking at the
15  spreadsheet.
16       MR. PUTTERMAN: Okay.
17  Q   And this database spreadsheet also indicates
18  that there were other submissions going on into
19  October of 2014, and then some on the next page,
20  through November and December 2014, and these are
21  actually either from the comcast.net email or the
22  babyglowz.com email.
23       So let me ask you this: Who else had access
24  to your computer at that time?
25  A   My wife.

**Page 77**

1  Q   Okay.  Anybody else?
2  A   No.
3  Q   Okay.  Do you have any recollection at all
4  that your wife applied for any payday loans at that
5  time under your name?
6  A   No, she didn't.
7  Q   Okay.  And you did not receive any money
8  from any payday lender at that time?  You didn't pay
9  money to any payday lender at that time?
10  A   No.
11  Q   Correct?  No as to both?
12  A   No as to both.
13  Q   Okay.  Did you apply for any payday loans
14  after you first contacted Mr. Wilens about your issues
15  with Cash Yes?
16  A   No, I don't believe I did.  I was done with
17  that at that point.
18  Q   Okay.  Have you applied for any payday loans
19  at any time since you became a plaintiff in this case?
20  A   No, I wouldn't -- no, not for online payday
21  loans, absolutely not.  And I have no bank account.
22  so --
23  Q   Do you have a bank account now?
24  A   I do not.
25  Q   Okay.  How do you handle incoming checks and

Page 78

1  things like that?
2      A   Well, I don't have incoming checks.  I don't
3  have authorized ACH transactions when I did have a
4  banking account, but -- so I do use PayPal a lot.
5  That's what I do.
6      Q   Okay.  That's for your business?
7      A   Correct.
8      Q   Okay.  So you just keep money in there and
9  withdraw it if you --
10     A   For business expenses and things like that.
11     Q   And to what do you transfer the money when
12 you need it for business expenses?
13     A   What do you mean?  I would use a debit card
14 for PayPal or --
15     Q   Got it.
16     A   -- you know, just do the PayPal transaction.
17     Q   That's also for your personal expenses?
18     A   No.  Some of it is I have an investor.
19     Q   Okay.
20     A   That's a whole 'nother -- so he regulates
21 that too.
22     Q   Okay.  What about, you know, your personal
23 household money and such?
24     A   Yeah.  We -- right now business is slow.  My
25 wife just got a job at a yogurt shop.  Her parents are

Page 79

1  taking care of us right now.
2      Q   Okay.  And that's just through cash or
3  whatever?
4      A   Yeah.  They pay -- they are paying our rent
5  and we reimburse them as --
6      Q   Okay.  Got it.  Would you please turn to
7  paragraph 59, which is on page 19, and I'd just like
8  you to read that to yourself.
9          (Witness reviews document.)
10     A   Okay.
11     Q   Now, I am looking at the last sentence which
12 refers to spam emails, and I think you testified
13 earlier in today's deposition that at some point after
14 you obtained the Cash Yes loan you received emails
15 from time to time from MoneyMutual asking if you
16 wanted to apply for another loan; is that correct?
17     A   Correct.
18     Q   Okay.  And did you respond to any of those
19 emails?
20     A   No.
21     Q   Did you apply for any further loans through
22 MoneyMutual?
23     A   No.
24     Q   Okay.  Did you indicate on -- in response to
25 any of those emails that you did not wish to receive

Page 80

1  further emails from MoneyMutual?
2      A   No.
3      Q   Did you just delete them?
4      A   No.  I don't think I deleted -- I think I
5  saved them.  I might have even gave Mr. Wilens one or
6  two.  I don't remember.  It's a while ago.  But I know
7  that I kept them.  Pretty important.
8      Q   Okay.  So this was after -- you received
9  these emails after you had contacted Mr. Wilens?
10     A   Yes.
11     Q   Okay.  Would you look at paragraph 60,
12 please.  Leaving aside -- I'm sorry.  Just go ahead
13 and read that to yourself.
14         (Witness reviews document.)
15     A   Okay.
16     Q   Leaving aside anything you may have been
17 told by your counsel, do you have any personal
18 knowledge of any of the facts that are alleged in
19 paragraph 60?
20     A   No.
21     Q   Would you look at paragraph 61, please.
22     A   Okay.
23     Q   And if you'd read that to yourself.
24         (Witness reviews document.)
25     A   Okay.

Page 81

1      Q   Leaving aside what you may have been told by
2  your counsel, do you have any personal knowledge of
3  any of the facts alleged in paragraph 61?
4      A   No.
5      Q   Okay.  When you did apply for payday loans
6  and you actually were able to enter into loan
7  agreements with payday lenders, did you ask any of
8  them whether they were licensed to make loans in
9  California?
10     A   No.
11     Q   At that time did you know anything about
12 whether or not there were licensing requirements in
13 California?
14     A   No.
15     Q   Was that -- was licensing an issue for you
16 at the time or was it simply a matter of obtaining
17 cash that you needed?
18     A   Well, it was an issue because I didn't want,
19 like you say, Guido banging on my door or anything
20 like that.  So it wasn't until after all this started
21 that I started -- looked in the beginning to find out
22 that they -- that it was unlicensed and that you had
23 to be licensed in the state.
24     Q   Do you recall from any of the websites you
25 visited, not just MoneyMutual but other websites as

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1  well, anything being said on any of the websites
2  concerning the licenses of lenders?
3      A   So I just looked for something that said
4  like, you know, network, trusted, you know, things
5  like that, like the OLA or, you know, that type of
6  thing.  They usually had a little symbol.
7      Q   You are referring to the symbol -- to OLA,
8  to the Online Lenders Alliance, correct?
9      A   Correct.  Or the CDDTL or something like
10  that.
11      Q   How did you learn about those particular
12  entities or brands?
13      A   That's who I was going to contact, after I
14  started getting harassed, to file a formal complaint.
15      Q   The OLA?
16      A   Yeah.
17      Q   Okay.  And how did you -- but how did you
18  learn about the OLA?
19      A   And the FTC and all that.  Just went down
20  the road, you know.
21      Q   But the OLA you know is not a government
22  agency, correct?
23      MR. WILENS: Are you asking or telling him
24  that?
25      THE WITNESS: I don't know that.  I didn't

1  know.  I don't know.  I just thought -- I thought they
2  were.
3  BY MR. PUTTERMAN:
4      Q   Did you actually contact the Online Lenders
5  Alliance about Cash Yes?
6      A   I can't remember.  I know there was a lot of
7  agencies that I contacted.
8      Q   What agencies did you contact?
9      A   Local and abroad.  So the FTC, the attorney
10  general.  Actually cease and desist orders and --
11      Q   Which attorney general?  California or
12  federal?
13      A   Both, I believe.
14      Q   Okay.  And you obtained a copy of a cease
15  and desist order from a California -- one of the
16  California governmental authorities, correct?
17      A   Correct.  They even issued one in my name.
18      Q   Do you remember which California authority
19  issued that cease and desist order in your name?
20      A   Department of Business Oversight, I think,
21  or whoever is in charge of financial lending.
22      Q   Whatever it's called now?
23      A   I've got documents on it all.  I just don't
24  know off the top of my head.
25      Q   Yeah.  Did you send a copy of that cease and

1  desist order to MoneyMutual?
2      A   I did.  I sent it to a place in Las Vegas.
3      Q   Do you remember who?
4      A   I don't know.  I have a copy of the envelope
5  that I sent it to.
6      Q   Do you remember when?
7      A   January, February of 2013, maybe somewhere
8  in there.
9      Q   Did you hear back from whatever entity you
10  sent it to in Las Vegas?
11      A   I can't remember.  I don't think so.  There
12  were so many different things going on.
13      Q   Did you talk with anybody in Las Vegas about
14  the cease and desist order?
15      A   I can't remember.  Like I said, I've got
16  records and documents of everything, but -- there are
17  so many phone calls.
18      Q   So many phone calls generally?
19      A   Yeah.  I mean from everybody.
20      Q   Okay.  Would you please read to yourself
21  paragraphs 70 through 73 that are on pages 21 and 22
22  of Exhibit 2.
23      (Witness reviews document.)
24      A   Okay.
25      Q   Leaving aside anything you may have been

1  told by your counsel, do you have any personal
2  knowledge of any of the facts alleged in those
3  paragraphs?
4      A   No.
5      MR. PUTTERMAN: Off the record for one
6  second, please.
7      THE VIDEOGRAPHER: We are going off the
8  record.  The time on the video screen is 11:57.
9      (Discussion off the record.)
10      THE VIDEOGRAPHER: This is the end of
11  disc 1.  It has a run time of approximately one hour
12  and 33 minutes.  The time on the video screen is
13  11:59.
14      (Lunch recess, 11:59 a.m.)
15
16
17
18
19
20
21
22
23
24
25

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1  AFTERNOON SESSION              12:43 P.M.
2         -oOo-
3         THE VIDEOGRAPHER: This begins disc 2 in the
4  video deposition of Sean L. Gilbert on December 1,
5  2015. The time on the video screen is 12:43.
6         MR. PUTTERMAN: Okay. I am going to ask the
7  reporter to mark as Exhibit 52 -- 51 documents that
8  were produced on behalf of Mr. Gilbert with the
9  production numbers Gilbert 031 and Gilbert 032.
10        (Document referred to herein marked for
11        identification Exhibit No. 51)
12        EXAMINATION (Resumed)
13 BY MR. PUTTERMAN:
14    Q   Now, you mentioned in your testimony here
15 today that you ultimately were able to contact Cash
16 Yes, and you also indicated that you had sent a copy
17 of a cease and desist order that you had received from
18 the Department of Business Oversight or the Department
19 of Corporations, whatever it was called at the time.
20    A   Something like that, yeah.
21    Q   Okay. Would you look at Exhibit 51. And
22 you also mentioned that -- you said that you had sent
23 it to somebody in Las Vegas and that you thought you
24 had saved the envelope or copy of the envelope on
25 that, correct?

1     A   Correct.
2     Q   Okay. Exhibit 51 is a two-page document
3  with an envelope and a letter sent to the CashYes.com
4  collections department. The letter is dated
5  January 20th, 2013. The envelope, however, is dated
6  January 8, 2013, so it's possible these two are not
7  actually connected.
8         Let me ask you to look at the envelope. Is
9  this envelope in your handwriting?
10    A   Yes.
11    Q   Okay. And it's addressed to Cash Yes/Cash
12 Jar/Payday Yes at an address in Columbia, Tennessee,
13 correct?
14    A   Correct.
15    Q   Where did you get that address?
16    A   On the Internet.
17    Q   Okay. And I see it was marked return to
18 sender. Do you see that?
19    A   Correct.
20    Q   Do you recall what was in this envelope?
21    A   I think it was a letter that I had wrote to
22 them.
23    Q   Okay.
24    A   It's probably this same one, but I had found
25 out the address in Belize after I sent this already

1  out.
2     Q   Okay. So it was probably the same letter
3  but not addressed to Cash Yes in Belize, addressed to
4  Cash Yes in Tennessee?
5     A   Both. So I sent this one first.
6     Q   That's what I am saying.
7     A   Yeah. Okay. Yes.
8     Q   In other words, a letter like the second
9  page of Exhibit 51 was included in the envelope, but
10 that one went to Tennessee and got returned to sender?
11    A   Right.
12    Q   And thereafter you sent substantively the
13 same letter but addressed to Cash Yes in Belize,
14 correct?
15    A   Correct.
16    Q   Okay. And this is where you refer -- and
17 you refer here to having made a complaint to various
18 law enforcement agencies, correct?
19    A   That's correct.
20    Q   Now, you don't say anything about
21 having made a complaint to MoneyMutual, correct?
22    A   No.
23    Q   Okay. And did you ever send a letter like
24 this to MoneyMutual?
25    A   No.

1     Q   Okay. Now, in the first paragraph it also
2  refers to, quote, a -- it says, quote:
3         "I/We have sent by Certified Mail, Fax,
4         E-mail, and by Phone, a copy of A Desist
5         and Refrain Order via public record,"
6         period, close quote.
7         Is that the cease and desist order that you
8  were referring to earlier in your testimony?
9     A   I am not sure if it was the one from -- that
10 was issued in my name or when that had been issued a
11 couple months before that in -- from the Department of
12 Corporations or whatever it was.
13    Q   Do you have a copy of the one that was
14 issued in your name?
15    A   I gave it to my attorney.
16        MR. PUTTERMAN: Jeff, I don't see that one
17 in the documents you produced.
18        MR. WILENS: I think he's confused.
19        MR. PUTTERMAN: You think there was just
20 one?
21        MR. WILENS: I don't think he means a cease
22 and desist letter issued by the State of California.
23 I think he means one issued by himself.
24        THE WITNESS: No, I think you've got me
25 mixed up. I am telling you it was by the State of

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1  California. I got it from Kim Sophia at California
2  corporations.
3  **BY MR. PUTTERMAN:**
4     Q   We have a copy of a cease and desist order
5  here.
6     A   **Right.**
7     Q   Okay. But it's from -- it dates from 2010.
8     A   Yeah, this one -- no, it was dated around
9  this date with my name on it, and it was from Kim
10  Sophia, which I kept those emails too.
11     **MR. WILENS:** To who?
12     **THE WITNESS:** It was forwarded to Cash Yes,
13  forwarded to MoneyMutual, forwarded to -- wish I had
14  it with me.
15     **MR. PUTTERMAN:** Well, let me -- let's follow
16  up on this; okay?
17     Exhibit 52 is a document which appears to be
18  an email from Dean Haakenson, H-A-A-K-E-N-S-O-N, of
19  the Enforcement Division of the California State
20  Department of Corporations, addressed to Mr. Gilbert,
21  dated January 15th, 2013.
22     **MR. WILENS:** What page is that?
23     **MR. PUTTERMAN:** Gilbert 041.
24     (Document referred to herein marked for
25     identification Exhibit No. 52)

1     **THE WITNESS:** Thank you.
2     **MR. WILENS:** Gilbert 41 is from -- okay.
3     **MR. PUTTERMAN:** You see it.
4     Q   Is this an email that you received from the
5  Department of Corporations acknowledging receipt of a
6  written complaint?
7     A   **It is.**
8     Q   Okay. Now, it says, quote:
9  "It was received in our office on
10     January 9, 2013 and has been assigned
11     the number listed above. It has been
12     submitted to the appropriate staff for
13     review and evaluation. We will contact
14     you for additional information if we
15     determine that we need it to complete
16     that process," period, close quote.
17     And were you then contacted by somebody at
18  the Department of Corporations?
19     A   I was.
20     Q   Okay. And by whom were you contacted?
21     A   **Sophia Kim, I believe, or Kim Sophia.**
22     Q   S-O-P-H-I-A?
23     A   **Yes.**
24     Q   K-I-M?
25     A   **I believe so, yes.**

1     Q   Okay. And was that by email or by phone?
2     A   **Both.**
3     Q   And what did Ms. Sophia tell you?
4     A   **She asked about the facts and the incident**
5  **that had happened.**
6     Q   Uh-huh.
7     A   **That's when I explained to her, and she had**
8  **told me some things that had already been pending**
9  **regarding Cash Yes and MoneyMutual, and that she**
10  **needed more time to investigate.**
11     Q   Okay. Time out. Did she -- do you
12  specifically recall that she mentioned MoneyMutual or
13  just Cash Yes?
14     A   **MoneyMutual too.**
15     Q   Well, did your written complaint include any
16  reference to MoneyMutual?
17     A   **It did.**
18     Q   I don't see that here in this group of
19  documents, but we'll go through them all and see if
20  there is.
21     Did you keep a copy of your written
22  complaint to the Department of Corporations?
23     A   I did.
24     Q   Then it should have been produced here,
25  correct?

1     A   **Should be.**
2     Q   Okay.
3     A   **It would be handwritten.**
4     Q   Okay. I have not seen in these documents
5  that were produced any handwritten correspondence from
6  you to the Department of Corporations.
7     **MR. WILENS:** Was it mailed?
8     **THE WITNESS:** Yeah. I didn't mail them --
9  they wouldn't let me do it online. They had to have a
10  written --
11     **MR. WILENS:** Did you make a Xerox copy of
12  the document?
13     **THE WITNESS:** I did. It's at home.
14     **MR. WILENS:** I haven't seen it. I would
15  point out, though, that none of this is terribly
16  significant to certification issues, although it would
17  go to the merits.
18     **MR. PUTTERMAN:** Right, it would go to the
19  merits.
20     **MR. WILENS:** So we'll get it to you
21  eventually, but --
22     **MR. PUTTERMAN:** Well, no, don't get it to me
23  eventually. It was required to be produced in
24  response to this deposition notice duces tecum.
25     **MR. WILENS:** My client never gave it to me.

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

Page 94

1   **MR. PUTTERMAN:** I understand that, but --
2   **MR. WILENS:** I asked for a lot of documents
3   at your clients' depositions --
4   **MR. PUTTERMAN:** Time out.
5   **MR. WILENS:** -- that weren't produced.
6   **MR. PUTTERMAN:** We're talking about a
7   particular document in which Mr. Gilbert states he
8   made a complaint to the Department of Corporations
9   concerning MoneyMutual; okay? Or in some way
10  mentioning MoneyMutual along with Cash Yes.
11     We obviously are entitled to and need a copy
12  of that document, and I am going to have to reserve my
13  right to, instead of concluding the deposition today,
14  adjourning the deposition until we get all the rest of
15  the documents that were responsible to the deposition
16  notice duces tecum.
17  **MR. WILENS:** Doesn't your client have it?
18  **MR. PUTTERMAN:** No.
19  **MR. WILENS:** I am sure the state would have
20  served you a copy of any complaint and asked you to
21  respond.
22  **MR. PUTTERMAN:** I am not aware of it and
23  that's why I need to see it. It should have been
24  produced now.
25     **THE WITNESS:** I've got 30 minutes. I can go

Page 95

1   home and get it.
2   **MR. WILENS:** Not to Roseville, you can't.
3   **THE WITNESS:** Why not? It took me 15
4   minutes to get here in traffic this morning.
5   **MR. WILENS:** Is there anyone home who can
6   fax it?
7   **THE WITNESS:** Well, yes, I have a fax
8   machine at home. Email. My wife doesn't know where
9   to look.
10  **MR. WILENS:** So you think you have it.
11  **THE WITNESS:** I don't think, I know.
12  **MR. WILENS:** Sean, don't argue with me. I
13  am your lawyer. Sean, do you have it?
14  **THE WITNESS:** I said I have it.
15  **MR. WILENS:** Like it's sitting out in the
16  open in a file, or you think it's going to be in some
17  folder or paper?
18  **THE WITNESS:** No, like it's sitting with all
19  the other 10,000 pages I have on top of my desk.
20  **MR. WILENS:** Well --
21  **BY MR. PUTTERMAN:**
22  Q   Are you talking about 10,000 pages that
23  relate to payday loans?
24  A   Yeah, because I did a lot of investigating
25  in the beginning when they got me fired from my job.

Page 96

1   **MR. WILENS:** We haven't produced things that
2   were not responsive to your request. You didn't ask
3   for his research on payday loans.
4      **THE WITNESS:** It's not all for Cash Yes or
5   Montel Williams, but it's --
6   **MR. PUTTERMAN:** You know, here's the deal:
7   We asked for a number of categories of documents;
8   okay? How do you know they're not responsive? You
9   haven't seen them.
10  **MR. WILENS:** I served a category list on my
11  client and told him what to look for, so it's just
12  like your depositions.
13  **MR. PUTTERMAN:** No, no, no, no, no, no.
14  Okay. He made a complaint to the Department of
15  Corporations concerning Cash Yes. That obviously
16  needs to be produced. It mentioned MoneyMutual. It
17  obviously needed to be produced for that reason as
18  well. Okay. He has said that he has a copy of an
19  envelope in which he sent something to MoneyMutual.
20  Well, that's not included in these documents. The
21  only copies of envelopes included in these documents
22  are those.
23  **MR. WILENS:** Complete your deposition as
24  best you can.
25  **THE WITNESS:** I don't think I said I sent an

Page 97

1   envelope to MoneyMutual. I said I sent something to
2   Las Vegas.
3   **BY MR. PUTTERMAN:**
4   Q   Okay. Do you remember to whom you sent it
5   in Las Vegas?
6   A   It could be -- I'm not sure.
7   Q   Do you have a copy of that envelope?
8   A   I might. I made copies of everything. I
9   have 10,000 pages.
10  Q   Are you sure?
11  A   So I'm not sure.
12  **MR. WILENS:** I don't mind visiting
13  Sacramento again.
14  **MR. PUTTERMAN:** You may have to visit
15  San Francisco the next time around.
16  **MR. WILENS:** It doesn't change the location
17  of where the deponent should go, but --
18  **MR. WILENS:** Well, the deponent may have
19  to come to San Francisco next time since the reason
20  we're going to have to adjourn the deposition is
21  because of the fact you say that you told the deponent
22  what to produce. The deponent had the deposition
23  notice duces tecum, he said he saw it, and he didn't
24  produce the documents required.
25  **MR. WILENS:** I don't think he understood

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1 that that was a particular document. I don't know if
2 you said any complaints you made to the state about
3 MoneyMutual in your list of documents.
4     **MR. PUTTERMAN:** Jeff, you know, please.
5     **MR. WILENS:** It seems to me that we should
6 just check with your clients. They may have it.
7     **MR. PUTTERMAN:** Client, I have not seen
8 anything like that from the client.
9     **MR. WILENS:** Maybe they never heard back
10 from the State of California.
11     **MR. PUTTERMAN:** Correct. Well, let me --
12 let me mark something else here and see how this may
13 relate.
14     Next in order?
15     **THE REPORTER:** 53.
16     **MR. PUTTERMAN:** Exhibit 53, because there is
17 one handwritten document here, but it doesn't look
18 like correspondence, but this is Gilbert -- designated
19 Gilbert 033. Maybe this will help.
20     (Document referred to herein marked for
21     identification Exhibit No. 53)
22     **THE WITNESS:** Thank you.
23 **BY MR. PUTTERMAN:**
24   Q   Can you tell us what this is?
25   A   **Yes. It's a document of the times I tried**

1 **to call and the communication I had with Cash Yes.**
2   Q   Okay. And that's your handwriting?
3   A   **Correct. From work.**
4   Q   Okay. And you actually created this page,
5 because you put the heading Cashyes.com?
6   A   **I put the heading on there, but the page was**
7 **a format or whatever.**
8   Q   Okay. Did you send this to the Department
9 of Corporations?
10   A   **I believe so. I'm not sure right off the**
11 **top of my head if this went with it, but everything**
12 **that I have for Cash Yes went with that complaint**
13 **letter to them.**
14   Q   So this is not the complaint letter here?
15   A   **No. This is just documentation.**
16     **MR. PUTTERMAN:** Okay. I am going to ask the
17 reporter to mark as Exhibit 54 a group of pages from
18 Mr. Gilbert's production marked Gilbert 043 through
19 Gilbert 51.
20     (Document referred to herein marked for
21     identification Exhibit No. 54)
22     **THE WITNESS:** Thank you.
23 **BY MR. PUTTERMAN:**
24   Q   Let's go through these pages, please,
25 Mr. Gilbert.

1     Now, the first page is a fax transmission
2 report of yours?
3   A   **Uh-huh.**
4   Q   Okay.
5   A   **Yes.**
6   Q   And the fax was sent to
7 Cashyes.com/Cashjar.com, correct?
8   A   **Correct.**
9   Q   Okay. And where did you get that fax
10 number?
11   A   **I think off the Internet, off their website**
12 **maybe.**
13   Q   Okay. And you sent this on or about
14 January 8th, 2013, correct?
15   A   **Correct.**
16   Q   And it shows pages 1 through 8.
17     Now, what did you fax them on or about
18 January 8th, 2013?
19   A   **My complaint that I had handwritten and all**
20 **the paperwork via certified mail. I'm not sure which**
21 **paperwork that was, but --**
22   Q   This was the complaint that you sent to the
23 Department of Corporations?
24   A   **I sent them a copy of that, yeah.**
25   Q   Right. Okay. Did you make a copy of the

1 entire package that you faxed to them, the entire
2 eight pages?
3   A   **Yeah. This is it, isn't it?**
4   Q   Well, not --
5   A   **This is being -- trying to show them that**
6 **they didn't have -- that they couldn't collect because**
7 **they were harassing me so bad that they couldn't**
8 **collect me or they couldn't sue me or take me to jail.**
9     **(Court reporter interrupts for clarity of**
10     **the record.)**
11     **THE WITNESS:** That they couldn't collect or
12 sue me or take me to jail because the loan was
13 illegal.
14 **BY MR. PUTTERMAN:**
15   Q   Okay. But it's not the complete package if
16 in fact you included a copy of your handwritten
17 complaint to the Department of Corporations, because
18 that's not included in here.
19   A   **I haven't got that far yet.**
20   Q   What do you mean, you haven't gotten that
21 far?
22   A   **I haven't looked through this yet.**
23   Q   Why don't you look through there.
24   A   **I am good now.**
25   Q   Your handwritten complaint to the Department

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

1  of Corporations isn't in here, correct?
2  **A  No.**
3  Q  Do you know why that is?
4  **A  Yeah. It's sitting right on top of my desk.**
5  Q  Okay. Did you pull it out from this packet
6  when you were giving documents to your counsel?
7  **A  It's one of the first documents I ever gave**
8  **him in the beginning.**
9  Q  The handwritten complaint you sent to the
10 Department of Corporations. Okay. That specifically
11 mentioned MoneyMutual?
12 **A  Correct.**
13 Q  What exactly did you say about MoneyMutual?
14 **A  That I was referred to Cash Yes from**
15 **MoneyMutual.**
16 Q  Okay. Did you say anything else about
17 MoneyMutual?
18 **A  It was -- no. There was nothing else to**
19 **say.**
20 Q  Okay. That was it?
21 **A  I was referred to Cash Yes from -- she asked**
22 **me how I was -- I told her that that's what I put on**
23 **the thing. She said I had to write the complaint, so**
24 **I did.**
25 Q  Okay. And what did she say to you about

---

1  MoneyMutual at any time? This is Sophia Kim or Kim
2  Sophia?
3  **A  Yeah, whatever. She said that she needed**
4  **the document or something with my name on it from**
5  **MoneyMutual, so I sent her something.**
6  Q  Do you recall what you sent her?
7  **A  My attorney has a copy of it too, but it's**
8  **the one with -- saying, you know, welcome back for a**
9  **loan, or something like that, with all my information**
10 **on it.**
11 Q  That's been produced.
12 **A  Right.**
13 Q  Okay. Did she say anything to you about
14 MoneyMutual?
15 **A  I can't recall that part of it. I know that**
16 **she was very interested in MoneyMutual as far as --**
17 **with my name on it.**
18 Q  Okay. But she didn't tell you anything
19 about MoneyMutual?
20 **A  She didn't go into the details.**
21 Q  Okay. Did you complain to her about
22 MoneyMutual?
23 **A  I just told her that MoneyMutual is the one**
24 **that referred me and would not give me any**
25 **information.**

---

1  Q  Okay. Keep --
2  This is what, Exhibit 53 we're looking at?
3  **THE REPORTER:** 54.
4  **BY MR. PUTTERMAN:**
5  Q  Keep that in front of you.
6  **A  Okay.**
7  Q  Okay. Or actually, do you know what? Let's
8  continue with that before I mark something else so we
9  get this out of the way completely.
10 Okay. Now, look at pages 044 through 047,
11 if you would, and just read through that to yourself
12 and then I'm going to ask you to tell me what these
13 four pages are.
14 (Witness reviews document.)
15 **A  Okay.**
16 Q  Can you tell me what these four pages are?
17 **A  I think this was what I sent Cash Yes.**
18 Q  By fax?
19 **A  Fax. And this is part of the packet I think**
20 **that I sent to them, like --**
21 Q  By mail and by fax?
22 **A  Certified mail. Right.**
23 Q  Good.
24 **A  About their illegal collecting -- collection**
25 **practices and why I didn't owe them any money at that**

---

1  point.
2  Q  And -- okay. And you also state on the --
3  if you look on page Gilbert 047 --
4  **A  Uh-huh.**
5  Q  -- and you state in the second paragraph
6  from the end, quote:
7  "I must also inform you that I will be
8  filing complaints with the Better
9  Business Bureau, the Federal Trade
10 Commission, California Department of
11 Corporations, and the United States
12 Attorney General Office." period, close
13 quote.
14 **A  Uh-huh.**
15 Q  Had you actually sent your complaint to the
16 Department of Corporations at the time you wrote this?
17 **A  Yes. All those certified letters went out**
18 **the same day.**
19 Q  Okay. So -- and you believe that you
20 included a copy of that complaint with this package
21 that you faxed and sent by certified mail to Cash Yes?
22 **A  I can't recall.**
23 Q  Okay. So you are not sure now whether you
24 actually included the Department of Corporations
25 complaint in this package?

---

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1   **A**   **Yes. I'm not sure. I have to look.**
2   Q   Okay. Where would you look?
3   **A**   **On my desk. I was just going through all**
4 **the stuff last night.**
5   Q   Would you go back a page and -- to Gilbert
6 046, and you see there is a paragraph -- it's about
7 the second full paragraph from the bottom that starts,
8 quote, "Due to the fact."
9   **A**   **Uh-huh.**
10   Q   Okay. Let me just read that into the
11 record. It says, quote:
12     "Due to the fact that Internet payday
13     loan lenders must be licensed in the
14     State of California to be a legal and
15     binding contract, your company should
16     NOT," all caps, "issue loans to
17     California residents at all. I am
18     requesting that you send me your license
19     number which enables you to offer loans
20     to California residents." period, close
21     quote.
22 Okay. Now, how did you learn about
23 licensing? Was this from some of your own Internet
24 research?
25   **A**   **Yes.**

1   Q   Okay. So is it correct that before you
2 actually contacted the California Department of
3 Corporations you had actually done some Internet
4 research and determined that Cash Yes needed to be
5 licensed in California?
6   **A**   **Correct.**
7   Q   Okay. Because this is dated January 8th
8 and -- can I see the last couple of exhibits you have
9 there, please? Thanks.
10   **A**   **What do you need?**
11   Q   Let me have the cover page for this exhibit
12 and let me have the last couple of exhibits you have
13 there in front of you.
14     Right. Exhibit 52 is the email from the
15 Department of Corporations stating that your written
16 complaint was received in our office on January 9th,
17 2013.
18     So you would have sent that out to the
19 Department of Corporations sometime around the couple
20 of days prior to January 9th, 2013?
21   **A**   **Okay. Now repeat that again.**
22   Q   Okay. The Department of Corporations in
23 Exhibit 52 stated that your -- quote, "your written
24 complaint," close quote, open quote, "was received in
25 our office on January 9, 2013," close quote.

1     And you sent that to the Department of
2 Corporations by certified mail, correct?
3   **A**   **Not that, no.**
4   Q   Just by --
5   **A**   **Just by regular standard mail.**
6   Q   Okay. So that means you would have sent it
7 sometime within the couple of days prior to
8 January 9th, correct?
9   **A**   **As a matter of fact, that might have been**
10 **faxed to them. They just had to have a handwritten**
11 **copy of it but faxed.**
12   Q   Okay. Did you then fax it on January 9th,
13 2013, the date that they say they received it?
14   **A**   **I don't know if it was that date, but that's**
15 **the date they got back to me, but I sent everything**
16 **out at one time.**
17   Q   This is part of Exhibit 51. So you are not
18 sure you sent the written complaint along with your
19 package to Cash Yes when you faxed it and mailed it on
20 January 8th, 2013, correct?
21   **A**   **I believe I notified them with this packet,**
22 **but I can't remember if I sent it with or without.**
23   Q   Okay. Now, I notice also that on the first
24 page of Exhibit 54, which is that fax cover page, you
25 did not fax this to anybody else except Cash Yes/Cash

1 Jar, correct?
2   **A**   **Correct.**
3   Q   Okay. Did you fax this package separately
4 to anybody else?
5   **A**   **I -- well, this is all the stuff that I -- I**
6 **found for, you know, the initial part. This is all**
7 **just started then, so this is just the material that I**
8 **had found for my complaint for the California**
9 **Department of Corporations.**
10   Q   You mean from your online research?
11   **A**   **Right, when I was looking for their phone**
12 **number.**
13     MR. WILENS: Sean, the question was did you
14 fax it to anyone else. Yes, no, or I don't remember.
15     THE WITNESS: Okay. I don't remember.
16 BY MR. PUTTERMAN:
17   Q   Pick A, B or C.
18     Okay. Returning again to page Gilbert 046
19 in Exhibit 54, you will see in bold, all caps, almost
20 down near the bottom of the page, it says, quote,
21 "CALIFORNIA DESIST AND REFRAIN ORDER," close quote,
22 and then you give an Internet link, correct?
23   **A**   **Correct.**
24   Q   Okay. And does this refer to a cease and
25 desist order you found concerning Cash Yes or Cash Jar

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1  online?
2    A  Yes. Yes.
3    Q  This was part of your research?
4    A  Yes.
5    Q  And you actually first obtained this then
6  from your own online research, not the California
7  Department of Corporations?
8    A  I don't recall.
9    Q  Well, since your complaint was first
10  received by them on January 9th and this is
11  January 8th, would that be a fair assumption?
12    A  Yes.
13       MR. WILENS: This is from the California
14  Department of Corporations.
15       MR. PUTTERMAN: Posted on the Web.
16       MR. WILENS: Yes, but still from them.
17       MR. PUTTERMAN: Let me revise my question.
18    Q  You obtained this from your Internet
19  research, correct, as opposed to having been sent the
20  cease and desist order from -- by somebody from the
21  California Department of Corporations, correct?
22    A  Say that again. Sorry.
23    Q  The reference here to the California desist
24  and refrain order --
25    A  Okay.

1    Q  -- on Gilbert 046 --
2    A  Right.
3    Q  -- that was one that you located on the Web,
4  right? Correct?
5    A  Correct.
6    Q  On the Department of Corporations website?
7    A  Correct.
8    Q  Okay. Is it correct, then, that you had not
9  been sent a copy directly by the California Department
10  of Corporations at this time?
11    A  That's correct.
12    Q  Okay. And I note in this four-page letter
13  there was no reference to MoneyMutual; is that
14  correct?
15    A  No.
16    Q  Okay. Then on Gilbert 048 through 050, and
17  they're not quite in the correct order, that's the
18  desist and refrain order that you were referring to on
19  Gilbert 046, correct?
20    A  Correct.
21    Q  And this one on Gilbert 049 is dated
22  May 24th, 2010; is that right?
23    A  That's correct.
24    Q  So this one obviously does not pertain
25  specifically to you?

1    A  Not at all.
2    Q  Okay. So now my question is: Was there a
3  separate desist and refrain order that was issued by
4  the Department of California Corporations that
5  referred specifically to you?
6    A  Yes.
7    Q  And when was that issued?
8    A  I don't know the date.
9    Q  Okay. Do you recall --
10    A  April, May.
11    Q  Of?
12    A  Of 2013.
13    Q  Of 2013. Now, let me ask you this: Was
14  that a desist and refrain order in this form that
15  appears on Gilbert 48 through 50, or was the order in
16  another form and specifically addressed to Cash Yes
17  and in words, substance or effect told them simply to
18  cut it out?
19    A  And that they were fined, yeah, but they
20  went in, held the email and all that stuff.
21    Q  Was it in the form then that was on -- in 48
22  through -- Gilbert 48 through 50?
23    A  Yeah. It looked like this, but it had my
24  name and it had my problem, my complaint.
25    Q  Okay.

1    A  The outcome.
2    Q  Do you have a copy of that document?
3    A  I do.
4    Q  Okay. Is there some reason why it was not
5  produced here?
6    A  I produced --
7       MR. WILENS: It's the one he is talking
8  about all the time.
9       THE WITNESS: I produced it.
10       MR. WILENS: It's the one that he says is on
11  his desk, on a folder, which he says he's produced
12  from day one.
13       MR. PUTTERMAN: To you.
14       MR. WILENS: Maybe it's my fault. I haven't
15  been able to locate it. I've gotten tons of papers
16  from --
17  BY MR. PUTTERMAN:
18    Q  This is a different thing than the customer
19  complaint because --
20    A  No, this is a complaint that was handwritten
21  to the California Department of Corporations --
22    Q  Correct. That was one thing.
23    A  -- but this is a legal order by the state
24  that was then resent to me months later saying that
25  they have been -- they didn't respond, they have these

Page 114

1  amount of fines, blah, blah, blah, but the whole thing
2  was because they had to have -- she was real intent on
3  MoneyMutual within Cash Yes.
4          MR. WILENS: Can I ask him a question?
5          MR. PUTTERMAN: Go ahead.
6          MR. WILENS: Have you ever seen that order
7  pertaining to you personally on the Internet,
8  published like that one?
9          THE WITNESS: Well, no. I never looked
10  because it came in certified mail to me.
11          MR. WILENS: Well, yeah -- but I am sure
12  you would have looked up all the things you could
13  find. So this is like an order for your particular
14  dispute. It wasn't a general order for all California
15  residents?
16          THE WITNESS: No. This is -- what do you
17  mean? I don't understand.
18          MR. WILENS: Okay. The thing you got about
19  Cash Jar --
20          THE WITNESS: This is to show them that you
21  guys can't do this to me, you know, that this is not
22  fair.
23  BY MR. PUTTERMAN:
24      Q    When you say "this," you are referring
25  now --

Page 115

1      A    To the old desist -- the old --
2      Q    The 2010 --
3      A    Right.
4      Q    -- desist and refrain order?
5          THE VIDEOGRAPHER: One at a time.
6          MR. WILENS: Mr. Gilbert, the 2010 order was
7  not particular to any one person. It was issued by
8  the Department of Corporations on behalf of all the
9  California residents against this company Cash Jar.
10          Do you think that what you saw was similar
11  to that, or was it just about you personally and the
12  loan that was made to you personally?
13          THE WITNESS: I don't know the details of
14  it, like that specific.
15          MR. WILENS: I will tell you that there is
16  nothing published on the Internet like that one. The
17  2010 is published on the Internet. You found it.
18  There is another one in 2014 published on the Internet
19  about Cash Yes, but that's not particular to you;
20  okay?
21          THE WITNESS: Correct.
22          MR. WILENS: So I am thinking maybe you got
23  a personal order pertaining to your personal dispute.
24          THE WITNESS: That could be a possibility
25  because it had my name on it.

Page 116

1          MR. WILENS: All right.
2  BY MR. PUTTERMAN:
3      Q    When you say it had your name on it, did it
4  have your name on it as somebody that it was being
5  served on or did it have -- for example, if you look
6  at Gilbert 048, did it have something on the first
7  page like this which specifically referred, however,
8  to you, or was it simply addressed to you?
9      A    No. It was -- it had my name and the
10  address and as well as in the order.
11      Q    The order itself specifically referred to
12  you?
13      A    Correct.
14      Q    Okay. And you believe you have that at
15  home?
16      A    Yes.
17      Q    Okay. Well, is there some reason that that
18  was not produced here?
19      A    I don't know. I produced it. That was like
20  the biggest thing in this whole thing when I got it.
21  was I gave -- I faxed it immediately or sent an email.
22      Q    To Mr. Wilens?
23      A    Correct. It made it sound like there was a
24  law that had just been passed in my name, is how that
25  sounded.

Page 117

1      Q    Okay. And when you got that, to whom did
2  you send it besides Mr. Wilens?
3      A    That's it.
4      Q    You didn't send it to Cash Yes?
5      A    It was out of my hands at that point. I
6  left everything for him to take care of.
7      Q    You didn't send it to MoneyMutual?
8      A    No.
9      Q    Okay. Did that order mention MoneyMutual?
10      A    I don't recall.
11      Q    Okay. But you can lay your hands on that at
12  home?
13      A    I have the document. I just haven't read it
14  in a while. It's been a few years.
15      Q    Okay. Now, the last page of this exhibit,
16  of Exhibit 54, is a copy of -- what appears to be
17  another copy of the same envelope we looked at
18  earlier. And you see the postmark was January 8th,
19  2013, and then it shows return to sender on
20  January 12th, 2013, and you sent it to Columbia,
21  Tennessee, correct?
22      A    Correct.
23      Q    Okay. And is that -- is Exhibit 54 then the
24  package than went -- that you mailed out to Cash Yes
25  and Cash Jar in Columbia, Tennessee on January 8th,

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1  2013?
2     A   Yes and no.  I sent two.  This one went
3  first.
4     Q   "This one" being what?
5     A   The one -- Exhibit 51, the one we're talking
6  about.
7     Q   Okay.
8     A   Right?
9     Q   Okay.
10    A   And then I found out the address from a
11 different source that had the Belize address, is why
12 the letter is addressed to Belize.
13    Q   Well, wait a minute, though.  The
14 envelope -- these appear to be the same envelopes.  If
15 you look at Gilbert 031 and Gilbert 051, that appears
16 to be the same envelope.
17    A   Do I have 31?
18        THE VIDEOGRAPHER: Don't take that apart.
19 BY MR. PUTTERMAN:
20    Q   Yes.  It's Exhibit 51.
21    A   Okay.
22    Q   See the envelope?
23    A   I do.
24    Q   Look at the envelope that's Gilbert --
25 Gilbert 51 but it's part of Exhibit 54.  It's the last

1  page of Exhibit 54.
2     A   Okay.  Gotcha.
3     Q   Those are photocopies of the same envelope?
4     A   Correct.
5     Q   Okay.  Do you have any other information
6  addressed to anybody in which you sent either
7  Exhibit 54 or the cease and desist order which you are
8  stating you received -- that specifically concerned
9  you and you received from the Department of
10 Corporations sometime in the spring of 2013?
11    A   2014 is when I received that.
12    Q   Oh, okay.  It was not till 2014?
13    A   Right, because I hadn't even done any of
14 this until January of 2013.
15    Q   Right.
16    A   So it was 2013 of -- okay.  Of May or April
17 of 2013.
18    Q   That's what I was referring to.  Do you have
19 any copies of any other envelopes in which you sent
20 that order out to anybody?
21    A   No.
22    Q   That's because you already had counsel and
23 you left it with Mr. Wilens?
24    A   Correct.
25    Q   Okay.

1         MR. WILENS: Just give me a moment here.
2     Well, I think I have an explanation maybe.
3  It's a document you already have, cease and desist
4  order against Cash Yes issued March of 2014.
5         If you look at the fax laid out there, the
6  fax, they seem to match up with Mr. Gilbert's case
7  without mentioning him by name.  Possible they sent
8  him a letter saying, you know, this is what we issued,
9  but they don't mention his name in the actual order
10 itself.
11        MR. PUTTERMAN: This was something you
12 previously produced to us in another context?
13        MR. WILENS: I think it was probably
14 produced.
15        MR. PUTTERMAN: In Pham?
16        MR. WILENS: Well, numerous times.  It was
17 attached to motions and things.  I think it was
18 attached to the complaint.  You have it.  March 28th,
19 2014 cease and desist order.
20        MR. PUTTERMAN: I don't recall it, but there
21 is something tickling me in the back of my mind that I
22 may have seen it.
23        MR. WILENS: Sophia Kim's name is on it and
24 it says that an email was sent by First Novus on
25 November 5th of 2013 to the California resident, and

1  one of these documents is an email, November 5th.
2         MR. PUTTERMAN: I know from the documents
3  here that Mr. Gilbert was informed by Cash Yes that
4  the loan had been sold to First Novus.
5         MR. WILENS: There is an email from First
6  Novus dated November 5th.  Well, in this court -- in
7  this ruling or order it refers to an email sent to the
8  California resident who it doesn't actually name.
9         MR. PUTTERMAN: And who is the desist and
10 refrain order or cease and desist order directed at?
11        MR. WILENS: It's directed at Cash Yes.
12        MR. PUTTERMAN: Okay.  And it's dated when?
13        MR. WILENS: March -- what did I just say?
14 March 2014.
15        MR. PUTTERMAN: Okay.  So this is
16 March 2014, the one that Mr. Wilens is referring to.
17        MR. WILENS: Why don't we print this out so
18 you can have it.
19        MR. PUTTERMAN: I think that's a good idea.
20 Do you want to take that out to the --
21        MR. WILENS: Let me take it out there.
22        MR. PUTTERMAN: No.  Take the computer out
23 to the reception desk and see if you can print it out.
24        MR. WILENS: Well, if you have a --
25        MR. PUTTERMAN: That's the best way to do

The Souza Group
(800) 230-3376

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 122

1   it.
2       **MR. WILENS:** I believe I can email it to
3   them and they can print it.
4       **MR. PUTTERMAN:** Why don't we take a short
5   break while Mr. Wilens tries to get this figured out.
6       **MR. WILENS:** Although if you have the entire
7   file, I'm sure you have --
8       **MR. PUTTERMAN:** I don't.
9       **THE VIDEOGRAPHER:** We are going off the
10  record.  The time on the video screen is 1300 hours
11  and 26 minutes.
12      (Recess taken, 1:26 to 1:41 p.m.)
13      **THE VIDEOGRAPHER:** We are back on the
14  record.  The time on the video screen is 1300 hours
15  and 41 minutes.
16      **MR. PUTTERMAN:** I am going to ask the
17  reporter to mark now as Exhibit 55 a document that
18  Mr. Wilens has been kind enough to have printed up
19  from the files that he has on his laptop.  It is,
20  quote, an "Order Voiding Transactions Pursuant to
21  California Financial Code Section 23060; and Citations
22  Pursuant to California Financial Code Section 23058."
23  And it's from -- it's before the Department of
24  Business Oversight of the State of California.
25

---

Page 123

1       (Document referred to herein marked for
2       identification Exhibit No. 55)
3       (Witness reviews document.)
4   **BY MR. PUTTERMAN:**
5       Q   Mr. Gilbert, do you recognize what's been
6   marked as Exhibit 55?
7       A   Yes.
8       Q   Is this the document to which you were
9   referring when you said you had received a -- an order
10  from the Department of Corporations to Cash Yes
11  pertaining to your particular case?
12      A   I believe so, yes.
13      Q   Okay.  And I see that one of the counsel
14  listed at the top with the Department of Corporations
15  is Sophia Kim.  See that?
16      A   Yes.
17      Q   That's the person with whom you were dealing
18  at the Department of Corporations, right?
19      A   Correct.
20      Q   Okay.  Now, let me ask you a couple things
21  about this.  First of all, paragraph 4 on page 2,
22  would you look at that, please.
23      A   Okay.
24      Q   Now, that refers to another desist and
25  refrain order apparently issued by the Commissioner of

---

Page 124

1   Business Oversight or Commissioner of Corporations,
2   whichever in effect -- was in effect at the time.  The
3   order was issued February 4th, 2013 to Cash Yes and
4   Hong Kong Partners d/b/a Cash Yes.
5       Do you see that?
6       A   Yes.
7       Q   Now, did you ever receive a copy of that
8   order from the Department of Corporations or
9   Department of Business Oversight?
10      A   I don't recall the letters that I got.  I
11  don't recall.
12      Q   Okay.  So you don't recall one way or
13  another whether you ever saw that desist and refrain
14  order?
15      A   Correct.
16      Q   Okay.  But then you did receive this one
17  dated March 28th, 2014, correct?
18      A   I don't know the exact date off the top of
19  my head, but this looks pretty close.  There was
20  another page that she sent me that had my name on it.
21      Q   Okay.  Would it have been the last page?
22      **MR. WILENS:** That had his name on it.
23      **MR. PUTTERMAN:** I know.  I don't mean -- I'm
24  sorry.
25      Q   I don't mean the last page of the exhibit.

---

Page 125

1   Would that have been the last page of whatever you
2   received?
3       A   I don't remember.
4       Q   Okay.  Because it sounds like a service
5   list.
6       **MR. WILENS:** No, it sounds like an address
7   for a letter.  I mean, it would probably be the first
8   page, I imagine.
9       **MR. PUTTERMAN:** Who knows.
10      Q   Now, I do have another question here and
11  that is in paragraph 6, paragraph 6 states -- does not
12  refer to -- this does not refer to the loan you
13  obtained from Cash Yes in November of 2012.
14      On paragraph 6 it states, quote:
15      "Yet, beginning in or around July 2013,
16      Cash Yes originated a deferred deposit
17      transaction with at least one California
18      resident who submitted a loan
19      application on the internet."
20      **MR. WILENS:** Well, I'm going to object as
21  speculative who the author of this order was referring
22  to.
23      **MR. PUTTERMAN:** Jeff, I am just reading from
24  the order.  That's all.
25      **MR. WILENS:** It said "beginning in or

---

Gilbert v                                                                    Sean Gilbert
Bank of America                                                         December 1, 2015

1  around," so --
2       MR. PUTTERMAN: I see what it says.
3       MR. WILENS: It doesn't mean July.
4       MR. PUTTERMAN: Jeff, I see what it says.  I
5  am just reading it.
6       MR. WILENS: Why are you asking him?
7       MR. PUTTERMAN: I haven't asked him anything
8  yet.
9       MR. WILENS: Your question would call for
10  speculation.
11       MR. PUTTERMAN: There is no question yet.
12       MR. WILENS: You asked a question.
13       MR. PUTTERMAN: I haven't asked a question.
14  I was in the middle of reading this when you
15  interrupted.
16       MR. WILENS: Only ask questions.  Don't read
17  things.
18       MR. PUTTERMAN: Jeff --
19       MR. WILENS: I thought it was a question.
20       MR. PUTTERMAN: No, no question.
21   Q   It says, quote:
22       "Yet, beginning in or around July 2013,
23       Cash Yes originated a deferred deposit
24       transaction with least one California
25       resident who submitted a loan

1       application on the internet.  In or
2       around July 2013, Cash Yes
3       electronically deposited approximately
4       $700 into the California resident's bank
5       account," period, close quote.
6       Do you see that?
7   A   Yes.
8   Q   Now, the loan we were talking about earlier
9  was November 2012; is that right?
10   A   Yes.
11   Q   Okay.  Is this different loan that you
12  obtained from Cash Yes in or around July 2013?
13       MR. WILENS: I'm going to object.  Are you
14  asking him if he got a loan or is this referring to a
15  loan he got?
16  BY MR. PUTTERMAN:
17   Q   I will ask you specifically.  Did you get
18  another loan from Cash Yes in or around July 2013?
19   A   No.
20   Q   Okay.  So this date in this order is just
21  wrong?
22       MR. WILENS: Objection.  Calls for
23  speculation as to what it's referring to, him or some
24  other person.
25

1  BY MR. PUTTERMAN:
2   Q   Well, okay.  Let's go on.
3       In paragraph -- it says, quote:
4       "In or around July 2013, Cash Yes
5       electronically deposited approximately
6       $700 into the California resident's bank
7       account.  Between July 2013 and
8       October 2013, Cash Yes electronically
9       debited interest and fees from the
10       California resident's bank account on a
11       bi-monthly basis, withdrawing a total of
12       approximately $1580," period, close
13       quote.
14       Was Cash Yes debiting money from your bank
15  account between July 2013 and October 2013?
16   A   No.
17   Q   Okay.  So this could not be referring to
18  your loan with Cash Yes, correct?
19       MR. WILENS: As phrased it's vague, but it
20  certainly doesn't match the facts as he knows it.
21       MR. PUTTERMAN: That's what I am asking, so
22  why don't you let him testify instead of you.
23       MR. WILENS: Because you asked him if it was
24  referring to his loan and that would require him to
25  guess.

1       MR. PUTTERMAN: The operative phrase is I
2  asked him, not you.
3       MR. WILENS: Your question calls for him to
4  speculate.
5       You are instructed not to speculate about
6  what it refers to.
7  BY MR. PUTTERMAN:
8   Q   Does this appear to refer to any loan that
9  you took from Cash Yes?
10   A   Yeah, I don't know.  I think they got the
11  dates wrong.
12       MR. PUTTERMAN: I am going to ask the
13  reporter to mark as Exhibit 56 -- and please keep the
14  order in front of you, Exhibit 55 -- four pages --
15  excuse me -- five -- six pages produced by Mr. Wilens
16  this morning with the handwritten designations of
17  Gilbert 087 through 092.  Those are my handwritten
18  designations, to be clear.
19       (Document referred to herein marked for
20       identification Exhibit No. 56)
21  BY MR. PUTTERMAN:
22   Q   I am going to direct your attention
23  specifically to pages 090, 091 of Exhibit 56.
24       MR. WILENS: 91?
25       MR. PUTTERMAN: 90, 91.

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

Page 130

1    (Witness reviews document.)
2  **BY MR. PUTTERMAN:**
3    Q    And you see there are two pages that appear
4  to be printouts or screenshots from Cash Yes website?
5    A    Uh-huh.
6    Q    Okay.  Did you make these screenshots or
7  print out these Web pages?
8    A    I did.
9    Q    When did you do this?
10    A    Yesterday.
11    Q    Oh, okay.  So this does not date back to any
12  of the events in question?
13    A    No.
14    Q    What was your purpose in printing this out?
15    A    To see if Cash Yes was still around, because
16  of MaxLend.
17    Q    Because of what?
18    A    MaxLend.
19    Q    What is MaxLend?
20    A    It's the -- basically Cash Yes.  I had
21  gotten -- same company.
22      MR. WILENS: That's a cryptic answer for
23  you.
24      MR. PUTTERMAN: That is a cryptic answer.
25      MR. WILENS: I know the answer, but I am not

Page 131

1  going to speak because it's not my deposition.
2      THE WITNESS: I don't know what to do.
3  **BY MR. PUTTERMAN:**
4    Q    Did you submit an application for a loan
5  through an entity called MaxLend?
6    A    No.
7    Q    Okay.  So what caused the Max -- name
8  MaxLend to come to your attention?
9    A    The fact that I was going through on
10  Exhibit 55 --
11    Q    Uh-huh.
12    A    -- and it stated that Cash Yes was referred
13  to as First Novus or whatever it is.  Right?
14    Q    Uh-huh.
15    A    And First Novus -- I remember my attorney
16  told me that they were the ones that took over my
17  loan, but it had the same phone number as Cash Yes and
18  the same -- that's when I clicked on First Novus and
19  then the lend button or whatever, and it took me to
20  MaxLend, which is the --
21      MR. WILENS: So sort of Nancy Drew-type
22  investigation.
23      THE WITNESS: I like to stay on top of
24  what's going on.  That is all.
25

Page 132

1  **BY MR. PUTTERMAN:**
2    Q    Let's go back to Exhibit 55, if we may, and
3  take a look on page 4 -- starting on page 4.  You see
4  there is a list of citations --
5    A    Uh-huh.
6    Q    -- to violations of the -- of California
7  deferred deposit transaction law?
8    A    Uh-huh.
9    Q    Okay.  Now, all of these refer to conduct
10  undertaken by Cash Yes in or around July 2013,
11  correct?
12    A    Correct.
13    Q    And your only loan with Cash Yes was taken
14  in November 2012; is that your testimony?
15    A    That's correct.
16    Q    And the amounts specified --
17    A    Uh-huh.
18    Q    -- on -- in paragraph 6 of Exhibit 55 do not
19  match up with the loan that you took in November 2012,
20  correct?
21    A    Correct.  But on paragraph 4 it states on
22  February 4, 2013, they issued a desist and refrain
23  order to Cash Yes for February -- that doesn't make
24  any sense.
25    Q    Right.

Page 133

1    A    That was in regards to my loan.
2    Q    Which was in --
3    A    Paragraph 4.  In paragraph 4, right.
4    Q    Okay.  But when I asked you about this
5  earlier, you don't recall -- you didn't recall whether
6  you had seen a copy of that February 4, 2013 desist
7  and refrain order or not.
8      MR. WILENS: He said this looks familiar but
9  he wasn't sure when he got this.  So this is obviously
10  not necessarily referring to Exhibit 55 but this being
11  the other cease and desist order.
12      MR. PUTTERMAN: Do you realize that that
13  will make no sense on the record, what you just said?
14      MR. WILENS: The problem is that you are
15  showing a man a document and you are saying is this
16  the cease and desist order, but there is two of them.
17      So how is he supposed to know one from the
18  other?
19      MR. PUTTERMAN: Well, we could start with
20  the fact that they're two different documents.
21      MR. WILENS: But we don't have the other one
22  to compare it.  It may look identical to this except
23  for the date.
24      MR. PUTTERMAN: Yes, except for the fact
25  that he's testified that this is the one he was

**The Souza Group**
**(800) 230-3376**

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 134

1  testifying about earlier, that he said he had received
2  from the Department of Corporations and that pertained
3  to his case.
4       MR. WILENS: He may have received it, but
5  this document --
6       MR. PUTTERMAN: Let's see if we can clarify
7  it with him.
8       THE WITNESS: So this is on February --
9  February 2013 order, paragraph 4.
10 BY MR. PUTTERMAN:
11  Q   Correct.
12  A   Okay. Then it goes in to reference on
13 paragraph 6 about July 2013.
14  Q   Correct.
15  A   So that's somebody else's unfortunate that
16 they're talking about.
17  Q   That's exactly what I am trying to establish
18 here with you. So this order --
19  A   There is two orders.
20  Q   Right. So this order does not pertain to
21 your circumstance, correct?
22  A   It does in paragraph 4.
23  Q   Paragraph 4 -- leaving aside paragraph 4,
24 the citations here that appear on page 4 do not refer
25 to your loan, correct?

---

Page 135

1  A   Citation F.
2       MR. WILENS: Refers to the earlier one.
3       MR. PUTTERMAN: It says in violation of the
4  February 2013 order; okay?
5  Q   My point is this: The citations here
6  pertain to another Cash Yes customer, correct? The
7  loan that's referenced here.
8  A   Correct.
9  Q   Okay. That's what I wanted to know.
10  A   Correct.
11  Q   Okay. Now, are you now saying that you did
12 receive an earlier order from the Department of
13 Corporations or the Department of Business Oversight,
14 whatever it was called at the time, in approximately
15 February of 2013 which pertained to your case?
16  A   I am. That's what I am saying.
17  Q   Okay. Where is that order?
18  A   Should have been produced, but I have it.
19 That's the one I have been talking about. So I have
20 that document.
21       MR. WILENS: That one is not on the Internet
22 anywhere, the February 2013 one, so I don't have it;
23 but if he did produce it, it's lost in a sea of
24 documents somewhere.
25

---

Page 136

1  BY MR. PUTTERMAN:
2  Q   But you still have a copy of that?
3  A   I still have it.
4  Q   Okay. So that's somewhere in the pile along
5  with the complaint you made to the --
6  A   It's not in a pile. I know where it's at.
7  Q   A file, a pile.
8  A   It's on top of my desk. My desk is half the
9  size of this.
10  Q   That's a pretty good size.
11  A   Well, got a lot of writing to do.
12  Q   Apparently. All right. So that has to be
13 produced to us, correct?
14  A   I should --
15       MR. WILENS: Are you -- is that a question
16 or --
17       MR. PUTTERMAN: That still remains to be
18 produced to us.
19       MR. WILENS: Yes. If the document exists,
20 we'll produce it.
21       THE WITNESS: Absolutely.
22 BY MR. PUTTERMAN:
23  Q   All right. Now, the February 2013 order,
24 did you send that out to anybody?
25  A   No. Just my attorney.

---

Page 137

1  Q   So you just gave that to Mr. Wilens and that
2  was the end of that as far as you were concerned?
3  A   Right.
4  Q   Okay. Did that order mention MoneyMutual
5  anywhere?
6  A   I want to say yes, but I can't be sure right
7  off the top of my head.
8  Q   So we need to see the order.
9  A   Yeah.
10  Q   Okay.
11  A   In fact, I think it does. It says that the
12 respondent had received a loan through MoneyMutual, so
13 yes, it does say it in there.
14  Q   Is that all --
15  A   That's based upon my testimony.
16  Q   Is that all it said in -- about MoneyMutual
17 in that order?
18  A   I don't -- it could have said more, other
19 people involved. I'm not sure.
20  Q   Okay. So we need to see that order.
21      Now, before -- is it before this
22 January 8th/January 9th activity that we see through
23 several documents that you called MoneyMutual for
24 contact information for Cash Yes?
25  A   No. It was before. It was January, right

---

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1  **in there, in the beginning of January.**
2  Q   Okay. So that's what I am asking.
3      Did you call MoneyMutual to get -- and you
4  got the phone number before this activity that
5  occurred January 8th/January 9th, correct?
6  **A   Correct.**
7  Q   2013. Okay.
8      I am next going to mark as Exhibit 57 --
9      Is that correct, Karen?
10 **THE REPORTER:** Uh-huh. Yes.
11 **MR. PUTTERMAN:** So Exhibit -- that was what?
12 That was Exhibit 55.
13 **THE WITNESS:** This says 57.
14 **THE REPORTER:** Right, because that's the
15 number that we're on.
16 **MR. PUTTERMAN:** We marked that one already.
17 Exhibit 57 is Gilbert 001 through Gilbert
18 014.
19     (Document referred to herein marked for
20 identification Exhibit No. 57)
21 BY MR. PUTTERMAN:
22 Q   Have you previously seen a copy of this
23 document?
24     (Witness reviews document.)
25 **A   No.**

1  Q   Do you recognize this as the loan agreement
2  that you executed over -- using the computer with Cash
3  Yes?
4  **A   Maybe it's not in the same format, but it**
5  **doesn't look like the same packet at all.**
6  Q   Okay. Go to Gilbert 014.
7  **A   Page 014?**
8  Q   Yes, Gilbert 014. Do you see where it says
9  "Borrower Name: sean gilbert"?
10 **A   Yes.**
11 Q   Do you recall signing your name by typing
12 it, typing your name on a form on the computer in
13 connection with getting the Cash Yes loan?
14 **A   Yes.**
15 Q   Is this -- do you recall that this appears
16 to be a copy of that?
17 **A   Yeah. This whole looks different, though.**
18 **It's not even close.**
19 Q   Not even close how?
20 **A   Just the format, the way this is --**
21 **annual percent, all that, doesn't look the same as the**
22 **one I have, the original one.**
23 Q   Okay. Do you have the original one?
24 **A   I produced it.**
25 Q   You mean you produced it to your counsel.

1  **A   Well, yeah. I mean, I didn't bring anything**
2  with me, but --
3      **MR. PUTTERMAN:** Counsel, we need a copy
4  of -- a copy of the loan agreement that Mr. Gilbert
5  presumably printed out and retained for his own
6  records.
7      **MR. WILENS:** If that's the loan agreement.
8  It does -- the email version looks -- is a slightly
9  different format, but we didn't produce every version
10 of the same document.
11     **MR. PUTTERMAN:** But here's the problem. He
12 says he doesn't recognize this, okay, which makes it
13 more difficult for me to ask him questions about what
14 he remembers or doesn't, because if he doesn't
15 remember it looking like this and he remembers it
16 being in another format, we need to have that one to
17 question him about.
18     **MR. WILENS:** It's on the screen when he is
19 looking at it with his eyeballs. That's the problem.
20 BY MR. PUTTERMAN:
21 Q   Did you print it out, the original loan
22 agreement?
23 **A   Yes.**
24 Q   Okay.
25     **MR. WILENS:** You can't print the loan

1  agreement out. It's on the screen. All you can do is
2  make a -- is print the pdf they send you later.
3  BY MR. PUTTERMAN:
4  Q   Which did you print out?
5  **A   I don't know. I got a loan document.**
6  That's what I have. I don't know which version it is.
7  Q   They sent you a loan document?
8  **A   Yes.**
9  Q   Okay. That presumably is what Mr. Wilens is
10 referring to when he says a pdf. That was by email?
11 **A   Yes.**
12     **MR. PUTTERMAN:** Okay. Jeff, is it your
13 understanding that this is identical to one that was
14 emailed to Mr. Gilbert?
15     **MR. WILENS:** It is identical in contents.
16     **MR. PUTTERMAN:** Okay. Then let's see how
17 far we can go with this one.
18 Q   Mr. Gilbert, when you got the emailed copy
19 of the loan agreement from Cash Yes, did you review
20 it?
21 **A   Yes.**
22 Q   Okay. Did you read the whole thing?
23 **A   I understood it.**
24 Q   Okay. Let's look at page -- at Gilbert 001
25 of Exhibit 57. The very first paragraph, do you see

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1  that it refers to Cash Yes as, quote, "a lender duly
2  licensed and registered under the International
3  Financial Services Commission Act of Belize,
4  Chapter 272," period, close quote?
5      Do you see that?
6  A  Yep.
7  Q  Did you know what Belize was?
8  A  No.
9  Q  You had never heard of Belize?
10 A  No.
11 Q  Okay.  Did you -- were you curious as to
12 what Belize was?
13 A  I had no reason to, no.
14 Q  Okay.  Let's go to the next page.
15     Do you see the paragraph entitled, quote,
16 "Right to Rescind"?
17 A  I do.
18 Q  Do you see that that paragraph includes a
19 fax number?
20 A  Yes.
21 Q  And it includes an email address?
22 A  Correct.
23 Q  Okay.  Now, when did you receive the emailed
24 copy of this loan agreement from Cash Yes?
25 A  I don't remember the -- when I signed it, I

1  think they just sent me a copy of it back.
2  Q  Promptly?
3  A  I wouldn't say promptly.  I'm not sure.  The
4  money might have to hit the account first, then they
5  sent it to me.
6  Q  Okay.  But within a few days or a week?
7  A  Something like that, yeah.
8  Q  Okay.  And that's when you read it?
9  A  I read it online first.
10 Q  Okay.  And you read it completely online?
11 A  Yeah.  I was at work.
12 Q  Okay.  And then you also looked at it when
13 it came to make sure the contents were the same?
14 A  No.  I just took it for granted.
15 Q  All right.  But you see that there was a fax
16 number and an email address here, correct?
17 A  Correct.
18 Q  Then why did you have to call MoneyMutual to
19 get contact information for Cash Yes?
20 A  I don't know.
21 Q  Do you have --
22 A  I figured that I would have got ahold of
23 MoneyMutual to find out about Cash Yes.  I was
24 emailing them.  They weren't getting back to me.
25 Q  Okay.  Did you try faxing them before you

1  called MoneyMutual?
2  A  Faxing them what?
3      (Court reporter interrupts for clarity of
4      the record.)
5      THE WITNESS: Before I was emailing them,
6  before I called them, I was emailing Cash Yes with no
7  response.
8  BY MR. PUTTERMAN:
9  Q  Okay.  When you didn't get a response from
10 the email, did you try faxing a note to them asking
11 them to get in touch with you?
12 A  No.
13 Q  Okay.  Why not?
14 A  I don't know.  It wasn't a problem at that
15 point.
16 Q  If you were emailing them, I assume it was
17 that you were --
18 A  I was emailing my situation.
19     MR. WILENS: Hold on, Sean.  Just wait.  Let
20 him finish the question.  You are not required to fax
21 anybody anything.  Don't be defensive.
22     MR. PUTTERMAN: Stop, stop, stop.
23     MR. WILENS: But you are arguing with him
24 and --
25     MR. PUTTERMAN: I am not arguing with him.

1  I am asking him questions.
2      MR. WILENS: You are arguing and he is
3  responding.
4      MR. PUTTERMAN: Jeff, that's fine.  It's
5  cross-examination, remember?
6      MR. WILENS: But the reporter is going to
7  have a problem.
8      MR. PUTTERMAN: The reporter is not having a
9  problem.  When she has a problem, she'll tell us she
10 is having a problem.
11     MR. WILENS: You just interrupted me and
12 that makes it difficult for the reporter, so please
13 wait for me to finish my statement.  Thank you.
14     MR. PUTTERMAN: You are welcome.
15 Q  Okay.  You were emailing them about your
16 circumstances, correct?
17 A  Correct.
18 Q  And the circumstances being that you were
19 not working because you had a medical problem?
20 A  Correct.
21 Q  Now, when they didn't respond to your
22 emails, did you try faxing them a letter or a note
23 about your circumstances?
24 A  Well, I had gotten a reply back eventually.
25 I don't know the time frame.  The dates.  It was not

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1  until I made a stink about it, that they were illegal
2  and they were burning me, that this became a problem.
3      Q   Okay.  And so the fax that we've looked at
4  before that you sent them in January of 2000 --
5  January 8th of 2014, was that the first fax you sent
6  to them?
7      A   I don't know.  That's probably
8  communication, no, on both ends.
9      Q   So there may have been communications before
10  then?
11     A   There were.  I believe so.
12     Q   All right.  And are there any of those that
13  you think you have in your file or pile?
14     A   I produced them actually.
15     Q   To Mr. Wilens?
16     A   Yes.
17         MR. WILENS: Well, I am sorry.  I missed
18  that.
19         MR. PUTTERMAN: Communications that
20  Mr. Gilbert had with Cash Yes prior to January 8th,
21  2015.
22         MR. WILENS: As far as I know, I produced
23  any email he had, and he has his notes, his phone log
24  notes.
25         MR. PUTTERMAN: The one we looked at?

1          MR. WILENS: Yes.
2          THE WITNESS: There are emails that were
3  sent from a Kari Anderson saying that she hopes I was
4  feeling better and that next thing and the other.  I
5  don't know the dates on those, if they were before or
6  after, but the loan was in October.
7  BY MR. PUTTERMAN:
8      Q   November.
9      A   November.  The loan was in November and they
10  started really making a stink in the middle of
11  December by calling my work, making threats, calling
12  my house all hours of night.  That's when I was really
13  pursuing the issue.
14         But before that I was trying to be cordial
15  with them, let them know I had been in the hospital,
16  and that's when Kari Anderson e-mailed me back, told
17  me that she hopes I was feeling better.  I have given
18  that stuff.
19     Q   We will see when we go through these.  I
20  don't recall offhand seeing any emails from Kari
21  Anderson.
22     A   It was from the info and recoveries.
23         MR. WILENS: You have that email.
24         THE WITNESS: I don't know the exact time
25  frame.

1  BY MR. PUTTERMAN:
2      Q   All right.  Getting back to the loan
3  agreement in Exhibit 57, do you see on page Gilbert
4  002 there is a heading called "Prepayment"?
5      A   Yes.
6      Q   And you see in the second line of that
7  paragraph there is a phone number, 1-866-568-1419?
8      A   Yes.
9      Q   Did you try calling them, calling Cash Yes
10  at that phone number?
11     A   That's -- yes.
12     Q   Now, so let me -- so you had the phone
13  number in the loan agreement, correct?
14     A   Appears so.
15     Q   Okay.  Now, does that refresh your
16  recollection at all as to whether you actually did
17  have to call MoneyMutual to get Cash Yes's phone
18  number?
19     A   Yes, because I didn't either have it with me
20  at the time or I didn't look for it or couldn't find
21  it, whatever.  Didn't re-download it.
22     Q   Okay.  So you called MoneyMutual.
23     A   Yes.
24     Q   You explained you needed Cash Yes's phone
25  number.  Correct?

1      A   Sure.  Yes.
2      Q   And they gave you the phone number?
3      A   Yes.
4      Q   But --
5      A   But that's all they would give me.
6      Q   Okay.  But that's basically what you wanted,
7  correct, was the contact information?
8      A   No.  I wanted an address and everything.
9      Q   They gave you the phone number?
10     A   That's all that they would do.  Right.
11     Q   Okay.  And by the way, you see that that
12  number is listed again in boldface further down on
13  that page in the paragraph that says, quote, "If you
14  cannot pay the Total Amount Owed on the Payment Due
15  Date," close quote, "you must contact us"?
16         Do you see that?
17     A   Yeah.
18     Q   And that was your situation, correct?  You
19  couldn't pay the amount due because of your medical
20  and financial circumstances, true?
21     A   Well, before that I -- yeah.  I mean, I
22  contacted them already.  The emails show it.
23     Q   Okay.  Did you -- when you -- if you
24  contacted them -- and you heard back from them in that
25  period of time or --

Page 150

1    **A   Yeah.**
2    Q   -- was that a period of time in which you
3    did not hear back from them by email?
4    **A   So between December and January 3rd --**
5    Q   Uh-huh.
6    **A   -- two weeks of that I was in a coma. I**
7    **didn't hear anything. There was nobody responding.**
8    **Two weeks after that. Except for the phone calls at**
9    **work and the harassing phone calls with no number to**
10   **return call, and they'd come from like a 000-0000**
11   **number on my phone.**
12   Q   Okay.
13   **A   I think at that time I was fired already at**
14   **my job, and I wasn't able to even get this document**
15   **from that forwarding address till later.**
16   Q   Now, which job were you fired from?
17   **A   New Dawn Residential.**
18   Q   That was the treatment facility?
19   **A   Correct.**
20   Q   And did they state why they were firing you?
21   **A   I have a lot of drama.**
22   Q   What do you mean by that?
23   **A   Well, I'd be in running group or something**
24   **like that with the clients and the phone would be**
25   **ringing off the hook, and she'd write messages,**

Page 151

1    **getting all stressed out during an intake, and it**
2    **created a problem.**
3    Q   Okay.
4    **A   So it was --**
5    Q   Now, did they fire you before or after you
6    had the asthma problem develop?
7    **A   After.**
8    Q   They fired you after that?
9    **A   Yeah.**
10   Q   They knew that you were in the hospital?
11   **A   Yes.**
12   Q   Okay. And were they aware -- do you know if
13   they were told that you were in a medically induced
14   coma?
15   **A   My job?**
16   Q   Yeah.
17   **A   Yeah, they knew.**
18   Q   Okay. So did they understand that you were
19   in no position, obviously, to be picking up or
20   returning calls at that point?
21   **A   Correct.**
22   Q   And they still fired you?
23   **A   Correct.**
24   Q   Okay. What was the reason that they
25   actually gave you for firing you?

Page 152

1    **A   They didn't really give me a reason. I just**
2    **was no longer a fit for their program.**
3    Q   So you don't know one way or another what
4    the actual reason was that they fired you, correct?
5    **A   After being talked to three times and a**
6    **minor write-up over phone calls, I figured that's what**
7    **it was.**
8    Q   Okay. But that's not what they told you?
9    **A   They didn't say anything. They just said**
10   **they didn't need me anymore at that time.**
11   Q   Okay. How long had you been away from the
12   job for medical reasons at that point?
13   **A   Two weeks.**
14   Q   Okay. Did you contact a lawyer about having
15   been terminated?
16   **A   I did. I went through the Department of**
17   **Labor and all that.**
18   Q   Okay. What happened?
19   **A   We settled, but it had nothing to do with**
20   **medical. Of course they're not going to admit that.**
21   Q   No, I understand. With a settlement nobody
22   admits anything.
23   **A   Well, they weren't going to admit that, but**
24   **I managed to make that up. So that's not why they**
25   **fired me. They were there at the hospital with me.**

Page 153

1    Q   Right, but my question is this: During the
2    Department of Labor proceedings during which you
3    settled, did they state the reason for which they
4    terminated you?
5    **A   No.**
6    Q   Okay.
7    **A   Well, they tried to say I gave the wrong**
8    **meds to the wrong client, is what it was.**
9    Q   Okay. So that was the stated reason that --
10   **A   That was the stated.**
11   Q   Okay. And they didn't state any other
12   reason?
13   **A   No.**
14   Q   Okay. Would you turn to page Gilbert 009 on
15   Exhibit 57. Do you see in the top boxes on that page
16   it says, "To limit our sharing," and then questions?
17   **A   Yes.**
18   Q   See it gives the same phone number twice?
19   **A   Okay.**
20   Q   Okay. And gives the website, correct?
21   **A   Okay.**
22   Q   Okay. So the point is in the loan agreement
23   itself it had the phone number in a number of places,
24   true?
25   **A   True.**

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 154

1  Q   Okay.  Do you think you just didn't think to
2  look at the loan agreement when you were trying to get
3  in touch with Cash Yes?
4  A   No.  I don't think I had the loan agreement.
5  It was still at work.
6  Q   Ah, okay.  It was on the work computer?
7  A   Well, not on the work computer.  When I
8  printed it up, it was with my folder that was stuck at
9  work.
10  Q   But you had received it by email, correct?
11  A   Correct.
12  Q   Wasn't the email available to you on your
13  home computer?
14  A   Not until after I could get New Dawn's
15  records off of it due to client and HIPAA laws.
16      (Court reporter interrupts for clarity of
17      the record.)
18      THE WITNESS: Emails that weren't pertaining
19  to clients, you know, via HIPAA laws.  So I couldn't
20  have any personal emails being forwarded back to me.
21  BY MR. PUTTERMAN:
22  Q   Okay.
23  A   So I couldn't have a copy of this then.
24  Q   Ah.  So the email to which it was sent was
25  your email at New Dawn?

---

Page 155

1  A   No.  It was my email at home, but because
2  there were records of it on the computer and they
3  seized that due to HIPAA laws make sure I wasn't
4  getting re-forwarded any clients' information with it.
5  Q   They seized your home computer?
6  A   Not the computer.  Just put a block on my
7  email address so I couldn't get forwarding.  Nothing
8  was going back and forth.  You see what I am saying?
9  Q   Nothing going back and forth between your
10  home email and your old New Dawn email?
11  A   Right.
12  Q   Okay.  But my question is this:  When the
13  agreement was emailed to you by Cash Yes, was it
14  emailed to you at your New Dawn email or at your home
15  email?
16  A   At my home email.
17  Q   Okay.  So if it was at your home email --
18  and it may be I'm confused here, so bear with me.  I'm
19  not a techy.
20  A   Okay.
21  Q   If it was mailed to you directly at your
22  home email, why couldn't you retrieve it on your home
23  email?
24  A   Because it was related to New Dawn.  I had
25  information from clients, from New Dawn, transferred,

---

Page 156

1  forwarded to the Comcast.  So therefore I had let them
2  go through every email, made sure that there was no
3  clients' information there.
4  Q   That's what I was trying to ask.
5      In other words, you did not have access to
6  your home email --
7  A   Correct.
8  Q   -- account until New Dawn went through it?
9  A   Correct.
10  Q   Thank you.  That's what I was trying to
11  figure out.  And that's why you needed to call
12  MoneyMutual to get the number?
13  A   Correct.
14  Q   Thank you.
15  A   Not a problem.
16      MR. PUTTERMAN: Why don't we take a
17  five-minute break.  That was tiring.
18      THE VIDEOGRAPHER: This is the end of
19  disc 2.  It has a run time of approximately one hour
20  and 25 minutes.  We are going off the record at 1400
21  hours and 22 minutes.
22      (Recess taken, 2:22 to 2:32 p.m.)
23      THE VIDEOGRAPHER: This begins disc 3 in the
24  video deposition of Sean L. Gilbert on December 1,
25  2015.  The time on the video screen is 1400 hours and

---

Page 157

1  32 minutes.
2      MR. PUTTERMAN: Okay.  Exhibit 58 is Gilbert
3  015 through 019.  It's entitled "Bank" -- quote, "Bank
4  of America," close quote, open quote, "Hold and
5  Transaction History."
6      (Document referred to herein marked for
7      identification Exhibit No. 58)
8      (Witness reviews document.)
9  BY MR. PUTTERMAN:
10  Q   Mr. Gilbert, have you seen this document
11  before?
12  A   Yes.
13  Q   Can you tell us what it is?
14  A   It looks like my bank statement.
15  Q   Okay.  Is a bank statement or is it a
16  printout from the bank's website showing your
17  transactions over a certain period of time?
18  A   It's actually a printout from the bank.
19  This says for bank use.
20  Q   So you went to the bank and asked them to
21  print it out?
22  A   I did.
23  Q   When did you do that?
24  A   November -- or wait.  I'm not sure what the
25  date was.  4-2010 at any rate.  I am not sure.

---

The Souza Group
(800) 230-3376

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 158

1   Q   Well, it says the search period is
2  November 10th, 2012 through February 5th, 2013.
3      Does that refresh your recollection?
4   **A   Yeah, that's right.**
5   Q   So it was in early February 2013?
6   **A   Yes.**
7   Q   What prompted you to go to the bank to ask
8  to have this printed out?
9   **A   The enormous amount of NSF fees.**
10   Q   The ones that are all listed in the
11  right-hand column?
12   **A   Right.**
13   Q   Okay.  Now, who did the highlighting on
14  these pages?
15   **A   I did.**
16   Q   Okay.  Why did you highlight the particular
17  entries?
18   **A   I believe it was because those were the**
19  **dates that I was in the hospital and I had to show**
20  **proof to somebody for something.**
21   Q   Was it to the bank to ask them to remove the
22  NSF fees?
23   **A   No, I don't believe -- I don't know.  I**
24  **think it could have even been for the Department of**
25  **Corporations, but I used one bank statement for a**

---

Page 159

1  **bunch of different verifications, I guess.**
2   Q   Okay.  Did you ever ask the bank to remove
3  some of the NSF fees on the grounds you could not
4  access your account for a period of time because you
5  were in the hospital and for part of that time in a
6  medically induced coma?
7   **A   I don't recall.  I think they might have**
8  **took a couple off, but I had direct deposit, so --**
9   Q   Okay.  Let's look at some items here on this
10  page.
11      There is a highlighted entry for
12  December 31st, 2012, and does this show a direct
13  payment to Cash Yes?
14   **A   It shows the amount that they were trying to**
15  **deduct.**
16   Q   Okay.  And did they succeed in deducting it?
17   **A   I don't know.  Doesn't look like it.**
18   Q   But they did -- the bank did assess an
19  NSF/overdraft fee, correct?
20   **A   They did.**
21   Q   Okay.  Now, the same day, December 31st,
22  2012, there is an entry for Advance America.
23      Do you see that?
24   **A   Yeah.**
25   Q   Who is that?

---

Page 160

1   **A   It's a brick and mortar store.**
2   Q   A payday loan brick and mortar store?
3   **A   Yes.**
4   Q   Does this concern a payday loan that you
5  took from Advance America?
6   **A   Yes.**
7   Q   Okay.  Did you pay that off completely?
8   **A   Yes.**
9   Q   And that had nothing to do with MoneyMutual,
10  correct?
11   **A   No.**
12   Q   Okay.  On December 28th, 2012, there is an
13  entry for Ameriloan.  Do you see that?  A debit?
14   **A   Yes.**
15   Q   Who is Ameriloan?
16   **A   That was an online, VI -- or yeah, online --**
17   Q   Online lender?
18   **A   Yeah.**
19   Q   Payday lender?
20   **A   Yes.**
21   Q   Okay.  And you had a payday loan from
22  Ameriloan --
23   **A   Yeah.**
24   Q   -- at that time?
25      When did you get that?

---

Page 161

1   **A   That was the VIP Loan Shop.**
2      MR. WILENS:  The question was when did you
3  get it.
4      THE WITNESS:  I don't know.  I don't know.
5  It was around the same -- I don't know.  I'm not sure.
6  BY MR. PUTTERMAN:
7   Q   Further down, on December 20th, there are
8  entries for debits for both OPD and VIP Loan Shop.
9      Do you see that?
10   **A   Yes.  Oh, yeah.  Okay.**
11   Q   Okay.  Those both concern payday loans that
12  you took?
13   **A   Yes.**
14   Q   Okay.  And you see that there is -- the VIP
15  Loan Shop appears to be different from Ameriloan?
16   **A   Yes.**
17   Q   Okay.  So those were -- VIP Loan Shop and
18  Ameriloan were two different loans, correct?
19   **A   Correct.**
20   Q   And neither the OPD loan nor the VIP Loan
21  Shop loan were through MoneyMutual, correct?
22   **A   Correct.**
23   Q   Okay.  Do you remember any particular
24  representations that were made on the websites through
25  which you obtained those loans that actually stick in

---

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1   your mind?
2       A   **What do you mean?**
3       Q   In other words, you didn't get those through
4   MoneyMutual website?
5       A   Correct.
6       Q   You got them presumably through other
7   websites, correct?
8       A   Correct.
9       Q   Okay.  Do you remember anything about --
10  specific about either of the websites you got those
11  through?
12      A   **Just the amount I could get was more than I**
13  **could get it at brick and mortar.**
14      Q   Okay.  The brick and mortar amounts were
15  restricted to lower -- brick and mortar stores were
16  restricted to lower amounts?
17      A   Correct.
18      Q   Okay.  You don't remember anything else
19  specific about the websites?
20      A   **They all say the same thing.  I mean that**
21  **their code of conduct, their -- that was the biggest**
22  **thing.  I just didn't want to be harassed, you know.**
23      Q   And the other thing was you needed to get
24  more money than was available through a brick and
25  mortar store?

1       Q   And then further down there is a
2   withdrawal -- excuse me -- a deposit, I should say,
3   for $250 from SGQ, Ltd.
4           Do you see that?
5       A   Yes.
6       Q   Was that a deposit from a payday lender?
7       A   Yes.
8       Q   Okay.  And so that was another payday loan
9   you took out at that time?
10      A   Correct.
11      Q   So you were actually -- either had or were
12  taking out a lot of payday loans during this period
13  because of your -- the fact that you weren't working,
14  correct?
15      A   **Kind of except the problem was they were**
16  **just renewing the loans on these other ones and taking**
17  **out the bare minimum without knowing that I was**
18  **supposed to call them and say I want to pay the whole**
19  **thing.**
20          **You know, I thought that's why I gave them**
21  **my account number, because assuming I was having to**
22  **pay one, rob Peter to pay Paul, you know, pulling out**
23  **one to get the other one.**
24      Q   Got it.  Down on December 7th, 2012, there
25  is a reference to a withdrawal by OPD.

1       A   Right.
2       Q   And then there is another Cash Yes deduction
3   or attempted deduction on December 20th, correct?
4       A   Yes.
5       Q   Okay.  Do you know if that one went through
6   or not?
7       A   **It doesn't look like it.**
8       Q   Because of the NSF/overdraft fee?
9       A   Correct.
10      Q   Because the available balance history and
11  statement balance are the same?
12      A   Right.
13      Q   Okay.  There is on December 14th an entry
14  for withdrawal from Action PDL.
15          Do you see that?
16      A   Yes.
17      Q   Was that another payday loan?
18      A   Yes.
19      Q   And through whom did you get that payday
20  loan?
21      A   Action.
22      Q   Okay.  Is that directly from their website?
23      A   Not sure.
24      Q   But that was online, correct?
25      A   Yes.

1       A   Correct.
2       Q   That was another payday loan, correct?
3       A   **Yeah.  It's the same one as the other OPD.**
4       Q   Right.  Would you please go to page Gilbert
5   017.  Do you see the third entry down is called Net
6   Spend?
7       A   Yes.
8       Q   What is that?
9       A   **It's a prepaid Visa card.**
10      Q   Okay.  Further down, on December 6th, there
11  is a -- looks like a deposit from something called
12  dMobi.
13      A   Yeah.
14      Q   What is that?
15      A   **Another payday loan, I guess.  That's before**
16  **that.  So that's one that had been rolled over.**
17      Q   DMobi.  Do you remember the full name?
18      A   **I don't.  Mobile -- I don't.  Mobility.**
19      Q   Mobility?
20      A   **I think so.  Something like that.  Payday**
21  **mobility or something.**
22      Q   Okay.  And then down on November 30th --
23  excuse me -- November 29th there are a couple of
24  Ameriloan withdrawals.  And that was for your
25  Ameriloan --

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1   A   Correct.
2   Q   -- payday loan, correct?
3   A   Correct.
4   Q   And on Gilbert 018 you've got a deposit from
5   OPD on November 28th, 2012, correct?
6   A   Yes.
7   Q   So that's about the time you got your payday
8   loan from OPD, correct?
9   A   That is the payday loan from OPD.
10  Q   Okay.  And on November 27th, 2012 is the
11  deposit from Cash Yes for your Cash Yes payday loan,
12  true?
13  A   True.
14  Q   $425?
15  A   Correct.
16  Q   Okay.  All right.  You can lay that aside.
17  Did you succeed at any point in stopping
18  with the withdrawals from various payday lenders?
19  A   Yes.
20  Q   How did you do that?
21  A   I closed the bank account down.
22  Q   Okay.  And so which loans were still
23  outstanding at the time or at least according to the
24  lender still outstanding at the time you closed the
25  bank account down?

1   A   I think all but like two, and that would be
2   the Advance America one.
3   Q   At the time you -- at the time you closed
4   the bank account down, the loans that were not yet
5   paid in full --
6   A   Yes.
7   Q   -- did you end up paying any of those in
8   full?
9   A   No.
10      MR. PUTTERMAN: Okay.  Exhibit --
11  What's the next one, Karen?
12      THE REPORTER: 59.
13      MR. PUTTERMAN: Exhibit 59 is page Gilbert
14  028.  Excuse me.  Gilbert 026.
15      (Document referred to herein marked for
16      identification Exhibit No. 59)
17  BY MR. PUTTERMAN:
18  Q   Did you receive this email from Cash Yes on
19  or about November 28th, 2012?
20  A   Yes.
21  Q   Okay.  Is this a copy of what you received
22  from Cash Yes at that time?
23  A   Yes.
24      MR. WILENS: What Bates was that?
25      MR. PUTTERMAN: Gilbert 026.

1   Q   Now, did you read this email when you got
2   it?
3   A   Briefly.
4   Q   Okay.  So you didn't really pay that much
5   attention to it, correct?
6   A   No.
7   Q   Okay.  Now, did you also receive any kind of
8   an email notice from MoneyMutual telling you that you
9   had been matched with Cash Yes for a loan?
10  A   I don't recall.
11  Q   Do you recall --
12  A   I recall when I called them, though, they
13  told me it was Cash Yes.
14  Q   When you called them when?
15  A   MoneyMutual, to find out what Cash Yes's
16  phone number was.
17  Q   Ah.
18  A   So that's when they confirmed it was Cash
19  Yes.
20  Q   They confirmed that your loan was with Cash
21  Yes?
22  A   Yes.
23  Q   Okay.  So they did give you a little more
24  information?
25  A   They just said your loan is through Cash

1   Yes, here's the number.
2   Q   Okay.  My question is, though:  After you
3   submitted your information through the MoneyMutual
4   website for a loan --
5   A   Uh-huh.
6   Q   -- okay, who contacted you first about the
7   fact that Cash Yes was prepared to make you a loan?
8   A   It went from the MoneyMutual website right
9   to theirs.
10  Q   Right to the Cash Yes website?
11  A   Correct.
12      MR. PUTTERMAN: Okay.  Exhibit 60 is Gilbert
13  027.
14      (Document referred to herein marked for
15      identification Exhibit No. 60)
16      THE WITNESS: Thank you.
17  BY MR. PUTTERMAN:
18  Q   Did you receive this email from Cash Yes?
19  A   I did.
20  Q   Okay.  Was this the first notice you got
21  from Cash Yes about your loan being delinquent?
22  A   I'm not sure.
23  Q   Well, do you recall anything that you got in
24  writing from Cash Yes earlier than the date here of
25  January 3rd, 2013?

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1    A   I got something else, but I don't know what
2    the date is on it.
3        Q   Okay.  Let me ask you this:  If you will go
4    back to Exhibit 53.  Can you find that there?  It's
5    this document here.
6        A   Okay.
7        Q   This is the record you kept of phone calls
8    from Cash Yes.
9        A   Okay.
10       Q   Do you have that in front of you?
11       A   Yes.
12       Q   Okay.  Now, does this indicate that the
13   first date you started at least recording phone calls
14   or emails was from January 8th, 2013?
15       A   I think this is for work.  This is where
16   they were calling at work.
17       Q   And I note for the January 8th, 2013,
18   you also -- you state, quote:  Received email from
19   Cash Yes.  Cash Yes called me.  Faxed all paperwork.
20   Emailed all paperwork.  Certified mail all documents.
21   Sent paperwork to state of corporations, it looks
22   like.
23       A   Uh-huh.
24       Q   Correct?  And received email material?
25       A   Marked.  I marked that.

1        Q   Email marked.  Okay.
2            So this confirms that January 8th is when
3    you sent your complaint, your handwritten complaint
4    and any accompanying paperwork to the Department of
5    Corporations, correct?
6        A   Correct, as well as all the lenders that I
7    was sending that to.
8        Q   Okay.  None of this was sent to MoneyMutual,
9    correct?
10       A   No, I don't believe so.
11       Q   Okay.  January 9th, 2013, somebody called.
12   And did they hang up on you or did you hang up on
13   them?
14       A   No.  They -- I called them.  They hung up on
15   me.
16       Q   Cash Yes?
17       A   Yes.
18       Q   Okay.  So prior to this date you had
19   obtained the phone number from MoneyMutual, correct?
20       A   Yes.  Got the phone number here on the 3rd.
21       Q   You are referring now to Exhibit 60?
22       A   I am sorry.  Yes, Exhibit 60.
23       Q   Okay.  So my question is this:  You got this
24   on January 3rd.  Had you tried to contact Cash Yes
25   prior to this date?

1        A   I had.
2        Q   Okay.  So you got the phone numbers of Cash
3    Yes on this January 3rd email, Exhibit 60, true?
4        A   Well, it's here, but I also got it from
5    MoneyMutual before that.
6        Q   That's what I was asking you.
7            Did you get it from MoneyMutual prior to
8    January 3rd?
9        A   Yes.
10       Q   Okay.  And you tried to use the number you
11   got from MoneyMutual prior to January 3rd?
12       A   I did.
13       Q   Okay.  Okay.  Did you respond to this
14   January 3rd, 2013 email?
15       A   I believe so, because -- yes, I did.  I
16   think.  Once again, I can't be sure on the date --
17       Q   Okay.
18       A   -- before or after, but I know I did.
19   That's when I let them know my situation.
20           MR. PUTTERMAN:  Let's take a look -- let's
21   mark as Exhibit 61 Gilbert 028 and 029.
22           (Document referred to herein marked for
23           identification Exhibit No. 61.)
24           THE WITNESS:  Thank you.
25           (Witness reviews document.)

1    BY MR. PUTTERMAN:
2        Q   Okay.  And did you have this email exchange
3    with Cash Yes on January 8th, 2013?
4        A   Yes.
5        Q   Okay.  Do you remember it?
6        A   I do.
7        Q   I noticed in there they made an offer of a
8    settlement if you made a payment of $425 within the
9    next 60 business days.
10           Do you see that?
11       A   Yes.
12       Q   Was that settlement offer acceptable to you?
13       A   No.
14       Q   Why not?
15       A   Because they were illegal and they caused so
16   much grief.  I wasn't willing to play with them at that
17   time.
18       Q   You sent them the email that's at the top of
19   the first page of Exhibit 61, correct?
20       A   Yeah.
21       Q   And the court order that you are referring
22   to there was the 2010 desist and refrain order?
23       A   That is right.
24       Q   Okay.  That was the only court order of
25   which you were aware of at that time?

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 174

1    **A**   <u>Correct.</u>
2    <u>MR. WILENS: It wasn't a court order, but</u>
3 <u>yeah.</u>
4    <u>MR. PUTTERMAN: Well, not a court order. It</u>
5 <u>was an order of the Department of Corporations.</u>
6    <u>Q   Okay. By the time you sent this email, did</u>
7 <u>you know what Belize was?</u>
8    <u>A   By the time I sent this?</u>
9    <u>Q   Yeah.</u>
10    <u>A   I had -- I did then, yes.</u>
11    <u>Q   Okay. And they also gave you a P.O. box in</u>
12 <u>Belize on the email from them to you, correct?</u>
13    <u>A   Correct.</u>
14    <u>Q   Okay. So is it correct that this was</u>
15 <u>received after you had faxed your packet to Cash Yes?</u>
16    <u>A   This is in response to letting them know</u>
17 <u>that I was -- I had already filed a complaint or that</u>
18 <u>I was -- I think it was a Sunday, so it didn't go out</u>
19 <u>until Monday is how that worked. 8th and 9th.</u>
20    Q   The packet that was Exhibit -- well, it says
21 January 8th was a Tuesday.
22    A   Okay. So then it had to -- the 4th -- okay.
23 That's right.
24    Q   Your handwritten log on Exhibit 53 -- so
25 that you sent out everything on January 8th, which

---

Page 175

1 would have been a Tuesday. So --
2    A   So Monday I put it all together and then --
3    Q   Tuesday sent --
4    A   -- Tuesday sent it out.
5    Q   Since you had faxed it to Cash Yes, you got
6 this email from them in response; is that correct?
7    A   I might have even emailed it too.
8    Q   Okay. You don't remember?
9    A   I don't -- I was letting them know
10 everything at that point.
11    Q   Well, it says -- actually it says here on
12 Exhibit 53, quote, "Emailed all paperwork," close
13 quote.
14    A   Yeah. I also sent them copies of it too,
15 then.
16    Q   So this email on Exhibit 61 from Cash Yes to
17 the best of your recollection was from them in
18 response to what you sent them?
19    A   Correct.
20    Q   Exhibit 54?
21    A   Right.
22    MR. PUTTERMAN: Okay. Now, let's mark as
23 Exhibit 62 Gilbert 030.
24    (Document referred to herein marked for
25 identification Exhibit No. 62)

---

Page 176

1    THE WITNESS: Thank you.
2 BY MR. PUTTERMAN:
3    Q   Okay. Is this the email you were referring
4 to earlier from somebody named Kari at Cash Yes?
5    A   Yes.
6    Q   Where she says, quote, "I hope you are
7 feeling better," close quote?
8    A   Correct.
9    Q   Okay. And did you respond to this email?
10    A   Yeah. I responded with all the rest of
11 these emails right here. This says Tuesday,
12 January 8th, and this is the day here -- well --
13    Q   Well, on Exhibit 61, the email from Info
14 Cash Yes on January 8th was 1:31 p.m. However, I
15 don't know which time zone that was.
16    A   And I think I was -- maybe there were two
17 departments, because one is for Info Cash Yes, one is
18 for Recoveries at Cash Yes.
19    Q   Right. And Kari says on Exhibit 62, quote:
20 "I can only work on the past due payment
21 of $157.50. I do not have any control
22 of your Extension payments," period,
23 close quote.
24    So you got two different emails from Cash
25 Yes, from two different departments?

---

Page 177

1    A   Correct.
2    <u>Q   Okay. Let me ask you this: Did you also</u>
3 <u>complain at some point to the Department of</u>
4 <u>Corporations about Ameriloan?</u>
5    <u>A   Yes.</u>
6    <u>Q   What was your complaint about Ameriloan?</u>
7    <u>A   That they were harassing me and -- due to an</u>
8 <u>unfortunate situation I had no control over. They</u>
9 <u>were just being butt-heads about it. Being</u>
10 <u>butt-heads, which really --</u>
11    <u>Q   That's a term of art, right?</u>
12    <u>A   Yeah. Well, I could have said something</u>
13 <u>else, but I don't know if they have that on that</u>
14 <u>machine.</u>
15    Q   Yes, they do.
16    MR. WILENS: They have every word in the
17 English language.
18    THE WITNESS: Really.
19    MR. PUTTERMAN: Okay. Exhibit --
20    THE REPORTER: 63.
21    MR. PUTTERMAN: Is Gilbert 040.
22    (Document referred to herein marked for
23 identification Exhibit No. 63)
24    MR. WILENS: Exhibit 61?
25    THE REPORTER: 63.

---

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 178

1     **MR. PUTTERMAN:** What are you missing?
2     **MR. WILENS:** I didn't scroll down far
3  enough.
4  **BY MR. PUTTERMAN:**
5     Q   Okay. Was this another email that you
6  received from the Department of Corporations with a
7  case number assigned to your complaint about
8  Ameriloan?
9     A   Yes.
10    Q   Okay. And was the Ameriloan ever paid back,
11 the Ameriloan loan ever paid back?
12    A   **They squashed the loan.**
13    Q   Who do you mean? Ameriloan?
14    A   **Correct.**
15    Q   They canceled --
16    A   **Sent me a receipt saying it was paid in**
17 **full.**
18    Q   And that was the end of that?
19    A   **Correct.**
20    **MR. PUTTERMAN:** Next in order, Karen?
21    **THE REPORTER:** 64.
22    **MR. PUTTERMAN:** Exhibit 54 is Gilbert 055,
23 056.
24    **THE REPORTER:** That's 64.
25    **MR. PUTTERMAN:** 64.

---

Page 180

1  pertained to your Cash Yes loan, correct?
2     A   **Yes.**
3     Q   Okay. Was there to your knowledge any
4  response from Cash Yes to either you or the Department
5  of Corporations or Department of Business Oversight
6  following that February 2013 desist and refrain order?
7     A   **No. This was the next thing I heard.**
8     Q   Okay.
9     A   **Except from the Department of Corporations.**
10    Q   Did you communicate at all with the
11 Department of Corporations to find out whether they in
12 fact were going to be able to do anything about your
13 Cash Yes loan?
14    A   **No. The letter I got was saying that they**
15 **resolved it on their terms as far as with fines or**
16 **whatever.**
17    Q   Okay. But they didn't say that they had
18 accomplished anything specifically with regard to your
19 loan?
20    A   **Not necessarily, no. I don't think so.**
21    Q   Okay. And at this point you were leaving
22 Mr. Wilens to handle these matters, correct?
23    A   **Yes.**
24    Q   So you didn't continue to communicate with
25 Cash Yes?

---

Page 179

1     (Document referred to herein marked for
2      identification Exhibit No. 64)
3  **BY MR. PUTTERMAN:**
4     Q   Have you previously seen this document?
5     A   **Yes.**
6     Q   Can you tell us what it is?
7     A   **Bullshit. Sorry.**
8     Q   Well, leaving aside that characterization,
9  can you give us a more specific identification?
10    A   **Specifically saying that my loan has been**
11 **sold to another -- to First Novus.**
12    Q   This was -- the email was sent on
13 November 5th, 2013, correct?
14    A   **Correct.**
15    Q   It was just under a year after you first
16 took out the Cash Yes payday loan, correct?
17    A   **Yeah.**
18    Q   Okay. Now, as I understand it from your
19 prior testimony, and of course we haven't seen the
20 document yet, but you believe that the order that we
21 saw referenced in the Department of Business
22 Oversight's order that pertained specifically to the
23 loan of another customer indicated that in early
24 February a desist and refrain order had been issued
25 against Cash Yes, and your recollection is that

---

Page 181

1     A   **That's correct.**
2     Q   Okay. And did you communicate at all during
3  this period with MoneyMutual?
4     A   **No.**
5     Q   And you said that you determined that First
6  Novus had the same telephone number as Cash Yes?
7     A   **Yes.**
8     Q   And how did you determine that?
9     A   **Well, look at -- I mean it's right here. It**
10 **says contact was First Novus at that number, but then**
11 **at the bottom it's got the same number.**
12    Q   Okay. Did you try calling First Novus?
13    A   **No.**
14    Q   Okay. Now, for how long did you continue to
15 get telephone calls concerning the Cash Yes loan or
16 that -- identifying themselves as being in connection
17 with the First -- with the Cash Yes loan?
18    A   **The last thing I got was like an arrest**
19 **thing or something like that, and I think it was like**
20 **October of 2014, that had anything to do with Cash**
21 **Yes.**
22    Q   Now, do you know that the thing you got
23 about an arrest pertained to the Cash Yes loan?
24    A   **Do I -- what do you mean?**
25    Q   Here's my question: Were there other

---

The Souza Group
(800) 230-3376

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1 outstanding payday loans in the autumn of 2014 that
2 you hadn't paid?
3     A   Just the ones that we have been talking
4 about.
5     Q   But there was more than just the Cash Yes
6 loan?
7     A   Right.
8     Q   Okay.  Now, we will look at those in a
9 minute, those arrest statements or whatever they are.
10     Did they specifically refer to the Cash
11 loan?
12     A   That one did, yes.
13     MR. PUTTERMAN: Okay.  Then we will take a
14 look at that in a minute, but first I'd like to mark
15 as Exhibit --
16     Karen?
17     THE REPORTER: 65.
18     MR. PUTTERMAN: 65, Gilbert 058 through 062.
19     (Document referred to herein marked for
20     identification Exhibit No. 65)
21 BY MR. PUTTERMAN:
22     Q   Can you tell us what this is?
23     A   Yeah.  I got an email saying that I had been
24 reapproved for a loan.
25     Q   And this is it?

1     A   This is it.  When I clicked on it, it said,
2 "Welcome back."
3     Q   Now, did you actually fill in the
4 information here or was this filled in when you got
5 it?
6     A   It was filled in on, you know, form filler,
7 whatever they got.
8     Q   So did you then actually apply for a loan in
9 response to this?
10     A   No.  I just printed it up to give to my
11 attorney.
12     Q   Okay.  And do you remember when you actually
13 got this?
14     A   Somewhere in the middle of January.  This
15 has a date on it, so --
16     Q   Oh, I see.  Down at the bottom.
17     A   One twenty -- yeah.
18     Q   Is that when you printed it up,
19 January 28th, 2013?
20     A   Correct.
21     Q   Okay.  And did you get any additional emails
22 since that time from MoneyMutual?
23     A   No.
24     Q   So this is -- is this the only one you got
25 after you applied for and obtained the loan from Cash

1 Yes?
2     A   I'm sorry?
3     Q   Is this the only follow-up email you got
4 from MoneyMutual after you obtained the Cash Yes loan?
5     A   I am not sure.  I know that there was one
6 that they said, you know, you have been re-approved.
7 So I don't know if it's this one or another one,
8 but --
9     Q   This is the only one you copied and
10 retained?
11     A   This is -- that's it.
12     MR. PUTTERMAN: Okay.  Let's look at this
13 arrest warrant, and this is Gilbert 63 through 65 and
14 this will be Exhibit --
15     THE REPORTER: 66.
16     MR. PUTTERMAN: Not 56.  66.  Okay.
17     (Document referred to herein marked for
18     identification Exhibit No. 66)
19 BY MR. PUTTERMAN:
20     Q   When and how did you get this thing?
21     A   Came in an email.
22     Q   Okay.  I don't see any from or to.  Was
23 there a cover email with it?
24     A   I had to do it -- I think I had to -- yeah,
25 I don't know.  It was in an email, though.

1     Q   I'm thinking that this was an attachment to
2 an email.
3     A   Maybe that's what it was.
4     Q   Okay.  Now, how do you know that this had to
5 do with the Cash Yes loan?
6     A   I don't.
7     Q   Okay.
8     A   This is -- I was forwarding anything like
9 this to the attorney.
10     Q   You mean Mr. Wilens?
11     A   Correct.
12     Q   Okay.  So we don't know who originated this
13 thing?
14     A   Correct.
15     Q   Okay.
16     MR. WILENS: Signed by judge something.
17     MR. PUTTERMAN: Yeah.  Well, I have a hunch
18 you might have trouble locating that judge.
19     THE WITNESS: I like the Photoshop.  Pretty
20 crappy.
21 BY MR. PUTTERMAN:
22     Q   Now, take a look on page Gilbert 064.
23     A   Okay.
24     Q   You see that there is -- in a box there it
25 says cashadvancedept5@gmail.com?

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1    A   Yes.
2    Q   You don't have any idea what that's --
3    A   No.
4    Q   Okay.  Do you recall when you actually
5   received this thing?
6    A   I don't, but I still have a copy of it.  I
7   saved a copy of it.
8    Q   With the email?
9    A   Yeah.
10       MR. PUTTERMAN: Okay.  We need to have that
11   produced.
12       MR. WILENS: I think you got it.
13       MR. PUTTERMAN: You do?
14       MR. WILENS: Yes.
15       MR. PUTTERMAN: Okay.  And I think that what
16   Mr. Wilens is referring to is what we are going to
17   mark as Exhibit 67, which is pages Gilbert 066 and
18   067.
19       (Document referred to herein marked for
20        identification Exhibit No. 67)
21   BY MR. PUTTERMAN:
22    Q   I am going to assume, and I think I am
23   probably safe in assuming, that what's redacted out at
24   the top is the -- your forwarding email from you to
25   Mr. Wilens, correct?

1    A   I don't have a copy, but yeah.  I mean, it's
2   all blacked out.
3    Q   Right.  All right.  Is this the email to
4   which the arrest warrant was attached?
5    A   Could have been.
6    Q   Because I notice it also comes from
7   cashadvancedept5@gmail.com.
8       Do you see that?
9    A   Yes.
10    Q   Now, it's addressed to
11   selenaacarter13@gmail.com.
12       Do you know who that is?
13    A   I don't.
14    Q   But you received this email?
15    A   I did.
16    Q   Okay.  So, for example, this could have been
17   auto forwarded by another Gmail account.
18       But you definitely received it?
19    A   Yeah.
20    Q   Okay.  I am assuming your wife is not Selena
21   Carter.
22    A   No.
23    Q   She's Mrs. Gilbert.
24    A   Ms. Debra Gilbert.
25    Q   Now, this refers to, quote, the legal

1   proceedings issued on your docket number EVR-38924
2   with one of Cash Advance Inc. Company.
3       Now, to your knowledge, you never took --
4   obtained a loan from Cash Advance Inc. Company,
5   correct?
6    A   Correct.
7    Q   And this is dated May 22nd, 2015.
8       Okay.  I am going to ask you to go back to
9   Exhibit 50, which is that group of spreadsheets.
10   Yeah, there you go.
11    A   All right.
12    Q   And to page 14, which is the, I believe,
13   second page from the bottom.
14    A   Okay.
15    Q   And you may remember we looked at this.
16   This was that alleged loan agreement with -- or
17   alleged acquisition of a lead by Camel Coin, Inc.  As
18   Mr. Wilens pointed out, it actually was through the
19   website cashadvance.com, and this was back in -- on or
20   about September 29th, 2014.
21       Do you see that?
22    A   Yes.
23    Q   So is it correct that that's just a
24   coincidence that you went through the web -- or that
25   this shows that you as having allegedly applied for a

1   loan through a website titled cashadvance.com and that
2   this communication, Exhibit 67, which was accompanied
3   by the so-called arrest warrant, also referred to Cash
4   Advance Inc.?
5       MR. WILENS: I'm going to object.  That
6   calls for speculation as to what's a coincidence or
7   not.  Cash advance is a generic term.
8       MR. PUTTERMAN: Well, if you look further
9   down on Exhibit 67, you see where it says "Note."
10   That first page.
11       MR. WILENS: Note?
12       MR. PUTTERMAN: Note.  It's like the last
13   paragraph at the end of the first page.
14       MR. WILENS: Yeah.
15   BY MR. PUTTERMAN:
16    Q   And you see it refers to its parent company
17   and a group of companies called, quote, "Cash Advance
18   Related Companies," close quote.
19       Do you recognize any of the names included
20   in there?
21    A   In regards to -- no.  I mean --
22    Q   And there is actually a text number on the
23   last page and an address for Cash Advance Inc. in
24   Arlington, Virginia.
25       Do you see that?

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 190

```
1    A   Yes.
2        MR. WILENS: There is no Cash Advance Inc.
3    in Arlington, Virginia.
4        MR. PUTTERMAN: Thank you for testifying.
5    Did you check?
6        MR. WILENS: Well, you can't ask him.
7        MR. PUTTERMAN: No. Dude, I said see where
8    it says that. I didn't ask him if he knows.
9        MR. WILENS: If you bother to read the list,
10   you will see it contains competitors of each --
11       (Court reporter interrupts for clarity of
12       the record.)
13       MR. WILENS: If you bother to read the list,
14   you will see it contains competitors of each other,
15   like Speedy Cash and Cash America International.
16       MR. PUTTERMAN: Yeah, and? Your point is?
17   I am referring to what's in this email;
18   okay? I'm certainly not vouching for the authenticity
19   of any of this.
20       MR. WILENS: He can't either. You are
21   asking him if he knows --
22       MR. PUTTERMAN: No, but that's what I asked
23   him, did he recognize any of the names, and he said
24   no. There was not even a question pending.
25       MR. WILENS: There was one pending.
```

---

Page 191

```
1    BY MR. PUTTERMAN:
2        Q   Okay. Did you ever try to contact this
3    supposed Cash Advance Inc., either at their address in
4    Arlington, Virginia or on this text-only number?
5        A   I don't believe so.
6        Q   Did you just send this on to Mr. Wilens?
7        A   I did.
8        Q   Have you received anything further from this
9    email account, cashadvancedept5@gmail.com?
10       A   Not sure. I haven't looked, but I get them
11   all the time. I don't know if it's from that email,
12   but similar.
13       Q   Okay. Do you have any idea or knowledge
14   concerning from whom this alleged Cash Advance Inc.
15   company obtained your email?
16       A   I have no idea.
17       MR. PUTTERMAN: Okay. Exhibit 69 -- 68 is
18   Gilbert 68 and 69.
19       (Document referred to herein marked for
20       identification Exhibit No. 68)
21       (Witness reviews document.)
22   BY MR. PUTTERMAN:
23       Q   Do you recognize this email from Payday
24   Mobility dated October 24th, 2013?
25       A   No.
```

---

Page 192

```
1        Q   Okay. Did you in fact get it?
2        A   I might have. I just --
3        Q   Don't remember it?
4        A   -- sent it.
5        Q   On to Mr. Wilens?
6        A   Correct.
7        Q   Is Mr. Wilens the equivalent of your
8    circular file?
9        A   I don't know what the right answer is to
10   that. I know what my files are. Just giving him a
11   hard time.
12       Q   Which is exactly what I was doing, was
13   giving him a hard time.
14       MR. WILENS: There is more circular things
15   than a trashcan.
16       MR. PUTTERMAN: I don't think we want to go
17   there. Not on the record. Yeah.
18       Q   You had a payday loan at some point from
19   Payday Mobility?
20       A   Correct.
21       Q   What happened with regard to that?
22       A   Same type of thing. I -- by then I found
23   out that -- you know, what was really going on and the
24   way that all these lenders were being so like pushy
25   and making threats. I just quit paying everybody, I
```

---

Page 193

```
1    refused to, and I couldn't get a bank account anyway.
2    I clicked it, closed down Bank of America, and that
3    was it.
4        Q   What ultimately happened with the Payday
5    Mobility loan?
6        A   It just went away. I sent them the same
7    type of stuff and they just squashed it.
8        Q   They stopped bothering you about it?
9        A   I think so, yeah.
10       MR. PUTTERMAN: Okay. Exhibit 69 is Gilbert
11   07 -- 071 -- excuse me. 070, 071.
12       (Document referred to herein marked for
13       identification Exhibit No. 69)
14   BY MR. PUTTERMAN:
15       Q   This was your loan agreement with OPD
16   Solutions, Inc.?
17       A   Yes.
18       Q   Okay. And you also took this out sometime
19   around -- well, in late November 2012, correct?
20       A   Correct.
21       Q   Which is almost the exact same time, I think
22   within a day of your Cash Yes --
23       A   Correct.
24       Q   -- loan. Okay.
25       And did you repay this loan?
```

---

The Souza Group
(800) 230-3376

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1    A   No.

2    Q   Okay.  And why not?

3    A   The same reason.  I mean they were -- nobody

4  would get back to me or they were illegal at that

5  point.  I took this loan to pay Cash Yes.  That way

6  there would be money in the account and --

7    Q   But this was just a day after the Cash Yes

8  loan, correct?

9    A   Right.

10    Q   So you knew the Cash Yes loan would become

11  due before this loan was due?

12    A   Correct.

13    Q   And so you took this to have the OPD loan to

14  have money in the account to pay Cash Yes?

15    A   Correct.

16    Q   Did you use some or all of this OPD loan to

17  pay Cash Yes?

18    A   I believe they are the ones that got it and

19  some NSF fees.  I can't remember that.  There was five

20  or six days I wasn't --

21    Q   In a coma?

22    A   Yeah.  I was out of it, so -- but my wife

23  was dealing with a lot.

24        MR. PUTTERMAN: Okay.  Gilbert 072 will be

25  Exhibit 70.

1        (Document referred to herein marked for

2        identification Exhibit No. 70)

3  BY MR. PUTTERMAN:

4    Q   Did you receive this email on or about

5  January 28th, 2013?

6    A   Yeah.

7    Q   Okay.  And that was because, as you

8  understood it at least, you hadn't paid this loan?

9    A   Correct.

10    Q   Did you complain to the Department of

11  Corporations about either Payday Mobility or OPD?

12    A   Yes.

13    Q   And what happened as a result of those

14  complaints?

15    A   Some couldn't be located or verified as far

16  as certain documents or whatever they needed and then

17  other ones were -- and my response to them.  They

18  were -- they dismissed it or sent me a thing saying it

19  was paid, or it went on my credit report that it was

20  disputed and then it was taken off.

21    Q   Did you get any more or did the department

22  issue any more desist and refrain letters related to

23  any of your loans?

24    A   No.  It was just the Cash Yes one.

25    Q   Did you make any complaints concerning any

1  of these loans or lenders to MoneyMutual?

2    A   No.

3    Q   Okay.  And in fact you hadn't obtained

4  either the Payday Mobility loan or the OPD loan

5  through MoneyMutual, correct?

6    A   I'm sorry?  No, I didn't.

7    Q   And you knew MoneyMutual was not a lender

8  itself, true?

9    A   Correct.

10    Q   Did -- to your knowledge, did MoneyMutual --

11  once Cash Yes got in touch with you and sent you a

12  loan agreement over the Internet and so on, do you

13  know if MoneyMutual was copied on that?

14    A   Copied?

15    Q   In other words, when they emailed you

16  something, did they show a cc line to MoneyMutual?

17    A   I don't know.

18        MR. PUTTERMAN: Okay.  Exhibit 71 is Gilbert

19  073 through 075.

20        (Document referred to herein marked for

21        identification Exhibit No. 71)

22        (Witness reviews document.)

23  BY MR. PUTTERMAN:

24    Q   Did you receive this letter on or about

25  January 18th, 2013 from National Credit Adjusters?

1    A   Yes.

2    Q   Did you review it at the time?

3    A   Vaguely.

4    Q   Okay.  And this refers to the OPD loan,

5  correct?

6    A   Correct.

7    Q   Okay.  Now, was there anything to which you

8  objected which you know was done by National Credit

9  Adjusters?

10    A   What do you mean?

11    Q   In other words, you know you've complained

12  about harassing phone calls and things like that

13  related to some of the loans.

14    A   Correct.

15    Q   Okay.  Did you receive harassing phone calls

16  from National Credit Adjusters?

17    A   I don't -- I don't think so.  I don't

18  recall.

19    Q   Okay.

20    A   I don't think so.

21    Q   In fact, you see on the last page they

22  actually included a scam alert.

23        Do you see that?

24    A   Yeah.

25    Q   Did you read that?

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

**Page 198**

1    A   Yes.
2    Q   Okay.  So did anybody try to call you with a
3 Middle Eastern and/or Indian accent at any point to
4 try and claim that you owed money on a loan?
5    A   Maybe a couple times.
6        I do remember something specific about the
7 OPD and all these other ones is that they were an
8 Indian tribe, so that's why the Department of
9 Corporations couldn't pursue further at that point.
10   Q   Okay.  So that refreshed your recollection
11 in that regard?
12   A   Correct.  Kansas is what did it.
13       MR. WILENS: That's just his recollection,
14 for what it's worth.
15       MR. PUTTERMAN: Yeah.
16   Q   You recall being informed by the Department
17 of Corporations, as to at least some loans, that the
18 loans -- that the lenders were affiliated with Indian
19 tribes and so the Department of Corporations did not
20 have jurisdiction?
21   A   They were were actively pursuing it, but
22 there was nothing they could do at this time.
23   Q   Right at that time?
24   A   But Cash Yes and the other ones are the ones
25 that they could help me out with.

---

**Page 199**

1        MR. PUTTERMAN: Exhibit 72 is Gilbert 76 and
2 77.
3        (Document referred to herein marked for
4        identification Exhibit No. 72)
5        (Witness reviews document.)
6 BY MR. PUTTERMAN:
7    Q   Okay.  Do you recognize these two pages?
8    A   Yes.
9    Q   These concerned your loan with SGQ
10 Processing, correct?
11   A   Correct.
12   Q   And you took this out on or about
13 December 13th, 2012, correct?
14   A   Correct.
15   Q   What was your purpose in taking out this
16 loan?
17   A   I think we -- I don't recall, but something
18 was going on evidently.
19   Q   Okay.  This loan was for $250, correct?
20   A   Correct.
21   Q   And this loan was not paid in full either,
22 correct?
23   A   I'm not sure.  I don't think so.  I think a
24 payment was made to them, though.
25   Q   Okay.  But it was not paid in full because

---

**Page 200**

1 at that point -- at some point thereafter you stopped
2 paying all of these loans?
3    A   I know there were a couple that I paid off.
4    Q   Okay.  You are just not sure?
5    A   I am not sure which ones right off the top
6 of my head.
7        MR. PUTTERMAN: Okay.  Exhibit 73 is Gilbert
8 078, 079.
9        (Document referred to herein marked for
10       identification Exhibit No. 73)
11       (Witness reviews document.)
12 BY MR. PUTTERMAN:
13   Q   Okay.  Do these refresh your recollection
14 that the loan from SGQ Processing was also sent for
15 collection?
16   A   Yes.
17   Q   It went to this National Credit Adjusters?
18   A   Yes.
19   Q   Okay.  And you will note that it says on the
20 first line of the second page, quote:
21       "This letter is to inform you that
22       National Credit Adjusters, LLC (NCA) has
23       purchased the above referenced account;
24       we are not collecting for SGQ
25       Processing," period, close quote.

---

**Page 201**

1        Did you see that when you read the letter?
2    A   Yes.
3    Q   Okay.  Did you understand what that meant?
4    A   Yes.
5    Q   That they were acting on their own?
6        (Court reporter interrupts for clarity of
7        the record.)
8        MR. WILENS: Assuming that they even exist
9 as their own.
10       MR. PUTTERMAN: Yes.
11       MR. WILENS: Go ahead and answer the
12 question.
13       THE WITNESS: Yeah.  I mean I did -- sure.
14 BY MR. PUTTERMAN:
15   Q   Okay.  If you look back on Exhibit 71,
16 National Credit Adjusters made the same statement with
17 regard to the OPD Solutions loan.
18       Do you see that?
19   A   Yes.
20   Q   Okay.  Now, neither of these loans were
21 obtained through MoneyMutual, correct?
22   A   No.
23   Q   No, I am not correct or --
24   A   No, they weren't through MoneyMutual.
25       MR. PUTTERMAN: Exhibit 74 is Gilbert 080.

---

The Souza Group
(800) 230-3376

| Page 202 | Page 204 |
|---|---|
| 1    (Document referred to herein marked for<br>2    identification Exhibit No. 74)<br>3  BY MR. PUTTERMAN:<br>4    Q   Did you receive a loan from United Cash<br>5  Loans?<br>6    A   I didn't, no.<br>7    Q   Okay.  You applied for one?<br>8    A   No.  This is to somebody else.<br>9    Q   Oh, yes.  Charles Cali?<br>10   A   That was a co-worker of mine.<br>11   Q   How did you get this?<br>12   A   He was being harassed himself --<br>13   Q   Uh-huh.<br>14   A   -- and so I told him what was going on at<br>15  the time --<br>16   Q   Uh-huh.<br>17   A   -- and so he went that route with it.  So I<br>18  forwarded it to Mr. Wilens.<br>19   Q   Okay.  So you don't know anything specific<br>20  about what happened with regard to Mr. Cali?<br>21   A   No.  I just --<br>22       MR. PUTTERMAN: And Gilbert 81 is<br>23  Exhibit 75.<br>24       (Document referred to herein marked for<br>25       identification Exhibit No. 75) | 1  Enterprises.  Do you see that on the first page?<br>2    A   Yeah.<br>3    Q   So these were all related to an Indian<br>4  tribe, correct?<br>5    A   Yeah.<br>6    Q   Okay.  You can lay that aside.<br>7       Now, when you -- after you spoke to<br>8  MoneyMutual and you were told to submit your<br>9  information through the MoneyMutual website, you went<br>10  to the MoneyMutual website, correct?<br>11   A   Correct.<br>12   Q   Okay.  And did you go right to the page<br>13  which included the -- on which you could enter your<br>14  information or did you read through the website?<br>15   A   I looked at the first page.  I can't<br>16  remember if it was on the same page or not.<br>17   Q   Okay.  You looked at the first page of the<br>18  website?<br>19   A   Correct.<br>20   Q   What do you remember from that?<br>21   A   Montel, you know, standing there just like<br>22  he was in the commercial.  The OLA on the bottom.<br>23   Q   The OLA emblem?<br>24   A   Correct.  And then some other ones or<br>25  whatever.  And then I think it was a thing about |

| Page 203 | Page 205 |
|---|---|
| 1  BY MR. PUTTERMAN:<br>2    Q   This was actually something that Mr. Cali<br>3  received from MoneyMutual, correct?<br>4    A   I guess, yeah.<br>5    Q   Not you?<br>6    A   No.<br>7    Q   Did he pass this on to you?<br>8    A   Yeah.  He wanted me to give it to the<br>9  attorney.<br>10   Q   Okay.  And you did that?<br>11   A   Yes.<br>12       MR. PUTTERMAN: Okay.  Exhibit 76 is Gilbert<br>13  082 through 086.<br>14       (Document referred to herein marked for<br>15       identification Exhibit No. 76)<br>16  BY MR. PUTTERMAN:<br>17   Q   Can you tell us what this is?<br>18   A   These are all of the -- the lenders that<br>19  were -- had been found out to be illegal at this time.<br>20  That was for Charles.<br>21   Q   Okay.  And these were all affiliated with<br>22  MTE Financial Services?<br>23   A   I guess that's what it says.  This was just<br>24  for --<br>25   Q   And you notice it refers to Miami Nation | 1  predatory, something like that.  They obey U.S. laws,<br>2  whatever, for collection purposes.  I don't have to<br>3  worry about Guido-type thing.<br>4    Q   That's going to become a term of art in this<br>5  case after your deposition.  We can maybe turn it into<br>6  a verb like being Guidoed.<br>7    A   Yeah.<br>8       MR. WILENS: There is already a name.  It's<br>9  called loansharking.<br>10       THE WITNESS: Pretty much.  I just didn't<br>11  want anything to pass around my family and my job in<br>12  this.  That's exactly what happened.<br>13  BY MR. PUTTERMAN:<br>14   Q   And did you ever call MoneyMutual to<br>15  complain that -- about the collection practices that<br>16  were apparently being engaged in by Cash Yes or any<br>17  other lender?<br>18   A   Well, the same conversation that I had with<br>19  them about trying to find out the phone number.  They<br>20  were so short with me about everything.  They wouldn't<br>21  give me any kind of information.  Until I got snotty<br>22  with them, that that's when they finally gave me the<br>23  phone number and that was it.<br>24       So I never pursued MoneyMutual anymore<br>25  because they straight told me that they were the |

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1  middleman, that they didn't make the loan. They just
2  referred it.
3     Q   Did you specifically ask them during that
4  call, is there a procedure for me to make a complaint?
5     A   No.
6     Q   Do you remember anything else about the
7  website, the first page of the website, when you
8  looked at it?
9     A   Just the part that stuck out that -- you
10 know, about the lending laws, that they followed all
11 and that their network of lenders were -- you know,
12 that they gave them an extensive application process
13 and that they could revoke, suspend at any time. So
14 that made me feel comfortable.
15    Q   Did you --
16    A   So they could be held accountable if
17 something was to go wrong.
18    Q   Okay. Did you read beyond the first page of
19 the website?
20    A   I don't know. Maybe. I mean probably. I
21 started filling my information. I think it was all in
22 one, big old page. Just scroll down.
23    Q   Anything else at all you remember from the
24 website? Anything.
25    A   Well, just Montel said you can trust me, you

1  know. I've -- I know all about -- you can trust our
2  network of lenders, I vouch for them. Basically, I
3  have been dealing -- we, us, that type of thing. Just
4  like what's been going on. I mean, there was just one
5  on the other night. So I am -- that's why I went for
6  it.
7     Q   Now, the only loan that you ever got through
8  MoneyMutual, the MoneyMutual website, was the Cash Yes
9  loan, correct?
10    A   Correct.
11    Q   And the other ones you got were all from
12 other websites, correct?
13    A   Correct.
14    Q   And none of them featured Montel Williams?
15    A   No, not that I know of.
16    Q   None of them were an exact duplicate or
17 anything like that of the MoneyMutual website?
18    A   No.
19    Q   Okay. And you remember that it referred to
20 following the laws and regulations with regard to
21 collections and so on?
22    A   Correct.
23    Q   Okay.
24    A   Strict screening process.
25        MR. PUTTERMAN: All right. I don't have

1  anything further for this witness at this time.
2              EXAMINATION
3  BY MR. WILENS:
4     Q   I do. Mr. Gilbert, if you had known that
5  Cash Yes was a criminal and illegal lender, would you
6  have used MoneyMutual to take out a loan with them?
7     A   No.
8         MR. PUTTERMAN: Objection. You have to
9  pause for a minute, allow --
10        THE WITNESS: Sorry.
11        MR. PUTTERMAN: -- allow me to make my
12 objection.
13        Objection. Argumentative. Leading. Lacks
14 foundation.
15        MR. WILENS: You got the answer?
16        Thank you. No further questions.
17        MR. PUTTERMAN: Okay. Now, we're just
18 adjourning the deposition for now because we are
19 pending a further production of documents which we
20 know will include the handwritten letter complaining
21 to the Department of Corporations which will include
22 the February 2013 order from the Department of
23 Corporations and may include other documents as well.
24        I am going to ask you, Mr. Gilbert, through
25 your counsel here that you and your counsel make a

1  thorough search of the records you have and produce
2  all additional records that are responsive to the
3  deposition notice duces tecum, and we will then have
4  to reschedule your deposition for sometime later this
5  month.
6         Are you going to be around generally in
7  December?
8         MR. WILENS: Could I say something first?
9         MR. PUTTERMAN: Yes.
10        MR. WILENS: Thank you.
11        Number one, I don't agree to reschedule his
12 deposition.
13        Number two, we haven't agreed to produce
14 anything. We said we'd look for the documents which
15 he thinks exist but may or may not exist, and we will
16 send them to you. You can decide what you want to do
17 with them at that -- at this time. There is no
18 possibility of another deposition this month. My
19 schedule does not permit it. And I don't see why you
20 would need it. It's not relevant to anything that's
21 urgent right now.
22        MR. PUTTERMAN: That depends on what's
23 produced. Right now we have pretty clear
24 noncompliance, and I don't know whether that's because
25 Mr. Gilbert failed to provide something to you or he

EXHIBIT E

1   DONALD J. PUTTERMAN (BAR NO. 90822)
    MICHELLE L. LANDRY (BAR NO. 190080)
2   PUTTERMAN LOGAN LLP
    One Maritime Plaza
3   300 Clay Street, Suite 1925
    San Francisco, CA 94111
4   Tel:     (415) 839-8779
    Fax:    (415) 376-0956
5   E-mail:   dputterman@plglawyers.com
              mlandry@plglawyers.com
6
    Attorneys for Defendants
7   MoneyMutual, LLC, Selling Source, LLC, Montel Brian Anthony
    Williams, Glenn McKay, PartnerWeekly, LLC, John Hashman,
8   Brian Rauch, Samuel W. Humphreys, Douglas Tulley, and
    Alton F. Irby III
9

10

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13                  (OAKLAND DIVISION)

14  SEAN L. GILBERT, KEEYA MALONE,          Case No. 4:13-cv-01171-JSW
    KIMBERLY BILBREW, CHARMAINE B.
15  AQUINO, on behalf of themselves and all  *[AMENDED]* NOTICE OF DEPOSITION
    persons similarly situated,              DUCES TECUM OF PLAINTIFF,
16                                           KEEYA MALONE
                Plaintiffs,
17                                           Date:    November 23, 2015
          v.                                 Time:    10:00 a.m.
18                                           Place:   Sidley Austin LLP
    BANK OF AMERICA, N.A., et al.,                    555 West Fifth Street
19                                                    Los Angeles. CA 90013
                Defendants.
20                                           Judge:   The Hon. Jeffrey S. White

21                                           Action Filed:   February 11, 2013
                                             Trial Date:     Not Set
22

23

24

25

26

27

28
                                                     CASE NO. 4:13-cv-01171-JSW

> DEFTS' Exhibit 1 for ID
> Witness: MALONE
> P. 1 of 10 PP. 11-23-15
> Lindsay Pinkham CSR 3716 CRR

1       PLEASE TAKE NOTICE that pursuant to Federal Rules of Civil Procedure, Rule 30 *et seq.*,

2   Defendant MONEYMUTUAL, LLC will take the deposition of Plaintiff KEEYA MALONE.  The

3   deposition will take place at Sidley Austin LLP, 555 West Fifth Street, Los Angeles, CA 90013,

4   commencing at 10:00 a.m., on November 23, 2015, unless the parties mutually agree to hold the

5   deposition on a different date or time and/or at a different location.

6       This deposition will be taken by stenographic and video means before an officer authorized to

7   administer oaths and will continue from day to day until completed.  The deposition will be taken for

8   purposes of discovery, for use at trial in this matter, and for any other purposes permitted under the

9   Federal Rules of Civil Procedure.

10      PLEASE TAKE FUTHER NOTICE that pursuant to Federal Rules of Civil Procedure,

11  Rules 30 and 34 *et seq.*, deponent is to produce the documents identified in **Attachment A** attached

12  to this Notice.

13

14  Dated: October 22, 2015                  PUTTERMAN LOGAN LLP

15

16

17

18                    By

                            Donald J. Putterman

19                    Attorneys For Defendants

20                    MoneyMutual, LLC, Selling Source, LLC,
                  Montel Brian Anthony Williams, Glenn McKay,

21                    PartnerWeekly, LLC, John Hashman, Brian Rauch,
                  Samuel W. Humphreys, Douglas Tulley,

22                    and Alton F. Irby III

23

24

25

26

27

28

## ATTACHMENT A

### DEFINITIONS

DOCUMENT, singular or plural, shall mean and refer to any "writing" as broadly defined in Cal. Evidence Code section 250, whether existing on paper or in electronic format.

PERSON, singular or plural, shall mean and refer to a natural person, firm, association, organization, partnership, business trust, corporation, limited liability company, limited liability partnership, public entity and any other form of organizing two or more PERSONS or entities in order to conduct business or other activities, whether domestic or foreign.

ALL shall mean and include ANY, and vice versa.

CONCERNING shall mean and include, without limitation, to refer to, relate to, constitute, comprise, mention and/or describe.

YOU, YOUR and YOURSELF shall mean and refer to Plaintiff Sean L. Gilbert (and any other name used at any time by Sean L. Gilbert), including all present and former agents, representatives, employees, servants, attorneys, insurance companies and all other PERSONS (as defined above) acting or purporting to act on behalf of Plaintiff Sean L. Gilbert.

The term COMPLAINT shall mean and refer to the Fourth Amended Complaint filed in the United States District Court for the Northern District of California as Case No. CV-13-01171-JSW by Sean L. Gilbert, Keeya Malone, Kimberly Bilbrew and Charmaine B. Aquino, on behalf of themselves and all persons similarly situated.

COMMUNICATIONS shall mean and refer to ALL means of conveying information, including written, oral, electronic and visual.

PAYDAY LOAN, singular or plural, shall mean and refer to the category of loans described in Paragraphs 33-36 of the COMPLAINT.

PAYDAY LENDER, singular or plural, shall mean and refer to ANY PERSON who YOU understood or understand to be engaged in the business of making PAYDAY LOANS.

AND shall mean and include OR, and vice versa.

MONEYMUTUAL DEFENDANTS shall mean and refer to Defendants MoneyMutual, LLC, Selling Source, LLC, PartnerWeekly, LLC, Glenn McKay, Brian Rauch, John Hashman, Samuel W.

1  Humphreys, Douglas Tulley and Alton Irby III.

2      WILLIAMS shall mean and refer to Defendant Montel Williams.

3  ### INSTRUCTIONS

4      1.    If any document request is deemed to call for disclosure of proprietary or confidential

5  information, Plaintiff's counsel are prepared to receive such data pursuant to the local rules or an

6  appropriate protective order with respect to confidentiality.

7      2.    If any information requested herein is withheld on the basis of a claim of privilege or

8  subject to protection as material prepared in anticipation of litigation or trial then that claim shall be

9  made expressly in writing, and such writing shall describe the nature of the documents,

10 communications, or things not produced or disclosed in a manner that will enable Plaintiff to assess

11 the applicability of the privilege or protection.  With regard to each claim of privilege or protection,

12 the following information shall be provided in the response or the objection:

13      a.   the type of document, e.g., letter or memorandum;

14      b.   general subject matter of the document;

15      c.   the date of the document;

16      d.   the nature and basis of the privilege claimed; and

17      e.   such other information as is sufficient to identify the document, including, where

18          appropriate, the author, addressee, and any other recipient of the document, and, where

19          not apparent, the relationship of the author, addressee, and any other recipient to each

20          other.

21      3.    If documents have been lost or destroyed, the documents so lost or destroyed shall be

22 identified by author, date, subject matter, date of loss or destruction, identity of the person

23 responsible for such loss or destruction and, if destroyed, the reason for such destruction.

24      4.    Pursuant to Federal Rules of Civil Procedure, Rule 34 *et seq.*, production of all

25 responsive documents or things shall be as they are kept in the usual course of business or said

26 documents or things shall be organized and labeled to correspond with the categories in the following

27 document requests.

28 ///

5.      Defendant is required to produce the original and each non-identical copy of each document or other tangible thing requested herein which is in its possession, custody or control, or that of any of its agents, attorneys, accountants, employees or representatives. If the original is not in Defendant's possession, custody or control, or that of its agents, attorneys, accountants, employees or representatives, the most full, clear legible copy thereof is to be produced.

6.      If a request is silent as to the time period for which production of documents or other things is sought, production shall be made of all documents originated in whole or in part and of all things within Defendant's possession, custody or control at any time through the date of production.

7.      To the extent Defendant alleges that the meaning of any term in these requests for production is unclear, then Defendant is to assume a reasonable meaning, state that assumed reasonable meaning, and respond to the request on the basis of that assumed meaning.

8.      Electronically stored information shall be produced in single page TIFF images with corresponding load files that include the following fields: "BegProd," "EndProd," "Pages" and "Volume," "Custodian," "Author," "Recipients" and "Date." The documents should be logically unitized (i.e., contain correct document breaks, for instance, a five-page fax consisting of a cover page and a four-page memo should be unitized as a five-page document). The production shall include optical character recognition information. In the case of responsive spreadsheets, or other responsive ESI for which the above format is not practicable, production should be in native form with unique identifying numbers associated with the native documents.

## REQUESTS FOR PRODUCTION

**REQUEST NO. 1:**

ALL COMMUNICATIONS from YOU to ANY of the MONEYMUTUAL DEFENDANTS.

**REQUEST NO. 2:**

ALL COMMUNICATIONS from ANY of the MONEYMUTUAL DEFENDANTS to YOU.

**REQUEST NO. 3:**

ALL DOCUMENTS CONCERNING ANY PAYDAY LOANS obtained by YOU as alleged in Paragraph 51 of the COMPLAINT.

///

ATTACHMENT A TO [*AMENDED*] NOTICE OF DEPOSITION DUCES TECUM OF PLAINTIFF, MALONE

**REQUEST NO. 4:**

ALL DOCUMENTS CONCERNING ALL payments made by YOU CONCERNING ANY PAYDAY LOANS obtained by YOU as alleged in Paragraph 53 of the COMPLAINT.

**REQUEST NO. 5:**

ALL DOCUMENTS CONCERNING ANY "spam emails" received by YOU from ANY of the MONEYMUTUAL DEFENDANTS, as referenced in Paragraph 59 of the COMPLAINT.

**REQUEST NO. 6:**

ALL DOCUMENTS CONCERNING YOUR allegations in Paragraph 58 of the COMPLAINT that "all of the Defendants" assisted one or more payday lenders (deferred deposit originators) in the origination of payday loans * * *."

**REQUEST NO. 7:**

ALL DOCUMENTS CONCERNING YOUR allegations in Paragraph 60 of the COMPLAINT that Defendants Glenn McKay, Samuel W. Humphreys, Douglas Tulley and Alton F. Irby III, collectively "directly ordered, authorized and participated in the tortious conduct described below including the decision to promote and facilitate payday loans by unlicensed lenders in California."

**REQUEST NO. 8:**

ALL DOCUMENTS CONCERNING YOUR allegations in Paragraph 61 of the COMPLAINT that Defendants Glenn McKay, Samuel W. Humphreys, Douglas Tulley and Alton F. Irby III, collectively "developed the plan of creating the MoneyMutual website described below and hiring celebrity Montel Williams to promote the website as a source of loans by unlicensed lenders."

**REQUEST NO. 9:**

ALL DOCUMENTS CONCERNING YOUR allegations in Paragraph 61 of the COMPLAINT that Defendants Glenn McKay, Samuel W. Humphreys, Douglas Tulley, Alton F. Irby III and WILLIAMS collectively "were responsible for developing the content of the MoneyMutual website and sites like it on the Internet, and the testimonials provided by Mr. Williams."

///

///

**REQUEST NO. 10:**

ALL DOCUMENTS CONCERNING YOUR allegations in Paragraph 61 of the COMPLAINT that Defendants Glenn McKay, Samuel W. Humphreys, Douglas Tulley, Alton F. Irby III and WILLIAMS "knew it was illegal for these lenders to make loans to California residents but intentionally promoted the lenders regardless."

**REQUEST NO. 11:**

ALL DOCUMENTS CONCERNING YOUR allegations in Paragraph 100 of the COMPLAINT that each of the MoneyMutual Defendants and WILLIAMS "generated much of their revenue by selling payday loan leads through the MoneyMutual website (www.moneymutual.com), which was widely advertised on television, radio and the Internet."

**REQUEST NO. 12:**

ALL DOCUMENTS CONCERNING YOUR allegations in Paragraph 103 of the COMPLAINT that "the lenders retained by Plaintiffs and the Class Members" "routinely violated" the MoneyMutual Code of Lender Conduct because the "Lenders routinely sold or gave the information to other entities so they could "spam" the borrowers in an attempt to sell more loans to them in the future."

**REQUEST NO. 13:**

ALL DOCUMENTS CONCERNING YOUR allegations in Paragraph 103 of the COMPLAINT that "[t]he Lenders also sold Plaintiffs' and Class Members' personal information (including social security numbers) to criminal operations often based in other countries. Those criminals would then make threatening phone calls to Plaintiffs' and Class Members' claiming they represented law enforcement agencies and they were going to arrest these borrowers unless the borrowers paid money they supposedly owed."

**REQUEST NO. 14:**

ALL DOCUMENTS CONCERNING YOUR allegations in Paragraph 104 of the COMPLAINT that "lenders harassed borrowers including Plaintiffs and Class Members who fell behind in their payments."

**REQUEST NO. 15:**

ALL DOCUMENTS CONCERNING YOUR allegations in Paragraph 104 of the COMPLAINT that "all of the lenders tried to collect money from Plaintiffs and the Class Members even though the debts were unlawful (void) * * * either by debiting it from Plaintiffs' and Class Members' bank accounts or by making written or oral demands for payment. In these demands, the lenders falsely stated that Plaintiffs and Class Members were legally obligated to pay the money."

**REQUEST NO. 16:**

ALL DOCUMENTS CONCERNING YOUR allegations in Paragraph 106 of the COMPLAINT that "[i]n reality, the MoneyMutual Defendants did not monitor the lenders for compliance. To the contrary, they were aware the lenders did not comply with the Code of Lender Conduct, but took no action to suspend or terminate their membership in the lending network."

**REQUEST NO. 17:**

ALL DOCUMENTS CONCERNING YOUR allegations in Paragraph 112 of the COMPLAINT that WILLIAMS "repeatedly personally vouched for the integrity of the MoneyMutual lending network and repeatedly stated or implied that he was personally part of MoneyMutual."

**REQUEST NO. 18:**

ALL DOCUMENTS CONCERNING YOUR allegations in Paragraph 115 of the COMPLAINT that each of the MONEYMUTUAL DEFENDANTS and WILLIAMS "decided which lenders would be added to the MoneyMutual Lending Network."

**REQUEST NO. 19:**

ALL DOCUMENTS CONCERNING YOUR allegations in Paragraph 115 of the COMPLAINT that each of the MONEYMUTUAL DEFENDANTS and WILLIAMS "knew that since those UNLICENSED LENDERS could not legally make any payday loans, they could not legally collect payments on the loans."

**REQUEST NO. 20:**

ALL DOCUMENTS CONCERNING YOUR allegations in Paragraph 115 of the COMPLAINT that each of the MONEYMUTUAL DEFENDANTS and WILLIAMS "knew that the lenders were violating the MoneyMutual website Lender's Code of Conduct by not being licensed

1  and collecting and trying to collect payments on these illegal loans [but] [n]evertheless * * *

2  permitted these lenders to join and to continue to participate in the Lending Network during the Class

3  Period and represented that they were legally authorized to make the loans and to collect payment."

4  **REQUEST NO. 21:**

5  　　　ALL DOCUMENTS CONCERNING YOUR allegations in Paragraph 116 of the

6  COMPLAINT that each of the MONEYMUTUAL DEFENDANTS and WILLIAMS "knew of these

7  various State law enforcement actions but continued to recommend these lenders to consumers and to

8  represent that they were in compliance with all applicable laws."

9  **REQUEST NO. 22:**

10  　　　ALL DOCUMENTS CONCERNING ALL amounts which YOU contend the

11  MONEYMUTUAL DEFENDANTS and WILLIAMS should be ordered "to make restitution and

12  disgorge."

13  **REQUEST NO. 23:**

14  　　　ALL DOCUMENTS CONCERNING the "monetary loss (hundreds of dollars)" which YOU

15  allege in Paragraph 154 were sustained by the Plaintiffs.

16  **REQUEST NO. 24:**

17  　　　ALL DOCUMENTS CONCERNING ANY complaint made by YOU at ANY time to ANY

18  of the MONEYMUTUAL DEFENDANTS OR WILLIAMS, CONCERNING ANY PAYDAY

19  LOAN OR PAYDAY LENDER.

20  **REQUEST NO. 25:**

21  　　　One copy of ANY engagement letter, agreement OR contract between YOU and YOUR

22  present counsel in this case, with the substantive contents of the letter, agreement or contract redacted

23  so that the remainder is sufficient only to determine the date of the letter, agreement OR contract.

24

25

26

27

28

1

2

<u>**CERTIFICATE OF SERVICE**</u>

3       I am over the age of eighteen and not a party to this action; I am employed by PUTTERMAN

4   LOGAN LLP. My business address is One Maritime Plaza, 300 Clay Street, Suite 1925, San

5   Francisco, California 94111.

6       On **October 22, 2015**, I served the foregoing document(s) described as:

7

8

**[*AMENDED*] NOTICE OF DEPOSITION DUCES TECUM
OF PLAINTIFF, KEEYA MALONE**

on the interested party(ies) below, using the following means:

9

10       ☒    ELECTRONIC TRANSMISSION based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses on the attached service

11   list on the dates and at the times stated thereon. I did not receive, within a reasonable time after the transmission, any electronic message or other indication

12   that the transmission was unsuccessful. The electronic notification address of the person making the service is

13

14       ☐    UNITED STATES MAIL by placing a true copy of the document(s) listed above for collection and mailing following the firm's ordinary business practice in a

15   sealed envelope with postage thereon fully prepaid for deposit in the United States mail at San Francisco, California addressed as set forth below.

16

17       ☐    OVERNIGHT DELIVERY by depositing a true copy of the same enclosed in a sealed envelope, with delivery fees provided for, in an overnight delivery service

18   pick up box or office designated for overnight delivery, and addressed as set forth below.

19

20       ☐    MESSENGER SERVICE by causing to be personally delivered a copy of the document(s) listed above to the person(s) at the address(es) set forth below.

21

22   Jeffrey Neil Wilens                ***Attorneys for Plaintiffs***
    Lakeshore Law Center           **SEAN L. GILBERT, KEEYA MALONE,**

23   18340 Yorba Linda Blvd., Suite 107-610    **KIMBERLY BILBREW,**
    Yorba Linda, CA 92886            **CHARMAINE B. AQUINO**

24   Tel: (714) 854-7205
    Fax: (714) 854-7206

25           jeff@lakeshorelaw.org
    Jeffrey P. Spencer

26   The Spencer Law Firm
    903 Calle Amanecer, Suite 220

27   San Clemente, CA 92673
    Tel: (949) 240-8595

28   Fax: (949) 240-8515
        jps@spencerlaw.net