# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

(OAKLAND DIVISION)

| | |
|---|---|
| SEAN L. GILBERT, KEEYA MALONE, KIMBERLY BILBREW, CHARMAINE B. AQUINO, on behalf of themselves and all persons similarly situated,<br><br>          Plaintiffs,<br><br>          v.<br><br>BANK OF AMERICA, N.A., et al.,<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   No. 4:13-cv-01171-JSW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Videotaped Deposition of

KEEYA MALONE

Monday, November 23, 2015

THE SOUZA GROUP

Certified Shorthand Reporters

4615 First Street, Suite 200

Pleasanton, California 94566

Reported by:

LINDSAY PINKHAM, CCRR, CSR

LICENSE NO. 3716

---

**Page 10**

1   asked and were responding to it.  Is that clear?
2   **A   Okay.**
3   Q   Okay.  You are here to give us your best
4   recollection.  You are not required to speculate, and if
5   you do not know the answer to a question, please say so.
6   However, even if you do not have a specific
7   recollection, but have a general recollection, you are
8   required to give us that general recollection.
9   Let me give you an example.  If I ask you when
10  an event occurred, and you do not remember the specific
11  day, but you remember the month and the year, please
12  give me the month and the year.  If you do not remember
13  the month, but you remember the general time of year or
14  season of the year, please let us have that information.
15  If you don't remember date, month, or season or time of
16  year, at least give us the year, if you are able to do
17  so.  Is that clear?
18  **A   Yes.**
19  Q   Same thing with estimates.  If I ask you how
20  many times something occurred and you don't remember a
21  specific number, give us your best estimate of how many
22  times.  I may ask you, was it more than five, more than
23  ten, and we'll get the best recollection you can give us
24  in that manner.  Okay?
25  **A   Okay.**

---

**Page 11**

1   Q   We will be taking breaks from time to time.  If
2   for some reason -- I usually do it about once an hour.
3   If for some reason you need a break and we don't seem to
4   be ready to take one, please let me know, and we'll try
5   to accommodate you.
6   Also, you are of course free to consult with
7   Mr. Wilens.  The only thing is that you should not
8   consult with him while a question is actually pending,
9   unless it's over an issue of attorney-client privilege,
10  in other words, a communication that you had with your
11  counsel.  Otherwise, please answer the question, and
12  we'll then give you an opportunity to consult with your
13  counsel.  Is that clear?
14  **A   Yes.**
15  Q   Okay.  Let me just turn off my phone there.
16  (Brief pause in proceedings.)
17  **MR. WILENS:** Yes, update your status.  "In
18  deposition, can't talk."
19  **MR. PUTTERMAN:** They'll just have to wait.
20  Q   Are you on any medication which you believe
21  might impair you in some respect with respect to your
22  ability to give us your best testimony today?
23  **A   No.**
24  Q   And you're feeling well?
25  **A   Yes.**

---

**Page 12**

1   Q   Good.  Would you please describe your
2   education, including high school and thereafter.
3   **A   Dorsey High school, graduated with a diploma,**
4   **and some college, El Camino.**
5   Q   And when did you graduate high school?
6   **A   '87.**
7   Q   And El Camino is a junior college?
8   **A   Correct.**
9   Q   Took courses?  Did you obtain a degree?
10  **A   No.**
11  Q   Have you had any other training or education
12  post high school, whether vocational or anything like
13  that?
14  **A   No.**
15  Q   What has your employment been since 2010?
16  **A   I work at a bank.**
17  Q   Which bank?
18  **A   OneUnited.**
19  Q   And where is that located?
20  **A   Compton, California.**
21  Q   How long have you worked at OneUnited?
22  **A   Two years.**
23  Q   What is your position there?
24  **A   Financial service rep.**
25  Q   Can you describe for me what's involved with

---

**Page 13**

1   your job as a financial services rep?
2   **A   Actually, it's a teller position.  I handle**
3   **transactions for customers.**
4   Q   Okay, yes, I know banks have invented fancy
5   names for everything.
6   Okay, before you worked at OneUnited, where
7   were you employed?
8   **A   Zions Bancorp.  They own California Bank &**
9   **Trust.**
10  Q   Okay.  I'm going to have to ask you to keep
11  your voice up just a little bit to make sure the
12  reporter can get you.  Although, if she's really having
13  trouble, she'll stop us and say something.
14  **A   Okay.**
15  Q   And how long did you work at Zions Bancorp?
16  **A   Five years.**
17  Q   And where was that located?
18  **A   Downtown.**
19  Q   Address?
20  **A   801 First Street.**
21  Q   And what was your position or your positions
22  during the five years you worked there?
23  **A   Wire specialist.**
24  Q   Can you describe for us what that involved?
25  **A   I did all electronic incoming and outgoing**

---

Gilbert v
Bank of America, N.A.

Keeya Malone
November 23, 2015

---

Page 14

1 **wires for all the customers and also employees.**
2 Q   And why did you leave Zions Bancorp?
3 A   **Relocated. They went to Arizona, laid us off.**
4 Q   Had you worked for other banks prior to Zions
5 Bancorp?
6 A   **Yes.**
7 Q   Which other banks?
8 A   **Sanwa Bank.**
9 Q   Where is located?
10 A   **Culver City.**
11 Q   How long were you there?
12 A   **Three years.**
13 Q   And what was your position?
14 A   **I was a head teller.**
15 Q   Do they still exist?
16 A   **No, they don't.**
17 Q   I suspected that might be the case.
18     And have you worked for other banks?
19 A   **Yes.**
20 Q   Can you name it?
21 A   **Hughes Federal Credit Union.**
22 Q   Where were they located?
23 A   **Manhattan Beach.**
24 Q   And for how long did you work at that credit
25 union?

---

Page 15

1 A   **I think about seven years.**
2 Q   What was your position or positions there?
3 A   **Payroll specialist.**
4 Q   So you've really had a lot of broad experience
5 with banks.
6 A   **Yes.**
7     MR. WILENS: Real banks, not like your
8 associates.
9     MR. PUTTERMAN: Nice. Play nice.
10 Q   Any other banks or financial institutions
11 besides the ones you've identified?
12 A   **Yes. First Interstate Bank.**
13     MR. WILENS: They've been gone quite a time.
14     MR. PUTTERMAN: Yes, they have, although I had
15 a five-sided case against them involving them in the
16 late 80s, early '90s, and I took to using the acronym
17 "FIB" in our papers, which their lawyers did not like
18 very much.
19 Q   And how long were you with First Interstate?
20 A   **I think about ten years.**
21 Q   Long time. And what positions did you have
22 there?
23 A   **I started off as a teller, moved up to head**
24 **teller, then I went to the back office where I did the**
25 **monitor of their credit cards.**

---

Page 16

1 Q   And where was that office located that you
2 worked in, or the offices?
3 A   **Downtown.**
4 Q   All right, very good.
5     I'm going to ask the reporter to mark as
6 Exhibit 1 the Amended Notice of Deposition Duces Tecum
7 of plaintiff Keeya Malone.
8     (Defendants' Exhibit 1 was marked
9     for identification.)
10 Q   BY MR. PUTTERMAN:  Ms. Malone, have you ever
11 seen this document before?
12 A   Yes.
13 Q   Would you please turn to the numbered page 3.
14 Now, you see starting on that page there are lists of
15 requests for production. Did you see that?
16     MR. WILENS: It's not clear if she knows what
17 you mean by "lists of requests for production."
18     MR. PUTTERMAN: Do you see the heading that
19 says "Requests for Production"?
20 A   Yes.
21 Q   And then after that, request No. 1, request
22 No. 2, request No. 3, and so on, over the next few
23 pages?
24 A   Yes.
25 Q   Have you reviewed this part of Exhibit 1

---

Page 17

1 before?
2 A   I looked at it, yes.
3 Q   And did you provide documents to your counsel
4 for him to provide to me?
5 A   Yes.
6 Q   I'd like to go through this, if we can.
7     First of all, requests No. 1 and 2 concern
8 communications between you and any of the MoneyMutual
9 defendants. Now, that's a number of people, but let me
10 ask you this specifically. What communications -- and
11 that can be by e-mail, by telephone, in person, by
12 letter, by text -- have you had at any time with anybody
13 at MoneyMutual?
14 A   No.
15 Q   None?
16 A   No.
17 Q   Okay. Request No. 3 says:
18     "All documents concerning any payday
19     loans obtained by you as alleged in
20     paragraph 51 of the complaint."
21     Now, I'm going to mark as Exhibit 2 what has
22 been titled by your counsel Revised Per Court Order
23 Fourth Amended Complaint.
24     (Defendants' Exhibit 2 was marked
25     for identification.)

---

Gilbert v
Bank of America, N.A.

Keeya Malone
November 23, 2015

---

Page 18

1   Q   BY MR. PUTTERMAN:  Actually, it should have
2   been -- would you turn to paragraph 53?  Okay.  This
3   request No. 3 should have referred to paragraph 53
4   rather than paragraph 51.  But if you look at
5   paragraph 53, it says:
6          "In November 2012, Plaintiff Malone
7          used the MoneyMutual.com website to
8          obtain payday loans from unlicensed
9          lenders Cash Yes and Bottom Dollar
10         Payday and paid at least $575 on these
11         loans."
12      Now, you actually have produced documents
13  concerning those two loans; correct?
14      MR. WILENS: Well, I'm going to object to the
15  question.  It calls for her to know what is in the
16  document production that was done by me.
17      Q   BY MR. PUTTERMAN: Did you provide your counsel
18  with documents concerning those two loans?
19      A   Yes.
20      Q   Okay.  Request No. 4 is:
21         "All documents concerning all
22         payments made by you concerning any
23         payday loans obtained by you as alleged
24         in paragraph 53 of the complaint."
25      And did you provide your counsel with documents

---

Page 19

1   concerning payments made by you on the loans?
2   A   Yes.
3   Q   No. 5 asks for documents concerning any spam
4   e-mails received by you from anybody affiliated with
5   MoneyMutual as referenced in paragraph 59 of the
6   complaint.
7       Can we take a look at paragraph 59, please.
8   Have you had a chance to read that?  You can read that
9   to yourself.
10  A   Okay (examining document).  Okay.
11  Q   Did you receive any spam e-mails from
12  MoneyMutual?
13  A   I received the application or the approval for
14  it.
15  Q   Do you have a general understanding of what a
16  spam e-mail is?
17  A   No.
18  Q   Have you ever heard the phrase before?
19  A   Yes.
20  Q   When you've heard the phrase, what's your
21  understanding of it?
22  A   Something that you shouldn't open.
23  Q   Because it might be a virus or something like
24  that?
25  A   Correct.

---

Page 20

1   Q   Do you recall receiving anything like that from
2   MoneyMutual?
3   A   No.
4   Q   Okay.  Have you received any e-mails from
5   MoneyMutual other than e-mails telling you that you've
6   been approved for a loan?
7   A   No.
8   Q   Let's go on request No. 7, which, as you see,
9   refers to three defendants -- excuse me, four
10  defendants -- Glenn McKay, Samuel L. Humphreys, Douglas
11  Tulley, and Alton F. Irby III.  And refers to paragraph
12  60 of the complaint.  Could you please turn to paragraph
13  60 of the complaint.
14  A   I'm there.
15  Q   And read that to yourself.
16  A   (Examining document) Okay.
17  Q   Have you ever heard of any of these gentlemen?
18  A   No.
19  Q   So I think it's fair to assume you have never
20  had any communications with any of these gentlemen?
21  A   No.
22      MR. WILENS: You mean the gentlemen named in
23  the paragraph 60?
24      MR. PUTTERMAN: Yes.
25  Q   And is it also correct that you do not know

---

Page 21

1   what position or role any of these gentlemen may have
2   played in connection with MoneyMutual?
3       MR. WILENS: I'm going to object.  Are you
4   asking, based on her personal knowledge, as opposed to
5   what her attorney might have told her?
6       MR. PUTTERMAN: Yeah.
7       MR. WILENS: Before any conversations with your
8   attorney, did you ever hear of these people?
9       THE WITNESS: No.
10  Q   BY MR. PUTTERMAN:  So other than through
11  communications with your counsel, you don't know
12  anything about them.
13  A   No.
14  Q   Okay.  And so therefore you don't have any
15  documents concerning them.
16  A   No.
17      MR. WILENS: Well, okay.  That's part of the
18  problem.  You mean in her personal possession, not what
19  the attorneys obtained through investigation?
20      MR. PUTTERMAN: No, absolutely not.  Just what
21  she has in her personal possession.  Okay?
22  Q   Let's look at request No. 10.  There's a
23  reference there to Messrs. McCoy, Tulley, Humphreys, and
24  Irby, and also to the defendant Montel Williams.  Do you
25  know who Montel Williams is?

---

Gilbert v
Bank of America, N.A.

Keeya Malone
November 23, 2015

1    A   Yes.
2    Q   And why don't you tell us in your own words who
3  he is, who you know him as.
4    A   A talk show host.
5    Q   And do you ever watch his talk show?
6    A   Yes, I did.
7    Q   And do you have a personal opinion, based on
8  that talk show, concerning Mr. Williams?
9    A   No.
10   Q   You don't like him, dislike him?
11   A   He's okay.
12   Q   Did you ever actually review the MoneyMutual
13  website?
14   A   I read the contract part of it, but I never
15  went like on their total website, no.
16   Q   Okay.  We'll take a look at that in more detail
17  shortly.
18       Do you know anything about what role
19  Mr. Williams may have had with MoneyMutual?
20   A   Based on just the commercials, he was
21  representing MoneyMutual.
22   Q   Okay.  He was endorsing MoneyMutual?
23   A   Correct.
24   Q   And which commercials are these?  Television?
25   A   Yes.

1    Q   So you saw some television ads for MoneyMutual?
2    A   Correct.
3    Q   And were the television ads what prompted you
4  to go to the MoneyMutual website?
5    A   Yes.
6    Q   Do you recall how many times over the years you
7  visited the MoneyMutual website?
8    A   Once or twice.
9    Q   Let me ask you this, while we're on there.
10  Have you visited from time to time the websites of other
11  lenders or companies offering short-term loans?
12   A   No.
13   Q   You've never visited the websites of any other
14  companies offering payday loans?
15   A   No.
16   Q   Let's look at request No. 12.  That says,
17  quote:
18       "All documents concerning your
19       allegations in paragraph 103 of the
20       Complaint that 'the lenders retained by
21       Plaintiffs and the Class Members'
22       'routinely violated' the MoneyMutual
23       Code of Lender Conduct because the
24       'Lenders routinely sold or gave the
25       information to other entities so they

1        could "spam" the borrowers in an attempt
2        to sell more loans to them in the
3        future.'"
4    Q   Now, did you receive spam e-mails or e-mails of
5  any kind from other lenders after you visited the
6  MoneyMutual website offering you loans?
7    MR. WILENS:  I'm going to object.  What do you
8  mean by "other lenders"?
9    Q   BY MR. PUTTERMAN:  By lenders other than
10  which -- the lender or lenders with which Ms. Malone was
11  connected after submitting her information through the
12  MoneyMutual website.
13   MR. WILENS:  Do you understand the question?
14   THE WITNESS:  Was I getting information from
15  other lenders?
16   Q   BY MR. PUTTERMAN:  Yes.
17   A   No, I wasn't.
18   Q   Okay.  Let's look at request No. 13, which
19  refers to:
20       "...documents concerning your
21       allegations in paragraph 103 of the
22       complaint that 'the Lenders also sold
23       Plaintiffs' and Class Members' personal
24       information (including Social Security
25       numbers) to criminal operations often

1        based in other countries.  Those
2        criminals would then make threatening
3        phone calls to Plaintiffs and Class
4        Members claiming they represented law
5        enforcement agencies and they were going
6        to arrest these borrowers unless the
7        borrows paid money they supposedly
8        owed.'"
9    Q   Why don't you take a look at paragraph 103 in
10  the complaint so you have it before you.
11   A   (Examining document.)
12   Q   Do you know or have any information that any
13  lender from whom you obtained a loan after submitting
14  information to MoneyMutual sold any of your personal
15  information to anybody else?
16   A   Can you repeat the question?
17   Q   Sure.  Let me ask the reporter restate it
18  first, and if it still doesn't work for you, I'll
19  rephrase it.
20       (Record read as follows:
21       "Q   Do you know or have any
22       information that any lender from whom
23       you obtained a loan after submitting
24       information to MoneyMutual sold any of
25       your personal information to anybody

Gilbert v
Bank of America, N.A.

Keeya Malone
November 23, 2015

**Page 26**

1  else?")
2  **THE WITNESS: Yeah. Yes.**
3  Q   BY MR. PUTTERMAN: What do you know in that
4  regard?
5  **A   I started receiving phone calls.**
6  Q   Excuse me?
7  **A   I was receiving phone calls.**
8  Q   And from whom did you receive phone calls?
9  **A   Bottom Dollar.**
10  Q   Now, Bottom Dollar was somebody to which you
11  applied -- through which you obtained a loan; correct?
12  **A   Well, I went through MoneyMutual, so I didn't**
13  **know who the lender was.**
14  Q   Right. But then you were contacted by Bottom
15  Dollar?
16  **A   Correct.**
17  Q   And was that by phone or by e-mail?
18  **A   By phone.**
19  Q   And was that with regard to your submission of
20  information to MoneyMutual?
21  **A   I'm guessing, because I just went through**
22  **MoneyMutual. I never gave them my information.**
23  Q   Do you have any information that Bottom Dollar
24  actually sold your information to anybody else?
25  **MR. WILENS: What do you mean by "sold it to**

**Page 27**

1  anyone else"?
2  **MR. PUTTERMAN: Well, I don't know. That's**
3  **what you say here in paragraph 103.**
4  **MR. WILENS: Well, if you know -- I don't know**
5  **how you would know if they sold it. But you would know**
6  **if someone else had it.**
7  **MR. PUTTERMAN: Well, let's hear whatever she**
8  **knows in that regard.**
9  **MR. WILENS: Did anyone else contact you, other**
10  **than Bottom Dollar, who had your personal information?**
11  **THE WITNESS: No.**
12  **MR. WILENS: No collection agencies?**
13  **THE WITNESS: No.**
14  **MR. PUTTERMAN: Can I ask the questions? But**
15  **thank you.**
16  MR. WILENS: You might take a look at the
17  documents, because some of the documents probably would
18  refresh her recollection.
19  MR. PUTTERMAN: Probably not, actually, in that
20  regard.
21  MR. WILENS: Well, they do, because we have
22  them.
23  Q   BY MR. PUTTERMAN: Did you ever receive --
24  Well, let's hope you produced them.
25  MR. WILENS: We did.

**Page 28**

1  Q   BY MR. PUTTERMAN: Did you ever receive
2  threatening phone calls from anybody?
3  **A   Yes, ma'am.**
4  Q   Concerning the Bottom Dollar loan?
5  **A   Yes.**
6  Q   What were the threatening phone calls you
7  received?
8  **A   They were going to sue me and serve me papers.**
9  Q   And did they say why?
10  **A   That I owed them more money.**
11  Q   Did you fully repay your Bottom Dollar loan?
12  A   Yes.
13  Q   How much was your loan for?
14  A   500.
15  Q   And did you also renew that loan?
16  A   No.
17  Q   Were there any other fees associated with that
18  loan?
19  A   Not that I was aware of.
20  Q   Okay. Did you pay interest on that loan?
21  A   $75.
22  Q   Did you ever obtain from your bank a refund of
23  any money paid on that loan?
24  A   No.
25  Q   Now, it was Bottom Dollar that was making the

**Page 29**

1  calls, or was it a collection agency?
2  MR. WILENS: I'm going to object. That calls
3  for speculation.
4  But you can answer to the best of your
5  knowledge.
6  THE WITNESS: Some calls were, they said they
7  were collecting, and then some actually announced that
8  they were Bottom Dollar.
9  Q   BY MR. PUTTERMAN: Okay. And what did they
10  tell you that you owed?
11  A   A thousand dollars.
12  Q   And did they tell you why?
13  A   No.
14  Q   Did they also correspond with you in any way
15  concerning the Bottom Dollar loan?
16  A   Are you speaking of the first loan, the only
17  loan I had?
18  Q   Well --
19  A   They didn't say anything about the $500 --
20  MR. WILENS: He's asking you if it
21  corresponded --
22  MR. PUTTERMAN: Please don't interrupt.
23  MR. WILENS: I'm going to object. Your
24  question is misunderstood. She doesn't know what you
25  mean by "correspond."

Gilbert v
Bank of America, N.A.

Keeya Malone
November 23, 2015

---

Page 30

1    MR. PUTTERMAN: Okay. Let me step back a
2 minute.
3    Q   How many loans did you get from Bottom Dollar?
4    A   One.
5    Q   And that was for $500?
6    A   Correct.
7    Q   And you started to say that they didn't call
8 you about the $500?
9        MR. WILENS: No, you said "correspond,"
10 Counsel.
11       MR. PUTTERMAN: I'm trying to get back to what
12 she was talking before you interrupted.
13       THE WITNESS: No, they didn't call me for that.
14    Q   BY MR. PUTTERMAN: Okay. And I assume they
15 didn't come after you about the $75.
16    A   No.
17    Q   Okay. So this was some other amount of a
18 thousand dollars.
19    A   Right.
20    Q   And did they finally stop?
21    A   No.
22    Q   Are you still getting calls?
23    A   Yes.
24    Q   And do the callers identify themselves?
25    A   Yes.

---

Page 31

1    Q   And who has been calling you?
2    A   Bottom Dollar.
3    Q   Did you ever complain to MoneyMutual about
4 getting these calls from Bottom Dollar?
5    A   No.
6    Q   Is there any reason why not?
7    A   I didn't know those two were connected.
8    Q   Well, you received -- you were contacted by
9 Bottom Dollar after you submitted your information to
10 MoneyMutual; correct?
11       MR. WILENS: Objection. Vague as to time.
12    Q   BY MR. PUTTERMAN: You can answer.
13    A   No. I wasn't contacted by Bottom Dollar.
14    Q   When were you contacted by Bottom Dollar about
15 the loan itself, about obtaining a loan?
16    A   I just received an e-mail from MoneyMutual
17 saying I received it.
18    Q   The loan from Bottom Dollar?
19    A   Correct.
20    Q   Okay. So you understood to that extent that
21 Bottom Dollar and MoneyMutual had some sort of
22 connection; correct?
23    A   Correct.
24    Q   Okay. But you did not complain later to
25 MoneyMutual about Bottom Dollar making these collection

---

Page 32

1 calls to you; correct?
2    A   Correct.
3    Q   Have you complained to anybody else, besides
4 your counsel, of course?
5    A   No.
6    Q   Is there any reason why not?
7    A   I didn't know who I could complain to.
8    Q   Other than these collection calls that you've
9 described related to the Bottom Dollar loan, have you
10 received any threatening calls from anybody concerning
11 anything else related to any loan by you, taken by you?
12    A   Collection agency, but they're not saying where
13 they're from. They don't give me information.
14    Q   So you don't know what the origin of that is?
15    A   Correct.
16    Q   On any of these calls you got about the Bottom
17 Dollar loan, did anybody ever tell you that they were a
18 law enforcement agency?
19    A   No.
20    Q   Did anybody ever threaten to have you arrested?
21    A   No.
22    Q   They just threatened to sue you?
23    A   Correct.
24    Q   Okay. And for -- about when did those calls
25 start?

---

Page 33

1    A   In 2013, after I did my last payment.
2    Q   This was the last payment on the loan you took
3 out in November 2012?
4    A   Correct.
5    Q   Was the repayment date originally earlier than
6 2013?
7    A   I'm not for sure.
8    Q   Okay. To your knowledge, did this loan keep
9 rolling over because it was not paid off on the original
10 due date?
11    A   It was paid off on the due date, but they said
12 the contract renews, and I didn't know why.
13    Q   Okay. And at some point after that -- and
14 don't tell me about any actual communications -- at some
15 point after that, did you then contact a lawyer?
16    A   Correct.
17    Q   Okay. And who was that?
18    A   Jeff.
19    Q   Jeff Wilens or Jeff Spencer?
20    A   Wilens.
21    Q   Wilens. This guy over here to your right.
22    A   Yes.
23    Q   And do you recall when you first contacted
24 Mr. Wilens?
25    A   In September.

---

The Souza Group
(800) 230-3376

Gilbert v
Bank of America, N.A.

Keeya Malone
November 23, 2015

1    Q    2013?

2    A    '13.

3    Q    Other than phone calls, did you receive

4 anything in the mail or by e-mail from Bottom Dollar or

5 from any collection agency concerning this loan and

6 threatening to sue you?

7    A    No.

8    Q    Okay. Did you ever receive harassing phone

9 calls in connection with any other loan you might have

10 taken out?

11    A    No.

12    Q    Now, in paragraph 53 there is also another loan

13 identified in November 2012. And that's a payday loan

14 from Cash Yes. Do you recall that?

15    A    No.

16    Q    You don't recall obtaining a loan from Cash

17 Yes?

18    A    No.

19    Q    You never received any money from Cash Yes?

20    A    No.

21    Q    Okay.

22      MR. WILENS: It didn't go through, Counsel.

23      MR. PUTTERMAN: Okay.

24      MR. WILENS: That's what Cash Yes is.

25      MR. PUTTERMAN: I'll take their word for it.

1    Q    In other words, it's not right.

2    A    Correct.

3    Q    Okay. Why did you apply for this particular

4 payday loan from Bottom -- excuse me -- through

5 MoneyMutual?

6    A    I was behind on my car note.

7    Q    Was this the car that turned out to be a lemon,

8 or a different car?

9    A    Different car.

10    Q    Okay. And was your car important to you?

11    A    Yes.

12    Q    Did you need it to go to work?

13    A    Yes.

14    Q    Okay. And if you did not go to work,

15 presumably, you did not get paid.

16    A    Correct.

17    Q    And you were caught short so you needed funds

18 to make sure the note was paid.

19    A    Correct.

20    Q    Okay. Did you attempt to obtain money in any

21 other way to keep current with the car note?

22    A    Yes.

23    Q    How did you try to get other money?

24    A    I asked family members, but they didn't have

25 it.

1 Remember, as I told you before, we don't know.

2      MR. WILENS: Well, you know it was approved by

3 your system and you forwarded it on to them. As a valid

4 lead.

5      MR. PUTTERMAN: As a lead. It wasn't approved

6 by us. But it was certainly a valid lead.

7      MR. WILENS: Prequalified.

8      MR. PUTTERMAN: Nice try.

9      MR. WILENS: These are prequalified leads.

10      See, God sides with me.

11      MR. PUTTERMAN: No, he doesn't.

12    Q    How much money over all did you ever pay to

13 payday lenders?

14      MR. WILENS: I'm going to object as vague. You

15 mean in her life? What's a payday lender? What are you

16 referring to?

17    Q    BY MR. PUTTERMAN: Have you ever taken out any

18 other payday loans?

19    A    No.

20    Q    Have you ever applied for other payday loans?

21    A    No.

22    Q    And this statement in paragraph 53 that you

23 obtained a payday loan from Cash Yes is not correct; is

24 that correct?

25    A    Correct.

1    Q    Any other way?

2    A    No.

3    Q    Did you have a credit card available?

4    A    No.

5    Q    Did you ask the car lender if they could extend

6 the note a little bit?

7    A    No.

8    Q    So there was no other way for you to obtain

9 money that you could think of to keep current on your

10 car note.

11    A    Correct.

12      MR. WILENS: Objection. Vague as to what you

13 mean by "no other way."

14      MR. PUTTERMAN: Well, you're a little late.

15    Q    Let me ask you this. Had you received a notice

16 from the car loan company that your loan was delinquent?

17    A    Yes.

18    Q    And how delinquent was it at that point?

19    A    30 days.

20    Q    And did they threaten to repossess it?

21    A    Yes.

22    Q    And that caused you to have to go find some

23 money to bring it current?

24    A    Yes.

25    Q    And after that, did you succeed in staying

Gilbert v
Bank of America, N.A.

Keeya Malone
November 23, 2015

1  current on your car loan?
2  A  Yes.
3  Q  Let me ask you this. Did you have any other
4  objections -- did you have any objections at the time to
5  the terms of the loan from Bottom Dollar?
6  A  No.
7  Q  And they gave you the money in a timely manner?
8  A  Yes.
9  Q  So you were able to pay off your note?
10  A  Yes.
11  Q  And it was actually an agreement that they sent
12  you?
13  A  Yes.
14  Q  And it described the interest and everything
15  else?
16  A  Not the interest.
17  Q  Not the interest?
18  A  No.
19  Q  Okay. We'll take a look at that and see what
20  it says.
21      Did you understand you were going to have to
22  pay something on this loan?
23  A  Correct.
24  Q  Now, your counsel, Mr. Wilens, indicated a few
25  minutes ago that actually you had applied for a loan and

1  it was refused, and that's how he was characterizing the
2  Cash Yes loan. Do you have any recollection of that?
3  A  Of?
4  Q  Of, in addition to Bottom Dollar, applying for
5  another loan.
6  MR. WILENS: I'm going to object, because your
7  question assumes that the same application wasn't used
8  to multiple lenders.
9  MR. PUTTERMAN: Same application does not go to
10  multiple lenders after -- the same lead does not go to
11  multiple lenders after a lender has acquired it.
12  MR. WILENS: Nevertheless, they both went
13  through MoneyMutual, so you must have used her
14  application twice. It's in the documents.
15  MR. PUTTERMAN: No.
16  MR. WILENS: Then how do you explain the fact
17  that your records show her personal information was sent
18  to Cash Yes for a loan?
19  MR. PUTTERMAN: Because what it means is that
20  that was also acquired, that she submitted again.
21  MR. WILENS: Why would she have -- if you've
22  been to the site once, you don't fill out your
23  information a second time. You have it on file.
24  MR. PUTTERMAN: Once it is acquired by
25  somebody, that's it.

1  MR. WILENS: So she would have no way of
2  knowing --
3  MR. PUTTERMAN: We don't circulate --
4  MR. WILENS: Then how did it get to Cash Yes?
5  MR. PUTTERMAN: Well, she may have submitted
6  her information again.
7  MR. WILENS: We can ask her if she remembers
8  filling out the same forms twice on the MoneyMutual
9  website.
10  Q  BY MR. PUTTERMAN: That's exactly what I'm
11  asking.
12  A  No.
13  Q  Okay.
14  MR. WILENS: So sounds like you did.
15  MR. PUTTERMAN: No.
16  MR. WILENS: Or she doesn't remember.
17  MR. PUTTERMAN: Yes, that's another plausible
18  alternative.
19      Give me one second. There is one thing I'm
20  going to have to refer to for the next questions.
21  Q  Exhibit 3 is a printout from the PartnerWeekly
22  database, which was produced to you electronically.
23  It's actually, what, a couple of years now, a
24  couple years ago, Jeff?
25  MR. WILENS: I don't know.

1  MR. PUTTERMAN: And this concerns information
2  submitted by Ms. Malone that found its way into the
3  PartnerWeekly system, either from MoneyMutual or from an
4  affiliate publisher.
5      (Defendants' Exhibit 3 was marked
6      for identification.)
7  Q  BY MR. PUTTERMAN: Okay, now, Ms. Malone, I
8  know you haven't seen this before, but I'm going to ask
9  you about some information on here. First of all, you
10  see things are in a row. You see that?
11  A  Yes.
12  Q  Okay. And I'm going to direct your attention
13  to the first entry, which is dated, it says "AppDate,"
14  it's dated September 7, 2012. Do you see that?
15  A  Yes.
16  Q  Okay. And then you go all the way across, and
17  I will represent to you that this indicates that you
18  submitted information through a website, not the
19  MoneyMutual website, but a different website, which the
20  publisher's name is "LeadRev," and the website URL is
21  "firstnationalpaydayloan.com." Do you see that?
22  A  Yes.
23  Q  Do you recall submitting an application through
24  a website back in 2012, in September of 2012, to
25  firstnationalpaydayloan.com?

Gilbert v
Bank of America, N.A.

Keeya Malone
November 23, 2015

---

**Page 42**

1    A    No.

2    Q    Okay.  Do you have any understanding at all as
3    to why the information on this application would be in
4    our database?

5         MR. WILENS: I'm going to object.  Calls for
6    speculation.  And also you have two different companies,
7    yet you have the exact same time, minus seven seconds,
8    apart.  So unless she was able to go to one website,
9    fill out a long application, and then go to another
10    application in seven seconds and fill out another
11    application --

12         MR. PUTTERMAN: Jeff, first of all --

13         MR. WILENS: Your company is using her
14    information on multiple -- she fills it out once and you
15    guys use it multiple lenders' websites.

16         MR. PUTTERMAN: Jeff, first of all, if the lead
17    was not acquired by somebody first time around, it would
18    be circulated again.  Once it is acquired by somebody,
19    that's it.

20         MR. WILENS: Then why do they have different
21    URLs?  This is what we're talking about.

22         MR. PUTTERMAN: I don't know that, unless it
23    was -- unless either she filled out another application
24    at about the same time, or I don't know whether the
25    publisher maintained, the same publisher maintained two

---

**Page 43**

1    different URLs.  I don't know the answer to that.

2         MR. WILENS: But they are seven seconds apart,
3    so it's highly unlikely --

4         MR. PUTTERMAN: Let me point out something to
5    you, though, okay?  And that is the second row shows
6    that the lead was then accepted by a lender called AMG.

7    Q    Do you recall having had any contact with a
8    lender that was related to an Indian tribe back in
9    September 2012 about a loan?

10    A    No.

11    Q    Do you recall applying for any loans, any
12    payday loans, in September 2012?

13    A    No.

14    Q    Is it possible anybody else could have been
15    using your computer?

16    A    They could have.

17    Q    Okay.  Back in September of 2012, who had
18    access to your personal computer?

19    A    I have a son, nephew, yes, they come over.

20    Q    How old was your son at that time?

21    A    2012, he was 20.

22    Q    How old was your nephew in 2012?

23    A    Same age, 20.

24    Q    Did you ever get any notice from any lender
25    that they had made a loan to you that needed to be

---

**Page 44**

1    repaid?

2    A    No.

3    Q    Do you have any reason to believe that either
4    your son or your nephew or somebody else used your
5    computer to apply for a payday loan?

6    A    No.

7    Q    So you have no knowledge at all about any
8    contact with a lender on or about September 7, 2012,
9    about a potential payday loan?

10    A    No.

11    Q    Okay.  Next line, which is the third line down,
12    indicates that a new -- that information was again
13    submitted by you on September 12, 2012, through a
14    different website, cashadvanceloans.com.  Do you see
15    that?

16    A    Yes.

17    Q    And that that lead was acquired again by the
18    same tribal affiliated lender called AMG.  Do you recall
19    applying for a loan on or about September 12, 2012?

20    A    No.

21    Q    Do you recall any contact with a lender
22    concerning a possible loan on or about September 9 --
23    excuse me -- September 12, 2012?

24    A    No.

25    Q    No recollection at all?

---

**Page 45**

1    A    No.

2    Q    How long have you had your present computer?

3    A    For years.

4    Q    Excuse me?

5    A    Probably about ten years or so.

6    Q    What kind of computer is it?

7    A    LG.

8    Q    So the computer you have now would be the same
9    computer that you were using back in September 2012; is
10    that right?

11    A    Correct.

12    Q    Let's go to the next line.  And you see that
13    that shows you submitting information on November 28,
14    2012?  You see that?

15    A    Yes.

16    Q    And at that point you said you submitted it
17    through a website called moneymutual.com.  And that was
18    a MoneyMutual -- so that was the first time you used the
19    MoneyMutual website; correct?

20    A    Correct.

21    Q    And you see that lead was acquired by an
22    entity called M. Mark High LTD.  Do you see that?

23    A    Yes.

24    Q    Okay.  Now, I will represent to you, and
25    Mr. Wilens will agree, that Cash Yes, which we saw

---

## Page 46

1  referred to in paragraph 53 of the complaint, is
2  affiliated with M. Mark High LTD. Does this refresh
3  your recollection that you did in fact apply for a loan
4  on or about September 28 -- November 28, 2012, but were
5  not approved for a loan?
6      **MR. WILENS:** Well, you can ask her if she used
7  the MoneyMutual website. How would she know --
8      **MR. PUTTERMAN:** No, no, that's what I'm asking.
9      **MR. WILENS:** You said, if she was approved for
10 a loan --
11     **MR. PUTTERMAN:** I didn't say by Cash Yes.
12 Q   Okay, first of all, let me break it down,
13 though, to address your counsel's objection. First of
14 all, does this refresh your recollection that on
15 November 28, 2012, you applied for a loan through the
16 MoneyMutual website?
17 A   Yes.
18 Q   And do you recall that you were not matched up,
19 or you were informed by MoneyMutual that you had not
20 been matched up with a lender?
21     **MR. WILENS:** Well, I think she was matched up.
22 But if she knows.
23     **THE WITNESS:** I didn't know I wasn't matched
24 up.
25 Q   BY MR. PUTTERMAN: Okay. Who did you think you

## Page 47

1  were matched up with? Were you contacted by a lender?
2  A   I was e-mailed saying I was approved.
3  Q   Okay. And did you then on November 28 complete
4  a loan on that day with a lender?
5  A   Yes.
6  Q   And what lender was that?
7  A   Actually, they didn't say. They called me on
8  my phone and asked me for my information.
9  Q   Okay. The lender called you on the phone.
10 A   Correct.
11 Q   And who was that lender?
12 A   Actually, they just said they saw my
13 application online for MoneyMutual.
14 Q   They didn't tell you who they were?
15 A   Correct.
16 Q   And what information did they want from you?
17 A   My bank account.
18 Q   And did you give them that information?
19 A   Yes.
20 Q   And what happened next?
21 A   They put a deposit of 500 in my account.
22 Q   Okay. Now, this was on November 28, 2012; is
23 that right?
24 A   I'm not for sure what day it was.
25 Q   Okay. Because you will notice on the following

## Page 48

1  line that it describes an application that was submitted
2  the next day, on November 29, through MoneyMutual
3  website, and that one went to an entity called BD PDL
4  Services LLC. And I will represent to you that I
5  believe that refers to Bottom Dollar. Is that what
6  you're thinking of, is the Bottom Dollar loan?
7  A   Yes.
8  Q   Okay. So that's on November 29. I'm on the
9  previous line, which was November 28.
10     **MR. WILENS:** That doesn't mean there was two
11 different applications. Maybe they were done by your
12 company on two occasions. You said it wasn't accepted,
13 so maybe the second one wasn't accepted. But you can
14 ask the witness if she knows, but I don't know how she
15 can figure out what this record means. She didn't
16 create it.
17     **MR. PUTTERMAN:** I'm asking her questions based
18 upon the record.
19 Q   What I'm asking you is this --
20     **MR. WILENS:** Three years ago. She doesn't
21 remember the exact date.
22     **MR. PUTTERMAN:** Jeff, stop with the
23 argumentative objections. No, if you have an objection,
24 just state it.
25     **MR. WILENS:** Calls for speculation.

## Page 49

1      **MR. PUTTERMAN:** Thank you.
2  Q   Let me ask you this. Do you have any
3  recollection of not hearing back on November 28 or on
4  the date you first submitted your information to
5  MoneyMutual, but then hearing back on the following day,
6  when you got a call from a lender?
7  A   I'm not for sure what date they called me.
8  Q   Did you submit your information on two
9  different days to MoneyMutual?
10 A   No.
11 Q   Did you ever submit your information to
12 MoneyMutual after November 2012?
13 A   No.
14 Q   Do you have any understanding why paragraph 53
15 states that you actually did obtain a loan from Cash Yes
16 in November 2012?
17 A   No, I don't know.
18 Q   All right, let's look at the bottom line. Did
19 you ever hear of a lender named Speedy Cash?
20 A   I heard of them.
21 Q   And how did you hear of them?
22 A   A commercial.
23 Q   That was on the TV?
24 A   Yes.
25 Q   And did you actually apply for a loan from

Gilbert v
Bank of America, N.A.

Keeya Malone
November 23, 2015

Page 50

1  Speedy Cash?
2  **A   No.**
3  **Q   In 2014, did you submit your information to**
4  **MoneyMutual?**
5  **A   No.**
6  **Q   Well, the last line on this printout indicates**
7  **that you applied or submitted your information for a**
8  **loan on September 27, 2014, and that the lead was**
9  **actually acquired by a company doing business as Speedy**
10  **Loan, and that was through the moneymutual.com website.**
11       MR. WILENS: Well, I'm going to object the way
12  you phrased that. It doesn't show anything. It's a
13  piece of paper that, according to your interpretation,
14  MoneyMutual claims that it got a new application in 2014
15  from her.
16       MR. PUTTERMAN: And there will be testimony
17  that supports that. Now, if you want to keep making
18  argumentative objections, we can discuss that in front
19  of Judge White or whichever magistrate is designated to
20  hear it. I suggest that you --
21       MR. WILENS: I suggest you review your
22  transcript of the depositions I took where you objected
23  to every single question and obstructed the process. I
24  won't do anything close to that. So unless the pot
25  wants to call the kettle black --

Page 51

1       MR. PUTTERMAN: I'm perfectly happy to call the
2  kettle black. But in this case, I'm simply telling you,
3  stop making argumentative objections and stop trying to
4  coach the witness.
5       MR. WILENS: Objection. Your question assumes
6  facts not in evidence and calls for her to speculate
7  what that line says.
8       MR. PUTTERMAN: No, I'm asking her specific
9  questions.
10  **Q   Did you submit your information through the**
11  **MoneyMutual website in September 2014 in order to obtain**
12  **a payday loan? And I'll just remind you that you're**
13  **under oath here.**
14  **A   No.**
15  **Q   Okay. So you have no idea why this might be in**
16  **MoneyMutual's database.**
17  **A   No, I don't know why.**
18  **Q   Now, in fact, in September 2014, you were**
19  **already a plaintiff in this case; correct?**
20  **A   Correct.**
21  **Q   And it was your understanding by September 2014**
22  **that payday loans were illegal; correct?**
23       MR. WILENS: Objection. Call for
24  attorney-client privilege to be disclosed. And payday
25  loans are not illegal. So next question. Instruct her

Page 52

1  not to answer.
2  **Q   BY MR. PUTTERMAN: Did you ever attempt to**
3  **determine whether anybody that you were in contact with**
4  **about a payday loan was licensed in California?**
5  **A   I'm sorry. Could you repeat the question?**
6  **Q   Actually, I'll withdraw the question.**
7       **Let me ask you this again. Have you ever been**
8  **contacted by a company called Speedy Cash about a payday**
9  **loan?**
10  **A   No.**
11  **Q   And you only heard of Speedy Cash on TV**
12  **commercials; correct?**
13  **A   Correct.**
14  **Q   And you never submitted any information to**
15  **MoneyMutual looking for a payday loan after November of**
16  **2012; is that right?**
17  **A   Correct.**
18  **Q   And do you have any understanding of whether or**
19  **not, if you did apply for such a loan through**
20  **MoneyMutual after you were already a plaintiff in this**
21  **case, that that might make it difficult for you to**
22  **continue as a named plaintiff in this case?**
23       MR. WILENS: Objection. That's completely
24  false. There would be no effect on this lawsuit at all,
25  and she's welcome to get any payday loan she needs or

Page 53

1  wants, as long as it's legal. MoneyMutual has some
2  legal lenders, but not the ones --
3  **Q   BY MR. PUTTERMAN: Can you please answer my**
4  **question?**
5       MR. WILENS: No, she's not going to answer it.
6  It's argumentative.
7       MR. PUTTERMAN: You're instructing her not to
8  answer.
9       MR. WILENS: As you phrased it, yes. It also
10  invades the attorney-client privilege as to what we
11  discussed.
12  **Q   BY MR. PUTTERMAN: Well, let me ask you this,**
13  **just taking your counsel's last statement there. Is it**
14  **your understanding that you are still free to apply for**
15  **a payday loan at any time?**
16  **A   Yes.**
17  **Q   Okay. Have you applied for any payday loan at**
18  **any time, through any website or by telephone, at any**
19  **time since you became a plaintiff in this case, which**
20  **was in 2013?**
21  **A   No.**
22       **MR. PUTTERMAN:** All right, why don't we take a
23  short break.
24       **THE VIDEOGRAPHER:** The time is 11:34 a.m. We
25  are going off the record.

Gilbert v
Bank of America, N.A.

Keeya Malone
November 23, 2015

Page 54

1    (Recess)
2    THE VIDEOGRAPHER: The time is 11:43 and we are
3    back on the record.
4    Q   BY MR. PUTTERMAN: Ms. Malone, is there
5    anything that you would like to supplement or revise
6    concerning the answers to questions you gave before our
7    break?
8    A   Yes.
9    Q   Okay. Why don't you go ahead. Exhibit 3
10   you're referring to?
11   A   Yes. Exhibit 3, the last one, for Speedy Cash,
12   2014, I don't have a bank account. So they couldn't
13   have possibly, or I wouldn't have required for a loan.
14   Q   Do you have any idea -- strike that.
15       All right. So you did not have a bank account
16   any time in 2014?
17   A   As of today, I don't.
18   Q   No, I'm asking, as of September 2014.
19   MR. WILENS: Do you remember the exact date --
20   okay, he's saying as of September 2014.
21   THE WITNESS: Correct, as of September, yes.
22   Q   BY MR. PUTTERMAN: You did not have a bank
23   account?
24   A   Correct.
25   Q   So you do not believe you applied for a loan on

Page 55

1    that date.
2    A   Correct.
3    Q   Again, other people had access to your computer
4    on that date?
5    A   Yes.
6    Q   Do you have a bank account now?
7    A   No.
8    Q   When was the last time you had a bank account?
9    A   Some part of 2013.
10   Q   Well, let me ask you this. How are you
11   currently paid by your employer? By check?
12   A   Yes.
13   Q   And you simply cash the check?
14   A   Correct.
15   Q   You don't maintain any kind of an account at
16   your employer?
17   A   No.
18   Q   Did you know in 2014 that you could not apply
19   for a payday loan unless you had a bank account?
20   A   Correct.
21   Q   You knew that?
22   A   Correct.
23   Q   How did you know that?
24   A   Based on the last loan I got from MoneyMutual,
25   you needed an account for them to put a direct deposit

Page 56

1    in.
2    Q   Okay. But did you understand, based on that
3    one loan experience, that there was no way you could get
4    a payday loan from anybody without a bank account?
5    A   Just based on experience, that's what I
6    thought, that you can't do it without a bank account.
7    Q   Did you ever ask anybody whether you could get
8    a payday loan in the form of a check?
9    A   No.
10   Q   Okay.
11       MR. PUTTERMAN: I'm going to ask the reporter
12   to mark as Exhibit 4 a document entitled "Consumer Loan
13   and Arbitration Agreement," and it has the numbers on
14   there of Malone -- actually, I'm going to do it as
15   MALONE001 and MALONE002.
16       (Defendants' Exhibit 4 was marked
17       for identification.)
18   Q   BY MR. PUTTERMAN: Have you seen this document
19   before?
20   A   (Examining document) I don't remember.
21   Q   Is this a document you provided to your
22   counsel?
23   A   I think so.
24   Q   And you see on the second page it has an
25   electronic signature and states that it was signed

Page 57

1    November 29, 2012?
2    MR. WILENS: Well, I won't call it an
3    electronic signature, but you can say what you see
4    there.
5    THE WITNESS: I see my name on there.
6    Q   BY MR. PUTTERMAN: In the signature block?
7    A   Correct.
8    Q   Do you recall actually agreeing to accept a
9    loan from Bottom Dollar Payday?
10   A   Yes.
11   Q   Do you recall if you read this document when
12   you received it?
13   A   I don't recall if I read it.
14   Q   And you see that it has a box under the federal
15   truth and lending disclosures where it says the annual
16   percentage rate of the loan?
17   A   Yes, I see the box.
18   Q   And it says 758.575 percent? Do you see that?
19   A   Yes, I see that.
20   Q   So you saw that at the time.
21   A   At the time I don't think I looked at it.
22   Q   Okay. You think you just agreed to this loan
23   without actually reading through the document?
24   A   Correct.
25   Q   Because you needed the money?

1  A  **Correct.**
2  Q  And you see under finance charge it states that
3  "the dollar amount the credit will cost me is $75"?
4  A  **Correct.**
5  Q  Okay.  So that the total of the payments would
6  be $575.  Correct?
7  A  **Correct.**
8  Q  Okay.  You can lay that aside for now.
9     Exhibit 5 will be a document designated
10 MALONE003 and MALONE004.  It's also entitled "Consumer
11 Loan and Arbitration Agreement."
12     (Defendants' Exhibit 5 was marked
13     for identification.)
14 Q  BY MR. PUTTERMAN:  Have you seen this document
15 before?
16 A  **No.**
17 Q  Well, did you provide this document to your
18 counsel?
19 A  **I could have.**
20 Q  If you go to the box on the second page, you
21 see it says "Signature, Keeya Malone," and it says
22 "Signed January 16, 2013"?
23 A  **Yes. I see the box.**
24 Q  And you see there is $500 financed, and the
25 total of payments is $500,

1  A  **Correct.**
2  Q  Why did you have to make this second agreement
3  with Bottom Dollar Payday?
4     MR. WILENS: Objection.  Assumes that she had
5  to make it.  So it's argumentative.
6     MR. PUTTERMAN: Let me amend the question.
7  Q  Why did you make this second agreement with
8  Bottom Dollar Payday?
9  A  **I didn't know it was a second agreement with**
10 **them.  I thought when I agreed to the first one, that**
11 **was it.**
12 Q  Well, the first one was in November.  Now this
13 one is in January.  And your counsel produced this in
14 response to the deposition notice that we marked as
15 Exhibit 1.
16     MR. WILENS: Doesn't mean it came from her,
17 though.  I have other sources of documents.
18     MR. PUTTERMAN: Well, presumably those
19 documents would have been stamped with the source.
20 Because right now this looks like a representation to me
21 that it came from her.
22     MR. WILENS: It isn't.  Not every document
23 produced by a deponent comes from my client.  Some of
24 them I got from the lender.
25     MR. PUTTERMAN: Are you representing that this

1  came from the lender?
2     MR. WILENS: I'd have to check.
3     MR. PUTTERMAN: Because I doubt it, frankly.
4     MR. WILENS: Well, we went to arbitration with
5  the lender, so I do have access to the documents, too.
6  Q  BY MR. PUTTERMAN:  Have you actually been to
7  arbitration, Ms. Malone, with Bottom Dollar Payday?
8  A  **Yes.**
9  Q  Do you have the result of that arbitration?
10    MR. WILENS: It's a confidential settlement.
11    MR. PUTTERMAN: You have to disclose if she
12 received money.
13    MR. WILENS: No, we can't disclose it.
14    MR. PUTTERMAN: Well, you have to.
15    MR. WILENS: Well, you're going to have to seek
16 relief from the agreement.
17    MR. PUTTERMAN: Okay.  Let me explain something
18 to you in short, declarative sentences.  If Ms. Malone
19 already received back the amount that she paid this
20 lender, she has no damage.
21    MR. WILENS: I don't agree with your premise.
22    MR. PUTTERMAN: Well, you know what?  I think
23 the notion that you may have entered into a confidential
24 agreement with the lender, which now supposedly
25 precludes you from telling us and the federal court

1  exactly what Ms. Malone received --
2     MR. WILENS: I'm happy to tell you.  If you get
3  relief from Mr. Croker, I'll be happy to tell you.  I
4  didn't ask for confidentiality; the lender did.  And I
5  can tell you this, she did not receive maximum damages
6  that are available to her under the law.
7     MR. PUTTERMAN: That is not the question that I
8  asked.
9     MR. WILENS: Well, I can't answer your
10 question, but I can tell you that your argument that if
11 she received partial damages, somehow she's not allowed
12 to continue with her lawsuit, is ridiculous.
13    MR. PUTTERMAN: Excuse me for one second while
14 I e-mail Mr. Croker.
15    MR. WILENS: Might as well go off the record.
16    MR. PUTTERMAN: We can go off the record.
17    THE VIDEOGRAPHER: The time is 11:53 a.m.  We
18 are going off the record.
19    (Off record)
20    THE VIDEOGRAPHER: The time is 11:57 a.m.  We
21 are back on the record.
22    MR. PUTTERMAN: Mr. Wilens, I am e-mailing
23 Mr. Croker asking him to waive confidentiality on the
24 Aquino, Gilbert [sic], and Malone arbitration outcomes
25 or settlements so that we can have the information here,

Page 62

1  and I have stated that I will designate them as
2  confidential on this record. Will you waive
3  confidentiality under the same terms?
4      MR. WILENS: Only as to the monetary payment to
5  the plaintiff or deponent. There's also a payment for
6  attorney's fees.
7      MR. PUTTERMAN: I'm sure there is.
8      MR. WILENS: And I can do that for my client
9  here, but obviously, you may need consent from each
10 deponent.
11     MR. PUTTERMAN: Well, I have a hunch we'll be
12 going to court to have confidentiality waived on the
13 whole thing.
14     MR. WILENS: I'm just going to tell you that
15 it's not 100 percent offset, so I'm not sure what your
16 point is.
17     MR. PUTTERMAN: You know what? I don't know
18 that until I know the amount.
19     MR. WILENS: Okay, but if I disclose to the
20 judge in camera what it was, and he says it's not 100
21 percent offset, then we agree that's the end of that
22 line of inquiry?
23     MR. PUTTERMAN: Maybe. The attorney's fees may
24 be relevant to your class action motion as well.
25     MR. WILENS: Well, I know, but -- it's not

Page 63

1  relevant to my motion. But relevant to my fees request
2  later.
3      MR. PUTTERMAN: Well, there won't be a fees
4  request later.
5      MR. WILENS: Oh, yeah, there will be.
6      MR. PUTTERMAN: Let's continue.
7      Let's mark as Exhibit 6 MALONE005 and
8  MALONE006.
9          (Defendants' Exhibit 6 was marked
10         for identification.)
11 Q   BY MR. PUTTERMAN: Now, you see that leaving
12 aside your e-mail to Mr. Wilens on August 30, 2013, that
13 the rest of this document, Exhibit 6, is an e-mail that
14 you received from customer service at
15 bottomdollarpayday.com?
16 A   Yes.
17 Q   Did you receive this e-mail?
18 A   Yes.
19 Q   And it's entitled "Courtesy Reminder from
20 Bottom Dollar." You see that?
21 A   Yes.
22 Q   And it states, quote, in part, "You have an
23 upcoming balance due on January 18, 2013." And then
24 after that it says:
25     "Dear Keeya Malone,

Page 64

1      "Thank you for being a Bottom Dollar
2  Payday customer. Your loan of $500 from
3  Bottom Dollar Payday is due on January
4  18, 2013. You have three options for
5  your convenience to choose from."
6  It says:
7      "1. Extend the loan. In this case,
8  we would just collect the finance fee of
9  $150 on your due date. You do not have
10 to notify us if you will be extending
11 the loan, as we will do it for you
12 automatically.
13     "2. Pay back the loan of $500 in
14 full plus the finance fee of $150 on the
15 due date. Please send us an e-mail at
16 customerservice@pdlsupport.com or call
17 us at 877-712-3729 and notify us by 5
18 P.M. CST three days prior to your due
19 date.
20     "3. Pay back a portion of your loan
21 and your finance fee of $150."
22 Now, my question to you is this. First of all,
23 pursuant to No. 2, did you e-mail or call them or notify
24 them three days prior to your due date that you were
25 going to pay back the loan?

Page 65

1      MR. WILENS: I'm going to object. There's no
2  evidence there's a loan or a due date. So your question
3  assumes facts not in evidence.
4      MR. PUTTERMAN: What are you talking about?
5      MR. WILENS: This is referring to a different
6  loan, not the one she got in November.
7      MR. PUTTERMAN: She's testified that she did
8  not get any other loan.
9      MR. WILENS: Right. This loan claims that
10 she's got a payment due January 18, but the other loan
11 said her payment was due long before then, and it was
12 paid.
13     MR. PUTTERMAN: Well --
14     MR. WILENS: What Bottom Dollar did is, they
15 renewed her loan against her will, without her
16 consent --
17     MR. PUTTERMAN: You know what, I want her to
18 testify, not you.
19     MR. WILENS: Ask her.
20     MR. PUTTERMAN: What do you think I was just
21 doing before you interrupted? Stop.
22     MR. WILENS: No, you're interrupting me --
23     MR. PUTTERMAN: Stop. Silence.
24     MR. WILENS: You're interrupting me.
25     MR. PUTTERMAN: Silence.

1    MR. WILENS: No. I don't take your commands,
2  and --
3    Q  BY MR. PUTTERMAN: When was your original
4  November loan due?
5    MR. WILENS: You can look at the documents.
6    Q  BY MR. PUTTERMAN: That would be Exhibit 4.
7    A  On December 7, 2012.
8    Q  Did you pay it back on December 7, 2012?
9    A  Yes, I did.
10   Q  Okay. How did you pay it back?
11   A  They took the deposit out of my account.
12   Q  And that account was at what bank? JPMorgan
13  Chase?
14   A  Yes.
15   Q  Do you have a record of that?
16   A  Yeah.
17   Q  Can you produce to us that record?
18   A  I can try. My account is closed.
19   Q  But you still should be able to obtain those
20  records from JPMorgan Chase. Will you attempt to do so?
21   A  Yes.
22   Q  Thank you. Now, is that in fact what happened
23  with Bottom Dollar Payday, they automatically renewed
24  the loan, even though it in fact had been paid off?
25   A  Yes --

1    MR. WILENS: Objection. Calls for speculation.
2  But she's answered.
3    MR. PUTTERMAN: That's all I want to know.
4  Okay.
5    Q  So in fact, you had the one loan, you paid it
6  off, and then they, for whatever reason, nonetheless
7  rolled it over, even though there was nothing to roll
8  over. Is that correct?
9    A  Correct.
10   Q  Okay. Thank you. That's what I'm trying to
11  get at.
12     Now, I think you indicated that you did not
13  complain to MoneyMutual about this; correct?
14   A  Correct.
15   Q  Okay. Do you know if MoneyMutual had anything
16  to do with Bottom Dollar Payday rolling over this loan
17  which had been paid off already?
18   A  Not that I know of.
19   Q  Okay. And have you ever heard of a company
20  called Selling Source?
21   A  No.
22   Q  Okay. So basically, Bottom Dollar Payday did
23  something wrong here, and to your knowledge, MoneyMutual
24  had nothing to do with that.
25     MR. WILENS: Objection. Vague as to which

1  "something wrong."
2    MR. PUTTERMAN: The something wrong in the
3  context of the questions I've been asking, which is
4  rolling over a loan which in fact had already been paid
5  off.
6    MR. WILENS: The question is argumentative.
7  She wouldn't have had --
8    MR. PUTTERMAN: Stop right there. You've made
9  the objection.
10   MR. WILENS: You can't ask this witness that
11  question. How does she know?
12   MR. PUTTERMAN: To her knowledge. She is
13  testifying as to her knowledge. Stop coaching her.
14  Now.
15   Q  Sorry for the yelling.
16     Okay. To your knowledge, MoneyMutual had
17  nothing to do with the fact that Bottom Dollar rolled
18  over your loan even though the loan had been paid off.
19   A  I don't know if they had anything to do with
20  it.
21   Q  To your knowledge, they didn't. To your
22  knowledge. You don't have any personal knowledge that
23  they did.
24   A  Correct. I don't.
25   Q  Okay, thank you. Again, I apologize for the

1  yelling. It sometimes happens. It's nothing personal.
2  It's the nature of litigation.
3     Now, did you e-mail back Bottom Dollar Payday
4  to tell them in words, substance, or effect, "What are
5  you doing? I paid this loan off."
6    A  I called them.
7    Q  Okay. When did you call them?
8    A  I'm not for sure what day I called them.
9    Q  At some point.
10   A  I called them around the last day I -- on the
11  day I made the last payment, when it was coming out of
12  my account.
13   Q  And when was that?
14   A  Around in December sometime.
15   Q  Okay. And you called them at that point to
16  tell them that it was being -- that you were paying it
17  off?
18   A  Correct.
19   Q  Okay. And after you received this e-mail that
20  we've marked as Exhibit 6, did you call them again to
21  say, in words, substance, or effect, "Why did you send
22  this to me?"
23   A  Correct.
24   Q  And what did they say?
25   A  That my loan automatically rolls over.

Gilbert v
Bank of America, N.A.

Keeya Malone
November 23, 2015

---

Page 70

1  Q   And did you point out to them that you had
2  actually paid it off a month ago?
3  A   Correct, I did.
4  Q   Did they say to you that they didn't receive
5  notice from you before it was paid off, so that's why
6  they automatically rolled it over?
7  A   No, they didn't say that.
8  Q   Okay. All right. But I think I get it.
9      MR. WILENS: I'm going to object. Move to
10 strike that remark. There's no jury.
11     MR. PUTTERMAN: Whatever.
12     MR. WILENS: What you got is that your client's
13 a crook, and dealt with crooks. That's what you get.
14 So you're going to throw in snide remarks, I will, too.
15     MR. PUTTERMAN: Actually, that wasn't a snide
16 remark.
17     MR. WILENS: Yeah, you don't believe her.
18     MR. PUTTERMAN: No, actually, that was not the
19 case. First of all, whether I believe her or not is not
20 the point. But now I think I understand what was going
21 on with Bottom Dollar Payday.
22     MR. WILENS: Yeah. They operate outside the
23 law.
24     MR. PUTTERMAN: Well, and how would we know
25 that if no complaint was made to us?

---

Page 71

1      MR. WILENS: Because you screened them to be in
2  your lender network. Remember?
3      MR. PUTTERMAN: Uh-huh. But we have no way of
4  knowing that -- somebody doesn't complain, we don't
5  know.
6  Q   Okay, Exhibit 7 is MALONE007.
7      (Defendants' Exhibit 7 was marked
8      for identification.)
9      MR. PUTTERMAN: And I wouldn't make snide
10 comments if I were you. If you're in fact collecting,
11 you know, hundreds of thousands of dollars in attorney's
12 fees on these arbitrations and your clients are not even
13 making a full recovery, you're in no position to talk.
14     MR. WILENS: My clients received better than
15 the minimum, but not the maximum, because the defendants
16 weren't interested in paying the maximum, in fees or
17 anything else.
18     MR. PUTTERMAN: I'm sure they paid you a lot
19 more in fees than your clients recovered.
20     MR. WILENS: Well, considering these are three
21 hundred to five hundred dollar loans, I don't know any
22 attorneys who work for three or five hundred dollars.
23 Do you?
24     MR. PUTTERMAN: Well, whether I know of such
25 attorneys or whether I know of attorneys who should be

---

Page 72

1  working for that amount's a different question.
2      MR. WILENS: Anyway, I'm sure you've enjoyed
3  your millions of dollars you've billed Selling Source.
4      MR. PUTTERMAN: You have this rather skewed
5  version of the world which makes you assume that certain
6  things are true which are not.
7      MR. WILENS: Attorneys won a lot of money? I
8  don't think that's a skewed version of the world, as an
9  attorney --
10     MR. PUTTERMAN: Well, you can think what you
11 want.
12     MR. WILENS: -- to say that.
13 Q   BY MR. PUTTERMAN: You have Exhibit 7 in front
14 of you?
15 A   Yes.
16 Q   And you received the e-mail here on January 18,
17 2013; correct?
18 A   Correct.
19 Q   Did you call them up after you received this
20 e-mail?
21 A   No, I didn't.
22 Q   Okay. Why not?
23 A   I called them on the last one, told them,
24 talked to them about it.
25 Q   But didn't you begin to get concerned once you

---

Page 73

1  got this e-mail saying that the loan has actually been
2  extended?
3  A   I didn't call them on that one, on this one.
4  Q   Okay. You just didn't.
5  A   No.
6  Q   Okay.
7      Exhibit 8 will be MALONE008.
8      (Defendants' Exhibit 8 was marked
9      for identification.)
10 Q   BY MR. PUTTERMAN: By the way, when you closed
11 your bank account, that was the JPMorgan Chase account;
12 correct?
13 A   Correct.
14 Q   Did you receive a final statement from the bank
15 on that account showing that it had been closed?
16 A   I'm not for sure. I will have to look.
17 Q   Okay. Could you please look for that, see if
18 you have one?
19 A   Sure.
20 Q   And produce it to us?
21 A   Okay.
22 Q   Thank you.
23     Okay, Exhibit 8 is another e-mail from Bottom
24 Dollar Payday dated January 22, 2013. It says:
25     "Dear Keeya Malone. Thank you very

---

---

Page 74

1  much for your payment of $150."
2  Okay, now you got this e-mail also; correct?
3  **A   That is correct.**
4  Q   Weren't you concerned at that point that they
5  apparently had taken the $150 out of your bank account?
6  **A   Yes, I was.**
7  Q   Did you call them?
8  **A   No. I called my bank.**
9  Q   Okay. And what did you say to your bank?
10 **A   That it was an unauthorized charge.**
11 Q   And what did the bank do?
12 **A   They sent it back.**
13 Q   Okay. So the bank put the money back in your
14 account.
15 **A   Correct.**
16 Q   Okay. Were there any other withdrawals from
17 your account prior to, or rather, after this event?
18 **A   Yes.**
19 Q   What else was withdrawn from your bank by
20 Bottom Dollar Payday?
21 **A   They attempted to do the same amount over.**
22 Q   Did the bank block it?
23 **A   Yes.**
24 Q   Okay. So my question then is, were other
25 amounts actually withdrawn from your bank after this

---

Page 76

1  extending the loan.
2  Now, was the loan actually paid off before this
3  notice? Do you recall?
4  **A   Yes.**
5  Q   Okay. So it was. Now, did you call them after
6  you got this notice?
7  **A   Yeah, I think so.**
8  Q   And what did you say to them?
9  **A   That I had paid off my loan and I didn't want**
10 **to extend it.**
11 Q   Okay. And did they tell you that it was
12 extended automatically?
13 **A   Correct.**
14 Q   And what did you say in response to that?
15 **A   I didn't receive the money, and I didn't want**
16 **another loan.**
17 Q   And what did they say in turn?
18 **A   It automatically renews, and that's a part of**
19 **their agreement.**
20 Q   All right. And you did not contact MoneyMutual
21 after you received any of these notices from Bottom
22 Dollar Payday; correct?
23 **A   No.**
24 **MR. PUTTERMAN:** Okay. Exhibit 10 is MALONE13.
25 (Defendants' Exhibit 10 was marked

---

Page 75

1  $150?
2  **A   No.**
3  Q   It was blocked after that.
4  **A   Correct.**
5  Q   And is that when the calls started?
6  **A   Correct.**
7  Q   Threatening to sue you?
8  **A   Yes.**
9  **MR. PUTTERMAN:** Okay. Exhibit 9 is
10 MALONE009 --
11 **MR. WILENS:** That was 9.
12 **THE REPORTER:** I think that was 8.
13 **MR. PUTTERMAN:** The last one, MALONE008, was
14 Exhibit 8.
15 **MR. WILENS:** And then 9 is MALONE -- I thought
16 we were talking about that.
17 **MR. PUTTERMAN:** No, 9 is MALONE009 and 010.
18 **MR. WILENS:** 7 is 7, 8 is 8?
19 **MR. PUTTERMAN:** As it happens, yes. 9 is 9 and
20 10.
21 (Defendants' Exhibit 9 was marked
22 for identification.)
23 Q   BY MR. PUTTERMAN: And as you can see, this is
24 an earlier e-mail from Bottom Dollar Payday dated
25 December 17, 2012, again, referring to either paying or

---

Page 77

1  for identification.)
2  Q   BY MR. PUTTERMAN:  And can you describe for us
3  what this e-mail dated January 24, 2013 is.
4  **A   It's a claim that I called the FDIC on Chase.**
5  Q   Okay. So let me understand the course of
6  events here, okay? You told Chase that an unauthorized
7  withdrawal had been made; correct?
8  **A   That is correct.**
9  Q   Now, what was Chase's initial response to that?
10 **A   That they could not return it.**
11 Q   You then called the FDIC?
12 **A   That is correct.**
13 Q   And when did you called FDIC?
14 **A   The same day. I'm not for sure what day it**
15 **was.**
16 Q   Sometime in January?
17 **A   Correct.**
18 Q   Okay. So you called the FDIC where? In
19 Washington or out here?
20 **A   I don't know where it was located. I just put**
21 **it up on the Internet.**
22 Q   It was like a service number?
23 **A   Correct.**
24 Q   So you spoke to somebody at the FDIC, and what
25 did you tell them?

Gilbert v
Bank of America, N.A.

Keeya Malone
November 23, 2015

---

Page 78

1    A    **That Chase is refusing to return an**
2    **unauthorized charge against my account.**
3    Q    And did you provide them with some information
4    about the charge and when it occurred and how it had
5    happened?
6    A    **Correct.**
7    Q    Okay.  And what did the person you were
8    speaking to say?
9    A    **They just took the report and I guess they were**
10   **going to forward it to Chase.**
11   Q    Okay.  So we don't know what went on with them,
12   but then Chase then did honor your claim.
13   A    **Correct.**
14   Q    Now, this, the claim here that says it's
15   approved, is not for $150; it's for $500.
16   A    **Correct.**
17   Q    Okay.  What was that $500?
18   A    **They was trying to get the payment for the**
19   **loan, the total amount.  Instead of sending 150, they**
20   **did a total of $500.**
21        MR. WILENS: "They" being who?
22        THE WITNESS: Bottom Dollar.
23   Q    BY MR. PUTTERMAN:  So they had actually taken,
24   not 150; they had taken 500.
25   A    **Correct.**

---

Page 79

1    Q    Okay.  Plus 150?
2    A    **At first they did the 150.**
3    Q    Okay.  Then they took another 500.
4    A    **Correct.**
5    Q    Now, did Chase end up refunding the whole 650?
6    A    **Correct.**
7    Q    Okay.  And this was all taken from Bottom
8    Dollar after they extended the loan, after you paid it
9    off?
10   A    **Correct.**
11   Q    So you did not make a claim for any of the
12   money you originally paid off; correct?
13   A    **Correct.**
14   Q    So that was not refunded to you.
15   A    **Correct.**
16        MR. PUTTERMAN: Okay.  Exhibit 11 will be
17   MALONE14 and 15.
18        (Defendants' Exhibit 11 was marked
19        for identification.)
20   Q    BY MR. PUTTERMAN:  Can you tell us what this
21   e-mail is?
22   A    **I don't remember.**
23   Q    It's something you received?
24   A    **Correct.**
25   Q    And did you understand what it was?

---

Page 80

1    A    Basically, it's a funding for some kind of
2    business, it looks like.
3    Q    Do you have any idea actually who it was from?
4    A    No.
5    Q    Okay.  Did you actually hit the "Visit Here"
6    button?
7    A    No, I didn't.
8    Q    And so you didn't apply for anything as a
9    result of receiving this e-mail.
10   A    Correct.
11   Q    Now, down below it says, "If you wish to not
12   receive further communication from our company, please
13   follow these instructions."  And then it has the
14   instructions on the next page for clicking on a link and
15   so on.  Did you do that to stop any further
16   communications?
17   A    Yes.
18   Q    And did that end it?
19   A    Correct.
20        MR. WILENS: Not quite, but get to the next
21   exhibit.
22        MR. PUTTERMAN: Yeah, okay.  I see.  Okay,
23   Exhibit 12 is MALONE16.
24        (Defendants' Exhibit 12 was marked
25        for identification.)

---

Page 81

1        MR. PUTTERMAN: Jeff, I don't have a third
2    copy, but I think you know what it is.
3        MR. WILENS: You already gave it to me.  I got
4    both of these already.
5        MR. PUTTERMAN: All right.  Exhibit 12 is the
6    second one you got there, MALONE16.
7    Q    And is this an e-mail you received from
8    something called either Advanced Network or
9    thecurrencyrundown.com?
10   A    Yes.
11   Q    Did you actually make an application to anybody
12   that resulted in you receiving this e-mail?
13   A    No.
14   Q    Okay.  You just got this sort of random?
15   A    Yes.
16        MR. WILENS: Sort of spammy.
17        MR. PUTTERMAN: Hmm?
18        MR. WILENS: Like spam.
19        MR. PUTTERMAN: Yeah.  I don't disagree.
20   Q    And do you have any idea what the source of
21   this was, in other words, how they got your e-mail
22   address?
23   A    No, I don't know.
24   Q    And you did not make a December 30, 2012
25   request for a payday advance?

---

Gilbert v
Bank of America, N.A.

Keeya Malone
November 23, 2015

Page 82

1    A   No.
2        MR. PUTTERMAN: Exhibit 13 is MALONE17.
3        (Defendants' Exhibit 13 was marked
4    for identification.)
5    Q   BY MR. PUTTERMAN: And this is another e-mail
6    from something called, it says "Account Services," but
7    yourcashplanner.com. And this was something also that
8    you did not solicit; is that right?
9    A   Correct.
10       MR. WILENS: I think it goes with 16, same
11   address.
12       MR. PUTTERMAN: No, it actually isn't.
13       MR. WILENS: At the bottom, "Safely
14   Discontinue" in Delray Beach, Florida.
15       MR. PUTTERMAN: Oh, yeah. But I was looking
16   thecurrencyrundown.com and yourcashplanner.com. But I
17   agree, this could be the same thing. I just don't know.
18   Yes, I see the address is the same. Okay.
19   Q   So you received this also, but this was not,
20   again, based upon anything that you did or applied for.
21   A   Correct.
22       MR. PUTTERMAN: Okay. Why don't we go off the
23   record for a minute.
24       THE VIDEOGRAPHER: The time is 12:24 p.m.
25   We're going off the record. This is the end of media

Page 83

1    No. 1.
2        (Luncheon recess)
3        THE VIDEOGRAPHER: We are back on the record.
4    The time is 1:15 p.m., and this is the beginning of
5    media No. 2.
6    Q   BY MR. PUTTERMAN: Good afternoon, Ms. Malone.
7    A   Good afternoon.
8    Q   I'd like to go through Exhibit 2 with you now,
9    which is the complaint, and I believe that you have that in
10   front of you.
11   A   Yes.
12   Q   And we've touched on a few points there, but
13   I'd like to go through it in a little bit more detail,
14   if we may. Now, some of this is going to be confirming
15   what you said earlier, but I'm going to try and keep
16   that to a minimum.
17       Would you first of all turn to paragraph 5.
18   A   Okay.
19   Q   Now, this refers to defendant Montel Brian
20   Anthony Williams, who is most commonly known as Montel
21   Williams. And you testified concerning having seen
22   Mr. Williams on TV advertisements as an endorser of
23   MoneyMutual. Correct?
24   A   Correct.
25   Q   Now, you personally don't know anything else

Page 84

1    about his relationship with MoneyMutual; is that right?
2    A   Correct.
3    Q   And you've never directly communicated with
4    Mr. Williams concerning any matter.
5    A   No.
6    Q   Okay. Let's go to paragraph 6. Glenn McKay. I
7    think you indicated earlier that you did not know who
8    Mr. McKay was?
9    A   No.
10   Q   Okay. And therefore you obviously have never
11   communicated with him?
12   A   No.
13   Q   And you don't know what relationship he has
14   with MoneyMutual or with any of the other defendants?
15   A   No.
16   Q   Okay. No. 7, paragraph 7 on page 4. Have you
17   ever heard of PartnerWeekly LLC, other than in
18   communications possibly with your counsel?
19   A   No.
20   Q   So you don't know anything about it?
21   A   No.
22   Q   And you've never communicated, to your
23   knowledge, with anybody at PartnerWeekly LLC.
24   A   I haven't.
25   Q   Paragraph 8 concerns a gentleman named Brian

Page 85

1    Rauch, R-a-u-c-h. And is it correct that you also don't
2    know who Mr. Rauch is?
3    A   Correct.
4    Q   You've never had any communications with him?
5    A   No.
6    Q   And you have no idea what his role or
7    relationship is or was with MoneyMutual or Selling
8    Source or any of the other defendants?
9    A   No.
10   Q   That's correct?
11   A   Correct. I'm sorry.
12   Q   That's okay.
13       Paragraph 9 refers to John Hashman. So again,
14   you don't know who Mr. Hashman is?
15   A   No.
16   Q   You've never communicated with him?
17   A   No.
18   Q   You don't know what his role or relationship
19   was with any of the other defendants?
20   A   No.
21   Q   Now let's look at 18, 19, and 20, which are on
22   page 6. And these are also names that we discussed
23   briefly earlier, Mr. Humphreys, Mr. Tulley, and
24   Mr. Irby. Do you see that?
25   A   Yes.

Gilbert v
Bank of America, N.A.

Keeya Malone
November 23, 2015

**Page 86**

1  Q    And again, you don't know who any of those
2  gentlemen are; correct?
3  A    Correct.
4  Q    You've never communicated with any of them?
5  A    No.
6  Q    And you have no idea what their role or
7  relationship is with any of the other defendants?
8  A    No.
9  Q    Okay.  Correct?
10 A    Correct.  I'm sorry.
11 Q    Thank you.
12       Let me ask you a question, just departing from
13 the complaint for a moment.  I believe you testified
14 that you first contacted your counsel, Mr. Wilens, in
15 approximately September of 2013; correct?
16 A    Correct.
17 Q    And was that prompted by the problems you were
18 having with Bottom Dollar?
19 A    Yes.
20 Q    And at that time, you didn't have any knowledge
21 that anything -- or belief, you didn't have any belief
22 that anything that MoneyMutual had done had anything to
23 do with the problems you were having with Bottom Dollar;
24 correct?
25 A    Correct.

**Page 87**

1  Q    And I think you indicated you really got that
2  loan because you were in a serious financial bind
3  because of your car loan payment; correct?
4  A    Correct.
5  Q    And did you at that time stop to think about
6  whether or not Bottom Dollar was allowed to make loans
7  in California?
8       MR. WILENS: Objection.  Vague as to what time.
9  She didn't know about Bottom Dollar.
10      MR. PUTTERMAN: When she got the loan.
11      MR. WILENS: Again, you could ask her, but it's
12 not even clear when she heard the name "Bottom Dollar."
13 She thought she was dealing with MoneyMutual.
14      MR. PUTTERMAN: Hold it.  I told you, stop
15 trying --
16      MR. WILENS: That's what she testified to.
17      MR. PUTTERMAN: No, she didn't.
18      MR. WILENS: Fine.  Why don't you ask her.
19 Q    BY MR. PUTTERMAN: When you got the loan, when
20 you were contacted by somebody and then got the loan,
21 you learned that that was Bottom Dollar; correct?
22 A    Afterwards.
23 Q    Okay.  But MoneyMutual didn't say, "We're
24 making you a loan," did they?
25 A    Well, they did say I was approved.

**Page 88**

1  Q    Right.  But they didn't say the loan was coming
2  from MoneyMutual.
3  A    Yeah, it didn't say.
4  Q    Okay.  In fact, have you ever seen or heard
5  anywhere that MoneyMutual itself made loans?
6  A    I'm not aware.
7  Q    So when you found out that the loan was coming
8  from Bottom Dollar Payday, or was made by Bottom Dollar,
9  at that time did you think at all about whether or not
10 Bottom Dollar was legally allowed to make loans in
11 California?
12      MR. WILENS: Objection.  Calls for a legal
13 conclusion.
14 Q    BY MR. PUTTERMAN:  You can respond.
15 A    I didn't know.
16 Q    Did you care?
17 A    At the time, no.
18 Q    When did you first start caring?
19 A    When I started getting threatening calls.
20 Q    And how did you connect up in your mind with
21 whether or not Bottom Dollar was allowed to make loans
22 in California?
23 A    I still didn't know then.
24 Q    Okay.  You didn't know one way or another.
25 A    Correct.

**Page 89**

1  Q    And that wasn't the issue for you, was it?
2  A    No.
3  Q    The issue was, you were getting these calls
4  because they claimed to have rolled over a loan that you
5  had already paid off.
6  A    Correct.
7       MR. WILENS: Let me talk to my client, please.
8  We're off the record.
9       MR. PUTTERMAN: Go off the record.
10      THE VIDEOGRAPHER: The time is 1:23 p.m.  We
11 are going off the record.
12      (Off record)
13      THE VIDEOGRAPHER: The time is 1:26 p.m.  We
14 are back on the record.
15 Q    BY MR. PUTTERMAN:  Okay, let us turn to
16 paragraph 53, which we looked at earlier, on page 17,
17 starts on page 17.  And we read this into the record
18 before, but you're confirming now you did not receive a
19 loan from Cash Yes, and the only payday loan you've ever
20 received was from Bottom Dollar Payday.
21 A    Correct.
22 Q    Okay.  And you've never, ever applied for
23 another payday loan.
24 A    Correct.
25 Q    Either before or after your Bottom Dollar

Gilbert v
Bank of America, N.A.

Keeya Malone
November 23, 2015

**Page 90**

1 Payday loan.
2 A Correct.
3 Q Let me ask you this about television ads. How
4 many times do you recall seeing television ads for
5 MoneyMutual?
6 A Several times.
7 Q Do you remember exactly what was said on them?
8 A Not verbatim, no.
9 Q What's your general recollection of what they
10 said?
11 A That you can get money the same day, that
12 they're reliable. Basically, that's it, what I can
13 remember.
14 Q Would it be correct that you probably saw a
15 television ad for MoneyMutual at about the same time you
16 were having an issue over paying your car loan?
17 A I saw it before then, too.
18 Q I understand that. And I'm sorry. I didn't
19 mean to imply otherwise, but you think you then saw it
20 around that time as well?
21 A Yes.
22 Q And that prompted you to go to the website?
23 A Correct.
24 Q Now, when you went to the website, did you go
25 straight for the page on which you could submit your

**Page 91**

1 information for a loan?
2 A No. It gives you like a small introduction.
3 Q Okay, we'll get back to that in a little bit.
4 So you went to that, you saw that page.
5 A Correct.
6 Q And then you went to the loan, which you could
7 submit your information.
8 A Correct.
9 Q Okay. And you did that.
10 A Yes.
11 Q Have you ever gone back to the MoneyMutual
12 website for any reason, whether just to look at it or
13 apply for a loan or --
14 A No.
15 Q Okay. Let's go to paragraph 55 on page 18.
16 A Okay.
17 Q Would you read that to yourself.
18 A (Examining document) Okay.
19 Q Was that your arrangement with Bottom Dollar
20 Payday? Does that describe your arrangement with them?
21 MR. WILENS: Hold on. Which paragraph are you
22 looking at here?
23 MR. PUTTERMAN: 55.
24 MR. WILENS: Okay. I'm going to object.
25 There's no foundation the witness knows what some of

**Page 92**

1 those terms mean.
2 But if you understand it, you can answer.
3 Q BY MR. PUTTERMAN: Or if you need to ask a
4 question about some of the terms in there, you can, of
5 course.
6 A They're saying that it was a postdated check.
7 MR. WILENS: Hold on. It's not what they're
8 saying.
9 THE WITNESS: I mean, what it's stating here.
10 Q BY MR. PUTTERMAN: Yes.
11 MR. WILENS: Well, I'm going to object. The
12 term "postdated check" is not defined for the witness.
13 It has a different meaning in this context.
14 MR. PUTTERMAN: Well, why don't you define what
15 the meaning was that you had in mind, since you wrote
16 it.
17 MR. WILENS: According to the State of
18 California, an electronic draft is the same as a
19 postdated check. So it doesn't have to be a physical
20 piece of paper. It can be an electronic authorization
21 to draw money from a bank account on a certain date.
22 Q BY MR. PUTTERMAN: Okay. Work with that
23 definition. I'm not adopting it, agreeing to it or
24 anything else, but I don't have to.
25 Using that definition, is that what you did

**Page 93**

1 with Bottom Dollar payday?
2 A Yes.
3 Q Okay. And look at paragraph 57. It says,
4 quote:
5 "As set forth above, because all of
6 the foregoing loans were made by
7 unlicensed lenders, they were all
8 illegal."
9 Do you personally know anything about that?
10 A No.
11 Q Okay. Let's look at paragraph 59. Now, it
12 says first, quote:
13 "During the Class Period, Defendant
14 Selling Source was engaged in the
15 business of promoting and facilitating
16 payday loans by unlicensed lenders to
17 California residents."
18 Now, I think you indicated before that you'd
19 never heard of Selling Source; correct?
20 A Correct.
21 Q So you don't know anything about what Selling
22 Source did or did not do.
23 A Correct.
24 Q Then it says, quote:
25 "Selling Source did this by

Gilbert v
Bank of America, N.A.

Keeya Malone
November 23, 2015

1    aggressively marketing the loans on the
2    Internet and to a lesser extent radio
3    and television."
4        Now, you've testified that you did see
5    MoneyMutual ads on television. Correct?
6    **A   Correct.**
7    **Q   Do you recall if those ads said anything about**
8    **Selling Source?**
9    **A   I don't remember.**
10   Q   Okay. You remember MoneyMutual, though.
11   **A   Correct.**
12   **Q   And you remember the fact that Montel Williams**
13   was the endorser on those ads.
14   **A   Correct.**
15   Q   Okay. Next sentence is, quote:
16          "Selling Source obtained leads in
17       part by creating branded websites."
18       Would it be correct that you don't know
19   anything about that --
20   A   I'm not for sure.
21   Q   Do you think you know anything at all?
22       MR. WILENS: Well, we had conversations with my
23   clients, so attorney-client privilege.
24       MR. PUTTERMAN: No, no, no, exclude -- I'm
25   asking as to your personal knowledge, without regard for

1    any conversation you may have had with your counsel.
2        THE WITNESS: I don't remember.
3    **Q   BY MR. PUTTERMAN: Now, looking at last**
4    **sentence, which refers to spam e-mails, you never**
5    **received any e-mails at all from Selling Source;**
6    **correct?**
7    **A   No.**
8    **Q   And you've never seen any advertisements for**
9    **Selling Source on any other website; correct?**
10   **A   I don't know.**
11   **MR. WILENS: Are you -- Selling Source by name,**
12   **they could have been using any one of hundreds of names.**
13   **Q   BY MR. PUTTERMAN: I'm referring to Selling**
14   **Source by name.**
15   **A   Not that I can recall.**
16   **Q   Okay.**
17       The witness, as you yourself have said, would
18   not know.
19       MR. WILENS: She has no way of knowing what
20   Selling Source is, because they could be using any
21   number of many other names.
22       MR. PUTTERMAN: That's all I'm inquiring about.
23       MR. WILENS: Well, I'll stipulate to that.
24   Doesn't get Selling Source off the hook, that's for
25   sure. Hope you're not going to ask the witness -- these

1    are interrogatories, anyway. I mean, asking them if she
2    knows about each fact alleged in the complaint sounds
3    like an interrogatory to me, a contention interrogatory.
4        MR. PUTTERMAN: I don't really care what it
5    sounds like to you. And it's not a contention
6    interrogatory, if you're asking about personal
7    knowledge.
8    **Q   Okay, paragraph 60. I think we've discussed**
9    **the subject matter of this before, but could you read**
10   **that to yourself again?**
11   **A   (Examining document) Okay.**
12   **Q   And it's correct, isn't it, that you don't know**
13   **anything about those gentlemen and what they did do or**
14   **did not do or might have done or anything?**
15   **A   Correct.**
16   **Q   Okay. Is the same true for paragraph 61?**
17       MR. WILENS: It's like 10 lines. Are you
18   asking her to read the whole thing --
19       MR. PUTTERMAN: Yeah, does she have personal
20   knowledge of anything that's alleged in paragraph 61.
21   Q   And by "personal knowledge," I mean information
22   or knowledge that you did not get from a conversation or
23   communication with your counsel.
24       MR. WILENS: Off the top of her head, okay, for
25   what it's worth, you can get these answers. I don't

1    know what good it's going to you.
2        MR. PUTTERMAN: I realize you're just trying to
3    keep yourself awake with those comments. But I'm
4    perfectly fine if you want to go on sleep.
5        MR. WILENS: No, I don't want you to ask my
6    client every single alleged fact in the complaint. That
7    will take a long time.
8        MR. PUTTERMAN: Well, what you want is not
9    dispositive here, and you'll notice that I have not
10   asked her about substantial parts of the complaint.
11       MR. WILENS: I haven't noticed that. You could
12   be working out of sequence, for all I know.
13       MR. PUTTERMAN: Stop.
14       **THE WITNESS: No, I don't know.**
15   **Q   BY MR. PUTTERMAN: Okay. Let's skip to**
16   **paragraph 67. Why don't you read that to yourself.**
17   **A   (Examining document) Okay.**
18   **Q   Now, you don't know anything about the**
19   **relationship of MoneyMutual and PartnerWeekly and**
20   **Selling Source with each other; correct?**
21   **A   No, I don't.**
22   **Q   Okay. Would you go down to paragraph 70,**
23   **please. And read that to yourself. Actually, why don't**
24   **you read all the way through paragraph 72.**
25       **MR. WILENS: So what paragraph is she reading?**

Page 98

1   **MR. PUTTERMAN:** 70 through 72.
2   **THE WITNESS:** (Examining document) Okay.
3   Q   BY MR. PUTTERMAN:  So it's correct you don't
4   know anything about the marketing contracts that are
5   referred to in those paragraphs; correct?
6   A   Correct.
7   **MR. PUTTERMAN:** Look at all these things I'm
8   skipping here.  Make you very happy, Jeff.
9   **MR. WILENS:** I realize you're just stretching
10  it out.
11  **MR. PUTTERMAN:** I think your nickname should be
12  "Last Word Wilens."
13  **MR. WILENS:** First word and last word.
14  **MR. PUTTERMAN:** And every middle word also.
15  **MR. WILENS:** I get my way.
16  Q   BY MR. PUTTERMAN:  Okay, would you turn to
17  paragraph 100, please.
18  A   Okay.
19  Q   And have you read that to yourself?
20  A   Okay.
21  Q   Okay.  You don't know anything about how any of
22  the MoneyMutual defendants generated their revenue;
23  correct?
24  A   No, I don't.
25  Q   Okay.  Now we're getting to allegations about

Page 99

1   the website, and I'm going to ask the reporter to mark
2   as next in order, 14 is the Request for Judicial Notice
3   in Support of the MoneyMutual Defendants', Montel
4   Williams' Motion to Dismiss.  And what I'm going to be
5   specifically --
6   **MR. WILENS:** You're going to put a whole motion
7   in as an exhibit?
8   **MR. PUTTERMAN:** No, no, it's the request for
9   judicial notice, because it has attached copies from the
10  website.  So that's what I'll be referring to.
11      (Defendants' Exhibit 14 was marked
12      for identification.)
13  Q   BY MR. PUTTERMAN:  Okay, I'm going to ask you
14  to go back first to, see there's one page that's just
15  marked Exhibit A?
16  A   Uh-huh.
17  Q   And I'd like to go through the pages under
18  Exhibit A with you.
19  **MR. WILENS:** Mine are in color.  Maybe she
20  wants to look at these?  Or some of them are in color.
21  **MR. PUTTERMAN:** I've got black and white here.
22  **MR. WILENS:** Exhibit A is in color.
23  **MR. PUTTERMAN:** Really?
24  **MR. WILENS:** Are we looking at the same
25  document here?

Page 100

1   **MR. PUTTERMAN:** Yours are in color?
2   **MR. WILENS:** Yeah.
3   **MR. PUTTERMAN:** Really?  Okay.  Good for you.
4   Q   This first page under Exhibit A, where it says
5   "Apply Now," see, with the exclamation point?
6   A   Yes.
7   Q   Do you recall reviewing this page on the
8   MoneyMutual website?
9   A   Yes.
10  Q   What is it specifically that you remember about
11  it?
12  A   The "Apply Now," you can get up to a thousand
13  dollars, and that their lenders -- I mean, he backs
14  their lenders.
15  Q   Okay.  You understood this to be that he backs
16  the lenders?
17  A   Correct.
18  Q   You see that it also says here that MoneyMutual
19  is not a lender?
20  A   Correct.
21  Q   Now, did you actually understand that
22  Mr. Williams was backing the lenders, or that he was
23  backing MoneyMutual?
24  A   My understanding, he was advertising for
25  MoneyMutual that lends funds.  That was my

Page 101

1   understanding.
2   Q   Okay.  Is this also the introductory statement
3   that you testified a few minutes ago that you read, the
4   statements on this page?
5   A   Correct.
6   Q   Let's turn to the next page, which says near
7   the top "How It Works."  You see that?
8   A   Yes.
9   Q   Did you read that page?
10  A   No.
11  **MR. WILENS:** What do you mean, that page?  It's
12  the same page.
13  **MR. PUTTERMAN:** I'm referring to the exhibit
14  here.
15  **MR. WILENS:** Well, I see how it works on the
16  first page.
17  **MR. PUTTERMAN:** No, no.  Okay.  It's -- yes, it
18  runs down.
19  Q   Do you see that?
20  A   Uh-huh.
21  Q   In other words, the "How It Works" is at the
22  bottom of the first page, and the same "How It Works" is
23  at the top of the second page.
24  **MR. WILENS:** Well, it's the same webpage.  You
25  just split it into two pages printed out.  See, this is

1  not the way it's on her computer, so I have a problem
2  with you asking her questions --
3      MR. PUTTERMAN: Well, this is the only way I
4  can have it here.
5  Q   But regardless what it is, do you recall
6  reading what appears on the second page of this exhibit?
7  A   No.
8  Q   Okay. Let's go to the third page of the
9  exhibit. And I agree with you, this looks like just
10 scrolling down on the page. So do you remember any part
11 of the -- reading any part of the third page of the
12 exhibit?
13 A   No.
14 Q   Did you see the little box there at the top of
15 the third page of the exhibit where it says, quote:
16     "Any questions about loan repayment,
17     schedule, and/or fees should be directed
18     to the lender."
19 And then it goes on to say:
20     "Remember -- MoneyMutual is not a
21     lender, and will not be able to provide
22     any information regarding loan repayment
23     schedules, fees, or other loan details."
24     Did you see that?
25 A   No.

1  Q   Okay. Is it correct, though, that you did not
2  ever call MoneyMutual to complain, at least, in part,
3  about Bottom Dollar Payday because you understood that
4  the loan itself did not come from MoneyMutual, but your
5  loan was with Bottom Dollar Payday?
6  A   I didn't know I could call MoneyMutual.
7  Q   Did you go back to the website to see?
8  A   No.
9  Q   They did have -- they had an 800 number.
10 A   I see that 1-800 number now, yeah.
11 Q   Okay. Let's go to Exhibit B. And again, I
12 agree with what Mr. Wilens will say if I don't, which is
13 that these two pages are actually one webpage scrolled
14 down. Follow me?
15 A   Yes.
16 Q   So looking at these two pages --
17     MR. WILENS: What do you mean, "these two
18 pages"?
19     MR. PUTTERMAN: On Exhibit B.
20     MR. WILENS: Exhibit B is not the same as
21 Exhibit A.
22     MR. PUTTERMAN: What?
23     MR. WILENS: You said "these two pages." What
24 two pages are you referring to?
25     MR. PUTTERMAN: I just said a minute ago that

1  we're going to Exhibit B.
2      MR. WILENS: But then you just said that "these
3  two pages." I'm just trying to figure out which two
4  pages you're referring to.
5      MR. PUTTERMAN: There's two pages under Exhibit
6  B.
7      MR. WILENS: Okay.
8      MR. PUTTERMAN: See?
9      MR. WILENS: It's a little bit clearer in my
10 copy. Why don't you look at this one.
11     MR. PUTTERMAN: That's fine.
12     MR. WILENS: It's in color and the print looks
13 better.
14 Q   BY MR. PUTTERMAN: And as I said a minute ago,
15 these two pages are actually just breaking out one
16 webpage that you could scroll down. Do you recall
17 reading anything on this page, this webpage?
18 A   Yes.
19 Q   What do you recall?
20 A   The lender conduct.
21 Q   What do you recall about that?
22 A   Basically how they say that the lenders that
23 they actually use are good lenders.
24 Q   Are what?
25 A   Are good lenders.

1  Q   Do you remember reading any of the specifics of
2  the code of lender conduct?
3      MR. WILENS: Why don't you read it now. I
4  don't know how you're going to remember it without
5  reading it. So...
6      THE WITNESS: (Examining document) I
7  remember --
8      MR. WILENS: It continues to the next page. It
9  goes 1, 2, 3, 4, 5.
10     THE WITNESS: (Examining document) As far as
11 the harassment and selling my information to a third
12 party.
13 Q   BY MR. PUTTERMAN: Okay, now, with regard to
14 selling information to a third party, you don't know who
15 actually gave your information to a third party;
16 correct?
17 A   No.
18 Q   Okay. Now, if you remembered these things,
19 didn't that make you think about complaining to
20 MoneyMutual that they had matched you with a lender that
21 was not following this code of lender conduct?
22 A   Well, I didn't think to go back to them, and I
23 didn't have their number. I just was dealing with
24 Bottom Dollar.
25 Q   Okay. But you knew that you could at least go

Gilbert v
Bank of America, N.A.

Keeya Malone
November 23, 2015

1    look up the MoneyMutual website and see if there was a
2    number; correct.
3    **A    Yeah, I could have.**
4    Q    Okay. But you didn't do that.
5    **A    Correct.**
6    Q    Because you just thought that you should be
7    dealing with Bottom Dollar?
8    **A    Correct.**
9    Q    Let's go to Exhibit C. Do you recall anything
10   from the pages that appear under Exhibit C?
11   **A    The annual percentage rate, I looked for that,**
12   **but it didn't give me an amount of how much the rate**
13   **would be.**
14   Q    On the loan?
15   **A    Of the loan.**
16   Q    Okay. And did you understand that that would
17   depend on the lender?
18   **A    No, I didn't understand that.**
19   Q    You just didn't see an annual percentage rate
20   on the website.
21   **A    Correct.**
22   Q    Did that cause you some concern?
23   **A    Yes.**
24   Q    But you went and applied anyway?
25   **A    Yes.**

1    Q    Because you needed the loan.
2    **A    Correct.**
3    Q    Now, when you obtained the loan from Bottom
4    Dollar Payday, that did include the interest rate;
5    correct?
6    A    Correct.
7    Q    Did you tell Bottom Dollar Payday that you did
8    not want the loan because of the interest rate?
9    A    When they contacted me, I asked them, what was
10   the interest rate, and they didn't give it to me. So at
11   that time I didn't know.
12   Q    But you finally saw it on the agreement;
13   correct?
14   A    Yes, but it was already in my account.
15   Q    Okay. But that was all strictly dealing with
16   Bottom Dollar Payday; right?
17   MR. WILENS: Objection. Argumentative. She
18   got it through MoneyMutual. She --
19   MR. PUTTERMAN: No. Let's not have
20   any recidivism here.
21   MR. WILENS: Well, don't put words in her
22   mouth. She told you how she got the loan.
23   MR. PUTTERMAN: It's cross-examination.
24   MR. WILENS: That doesn't mean that you can
25   ignore her testimony.

1    MR. PUTTERMAN: I'm not ignoring her testimony.
2    I'm asking for her testimony.
3    MR. WILENS: She told you. She answered it
4    already.
5    MR. PUTTERMAN: Okay.
6    Q    Any discussion about interest rate that you had
7    was with Bottom Dollar Payday; correct?
8    **A    Well, the person that was on the phone, I**
9    **don't know if they were the representative from Bottom**
10   **Dollar or MoneyMutual. But I did discuss it.**
11   Q    So far as you understood, though, you were
12   dealing with Bottom Dollar at that point.
13   MR. WILENS: She just answered the question.
14   She said no, she didn't know.
15   THE WITNESS: I didn't know who I was dealing
16   with at that time.
17   Q    BY MR. PUTTERMAN: They didn't identify
18   themselves?
19   **A    No.**
20   Q    Did you ask?
21   **A    No.**
22   Q    Let's continue to look at Exhibit C. Do you
23   see on the first page on Exhibit C it says, "What is
24   MoneyMutual"?
25   **A    Yes.**

1    Q    Did you read what was under that?
2    **A    Yes.**
3    Q    So you understood from that that MoneyMutual
4    was going to try to connect you with a lender.
5    **A    Correct.**
6    Q    Okay. And you didn't understand that
7    MoneyMutual itself was the lender.
8    MR. WILENS: The way you phrased that is
9    awkward, but she can answer it.
10   MR. PUTTERMAN: Right.
11   THE WITNESS: Well, I figured they had, within
12   MoneyMutual, it would be a lender.
13   Q    BY MR. PUTTERMAN: And what do you mean when
14   you say "within MoneyMutual"?
15   **A    Like you apply for a loan and they give you a**
16   **loan officer, but it's still with that company, not**
17   **outside of the company.**
18   Q    Well, remember -- and why did you think that?
19   **A    Because I was going through MoneyMutual.**
20   Q    Remember, we looked at Exhibit A and you said
21   you had seen the first page on Exhibit A?
22   **A    Correct.**
23   Q    And it says MoneyMutual is not a lender.
24   MR. WILENS: Yeah, by that name. Maybe they
25   have other names. You're arguing with the witness.

Page 114

1    You don't have to answer that question.
2        **MR. PUTTERMAN:** Yeah, she does.
3        **MR. WILENS:** You're asking her, if she had read
4    this back in November 2012, would she then have
5    concluded what?
6        **MR. PUTTERMAN:** Would she have understood then
7    why there was no APR listed on the MoneyMutual website.
8        **MR. WILENS:** Well, why can't you list the
9    lender's APRs on the website?
10       **MR. PUTTERMAN:** Actually, you're not allowed
11   to. FTC won't permit it.
12       **MR. WILENS:** Well, I don't know -- I'm just
13   saying, it's possible.
14       **MR. PUTTERMAN:** FTC won't permit it.
15       **MR. WILENS:** That's not what you say in your
16   explanation.
17       **MR. PUTTERMAN:** The FTC won't permit it.
18       **MR. WILENS:** The lenders advertise rates on
19   their websites.
20       **MR. PUTTERMAN:** FTC will not permit a loan
21   generator to do it, a lead generator.
22       **MR. WILENS:** You mean a loan broker?
23   Q   BY MR. PUTTERMAN:  Can you answer my question?
24       **MR. WILENS:** Do you understand the question?
25   He's asking you, assuming you had read this back then,

Page 115

1    would you know what the reason is that they can't list
2    the APR on the website?
3        **THE WITNESS:** No.
4    Q   BY MR. PUTTERMAN:  You don't understand, you
5    would not understand that terms and interest rates and
6    so on vary from lender to lender?
7        **MR. WILENS:** How would she know they vary?
8    That's what you're saying.
9        **MR. PUTTERMAN:** Okay, she's only worked in
10   banks for how long?
11       **MR. WILENS:** Most banks have pretty much the
12   same interest rate. There's very little competition.
13       **MR. PUTTERMAN:** Thank you for that economic
14   dissertation, Mr. Wilens.
15       **MR. WILENS:** But you can list all the lenders,
16   all the banks' rates. They're published in the
17   newspaper.
18   Q   BY MR. PUTTERMAN:  Did you understand that
19   whatever lender you went to would have its own rates,
20   terms, and so on?
21       **MR. WILENS:** Okay, I'm going to object to the
22   form of your question, because you're assuming that's
23   true, and we don't even know if that's true or not.
24       **MR. PUTTERMAN:** Doesn't matter.
25       **MR. WILENS:** He wants you to assume that they

Page 116

1    all have different rates.
2        **MR. PUTTERMAN:** No, that's not what I want.
3    Q   What I want to see is if you -- let me ask it
4    this way. Would you have understood that whatever the
5    interest rate would be would depend on the lender with
6    whom you were matched?
7    A   No.
8    Q   You would not have understood this from that
9    paragraph?
10   A   No.
11   Q   Even though, it says, quote, "The reason for
12   this is that terms, rates, APRs, and fees vary from
13   lender to lender."
14       **MR. WILENS:** I'm going to object. Arguing --
15   maybe she doesn't believe that.
16       **MR. PUTTERMAN:** Stop coaching the witness.
17       **MR. WILENS:** No, you're just arguing with her.
18   Q   BY MR. PUTTERMAN:  Do you understand what that
19   sentence means?
20       **MR. WILENS:** That's what they claim.
21       **MR. PUTTERMAN:** Jeff, be quiet.
22       **MR. WILENS:** No.  Stop arguing with my witness.
23       **MR. PUTTERMAN:** You know what --
24       **MR. WILENS:** Ask another question.
25       **MR. PUTTERMAN:** -- we're going -- I'm going to

Page 117

1    go for a protective order against you.
2        **MR. WILENS:** Go ahead.
3        **MR. PUTTERMAN:** I will. And if you think I
4    won't, you're kidding yourself.
5        **MR. WILENS:** You can't have a protective order
6    against me.
7        **MR. PUTTERMAN:** Yeah, I can, for making
8    speaking objections at deposition, I can, and you know
9    it.
10       **MR. WILENS:** The question you just asked was
11   completely improper.  You're trying to argue with her.
12   Q   BY MR. PUTTERMAN:  Do you understand what that
13   sentence means?
14   A   Reading it now?
15   Q   Yes.
16   A   I understand what it's saying here.  But I
17   didn't understand that then.
18   Q   Do you actually remember reading that in 2012?
19   A   I don't remember reading that.
20   Q   Has something occurred which would cause you to
21   have understood something now, like this sentence, that
22   you would not have understood in 2012?
23   A   I don't understand why you can't give me the
24   interest rate based on the dollar amount that I'm
25   requiring.

Gilbert v
Bank of America, N.A.

Keeya Malone
November 23, 2015

---

Page 118

1  Q    Okay. But whether you believe that MoneyMutual
2  could or could not, the question is, did you understand
3  that they were not providing it here?
4  A    I understand it today.
5  Q    Well, and you testified earlier that you
6  couldn't find an APR on the website then; correct?
7  A    Correct. I couldn't.
8  Q    And that caused you some concern; is that
9  right?
10  A    Correct.
11  Q    But you went ahead and applied anyway.
12  A    Correct.
13  Q    You didn't try to call the 800 number that
14  appears in several places on the website; correct?
15  A    Someone did call me.
16  Q    I'm asking about before you applied.
17  A    Correct.
18  Q    And you see there's some other material that
19  goes down on this page. There's a heading that says,
20  "What happens if I don't pay the loan back on time or
21  don't pay it back at all?" And then it says, "What is
22  the renewal policy for these types of loans?"
23      Now, did you read the information that was
24  under there?
25  A    No, I didn't see it.

---

Page 119

1  Q    And why was that?
2  A    I apparently didn't scroll down far enough.
3  Q    Because what you were primarily interested in
4  was applying for the loan so that you could get money to
5  pay your car loan; correct?
6  A    Correct.
7  Q    Now, at the bottom of the page and carrying
8  over to the next page, it says, quote, "You may also
9  contact us via snail mail at the address below." And
10  above that, it also provides, see, above that it says,
11  quote:
12      "MoneyMutual provides its services
13      in compliance with Federal and
14      applicable law. We work hard to provide
15      a quick and easy service for our
16      customers. If you have any questions,
17      issues, or concerns, please contact us
18      immediately at (800) 741-3300, or
19      customerservice@moneymutual.com."
20      Did you see that?
21  A    No.
22  Q    So you didn't raise the -- you didn't think it
23  was important enough at that time, given your
24  priorities, to raise a question about why no APR was
25  listed on the website?

---

Page 120

1      MR. WILENS: Objection. Argumentative. It's
2  fine print. Maybe she didn't even notice it. It was
3  not visible to her. You're just arguing with the
4  witness.
5  Q    BY MR. PUTTERMAN: Okay, you can answer the
6  question.
7      MR. WILENS: Was it important for them to tell
8  you the truth on the website?
9      MR. PUTTERMAN: No, you don't get to ask the
10  questions here in my examination.
11      MR. WILENS: Well, then I'll advise the witness
12  that the question is arguing with her.
13      Basically, just --
14  Q    BY MR. PUTTERMAN: You can respond.
15      MR. WILENS: -- refusing to believe you.
16  Q    BY MR. PUTTERMAN: You can respond.
17  A    Yes, I did care.
18  Q    Okay. But not enough to contact MoneyMutual to
19  ask about it?
20      MR. WILENS: Objection. Argumentative about
21  how much she cared.
22      Did you care a lot?
23      MR. PUTTERMAN: You don't get to ask the
24  questions here.
25      MR. WILENS: You don't get to argue with my

---

Page 121

1  client.
2      MR. PUTTERMAN: You can respond to the
3  question.
4      MR. WILENS: He's asking if you cared a lot.
5      MR. PUTTERMAN: Jeff, be quiet.
6      THE WITNESS: Yeah, I did care.
7  Q    BY MR. PUTTERMAN: Okay, but you did not
8  contact MoneyMutual to ask about it.
9      MR. WILENS: Asked and answered. But answer it
10  again.
11      THE WITNESS: No, I didn't.
12  Q    BY MR. PUTTERMAN: Okay, take a look at
13  Exhibit D. Do you recall seeing this page?
14  A    No.
15  Q    Okay, you can lay that aside.
16      Let's go back to the complaint, Exhibit 2.
17  Let's go to paragraph 103?
18  A    Okay.
19  Q    Now, you see paragraph 103 refers to the code
20  of lender conduct, which we just saw on the website
21  pages; correct?
22  A    Correct.
23  Q    Paragraph 103 states in part, quote:
24      "One of the requirements is that the
25      Lenders on the network are prohibited

---

Gilbert v
Bank of America, N.A.

Keeya Malone
November 23, 2015

---

Page 122

1  from using the borrower's personal
2  information to market other products or
3  services or give the information to
4  third parties. However, this
5  requirement was routinely violated by
6  the lenders retained by Plaintiffs and
7  the Class Members. The Lenders sold or
8  gave the information to other entities
9  so they could 'spam' the borrowers in an
10 attempt to sell more loans to them in
11 the future."
12     We'll stop there for the moment. Now, we
13 looked at your -- the documents that were produced on
14 your behalf earlier, and I think we saw a couple of
15 e-mails that looked like they might have been spam
16 e-mails; correct?
17 A  Correct.
18 Q  But you did not know where the senders of those
19 e-mails got your e-mail address; correct?
20     MR. WILENS: Objection. Calls for speculation.
21     MR. PUTTERMAN: That's what I'm asking. I'm
22 saying, you don't know.
23     MR. WILENS: She has a suspicion. Know for a
24 fact?
25 Q  BY MR. PUTTERMAN: Do you know?

---

Page 123

1     MR. WILENS: "Know" is vague. Can you....
2     THE WITNESS: No, I don't know.
3 Q  BY MR. PUTTERMAN: Okay. Do you have any idea
4 of whether they had other information concerning you
5 besides your e-mail address?
6 A  I don't know.
7 Q  Did you think then that maybe you should
8 complain to MoneyMutual because you thought that
9 information you had submitted to them was being used by
10 somebody else?
11 A  No.
12 Q  Why not?
13 A  I don't know.
14 Q  Did you contact Bottom Dollar Payday to ask
15 them if they had sold or given away any of your
16 information?
17 A  No, I didn't.
18 Q  Why not?
19 A  I don't know.
20 Q  Did you just basically think that these were,
21 like, annoying e-mails and get rid of them?
22 A  Correct.
23 Q  Okay. And you didn't make any new loan or buy
24 any goods or services based on any of those spam
25 e-mails?

---

Page 124

1 A  No.
2 Q  Okay. We've discussed the rest of that
3 paragraph, which concerned the calls that you received
4 from Bottom Dollar Payday and apparently collection
5 agencies concerning that loan. Correct? We've already
6 been through that?
7 A  Correct.
8 Q  And you've described to the best of your
9 recollection those calls and what they said.
10 A  Correct.
11 Q  Okay. The contents, the substance of paragraph
12 104 we've discussed, when we discussed what was going on
13 with Bottom Dollar Payday. Correct?
14     Now, let me ask you this. Look at paragraph
15 105, please. And read that to yourself.
16 A  (Examining document.)
17 Q  Do you recall if you saw that language on the
18 website?
19     MR. WILENS: She doesn't have it in front of
20 her right now.
21     MR. PUTTERMAN: She just went through quite a
22 bit of it.
23 Q  Do you recall having seen that language on the
24 website?
25 A  I don't remember.

---

Page 125

1 Q  Now let me ask you this. If you had seen that
2 language on the website, would that have prompted you
3 to call MoneyMutual to complain about Bottom Dollar
4 Payday?
5 A  Yeah.
6 Q  Okay. And that's because you would have seen
7 that MoneyMutual wanted to know about lenders that did
8 not follow the code of lender conduct.
9 A  Correct.
10 Q  Okay. Would you turn to paragraph 108, please,
11 and read that to yourself.
12 A  (Examining document.)
13 Q  Does paragraph 108 reflect what you recall
14 seeing on the website?
15 A  Yeah.
16 Q  Especially the big picture; right?
17 A  Correct.
18 Q  Turn to paragraph 109.
19 A  Okay.
20 Q  Do you recall ever seeing any advertisements
21 for MoneyMutual on YouTube?
22 A  No.
23 Q  Okay, would you turn to paragraph 110, please.
24 A  Okay.
25 Q  Now, that starts out by saying, quote:

---

Min-U-Script®

Gilbert v
Bank of America, N.A.

Keeya Malone
November 23, 2015

1    "On the MoneyMutual website, during
2    the Class Period, there was a frequently
3    asked questions page that contained the
4    following information:
5        "'Q   Why is Montel Williams
6    endorsing this site?
7        "'A   Montel Williams has endorsed
8    MoneyMutual to provide access to short
9    term cash loans to people who have no
10    other alternatives.  Montel takes pride
11    in being able to provide people with
12    information to help them live better
13    physically, spiritually, financially and
14    emotionally.  Montel understands that
15    people have unexpected and needed
16    expenses and sometimes difficult to pay
17    due to lack of funds or credit.'"
18    And that was you at that time; correct?
19    A   Correct.
20    Q   Because you needed the money for the car.
21    A   Correct.
22    Q   For the car loan, and you needed the car for
23    work.
24    A   Yes.
25    Q   And no work, no pay.

1    described above.  In reliance on the
2    general representations on the
3    moneymutual.com website and on those
4    made by Montel Williams that the lenders
5    were trustworthy and reliable, and in
6    reliance about the specific
7    representations made in the Lender's
8    Code of Conduct described above,
9    Plaintiffs applied for loans through the
10    MoneyMutual website."
11    Now, I think you've already testified quite a
12    bit that you were particularly motivated to get the loan
13    because you needed money to pay off your car loan, and
14    that you did not see anything about an APR on the
15    website, which concerned you, but you did not make any
16    inquiry about that before you applied.  Correct?
17    A   Correct.
18    Q   Were there -- I would like you to tell me what
19    else on the website, if anything, you particularly
20    relied upon when you decided to submit your information
21    for a loan through MoneyMutual.
22    A   That my information wouldn't be shared to
23    anyone, and that the lenders are reliable and
24    trustworthy.
25    Q   Okay.  But I think you've testified that you

1    A   Correct.
2    Q   And no pay, real trouble.
3    A   Yes.
4    Q   Okay.  Would you turn to paragraph 115, please.
5    A   Okay.
6    Q   Now, the first sentence says, quote:
7        "The MoneyMutual defendants and
8    Montel Williams decided which lenders
9    would be added to the MoneyMutual
10    Lending Network."
11    You don't know anything about that subject;
12    correct?
13    A   Yes.
14    Q   And is it true that you don't personally know
15    anything about any of the rest of paragraph 115?
16    A   I don't know.
17    Q   Paragraph 120.
18    A   Okay.
19    Q   Quote:
20        "With respect to the specific loans
21    referenced in paragraphs 51 to 54 as
22    being originated through the MoneyMutual
23    website, the Plaintiffs read the
24    website, and believed the
25    representations contained therein and

1    did not complain to MoneyMutual afterwards, that it
2    looked like your information had been sold by somebody,
3    and that you did not believe that Bottom Dollar Payday
4    was reliable and trustworthy.  Correct?
5    A   Correct.
6    Q   Didn't you think that it would be important for
7    MoneyMutual to know that, since it stated that it had a
8    code of lender conduct to which it expected lenders to
9    adhere?
10    A   Well, at that time --
11        MR. WILENS: I'm going to object.  It's
12    argumentative.  You can answer it yes or no.
13        THE WITNESS: I'm sorry.  What was the
14    question?
15        MR. PUTTERMAN: Madam Reporter, would you
16    please read back the question?
17        (Record read as follows:
18        "Q   Didn't you think that it would be
19        important for MoneyMutual to know that,
20        since it stated that it had a code of
21        lender conduct to which it expected
22        lenders to adhere?")
23        THE WITNESS: Yes.
24    Q   BY MR. PUTTERMAN: Then why didn't you let
25    MoneyMutual know?

Page 130

1   **A    I didn't see a telephone number for them.**
2   **Maybe I didn't do my research.  And I was just dealing**
3   **with the person who gave me the money.**
4       Q    And you did not go back to the website to see
5   if there was a phone number?
6           MR. WILENS: Asked and answered.  She said she
7   did not.
8           MR. PUTTERMAN: She can answer it again.
9           THE WITNESS: I didn't see the number, the
10  telephone number for them.
11      Q    BY MR. PUTTERMAN: But what I'm saying is,
12  after you start receiving spam e-mails and after you
13  start having problems with Bottom Dollar Payday, you did
14  not return to the website to see if there was a
15  telephone number; correct?
16  **A    Correct.**
17      Q    Did you try Googling MoneyMutual?
18  **A    No.**
19      Q    So you did not take any steps at all to see if
20  you could reach MoneyMutual to make a complaint.
21          MR. WILENS: She hired an attorney.  He made a
22  complaint.
23      Q    BY MR. PUTTERMAN: You can answer my question.
24  **A    Basically, I did hire an attorney.**
25      Q    Okay, so even though you just testified a

Page 131

1   moment ago that you thought that Money Mutual would want
2   to know about it, perhaps should know about it, you did
3   not try to tell them about it.  You hired an attorney.
4   **A    Correct.**
5       Q    Okay.  But you hired an attorney at that time
6   not because of MoneyMutual, but because of Bottom Dollar
7   Payday; correct?
8           MR. WILENS: I'm going to object.
9   Attorney-client privilege --
10          MR. PUTTERMAN: That's not privileged, as to
11  why she went to you.
12          MR. WILENS: No.  She's not going to answer it.
13          MR. PUTTERMAN: She can answer it.  It's not a
14  communication.  I'm asking her why she went to you.
15          MR. WILENS: For help.  It's not for her to say
16  who did what.
17          MR. PUTTERMAN: No, that's not what I'm asking
18  at all.  And she already said that it was what was going
19  on with Bottom Dollar Payday that motivated her.
20          MR. WILENS: That's correct.  You got your
21  answer.
22          MR. PUTTERMAN: No, I want her to answer this
23  question.
24          MR. WILENS: No.  This question calls for
25  attorney-client privilege.

Page 132

1           MR. PUTTERMAN: It does not call for privileged
2   communications.
3           MR. WILENS: Well, that's my call.  It does.
4           MR. PUTTERMAN: No, it's not.  You're just
5   desperate.
6           MR. WILENS: Desperate about what?
7           MR. PUTTERMAN: Desperate about your case.
8           MR. WILENS: It's not her job to investigate
9   every culprit and determine who's responsible.  I don't
10  know why you're beating her up over it.
11          MR. PUTTERMAN: You'll find out in our papers.
12          MR. WILENS: No, it's irrelevant.  It's not her
13  job to let MoneyMutual know crooks are operating out of
14  its website.  Okay?  It's not her job to be a policeman
15  for your company.
16          MR. PUTTERMAN: Okay, can I quote you on that?
17          MR. WILENS: Yes.
18          MR. PUTTERMAN: Okay.
19      Q    Do you adopt that statement by your attorney?
20  **A    Yes.**
21      Q    Okay.  So if somebody is doing something wrong
22  and you think that somebody else should know about it,
23  you nonetheless don't feel that it's necessary for you
24  to let them know?
25          MR. WILENS: Objection.  That could apply to a

Page 133

1   million situations.
2           You don't have to answer that question.  It's
3   frivolous and argumentative.
4           MR. PUTTERMAN: Yes, she does.  Stop.
5           MR. WILENS: Can you think of every possible
6   circumstance --
7           MR. PUTTERMAN: No, that's not the question.
8           MR. WILENS: That's what you just asked her.
9           MR. PUTTERMAN: Would you reread the question,
10  please.
11          MR. WILENS: No, no need.  We're not going to
12  answer it.  You're just arguing with the witness.  I
13  want you to move forward with the deposition, asking her
14  factual questions about this lawsuit.  Your question is
15  just arguing with her.
16          MR. PUTTERMAN: This is actually highly
17  relevant.
18          MR. WILENS: No, it's completely irrelevant.
19          MR. PUTTERMAN: That's because you --
20          MR. WILENS: You don't understand --
21          MR. PUTTERMAN: -- you suffer from a severe
22  case of plaintiff's counsel tunnel vision.
23          MR. WILENS: No, I understand what your defense
24  is.  It just doesn't make any sense.  It's an incoherent
25  defense, unless --

Gilbert v
Bank of America, N.A.

Keeya Malone
November 23, 2015

---

Page 134

1 Q BY MR. PUTTERMAN: Do you have any personal
2 knowledge that any lender shared information with a
3 criminal?
4 MR. WILENS: The lenders are the criminals.
5 Define "criminal."
6 MR. PUTTERMAN: That is not -- you know what,
7 I'm talking about your complaint here. So cut it out.
8 Your complaint is on her behalf. So just stop it right
9 now.
10 Q I want to know if you know anything about
11 lenders dealing with criminals.
12 MR. WILENS: Objection. Argumentative.
13 MR. PUTTERMAN: I don't care about your
14 objection.
15 MR. WILENS: You don't need to answer that
16 question.
17 Q BY MR. PUTTERMAN: Yes, you do, ma'am.
18 Otherwise you're going to be coming back for another
19 session, because I'm going to be making a motion.
20 You can't instruct her. This is not an issue
21 of privilege. I asked a factual question about
22 allegations in the complaint. You're the one who chose
23 to use that lenders were providing information to
24 criminals. So I'm entitled to ask her if she knows
25 anything about that.

---

Page 135

1 MR. WILENS: The lenders are the criminals.
2 That's in the complaint. Why don't you read it.
3 MR. PUTTERMAN: I've read it many times.
4 MR. WILENS: You raised your voice and you're
5 yelling at your client. It's all on video, Counsel.
6 MR. PUTTERMAN: That's fine.
7 MR. WILENS: I'm not going to permit that.
8 Q BY MR. PUTTERMAN: Please answer the question,
9 Ms. Malone.
10 MR. WILENS: Okay, what's the question?
11 Q BY MR. PUTTERMAN: The question is, do you know
12 anything about lenders providing information to
13 criminals?
14 MR. WILENS: Do you know what -- who the
15 criminals are here in this gang of thieves?
16 THE WITNESS: No.
17 MR. WILENS: Okay.
18 MR. WILENS: But they are, so doesn't matter if
19 she knows or not. So you're wasting time.
20 Q BY MR. PUTTERMAN: Did you ever inquire of
21 MoneyMutual before you applied or submitted information
22 for a loan through its website whether the lenders that
23 MoneyMutual -- that were in MoneyMutual's network could
24 legally make loans in California?
25 A No.

---

Page 136

1 Q Do you recall seeing anywhere on the
2 MoneyMutual website any statement that lenders in
3 MoneyMutual's network were licensed to make loans in
4 California?
5 A No, I don't recall.
6 Q And at that time that you were applying for the
7 loan, where defendants were or were not licensed was not
8 a concern for you; correct?
9 MR. WILENS: Objection. Vague as to what her
10 knowledge of the legalities of making loans is.
11 Q BY MR. PUTTERMAN: You can respond.
12 A Yes, I did care.
13 Q Did you ask MoneyMutual, then, about licenses?
14 A I didn't have a number. I didn't see a number
15 for MoneyMutual.
16 Q All right. So that's the second concern that
17 you've raised which is, in addition to the absence of
18 any APR on the website, that you were concerned or
19 interested in whether or not the lenders in
20 MoneyMutual's network were licensed to make loans in
21 California?
22 MR. WILENS: Objection.
23 MR. PUTTERMAN: Don't interrupt me.
24 MR. WILENS: Objection. Your question --
25 MR. PUTTERMAN: Don't interrupt me.

---

Page 137

1 MR. WILENS: Objection. Are you done?
2 MR. PUTTERMAN: No, I'm not done.
3 MR. WILENS: Your question is too long, then.
4 End it.
5 Q BY MR. PUTTERMAN: You were both concerned that
6 there was no APR on the website, and that the -- you
7 were concerned about whether or not lenders were
8 licensed to make loans in California. Correct?
9 MR. WILENS: Objection. She testified she was
10 concerned about other things, too. And you said there
11 was only two things.
12 MR. PUTTERMAN: I'm asking about those two
13 items. Thank you.
14 MR. WILENS: You said those were the only two
15 things, which is not true.
16 MR. PUTTERMAN: No, I did not say that.
17 MR. WILENS: You just did in the first
18 question.
19 MR. PUTTERMAN: No, I didn't. And you're
20 getting a protective order. And sanctions.
21 MR. WILENS: You can issue your own protective
22 order.
23 Q BY MR. PUTTERMAN: Okay. Those were two
24 concerns you had before you applied for the loan; right?
25 A Correct.

---

The Souza Group
(800) 230-3376

Page 138

1  Q   Now, we've already established that you did not
2  contact MoneyMutual before you submitted your
3  information through the website concerning the APRs.
4       Did you contact MoneyMutual or attempt to
5  contact MoneyMutual in any way to inquire about whether
6  or not the lenders in the network were licensed to make
7  loans in California?
8  A   No.
9  Q   Why not?
10  A   I didn't think they would put anyone on their
11  website that wasn't.
12  Q   And why did you think that?
13  A   Because Montel Williams was supporting the
14  MoneyMutual, so I didn't think he would put anybody on
15  there that would be unlicensed to lend money to anyone.
16  Q   Did you understand that the website was
17  accessible throughout the United States?
18  A   No.
19  Q   Do you think the Internet just comes to
20  California?
21  A   No, because I didn't know I would have
22  unlicensed lenders in there.
23  Q   What did you know about licensing requirements
24  for lenders back in 2012?
25  A   Actually, I don't have any information on

Page 139

1  licensed lenders.
2  Q   You didn't know anything about it?
3  A   No.
4  Q   You didn't know what kind of lenders had to be
5  licensed?
6  A   Correct.
7  Q   Did you know that lenders had to be licensed at
8  all?
9  A   I didn't know about any.
10  Q   So you didn't know one way or another whether
11  or not lenders had to be licensed in California back in
12  2012.
13  A   Well, I mean, if you're working in the bank,
14  yeah.
15  Q   But you didn't know anything about licensing to
16  make loans; correct?
17  A   Well, I know you have to have a license to do
18  loans.
19  Q   Okay.  What did you know about that in 2012?
20  A   That you have to go to school to be licensed to
21  approve a loan or to be an underwriter for a loan.
22  Q   I'm talking about something different here.
23  I'm talking about whether or not companies making loans,
24  different types of loans, had to be licensed.  Did you
25  know anything about those requirements?

Page 140

1  A   No.
2  Q   Did you know anything about companies having to
3  be licensed at all to make loans in California?
4  A   I know some companies do.
5  Q   And this is now in 2012?
6  A   Correct.
7  Q   Okay.  What did you know?
8  A   In order to have a company to give you a loan,
9  you have to be licensed.
10  Q   Okay.  That came out a little confused.  You
11  said in order for a company give you a loan, you had to
12  be licensed.  Do you want to --
13  A   Not me have to be licensed, but they, the loan
14  person has to be, have a license to do that.
15  Q   Did you ask anybody at Bottom Dollar Payday
16  whether they had a license to make loans in California?
17  A   No.
18  Q   And you never asked MoneyMutual about that?
19  A   No.
20  Q   Did you even think about licensing at the time?
21  A   No.
22  Q   Are you aware of any facts showing that
23  MoneyMutual knew from anybody else that Bottom Dollar
24  Payday had done what it did to you, namely, rolling over
25  a loan that had already been paid off?

Page 141

1       MR. WILENS: I'm going to object to the
2  question.  It calls for a contention interrogatory.
3       MR. PUTTERMAN: No, it doesn't.  I'm asking her
4  if she knows whether MoneyMutual knew from anybody else
5  or any other source --
6  Q   That Bottom Dollar Payday had done to anybody
7  else what it did to you.  You can respond.
8       MR. WILENS: It calls for speculation.  But do
9  you know?
10       THE WITNESS: Personally, no.
11  Q   BY MR. PUTTERMAN: Okay.  Have you heard that
12  from anybody else, that Bottom Dollar Payday had rolled
13  over their loan, even though they had paid it off?
14  A   I don't know anyone who has it but me
15  personally.
16  Q   Okay.  Do you know personally whether anybody
17  else ever told MoneyMutual that they believed Bottom
18  Dollar Payday was improperly using or selling
19  information obtained from leads?
20  A   No.
21  Q   Now, when you spoke with somebody about the
22  loan on the phone, do you recall specifically what other
23  information you gave them?  Just your bank, I think you
24  indicated your bank information; correct?
25  A   Well, over the phone I gave them my banking

Gilbert v
Bank of America, N.A.

Keeya Malone
November 23, 2015

1    **FURTHER EXAMINATION**
2  **BY MR. PUTTERMAN:**
3    Q    When you started having your problems with
4  Bottom Dollar Payday, did you call the police?
5    A    No.
6    Q    Did you call the FBI?
7    A    No.
8    Q    Did you call any law enforcement agency?
9    A    No.
10   Q    Okay.  You didn't actually even call the FDIC
11 until JPMorgan Chase would not refund the money into
12 your account; correct?
13   A    Correct.
14   Q    Did you call any government agency at all to
15 complain about Bottom Dollar Payday?
16   A    No.
17   Q    Did you think what they were doing was
18 criminal?
19   A    The harassment, yes.
20   Q    Okay.  And when things are criminal, that's
21 what law enforcement is for; correct?
22   A    Correct.
23   Q    Did you call anybody in the Los Angeles County
24 District Attorney's office?
25   A    No.

1    Q    Did you call anybody in the U.S. Attorney's
2  office in Los Angeles?
3    A    No.
4    Q    Why not, if you thought it was criminal?
5    A    I didn't know my rights, so I called an
6  attorney to figure it out.
7    Q    And even after that, though, you did not
8  complain to law enforcement; correct?
9    A    No.
10   Q    Now, Bottom Dollar Payday, as I understand it,
11 was affiliated with Rare Moon Media, which is located in
12 Kansas City, or excuse me, the state of Kansas.  Have
13 you contacted any law enforcement agency in Kansas to
14 complain about Bottom Dollar --
15       MR. WILENS: I'm going to object.  She's
16 represented by counsel.  She's not contacting anybody
17 right now.
18       MR. PUTTERMAN: That's nice.
19   Q    Did you do that?
20   A    No.
21   Q    Now, with regard to you being aware of some
22 payday lenders being what we call brick-and-mortar
23 stores in your area, do you know which payday lenders
24 are located anywhere near where you live?
25   A    I think Cash something, Quick Cash or something

1  like that.
2    Q    You walk past that store?
3    A    No.  It's in driving distance from my house.
4    Q    It's where?
5    A    Driver's distance.
6    Q    About how far?
7    A    About 15 minutes away.
8    Q    So not too far.
9    A    Yeah.
10   Q    Have you ever gotten a loan from them?
11   A    No.
12   Q    Have you ever stopped in there to talk about
13 getting a loan from them?
14   A    No.
15   Q    Well, when you were concerned about the fact
16 that the MoneyMutual website did not have an APR on it,
17 did you think about going to talk to them, since they
18 were not very far from you?
19   A    No.
20   Q    Why not?
21   A    To be honest, I didn't see the building until
22 someone told me about it.
23   Q    So you were not aware of it before then.
24   A    Correct.
25   Q    Okay.  And that's why you thought, well, this

1  was your really only alternative.
2    A    Correct.
3    Q    Okay.  And at that time your focus was making
4  your car loan payment.
5    A    Correct.
6       MR. PUTTERMAN: Okay.  I have nothing further.
7
8       **FURTHER EXAMINATION**
9  BY MR. WILENS:
10   Q    If you had known that Montel Williams and
11 MoneyMutual were going to recommend a criminal operation
12 operating out of the Caribbean as your payday lender,
13 would you have gone through with that loan?
14       MR. PUTTERMAN: Objection.  Misstates the
15 evidence, lacks foundation, argumentative, calls for
16 speculation, and not reasonably calculated to lead to
17 the discovery of admissible evidence.
18       THE WITNESS: No.
19   Q    BY MR. WILENS:  And then you would have
20 explored the other neighborhood options or other legal
21 companies in California; right?
22   A    Correct.
23       MR. WILENS: No further questions.
24       MR. PUTTERMAN: I have nothing further.
25       Okay, thank you very much, Ms. Malone.