# EXHIBIT B

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

(OAKLAND DIVISION)

SEAN L. GILBERT, KEEYA )
MALONE, KIMBERLY BILBREW, )
CHARMAINE B. AQUINO, on )
behalf of themselves and all )
persons similarly situated, )
                              )
       Plaintiffs, )
                              )  No. 4:13-cv-01171-JSW
      v. )
                              )
BANK OF AMERICA, N.A., et )
al., )
                              )
       Defendants. )
                              )

Videotaped Deposition of

CHARMAINE B. AQUINO

Tuesday, November 24, 2015


THE SOUZA GROUP

Certified Shorthand Reporters

4615 First Street, Suite 200

Pleasanton, California 94566


Reported by:

LINDSAY PINKHAM, CCRR, CSR

LICENSE NO. 3716

Page 10

1  A   No.
2  Q   -- response?  Remember what I said about
3  waiting for me to finish?
4      Also, I meant to say, the court reporter can't
5  take down nods, shakes of the head, or gestures.  So you
6  really do have to answer orally.  You can't shake your
7  head as an answer to a question.  You have to say "no."
8  Okay?
9  A   Sure.
10 Q   Good.  Shall we?
11 A   Yes.
12 Q   Okay.  Would you please describe for us what
13 your education is from high school on.
14 A   I took high school back in the Philippines.  I
15 graduated in 1993, then came back home here in the
16 states to pursue my college degree at DeVry, graduated
17 in 2000 with a Bachelor of Science degree in computer
18 information systems.
19 Q   Okay.  This was in 2003?
20 A   2000 I graduated.
21 Q   2000.  I'm sorry.  And have you been regularly
22 employed since then?
23 A   After that, yeah, I've been part time, because
24 I was focusing on my studies.  I was going full time.  I
25 was working part time with FedEx Ground, and then from

Page 11

1  then on, after I graduated, I got a full-time job in the
2  management.
3  Q   With FedEx?
4  A   Yes.
5  Q   Have you been with FedEx the entire time since
6  then?
7  A   I stayed there with the company for eight
8  years.
9  Q   And what was your position and your
10 responsibilities there?
11 A   I was a service manager, managing the
12 contractors, drivers, data entry clerks, making sure
13 that everything's all consistent with numbers.
14 Q   Okay.  And after that what was your employment?
15 A   After FedEx, I went to UC Irvine Medical
16 Center.
17 Q   Okay.  And what was your employment there?
18 A   I was full time as an administrative assistant.
19 Q   To a doctor or --
20 A   No, just administrative assistant for
21 processing department that handles instruments for
22 surgery, cases to prepare, pulling out the instruments
23 and supplies.
24 Q   How long were you there?
25 A   Eight years.

Page 12

1  Q   When did you leave there?
2  A   I left 2006.  Correction.  2015 at UC Irvine,
3  this year.
4  Q   Okay.  So you left UC Irvine in 2015.  So this
5  year.
6  A   Uh-huh.
7  Q   And have you been employed since you left --
8  A   Yes.  I worked for Kaiser Permanente from
9  January 11, 2015, till present.
10 Q   And what's your position at Kaiser?
11 A   Administrative assistant II.
12 Q   Let's move right along here.  To your
13 recollection, did you ever submit information for a
14 payday loan through the moneymutual.com website?
15 A   I don't recall.  I just remember looking at the
16 website, reading -- I saw Montel Williams, but I do not
17 recall filling out information.  I was just skimming
18 through.
19 Q   Okay.  And that was at a time you were
20 considering applying for payday loans?
21 A   Correct.
22     MR. PUTTERMAN:  And Jeff, you may know this
23 already, but I will represent you that on all the
24 submissions of information or applications that we show
25 on our database for Ms. Aquino, we do not show any

Page 13

1  submissions of information or applications through the
2  moneymutual.com website.
3     MR. WILENS:  There's a couple MoneyMutual
4  websites, for some reason.  I'm not sure how they're
5  distinguished.
6     MR. PUTTERMAN:  They would all be shown as
7  MoneyMutual, and there are none on here.  And I assume
8  you knew that already, because you reviewed it.
9  Q   Would you please turn to -- actually, I'm going
10 throw some names out here.  Have you ever heard of a
11 company called PartnerWeekly LLC?
12 A   No.
13 Q   So you know nothing about them?
14 A   Correct.
15 Q   And you've never communicated with anybody from
16 PartnerWeekly?
17 A   Never.
18 Q   Do you know anything about or have you ever
19 heard of a company called Selling Source?
20 A   All I know about Selling Source is I heard -- I
21 haven't heard them before.  Sorry, I haven't heard them
22 before.
23 Q   And I don't know if you were here for the
24 admonition that I gave Ms. Bilbrew, but I'm asking only
25 as to your personal knowledge, not based upon anything

**Page 14**

1  you might have been told by your counsel, Mr. Wilens.
2  Do you understand that?
3      MR. WILENS: Yeah, but, see, here's the
4  problem. She has heard of them, and she needs to say
5  she has. Otherwise, you're going to try to say, "These
6  class representatives don't know anything that's going
7  on in their own case."
8      MR. PUTTERMAN: No, I'm not going to say that.
9      MR. WILENS: Well, I don't know where you're
10 going with this question.
11     MR. PUTTERMAN: Jeff, I want to make sure that
12 they themselves of their personal knowledge don't know
13 the names and have not communicated with specific
14 individuals or entities. That's all.
15     MR. WILENS: Then you can --
16     MR. PUTTERMAN: Which is all I'm doing.
17     MR. WILENS: Those are two different questions.
18     MR. PUTTERMAN: Jeff, stop. I know it's
19 getting late, and I know you're turning into a
20 crankosaurus, but try not to, so we can get through
21 this.
22     MR. WILENS: You can testify that you know
23 Selling Source if you know it as you sit here today.
24 There's no reason to look like you're oblivious to your
25 case.

**Page 15**

1      MR. PUTTERMAN: Jeff, I specifically excluded
2  any knowledge that she got, and it's on the record that
3  I've excluded it, from you. Okay? It's perfectly clear
4  what I'm asking, and nobody's going to make anything out
5  of it. I can only assume that you suspect people are
6  going to do things that you would do yourself.
7      MR. WILENS: No, I've had defendants do exactly
8  that.
9      MR. PUTTERMAN: That's fine. But I just
10 represented to you I'm not going to do it.
11     MR. WILENS: Well, it's on the record.
12     MR. PUTTERMAN: Yes, it is on the record. And
13 I knew it would be on the record when I said that.
14 Q   Okay. Back to Selling Source. Do you have any
15 personal knowledge or have you ever heard of an entity
16 called Selling Source?
17 A   No.
18 Q   And you've never communicated, to your
19 knowledge, with anybody from Selling Source?
20 A   That's correct.
21 Q   Have you ever heard of or know a gentleman
22 named Glenn McKay?
23 A   No.
24 Q   You have never communicated with Mr. McKay?
25 A   That's correct.

**Page 16**

1  Q   You don't know anything about him?
2  A   That's correct.
3  Q   Same questions with regard to a gentleman named
4  Brian Rauch, R-a-u-c-h. But it's pronounced "Rauch."
5  Have you ever heard of him?
6  A   No.
7  Q   Do you know anything about him?
8  A   No.
9  Q   Have you ever communicated with him?
10 A   No.
11 Q   Same questions with regard to a gentleman named
12 John Hashman. Have you ever heard of him?
13 A   No.
14 Q   Do you know anything about him?
15 A   No.
16 Q   Have you ever communicated with him?
17 A   No.
18 Q   Okay. Next name will be Samuel Humphreys. Do
19 you know or have you of heard of Samuel Humphreys?
20 A   No.
21 Q   Have you ever communicated with him?
22 A   No.
23 Q   Do you know of or have you ever heard of a man
24 named Douglas Tulley?
25 A   No.

**Page 17**

1  Q   Have you ever communicated with Mr. Tulley?
2  A   No.
3  Q   Next is a man named Alton F. Irby III. Have
4  you ever heard of Mr. Irby?
5  A   No.
6  Q   Do you know anything about Mr. Irby?
7  A   No.
8  Q   Have you ever communicated with Mr. Irby?
9  A   No.
10 Q   Okay, good. You have heard of Montel Williams.
11 A   Yes.
12 Q   What do you know about Montel Williams?
13 A   All I know is he's an actor on a TV show, talk
14 host. That's all I know about him.
15 Q   Have you ever watched his talk show?
16 A   I glanced at it, but I don't have time with the
17 hours that I work. I just glanced at the channel and
18 that's it.
19 Q   Now, have you seen television ads with Montel
20 Williams endorsing MoneyMutual?
21 A   I saw it a few times. All I remember is he
22 says about, you know, his website said -- sorry -- he's
23 talking about loans, they're there to help you if you
24 need any assistance, and stuff. That's all I recall.
25 Q   Okay. And I think you said you've at least

**Page 18**

1 looked at the MoneyMutual website; correct?
2   A   Yes.
3   Q   But you have no specific recollection of
4 actually applying for a loan through that specific
5 website.
6   A   That's correct.
7   Q   That allows us to move along a lot faster.
8       Do you have Exhibit 2 somewhere there in front
9 of you? That's the complaint. Here we go (handing
10 document to the witness).
11      Now, would you please turn to page 18 of the
12 complaint, and to paragraph 54, and read that to
13 yourself. Are you done?
14  A   Yes.
15  Q   Now, does this accurately describe various
16 payday loans that you obtained in February and March of
17 2013?
18  A   That's correct.
19  Q   Okay. This was a loan from a company called
20 Liquid Ventures. Do you see that?
21  A   Yes.
22  Q   Do you know that by some other name?
23  A   I cannot recall.
24  Q   Let me ask you this. There were some documents
25 produced by your counsel, one of which were loan

**Page 19**

1 agreements for a company called Hamilton Liberty Inc.
2 dba bestchoice123.com.
3   A   Yes, I recall.
4   Q   Is that a loan agreement that you'd entered
5 into after applying for a loan on the Internet?
6   A   That's correct.
7   Q   And do you remember or did you ever know
8 whether that was related to one of the companies named
9 here, either Liquid Ventures, Devwire Consulting, Vista
10 B, or Vivus Servicing?
11  A   No, I would not know.
12  Q   Okay, you don't know one way or the other?
13  A   No.
14  Q   Let me ask you, this appears to be a number of
15 loans that occurred specifically in February and March
16 of 2013. What caused you to obtain this number of loans
17 in that two-month period?
18  A   At that time I was going through family matters
19 and financial crisis. My brother passed away, my mom is
20 a breast cancer survivor, and I'm the only eldest one
21 supporting my family, trying to support my mom at the
22 same time to recover from what she was going through.
23  Q   So you just needed more money at that time to
24 help out with family matters.
25  A   Yes, because my job itself wasn't enough.

**Page 20**

1 sufficient.
2   Q   Has your mother recovered by the way?
3   A   Yes, she's a breast cancer survivor.
4   Q   Good. Glad to hear that. Now, did you
5 obtain -- attempt to obtain funds during this period of
6 time from any other sources?
7       MR. WILENS: Other than what?
8   Q   BY MR. PUTTERMAN: Other than the payday loans
9 that are referenced here.
10  A   I think I was only going through payday loans.
11  Q   Was there a reason for that?
12  A   I didn't want to rely on family members,
13 because they'll give me the third degree lectures and
14 stuff. I just wanted personal, do it on my own without
15 their assistance.
16  Q   Right. If they're not contributing, they don't
17 have a right to bother you about it.
18  A   Yes.
19  Q   I understand that very well.
20      What about trying to get a loan or loans from a
21 bank?
22  A   I know that for a fact I would not get
23 approved, because based on my credit score.
24  Q   Okay. And is there some particular reason why
25 your credit score would not qualify you?

**Page 21**

1   A   Low credit score or something in the past.
2   Q   Do you know what caused that?
3   A   Well, when my father used to live with us, he
4 ruined my credit and stuff. And I know it takes like
5 seven years or thirteen years if I do bankruptcy.
6   Q   Are you okay? Do you want to take a short
7 break?
8   A   I'm okay.
9   Q   Okay. If you do need a take a short break,
10 please say so.
11  A   No problem.
12  Q   All right. And I gather you did not have
13 enough money available on credit cards? Or did you have
14 any credit cards?
15  A   No, I didn't have credit cards at that time, I
16 don't recall.
17  Q   So getting payday loans was really the only
18 resource that you had.
19  A   The last resource.
20  Q   Had you ever gotten payday loans before this
21 period of time?
22  A   Yes, with Speedy Cash. But I paid them off.
23 Short-term.
24  Q   And how long ago was that?
25  A   Two years ago.

Page 22

1  Q   And why did you need a payday loan at that
2  time?
3  A   It was to cover my expense and stuff with
4  fixtures and cars.
5  Q   So there was some short-term expenses that came
6  up.
7  A   And it helped out, and then I paid them back.
8  Q   So with the loan you were able to help cover
9  those short-term expenses?
10 A   Yes.
11 Q   And you paid it back?
12 A   Yes.
13 Q   So did you think that that loan was a good
14 thing?
15 A   Yes.
16 Q   Do you think that payday loans can be helpful?
17 A   Can be if they're, you know, if they're
18 following the law.
19 Q   Since this period of February and March 2013,
20 have you obtained other payday loans?
21 A   Yes. Cash Call.
22 Q   When did you obtain a payday loan from Cash
23 Call?
24 A   Roughly estimate years, 2013, I think.
25 Q   Did you repay that one?

Page 23

1  A   I settled with them. It was an installment
2  loan. It was for 2,600, and then they deduct the
3  processing fee, I think, 125 --
4  Q   So it leaves you between 24 and 25 hundred?
5  A   Yes.
6  Q   And how much did you settle with them for?
7  A   Because I was back pay on them, and I tried to
8  make arrangement --
9       MR. WILENS: Was that by yourself or with an
10 attorney?
11      THE WITNESS: With an attorney.
12 Q   BY MR. PUTTERMAN: I don't know want to know
13 anything that went on with the attorney, okay, but how
14 much did you --
15      MR. WILENS: Was it a confidential settlement;
16 do you know?
17      THE WITNESS: Confidential settlement -- it was
18 a confidential settlement.
19 Q   BY MR. PUTTERMAN: Okay. Then don't tell me
20 anything about it. Any other payday loans since
21 February and March 2013?
22 A   Orange Rocket.
23 Q   When was that?
24 A   Just to make ends meet, to cover paying off the
25 payday loans that I have outstanding, to cover the fees

Page 24

1  and stuff. Because my account was becoming negative.
2  Q   And did you pay off that loan?
3  A   Yes.
4  Q   Was that an Internet loan or a --
5  A   In the store.
6  Q   Storefront. And when was that?
7  A   2013 as well, around June.
8  Q   So you have found payday loans to be helpful to
9  you in the right circumstances.
10 A   Correct.
11 Q   Okay. I'm going to ask the reporter to mark as
12 next in order -- and that would be, Ms. Reporter?
13      THE REPORTER: Did you want to mark this?
14      MR. PUTTERMAN: Yeah, I'm sorry. Let's mark
15 that.
16      (Defendants' Exhibit 35 was marked
17      for identification.)
18 Q   BY MR. PUTTERMAN: Ms. Aquino, the court
19 reporter has just handed you a copy of a document called
20 the Notice of Deposition Duces Tecum of Plaintiff
21 Charmaine B. Aquino. Do you see that?
22 A   Yes.
23 Q   Have you seen this document before?
24 A   Yes.
25 Q   And you see that this document asks that you

Page 25

1  provide a number of documents that are listed in it. Do
2  you see that?
3  A   Yes.
4  Q   And did you provide or have you provided
5  documents to your attorney, Mr. Wilens, so he could
6  produce them to us?
7  A   Yes.
8       MR. PUTTERMAN: Let's mark as Exhibit 36 --
9       MR. WILENS: 35 was the deposition notice?
10      MR. PUTTERMAN: Yeah.
11      MR. WILENS: What was 34?
12      MR. PUTTERMAN: Actually, your copy of it's
13 over here.
14      (Off record)
15      MR. PUTTERMAN: Okay, I'm going to ask the
16 reporter to mark as Exhibit 36 a three-page printout
17 from the PartnerWeekly database which reflects loan --
18 submissions of information by Ms. Aquino to various
19 websites in connection with applying for payday loans.
20      MR. WILENS: Where did 34 go?
21      (Off record)
22      (Defendants' Exhibit 36 was marked
23      for identification.)
24 Q   BY MR. PUTTERMAN: Now, you obviously have not
25 seen this before, because this is from one of my

Page 26

1  clients' databases. But you see that your name appears
2  on it?
3  A  Yes.
4  Q  And that's your e-mail address that appears
5  under the column that says "E-Mail"?
6  A  Yes.
7  Q  Okay. And that 1820 West 153rd Street address
8  in Gardena is your home address; correct?
9  A  That's correct.
10 Q  I'm going to start with the first page on this.
11 And we'll gradually work our way through also the loans
12 here that you obtained as a result of submitting
13 information to publisher affiliates of my clients.
14     There is initially a group listed here on the
15 first page on December 24, 2010. Do you see that?
16 A  Yes.
17 Q  Okay. Now, I can tell from the times on
18 December 24 that this group of December 24 is the result
19 of one submission of information by you to a website
20 looking for a payday loan. And all of them are listed
21 as "failed," which means, simply means that the lead
22 that was created when you submitted your information was
23 not picked up by various potential lenders that reviewed
24 it until the final one with that date. And where it
25 says "completed," and you see it says "AMG" at the end?

Page 27

1  A  Uh-huh.
2  Q  AMG at that time was what we call a tribal
3  lender. It was one affiliated with an Indian tribe. Do
4  you recall if you actually got a loan from a payday
5  lender back around Christmas of 2010?
6  A  Yes.
7  Q  What do you recall in that regard?
8  A  I don't know exactly the company name, but
9  based on when I researched it, it was a tribal
10 company -- Indian reservation. I recall this.
11 Q  Back in Oklahoma or something?
12 A  Something like that, yes.
13 Q  Okay. And so you actually did obtain a loan
14 then?
15 A  Yeah. I don't know the exact roughly amount.
16 It's in the 200's.
17 Q  And was that for Christmas purposes?
18 A  Yes.
19 Q  Gee. That was hard to guess, given the date.
20 A  Just to pay off fixtures for my car at that
21 time.
22 Q  And you repaid that loan?
23 A  I can't recall. I think I did. I can't
24 recall.
25 Q  Did you think your experience with that lender

Page 28

1  was okay?
2  A  I don't remember.
3  Q  Okay. The next group is a small group dated
4  January 2, 2013. Do you see that? There's about four
5  in that group?
6  A  January 2, 2013?
7  Q  Yeah. See, it's beneath the December 24, 2013
8  group, and then there's a group of about four that are
9  dated January 2, 2013.
10 A  Yeah.
11 Q  The dates are on -- I'm sorry.
12 A  It says "failed" on January 2.
13 Q  Right. But do you recall applying through some
14 website right after the new year on January 13 for a
15 payday loan?
16 A  No.
17 Q  Okay. The next group of dates are dated
18 January 29, 2013. Do you see that?
19 A  Yes.
20 Q  Do you recall applying for a loan at the end of
21 January 2013?
22 A  Yeah, it sounds familiar.
23 Q  What do you recall in that regard? Do you
24 recall the specific website that you applied through?
25 A  The usapaydaystore.com.

Page 29

1  Q  That was the one that you actually applied
2  through? Or are you just remembering that because that
3  was where you got the, as a result of which you got the
4  loan?
5  A  Yeah.
6  Q  Okay. And what was again, was this the same
7  lender that you had before?
8  A  Yes.
9  Q  Back in 2010? And you entered into an
10 agreement with them?
11 A  This one?
12 Q  Right, right at the very end of January 2013?
13 A  This one's like another Indian tribe.
14 Q  Yes.
15 A  I think I had to close my account on this one,
16 my checking account with them.
17 Q  Okay.
18 A  Because they were taking out funds from my
19 account consistently, and it was only like for 250 that
20 I can recall, and I'm, like, why am I being charged
21 twice? So I had to close my checking account.
22 Q  Did you complain to anybody about this?
23 A  I complained this -- I don't recall. It's been
24 awhile. All did I was complain to my bank, how come
25 they're taking twice on my account. I'm going to close

Page 30

1  my account if, you know, they -- so...
2  Q   So did you close your account,
3  A   (Nodding head.)
4  Q   Okay. And you opened up a new account at the
5  same bank?
6  A   Yes.
7  Q   Which bank was that?
8  A   Chase. Sorry. SchoolsFirst Credit Union.
9  Q   Okay. I recall seeing that in your documents.
10     Okay, let's go below that. And you see there's
11 a large group dated February 1, 2013. You see that?
12 A   Liquid Ventures?
13 Q   Yeah, the one at the bottom is Liquid Ventures,
14 but you can see that your application was reviewed by a
15 number of others and was not accepted, but it was
16 accepted by Liquid Ventures, you see that, on
17 February 1?
18 A   Yes.
19 Q   And this was the period of time in February and
20 March 2013 that you described the problems that you were
21 having that was causing you to apply for payday loans?
22 A   That's correct.
23 Q   And you entered into an agreement as a result
24 of this application on February 1, 2013?
25 A   All I remember is taking a loan out.

Page 31

1  Q   Okay. Do you remember the name of the company
2  you actually took the loan out with?
3  A   Liquid Ventures? I'm not sure if they use a
4  different name.
5  Q   That's what I'm wondering. Let me see if I can
6  help out with that. Keep that in front of you, but I'm
7  going to have the reporter mark another exhibit.
8      This will be Exhibit 37. And this is a
9  document that has been marked, the pages have been
10 marked as Aquino 1 through Aquino 13.
11     (Defendants' Exhibit 37 was marked
12     for identification.)
13 MR. WILENS: I can't read across this long
14 spreadsheet, but Liquid Ventures, is that 1-29 or 2-1?
15 MR. PUTTERMAN: That's 2-1.
16 MR. WILENS: Are you sure about that? And what
17 about Devwire? Is that still also 2-1? It's on the
18 same page.
19 MR. PUTTERMAN: No, the Devwire?
20 MR. WILENS: Yeah. It's on the same page.
21 MR. PUTTERMAN: Hold on a second. Yes, looks
22 like it. You'll notice -- see, remember what I told you
23 about this one from the same lead starts out from one
24 affiliate and can come in through another one.
25 MR. WILENS: So it's a crapshoot which of those

Page 32

1  two is Hamilton, if that's what you're getting at.
2  They're both the same date. It's hard to figure out
3  from the timing.
4      MR. PUTTERMAN: I agree with you.
5  Q   So you have Exhibit 37 in front of you;
6  correct?
7  A   Yes.
8  Q   And this is the loan agreement and disclosures
9  with Hamilton Liberty, Inc., doing business at
10 bestchoice123.com. Do you see that?
11 A   Yes.
12 Q   And do you recognize this as a loan agreement
13 you entered into for payday loan?
14 A   Yes.
15 Q   I note in the middle of the second paragraph
16 it's got a sentence that reads, quote:
17     "If the agreement is approved, it
18     will be consummated as of 02/04/2013."
19     Do you see that? It's in the second paragraph
20 on the first page.
21 MR. WILENS: Well, you said it, so I don't know
22 why you're asking her if she sees it. Ask your
23 question.
24 Q   BY MR. PUTTERMAN: My question is, as your
25 counsel correctly pointed out, the database, Exhibit 36,

Page 33

1  shows that an application by you for a payday loan was
2  actually accepted by two lenders on February 1, 2013.
3  Do you remember taking out two payday loans right at the
4  beginning of February 2013?
5  A   All I remember is Hamilton Liberty, they
6  changed their name under Best Choice or whatever,
7  Hamilton Liberty sounds familiar.
8  Q   So you remember this loan agreement.
9  A   Uh-huh, yes.
10 Q   And do you remember how much it was for?
11 A   700.
12 Q   Okay. And there was a finance charge on top of
13 that?
14 A   That's correct.
15 Q   Let's turn to page 2. And you see there are
16 some information in boxes near the top of the page?
17 A   Yes.
18 Q   Okay. And this says in fact that the amount
19 you were borrowing was $700; correct?
20 A   That's correct.
21 Q   And a finance charge of $210.
22 A   Correct.
23 Q   For a total of $910.
24 A   Correct.
25 Q   Did you pay this loan back?

Page 34

1  A  **I think I paid -- they took from my account**
2  **like 700 or so.**
3  Q  Did you end up having any dispute with the
4  Hamilton Liberty or Best Choice 123 about the loan?
5  A  **I did not talk to them anything personally. I**
6  **just paid it -- they keep deducting, assuming, like, you**
7  **know --**
8  Q  Right. Was it paid off, so far as you know?
9  A  **I can't remember.**
10 Q  Do you remember if this loan ever went to a
11 collection agency?
12 A  **Not that I recall.**
13 Q  So do you recall any problems with this loan at
14 the time?
15 A  **Not that I remember.**
16 Q  So did you think that this loan worked out for
17 you, the Hamilton Liberty loan?
18 A  **It helped me a little.**
19 Q  Well, you needed more than just the one loan
20 could provide. Right?
21 A  **Yeah, to pay off all the other loans.**
22 Q  So was this used to pay off another loan, or
23 was this used for the other purposes, in other words to
24 help support your mother?
25 A  **To help pay off other loan and to cover the**

Page 35

1  **damages that was done to my account.**
2  Q  Okay. The damages that were done to your
3  account by who?
4  A  **Other lenders.**
5  Q  Do you recall who the other lenders were?
6  Because this is now the beginning of February only.
7  A  **The Indian tribal ones.**
8  Q  Oh, AMG?
9  A  **Yeah.**
10 Q  Okay.
11 A  **That's the only one. That's all I remember is**
12 **the Indian tribal.**
13 Q  So there were problems with the Indian tribe
14 loan, correct, but not with the Hamilton Liberty loan?
15 A  **Not that I can remember.**
16 Q  Okay. Let's go back to Exhibit 36, which is
17 the big database. And we're on the first page. Much
18 further down, also it's the last entry for February 1,
19 there's another loan, and this is one that's -- there's
20 another application that was accepted or approved, that
21 is listed for Devwire Consulting. Do you see that?
22 A  **Yes.**
23 Q  And that's on February 1 also.
24 A  **Uh-huh.**
25 Q  So my question again is, do you remember right

Page 36

1  around the beginning of February 2013 getting two payday
2  loans? Let me give you a little context here which
3  might help a little bit.
4      The database here, the information that my
5  client has, only shows when what's called a lead was
6  acquired by a lender. The lead results from you having
7  submitted to a website your information to be used to
8  help obtain a payday loan. Are you following me so far?
9  A  **Yes.**
10 Q  So the fact that it shows up here doesn't mean
11 that the loan ultimately went through. It just means
12 that the lender acquired your information and then would
13 have contacted you.
14 A  **Yes.**
15 Q  So let me phrase it another way. Do you recall
16 being contacted in early February by -- very early
17 February, around the 1st or 2nd or so, by more than one
18 lender to discuss a payday loan with you?
19 A  **Actually, anything that comes across my cell**
20 **phone, and I don't know the number, I research online**
21 **first. If it's scam or anything, I don't call back.**
22 Q  So do you recall talking to any payday lenders
23 around the beginning of February?
24 A  **Yeah, requesting for more information to be**
25 **approved for a loan or my account references and stuff.**

Page 37

1  Q  They were asking you for that information. And
2  did you give them that information?
3  A  **I can't remember.**
4  Q  Okay. Let me ask you this, see if this will
5  help at all. Let's look at the database again. And the
6  last group that are down at the bottom of the first page
7  and then carry over to the second page is a long group
8  dated February 11, 2013. And you'll see that on the
9  second page, the lead was acquired by -- a lead there
10 was acquired by a company named Vista B LLC. Do you see
11 that?
12 A  Yes.
13 Q  Let's try and see if we can associate that with
14 somebody in particular. I'm going to ask the reporter
15 to mark as Exhibit 38 AQUINO14 and 15, which is entitled
16 "Consumer Loan and Arbitration Agreement."
17     (Defendants' Exhibit 38 was marked
18     for identification.)
19     MR. PUTTERMAN: Jeff, I think I'm missing one
20 copy of this.
21     MR. WILENS: What page is it?
22     MR. PUTTERMAN: AQUINO14 and 15. It's
23 Exhibit 38.
24     MR. WILENS: VIP loan?
25     MR. PUTTERMAN: Uh-huh.

**Page 38**

1  Q   Okay, have you seen Exhibit 38 before?
2  A   Yes.
3  Q   Okay. And does this relate to another payday
4  loan that you obtained?
5  A   Yes.
6  Q   And this is with a lender called VIP PDL
7  Service, LLC. Do you see that?
8  A   Yes.
9  Q   And it's dated, on the second page, do you see
10 there's a signature box?
11 A   Yes.
12 Q   Okay. Did you type in your name on a form on
13 the computer in connection with this loan?
14 A   Yes.
15 Q   Okay. And is that -- did you do it in that box
16 when it was on the computer that's on the second page?
17 A   No. I did it online, the first thing, and then
18 it automatically...
19 Q   Generated?
20 A   Generated.
21 Q   Did you read this loan agreement before you
22 signed it?
23 A   It was online, and at that time I was not
24 supposed to be doing it. It was at work. And I don't
25 want to -- so I was just skimming through.

**Page 39**

1  Q   Did you have an opportunity to review this
2  after you signed it?
3  A   No, because I was at that time desperate that I
4  wanted to --
5      MR. WILENS: The question was, yes, I had an
6  opportunity, or no, I didn't.
7      THE WITNESS: Oh, sorry. Yes --
8  Q   BY MR. PUTTERMAN: Right. You should not
9  simply say what Mr. Wilens says. He's just saying that
10 you should answer "yes" or "no."
11 A   Yes, I was able to review it by skimming.
12 Q   Okay. And did you actually print out a copy
13 for yourself?
14 A   I saved it on my folder.
15 Q   On your computer?
16 A   Well, e-mail.
17 Q   E-mail. Okay. And this says signed February
18 11, 2013. You see that?
19 A   Yes.
20 Q   Okay. And that is the date that, on the second
21 page, shows the lead was acquired by Vista B LLC.
22 A   Yes.
23 Q   Were you contacted on February 11, 2013, by a
24 payday lender?
25 A   I can't remember on this one.

**Page 40**

1  Q   Do you remember speaking to a payday lender
2  sometime in early to mid February, speaking to them
3  maybe very late at night?
4  A   I don't answer calls during business hours.
5  Q   Well, that's why I'm asking --
6  A   If it's late at night, no.
7  Q   Do you remember talking to a payday lender on
8  or about February 11 at all?
9  A   I can't remember.
10 Q   On the first page of Exhibit 38, it states that
11 the amount of the loan was $500, and that there was a
12 finance charge of $150. Do you see that?
13 A   Yes.
14 Q   Okay. And with the total payment due of $650.
15 Do you see that?
16 A   Yes.
17 Q   And that was due on March 1, 2015; correct?
18 A   Correct.
19 Q   Okay. Did you repay this loan?
20 A   I made partial payments.
21 Q   Okay. And why did you make only partial
22 payments?
23 A   Because I couldn't afford it, and I didn't
24 realize it was for 500, that you have to pay it on the
25 spot. I thought it was like arrangement loans.

**Page 41**

1  Q   So you thought it was going to be like an
2  installment payment, not all at one time.
3  A   Yes.
4  Q   So when it came due, you could not pay the
5  entire thing.
6  A   And then what woke me up, too, is the address,
7  San Jose, Costa Rica.
8  Q   Yes. And what about that?
9  A   I was, like, is that legit in California? And
10 I go, oh-oh. I go, this doesn't sound legit to me. So
11 I said, wait a minute, why are they deducting my account
12 twice for this amount or service fee or whatever? And
13 then I go, San Jose, Costa Rica? I thought I'm dealing
14 with a lender that's locally. But I didn't realize it's
15 San Jose, Costa Rica, out of state.
16     MR. WILENS: Out of the country.
17 Q   BY MR. PUTTERMAN: And do you remember where
18 Hamilton Liberty was located?
19 A   No, I don't remember. Some foreign country, I
20 think.
21 Q   Okay. Do you recall that Hamilton Liberty --
22 did you learn at some point that it was located in
23 Nevis, the country of St. Christopher-Nevis?
24 A   The only thing I remember about this one,
25 Hamilton Liberty.

**Page 42**

1  Q  You're referring now to Exhibit 37. Right?
2  That's Hamilton Liberty.
3  A  Yeah.
4  Q  Yeah.
5  A  When I saw the loan agreement, I don't recall
6  seeing Nevis on it. So I didn't know till later --
7  discover it till later. Sorry.
8  Q  But I think you testified earlier that you paid
9  off the loans and you didn't have any particular
10 problems with Hamilton Liberty; correct?
11 A  I don't recall. Sorry. I can't recall.
12    MR. WILENS: No, she said that they took some
13 money out of her bank account.
14    MR. PUTTERMAN: No, she had problems with AMG.
15    MR. WILENS: She also -- well, you got her bank
16 statements, so you can do the math yourself. What she
17 said was that they took money out of her bank account
18 for Hamilton and they took money out her bank account
19 for VIP, but it may not have been the full amount.
20    MR. PUTTERMAN: Right. Okay.
21 Q  So you stopped paying -- did you stop paying
22 VIP?
23    MR. WILENS: When you say "stop paying," you
24 mean stop payment? Block the account?
25    MR. PUTTERMAN: Let me rephrase it.

**Page 43**

1  Q  You made a partial payment, and they were
2  withdrawing money from VIP, from your account. Correct?
3  A  Yes.
4  Q  Now, at some point did you stop that?
5  A  Yeah, I had to stop it because of the
6  transaction that they kept doing consistently,
7  withdrawing from my account.
8  Q  Okay. And what happened when you stopped that?
9  A  I have not heard -- -- I have not heard
10 anything, harassment call or anything.
11 Q  You never received a call from them, and you
12 never received -- you have to answer audibly.
13 A  Sorry. I can't recall if I received a call,
14 because if it's a blocked number, I don't answer it. If
15 it's a number unknown or if it's a number that's like a
16 foreign number, I will not answer it. I will trace it
17 first before, online, see if it's valid or invalid. If
18 it's scammers, sorry, I won't answer.
19 Q  So you don't recall ever being contacted by a
20 collection agency or ever talking to a collection agency
21 about the VIP loan?
22 A  That's correct.
23 Q  Okay. And you don't recall ever talking to VIP
24 about the loan after you stopped their ability to take
25 payments from your bank; correct?

**Page 44**

1  A  That's correct.
2  Q  Okay. And do you recall right now, as you sit
3  here, about how much was paid on that loan before you
4  stopped it?
5  A  400, 500.
6  Q  Thereabouts?
7  A  Estimation.
8  Q  Okay. Continuing on the second page of the
9  database, which is Exhibit 36, after the entries for
10 February 11, there are entries for February 21, a group
11 of entries for February 21, 2013. Do you see generally
12 those? And they all just show as "failed." Do you
13 recall applying for a loan or submitting your
14 information to a website around February 21, 2013, but
15 not being able to complete a loan?
16 A  I don't recall.
17 Q  Then there's another group following that on
18 March 7. And again, it doesn't show that the lead was
19 acquired by anybody from whoever you submitted to on
20 March 7. Do you see that?
21 A  Yes.
22 Q  Would it be fair to assume you did not make any
23 copies or print out any of the -- or take screenshots of
24 any of the websites to which you submitted information
25 looking for a payday loan?

**Page 45**

1  A  No. It's only what I applied for. That's the
2  only thing I produced.
3  Q  Okay. Did you make any kind of a list of
4  websites that you used to apply for loans?
5  A  All I can recall is going to one site. That's
6  it.
7  Q  Which site is that?
8  A  The VIP. That's all I remember.
9  Q  Okay.
10 A  The VIP, whatever site that was.
11 Q  Whatever site the VIP loan was?
12 A  Yeah. That's all I remember, VIP something.
13 Q  Okay. Was that something called
14 paydaypayday.com?
15 A  Something like that.
16 Q  Because that's what it shows on the Vista B
17 loan, which turned into the VIP loan, I believe. Do you
18 see that?
19 A  Yes.
20 Q  Okay. So you remember going to that particular
21 website. Correct?
22 A  It looked familiar.
23 Q  Okay.
24    MR. WILENS: They all have the word "payday" or
25 "cash." I don't know how they can remember one from the

Page 46

1 other.
2    MR. PUTTERMAN: Well, maybe because it says
3 "payday" twice.
4    Q   Now, after apparently you unsuccessfully
5 applied for a loan on or about March 7, the next group,
6 which is at the bottom of the second page and goes over
7 to the top line on the third page, is on March 8. Do
8 you see that?
9    A   The third page.
10   Q   Yes, there's a few entries on the bottom of the
11 second page, but then the very first entry on the top
12 page shows that a loan application by you that was
13 submitted on March 8, 2013, was accepted by a company
14 called Vivus Servicing Ltd. Do you see that?
15   A   Yes.
16   Q   And do you know which loan -- did you enter
17 into a loan on or about March 8, 2013?
18   A   The name does not sound familiar. I don't
19 recall getting a loan agreement from these people.
20   Q   Okay. Or at least, not under that name.
21   A   Yes, correct.
22   Q   Okay. Well, let's look at a couple of the
23 other documents that you've produced and see if we can
24 attach loan agreements to entities.
25       Okay, first I'll ask the reporter to mark as

Page 47

1 Exhibit 39 a document entitled "Consumer Loan Agreement
2 and Promissory Note and Truth in Lending Disclosures"
3 with the numbers AQUINO48 through AQUINO50.
4    MR. WILENS: If it would save time, I can tell
5 you -- which one are you looking at? 48 to 50?
6    MR. PUTTERMAN: Yeah.
7    MR. WILENS: I thought you were looking at 35.
8        (Defendants' Exhibit 39 was marked
9        for identification.)
10   Q   BY MR. PUTTERMAN: Now, you see that this is
11 with a company named Dollar Premier, care of ABJT
12 funding. Do you see that?
13   A   Yes.
14   Q   And if you turn to the last page, AQUINO50.
15 You see it has your name under where it
16 says "Signature"? And it has the date February 12,
17 2013?
18   A   Yes.
19   Q   Do you have any idea what website you submitted
20 your information to to obtain this loan?
21   A   I cannot remember this one, if it's directly
22 Dollar Premier.
23   Q   Yes, I think this is Dollar Premier. Do you
24 remember Dollar Premier?
25   A   It rings a bell. It rings a bell, yes. Dollar

Page 48

1 Premier website.
2    Q   Well, neither Dollar Premier nor ABJT appear on
3 the database that we've marked as Exhibit 36. And in
4 paragraph 54 of Exhibit 2, it's stated that, quote:
5        "In the same time frame, plaintiff
6        Aquino also obtained a payday loan from
7        Dollar Premier (ABJT Funding LLC) but it
8        has not yet been determined whether this
9        was obtained from a Selling Source
10       affiliate or not."
11       And you don't remember the specific website to
12 which you submitted information for that loan?
13   A   No.
14   Q   Okay. Did you make payments on this loan?
15   A   Yes.
16   Q   Do you recall how much?
17   A   They were taking off like 100 something. I
18 can't recall. It's been awhile.
19   Q   Okay. You see that on the first page it shows
20 the original loan, $500, with a finance charge of 150?
21   A   Yes.
22   Q   So the total payment was 650? Do you know how
23 much was actually paid to Dollar Premier?
24   A   I can't remember.
25   Q   All right.

Page 49

1    A   Unless it's in my checking statement.
2    Q   This one does not appear to have gone through
3 any of my clients.
4    MR. WILENS: There's no way to know if they're
5 Devwire Consulting through some network of --
6    MR. PUTTERMAN: I think that that may be a
7 different one here. It might be. Let's see. Oh, Jeff,
8 I'm sorry. Here was your copy of Exhibit 38.
9        Exhibit 40 is entitled "Advance Me Today -
10 Terms and Conditions," and it's AQUINO0044 through 0047.
11       (Defendants' Exhibit 40 was marked
12       for identification.)
13   Q   BY MR. PUTTERMAN: Do you recognize this
14 document?
15   A   Not this document, but I remember the name.
16   Q   What do you remember about the name?
17   A   I think the name sounds familiar from. I
18 think -- I don't remember if I obtained a loan with them
19 or got the loan agreement with them.
20   Q   And do you know through what website you
21 obtained this loan?
22   A   I think this was under the VIP one.
23   Q   You think this had something to do with the --
24   A   VIP, Costa Rica and then --
25   MR. WILENS: That's just a coincidence.

### Page 50

1  Charmaine. Don't go by the country. There's lots of
2  lenders in Costa Rica and the Caribbean islands.
3        THE WITNESS: The name sounds familiar.
4        MR. WILENS: Because there's e-mails in the
5  documents. He'll get to those.
6        What's the date of this loan? Do you know?
7        MR. PUTTERMAN: I don't see any date on here at
8  all.
9        MR. WILENS: Sometime in 2013. Advance Me
10 Today has another loan agreement which is document 35.
11       MR. PUTTERMAN: Let's mark, it's actually --
12 yeah, let's mark as Exhibit 41 what's entitled "Loan
13 Agreement, Promissory Note and Disclosure, Lenders
14 International Ltd. T/A Advancemetoday.com."
15       (Defendants' Exhibit 41 was marked
16       for identification.)
17 Q   BY MR. PUTTERMAN: Do you recognize this
18 document?
19 A   Yes.
20 Q   Is this another loan agreement that you entered
21 into?
22 A   Yes.
23 Q   And I see the date on this one, on the last
24 page --
25 A   2012.

### Page 51

1  Q   December 7, 2012.
2        MR. WILENS: That's an earlier loan she got
3  from that company.
4        MR. PUTTERMAN: Right. And we don't have
5  anything on our database for Ms. Aquino in 2012. So I
6  don't believe this is through us.
7  Q   Let me ask you a question. During this period
8  of time, late 2012 -- well, first let me ask you this.
9  When did these issues, these family issues, start
10 developing seriously so that you started looking for
11 payday loans? Was it actually in late 2012?
12 A   Yes.
13 Q   Okay. And you were applying on a lot of
14 websites; is that correct?
15 A   All I remember is applying for one website, but
16 I didn't know on the back end they're sending my
17 information.
18 Q   Okay. But what I'm asking is this. How
19 frequently were you applying for loans? Was it every
20 day? Every couple of days? Once a week?
21 A   Couple of days.
22 Q   Every couple of days?
23 A   That I can remember. If I got approved for
24 one, I'll wait, and then see if I can get approved for
25 another one to pay it off.

### Page 52

1  Q   In a couple days?
2  A   Yes.
3  Q   So you were sort of rolling from one to the
4  other to the next one and so on.
5  A   That's correct.
6  Q   And were you also using the same website or
7  were you using multiple websites?
8  A   I was researching on yahoo.com, lenders out
9  there, payday, and if it suits me, then I'll try to use
10 it. But if it's a website that's not familiar, I try to
11 back out of it, close it out.
12 Q   When you say a website that suits you, what did
13 you mean by that?
14 A   Like if the URL doesn't look fishy or -- like
15 https, or if it doesn't look familiar to me, I'll close
16 it out.
17 Q   Okay. But doing it this way, in other words,
18 every couple of days, that involved different websites
19 that you would pull up?
20 A   Yes.
21 Q   Okay. And you just don't know all the websites
22 that you might have submitted information through?
23 A   That's correct.
24 Q   Okay.
25       MR. PUTTERMAN: Let's mark as Exhibit 42 --

### Page 53

1  Q   So let me ask you about the Advance Me Today
2  loan. This was for $500 with a finance charge of 650.
3  Do you see that?
4  A   (Nodding head.)
5  Q   Was this loan paid off?
6  A   I don't remember if it is.
7        MR. WILENS: They gave her a second loan, so it
8  must have been.
9        THE WITNESS: I don't remember.
10 Q   BY MR. PUTTERMAN: Well, I'm assuming that, but
11 I'm just asking as to her recollection.
12       THE WITNESS: I don't remember. It's been
13 three years ago.
14 Q   BY MR. PUTTERMAN: Understood.
15       Exhibit 42 is going to be AQUINO34.
16       (Defendants' Exhibit 42 was marked
17       for identification.)
18 Q   BY MR. PUTTERMAN: Do you recognize this
19 document?
20 A   Yes.
21 Q   Was this in relation to another -- was this in
22 relation to a new loan, or to the existing loan that you
23 had with Advance Me Today?
24 A   Existing loan.
25 Q   So this was actually a statement of what had

Page 54

1  been paid and what was due?
2  **A  Yes.**
3      MR. WILENS: When you say -- which loan are you
4  referring to? It's not the December loan, because it
5  says the loan start date April 11, 2013.
6      MR. PUTTERMAN: Okay.
7  Q   So did you get a second loan from Advance Me
8  Today?
9  **A  I don't remember.**
10     MR. WILENS: This is what the next document
11 pages are that don't have a date on them. Remember
12 those terms and conditions? Apparently it refers to
13 that one.
14     MR. PUTTERMAN: Okay.
15 Q   So do you remember anything about getting a
16 second loan?
17 **A  No, I don't remember. Only the first loan.**
18 Q   All right. Well, this doesn't appear to have
19 been our loan anyway. It does not appear to have been
20 generated through a lead from PartnerWeekly.
21     All right, you can lay that aside.
22     Returning to Exhibit 36, what the database
23 shows here is that leaving aside AMG, which was a tribal
24 lender, that there were four times that leads that went
25 through my client's system were accepted by lenders.

Page 55

1  One for Liquid Ventures, one for Devwire Consulting, one
2  for Vista B LLC, and one for Vivus Servicing. Correct?
3  **A  Correct.**
4  Q   But you don't know which loans you actually
5  got -- you don't know specifically whether any of these
6  acquired leads themselves resulted in loan agreements or
7  not. Correct?
8      MR. WILENS: Object. Argumentative. And she's
9  already testified about two of them that she's matched.
10     MR. PUTTERMAN: Well, no, she hasn't matched
11 any. There's some with dates.
12 Q   Do you recognize the name Liquid Ventures?
13     MR. WILENS: That's the name you used. Not the
14 name she uses.
15     MR. PUTTERMAN: That's the name that appears on
16 the database.
17     MR. WILENS: I know, but that's just the name
18 you use. She would not have gone to Liquid Ventures.
19     MR. PUTTERMAN: I get that.
20 Q   Do you recognize the name Liquid Ventures?
21 **A  No.**
22 Q   Do you know whether that lead acquired by
23 Liquid Ventures actually resulted in a loan agreement?
24 **A  I don't remember on this. I know the real name**
25 **of it.**

Page 56

1  Q   Okay. What was the real name of Liquid
2  Ventures?
3      MR. WILENS: She's asking you that.
4      THE WITNESS: I wouldn't know.
5  Q   BY MR. PUTTERMAN: Oh, I'm sorry. I
6  misunderstood. Do you recognize the next name down,
7  Devwire Consulting?
8  **A  No.**
9  Q   Do you know whether or not a loan agreement
10 resulted from that lead that was acquired by Devwire
11 Consulting?
12 **A  No, unless I know the real name as well.**
13 Q   Okay. Then on the next page, there's a lead
14 that was acquired by Vista B LLC. Do you see that?
15 **A  Yes.**
16 Q   Do you know whether that lead resulted in a
17 loan agreement?
18 **A  I don't remember either.**
19 Q   Okay. And finally, on the last page, there's a
20 lead that was acquired by Vivus Servicing Ltd. Do you
21 know whether a loan agreement resulted from that
22 acquisition of a lead?
23 **A  Not with this name.**
24 Q   Okay. Did you maintain a list anywhere of all
25 the lenders, at least, by the names that you knew them,

Page 57

1  that you obtained loans from?
2  **A  Only when I have a copy of the agreement.**
3  Q   And do you think you made a copy of every
4  agreement in connection with every loan that you
5  obtained during this period?
6  **A  Only what I got approved for.**
7  Q   Right. That's what I mean. So these are all
8  the loans that -- you've produced to us documents
9  relating to all the loans that you got approved for and
10 actually obtained?
11     MR. WILENS: Well, I didn't produce AMG.
12     MR. PUTTERMAN: I understand that. Excluding
13 AMG. That's a fair statement.
14 Q   But otherwise, what we have here before us
15 today are the loan agreements for all the loans that you
16 were actually approved for during this period --
17 **A  That's correct.**
18 Q   -- correct? And I think I asked you this
19 before, and if I did, please forgive me. You did not
20 maintain a list of all the websites through which you
21 actually submitted information looking for a payday
22 loan; correct?
23 **A  That's correct.**
24 Q   Okay. Let's take a look. You produced some
25 bank statements here.

Page 58

1    And Jeff, you referenced e-mails, and there
2 were no e-mails in the production you provided for
3 Ms. Aquino.
4    MR. WILENS: Well, I consider that page 34 to
5 be an e-mail. Maybe it wasn't an e-mail.
6    MR. PUTTERMAN: Okay. So that's what you're
7 referring to?
8    MR. WILENS: Yeah.
9    MR. PUTTERMAN: Okay, thank you.
10   All right. Exhibit 43 is AQUINO16 through 18.
11       (Defendants' Exhibit 43 was marked
12       for identification.)
13 Q   BY MR. PUTTERMAN: Do you have that in front of
14 you? Do you recognize this as a statement from the
15 SchoolsFirst Federal Credit Union for an account you
16 maintained at that credit union?
17 A   Yeah. Yes.
18 Q   And this is for the period January 1, 2013, to
19 January 31, 2013?
20 A   Correct.
21 Q   Let's go to the separate page. You see that
22 there's an entry on January 3, a withdrawal?
23 A   Yes.
24 Q   For AMTPD? I'm going to assume that that
25 refers to Advance Me Today Payday. Is that correct?

Page 59

1 A   Yes.
2 Q   And then there's another withdrawal on January
3 15 for Advance Me Today Payday. Correct?
4 A   Correct.
5 Q   Okay. Let's turn to page AQUINO18. Now, it
6 looks like there's a withdrawal on January 18 from the
7 Dollar Loan Center. Do you see that?
8 A   Yes.
9 Q   What's that referring to?
10 A   An installment loan.
11 Q   Okay. This was an installment loan that you
12 had with Dollar Loan Center?
13 A   Yes.
14 Q   Was that a storefront?
15 A   Storefront.
16 Q   And how much was that loan for?
17 A   2,500.
18 Q   And did you pay all that.
19 A   Yes, it has been paid off.
20 Q   So that was not a payday lender. That was an
21 installment loan?
22 A   That's correct.
23 Q   Then there's an entry on January 30 of 2013,
24 and it is a deposit of $400 from United Cash Loans. Do
25 you see that?

Page 60

1 A   Yes.
2 Q   And who is that?
3 A   They go under United Cash Loans.
4 Q   Who?
5 A   It's a payday loan.
6 Q   Okay. It's a payday loan. Do you know which
7 payday lender it is? Is this a loan you got over the
8 Internet?
9 A   Yes.
10   MR. WILENS: I think that's AMG.
11   MR. PUTTERMAN: Hmm?
12   MR. WILENS: I think it might be one of AMG's
13 companies.
14   MR. PUTTERMAN: I think it might be also.
15 Q   Is this the one with the tribe?
16 A   I think so.
17 Q   Then on January 31 there's a withdrawal, and
18 that appears to be for Advance Me Today Payday.
19 Correct?
20 A   Correct.
21 Q   And then let's go to the -- so I think we're
22 done, then, with Exhibit 43.
23       Exhibit 44 will be AQUINO19 through 23.
24       (Defendants' Exhibit 44 was marked
25       for identification.)

Page 61

1 Q   BY MR. PUTTERMAN: And do you recognize this as
2 another monthly statement from SchoolsFirst Federal
3 Credit Union for your account there?
4 A   Yes.
5 Q   And this is for the period February 1 through
6 February 28, 2013; correct?
7 A   Correct.
8 Q   Now, let's look at the first page. I'm not
9 sure why the entry for McDonald's is still included
10 here. But I'm assuming you were not borrowing money
11 from McDonald's.
12 A   No. I was eating.
13 Q   That makes perfect sense.
14   MR. WILENS: Sometimes the redacting tool
15 doesn't work perfectly.
16   MR. PUTTERMAN: Yes, I know that.
17   MR. WILENS: Overcompensates or
18 undercompensates.
19 Q   BY MR. PUTTERMAN: Okay. So there's an entry
20 on February 4, which appears to be a deposit from
21 Hamilton Liberty. Is that correct?
22 A   Yes.
23 Q   And that was your $700 loan with them.
24 A   That's correct.
25 Q   Okay. And we're not sure whether or not that

Page 62

1 relates to the lead that -- or one of the leads that was
2 acquired from your submissions on February 1. Correct?
3     MR. WILENS: Well, you're asking if you're not
4 sure, so she doesn't know what you're sure about or not.
5 But we have circumstantial evidence linking it to one of
6 the leads.
7     MR. PUTTERMAN: What's that, other than the
8 date?
9     MR. WILENS: I mean, other than the date, it's
10 not a trivial factor. It's also a researching of the
11 nature of the background of the company as well as the
12 URL published, led me to believe that they're the same
13 companies. But that's outside the knowledge of this
14 witness.
15    MR. PUTTERMAN: Okay. That's fine.
16 Q   You don't know whether that relates to an
17 application that you may have submitted on or about
18 February 1; correct?
19 A   That's correct.
20 Q   Okay. Now on February 12 there's another
21 deposit. Do you see that?
22 A   Yes.
23 Q   And that is for a $250 deposit for something
24 called Vince Enterprises. Do you see that?
25 A   Yeah.

Page 63

1 Q   Okay. Who -- what does that refer to? Is that
2 a payday loan that you obtained?
3 A   Payday loan.
4 Q   And do you know when you applied for that
5 particular payday loan?
6 A   February 11.
7 Q   You think that was February 11?
8 A   11 that I applied for, and then it got
9 deposited February 12.
10 Q   Okay. You actually recall that?
11 A   I recall it.
12 Q   Do you recall which website you applied through
13 for that loan?
14 A   I don't remember.
15 Q   Then on February 14, there's a deposit from VIP
16 loans for $500; correct?
17 A   Correct.
18 Q   And we've seen the loan agreement for that.
19 A   Yes.
20 Q   Do you have a loan agreement for Vince
21 Enterprises?
22 A   Not that I recall. I can't remember if that's
23 the name they use.
24 Q   So to your knowledge, you do not have in your
25 possession right now, either electronic or hard copy, a

Page 64

1 loan agreement for somebody called Vince Enterprises?
2 A   That's correct.
3 Q   Okay. On February 14, there's a withdrawal by
4 AMT, Advance Me Today; correct?
5 A   Correct.
6 Q   And then on February 15, and actually twice on
7 February 15, there's two debits from United Cash Loans,
8 which was your installment loan. Or rather, that was
9 your AMG, your tribal loan.
10 A   Yeah.
11 Q   And then on February 15, there's also a
12 withdrawal for Hamilton Liberty.
13 A   Yes.
14 Q   Correct? Okay, let's go to page AQUINO22. And
15 there's the start of an entry of a withdrawal there on
16 February 28 by Advance Me Today. Correct?
17 A   Correct.
18 Q   And that entry, that's the same entry that
19 continues over to the last page of the month?
20 A   Correct.
21    MR. PUTTERMAN: Okay. Let's mark as Exhibit 45
22 AQUINO24 through 26.
23    (Defendants' Exhibit 45 was marked
24     for identification.)
25 Q   BY MR. PUTTERMAN: Do you recognize this as a

Page 65

1 monthly statement for your account at SchoolsFirst
2 Federal Credit Union for the month of March 2013?
3 A   Yes.
4 Q   Now, on the first page there's a number of
5 withdrawals. The first one on March 1 is from United
6 Cash Loans; correct?
7 A   Yes.
8 Q   That's your installment loan. That's not a
9 payday loan. The next, after that there's a withdrawal
10 by Vince Enterprises again. Correct?
11 A   Correct.
12 Q   And that is a payday loan.
13 A   Yes.
14 Q   Then there's another withdrawal by United Cash
15 loan on March 1. And immediately after that is a
16 withdrawal overdraft fee. Do you see that?
17 A   Yes.
18 Q   Then there's another withdrawal on March 1 from
19 VIP loans. And that's a payday loan.
20 A   Yes.
21 Q   And there's another withdrawal on March 1 from
22 Hamilton Liberty, which is another payday loan.
23 Correct?
24 A   Yes.
25 Q   And after that, there's another -- in fact,

### Page 74

1   A   Correct.
2   Q   And then on the second page, did you stop those
3   Dollar Premier withdrawals?
4   A   Yes.
5   Q   Okay. Why did you do that?
6   A   Because they kept taking too much accounts, so
7   I said -- I put a stop on it, because they keep
8   withdrawing and withdrawing, and then I think when I
9   checked it, I think I overpaid.
10  Q   In other words, they took more money out than
11  you thought you owed.
12  A   Yes.
13  Q   So the bank then reversed some of those
14  withdrawals; correct?
15  A   Correct.
16  Q   And that's what the deposits are. Right?
17  A   Yes.
18  Q   All right, you can lay that aside.
19      Why don't we take about a ten-minute break,
20  because the disc has to be changed anyway.
21      MR. WILENS: What have you got left?
22      MR. PUTTERMAN: We'll be done by 5:00 at the
23  latest.
24      MR. WILENS: You really have another 55
25  minutes?

### Page 75

1       MR. PUTTERMAN: I didn't say that. That's why
2   I said "at the latest."
3       THE VIDEOGRAPHER: The time is 4:05 p.m. We
4   are going off the record and this is the end of media
5   No. 1.
6       (Recess)
7       THE VIDEOGRAPHER: We are back on the record.
8   This is the beginning of media No. 2 and the time is
9   4:19 p.m.
10  Q   BY MR. PUTTERMAN: Ms. Aquino, let's turn to
11  the subject of any collection activities that were
12  undertaken against you in connection with payday loans.
13  Were you ever contacted by any collection agencies in
14  connection with any of the payday loans that you took
15  out during this period, the period being roughly January
16  through April of 2013?
17  A   The only one I can recall, when I was at work,
18  I've been getting these harassment calls claiming that
19  they're collection agency, if I don't pay them, that the
20  government is going to put me in jail.
21      And I'm, like, this is bogus. And then they
22  kept calling nonstop, so I stopped calling, and it was
23  just ongoing. So I told my co-workers, don't answer it.
24  So I gave another number to call me, and it just goes
25  directly to voicemail.

### Page 76

1   Q   After which you delete it.
2   A   It was annoying. And my supervisor, "Turn that
3   phone off."
4   Q   Which loan was that in connection with? Do you
5   know? Do you recall?
6   A   Not that -- I don't remember. It was just some
7   person claiming like a Middle Eastern accent, "Oh, I
8   need my money now. You owe me," or this, something.
9   Q   So you don't even know if it related to a
10  payday loan, it was random?
11  A   Yeah, just random. I was, like, how did they
12  get my number?
13  Q   Did you ever check to see if Mr. Wilens speaks
14  in a Middle East accent?
15      MR. WILENS: Only when I'm pretending to be a
16  terrorist. And now that we've managed to offend every
17  group, move on.
18      MR. PUTTERMAN: Okay. That actually was a
19  joke.
20  Q   All right, any other collection harassment or
21  anything like that that you've experienced?
22  A   Not that I remember. I just ignore it.
23  Q   Did you start receiving unsolicited offers for
24  other loans by e-mail?
25  A   I can't remember.

### Page 77

1   Q   Is there -- let me ask this. Do you have any
2   reason to believe that your personal information was
3   sold or given away to anybody by any of the lenders from
4   whom you obtained payday loans?
5   A   Probably. It was probably given to other sites
6   without my authorization. I would not know unless they
7   kept calling. Why are all these people calling? How
8   did they get my information? That's the only thing I
9   can think of.
10  Q   Okay. But beyond that, you don't have any
11  knowledge of how or when or by whom that might have
12  occurred?
13  A   That is correct.
14      MR. PUTTERMAN: Okay. Jeff, I have nothing
15  further at this time.
16      MR. WILENS: No questions.
17      MR. PUTTERMAN: Okay, we're done.
18      Ms. Aquino, thank you very much. Contrary to
19  your counsel's opinion, I prefer not to extend out
20  depositions unnecessarily. And I'm also very concerned
21  about his cold and his well-being, so I want to get him
22  out of here as quickly as possible. Thank you very
23  much.
24      MR. WILENS: If you're concerned about my
25  financial well-being, you know what to do.