# EXHIBIT C

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

(OAKLAND DIVISION)

| | |
|---|---|
| SEAN L. GILBERT, KEEYA MALONE, KIMBERLY BILBREW, CHARMAINE B. AQUINO, on behalf of themselves and all persons similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>BANK OF AMERICA, N.A., et al.,<br><br>        Defendants. | No. 4:13-cv-01171-JSW |

Videotaped Deposition of

KIMBERLY YVETTE BILBREW

Tuesday, November 24, 2015

THE SOUZA GROUP

Certified Shorthand Reporters

4615 First Street, Suite 200

Pleasanton, California 94566

Reported by:

LINDSAY PINKHAM, CCRR, CSR

LICENSE NO. 3716

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

1   Q   These are with the CFPB?
2   A   Yes, correct.  And a follow-up letter with one
3   debt collector, and I think that's it.
4   Q   Okay, good.  You can lay that aside.
5        I'm going to ask the reporter put in front of
6   you -- actually, here are some of the exhibits from
7   yesterday.  And knowing our reporter, I'll bet they're
8   in nice numerical order.
9        Would you please pull out Exhibit 2, which is
10  the complaint in this matter.  And I'm going to go
11  through some paragraphs with you, and then we may go off
12  on some diversions in the middle, because I'm usually
13  distracted.
14       I'd like you to turn first to paragraph 5;
15  which is on page 3.  Now, you see that this refers to
16  defendant Montel Brian Anthony Williams?
17  A   I do.
18  Q   Commonly known as Montel Williams.  Do you know
19  who Mr. Williams is?
20  A   Yes, I do.
21  Q   And who is he?
22  A   I know him to be a television personality and
23  also a talk show host.
24  Q   Do you watch his talk show?
25  A   No.

1   Q   Any reason why not?
2   A   I don't have television at home for the last
3   two years.
4   Q   Is that a good thing or a bad thing?
5   A   Probably good.  I save money.
6   Q   When you still had a television, did you watch
7   his show at all?
8   A   I think when I was younger.
9   Q   But not in recent years?
10  A   No.
11  Q   Do you have any understanding of what his role
12  or relationship is with MoneyMutual?
13  A   I understand that he is the spokesperson for
14  MoneyMutual.
15  Q   And what do you base that understanding on?
16  A   Based on his commercials that I've seen when I
17  did have television.
18  Q   And those were television commercials?
19  A   Yes.
20  Q   Do you remember what was said on any of those
21  commercials?
22  A   He basically -- I don't recall verbatim, but he
23  basically was selling it as a trustworthy source, when
24  you need help with finances, you don't want to be late
25  with your rent, you have car problems, that it's a

1   trusted source for --
2   Q   When you say "it," do you mean MoneyMutual?
3   A   MoneyMutual.  MoneyMutual is a trusted source
4   for obtaining short-term loans.
5   Q   All right, would you please go to paragraph 6.
6   Starts at the bottom of the same page.  And you see in
7   paragraph 6 there's a reference to Glenn McKay?
8   A   I do.
9   Q   Now, again, excluding anything that you may
10  have learned from your counsel, do you know who Glenn
11  McKay is?
12  A   I do not.
13  Q   Do you have any knowledge at all of what Glenn
14  McKay's relationship is to any of the other defendants?
15  A   I do not.
16  Q   And I gather, then, you also don't know what
17  his role might be in connection with any of the other
18  defendants?
19  A   No, I do not.
20       MR. PUTTERMAN: And just as an aside, Madam
21  Reporter, have you noted that Ms. Charmaine Aquino is in
22  the room also?
23       THE REPORTER: Yes, I have.
24       MR. PUTTERMAN: Which, frankly, I think will be
25  helpful, because that will enable her to go through this

1   faster, because she'll know what to expect.  Or maybe
2   not.
3   Q   Okay, would you please go to paragraph 7 on
4   page 4.  And you see that refers to defendant
5   PartnerWeekly LLC?
6   A   I do.
7   Q   Do you know anything about that company?
8   A   I do not.
9   Q   Do you know anything about that company's
10  relationship with the other defendants?
11  A   No, I do not.
12  Q   And do you know anybody who's affiliated or
13  associated with PartnerWeekly LLC?
14  A   I do not.
15  Q   Have you ever communicated with PartnerWeekly
16  LLC?
17  A   I have not.
18  Q   Have you ever communicated with Mr. McKay?
19  A   I have not.
20  Q   Okay, let's go to paragraph 8.  That refers to
21  a defendant Brian Rauch, spelled R-a-u-c-h, but it's
22  pronounced Rauch.  Do you know who Mr. Rauch is?
23  A   I do not.
24  Q   Have you ever communicated with him?
25  A   I have not.

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

Page 18

1   Q   Do you know what his relationship is with any
2   of the other defendants?
3   A   I do not.
4   Q   Do you know what role he might have played in
5   connection with any of the events described in this
6   complaint?
7   A   I do not.
8   Q   Okay, same questions as to paragraph 9,
9   referring to John Hashman.  Do you know who he is?
10  A   No.
11  Q   Have you ever communicated with him?
12  A   No.
13  Q   Do you know what his relationship is or was to
14  any of the other defendants?
15  A   No.
16  Q   Do you have any knowledge concerning his role
17  with regard to the other defendants or in connection
18  with what's alleged in this complaint?
19  A   No.
20  Q   Okay, let's skip forward to page 6, please,
21  paragraphs 18, 19, and 20.  You see those paragraphs
22  refer to three individuals, Samuel W. Humphreys, Douglas
23  Tulley, and Alton F. Irby III?
24  A   I do.
25  Q   Do you know who any of those gentlemen are?

Page 19

1   A   I do not.
2   Q   Have you ever communicated with any of those
3   gentlemen?
4   A   I have not.
5   Q   Do you know what any of their relationships
6   might be with any of the other defendants?
7   A   No.
8   Q   Do you know what role they may have played with
9   regard to the other defendants or with regard to the
10  allegations in the complaint?
11  A   I do not.
12  Q   Let me ask you this.  Do you know what a payday
13  loan is?
14  A   Yes.  A payday loan is a short-term loan.  It's
15  usually -- it's a short-term loan that's usually paid
16  back on the next payday.
17  Q   And how did you learn about payday loans?
18  A   I've had them previously over the years.
19  Q   Starting about when?  Do you know?
20  A   I want to say maybe around 2007.
21  Q   And why have you obtained payday loans in the
22  past?
23  A   Just to either make rent, car issues, maybe pay
24  a bill, not wanting to be late.
25  Q   At any of those times, did you investigate what

Page 20

1   other alternatives you might have to obtaining payday
2   loans?
3   A   Yeah.  Probably a short-term loan with my bank,
4   but, you know, that didn't work out, so...
5   Q   So when you've obtained a payday loan, has that
6   been what I'll call the funding of last resource for you
7   at the time?
8   A   No, usually I tend to think ahead, so it's
9   usually not like a last minute thing with me, no.
10  Q   Okay, but when you've obtained a payday loan,
11  have you had any alternative financial resource
12  available at that time?
13  A   I probably could have asked my parents, but I
14  didn't want to.
15  Q   That comes with its own baggage.
16  A   Yes.  I was trying to be self-sufficient.
17  Q   Did you find payday loans helpful when you
18  obtained them?
19  A   Yes, I did.
20  Q   Do you remember at any time when you obtained a
21  payday loan whether you inquired as to whether the
22  lender was actually licensed to make loans in
23  California?
24  A   No, not then, no.
25  Q   Why not?

Page 21

1   A   I wasn't aware of license, you know, the laws
2   regarding payday loans.
3   Q   But you strike me as a person who would have
4   read the loan agreements carefully --
5   A   I skimmed them, yes.
6   Q   So you were aware, for example, typically of
7   the interest that you would be paying?
8   A   Yes, I was.
9   Q   And the fees?
10  A   Yes.
11  Q   And did you understand that at least some of
12  those loans had rollover provisions of some kind?
13  A   Are we --
14  Q   No, I'm just speaking generally.
15      MR. WILENS: I'm going to object to the
16  term "rollovers."  You're going to have to define that.
17  Because rollovers are not legal in California.
18      MR. PUTTERMAN: That's what you're going to be
19  doing in this case.
20      MR. WILENS: Okay, that humor escaped me
21  completely.  But I'm sure you thought it was amazingly
22  clever.
23      MR. PUTTERMAN: No, it was only sort of
24  mediocre clever.
25      MR. WILENS: So define your term, if you would.

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

---

Page 22

1   Q    BY MR. PUTTERMAN:  Let me ask you this.  Before
2   we get -- any loans you took, before we get to the loans
3   that are involved with this case, did any of your loans
4   have a provision whereby you could extend the loan?
5   A    No.
6   Q    And do you remember some of the companies from
7   whom you obtained payday loans?
8   A    The only one I do remember was Check 'n Go, and
9   that was in 2007.
10  Q    And was that online or brick and mortar store?
11  A    It was online, directly to their website.
12  Q    Now, at some point, you started submitting
13  information to potentially obtain loans through the
14  MoneyMutual website; correct?
15  A    Yes.
16  Q    And what prompted you to do that generally?
17  A    It was going towards the end of January 2013.
18  My rent was due, it was a lot, and my 14-year-old car
19  had broken down at the same time.  So I was trying to
20  either figure out how to do car repairs or get enough
21  money to get a new car, a down payment, as well as
22  trying to cover my rent.
23  Q    Okay, so you had a lot going on.
24  A    Yes, within that week.
25  Q    And was there some reason in particular that

---

Page 23

1   you went to the MoneyMutual website?
2   A    I just remember it from commercials.
3   Q    At that time did you investigate other
4   potential sources of funds?
5   A    Yes, I did.
6   Q    And what sources did you investigate?
7   A    I investigated Cash Call.
8   Q    And what do you recall that Cash Call was?
9   A    Cash Call was a short-term lender, not
10  necessarily a payday loan, but an installment loan.
11  Q    And did you attempt to obtain a loan from Cash
12  Call?
13  A    I went through the process and then I decided
14  against it at that time, because I did not want to take
15  out a full -- I think the minimum was 2600.
16  Q    You wanted less?
17  A    Yes, I wanted less.
18      MR. WILENS:  Well, she wanted more, but she
19  didn't want to have to pay back that much.
20      THE WITNESS:  Yeah.
21      MR. WILENS:  Now we're even.
22  Q    BY MR. PUTTERMAN:  Okay, we'll come back to
23  those loans in a little bit.  And I'm going to jump
24  ahead now, back in Exhibit 2.  Well, actually, we're
25  going to come back to those loans in a very little bit.

---

Page 24

1   because we're going to go to paragraph 52 on page 17.
2   And that paragraph says:
3       "Between January and April 2013,
4       plaintiff Bilbrew used the
5       moneymutual.com website to obtain payday
6       loans from unlicensed lenders Cash Yes,
7       7X Services, LLC, and My Quick Funds,
8       and paid at least $450 on these loans."
9   A    Yes.
10  Q    And that's all correct?
11  A    Yes, as I recall.
12  Q    Now, why did you obtain loans from those three
13  lenders during that period of time from January to April
14  2013?
15  A    Basically, I was still trying to -- still
16  didn't get enough -- well, between January and April, I
17  was still trying to -- I had had a postdated check for
18  my car, I had bought a new car, a new used car, so I had
19  a postdated check, so I was just trying to make sure I
20  covered rent and funds.
21  Q    And you were able to obtain funds from these
22  three lenders; correct?
23  A    Yes, I was.
24  Q    And how much total did you get from those
25  three?

---

Page 25

1   A    Through that time span?
2   Q    Yes, between January and April 2013.
3   A    There were various loans.  I would probably
4   say --
5       MR. WILENS:  You don't need to guess.
6   Q    BY MR. PUTTERMAN:  You can give an estimate,
7   though.
8   A    Maybe under 1500, probably.
9   Q    Now, was there more than one loan with any of
10  these lenders?
11  A    Yes.
12  Q    Can you describe that for me?
13  A    I believe I took out two with Cash Yes, I think
14  possibly two with 7X Services, which I know it to be
15  CastlePayday, and one with My Quick Funds.
16  Q    Let me ask you this.  Was your initial loan
17  with Cash Yes satisfactory?
18  A    The first one was, yes.
19  Q    And that's one that you got after going through
20  the MoneyMutual website?
21  A    Yes, I believe it was the first one.
22  Q    Was the second one in response to a direct
23  offer from Cash Yes?
24  A    The $100 one, yes.
25  Q    And was that satisfactory?

---

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

| | | Page 26 |
|---|---|---|
| 1 | **A** | **Yes.** |
| 2 | **Q** | And you knew what the interest rates were? |
| 3 | **A** | **Yes, for those.** |
| 4 | **Q** | And you knew what the fees were? |
| 5 | **A** | **Yes.** |
| 6 | **Q** | So fair to say you went into it with your eyes |
| 7 | open? | |
| 8 | **A** | **Yes.** |
| 9 | **Q** | Now, was the first loan with 7X satisfactory? |
| 10 | **A** | **Yes. It was fair. Well, not fair, but --** |
| 11 | | MR. WILENS: He's just using the term |
| 12 | "satisfactory." It's kind of vague. It doesn't mean |
| 13 | it's legal; just means it's satisfactory. |
| 14 | | THE WITNESS: Yes. |
| 15 | **Q** | BY MR. PUTTERMAN: I'm not into that at all. |
| 16 | I'm into, you know, did it serve your purposes, did you |
| 17 | understand it when you signed up for it -- |
| 18 | **A** | **Yes.** |
| 19 | **Q** | -- and did you feel that that particular loan |
| 20 | was handled properly? |
| 21 | **A** | **Yes.** |
| 22 | **Q** | Okay. And the same -- and when I |
| 23 | use "satisfactory" with regard to the two Cash Yes |
| 24 | loans, do you understand that that's what I was |
| 25 | referring to? |

| | | Page 27 |
|---|---|---|
| 1 | **A** | **Yes, I understand.** |
| 2 | **Q** | And your answer remains "yes" to both of them? |
| 3 | **A** | **Yes.** |
| 4 | **Q** | Now, I'm getting from your facial expression |
| 5 | and body language that the second loan with 7X might not |
| 6 | have been satisfactory? |
| 7 | **A** | **No.** |
| 8 | **Q** | Okay. Can you tell me why? |
| 9 | **A** | **I didn't realize -- when I first went into the** |
| 10 | **loan, I was able to pay the first one back, everything.** |
| 11 | **And then I didn't realize when I got the second one** |
| 12 | **that -- I didn't know anything about rollovers. I** |
| 13 | **thought I was going to pay just a straight fee and then** |
| 14 | **there was the balance. Then it renewed, and I realized** |
| 15 | **that I'm in a rollover situation, which I didn't like.** |
| 16 | **Q** | Let me step back for one second. The first 7X |
| 17 | loan is one that you got by submitting information |
| 18 | through moneymutual.com; correct? |
| 19 | **A** | **I did, yes.** |
| 20 | **Q** | Was the second one the result of a direct offer |
| 21 | from 7X, or CastlePayday? |
| 22 | **A** | **I don't recall. I think I may have went** |
| 23 | **directly to them. I thought I went through MoneyMutual,** |
| 24 | **but I think I may have went directly to CastlePayday.** |
| 25 | **Q** | So do you recall how much in fees or other |

| | | Page 28 |
|---|---|---|
| 1 | charges and so on mounted up through the rollovers on |
| 2 | the second CastlePayday loan? |
| 3 | **A** | **I don't. I know it was like in excess of,** |
| 4 | **like -- close to 200. About $175.** |
| 5 | **Q** | Did you communicate about this with |
| 6 | CastlePayday? |
| 7 | **A** | **Towards April I did. In April I did.** |
| 8 | **Q** | And what did you tell CastlePayday? |
| 9 | **A** | **I told them that I couldn't afford the** |
| 10 | **rollovers, I didn't realize that there was rollovers, or** |
| 11 | **"renewals," as they referred to them, and I wanted to** |
| 12 | **negotiate, I wanted to pay them the principal amount I** |
| 13 | **borrowed and just a fee. I could not have this, like,** |
| 14 | **constant rollover in my Bank of America account.** |
| 15 | **Q** | Let me ask you this. How much was the first |
| 16 | CastlePayday loan for; do you remember? |
| 17 | **A** | **I don't remember. I know it was probably about** |
| 18 | **600, maybe, 700.** |
| 19 | **Q** | And did you pay that one back? |
| 20 | **A** | **I believe I did.** |
| 21 | **Q** | And how much was the second one for? |
| 22 | **A** | **The second one may have been around 700.** |
| 23 | **Q** | Now, what was Castle Payday's response? |
| 24 | **A** | **I didn't really -- I can't recall, but I** |
| 25 | sent e-mails, exchanged e-mails, and I was constantly |

| | | Page 29 |
|---|---|---|
| 1 | being quoted by CastlePayday their terms. There really |
| 2 | wasn't any communication. It broke down. |
| 3 | **Q** | Okay. We'll get back to that and the outcome |
| 4 | of that a little bit later. I have some idea from the |
| 5 | documents that have been produced. |
| 6 | | Now, how much of the original loan of the 700 |
| 7 | did you pay back? |
| 8 | **A** | **For CastlePayday?** |
| 9 | **Q** | Yes. |
| 10 | **A** | **None.** |
| 11 | | MR. WILENS: Of the original loan? |
| 12 | | THE WITNESS: Oh, I'm sorry, the original loan. |
| 13 | I paid the original loan back, the first loan back. I |
| 14 | think it was like 850, possibly. |
| 15 | **Q** | BY MR. PUTTERMAN: When all was said and done. |
| 16 | **A** | **Yes.** |
| 17 | **Q** | Okay. And the second loan for 700 you did not |
| 18 | pay back. |
| 19 | **A** | **I did not pay that back.** |
| 20 | **Q** | Okay. And again, we'll get into that a little |
| 21 | bit further down the line. |
| 22 | | Now, let me ask you this. When you started |
| 23 | having this problem with CastlePayday, did you attempt |
| 24 | to complain to MoneyMutual? |
| 25 | **A** | **No, I did not.** |

The Souza Group
(800) 230-3376

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

---

Page 30

1   Q   Why not?
2   A   I didn't think that was an option.
3   Q   Why didn't you think that was an option?
4   A   Because I was dealing directly with
5   CastlePayday. And I remember something, I think, on the
6   website about, if you have questions about your loan,
7   contact the lender.
8   Q   Does that also tend to support in your mind
9   that the second loan may have come directly from you
10  dealing with CastlePayday?
11  A   Yes.
12  Q   Let's go to the last loan with My Quick Funds.
13  What can you tell me about? How much was it for?
14  A   I believe My Quick Funds was for, I think,
15  $600.
16  Q   And was that loan satisfactory in the sense
17  that we've been discussing?
18  A   Yes.
19  Q   And did you repay that loan?
20  A   No, I didn't.
21  Q   Why not?
22  A   Because at the same time I was dealing with the
23  CastlePayday rollover, I was going through the same
24  thing with My Quick Funds.
25  Q   They did a rollover?

---

Page 31

1   A   Yes, I believe they did. And I believe they
2   were both coming due at the same time. So I tried to
3   negotiate both of them.
4   Q   You could not afford to pay either of them with
5   the rollovers started --
6   A   No. The rollovers, no.
7   Q   Did you negotiate with My Quick Funds?
8   A   My Quick Funds, yes. I tried to.
9   Q   Can you describe those negotiations?
10  A   I wrote a couple of e-mails to them and advised
11  them that I would not be paying the loan back, other
12  than in installments.
13      And they, like CastlePayday, quoted their terms
14  and advised that I would be sent to a collection agency,
15  and I should pay back the loan, and if I didn't, who
16  knows what the collection agency would do.
17  Q   This was just dealing, at that time, dealing
18  with My Quick Funds.
19  A   Yes.
20  Q   Now, let me ask you this. Did you have loan
21  agreements with both My Quick Funds and, well, what
22  we're calling CastlePayday?
23  A   Yes.
24  Q   And did you read through them when you got
25  them?

---

Page 32

1   A   I read through most -- some of it, yes.
2   Q   Was there some reason you didn't read through
3   all of it?
4   A   It was a lot of information, but I did read
5   through. I just did not catch the rollover, the
6   renewal.
7   Q   After you start negotiating with both those
8   companies, did you go back and look at the agreements
9   again, since they were referring you to the terms?
10  A   I didn't read through them completely, but I
11  just -- I was really stressed out. I didn't read
12  through them completely. I just wanted to negotiate a
13  deal with them.
14  Q   And would I be correct in assuming that you
15  also didn't contact MoneyMutual with your complaints
16  about My Quick Funds?
17  A   No, I didn't. I didn't see a reason at the
18  time, because I was dealing directly with the loans.
19  Q   Okay. Did you consider the possibility, either
20  with regard to My Quick Funds or CastlePayday, that
21  MoneyMutual, if you talked to them, might be able to put
22  some pressure on either of those companies?
23  A   No, I did not.
24  Q   Any reason why not?
25  A   Again, I was negotiating with the loans

---

Page 33

1   directly. I was really stressed out about having a lot
2   of money come out of my account, and I just -- was just
3   focused on negotiating with those two loans.
4   Q   Okay. Now, did you also obtain some other
5   payday loans during that period, January through April
6   2013, other than through MoneyMutual website?
7   A   I had a Cash Call loan. I eventually took out
8   a Cash Call loan. And I had, like, a storefront loan.
9   Q   So the Cash Call loan was online?
10  A   Yes.
11  Q   And about how much was that for?
12  A   That minimum was 2600. I got 2500 or 24.
13  Q   And was that loan satisfactory?
14      MR. WILENS: What did you just say? The
15  minimum was 26 and you got 24?
16      THE WITNESS: Yes. There was a fee.
17      MR. WILENS: Okay. So it was a $2600 loan.
18      THE WITNESS: Yes.
19  Q   BY MR. PUTTERMAN: Okay. And that was like an
20  installment loan?
21  A   Yes.
22  Q   Okay. Was that loan satisfactory?
23  A   Yes.
24  Q   And did you pay that off?
25  A   Not directly to them. I paid it off to a debt

---

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

Page 34

1  collector.
2  Q  Why did it go to a debt collector?
3  A  I was having a hard timekeeping up with the
4  loans in that period, the rollovers. And I was in the
5  process of moving.
6  Q  Can you describe your interaction with the debt
7  collector over the Cash Call loan?
8  A  There was just letters. There wasn't really
9  any interaction.
10  Q  Okay. But you eventually made arrangements to
11  pay it off?
12  A  Yes, I did.
13  Q  And you did?
14  A  I did.
15  Q  Now, you said you also got a storefront loan.
16  Do you remember who that was from?
17  A  No, it was some loan I had been dealing with
18  off and on the year before in the west of L.A., Santa
19  Monica. I don't remember the name. And that was paid
20  off as well.
21  Q  Okay. Now, I notice that Exhibit 52 says that
22  you, quote, "paid at least $450 dollars on these loans,"
23  close quote, which were the Cash Yes, 7X Services, or
24  CastlePayday --
25  A  Correct.

Page 35

1  Q  -- and My Quick Funds loans. Now --
2  MR. WILENS: You mean paragraph 52.
3  MR. PUTTERMAN: Yes. I'm sorry.
4  Q  Now, in light of your testimony, there's a -- I
5  just want to clarify which loans exactly, the $450 was
6  paid on, or at least $450.
7  So you had the first Cash Yes loan that you got
8  as a result of submitting information to MoneyMutual,
9  and you paid off, I think you said, about 850 total on
10  that.
11  MR. WILENS: Well, I'm going to advise the
12  witness not to guess. There's documents that say these
13  things, and if you need to refresh your recollection --
14  MR. PUTTERMAN: Well, she already testified on
15  it. I'm just going through here.
16  MR. WILENS: That was a wild estimate. Now
17  you're asking her for a more precise breakdown.
18  MR. PUTTERMAN: Didn't sound like a wild
19  estimate to me. Why don't you just let her answer.
20  MR. WILENS: Well, it is an estimate, because
21  it's not what the documents show. So I don't know what
22  to tell you.
23  Q  BY MR. PUTTERMAN: Okay. Give us your best
24  answer, with the understanding that it might vary from
25  the documents.

Page 36

1  MR. WILENS: But you're entitled to refresh
2  your recollection if you need to. You're not going to
3  find it in there. You're going to have to look at the
4  bank records or loan documents.
5  Q  BY MR. PUTTERMAN: I'm just asking you, what do
6  you recall, without looking at the documents, about what
7  did you pay back on them?
8  A  Could you specify the period, or just the
9  individual loans?
10  Q  Just the individual loans.
11  A  For Cash Yes?
12  Q  The first loan.
13  A  I believe I paid at least, I'm going to say
14  about 450 for that loan.
15  Q  So you did not pay back the entire first loan?
16  A  I did pay back the entire first loan.
17  Q  Okay. And the second loan you did not pay --
18  excuse me. Did you pay that back?
19  A  The second loan for Cash Yes?
20  Q  Yes.
21  A  Yes, I did.
22  Q  And how much did you pay on that?
23  A  I want to say it was 100.
24  Q  Okay. But might have been a little bit more
25  with fees?

Page 37

1  A  Yes. Sorry. I'm just trying to remember how
2  many I'd taken out with Cash Yes.
3  MR. WILENS: If you need to refresh your
4  recollection, don't guess. We have all the loan
5  agreements here. You don't need to actually -- you just
6  need to say the words. He'll give you a document if you
7  need to refresh --
8  Q  BY MR. PUTTERMAN: I'll be showing you the
9  documents a little bit later.
10  A  Okay.
11  MR. WILENS: So rather than guess, if you need
12  to, just say you would have to refresh your
13  recollection.
14  THE WITNESS: I have to refresh. I can't
15  remember.
16  Q  BY MR. PUTTERMAN: Okay. And that was the one
17  you got -- the second one was the one you got directly
18  dealing with Cash Yes.
19  A  I'm not sure. I have to refresh my memory.
20  Q  Okay. The CastlePayday loan, the first one you
21  paid back?
22  A  Yes.
23  Q  And do you remember how much you paid?
24  A  I believe it may have been 750.
25  Q  And the second one you did not pay because of

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

1  the --
2  **A   I did not --**
3  **Q   -- dispute over the rollovers.**
4  **A   -- yes, correct.**
5  **Q   And the My Quick Funds you did not pay --**
6  **A   I did not, because of the dispute.**
7  **Q   Do you remember making payments to an entity**
8  called United Cash?
9  **A   I do not.**
10      MR. PUTTERMAN: I'm going to ask the reporter
11  to mark as Exhibit 16 a printout from the PartnerWeekly
12  database showing Ms. Bilbrew's applications for loans
13  through either MoneyMutual or through other affiliated
14  publishers.
15      (Defendants' Exhibit 16 was marked
16      for identification.)
17  **Q   BY MR. PUTTERMAN: Let me ask you this first.**
18  Have you not communicated with MoneyMutual about any of
19  your loans after you obtained the loans?
20  **A   No.**
21  **Q   And again, why not?**
22  **A   Because I was negotiating directly with the**
23  **loans themselves.**
24      MR. WILENS: The lenders, you mean.
25      THE WITNESS: The lenders. Sorry.

1  **Q   BY MR. PUTTERMAN: And you understood that the**
2  MoneyMutual website had stated that if you had questions
3  or issues about the loans, you should discuss them with
4  the lender?
5  **A   Yes.**
6  **Q   Did you understand that MoneyMutual was not the**
7  lender?
8  **A   Yes.**
9  **Q   Let's take a look at this printout. Now, the**
10  first time you submitted information to a website that
11  ended up going through the, I'll call it the
12  PartnerWeekly system, appears to have been on October
13  25, 2010. Do you see that?
14  **A   Yes.**
15  **Q   And that was through something called Access**
16  Financial Services, but it also says, the URL says
17  checkngo.com. Do you remember applying for that loan?
18  **A   There's a possibility I did. I don't really**
19  **recall, but there's a possibility.**
20  **Q   This indicates that the lead was actually**
21  acquired by somebody. Do you recall getting a payday
22  loan at about the time?
23  **A   No.**
24  **Q   So you might not have?**
25  **A   No. I remember going into Check 'n Go at a**

1  certain point in and around this period, but I thought
2  the loan was denied, so I did not get any money.
3      MR. WILENS: This doesn't mean the loan was
4  granted or denied. It just means that they accepted it
5  for consideration. It met the qualifications.
6      THE WITNESS: There's a possibility I did, yes.
7  **Q   BY MR. PUTTERMAN: We then have what appears to**
8  be likely to be one submission on January 29, 2013. So
9  that's the period in which you're discussing. And it
10  shows four different URLs, but I will represent to you
11  this was likely the result of one submission. You see
12  on January 29?
13  **A   I do.**
14  **Q   Now, do you recognize either any of the URLs or**
15  the publisher names as one that you submitted an
16  application for a payday loan through?
17  **A   I don't.**
18  **Q   Okay. But you indicated you were applying for**
19  payday loans during that period.
20  **A   Yes.**
21  **Q   Okay. So you believe you quite probably did**
22  submit an application?
23  **A   I believe I did.**
24  **Q   Okay. Then we come to -- and do you recall, by**
25  the way, submitting applications during that period and

1  not being approved for loans?
2      MR. WILENS: Are you talking about January 29
3  or January 30?
4      MR. PUTTERMAN: 29.
5      MR. WILENS: Five of them. You said four
6  earlier.
7      MR. PUTTERMAN: Yeah. Could be five.
8  **Q   How that works, by the way, is that sometimes**
9  an affiliate publisher will also distribute the lead to
10  other publishers who happen to be affiliates of the
11  lead. One submission, one application submission, comes
12  into the system from several sources.
13      All right, let's go to the January 30. And
14  that appears to be a submission of information by you
15  through the MoneyMutual website which resulted in an
16  acquisition of the lead by 7X Services, LLC. Correct?
17  **A   Correct.**
18  **Q   Okay. And that turned out to be the loan that**
19  you arranged with CastlePayday?
20  **A   I believe so.**
21  **Q   Okay. Now, after you were matched up with**
22  CastlePayday, did they contact you?
23  **A   Yes.**
24  **Q   And how did they do that?**
25  **A   I can't remember. There was a possibility, I**

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

1   believe, it was phone.
2   Q   And at that point, after that point, did you
3   have anything further to do with MoneyMutual in
4   connection with that loan?
5   A   No.
6   Q   Then the next one down the list shows that on
7   or about February 4, 2013, you submitted information to
8   MoneyMutual or to an affiliate, and the lead was
9   acquired by M. Mark High LTD, which I will represent to
10  you is an affiliate of Cash Yes.  So that then would be
11  the Cash Yes loan?
12  A   Correct, yes.
13  Q   The initial Cash Yes loan.
14  A   Yes.
15  Q   Now, do you remember getting the Cash Yes loan
16  as a result of going through the MoneyMutual website, or
17  through another website?
18  A   MoneyMutual.
19  Q   You remember that one as being a MoneyMutual.
20  A   Yes.
21  Q   Okay.  The next one is submission of
22  information on April 1, 2013, and the lead there appears
23  to have been acquired by My Quick Funds.  So that would
24  be what resulted in the My Quick Funds loan.  Correct?
25  A   Correct.

1   Q   Okay.  Now, with regard to Cash Yes, were you
2   contacted by Cash Yes?
3   A   Yes.
4   Q   And after you were contacted by Cash Yes, did
5   you have any further dealings or interaction with
6   MoneyMutual in connection with that Cash Yes loan?
7   A   No.
8   Q   Same questions with regard to My Quick Funds.
9   Did they contact you?
10  A   Yes.
11  Q   And after they contacted you, did you have any
12  further communications or interactions with MoneyMutual
13  concerning the My Quick Funds loan?
14  A   No.
15  Q   Now, it appears from this printout that on July
16  22, 2013, you again submitted information through the
17  MoneyMutual website.  Do you see that?
18  A   I do.
19  Q   But it says "failed" here, which means that you
20  were not matched up with a lender.  Do you recall going
21  to the MoneyMutual website again?
22  A   I do.
23  Q   Okay.  And was that because you had found the
24  MoneyMutual satisfactory in your prior attempts to be
25  matched up with a lender?

1   A   I do.
2   Q   And at that time did you believe that the
3   problems with the lender were the result of the lenders
4   on the second loans with CastlePayday and My Quick
5   Funds, were the result of the lender not doing things
6   properly?
7   A   I do.
8   Q   Okay.  Were you upset in July 2013 that you
9   couldn't get matched up with a lender again through the
10  MoneyMutual website?
11  A   No.
12  Q   And why not?
13  A   Well, the long answer is, I was in the process
14  of moving, and I had a very big deposit, and I did not
15  want to ask my family for money.  But I just sucked it
16  up and asked, and they helped.
17  Q   Good.  Now, we don't have any other record,
18  after July of 2013, of you applying for another payday
19  loan through MoneyMutual.
20  A   No.
21  Q   And is there a reason you did not go back to
22  the MoneyMutual website after that?
23  A   Because of the harassment I was receiving from
24  CastlePayday in August, and just, you know, tightened my
25  belt.  But mostly I was stressed out from the harassment

1   that I received from various phone calls, other, I
2   guess, lenders that I didn't take loans out with, but
3   people who had my information calling me on my cell
4   phone and at work.
5   Q   And did you blame MoneyMutual for any of that?
6       MR. WILENS: I want to object.  Are you asking
7   her at that time, before she consulted with an attorney?
8       MR. PUTTERMAN: Yes.
9       MR. WILENS: Not legally blame, but blame just
10  in your mind.
11  Q   BY MR. PUTTERMAN: Right.  Call it "assigned
12  fault?"
13  A   Yes.
14  Q   "Blame" is good.  "Blame" is good.
15      MR. WILENS: "Blame" is better.
16      THE WITNESS: Blame?  At the time I blamed the
17  lenders.
18  Q   BY MR. PUTTERMAN: When was the first time you
19  blamed MoneyMutual?
20  A   When I -- after the first one, CastlePayday,
21  and then the second with My Quick Funds.  And then I
22  started getting calls for loans I never took out,
23  constant e-mails, harassment.  I attributed it to it all
24  coming in from MoneyMutual, because I wasn't sticking my
25  information in any other website.

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

Page 46

1  Q   Well, at that point did you call MoneyMutual to
2  complain?
3  A   I did not.
4  Q   And why not?
5  A   Because at that point I didn't know if it was
6  an option. I wasn't versed in the laws of licensed
7  versus unlicensed lenders, and I was looking more for
8  help dealing with the individual lenders at the time.
9  Q   And you didn't call MoneyMutual about that,
10 either?
11 A   No, I didn't.
12 Q   Now, you ultimately complained to the CFPB; is
13 that correct?
14 A   Yes, I did.
15 Q   But at that time, when you complained to the
16 CFPB, you still didn't complain to MoneyMutual?
17 A   No, I didn't. I was focused on the lenders.
18 Q   Did you consider whether or not MoneyMutual
19 might want to know if you were having trouble with
20 lenders with whom MoneyMutual was doing business?
21 A   No, I was too focused on stopping the
22 harassment.
23 Q   Okay.
24     Since July of 2013, have you applied for other
25 payday loans?

Page 47

1  A   Yes, I have.
2  Q   And do you recall through what websites you
3  applied?
4  A   No websites. Storefront.
5  Q   Do you remember which storefronts?
6  A   Just one.
7  Q   Which one?
8  A   I can't remember the name. I think it's Pit
9  Stop.
10 Q   Is that the one in Santa Monica?
11 A   No, this is, I think, West Hollywood.
12 Q   And did you obtain payday loans from that
13 storefront?
14 A   Yes, I have.
15 Q   And for what purposes did you obtain those
16 loans?
17 A   Just general bills, gas, groceries, making it
18 through payday. I get paid twice a month.
19 Q   And did you find the loans satisfactory?
20 A   I did.
21 Q   They basically tided you over?
22 A   Yes. Easy to pay back.
23 Q   Okay. Well, let me ask you this. Would it be
24 fair to say that at least in principle, you support the
25 notion of payday loans being available?

Page 48

1  A   Absolutely, I do.
2  Q   Your particular problem arose with these two
3  lenders.
4  A   Absolutely.
5     MR. PUTTERMAN: All right, we've been going
6  about an hour. Why don't we take a short break.
7     THE VIDEOGRAPHER: The time is 10:28 a.m.
8  We're going off the record.
9     (Recess)
10    THE VIDEOGRAPHER: The time is 10:37 a.m. We
11 are back on the record.
12 Q   BY MR. PUTTERMAN: Do you have, Ms. Bilbrew,
13 any facts or knowledge that MoneyMutual or any of the
14 other MoneyMutual defendants sold or gave your
15 information from leads to anybody but the lenders who
16 contacted you after receiving those leads?
17 A   The only fact I have is that MoneyMutual was
18 the only website I used, and all the problems that I've
19 have have stemmed from using the website, based on the
20 harassment and these lenders.
21 Q   Okay. But you don't know, for example, if the
22 information was sold or given out by MoneyMutual or by
23 the lenders; correct?
24 A   I don't know. I just know that I put my
25 information in MoneyMutual's website, and I've been

Page 49

1  having problems ever since with harassment and scammers.
2  Q   Now, when you dealt with the collection
3  agencies for -- in connection with both the CastlePayday
4  loan and with the My Quick Funds loan, were you told by
5  those agencies that they had actually bought the
6  accounts from the original lenders?
7  A   The original lenders' names were used. They
8  never said they bought the accounts. They just started
9  in with harassment.
10 Q   And did you understand from looking at the
11 agreements that -- or just generally, that if you didn't
12 pay the bills, that lenders reserved the right to send
13 the accounts to collection agencies?
14 A   I do.
15 Q   And you don't know therefore whether or not the
16 collection agencies might have given out or sold your
17 information; is that correct?
18 A   I don't know if they have. I don't know if
19 they were really even collection agencies.
20 Q   Well, whoever it was that was talking to you,
21 they obviously had information about you; correct?
22 A   Yes, they had information about me.
23 Q   Which that much you understood, because of the
24 fact that they were collection agencies on the loans;
25 right?

The Souza Group
(800) 230-3376

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

---

Page 50

1    **MR. WILENS:** Hold on.  That question doesn't
2  make any sense.  This "collection agencies on the loan"?
3    **MR. PUTTERMAN:** Let me rephrase it.
4  Q    And you understood they had that information
5  because they were trying to collect on the loans.
6    **MR. WILENS:** Objection.  Speculation as to how
7  or why they had it.
8  Q    BY MR. PUTTERMAN:  Well, was that your
9  understanding?
10  A    I'm sorry.  Could you rephrase that?
11  Q    Yeah.  Did you understand when they contacted
12  you that they had information because of the fact they
13  were collecting on the loans?
14  A    **Whoever they were that contacted me, I knew**
15  **they had my information with regards to the loans.**
16  Q    Okay.  And obviously they would have had
17  trouble trying to collect on the loans if they didn't
18  have your information.
19  A    **Correct.**
20  Q    Okay.  So you don't know what they may have
21  done with the information --
22  A    **No, I don't.**
23  Q    -- whoever they were.
24  A    **Whoever they were.  I don't think that many of**
25  **them were real collection agencies.**

---

Page 51

1  Q    I don't know one way or another, so...
2    So the point is, you know, and what I'm getting
3  at, which is no great secret, is that while you stopped
4  doing business with the MoneyMutual website because you
5  had provided them information that was eventually used
6  for all kinds of, I'll say, other purposes, sending you
7  e-mails about loans you hadn't taken and things like
8  that, as you described earlier, you don't know what or
9  where that actually -- who was actually responsible for
10  doing that.
11  A    **As far as loans that I didn't take out, I don't**
12  **know.  As far as the loans that I put my information and**
13  **got through MoneyMutual, yes.**
14  Q    Okay.  Now, at any time, once it appeared to
15  you that this information was out on the street, did you
16  call MoneyMutual to ask them what they had done with
17  your information?
18  A    **No, I did not, because I, again, I was dealing**
19  **directly with the lenders, and at a certain point, with**
20  **the harassment, I just hired a lawyer.**
21  Q    That would be Mr. Wilens?
22  A    **Yes, after -- actually, I also -- forgot to**
23  **mention -- I also called, I can't remember, a few state**
24  **agencies, who ran the names of these loans through the**
25  **database and said they were illegal.**

---

Page 52

1  Q    You mean the lenders.
2  A    **The lenders, yes.**
3  Q    Did they explain to you why they were illegal?
4  A    **That they did not have a license in the State**
5  **of California.**
6  Q    After you got that information, did you call up
7  MoneyMutual to ask them why they had put you in touch
8  with lenders who were not licensed to make loans in
9  California?
10  A    **No, I did not.  I hired a lawyer.**
11  Q    That again would be Mr. Wilens.
12  A    **Mr. Wilens, uh-huh.**
13  Q    Is there any reason you also didn't call
14  MoneyMutual to complain?
15  A    **There was no reason for me to call, because I**
16  **was still focused on the lenders.  And again, I remember**
17  **on MoneyMutual's website seeing if you had any questions**
18  **about your loans or application, contact the lender.**
19  Q    Okay.  But what I'm talking about here now is
20  not actually a question about the loan.  It's a question
21  about MoneyMutual, lenders who were not licensed in
22  California acquiring leads from MoneyMutual.  So what
23  I'm asking now is, did you think to complain to
24  MoneyMutual about that, since they apparently had put
25  you in touch with lenders who were not licensed in

---

Page 53

1  California?
2  A    **No, I did not.  I was stressed out.  I was just**
3  **trying to get the harassment to stop.**
4  Q    Okay.  Now, you did not complain to anybody
5  about the Cash Yes loans; correct?
6    **MR. WILENS:** Objection.  Vague.  She just said
7  she did complain about Cash Yes.  Oh, Cash Yes?
8    **MR. PUTTERMAN:** Cash Yes.
9    **MR. WILENS:** Well, I mean, excluding your
10  attorney.
11    **THE WITNESS:** Yes.  Only to my attorney I did.
12  Q    BY MR. PUTTERMAN:  Okay.  Because you hadn't
13  had any problems with Cash Yes.
14  A    No.
15  Q    Okay.  Did it then bother you that Cash Yes was
16  not licensed?
17  A    I wasn't aware of that at the time.  I wasn't
18  aware -- I only ran through who was coming at me at the
19  time.  And then once I called or hired my attorney, only
20  did I learn who was licensed and who was not licensed.
21  Q    So let me ask you this, then.  Since your
22  experience with Cash Yes was satisfactory, what is it
23  about Cash Yes being unlicensed that bothers you, if
24  anything?
25  A    Going back to satisfactory, I found the loan

---

Page 54

1  satisfactory that I applied for it and got the money. I
2  didn't know at the time that they were unlicensed. And
3  as far as what bothered me, it was an unlicensed loan.
4  I was able to pay back the first -- but the rollovers,
5  that's what bothered me. I was unable to basically
6  negotiate with them.
7      Q   Okay, I'm focusing just on Cash Yes.
8      A   Yes, I'm speaking about Cash Yes.
9      Q   But did you have rollovers with Cash Yes?
10     A   I believe I did. I don't believe I paid all of
11  Cash Yes back. I don't think I did.
12     Q   But were you able to negotiate with them?
13     A   No, I was not able to negotiate with any of
14  these loans.
15     Q   Okay, that was unclear to me in your prior
16  testimony. So let's make sure we get that out. So Cash
17  Yes did rollovers also.
18     A   Yes, the last loan I took out.
19     Q   The second loan.
20     A   The second loan.
21     Q   That's the one you did directly --
22         MR. WILENS: There's more than two loans.
23         THE WITNESS: There's more than two loans.
24  That's right. There's about three, I think.
25     Q   BY MR. PUTTERMAN: Okay. Let's find out about

Page 55

1  the third loan.
2         MR. WILENS: That's why I said, if you need to
3  refresh your recollection, just say so.
4      Q   BY MR. PUTTERMAN: So there was a third loan
5  also.
6      A   Yes.
7      Q   And that was one arranged directly with Cash
8  Yes.
9      A   I believe so.
10     Q   And you did that because the first two loans
11  were satisfactory.
12     A   Yes.
13     Q   Is it the third loan that you had a problem
14  with rollovers?
15     A   Yes. Because the first two were easily paid
16  back. Again, I had no idea, or I didn't understand the
17  rollover situation. I was going to make a payment on
18  the Cash Yes loan, and then I found it was going to be
19  rolling over, so that's when I shut down all three of
20  the loans and tried to negotiate with all three.
21     Q   Did you then ask the state agencies you called
22  about Cash Yes as well as the other two?
23     A   I don't recall. I just remember discussing
24  CastlePayday with one. CastlePayday, I think, was one,
25  and My Quick Funds.

Page 56

1      Q   And were you contacted by anybody trying to
2  collect on the third Cash Yes loan?
3      A   No. I exchanged e-mails with someone at Cash
4  Yes asking to pay in installments. Other than that, it
5  went silent.
6      Q   So you didn't hear back from them at all?
7      A   No.
8      Q   And you didn't hear from anybody who claimed
9  that they were attempting to collect on that Cash Yes
10  loan?
11     A   No.
12     Q   So you actually, you don't have any complaint
13  about collection practices associated with Cash Yes or
14  anything like that?
15     A   Not collection practices with Cash Yes, no,
16  other than the fact that I couldn't negotiate with them.
17     Q   Right. Although it sounds like you sort of
18  successfully did, if they went silent.
19         MR. WILENS: Not quite.
20         THE WITNESS: Not quite. We're in arbitration.
21     Q   BY MR. PUTTERMAN: Who initiated that
22  arbitration?
23     A   My lawyer, or the court.
24         MR. WILENS: They moved to compel arbitration.
25  They were sued in this case --

Page 57

1      Q   BY MR. PUTTERMAN: Because you sued them.
2      A   Yes.
3      Q   My point is this. Before you sued them in this
4  case, did they simply stop communicating with you about
5  the loan, the third loan?
6      A   Yes.
7      Q   Okay. And to your knowledge, they didn't make
8  any collection efforts?
9      A   Not that I know of.
10     Q   Okay. So as far as you were concerned, they
11  had dropped it.
12     A   No, I never felt that they dropped it. It was
13  silent. There was a couple weeks of silence, too, with
14  the other loans. So I knew that the loan was still out
15  there.
16     Q   And then you sued them.
17     A   I was in the process of suing them with, well,
18  I hired Jeffrey, and then I joined this lawsuit later
19  on. There was already a lawsuit, I believe.
20     Q   Do you remember when you first contacted
21  Mr. Wilens?
22     A   In April of 2013.
23     Q   And when did you retain him?
24     A   I believe it was in August after CastlePayday,
25  after the problems with CastlePayday.

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

---

Page 58

1  Q  Did he ever wear a tie when you talked with
2  him?
3      MR. WILENS: On the phone.
4      THE WITNESS: He was on the phone.
5  Q  BY MR. PUTTERMAN:  Do you know if he owns a
6  tie?
7  A  I'm not sure.
8      MR. WILENS: If you ever showed up for court,
9  you'd see me there.
10     MR. PUTTERMAN: I did see you in the Pham case
11 once with a tie, but I thought it was borrowed.
12     MR. WILENS: It was.  I had to give it back.
13 Q  BY MR. PUTTERMAN:  All right.  So with regard
14 to your information potentially getting out there, now,
15 you did give your information to some other websites;
16 correct?
17 A  Could you rephrase -- who?
18 Q  If you go back to paragraph 16, which is the
19 printout of that database, you see that on January 29,
20 2014, you submitted information to at least one other
21 website?
22 A  I don't recall what that website was.
23 Q  Okay, I understand that.  But it was not
24 MoneyMutual.
25     MR. WILENS: But this is -- you're testifying

---

Page 59

1  to her that this is a website she went to, according to
2  your Selling Source records.
3      MR. PUTTERMAN: And?
4      MR. WILENS: She would have no way of knowing
5  that, because apparently, these people operate all sorts
6  of different names and have different addresses.
7      MR. PUTTERMAN: No, you're missing my point.
8      MR. WILENS: It's the same company.
9      MR. PUTTERMAN: No, it's not.
10     MR. WILENS: Selling Source and MoneyMutual are
11 the same company.
12     MR. PUTTERMAN: We're not talking about Selling
13 Source.  These are not Selling Source websites.
14     MR. WILENS: If they're on this list, they have
15 to be Selling Source.
16     MR. PUTTERMAN: No.  It means that they're
17 publisher affiliates who submitted leads to
18 PartnerWeekly.
19     MR. WILENS: PartnerWeekly is a subsidiary of
20 Selling Source.  MoneyMutual is a sister company.
21 They're all the same for our purposes.
22     MR. PUTTERMAN: Jeff -- Jeff --
23     MR. WILENS: -- in your master database.
24     MR. PUTTERMAN: -- would you try to understand
25 something here?  It's in somebody else's database before

---

Page 60

1  before we get it.
2      MR. WILENS: But you do get it instantly.
3      MR. PUTTERMAN: Yeah, but why don't you let me
4  ask the question and you'll see what I'm about to ask.
5      MR. WILENS: I know, but you're telling her --
6      MR. PUTTERMAN: Jeff, stop.
7      MR. WILENS: It was obviously your client's
8  database.  Every single thing on this page is your
9  client.
10     MR. PUTTERMAN: Jeff -- every single thing on
11 that page does not originate with my clients.
12     MR. WILENS: No, but the personal information
13 got into your system.
14     MR. PUTTERMAN: Right.  But the personal
15 information got into somebody else's system first,
16 before we get it.  That's what I'm about to --
17     MR. WILENS: Go ahead.  I mean, I don't know
18 how she would know that.  Look, you want to ask her --
19     MR. PUTTERMAN: Jeff, let me just ask the
20 question.
21     MR. WILENS: -- silly question.
22     MR. PUTTERMAN: I don't care about your
23 opinion.
24     MR. WILENS: Well, you should.
25     MR. PUTTERMAN: I don't.

---

Page 61

1      MR. WILENS: He's asking you to guess, so
2  see what he --
3      MR. PUTTERMAN: No.  And stop coaching the
4  witness, okay?  It's not proper, and you know it.
5  Q  All right.  Now, the point is you submitted it
6  at some point to another website --
7      MR. WILENS: She's not saying she did.  You say
8  that.
9      MR. PUTTERMAN: Yeah, I am saying she did,
10 because that's what this database shows.  Okay?
11 Q  You have from time to time applied for loans
12 through other websites; correct?
13 A  I don't recall.  I only remember going to
14 Check 'n Go and MoneyMutual.
15 Q  Okay.  Do you remember sitting at the computer
16 and applying through other websites but not getting
17 matched up?
18 A  Only in July of 2013.
19 Q  Let me ask you this.  Do you deny that you may
20 have submitted applications for payday loans through
21 other websites?
22 A  No.  But I don't recall.  I only recall
23 Check 'n Go and MoneyMutual.
24 Q  I understand that you don't recall.  I just
25 wanted to make sure that it was that you didn't recall.

---

**The Souza Group**
**(800) 230-3376**

Gilbert v                                                                                    Kimberly Bilbrew
Bank of America, N.A.                                                               November 24, 2015

1   not that you didn't do it.
2      A   Yes.
3      Q   Okay. So if you did in fact apply for loans
4   through other websites, you don't know what happened to
5   that information; correct?
6          MR. WILENS: I'm going to object. That's a
7   hypothetical, and it would call for her to speculate.
8   It depends on what the website is. If it's a legitimate
9   website, I'm sure nothing happened to it. But if it's a
10  scammy website, then probably something did. How could
11  she answer that question?
12     Q   BY MR. PUTTERMAN: Well, do you adopt what your
13  counsel just said?
14     A   In this time frame, according to these records,
15  I only remember going on MoneyMutual's website.
16     Q   Okay.
17     A   January 29, January 30, I don't recall going on
18  any other.
19     Q   Well, I can definitely represent to you that
20  there will be testimony as to what these records show
21  about -- and that testimony will be that these records
22  show that you submitted information on January 29 to at
23  least one other website that was not the MoneyMutual
24  website.
25     A   I don't recall.

1          MR. WILENS: But it was Selling Source.
2          MR. PUTTERMAN: No.
3          MR. WILENS: That's disputed. I know what
4   you're saying, Counsel. But I just don't believe you.
5          MR. PUTTERMAN: Well, I don't care whether you
6   believe me or not. Your beliefs are tailored by your
7   particular skewed views. Okay? And that's fine.
8   They're your beliefs. Okay? But the fact that you
9   don't believe me doesn't mean that it doesn't turn out
10  to be true.
11         MR. WILENS: Whether it's Selling Source or
12  it's co-conspirators, it doesn't matter. The point is,
13  it was your websites and your network of websites she
14  went to, and her information was compromised. Now, if
15  she went to a completely different lender, if she had
16  gone to Cash Yes directly herself, I understand. But
17  all these records show is that it was something in the
18  network of websites controlled, or affiliated with, as
19  you put it, Selling Source.
20         MR. PUTTERMAN: Yeah. And the bottom line is,
21  though, that these are affiliated by contract, okay? While we
22  have contracts that lay out specifics with regard to
23  them, okay, we did not control them, because they are
24  independent entities.
25         MR. WILENS: Well, you're still aiding and

1   abetting each other. Whether you claim it's a
2   contractual relationship is irrelevant.
3          MR. PUTTERMAN: You know, Jeff, all I can say
4   is this. You need to read up a little bit on the law of
5   aiding and abetting.
6          MR. WILENS: We'll go to trial and see what the
7   jury instructions say.
8          MR. PUTTERMAN: I'm not too concerned about
9   that.
10         MR. WILENS: Of course not. Because you're
11  going to settle long before it goes to trial.
12         MR. PUTTERMAN: So he says.
13     Q   Getting back to actual substance here instead
14  of our witty repartee with each other.
15         Did you ever complain to any of the, to either
16  My Quick Funds or to CastlePayday, that you believe they
17  had sold or given your information to somebody who was
18  improperly using it?
19     A   No.
20     Q   Did you ever ask either of them if they had
21  sold or given away your information to anybody?
22     A   No. The only communication I've had with them
23  was trying to negotiate. The harassment came much
24  later.
25     Q   Okay. When the harassment started, did you

1   complain to either of them about what they had done with
2   your information?
3      A   I did not. I hired a lawyer.
4      Q   Okay. So that was your response to that. You
5   didn't complain to either of them.
6      A   I did not. I was seeking legal advice on these
7   loans.
8      Q   Okay.
9          Let's mark as -- what's the next in order?
10         THE REPORTER: 17.
11         MR. PUTTERMAN: Okay. I'm going to ask the
12  reporter to mark as Exhibit 17 a document which has been
13  designated as BILBREW066 through 069; and Exhibit 18
14  will be BILBREW073 through 077.
15         (Defendants' Exhibits 17 and 18 was
16         marked for identification.)
17     Q   BY MR. PUTTERMAN: Okay. Ms. Bilbrew, while I'm
18  doing this, why don't you take a moment to look through
19  those.
20     A   Okay (Examining documents).
21         MR. PUTTERMAN: I'm sorry. Is the last page on
22  18 077 or 078?
23         THE WITNESS: 078.
24         MR. PUTTERMAN: 078 should not be included with
25  that.

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

Page 66

1   Madam Reporter, would you please note that I'm
2   removing page 078 from Exhibit 18.
3       MR. WILENS: Is the one you gave me 18 or 17?
4       MR. PUTTERMAN: I gave you 17 and about to give
5   you 18. Here's 18.
6   Q   Okay, let's look at Exhibit 17 first. Now, do
7   you recognize this document?
8   A   I do.
9   Q   Can you tell us what it is?
10  A   It's my complaint that I filed with the CFPB
11  regarding harassment regarding CastlePayday.
12  Q   Okay. Now, this was done after you actually
13  had retained Mr. Wilens; correct?
14  A   Yes.
15  Q   Okay. Now, did Mr. Wilens assist you with
16  this?
17  A   Yes. I received harassment while I was at work
18  on my cell phone. I went to another office and I
19  called --
20      MR. WILENS: The question is, did I assist you,
21  yes or no?
22      THE WITNESS: Yes. Sorry.
23  Q   BY MR. PUTTERMAN: Did he actually draft your
24  initial complaint?
25  A   No.

Page 67

1   Q   You drafted it with his assistance?
2   A   No.
3   Q   You drafted it yourself?
4   A   Yes, I did.
5   Q   Okay. And that would be back on page
6   BILBREW069?
7   A   Correct.
8   Q   Dated November 5, 2013?
9   A   Correct.
10  Q   How did you find out about the CFPB?
11  A   I went online to find out how to deal with
12  harassment, consumer harassment.
13  Q   And that's how you found out about the CFPB?
14  A   I did.
15  Q   And they had customer service or complaint
16  information, how to make a complaint or ask for
17  assistance?
18  A   Yes.
19  Q   Which you did.
20  A   I did.
21  Q   And this is about the harassment, the phone
22  calls you were receiving at work from this Humphreys
23  associate?
24  A   Correct.
25  Q   And I see in here that you state that certain

Page 68

1   threats were made to you over the phone.
2   A   Yes.
3   Q   To disclose information to your employer, for
4   example.
5   A   Correct.
6   Q   Did anybody -- in connection with this loan, so
7   now this is with regard to the CastlePayday loan;
8   correct?
9   A   As understood, yes.
10  Q   Did anybody ever threaten to bring criminal
11  charges against you in connection with that loan?
12  A   No. I don't recall -- well, I don't recall.
13  Q   Did anybody tell you -- call you and tell you
14  they were from law enforcement and you were going to be
15  criminally charged in connection with that loan?
16  A   No.
17  Q   Now, I notice here that, about in the fourth
18  sentence, it states, quote:
19      "I called back and she advised her
20      name was 'Brooke Logan' and she was
21      going to send in info to my employers
22      about the 'debt' I allegedly owed a
23      company called Castle Financial per
24      National Credit Adjusters (whom I wrote
25      many weeks ago advising that they BOUGHT

Page 69

1       and are trying to collect on an illegal
2       payday loan in the state of
3       California)."
4   Now, I note that you say that you had had
5   communications with National Credit Adjusters, referring
6   to the fact that they had bought the payday loan from
7   CastlePayday. Do you see that?
8   A   Yes.
9   Q   And what was that, your use of the
10  term "bought," based upon?
11  A   I received letters from them. I can't remember
12  the details, but I understood that they were collecting
13  on the loan for CastlePayday.
14  Q   Why specifically did you use the term "bought"?
15  A   I believe that they buy loans, loans in
16  default.
17  Q   Okay. So that was your understanding, at
18  least.
19  A   Yes.
20  Q   And I understand you don't know what they did
21  or didn't do with CastlePayday, but at least, that's
22  what you were advised by them.
23  A   Yes. Or what I understood.
24  Q   You're familiar with the practice of companies
25  selling bad debts to other companies?

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

---

Page 70

1   **A   Yes.**
2   Q   What do you know about that?
3   **A   I understand that there is an industry where**
4   companies buy debt, consumer loans.  I understood that
5   it was my understanding or I thought that National
6   Credit Adjusters was such a company.
7   Q   Okay.  And in that regard generally, do you
8   understand that once the lender -- if the lender
9   actually does sell the loan to the collector, they don't
10  necessarily have control over the collector --
11       MR. WILENS: I'm going to object.  It calls for
12  speculation.  She doesn't know what the relationship is
13  between these two fake entities.
14       MR. PUTTERMAN: Okay.  First of all, okay,
15  other than some of the pointless inclusions in that
16  objection, what I'm asking her is purely as to her
17  understanding.
18       MR. WILENS: Her understanding is --
19       MR. PUTTERMAN: Jeff, stop coaching.  She
20  doesn't --
21       MR. WILENS: I'm making an objection.
22       MR. PUTTERMAN: Then just state it.  Calls for
23  speculation.
24       MR. WILENS: I did.  Her understanding of a
25  relationship like that is irrelevant.  She's not here to

---

Page 71

1   testify about anything other than her personal
2   observations and what she did or knows.
3        MR. PUTTERMAN: That's fine.  She can respond
4   to the question.
5        MR. WILENS: But I'm asking you not to guess
6   about things you don't know anything about.
7   Q   BY MR. PUTTERMAN: Did you have any
8   understanding or opinion in that regard?
9   A   Could you rephrase the question?  I'm sorry.
10  Q   Did you have any understanding or opinion,
11  regardless of what it might have been based on, that if
12  a lender sold, actually sold a loan to a collection or
13  debt collector, that the lender might not have control
14  anymore over what the collector did?
15  A   No.
16  Q   Did you believe the lender retained control
17  over the collector to whom it sold a bad debt?
18  A   I didn't know who -- no.  I didn't know what
19  the relationship was.  I didn't know if they were
20  collecting directly for CastlePayday or --
21  Q   I'm asking generally --
22  A   Yes.  I didn't know.
23  Q   Okay.  So you just didn't have an understanding
24  one way or the other.
25  A   No, I didn't.

---

Page 72

1   Q   That's a perfectly fine answer, by the way,
2   okay?  Regardless of whatever Mr. Wilens was --
3        MR. WILENS: It is.  But it's irrelevant to
4   this case.
5        MR. PUTTERMAN: So?  Then just state
6   irrelevant.
7        MR. WILENS: I said relevance three times.
8        MR. PUTTERMAN: Yeah, in the course of three
9   paragraphs.
10  Q   Okay, now, I notice here that while you're
11  complaining about Humphreys & Associates, you don't
12  actually complain about CastlePayday in this complaint;
13  correct?
14  A   At the time, when I wrote this, I just knew the
15  words "Castle Financial."
16  Q   Okay.  Castle Financial, then.
17  A   I assumed it was CastlePayday.
18  Q   Okay.  So you didn't make any complaint,
19  though, about the lender themselves here.
20  A   "The lender" being CastlePayday?
21  Q   Right.
22  A   No, because I understood that the debt was
23  either sold off or being collected.  I was more focused
24  on what was happening to me through Humphreys &
25  Associates, the harassment.

---

Page 73

1   Q   Okay.  And -- I think I know what the answer's
2   going to be, but what I think doesn't make any
3   difference until we have it from you on the record.  You
4   did not make any complaint here about MoneyMutual;
5   correct?
6   A   I did not, because I was focused on Humphreys &
7   Associates.
8   Q   Okay.  Did you have any belief at this time
9   that MoneyMutual was somehow responsible for what
10  Humphreys & Associates was doing?
11  A   I'm sorry.  Would you rephrase?
12  Q   At the time you made this complaint to the
13  CFPB, did you believe that MoneyMutual had some sort of
14  responsibility for what Humphreys & Associates was doing
15  with their behavior?
16  A   I did not, because I was focused on Humphreys &
17  Associates.  I was focused on the loan and the original
18  lender.
19       MR. WILENS: I'm going to object.  The question
20  calls for a legal conclusion, anyway.
21       MR. PUTTERMAN: You can stop mouthing at her.
22       MR. WILENS: I'm going to consult with my
23  client.
24       MR. PUTTERMAN: That you can do.
25       THE VIDEOGRAPHER: Still on?

---

Page 74

1    MR. PUTTERMAN: No, stay on the record.
2        (Mr. Wilens and the witness are
3        absent from the room 11:09 to 11:12
4        a.m.)
5    Q    BY MR. PUTTERMAN: Would you turn to the second
6    page from the end of Exhibit 17, BILBREW067. And you
7    see the section that's entitled "Consumer Information"?
8    A    I do.
9    Q    Did you fill out the information in there?
10   A    I did.
11   Q    Okay. So you showed the debt collector as
12   Humphreys & Associates, and you showed the creditor as
13   National Credit Adjusters, LLC?
14       MR. WILENS: What page is this?
15       THE WITNESS: 67.
16   Q    BY MR. PUTTERMAN: Correct?
17   A    Correct.
18   Q    Okay. And where it says "Submit a complaint
19   against a creditor," you said yes.
20   A    Yes.
21   Q    And actually, up at the top of that page, you
22   state that -- there's a question, "What do you think
23   would be a fair resolution to your issue?" Do you see
24   that?
25   A    I do.

Page 75

1    Q    And you request an investigation of Humphreys &
2    Associates; correct?
3    A    I do.
4    Q    And then you state, quote:
5        "Also I would advise that you look
6        into National Credit Adjusters, who are
7        selling info to these criminals."
8        Now, did you write that or did Mr. Wilens?
9    A    I wrote it.
10   Q    Now, you had previously seen a copy of the
11   complaint in this action; correct?
12   A    Pardon?
13       MR. WILENS: I'm going to object. What do you
14   mean by "previously"?
15   Q    BY MR. PUTTERMAN: Prior to filling out this
16   information in November of 2013, you had seen a copy of
17   the complaint in the civil action, the Gilbert case;
18   correct?
19   A    I don't recall.
20   Q    Okay. Now, you had already retained Mr. Wilens
21   at this point?
22   A    Yes.
23   Q    And when do you recall you became an actual
24   plaintiff in the case?
25   A    I feel like it was the beginning of January of

Page 76

1    2014.
2    Q    But do you remember when you first saw a copy
3    of whatever complaint was on file?
4    A    I feel like it was January 2014.
5    Q    Now, here you don't state that either
6    MoneyMutual or, for that matter, CastlePayday, you
7    thought, was selling info, quote, to these criminals,
8    close quote. Correct?
9    A    I was focused on Humphreys & Associates --
10       MR. WILENS: The answer is no.
11       THE WITNESS: No.
12   Q    BY MR. PUTTERMAN: Okay. But you did state
13   that National Credit Adjusters was selling info to these
14   criminals.
15   A    I did.
16   Q    Okay, now, if you go to the first page, Bilbrew
17   066, once again there's a heading that says, quote,
18   "Describe what happened so we can understand the issue,"
19   close quote. And you wrote what's included after that,
20   Correct?
21   A    I did.
22   Q    Okay. And then up top it says, quote --
23   further up it says "Explanation of Closure." And that
24   states, quote:
25       "Upon receipt of Ms. Bilbrew's

Page 77

1        complaint, NCA reviewed the complaint as
2        well as NCA's records. On November 13,
3        2013, NCA communicated directly with
4        Ms. Bilbrew via letter providing a
5        detailed explanation of NCA's actions.
6        Should NCA receive any additional
7        communication from Ms. Bilbrew
8        subsequent to her receipt of our
9        communication, it will take the
10       necessary steps to resolve her
11       concerns."
12       MR. WILENS: That's what Humphreys & Associates
13   said. If you read the sentence before that.
14       MR. PUTTERMAN: Okay, yes. Thank you.
15   Q    You see that?
16   A    I do.
17   Q    Now, did you get a letter from NCA on November
18   13, 2013?
19   A    I received a letter, yes.
20   Q    And has that been produced to us?
21   A    It has.
22   Q    And I'm going to then mark as Exhibit 19 what's
23   been designated BILBREW078.
24       (Defendants' Exhibit 19 was marked
25       for identification.)

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

---

Page 78

1  Q   BY MR. PUTTERMAN:  And is that the letter you
2  received from National Credit Adjusters?
3  A   It is.
4  Q   And was this a satisfactory outcome for you?
5  A   Yes.
6  Q   And that was the end of any contacts you
7  received from anybody concerning any kind of collection
8  on the original CastlePayday loan?
9  A   Correct.
10  Q   Okay.  It states, specifically, quote, in part:
11      "NCA has reviewed your
12      correspondence as well as our records.
13      In order to resolve your complaint, NCA
14      has recalled the account from Humphreys
15      & Associates and terminated it.  The
16      account balance has been zeroed out, the
17      account will not be sold or transferred,
18      and all collection activity on the
19      account has been terminated."
20      And insofar as you know, that's what has
21  occurred?
22  A   So far.
23  Q   Well, you haven't heard anything further from
24  them; correct?
25  A   Not that I recall.

---

Page 79

1  Q   Okay.  Let's turn to Exhibit 18.  And let's go
2  to the last page, which is BILBREW077.  Did you make the
3  complaint that appears on this page on or about April
4  30, 2014, to the CFPB?
5  A   I did.
6  Q   And did you write this yourself or did you
7  receive assistance on this from Mr. Wilens?
8  A   I wrote this myself.
9  Q   And you refer to Searay Portfolio Management.
10  Why don't you describe to us here what Searay Portfolio
11  Management did in connection with attempting to collect
12  on the My Quick Funds loan.
13  A   Well, Searay Portfolio left a couple messages
14  on my cell phone while I was at work, basically, a
15  couple messages claiming that there were two claims or
16  complaints filed against me in my local county court for
17  wire fraud and, I don't know, other issues, failing to
18  pay a debt, and that if I didn't get back to them, they
19  would go ahead and file, press charges or file charges
20  against me.
21      So I called back and I spoke to someone, I
22  believe it was David Moore, and I told him, you know, I
23  asked him what the loan was for, and he said that "We
24  now own My Quick Funds and" --
25  Q   Let me interrupt you for just one second.  That

---

Page 80

1  they owned My Quick Funds --
2  A   I'm sorry.  Actually, the loan.  Well,
3  actually, they owned the loan that I took out from My
4  Quick Funds -- or actually, I'm sorry -- scratch that.
5  That they are collecting for My Quick Funds, and that I
6  owe about $985.
7  Q   So let me interrupt again.  So let me just
8  clarify.  Did they say they owned the loan, or that they
9  were actually just collecting on the loan?  Do you
10  remember?
11  A   The story kind of like changed.  My
12  understanding is that they were collecting for their
13  client, was the term that they used.  I don't know who
14  that client was, other than that it was the My Quick
15  Funds loan.
16  Q   Okay.  Why don't you continue now, please.
17  Sorry for interrupting.
18  A   No, that's fine.  And I advised that I did take
19  the loan out and I did not owe $985.  It basically
20  ensued with the gentleman on the line yelling at me,
21  telling me that he didn't care how much I owed or not,
22  that he was going to sue me, take me to court, and I
23  need to pay up, I had 24 or, I think, 48 hours to make a
24  decision before they filed charges against me.
25  Q   Or to make a deal or whatever?

---

Page 81

1  A   Yes.
2  Q   And you then filed the complaint with the CFPB.
3  A   I did.
4  Q   Okay.  Now, if you turn to BILBREW075, there's
5  an auto response from the CFPB on May 15, 2014.  And it
6  says, quote, "We wanted to let you know that the company
7  responded to your complaint," close quote.  And a little
8  bit below that where it says, "What happens next," it
9  says, "Review the company's response," and it gives you
10  a log-in address to read it online.  Correct?
11  A   Correct.
12  Q   Or call them, and we'll talk it over with you.
13      Okay, did you log on to read the actual
14  response?
15  A   I did.
16  Q   Did you print it out?
17  A   No, I didn't.
18  Q   Any reason why not?
19  A   I didn't feel I needed to print it out.
20  Q   Okay.  And above that, do you remember what the
21  response said?
22  A   I remember something about the response saying
23  that they tried to work out with me, they didn't do
24  anything that I said that they did as far as like filing
25  or threatening me with criminal complaints, and that I

---

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

---

Page 82

1  was the one that became irate.
2  Q   And your response to that is directly above
3  what we've been looking at, on May 15, 2014. Correct?
4  A   Correct.
5  Q   Okay. So it looks like you got the response
6  from the CFPB, the auto response, which was at 12:04,
7  and then within a short period of time you went and
8  looked at Searay's response and then you responded.
9  A   I did.
10 Q   At 1:15 p.m.
11 A   I did.
12 Q   Now, do you recall that in Searay's response,
13 they actually said that they had, quote, purchased the
14 title, close quote, to the loan?
15 A   I see at the top their response that they claim
16 they purchased the chain of title.
17 Q   Okay. And what was the eventual resolution of
18 this?
19 A   I haven't heard back from them.
20 Q   Okay, well, let's go --
21     MR. WILENS: "Them" being the --
22     THE WITNESS: Searay. I have not heard back
23 from Searay. Apparently, according to the explanation
24 of closure, the account's now closed in cease-and-desist
25 status.

---

Page 83

1  Q   BY MR. PUTTERMAN: And you're referring now to
2  the first page --
3  A   First page.
4  Q   Of this document? BILBREW073. Correct?
5  A   Correct.
6  Q   And that's where it says, quote, "Response,"
7  close quote?
8  A   Yes.
9  Q   And since this response, have you heard
10 anything further on attempts to collect on that loan?
11 A   I don't know if I've heard for that specific
12 loan. I just constantly have been called. I don't call
13 people back anymore to find out why they're bothering
14 me.
15 Q   So people have just been leaving messages?
16 A   Yeah. It's been a constant source for two
17 years, ever since I put my information into MoneyMutual.
18 Q   But again, you don't know who got the
19 information, from where. Correct?
20 A   There's no way I could, other than the fact I
21 put my information into MoneyMutual's website, and since
22 then I've been constantly harassed. I don't even bother
23 to even call people back anymore. It's the same
24 harassment over and over.
25 Q   Okay. And again, I have to ask you, have you

---

Page 84

1  ever called MoneyMutual to tell them about this or
2  complain about it?
3  A   No, I didn't. I didn't call them back. But I
4  know the informations come from the website.
5  Q   How do you know that?
6  A   There's no other explanation, other than the
7  fact that these people are constantly calling me,
8  quoting either some loans I've taken out, like My Quick
9  Funds. I haven't heard back from that. But I'm
10 constantly being called with information that I
11 submitted, and a bank account that I no longer have is
12 constantly being quoted, the bank account, the number.
13 Q   So I understand you attribute this to having
14 first submitted information to the MoneyMutual website.
15 A   Yes.
16 Q   But is it correct that you don't necessarily
17 attribute it to MoneyMutual, providing the information
18 to anybody but the lenders with whom you entered into
19 loans; correct?
20 A   I'm sorry. Could you rephrase that?
21 Q   Yes. It was a little messy. First of all,
22 it's correct that you attribute that to originally
23 having submitted information to MoneyMutual; correct?
24 A   I do.
25 Q   Okay. But you do not know that MoneyMutual

---

Page 85

1  itself turned that information over to anybody but the
2  lenders who contacted you and with whom you entered into
3  loan agreements; correct?
4  A   I don't know. I just know the lenders and the
5  leads that I didn't take loans from all were generated
6  by MoneyMutual. I just -- all I know is I put my
7  information in MoneyMutual -- and by the way, I did not
8  have that Bank of America account very long. It's the
9  only time I've ever submitted my Social Security or that
10 bank account information into one website, MoneyMutual.
11 Q   Okay. My real point here is, you don't know
12 who ultimately turned loose this information --
13 A   No, I have no idea, like, what MoneyMutual's
14 doing, other than I gave MoneyMutual my information.
15 Q   And you have no idea what the lenders are doing
16 or the collection agencies with whom they dealt are
17 doing with that information; correct?
18 A   Only from the trail I could find, you know,
19 CastlePayday, NCA, Humphreys & Associates, that's the
20 only trail I could follow, other than the fact that it
21 just leads back to CastlePayday, MoneyMutual.
22 Q   Okay. Now, I notice on this CFPB complaint
23 there's -- well, let's look on page BILBREW074. And
24 again, there's that whole consumer information heading.
25 See that?

---

The Souza Group
(800) 230-3376

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

---

Page 86

1   **A   Yes. I do.**
2   Q   And you filled that out; correct?
3   **A   I did.**
4   Q   And it says "Company Submitted Against," that's
5   Searay Portfolio Management --
6   **A   Correct.**
7   Q   And it says "Debt Collector Information," and
8   that says "Searay Portfolio Management."
9   **A   Yes.**
10   Q   And then it says "Creditor Information." You
11   see that?
12   **A   Yes.**
13   Q   And you filled out "My Quick Funds."
14   **A   I did.**
15   Q   And then it says "Submitted Complaint Against
16   Creditor," and you filled out "No."
17   **A   Because I didn't know where -- again, I was**
18   **focused on Searay Portfolio.**
19   Q   And there's no mention anywhere in here of
20   MoneyMutual; correct?
21   **A   There's no mention of MoneyMutual, but again, I**
22   **know all this started because of MoneyMutual.**
23   Q   Okay. My question simply was -- and let me
24   just say this, I understand you have a position in the
25   case, okay, but this will go faster if you just respond

---

Page 87

1   to the question.
2   **A   Okay. Apologies.**
3   **MR. WILENS:** Wait for the question.
4   Q   BY MR. PUTTERMAN: And the question simply was,
5   this does not mention MoneyMutual at all. Correct?
6   **A   No, it doesn't.**
7   **MR. PUTTERMAN:** Let's let the reporter change
8   the disc. It will just take a minute.
9   **THE VIDEOGRAPHER:** The time is 11:29 a.m. We
10   are going off the record, and this is the end of media
11   No. 1.
12       (Recess)
13       (Defendants' Exhibit 20 was marked
14       for identification.)
15   **THE VIDEOGRAPHER:** The time is 11:39 a.m. We
16   are back on the record and this is the beginning of
17   media No. 2.
18   Q   BY MR. PUTTERMAN: Okay, Ms. Bilbrew, I've
19   asked the reporter to place in front of you what's been
20   marked as Exhibit 20, which has the designations
21   BILBREW064 and 065.
22       Jeff, here's your copy.
23       Now, are these two letters that you received
24   from National Credit Adjusters?
25   **A   Yeah. Yes.**

---

Page 88

1   Q   And the one at the top is dated July 11, 2013.
2   **A   Yes.**
3   Q   And the first sentence states, quote:
4       "This letter is to inform you that
5       National Credit Adjusters LLC (NCA) has
6       purchased the above referenced account.
7       We are not collecting for CastlePayday."
8       Do you see that?
9   **A   Yeah.**
10   Q   So that at least is what you were told;
11   correct?
12   **A   Yes.**
13   Q   That CastlePayday no longer owned the loan; it
14   had been sold to National Credit Adjusters.
15   **A   It appears so.**
16       **MR. WILENS:** That's what it says.
17       **THE WITNESS:** Yes.
18   Q   BY MR. PUTTERMAN: Now, after you received this
19   letter, did you contact CastlePayday to find out what
20   they had done?
21   **A   No, I didn't. I don't recall, no, I don't**
22   **recall.**
23   Q   So you took this letter at face value so far as
24   that was concerned?
25   **A   I did.**

---

Page 89

1   Q   Now, aside from the amount that it states you
2   owed, was there anything else that you objected to
3   specifically in this letter?
4       **MR. WILENS:** Object to your question as vague.
5   What do you mean, she objected to?
6       **MR. PUTTERMAN:** In other words, okay, let me
7   elaborate on that.
8   Q   Was there anything specific in this letter
9   itself that you considered to be harassing or improper?
10       **MR. WILENS:** I'm going to object to the extent
11   it calls for a legal conclusion as to the many legal
12   violations present in the letter.
13       But you can give a layperson's opinion or your
14   gut reaction to the letter.
15   Q   BY MR. PUTTERMAN: And that's exactly what I'm
16   asking for.
17   **A   No, other than the balance, no.**
18   Q   Okay. And let's turn to the second letter. Is
19   it correct that you received this on or about August 15,
20   2013?
21   **A   Yes.**
22   Q   Okay. And this included a, sort of a, what
23   I'll call a special, today only discount; correct?
24   **A   Correct.**
25   Q   And this was not acceptable to you, I assume?

---

Min-U-Script®

**The Souza Group**
**(800) 230-3376**

(22) Pages 86 - 89

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

---

Page 90

1   **A   No. it wasn't.**
2   Q   Again, leaving aside the amounts that the
3   letter claims that you owed, was there anything specific
4   in this letter that you found objectionable or
5   harassing?
6   **A   No.**
7   Q   Okay. So the problem really started with
8   Humphreys & Associates.
9       **MR. WILENS:** I'm going to object. Again --
10      **MR. PUTTERMAN:** Let me rephrase that slightly.
11  Q   So the problem in terms of harassing behavior
12  or objectionable collection behavior really started with
13  Humphreys & Associates; correct?
14  **A   For this loan?**
15  Q   Yes.
16  **A   Yes.**
17  Q   Okay. Let's go back to Exhibit 2, which is the
18  complaint again. And I'm going to ask you to turn to
19  paragraph 59, which is on page 19. And would you please
20  read that to yourself.
21  **A   (Examining document).**
22  Q   Okay. Have you read that?
23  **A   I did.**
24  Q   I'm going to specifically read the last
25  sentence of that paragraph, which says, quote:

---

Page 91

1       "But Selling Source also sent spam
2   e-mails to California residents and
3   displayed advertisements on websites
4   visited by California residents."
5   Do you see that?
6   **A   Yes.**
7   Q   Now, have you ever actually heard or know
8   anything about an entity called Selling Source?
9   **A   No.**
10  Q   As far as you understood, you were working
11  through MoneyMutual; correct?
12  **A   Yes.**
13  Q   Now, did you receive any spam e-mails from
14  MoneyMutual?
15  **A   I occasionally saw e-mails from MoneyMutual.**
16  Q   And do you remember what they said?
17  **A   Something like, "Hi, Kimberly" -- I can't**
18  **remember verbatim, but, like, you know, just sort of**
19  **reminders. "We're here if you need another loan," or,**
20  **"Get another loan," sort of thing, with Montel on the**
21  **front.**
22  Q   And did you respond to any of those?
23  **A   I don't recall.**
24  Q   Do you recall anything objectionable in the
25  content of themselves of those e-mails?

---

Page 92

1   **A   Could you elaborate as "objectionable"?**
2   Q   Were you offended by anything in the contents
3   of those e-mails?
4   **A   No.**
5       **MR. PUTTERMAN:** I'm going to ask the reporter
6   to mark as Exhibit 21 BILBREW001-002.
7       Jeff, I'm missing one copy of this. Would you
8   mind looking over the witness?
9       **MR. WILENS:** What is it?
10      **MR. PUTTERMAN:** That (indicating).
11  BILBREW001-002.
12      (Defendants' Exhibit 21 was marked
13      for identification.)
14  Q   BY MR. PUTTERMAN:  Now, I'm not going to refer,
15  obviously, to the e-mail by which you sent this on to
16  Mr. Wilens, but to the e-mail from MoneyMutual to you
17  dated February 12, 2013.
18  **A   Uh-huh.**
19  Q   Is this one of the e-mails you were just
20  referring to?
21  **A   Yes.**
22  Q   Okay. And do you recall if you responded to
23  this e-mail?
24  **A   I don't recall.**
25  Q   Now, you see that further down it says:

---

Page 93

1       "To no longer receive e-mails from
2   Continental Communications, click here
3   to unsubscribe."
4   Do you see this?
5   **A   Yes.**
6   Q   Did you click to unsubscribe to that?
7   **A   No. I didn't read that far down.**
8   Q   You just deleted it or whatever once you saw
9   what it was?
10      **MR. WILENS:** We didn't delete it. We gave it
11  to you.
12      **THE WITNESS:** Or filed it.
13  Q   BY MR. PUTTERMAN:  I'm sorry. Okay. It went
14  into an electronic file.
15  **A   Yeah.**
16  Q   Now, back in February 2013, do you recall why
17  you would have saved this to a file?
18  **A   I don't know, maybe because in the process**
19  **of getting loans from January 29 through -- I tend to**
20  **file things later. I don't really read my e-mails. I**
21  **just go through what I want and put it off to the side.**
22  Q   Now, you see where it says, "Kimberly, you may
23  have additional advances available"?
24  **A   Yes.**
25  Q   Below that it reads, quote:

---

The Souza Group
(800) 230-3376

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

---

Page 94

1      "The process is quick, easy, and
2  safe. By using the information you
3  provided for your previous matching
4  request with MoneyMutual, you can skip
5  the bulk of the process, get an answer
6  in seconds!"
7      Exclamation point, close quote. You see that?
8  A  Yes.
9  Q  Do you recall if you understood when you read
10  that that you would not be matched with another lender
11  unless you specifically clicked on that MoneyMutual
12  one-step process?
13  A  Yeah. I don't really remember. I just filed
14  the e-mail, pulled it out when I needed it to send to
15  Jeffrey.
16  Q  Okay. So you don't recall actually going and
17  applying for any more loans in response to this --
18  A  I don't recall. I may have went to the website
19  at some point directly, but I don't recall.
20  Q  I understand that there were loans both before
21  and after.
22  A  I don't recall.
23  Q  Okay. But you knew about the website already.
24  A  Yes.
25  Q  Okay. You can lay that aside.

---

Page 95

1      Now I'm going to ask you to look at paragraph
2  60 and read that to yourself.
3  A  (Examining document)
4  Q  Do you have any personal knowledge of any facts
5  concerning the allegations that are stated in paragraph
6  60?
7  A  No.
8  Q  I'm going to ask you the same question with
9  regard to 61. So would you please read that to
10  yourself.
11  A  (Examining document) Okay.
12  Q  Do you have personal knowledge of any facts
13  concerning the allegations made in paragraph 61?
14  A  Could you be more specific with regards to
15  "allegations"?
16  Q  Yes. "Allegations" mean that in paragraph 61,
17  various statements are made. Do you see that?
18  A  Yes.
19  Q  Okay. Do you have personal knowledge of any
20  facts concerning any of those statements?
21  A  Personal knowledge? No.
22  Q  Okay. And again, we're excluding anything you
23  may have heard from your counsel. You understand that?
24  A  Yes, absolutely.
25  Q  Okay.

---

Page 96

1      MR. WILENS: So you don't know who Montel
2  Williams is.
3      THE WITNESS: Well, yeah, I know who Montel
4  Williams is --
5      MR. WILENS: See, you have to go through each
6  sentence, and each sentence may contain multiple facts
7  in it. That's what he really wants to ask you about.
8      MR. PUTTERMAN: But she's already testified
9  that she knows who Montel Williams is. What I'm really
10  talking about here is the statements that are actually
11  made in paragraph 61. And I think the witness
12  understood it that way --
13      MR. WILENS: Well, one of them is that they
14  hired celebrity Montel Williams. She knows they did
15  that.
16      MR. PUTTERMAN: But she's already testified to
17  that.
18      MR. WILENS: I know, but your question didn't
19  say if she's already -- she doesn't have to mention it.
20      MR. PUTTERMAN: Your point's taken.
21  Q  Okay, would you please read to yourself
22  paragraphs 70 to 72. That's on pages 21 to 22.
23      Do you know anything about the, quote,
24  marketing contracts, close quote, that are referenced in
25  those paragraphs?

---

Page 97

1  A  No.
2      MR. PUTTERMAN: Jeff, this would be a good time
3  for you guys to take a lunch break so I can make my
4  call. How long do you think you need?
5      MR. WILENS: I don't know. I mean, are you
6  going to call from here? There's a conference room at
7  the end of the hall you can probably use.
8      MR. PUTTERMAN: That's not the issue. But I'm
9  assuming that you guys may want to get something to eat.
10      MR. WILENS: Some of us may, some of us
11  may just --
12      THE WITNESS: I'm fine.
13      MR. PUTTERMAN: That starts in five minutes for
14  me, and then I will just come back when I'm done and we
15  will continue. Okay? So off the record.
16      THE VIDEOGRAPHER: The time is 11:54 a.m. We
17  are going off the record.
18      (Recess)
19      THE VIDEOGRAPHER: The time is 12:32 p.m. We
20  are back on the record.
21  Q  BY MR. PUTTERMAN: Ms. Bilbrew, I understood
22  from your earlier testimony that when you decided that
23  you needed to get some payday loans in early 2013, that
24  you remembered seeing the MoneyMutual television ads.
25  Correct?

---

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

1 **A   Correct.**

2 **Q   And so you went to the MoneyMutual website; is**
3 **that correct?**

4 **A   Correct.**

5 **Q   Do you remember how you located the MoneyMutual**
6 **website?  Did you actually remember what the website**
7 **address was or did you Google it or what?**

8 **A   I don't remember.**

9 **Q   Okay.  However you did, you got to the website;**
10 **correct?**

11 **A   Yes.**

12 **Q   Now, at that point you already knew that you**
13 **wanted at least one payday loan.**

14 **A   Yes.**

15 **Q   Did you at that time read through the website?**

16 **A   MoneyMutual's website?**

17 **A   Yes.**

18 **A   Yes, I went through the website.**

19 **Q   What do you remember about it?  And I'll be**
20 **showing you some pages from it, but I'd like to know,**
21 **just sitting here, as you are today, what you remember**
22 **about the website.**

23 **A   I remember seeing Montel Williams as a**
24 **spokesperson advising that it was a trustworthy source.**

25 **Q   The MoneyMutual --**

1 **A   MoneyMutual being the trustworthy source for**
2 **loans, and that the loans would be helpful for**
3 **short-term cash needs, and that MoneyMutual was**
4 **trustworthy and that the loans -- or the lenders that go**
5 **through the site are basically, you know, are held to a**
6 **high standard of code of conduct.**

7 **Q   Okay.  Anything else that you remember offhand?**
8 **And I understand you're not going to have complete**
9 **recollection of it by any means.**

10 **A   No, I just remember that it was just heavily --**
11 **or I remember just constantly seeing that MoneyMutual**
12 **was a trustworthy source for short-term loans.**

13 **Q   And the other thing you probably remember is**
14 **constantly seeing Montel's picture.**

15 **A   Of course.  Pretty much --**

16 Q   Pretty much.  Okay.  I am going to ask you to
17 find in that stack of exhibits from yesterday
18 Exhibit 14.  And don't worry, you're not going through
19 this whole thing.  I'm going to ask you to -- there's
20 first this request for judicial notice.  You don't have
21 to look at that.  And then underneath there's a
22 "Declaration of Donald J. Putterman."

23 A   I'm sorry.  What page?

24 Q   You see there's a stapled-together document?
25 Yeah.  And we'll put that back on when we're finished.

1 There.  You've got the declaration?

2 A   Yes, I do.

3 Q   What we're going to go to actually is first
4 Exhibit 8 to that declaration.  And so if you leaf down
5 a little bit, you'll come to a page that
6 says "Exhibit A."

7 **A   Okay, I'm there.**

8 Q   Now, after that, are actually one, two, three
9 pages that are actually taken from one website page.  In
10 other words, it's divided up here for purposes of
11 copying and printing.  Okay?

12 **A   Okay.**

13 Q   So looking at the first page of Exhibit A,
14 which is the top of that website page, okay, do you
15 remember reading the material that's on page 1 of
16 Exhibit A?

17 **A   I do.**

18 Q   And you saw where it states, quote,
19 "MoneyMutual is not a lender," close quote?

20 **A   I do.**

21 Q   And you understood that when you read it?

22 **A   I did.**

23 Q   And it says then, quote:

24     "If you are matched with a lender,
25     MoneyMutual will redirect to the

1     lender's website where you will be able
2     to review loan terms and conditions.  In
3     many cases, the lender will then contact
4     you to confirm your personal information
5     and finalize the loan."

6     Now, each time you submitted the information to
7 the MoneyMutual website, except for that last time, you
8 in fact were contacted by the lenders; correct?

9 **A   Correct.**

10 Q   And you entered into agreements with the
11 lenders; correct?

12 **A   Correct.**

13 Q   And they provided you with copies of the
14 agreements.

15 **A   Correct.**

16 Q   Okay.  And we'll go into those later, because I
17 think you've provided us with a number of those here, or
18 your counsel has.

19 **A   I believe so, yes.**

20 Q   Okay, let's go to the second page of Exhibit A.
21 Do you recall seeing and reading this part of the
22 website page?

23 **A   I don't remember.**

24 Q   Let me direct your attention down toward the
25 bottom of the page, and the statement there actually

Page 102

1 continues on the following page.  You see where it has
2 the triangle and the exclamation point?
3 **A   I do.**
4 **Q   It starts by saying, quote:**
5     "Any questions about loan repayment,
6     schedule, and/or fees should be directed
7     to the lender."
8     Now, you remember seeing that at some point?
9 **A   I remember reading something to that effect.**
10 **Q   Because I think you referred to it in your**
11 testimony earlier today.
12 **A   Yes.**
13 **Q   It then says, quote:**
14     "If you have any questions about
15     applying for a loan, we can be reached
16     at 1-800-809-2138."
17 **A   Uh-huh.**
18 **Q   So do you recall being generally aware that**
19 there was an 800 number for MoneyMutual?
20 **A   I don't recall.**
21 **Q   Do you believe that you probably read that when**
22 you read what it said about contacting the lender if you
23 had a question about the loan?
24 **A   Yes, I do.**
25 **Q   Okay.  Going over to page 3 of Exhibit A.  Do**

Page 103

1 you remember seeing this material at the bottom of the
2 webpage?
3 **A   Yes.**
4 **Q   Okay.  Let's go to Exhibit B.  And this again**
5 is -- now we have two pages which constitute another
6 webpage.
7     MR. WILENS: Why don't you look at my color
8 version.
9     MR. PUTTERMAN: Absolutely.
10    MR. WILENS: The copy he gave you is not as
11 legible.
12    THE WITNESS: Thank you.
13 **Q   BY MR. PUTTERMAN: Now, do you remember reading**
14 about the MoneyMutual Code of Lender Conduct?
15 **A   Yes, I do.**
16 **Q   And did you have any reaction to that when you**
17 read it?
18 **A   I did.**
19 **Q   And what was that?**
20 **A   I felt that MoneyMutual held that the lender**
21 **network was -- I felt that I didn't have anything to**
22 **worry about with anybody that was participating in**
23 **giving loans -- or participating with MoneyMutual or**
24 **distributing loans.  I felt that I was in a safe place.**
25 **Q   Now, did you understand, then, when you looked**

Page 104

1 at this also that MoneyMutual was concerned that its
2 lenders follow these standards?
3     MR. WILENS: I'm going to object.  It's
4 speculation as to whether she was -- whether MoneyMutual
5 is or is not concerned.  You asked her --
6     MR. PUTTERMAN: Jeff, you're not listening to
7 the question.
8     MR. WILENS: The way you phrased it was, did
9 she understand that MoneyMutual was concerned.
10    MR. PUTTERMAN: Was that her understanding.
11    MR. WILENS: Rephrase it, "is that your
12 interpretation" or something like that.
13    MR. PUTTERMAN: Fine.
14 **Q   Was it your understanding or interpretation of**
15 this that MoneyMutual was concerned that its lenders
16 follow high standards?
17 **A   Yes.**
18 **Q   Did you understand or interpret this as meaning**
19 that MoneyMutual would certainly want to know about it
20 if its lenders were not following these high standards?
21 **A   No.**
22 **Q   Okay.  Why didn't you make that connection?**
23 **A   Because when I read this, I figured that since**
24 **MoneyMutual was doing business with these lenders that**
25 **they had already vetted, that these lenders were**

Page 105

1 **legitimate.**
2 **Q   Okay, but my question then is this:  If a**
3 lender has been vetted, okay, and MoneyMutual considered
4 them legitimate, how would MoneyMutual know if the
5 lender then started doing something wrong with regard to
6 individual loans?
7 **A   Well, when I first saw this website with Montel**
8 **endorsing this service, and then what I did read from**
9 **here in my mind, that MoneyMutual was a trustworthy**
10 **source, the people they were doing business with were**
11 **trustworthy.**
12    I did not interpret it as, like, if you have
13 problems, please let us know.  I don't see anywhere that
14 it's saying if you have problems, call us.  The only
15 number, as you pointed out before, was basically if you
16 had questions about the loan, about your application.
17 **Q   Okay.  Well, let me ask you this, then.  Did**
18 you have an understanding or interpretation that
19 MoneyMutual would not want to know if a lender turned
20 out to be somehow untrustworthy or unreliable?
21 **A   I had no understanding that MoneyMutual wanted**
22 **feedback on the lenders.  My only understanding is the**
23 **code of lender conduct, is that MoneyMutual only dealt**
24 **with proper lenders, legal lenders.**
25 **Q   Okay.  And you did not extend that thought to**

Gilbert v
Bank of America, N.A.

Kimberly Bilbrew
November 24, 2015

1  think that they would want to know about it if a lender
2  turned out not to be proper.
3  **A   No, when I read this, to me it seems like**
4  **Montel and MoneyMutual were vouching for their service,**
5  **that it was trustworthy.  That's what I read, that it**
6  **was supposed to be trustworthy.**
7  Q   Okay.  Let's look at No. 5, because that's been
8  a particular point with you.  It says, quote:
9       "Lenders shall not engage in
10      harassing or abusive collections
11      practices and agree to comply with any
12      and all applicable federal and state
13      collections practices laws and
14      regulations."
15      Now, here I want to distinguish between the
16  lenders themselves and whoever the loans may have ended
17  up with when you didn't pay them off.
18      MR. WILENS: I want to object.  We don't know
19  any loans ended up with anyone other than the lenders.
20  So it's a hypothetical question.
21      MR. PUTTERMAN: Whatever.
22  Q   Do you know, have personal knowledge of whether
23  or not any of the lenders you dealt with engaged in
24  abusive or harassing collection practices, or the other
25  people you dealt with, for example, Searay and Humphreys

1  & Associates, were the ones who were engaging in abusive
2  and harassing collections practices?
3      MR. WILENS: Objection.  Again, you're making a
4  distinction that may or may not exist.  Or you're asking
5  her to speculate.  There's a difference.
6      MR. PUTTERMAN: I'm asking her as to what she
7  knows.
8      THE WITNESS: I only know who's harassed me,
9  Searay and, who was it, Humphreys & Associates.
10  Q   BY MR. PUTTERMAN: Okay.  "Va bene," as we say
11  in Italian.
12      Let me ask you this.  Point number one in the
13  MoneyMutual Code of Lender Conduct, it says, quote:
14      "Lenders shall not use your
15      information to sell other products or
16      services, or otherwise market your
17      information."
18      Do you see that?
19  A   Yes, I do.
20  Q   Now, to your knowledge, you know, just, again,
21  based on your personal knowledge, did any of the lenders
22  here -- Cash Yes, CastlePayday, or My Quick Funds --
23  market to you any other products or services other than
24  financial services?
25  A   I know that Cash Yes offered an Amazon gift

1  **card.  That's the only thing I'm aware of.**
2  Q   Was that in connection with taking out another
3  loan?
4  A   Yes.
5  Q   Okay.  So that was like an inducement to do
6  another loan.
7  A   Yes.
8  Q   Beyond that, you're not aware of anything?
9  A   Not that I recall.
10  Q   Okay.  Now, No. 2 is of interest because that's
11  another issue that we've been discussing with you here
12  today.  Quote:
13      "Lenders should not resell your
14      information to any third party or
15      otherwise use your information other
16      than for the sole purpose of fulfilling
17      the loan and/or communicating with you
18      about your loan."
19      Now, other than either putting the loans out
20  for collection or actually selling the loans to a
21  collector, do you know of any other sales by the lenders
22  themselves of your information?
23  A   On a personal level?
24  Q   Yes.
25      MR. WILENS: Okay.  Go ahead and answer that

1  question.
2      THE WITNESS: I only know that I've been
3  getting constant e-mails and leads that I believe are
4  generated through MoneyMutual, and for loans that I
5  don't owe, other than My Quick Funds and CastlePayday.
6  Q   BY MR. PUTTERMAN: When you say that you
7  believe have been generated by MoneyMutual, you mean
8  that were an ultimate result of you having submitted
9  your information to MoneyMutual?
10  A   Yes.
11  Q   Okay.  But you don't know if MoneyMutual or the
12  specific lenders who you got the loans from were
13  responsible for that; correct?
14  A   No, I don't know.
15  Q   Okay.  Quote, No. 3:
16      "Lenders shall provide a customer
17      service phone number and shall be
18      responsible and helpful in addressing
19      your concerns.  The lenders shall attend
20      to your questions, issues, and
21      complaints in a reasonable and
22      professional manner within two business
23      days of request."
24      Now, I know that you testified earlier that you
25  were not able to negotiate with the lenders; correct?

The Souza Group
(800) 230-3376

**Page 110**

1  **A   Correct.**
2  Q   Okay.  Did they communicate with you promptly
3  in response to you?
4  **A   Yes.**
5  Q   Okay.  Were the people you dealt with actually
6  at the lenders polite, courteous?
7  **A   I don't recall them being discourteous, but --**
8  **well, except one, My Quick Funds, other than, sort of, I**
9  **felt, like, a veiled threat, was, "If you don't pay,**
10  **we're going to have to send you to collection, and we**
11  **don't know what those collectors are going to do to**
12  **you."**
13  Q   But other than that, nothing stuck out as being
14  discourteous or nonresponsive?
15  **A   No.  I mean, they barely addressed it, didn't**
16  **want to negotiate.  They just kept sending me, like,**
17  **"Here's your contract."**
18  Q   Again, though, you didn't tell MoneyMutual
19  about that; correct?
20  **A   No, I did not.**
21  Q   Okay.  No. 4, quote:
22      "Lenders shall clearly and
23      conspicuously present you with all
24      relevant information about the terms and
25      conditions of the loan before obtaining

**Page 111**

1      your consent, including but not limited
2      to the amount of the loan, the term of
3      the loan, including any renewal
4      policies, schedule of payments,
5      including when funds will be withdrawn,
6      any fees or interest associated with the
7      loan, consequences of late payment or
8      nonpayment."
9      Any fees -- now, you did receive the agreements
10  from all of the lenders; correct?
11  **A   Yes.**
12  Q   And did you see the agreements before you
13  actually entered into the loans?
14      MR. WILENS: Objection.  Vague as to what you
15  mean by "entered into them."  It's an online process.
16      MR. PUTTERMAN: Well, I understand that.
17  Q   Before you agreed to take the loan online, did
18  they provide you with the agreements themselves?
19  **A   I don't recall.  I don't think so.  I believe**
20  **the agreements were once we were in the middle of it, or**
21  **I was going through a different, what do you call it,**
22  **different windows.**
23  Q   Okay.  The agreements did show up somewhere
24  along the line.
25  **A   Yes, pretty much toward the end, like, "Sign**

**Page 112**

1  here."
2  Q   But you did have an opportunity -- you could
3  download the agreement; correct?
4  **A   I don't recall.  I believe maybe one or two**
5  **cases I was on the phone with the lender while they were**
6  **walking me through, while I was going through the**
7  **websites.**
8  Q   Did you ask them to actually send you copies of
9  the agreement?
10  **A   The agreements would show up at the end, after**
11  **they walked me through, click here, click here, amount,**
12  **sign, you know, and then at the top.  But it was a lot**
13  **of information.  I don't recall.  But I know it was**
14  **never before.**
15  Q   But you got the agreements, and then you had an
16  opportunity to review them; correct?
17  **A   Not as much time.  It was a very quick process**
18  **in most cases, I skimmed through.**
19  Q   Okay.  But you did not tell MoneyMutual about
20  your experiences in that regard.
21  **A   No, I didn't.**
22  Q   Okay.  Let's go to Exhibit C, which is -- has
23  four pages.  Do you see that?
24  **A   Yes.**
25  Q   Now, on the second page, you see there's a

**Page 113**

1  heading that says "What kind of lenders can MoneyMutual
2  match me with?"
3  **A   Yes.**
4  Q   And you recall reading that?
5  **A   I don't.**
6  Q   Okay.  You already knew about payday loans,
7  though; correct?
8  **A   Yes.**
9  Q   So you had a general understanding of how they
10  worked.
11  **A   A general.**
12  Q   Turn to the next page, please.  There's a
13  heading that says, quote, "How much do I have to pay
14  back?  What is the APR?"  Do you see that?
15  **A   Yes.**
16  Q   Did you read that?
17  **A   I don't recall reading this.**
18  Q   Did you understand, though, that the actual
19  terms and rates and so on would come from whatever
20  lenders you'd be matched with?
21  **A   Yes, I did.**
22  Q   And that had been your experience with payday
23  loans that you'd taken before; correct?
24  **A   Yes.**
25      MR. WILENS: Let me reassemble this exhibit

Page 114

1  here.  Where's the official one?
2      MR. PUTTERMAN: You have the official one,
3  didn't you?  Oh, I think it's those pages over there.
4      THE WITNESS: Here's the rest of it.  Here's
5  all of it.  Sorry.
6      MR. WILENS: Hold on.  I have two pages of
7  Exhibit B, and then I have the label Exhibit C.  So
8  where's --
9      MR. PUTTERMAN: It's presumably the next pages.
10     MR. WILENS: Hand me the front of it.  Go
11 ahead.
12  Q   BY MR. PUTTERMAN:  Okay.  It says here, quote:
13 "What happens if I don't pay the loan back on time or
14 don't pay it back at all?"  Did you read what's under
15 that heading?
16  A   I don't believe I did.  I had every intention
17 to pay the loans back.
18  Q   Then there's a heading below that that says,
19 quote, "What is the renewal policy for these types of
20 loans?"  Did you read that?
21  A   No, I didn't.
22  Q   Would you read under that section now?
23  A   (Examining document.)
24  Q   Do you have any trouble understanding what's
25 stated there?

Page 115

1  A   No.
2  Q   And you see that it says quote:
3      "Please make sure to review your
4      lender's renewal policies and make your
5      payment preferences known to your
6      lender.
7      It also says in the sentence before that,
8  quote:
9      "Some options may result in a
10     renewed loan and additional loan fees."
11     And you understand that?
12     MR. WILENS: Hold on.  I'm going to object to
13 the question.  It's not factually true.  So if you're
14 asking her if that's true, the answer's no.
15     MR. PUTTERMAN: I didn't ask her that.
16     MR. WILENS: You said "you understand that."
17 That's not the law.  But that's what it says under --
18     MR. PUTTERMAN: I said, do you understand what
19 is stated there.
20     MR. WILENS: That's what it claims.
21     THE WITNESS: I understand how it reads, yes.  I
22 understand what they're trying to communicate.
23  Q   BY MR. PUTTERMAN:  All I'm asking.
24     MR. WILENS: It also says you comply with
25 federal and applicable law in the same paragraph, which

Page 116

1  isn't true.
2      MR. PUTTERMAN: Jeff, we don't need the
3  commentary.  It's not an appropriate objection.
4      MR. WILENS: Okay, I'll save that question for
5  when I ask her.
6      MR. PUTTERMAN: You can ask your witness
7  whatever you like, as long as you don't make the
8  questions objectionable, as you did yesterday.
9      MR. WILENS: No, you just didn't like the
10 questions.  They were personally objectionable to you.
11 Not legally objectionable.
12     MR. PUTTERMAN: I didn't care about the
13 questions.
14     MR. WILENS: Sure.  Are we done with this one?
15     MR. PUTTERMAN: No.
16  Q   Let's take a look at the single page under
17 Exhibit D.  Do you recall reading this page?
18  A   I don't recall reading this page.
19  Q   Okay.  You can set this exhibit aside, or
20 rather, why don't you get it back from Mr. Wilens and
21 let's clip it all together again.
22     Do you have -- can you tell me the amount that
23 you paid to the lenders on -- collectively now -- Cash
24 Yes, My Quick Funds, and CastlePayday, the amounts you
25 paid to them on the initial loans from each?  In other

Page 117

1  words, the ones that resulted directly from you
2  submitting information to the MoneyMutual website.
3  A   When you say "initial," are you saying all of
4  them, or just the first?
5  Q   The first.
6  A   The first?
7      MR. WILENS: The question is, can you.  Yes or
8  no?
9      THE WITNESS: I can't remember the total
10 amount, no.
11  Q   BY MR. PUTTERMAN:  Have you suffered any other
12 damages dealing with these particular payday lenders of
13 which you're aware?
14  A   "Damages" being?
15  Q   Actual financial loss.
16  A   Other than the fees being exorbitant?
17     MR. WILENS: Do you understand what the term
18 "damages" means?  If you don't --
19     THE WITNESS: Like other -- no, not that I'm
20 aware of, no.
21  Q   BY MR. PUTTERMAN:  All right, I'm just going to
22 go through some more of the documents that were produced
23 to us, and that will enable us, I believe, to finish up.
24 Ms. Aquino can hardly wait.
25     Okay, Madam Reporter, next in order.  22 is