EXHIBIT D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

-oOo-

| | | |
|---|---|---|
| SEAN L. GILBERT, KEEYA MALONE, KIMBERLY BILBREW, CHARMAINE B. AQUINO, on behalf of themselves and all persons similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| -vs- | ) ) | No. 4:13-cv-01171-JSW |
| BANK OF AMERICA, N.A., et al., | ) ) ) | |
| Defendants. | ) ) ) | |

Videotaped Deposition of

SEAN L. GILBERT

Tuesday, December 1, 2015

THE SOUZA GROUP
Certified Shorthand Reporters
4615 First Street, Suite 200
Pleasanton, California 94566

Reported by:
KAREN SCOTT, CCRR, CSR
LICENSE NO. 4027

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1    A    Last night.
2    Q    Okay.  And you had seen it before then,
3  correct?
4    A    Yeah.
5    Q    When did you first contact Mr. Wilens about
6  the matters that are involved in this complaint?
7    A    I think in January of 2013.  Maybe
8  January -- somewhere in there.  December,
9  January 2013, '12.
10    Q    That's exactly what I was talking about when
11  I said give us your best recollection.  I mean, that's
12  the perfectly appropriate answer.
13          And what prompted you -- I don't want you to
14  get into any conversations or communications you had
15  with Mr. Wilens, but what prompted you to contact a
16  lawyer?
17    A    Well, I was working for a substance abuse
18  company and it was a residential treatment program,
19  and I was getting calls from Cash Yes to my boss all
20  the time about what was going on and this, that, and
21  so I went to go ahead and look up the OLA, because I
22  remembered that they were supposed to be part of a
23  network, you know, that when I got it from MoneyMutual
24  that I didn't have to worry about none of that or --
25  you know, that they would practice safe lending laws

1  and all that kind of stuff.
2          So I wanted to call and find out why they
3  would do that, you know, and then that's when I found
4  out a lot of other stuff and that's when I contacted
5  Mr. Wilens after that.
6    Q    What was the other stuff you found out?
7    A    Just that they weren't even in this country.
8  There were numerous complaints from people just like
9  me that had fallen into the same trap and were
10  basically -- you know, hadn't got that loan if it
11  hadn't been through MoneyMutual.  I saw it on TV and I
12  called.
13    Q    When you said you saw it on TV and you
14  called, you mean you called MoneyMutual after seeing a
15  MoneyMutual ad --
16    A    Right.
17    Q    -- on television?
18    A    And then I filled out the application like
19  they asked me to.
20          (Court reporter interrupts for clarity of
21          the record.)
22          THE WITNESS: Yes.  And then I filled out
23  the application like they -- I can't really recollect.
24  I guess it was online.  That's what they -- I had to
25  do.  And then I got a thing from -- from them saying I

1  was approved from Cash Yes or thereabouts, or I got
2  loan documents or something like that.
3  BY MR. PUTTERMAN:
4    Q    Okay.  I don't want to get too far ahead of
5  us, but since you had mentioned that I wanted to
6  follow up on it.
7          All right.  I am going to ask you some
8  questions about some of the things that are said in
9  here, and here being Exhibit 2.
10          First of all, when you saw the television
11  ad, had you seen the ad before?
12    A    Yes.
13    Q    Okay.  What do you remember about the
14  television advertising?
15    A    Well, it was Montel Williams.  I mean,
16  that's, you know, the first thing I remembered, but I
17  remember I was sitting -- it was in my room and I was
18  standing next to my dresser.  That's the way I
19  remember it.
20          He was standing there talking, and then he
21  said he had a trusted lender of networks that, you
22  know, you could trust that -- around those lines.
23          So I looked over at my wife and that's -- I
24  asked if I should go forward.  She said yes.
25    Q    Did you know who Montel Williams was at that

1  time?
2    A    Well, I know who he had been or whatever,
3  but I mean I just thought he was -- you know, he
4  worked for MoneyMutual.
5    Q    What did you know about him otherwise?
6    A    He's a talk show host.
7    Q    Okay.  Is that a show you ever watch?
8    A    When I was younger.  Not by choice.
9          I had parents at the time, you know, that
10  would watch him, so I had to sit there and watch it if
11  I wanted to watch it at that time.
12    Q    You were a family captive?
13    A    I was held family captive.  Exactly.  I had
14  seen a few of his shows.
15    Q    Was that the first time you had ever
16  contacted MoneyMutual for a potential referral to a
17  lender?
18    A    Through MoneyMutual?
19    Q    Yeah.
20    A    I believe so, yes.  I'm not sure.  I believe
21  so, but I'm not positive.
22    Q    Okay.  Now, have you ever talked to Montel
23  Williams?
24    A    Personally?
25    Q    Yes.

| Page 22 | Page 24 |
|---|---|

**Page 22**

1  A  No.
2  Q  And do you -- other than having seen him as
3  an endorser for MoneyMutual, do you have any knowledge
4  concerning what his relationship with MoneyMutual was
5  or is?
6  A  No.
7  Q  Okay.  Would you look at paragraph 6 of
8  Exhibit 2, which is on page 3.  Starts on page 3, runs
9  over to page 4.
10  A  Okay.
11  Q  See there is a reference to a Mr. Glenn
12  McKay?
13  A  Yeah.
14  Q  Do you know who Mr. McKay is?
15  A  Now or then?
16  Q  Okay.  I should have said this when I was
17  giving you the introductory spiel.
18      When I ask you for your knowledge or
19  information, I want you to exclude whatever you may
20  have learned from your counsel in the course of this
21  case.
22  A  Okay, I've gotcha.
23  Q  I only want your personal knowledge
24  exclusive of that; okay?
25  A  No, I didn't know.

**Page 23**

1      MR. WILENS: But that was a yes-or-no
2  question.  So if you know because of something I told
3  you, you can still say yes.
4      MR. PUTTERMAN: No, I want him to exclude
5  that.
6      MR. WILENS: No, I feel that will present an
7  inaccurate answer.  If you want to ask him what was
8  said, that's one thing; but if your question was do
9  you know this individual and he is going to answer
10  that yes or no --
11      MR. PUTTERMAN: Let me rephrase the
12  question.
13  Q  Aside from what you may have learned from
14  your attorney, do you know anything about Glenn McKay?
15  A  No.
16  Q  Okay.  Have you ever communicated with
17  Mr. McKay?
18  A  No.
19  Q  Again, aside from what you may have learned
20  from your attorney, do you know anything about his
21  role or relationship with MoneyMutual?
22  A  No.  I do -- no.
23  Q  Would you please look next at paragraph 7.
24  And you see there is a reference there to Partner
25  Weekly, LLC?

**Page 24**

1  A  (Witness nods head.)
2  Q  Again, aside from anything you may have
3  learned from your attorney, have you ever previously
4  heard of Partner Weekly, LLC?
5  A  So in the beginning of this I think I might
6  have sent them a letter, because I couldn't find the
7  information from Cash Yes or who Cash Yes was, how to
8  get ahold of them.  So I had to go back through where
9  I started, which is MoneyMutual.
10      So I don't know if it was Partner Weekly,
11  but it was whatever phone number I had gotten for
12  MoneyMutual, which I think they were one and the same;
13  but I never talked to anybody.  I just kind of sent an
14  email, never got a response.
15  Q  Okay.  And you are not sure whether that got
16  sent to Partner Weekly or MoneyMutual?
17  A  I have no idea.
18  Q  Okay.  What was the substance of the
19  communication?
20  A  Get the information about Cash Yes.
21  Q  What information was that?
22  A  Address, phone number, somebody I could talk
23  to.
24  Q  This was after you had the loan from Cash
25  Yes?

**Page 25**

1  A  Right.
2  Q  Okay.  I didn't see it in what was
3  previously produced and I didn't look at what Mr. -- I
4  haven't looked yet at what Mr. Wilens gave me today
5  before I asked that it be copied.
6      But did you retain a copy of that email and
7  produce it here?
8  A  I can't say that I even have it at the
9  moment because it was so in the beginning.  However, I
10  know that that's the avenue I took because I needed
11  to --
12      MR. WILENS: You answered the question.
13      THE WITNESS: Okay.  Gotcha.
14  BY MR. PUTTERMAN:
15  Q  What were you going to finish saying?
16  A  Nothing.
17  Q  No, I can now ask you that follow-up
18  question.
19  A  Oh.  I was just looking for information to
20  be able to get ahold of these people to ask them why
21  they were calling my work, because I went through
22  MoneyMutual.  That's where I started.
23  Q  Okay.  Do you -- give us your best
24  recollection of what you said in the email.
25  A  Just what I just said.

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 26

1    Q   Okay.
2    A   I needed address, phone number, some
3  information --
4    Q   Okay.
5    A   -- because they wouldn't -- they told me I
6  need to go through the lender.
7    Q   And what do you remember that from?
8    A   That it was part of their -- I needed to go
9  through their lender, that they told me the loan --
10  who they had referred the loan to, and so I was right
11  back to where I had started.
12    Q   Okay.  Do you recall seeing that in -- on
13  the MoneyMutual website, or did somebody from
14  MoneyMutual actually communicate with you and tell you
15  to go through the lender?
16    A   I don't recall.  It was a phone call.  No,
17  it was an email.  It was an email.
18    Q   That you got from MoneyMutual?
19    A   Yes.
20    Q   I just want to try and nail down when you
21  got this email.
22        Was this after you submitted your
23  information to MoneyMutual but before you got the
24  loan?
25    A   No.  It was after I had gotten the loan.

---

Page 27

1    Q   Okay.  So -- and do you recall now that that
2  email was in response to something you sent to
3  MoneyMutual?
4    A   Yeah, I was --
5    Q   Okay.  Was that the call or an email or
6  what?
7    A   I'm not sure, because I had gotten calls and
8  emails for a couple different things that I was trying
9  to figure out.  You know, I was trying to locate
10  anything I could find online for an address.
11    Q   For Cash Yes?
12    A   For Cash Yes.
13    Q   Okay.
14    A   But I couldn't find -- nobody would return
15  my calls, so it had to be from MoneyMutual.  I don't
16  know if it was a call or an email.  I don't remember.
17        (Court reporter interrupts for clarity of
18        the record.)
19        THE WITNESS: I don't know if it was a call
20  or an email or both.
21  BY MR. PUTTERMAN:
22    Q   Okay.  So that in turn may be why, if there
23  hasn't been an email produced, because it might have
24  been a call.
25    A   It very well could have or it could have got

---

Page 28

1  erased back then, not thinking that all this was ever
2  going to happen, you know.
3    Q   Bottom line is you communicated one way or
4  another with MoneyMutual --
5    A   Correct.
6    Q   -- and in response you got back an email
7  stating that you had to work through the lender?
8    A   Correct.
9    Q   Okay.  And did they provide you any contact
10  information for Cash Yes?
11    A   No.
12    Q   How did you finally get contact information
13  for Cash Yes?
14    A   I just started sending out certified mail to
15  the address I could find that had anything to do with
16  them.
17    Q   Did that finally provoke a response from
18  Cash Yes?
19    A   It was returned.
20    Q   The mail was returned?
21    A   Yes.
22    Q   Okay.  What did you do next to try and find
23  Cash Yes?
24    A   Started doing research and finally found out
25  that they were in another country, and I think that's

---

Page 29

1  when I got ahold of Mr. Wilens.
2    Q   Okay.  How did you find that out, do you
3  recall?
4    A   Just looking up different websites.  I don't
5  know.  I have to think about it for a minute and come
6  back to it.
7    Q   Sure.  Now, did you happen to have a copy at
8  that time of your agreement with Cash -- your loan
9  agreement with Cash Yes?
10    A   Yes.
11    Q   Did you look at that to see if that had any
12  hints as to how you could reach them?
13    A   Yes.
14    Q   You didn't find anything?
15    A   No.
16    Q   Okay.  Aside from the one communication
17  you've described with MoneyMutual, that you've just
18  testified about, did you have any other communications
19  with MoneyMutual concerning Cash Yes?
20    A   Not Cash Yes, no.
21    Q   Did you have other communications with
22  MoneyMutual on anything other than concerning Cash
23  Yes?
24    A   Yes.
25    Q   Okay.  Please describe that for me.

---

---

**Page 30**

1 　　A　 They would call or send me an email saying I
2 had been approved for another loan, that type of
3 thing.
4 　　Q　 Okay.  And did you proceed with any further
5 loans through MoneyMutual?
6 　　A　 No.
7 　　Q　 Okay.  This was after the Cash Yes
8 experience?
9 　　A　 Yes.
10 　　Q　 Okay.  Did you have any other call -- I
11 think you may have answered this already.  Please
12 forgive me if you have.
13 　　　　Did you have any other calls with
14 MoneyMutual concerning specifically Cash Yes?
15 　　A　 I don't believe so.
16 　　Q　 Okay.  Did you ever make a call or send an
17 email to MoneyMutual complaining about Cash Yes?
18 　　A　 Yes.
19 　　Q　 Okay.  Was that in the one call or email
20 that you are referring to?
21 　　A　 I think -- believe it was after.
22 　　Q　 Okay.  Was it a call or an email?
23 　　A　 It was an email.
24 　　Q　 Okay.  Have you produced that email?
25 　　A　 I am not sure.

---

**Page 31**

1 　　Q　 Do you believe you still have it?
2 　　A　 I'm not sure.  See, all this -- I'm not
3 sure.
4 　　　　I know that I ended up getting a phone
5 number for them, but they wouldn't give me any more
6 information about Cash Yes at all.  So I ended up
7 getting a phone number, and that's when I was trying
8 to call Cash Yes.
9 　　Q　 Okay.  Wait.  Let's step back.  Did --
10 　　A　 Go ahead.
11 　　Q　 You got a phone number from MoneyMutual for
12 Cash Yes?
13 　　A　 They told -- yes.  They didn't give me the
14 phone number.  They told me to look on my loan
15 documents.
16 　　　　So I looked on my loan documents.  I didn't
17 see anything.  I might have overlooked it, but I
18 remember now that there was a phone number.  I called
19 that phone number.
20 　　Q　 And did you get that from MoneyMutual?
21 　　A　 Yes.
22 　　Q　 That was through a phone call with
23 MoneyMutual?
24 　　A　 Right.  But they were very short.
25 　　Q　 What do you mean by that?

---

**Page 32**

1 　　A　 Well, I remember I was upset because they
2 wouldn't give me any information, but yet they had all
3 my information to give somebody to give me a loan, but
4 they can't give me any information about, you know,
5 how to contact them, but yet I have to contact them to
6 resolve it.
7 　　Q　 Okay.  But they did give you a phone number?
8 　　A　 Yes.
9 　　Q　 Okay.  So they did give you some information
10 so you could contact --
11 　　A　 I believe they gave me a phone number.
12 　　Q　 And did you use that phone number to call or
13 contact Cash Yes?
14 　　A　 Yes.
15 　　Q　 Did you actually reach Cash Yes?
16 　　A　 No.
17 　　Q　 Who did you reach?
18 　　A　 I reached just solely through emails.
19 　　Q　 Well, what happened when you tried to
20 reach --
21 　　A　 Well, they --
22 　　Q　 Remember only one of us can talk.
23 　　A　 Oh, sorry.
24 　　　　MR. WILENS:  Just slow down, Sean.  Wait for
25 a question.

---

**Page 33**

1 BY MR. PUTTERMAN:
2 　　Q　 Okay.  So let's step back.
3 　　　　You got a phone number from MoneyMutual to
4 call Cash Yes?
5 　　A　 Yes.
6 　　Q　 Okay.  You then tried to call Cash Yes
7 through that phone number?
8 　　A　 Yes.
9 　　Q　 Okay.  What happened when you tried to call
10 them?
11 　　A　 I got no answer.  I left a message.
12 　　Q　 You got an answering machine?
13 　　A　 A service.
14 　　Q　 Service?
15 　　A　 Correct.
16 　　Q　 Okay.  Now, did Cash Yes communicate with
17 you after you left that message?
18 　　A　 Via emails.
19 　　Q　 Okay.  So you made the call, you got a
20 service, you left a message.
21 　　A　 Correct.
22 　　Q　 That then led to Cash Yes contacting you by
23 email?
24 　　A　 Yes.  But they had been contacting me
25 through my job and all that.

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 34

1    Q   I understand that.  I am just referring to
2  this line of communication.
3    A   Yes.
4    Q   Because my understanding was -- was that --
5  and correct me if I am wrong -- that although they had
6  been contacting you through your work, they were not
7  leaving -- or were they leaving contact information?
8    A   They were not leaving contact information.
9    Q   Okay.  So the point is you had no contact
10 information for Cash Yes until you called MoneyMutual?
11   A   Correct.
12   Q   Okay.  MoneyMutual gave you the phone
13 number?
14   A   Correct.
15   Q   You called the number, left a message with
16 the service, and then Cash Yes got back to you via
17 email?
18   A   Right.
19   Q   Okay.  So I've got the sequence of events
20 right there?
21   A   Yes.
22   Q   Okay.
23   A   In the meantime there were other emails that
24 were being sent from their recovery department or
25 whatever.

---

Page 35

1    Q   Right.  Did you try sending any emails back
2  to them at the address, the sender's address?
3    A   They didn't have an address.
4    Q   There was no from line?
5    A   No.  The same phone number that I called
6  them from was the one that was at the bottom of the
7  emails.
8    Q   Wait.  Were these then before or after --
9    A   During.  It was all during that -- they
10 started sending the recovery --
11       (Court reporter interrupts for clarity of
12       the record.)
13       MR. WILENS:  Sean, he asked you something
14 and it was before or after, and you said "during."
15 You could have just stopped right there.  And just
16 wait for another question.
17       THE WITNESS:  All right.
18 BY MR. PUTTERMAN:
19   Q   Getting back to this.
20       When you called MoneyMutual for contact
21 information about Cash Yes, had you already been
22 receiving emails from Cash Yes?
23   A   Yes.
24   Q   Okay.  Now, did those emails -- and we'll
25 look at some of them because you produced documents.

---

Page 36

1        Did those emails include an email address on
2  the from line?
3    A   Yes.
4    Q   Okay.  Did you try to email back to any of
5  those email addresses?
6    A   Yes.
7    Q   Okay.  When you did that, what happened?
8    A   I got a reply.
9    Q   Okay.  So you are saying then that you were
10 actually in contact via email with Cash Yes before you
11 called MoneyMutual?
12   A   No.
13   Q   Okay.  Can you describe for me the sequence
14 as best you remember it?
15   A   I was looking for a way to contact Cash Yes.
16   Q   Correct.
17   A   So I couldn't get any information except for
18 through their website, which wasn't going anywhere.  I
19 was not getting a response.
20        So at that point a couple days went by.
21 They kept calling my work with no contact information.
22   Q   Okay.
23   A   I called MoneyMutual to find out how I can
24 get in touch with the lender.  They gave me the phone
25 number, a different phone number than one that was on

---

Page 37

1  their website.  I called that.  That's when I got an
2  email, but see, I had an email at work too at the
3  time, so there was -- you know, at my job.  They were
4  sending emails there too.
5    Q   Right, and that's my question then.  Were
6  you getting those emails before you called -- already
7  before you called MoneyMutual?
8    A   Just the way I just explained it is the way
9  I finally got emails from them.
10   Q   Okay.  So you then called, you left a
11 message at the service, and then you started getting
12 emails?
13   A   Correct.
14   Q   And some of those emails came in to work?
15   A   Right.  They came in my personal, and then
16 also I had all my stuff being forwarded from my
17 business -- or, you know, from the treatment program.
18   Q   Right.  So that's how you got them at work,
19 was because you had your personal email forwarded --
20   A   Right.
21   Q   -- to send you to your work email?
22   A   Correct.
23   Q   Got it.
24   A   Okay.
25   Q   When you called MoneyMutual, to the best of

---

Page 38

1  your recollection -- to get the contact information --
2  to the best of your recollection what did you say to
3  whomever you spoke with?
4  **A   I just explained my situation.**
5  Q   Okay.  Did you tell them who you were?
6  **A   Yeah.**
7  Q   In other words, you said my name is Sean
8  Gilbert or something?
9  **A   Yeah.  They asked who -- what my name was.**
10 Q   Okay.
11 **A   And I don't remember much more about, you**
12 **know, to find out who I was or not, but that was about**
13 **it.  I mean, there was no information really given.**
14 **They just told me I had to contact Cash Yes.**
15 Q   Okay.  Now, did you ask them if you could
16 make a complaint to them about Cash Yes?
17 **A   Not at that time.**
18 Q   Okay.  Did you have a communication with
19 MoneyMutual at some point after that time in which you
20 asked if you could make a complaint against Cash Yes?
21 **A   I don't believe so.**
22 Q   Let's go back to Exhibit 2.
23     We were looking at exhibit -- at
24 paragraph 7, which referred to Partner Weekly.
25 **A   Okay.  Yeah.**

Page 39

1  Q   Okay.  So now that we have gone through the
2  sequence of your communication with MoneyMutual and
3  how you got the phone number and so on for Cash Yes,
4  do you remember specifically that you spoke -- you
5  actually called MoneyMutual at that time?
6  **A   Correct.**
7  Q   Okay.  Did anybody at that time say anything
8  to you about Partner Weekly?
9  **A   No.**
10 Q   Okay.  Now, having been through that whole
11 sequence, do you remember if you ever communicated
12 with Partner Weekly specifically?
13 **A   No.**
14 Q   Okay.  You did not communicate?
15 **A   No.**
16 Q   Okay.  You communicated with MoneyMutual?
17 **A   Right.**
18 Q   Got it.  And again leaving aside anything
19 you may have been told by your counsel, do you know
20 anything about Partner Weekly?
21 **A   No.**
22 Q   Okay.  Let's move on to paragraph 8.  You
23 see there is a reference to a gentleman named Brian
24 Rauch.  It's spelled R-A-U-C-H.
25 **A   I do.**

Page 40

1  Q   Do you know who -- leaving aside anything
2  you may have been told by your counsel, do you know
3  anything about Mr. Rauch?
4  **A   No.**
5  Q   Do you know who he is?
6  **A   No.**
7  Q   Do you know what his role or relationship
8  might be with any of the other MoneyMutual defendants?
9  **A   No.**
10 Q   Have you ever communicated with him?
11 **A   No.**
12 Q   Okay.  Going to paragraph 9, I am going to
13 ask you the same questions about John Hashman.  Aside
14 from what you may have been told by your counsel, have
15 you ever heard of Mr. Hashman?
16 **A   No.**
17 Q   Do you have any knowledge of who he is?
18 **A   No.**
19 Q   Have you ever communicated with him?
20 **A   No.**
21 Q   Do you have any knowledge of what his role
22 or relationship may have been with the other
23 MoneyMutual defendants?
24 **A   No.**
25 Q   Okay.  Would you please turn to paragraph 18

Page 41

1  on page 6.  You see there is a reference there to a
2  Mr. Humphreys?
3  **A   Yes.**
4  Q   Aside from what your counsel may have told
5  you, do you know who Mr. Humphreys is?
6  **A   No.**
7  Q   Have you ever heard of him?
8  **A   No.**
9  Q   Have you ever communicated with him?
10 **A   No.**
11 Q   Do you know what role or relationship he may
12 have had with the other MoneyMutual defendants?
13 **A   No.**
14 Q   Paragraph 19, where there is a reference to
15 Douglas Tulley, do you see that?
16 **A   Yes.**
17 Q   Aside from what your counsel may have told
18 you, have you ever heard of Mr. Tulley?
19 **A   No.**
20 Q   Do you know who he is?
21 **A   No.**
22 Q   Have you ever communicated with Mr. Tulley?
23 **A   No.**
24 Q   Do you have any knowledge concerning what
25 his role or relationship may have been with the other

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

| Page 42 |
| --- |

1  MoneyMutual defendants?
2  **A  No.**
3  **Q  Paragraph 20.  Same questions as to Alton F.**
4  **Irby the Third.  Aside from what your counsel may have**
5  **told you, do you know who Mr. Irby is?**
6  **A  No.**
7  **Q  Have you ever heard of him?**
8  **A  No.**
9  **Q  Have you ever communicated with him?**
10  **A  No.**
11  **Q  Do you have any knowledge concerning what**
12  **his role or relationship may have been with the other**
13  **MoneyMutual defendants?**
14  **A  No.**
15  **Q  Okay.  Let's go all the way to**
16  **paragraph 51 -- oh, one more question.**
17  **Have you ever heard of a company called**
18  **Selling Source aside from what your counsel may have**
19  **told you?**
20  **A  No.**
21  **Q  To your knowledge, have you ever**
22  **communicated with anybody from Selling Source?**
23  **A  No.**
24  **Q  Do you have any knowledge of what Selling**
25  **Source's role or relationship may have been with the**

| Page 43 |
| --- |

1  other MoneyMutual defendants?
2  **A  No.**
3  Q  Okay.  Let's go to paragraph 51 on page 17,
4  and you see that this paragraph concerns you.
5  **A  Just a second.  Page 17?**
6  Q  Yes, please.
7  **A  Okay.  51.**
8  Q  Okay.  And you see it states in the first
9  sentence of paragraph 51, quote:
10      "In November 2012 Plaintiff Gilbert used
11      the MoneyMutual.com website to obtain a
12      payday loan from unlicensed lender Cash
13      Yes and paid at least $105 when Cash Yes
14      attempted to remove funds from his bank
15      account," period, close quote.
16      Do you see that?
17  **A  Yes.**
18  Q  Okay.  Now, before you got the Cash Yes
19  loan, which we have already started discussing that a
20  little bit, had you ever obtained a payday loan?
21  **A  Yes.**
22  **Q  And how often before this Cash Yes loan had**
23  **you -- had you obtained payday loans?**
24  **A  It was at the same time.**
25  **Q  Okay.  In other words, at about that time**

| Page 44 |
| --- |

1  you had obtained at least one other payday loan?
2  **A  Yes.**
3  Q  Okay.  Do you recall who that loan was from?
4  **A  I don't.**
5  Q  Do you recall if it was from some company
6  associated with an Indian tribe?
7  **A  I don't.  It might have been brick and**
8  **mortar.**
9  Q  Okay.  Did you have a satisfactory
10  experience with that payday loan?
11      MR. WILENS: Which payday loan?
12      MR. PUTTERMAN: The one that he obtained at
13  about the same time that he just described.
14      MR. WILENS: Do you remember anything about
15  it?
16      THE WITNESS: A little bit.  I mean --
17  BY MR. PUTTERMAN:
18  Q  Tell us what you remember.
19  **A  We'll have to come back.  I've just got to**
20  think about it for a minute.  It wasn't great.  I
21  mean --
22  Q  Do you remember anything at all about it?
23  **A  Yeah.  I mean, I was in the hospital and I**
24  had gotten a couple of (unintelligible) just during
25  the time right then, like what, November, December.

| Page 45 |
| --- |

1  Q  2012?
2  **A  Right.  So I was in -- the problem was I was**
3  in the hospital and there was money being taken in --
4  or out of my account.
5      And I think my wife had tried to get ahold
6  of one of them, and they ended up pulling out more or
7  less, I can't remember, but then they just renewed the
8  loan and so -- and a bunch of NSF fees when I got out
9  of the coma.  So --
10  Q  Oh, what happened to you?
11  **A  I've got bad asthma, so they have to**
12  intubate me once in a while and when they do, they put
13  me down for like seven days.  Well, this --
14      (Court reporter interrupts for clarity of
15      the record.)
16      THE WITNESS: So they put me down for a week
17  or so.
18  BY MR. PUTTERMAN:
19  Q  A medically induced coma?
20  **A  Correct.**
21  Q  Okay.  Now, when you are referring to the
22  money being taken out of your account by one of them,
23  are you referring now to Cash Yes or some other payday
24  lender?
25  **A  Cash Yes --**

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

|  | Page 46 |
|---|---|

1    Q    Okay.
2    A    -- was one of them.
3    Q    All right.  And did you have other payday
4    loans at the time?
5    A    Yes.
6    Q    Do you know about how many?
7    A    Not off the top of my head.  It was a few,
8    though.
9    Q    Okay.  Were these loans you had obtained
10   online or through brick and mortar or both?
11   A    Online.
12   Q    Do you remember the names of any of the
13   companies from whom you got the online loans at that
14   time?
15   A    VIP Loan Shop, I think.  I think OPD
16   Solutions.  A couple.  I'm not sure.
17   Q    Okay.  But you did not get these loans
18   through MoneyMutual, correct?
19   A    No.
20   Q    Do you recall what website you got these
21   loans from, website or websites?
22   A    I don't.
23   Q    Okay.  Do you recall if you went directly to
24   the websites of any of these lenders?
25   A    The VIP Loan Shop, I believe I did.

|  | Page 47 |
|---|---|

1    Q    What about the OPD Solutions?
2    A    I think same type of thing.  So at that time
3    I didn't know that there was a network and all that
4    stuff, so they just referred.  Do you know what I
5    mean?  I didn't know all that.  I thought I was
6    dealing with the people that you filled out the
7    application with.
8    Q    Okay.  But you don't remember who the people
9    were with whom you filled out the applications?
10   A    No.
11   Q    Okay.  Now, did you repay these loans or if
12   not, what happened with them?
13   A    It was all at the same time.
14   Q    Right.
15   A    So they were trying to take money out of my
16   account after I contacted them, let them know my
17   situation, and that's when it just got overbearing.  I
18   mean the phone calls, all that.  Just --
19   Q    Your situation being that you were in the
20   hospital?
21   A    Right.  So that -- I hadn't been to work, so
22   I didn't -- I hadn't had my paycheck come in.  And I
23   think I called them because -- one of them because
24   they had just renewed my loan after taking out just
25   the bottom line, and they didn't say that in the

|  | Page 48 |
|---|---|

1    beginning.
2    Q    Do you still have any of the documents
3    related to these loans?
4        MR. WILENS:  We produced some.
5        THE WITNESS:  My attorney's got them.
6    BY MR. PUTTERMAN:
7    Q    Okay.  Is there any documents that you have
8    concerning those loans which you haven't produced?
9    A    No.
10   Q    Okay.  All right.  So around this period, is
11   it correct that you were obtaining payday loans
12   because of the medical problems you were having and
13   your inability to go into work?
14   A    Correct.
15   Q    Okay.  So you needed money.
16   A    A little bit.  My in-laws were out of town,
17   so normally they would have covered it.  However, they
18   were on vacation, so -- out of the country.  There was
19   no way that I could contact them or we could contact
20   them.  They didn't even know I was in the hospital at
21   the time.
22   Q    All right.  Did you have any other
23   alternative sources of funds at that time besides
24   payday loans?
25   A    No.

|  | Page 49 |
|---|---|

1    Q    Okay.  No credit cards that you could use?
2    A    No.
3    Q    Did you have medical insurance at that time?
4    A    No.  I just got my medical insurance through
5    Kaiser.
6    Q    Okay.  So, now, before this episode where
7    you became ill and you needed some extra money, had
8    you used payday loans before?
9    A    No.
10   Q    So this -- how did you learn about payday
11   loans at this time, generally speaking?
12   A    I don't know if it was the commercial, a
13   combination of both.  It was something like that,
14   though I think I saw a commercial.
15   Q    Okay.  A commercial maybe from other online
16   payday lenders?
17   A    My bank might have referred an option for
18   that, or I applied for a loan from a bank and they
19   denied me.
20   Q    Did the bank tell you why they denied you a
21   loan?
22   A    I didn't have enough creditworthiness at the
23   time.
24   Q    Have you ever taken bankruptcy?
25   A    No.

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1   Q   It was just a question of not having a good
2   enough credit history for the bank?
3   A   Correct.
4   Q   Okay.  We'll come back to the Cash Yes loan,
5   but I want to go to the next sentence in paragraph 51.
6   It says, quote:
7      "In September 2014, Plaintiff ... used
8      the website of Selling Source affiliate
9      'cashadvance.com' to obtain a payday
10     loan from unlicensed lender Camel Coin
11     and paid at least $100 on that loan.
12     Plaintiff did not know at the time that
13     cashadvance.com was controlled by
14     Selling Source," period, close quote.
15     My first question is:  You didn't know --
16  you yourself did not have personal knowledge of
17  anything concerning Selling Source at the time you got
18  this loan, correct?
19  A   No.
20  Q   Okay.  You submitted information through a
21  website called cashadvance.com, correct?
22  A   So I can't be certain on that.
23  Q   Okay.  So you yourself don't remember what
24  website you submitted information through?
25  A   Correct.

1   Q   But you did submit information through
2   somebody.
3   A   Correct.
4   Q   And you ended up being matched up with a
5   lender called Camel Coin?
6   A   I suppose.
7   Q   Do you remember what the name was of the
8   lender that you understood you were dealing with?
9   A   So I don't understand how that all came -- I
10  don't remember getting a loan from Camel Coin,
11  especially in 2014.  I was seeking a loan for a
12  different reason but not for a little amount.
13  Q   Okay.  What kind of a loan were you seeking
14  at that time?
15  A   Funding for my business, for my patents.
16  Q   Which was not going to happen with a payday
17  loan, correct?
18  A   No, not at all.
19  Q   Right.  Do you recall in September 2014
20  getting a payday loan from anybody?
21  A   No.
22  Q   So would it be fair to say that you didn't
23  have any dealings with a payday lender at that time?
24  A   Yeah.
25  Q   And so of course nobody -- well, let me ask

1   you this:  Did anybody -- was anybody contacting you
2   about paying back a payday loan at that time?
3   A   That happens now.
4   Q   Okay.
5      MR. WILENS: So the answer is it was
6   happening then too?
7      THE WITNESS: Huh?
8      MR. WILENS: The question was, was it
9   happening in 2014.
10     THE WITNESS: Yes.
11  BY MR. PUTTERMAN:
12  Q   Okay.  But you hadn't taken any loan out at
13  the time?
14  A   No.
15  Q   Okay.  Did you -- so if you didn't take any
16  loan out, you didn't pay any loan back?  I know that
17  sounds obvious, but --
18  A   Well, yeah.  I mean --
19  Q   Okay.  And was anybody trying to pull money
20  out of your bank account in or after September 2014?
21  A   No.  No.
22  Q   So you didn't receive any money from a
23  payday lender in September 2014, and you didn't pay
24  any money to a payday lender in September 2014 or
25  thereafter?

1   A   Not that I know of, no.
2   Q   Okay.  Do you have any knowledge of why this
3   sentence states that you did obtain a payday loan and
4   you paid at least a hundred dollars on that loan?
5      MR. WILENS: You don't need to answer that
6   question.  It's privileged.
7   BY MR. PUTTERMAN:
8   Q   Aside from what you may have discussed with
9   your attorney.
10     MR. WILENS: You can't answer that question.
11  He's asking you why a complaint which was drafted by
12  your attorney says something, so there is no way that
13  the question can be phrased.
14     MR. PUTTERMAN: That's not correct.
15     MR. WILENS: I would point out that it's
16  your records that said he went to that website, so his
17  personal information is being transferred all over the
18  Internet.
19     MR. PUTTERMAN: Nothing like that is
20  obvious.
21     MR. WILENS: Plaintiff --
22     MR. PUTTERMAN: Excuse me.  Our records
23  don't say anything about what I specifically asked
24  about here, about payment of at least $100 on a loan
25  allegedly obtained in September 2014.

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 54

1   Q   Do you have any personal knowledge of having
2   made a payment of at least a hundred dollars on a
3   supposed payday loan that you received in
4   September 2014?
5   A   No.
6       MR. WILENS: We are withdrawing that
7   reference. We don't have any support for it at this
8   time.
9       MR. PUTTERMAN: For the payment of the
10  hundred dollars?
11      MR. WILENS: Right. We don't -- it doesn't
12  appear that any bank records could substantiate that,
13  so that loan apparently never went through, whatever
14  it was. There is other loans he can tell you about.
15  Business -- business loans. We have a theory, but --
16      MR. PUTTERMAN: Jeff, I only remind you that
17  the records that we produced that you refer to are our
18  database records, and those only reflect leads sold.
19  They do not -- let me finish. Okay. They do not in
20  any way indicate that a loan was actually completed.
21      So what I am hearing from the witness is
22  that although -- and he doesn't have any knowledge
23  about this -- is that although a loan lead may have
24  been sold to somebody, okay, there was no loan
25  completed at that time in September 2014.

---

Page 55

1       MR. WILENS: We're withdrawing the
2   allegation that there was a loan that was completed or
3   funded with Camel Coin. I know he did apply for other
4   loans and he might have got those. Business loans.
5       MR. PUTTERMAN: Okay. Different issue
6   altogether.
7       MR. WILENS: Not if the information came
8   from the same source.
9   BY MR. PUTTERMAN:
10  Q   Did you apply for business loans in
11  September 2014?
12  A   I did.
13  Q   Did you -- did you obtain any business loans
14  in September 2014?
15  A   I did not.
16  Q   Who do you recall and what were the amounts
17  of these loans that you were seeking?
18  A   25,000 or above.
19  Q   Okay. To whom do you recall applying?
20  A   There were several, so -- there were
21  several.
22      MR. WILENS: Are they on the Internet or --
23      MR. PUTTERMAN: Jeff, I am going to ask that
24  question: okay? My deposition, remember?
25      THE WITNESS: They were on the Internet.

---

Page 56

1   BY MR. PUTTERMAN:
2   Q   Okay. And you don't remember to whom you
3   applied?
4   A   Like Rise, Crediteria, Fundable.
5   Q   Okay.
6   A   Agencies like that.
7   Q   Now, had they initially contacted you or did
8   you look them up?
9   A   No, I would -- I looked them up.
10  Q   Okay. So you looked up lenders from whom
11  you could potentially obtain more substantial business
12  loan funding for your business?
13  A   Correct.
14  Q   Okay. And you submitted information through
15  those, through their websites?
16  A   Correct.
17  Q   And you were turned down?
18  A   Sort of.
19  Q   Okay. Explain what you mean by "sort of."
20  A   I was turned down for the amount that I was
21  seeking.
22  Q   Okay.
23  A   But then I would get an email saying but you
24  have been approved for this amount, click here for
25  that, and it would take me to a payday lender.

---

Page 57

1   Q   Okay. And you don't know how those -- and
2   that occurred after you applied and were turned down
3   for the larger loans?
4   A   Correct.
5   Q   Okay. And you don't know how the
6   information then got to the payday lenders who
7   solicited you for loans?
8   A   Correct.
9   Q   Okay. It just happened?
10  A   Yeah. Hundreds and hundreds of emails.
11  Q   But that was the sequence? You would apply
12  for these larger loans, and then you started
13  getting -- you'd be turned town and you'd start
14  getting solicitations from payday lenders?
15  A   Right.
16  Q   Okay. And this was around September 2014?
17  A   Correct.
18      MR. PUTTERMAN: Okay. All right. So, Jeff,
19  we can treat that Camel Coin allegation as withdrawn,
20  correct?
21      MR. WILENS: The allegation that he got a
22  loan from Camel Coin, I can't verify that, so we're
23  dropping that allegation, but not that his personal
24  information was shared by Selling Source somehow with
25  other lenders. In other words, he was basically

---

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

Page 58

1   spammed for payday loans as soon as he applied.
2        MR. PUTTERMAN: I am just talking about the
3   second sentence of paragraph 51.
4        MR. WILENS: I don't have that in front of
5   me.
6        THE WITNESS: Page --
7        MR. WILENS: Well, no, not -- we're not
8   withdrawing the allegation that Selling Source
9   affiliate is cashadvance.com. And we are not
10  withdrawing the allegation that he went to that
11  website or somehow went to another website and he got
12  to that website. But he did not obtain a payday loan
13  from unlicensed lender Camel Coin. Well, it is
14  unlicensed, but he did not obtain a payday loan from
15  Camel Coin and did not pay $100 on that loan. So part
16  of that sentence is withdrawn.
17  BY MR. PUTTERMAN:
18       Q   Okay. Now, in the next sentence it states,
19  quote:
20       "Mr. Gilbert has also obtained loans
21       from two lenders controlled by former
22       Defendant Rare Moon Media, LLC, but
23       those claims are subject to this Court's
24       order compelling arbitration," period,
25       close quote.

Page 59

1        Are those the loans that you referred to
2   earlier that you got separate and apart from going
3   through MoneyMutual? I think you said VIP?
4        A   I think so, yeah.
5        Q   And then there was another lender?
6        A   I think so.
7        Q   And I assume that leaving aside whatever you
8   were told by -- you know, you may have been told by
9   your counsel, when you did that you didn't know
10  anything about Rare Moon Media, LLC, correct?
11       A   No.
12       Q   Okay. It then says, quote -- oh, and have
13  you actually settled those arbitrations?
14       A   I think so.
15       Q   Okay. And what I am going to do here is
16  what we did in -- I believe it was the Malone
17  deposition. I am going to ask you how much money you
18  received in those settlements, and pending my
19  providing your counsel, Mr. Wilens, with permission --
20  with the email we got from counsel for Rare Moon Media
21  waiving the confidentiality of that information but
22  asking that it be designated confidential for within
23  this case, the court reporter will just leave your
24  answer blank to be filled in; okay? So my question
25  is --

Page 60

1        A   I didn't understand any of that.
2        Q   I will bet you didn't, so I will make it
3   real simple.
4        My question is this: How much did you
5   receive in settlement of those arbitrations, question
6   mark. You are not going to answer that now. The
7   reporter is going to leave the answer blank; okay?
8   And after Mr. Wilens and I discuss that, that will be
9   filled in as a correction or addition to your
10  testimony; okay?
11       A   Okay.
12       MR. PUTTERMAN: Jeff, agreeable?
13       MR. WILENS: Well, the loan he got from Rare
14  Moon wasn't a Selling Source loan, so I don't see how
15  it's relevant to this case.
16       MR. PUTTERMAN: All right. Do you know
17  what? That is a valid point.
18       Did you -- have you settled any arbitration
19  on behalf of Mr. Gilbert involving any Selling Source
20  loan?
21       MR. WILENS: No. Cash Yes is pending
22  arbitration. That's the only Selling Source.
23       MR. PUTTERMAN: Fine. Then we don't have to
24  worry about that.
25       MR. WILENS: So strike that blank thing.

Page 61

1        MR. PUTTERMAN: Strike the blank. Yeah.
2        Q   Did you repay the loans you obtained from
3   the two lenders you described before VIP and the other
4   one?
5        A   Yes, to a point.
6        Q   Okay. And then it became a problem and you
7   stopped?
8        A   Correct.
9        Q   Okay. The final sentence of that paragraph
10  says, quote:
11       "Plaintiff Gilbert has also obtained
12       loans from other unlicensed lenders but
13       currently we are unable to confirm
14       whether those loans came from members of
15       Selling Source's marketing network,"
16       period, close quote.
17       Do you remember any other lenders from whom
18  you've obtained payday loans at any time?
19       A   That's what it says, yeah. I mean, I just
20  don't -- couldn't find out who or what.
21       Q   So you don't have any records pertaining to
22  those other loans?
23       A   No. I mean there is no -- there is so much
24  going on with this. I don't understand some of it.
25       MR. PUTTERMAN: Okay. Why don't we take a

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 62

1 short break. We have been going for about an hour.
2 About five minutes or so. And I will also check on
3 the -- where those --
4 **MR. WILENS:** They're right there. Can I get
5 my originals back?
6 **THE VIDEOGRAPHER:** We are going off the
7 record. The time on the video screen is 11:11.
8 (Recess taken, 11:11 to 11:24 a.m.)
9 **THE VIDEOGRAPHER:** We are back on the
10 record. The time on the video screen is 11:24.
11 **MR. PUTTERMAN:** I am going to ask the
12 reporter to mark as Exhibit 50 a sheaf of printout
13 spreadsheet pages from the Partner Weekly database.
14 But do you know what I am going to going to do is I am
15 going to number the corners of these pages first.
16 I have numbered them in the lower left-hand
17 corner as pages 1 through 15.
18 (Document referred to herein marked for
19 identification Exhibit No. 50)
20 **MR. PUTTERMAN:** Jeff, let me just number the
21 set I am going to give you so that we can easily get
22 to the same pages here.
23 Okay. Here you go.
24 **MR. WILENS:** Which exhibit was this?
25 **MR. PUTTERMAN:** 50.

---

Page 63

1 Q Mr. Gilbert, I will represent to you that
2 Exhibit 50 are printouts of a database maintained by
3 Partner Weekly, which is a company affiliated with
4 MoneyMutual, and these all concern the circulation of
5 leads which resulted from you submitting information
6 either to a MoneyMutual website or to another website
7 which is a -- what is called an affiliate of Partner
8 Weekly, meaning that it's independently owned and
9 operated but has a contractual relationship with
10 Partner Weekly.
11 Now, because of the fact -- not each entry
12 here represents an independent submission of
13 information from you because some of these affiliate
14 websites also sell leads to yet other websites, some
15 of which also have contractual relationships with
16 Partner Weekly. So the information can reach Partner
17 Weekly through a number of sources.
18 In addition, with the Partner Weekly
19 software, if a lead is submitted in realtime to a
20 lender and the lender does not buy the lead, it will
21 then automatically be submitted to another potential
22 lender.
23 So that's why in some cases here there will
24 be a number of line items on the same date very close
25 in time, within seconds of each other. Each of them

---

Page 64

1 doesn't represent a separate submission of information
2 by you. I just wanted to give you a little context
3 here so that you have a little better understanding of
4 what we are going to be looking at.
5 Okay. I'd like you to look at the page
6 which I have marked one in the lower left-hand corner.
7 Do you have that?
8 A Yes.
9 Q If you look at the top of that page, the --
10 literally the first line item and the third line
11 item -- well, the first two line items refer to the
12 submissions by somebody apparently living in -- a Sean
13 Gilbert living in Chatsworth, California and having at
14 that time the email address of seang1999@gmail.com.
15 Is that you or a different Sean Gilbert?
16 A That's not me.
17 Q Okay. Just think what kind of shape we'd be
18 in if your name was John Smith. Okay.
19 Now, the third entry shows a application
20 date of November 5th, 2012. Do you see that?
21 A Yes.
22 Q And that's by Sean Gilbert with the email
23 seang95678@comcast.net with an address in Roseville.
24 Do you see that?
25 A Yes.

---

Page 65

1 Q And is that you?
2 A Yes.
3 Q Okay. Good. Now, that line items indicates
4 that you submitted information at that time looking
5 for a payday loan to an entity called Optimized
6 Contact Solutions, which I am sure you don't remember,
7 but it shows that the lead was acquired by a lender
8 called AMG.
9 Now, as I was discussing with Mr. Wilens
10 earlier, the fact that a lead was acquired by a lender
11 does not mean that you actually completed a loan
12 agreement with that lender.
13 So let me ask you this first: Back around
14 November 5th, 2012, was that about the time you were
15 having medical issues and were not able to work, or
16 was it a little later?
17 A It was actually before I was having my
18 medical issues.
19 Q Okay. So they were ongoing at this time?
20 A Yes. I just found out shortly before then
21 that I had asthma and didn't know what it was and why
22 I was having the problems I was having.
23 Q Okay.
24 A But it was a reoccurring issue.
25 Q Do you recall obtaining a payday loan around

---

The Souza Group
(800) 230-3376

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 66

1  the beginning of November 2012 from anybody?
2    **A  I don't recall.**
3    Q   You don't recall one way or another?
4    **A  I don't recall.  I don't recall at that**
5  **point in time the date.  I don't even know about the**
6  **beginning of the month.**
7    Q   Okay.  You had -- you were having sort of a
8  personal medical crisis at that time?
9    **A  My life was completely flipped upside down.**
10 **There was a lot of issues going on.**
11   Q   Okay.
12   **A  It wasn't just that or financially it was**
13 **just --**
14   Q   After that -- after that November 5th entry,
15 there is a lot of entries -- I will just represent to
16 you there are some for November 16th, which appear to
17 be -- have resulted from one submission of
18 information.  November 17th, November 18th, and it
19 continues actually through November, on the next
20 several pages, virtually every day.
21       Do you recall applying for payday loans at
22 that time on an ongoing, perhaps even daily basis?
23   **A  I know that I was looking for -- for money,**
24 **but I wasn't -- I don't think every day.  I mean --**
25 **no, not every day.**

---

Page 67

1    Q   Okay.  But frequently?
2    **A  What's frequent?**
3    Q   More than once a week.
4    **A  About maybe once or twice a week, I think,**
5  **if that.  If even twice, I'd get turned down and get**
6  **depressed.**
7    Q   So you remember being turned down on these
8  applications?
9    **A  Correct.**
10   Q   Excuse me.
11   **A  Bless you.**
12   Q   Thank you.  And were you ever told why your
13 applications were being turned down?
14   **A  Just said I didn't fit the requirements.**
15   Q   Okay.  And that in turn would depress you?
16   **A  Right, because I think one of them was I**
17 **hadn't been employed long enough, but I was employed**
18 **long enough.  I just don't understand where all that**
19 **was coming from.  So it was just that and, you know --**
20 **that.**
21   Q   Were you ever contacted by any lender by
22 telephone to discuss your application during that
23 period, leaving aside Cash Yes for now?
24   **A  No, unless it was the VIP Loan Shop.  They**
25 **had to verify information or whatever, hear a voice,**

---

Page 68

1  so it would be that, but that's not nothing like you
2  have been approved for a loan.
3    Q   Okay.  Do you remember being approved for
4  loans by anybody in addition to Cash Yes during this
5  period?
6    **A  Yeah.  I would get phone calls and messages**
7  **saying I had been approved for a loan.**
8    Q   This is now during approximately November?
9    **A  Right.**
10   Q   Okay.  Did you actually complete any loan
11 agreements during that period?
12   **A  I don't know about loan agreements, but I**
13 **know that I would call back in the beginning, and then**
14 **it was even more depressing then because they would**
15 **tell me, oh, well, no, actually you don't qualify.**
16       **I was like, what do I do?  You tell me I**
17 **qualified type of thing.  You know, get me on the**
18 **phone.  So that made me more angry and I just --**
19   Q   Got frustrated?
20   **A  Exactly.**
21   Q   Okay.  So I am going to ask you to go all
22 the way to page 3.  And I realize this is a little
23 tough to follow and count, but the 22nd line down.
24       MR. WILENS: The 22nd?
25       MR. PUTTERMAN: The 22nd line down.

---

Page 69

1        MR. WILENS: Are you talking about the one
2  that says completed at the --
3        MR. PUTTERMAN: Yeah, that's the one.
4        THE WITNESS: I see that.
5  BY MR. PUTTERMAN:
6    Q   Yeah.  Okay.  And that appears to -- it
7  appears from the database that on November 26th, 2014,
8  you submitted your information to moneymutual.com and
9  the lead was acquired by an entity called M. Mark High
10 Ltd.
11       Now, you have never heard of M. Mark High
12 Ltd., correct, other than what you may have been told
13 by your attorney?
14   **A  Correct.**
15   Q   But I can comfortably represent to you that
16 Cash Yes is an affiliate of M. Mark High Ltd.; okay?
17 So this is a lead that would have been -- that I
18 believe would have led to your Cash Yes loan.
19   **A  Okay.**
20   Q   Okay?  Was this in fact -- was it on or
21 about that time that you once again saw a
22 moneymutual.com advertisement on television and then
23 called moneymutual.com?
24   **A  Can you repeat that?**
25   Q   Was it around November 26th that you --

---

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 70

1  A  **Yes.**
2  Q  **-- actually contacted --**
3  A  **Yes.**
4  Q  **-- moneymutual.com --**
5  A  **Yes.**
6  Q  **-- about a loan?**
7     **And they told you to go to the website and**
8  **fill out the information, correct?**
9  A  **Correct.**
10 Q  **And that led you to the Cash Yes loan?**
11 A  **Correct.**
12 Q  Okay.  Now, how long were you unable to work
13 because of your medical issues at that time?
14 A  Which incident?  So there was a few
15 incidents.  One was three weeks.  One was four days,
16 intervals of three -- two to five days from
17 thereafter.
18 Q  Were these all asthma related?
19 A  Yes.
20 Q  Because your asthma was not under control
21 completely yet?
22 A  Correct.  I didn't even know I had asthma at
23 that point, so I didn't know what was triggering it or
24 anything.
25 Q  All right.  So did you continue to

---

Page 71

1  periodically apply for payday loans through various
2  websites during December of 2012?
3  A  Yeah.
4  Q  **Okay.  Do you recall receiving other payday**
5  **loans during that period besides the Cash Yes loan?**
6  A  **Yeah.  I don't know if those other ones were**
7  **before or after, though.**
8  Q  **Okay.  But you got some other ones?**
9  A  **Yeah.  I am talking about the VIP.  I don't**
10 **know if those were before or after.**
11 Q  **Do you recall if there were any payday loans**
12 **during that period which you paid back completely?**
13 A  **Yeah.  I mean, I think there was that -- the**
14 **VIP or Action or something like that, and I have those**
15 **documents.  My attorney's got them too, but --**
16 Q  **Okay.  Now -- and it's correct that you**
17 **applied through a number of websites?**
18 A  **A few, I am sure, yeah.**
19 Q  **Okay.**
20 A  **Couple.**
21 Q  **Those websites, those other websites, did**
22 **not refer to MoneyMutual in any respect, correct?**
23 A  **Not that I -- I don't know.**
24 Q  **Not that you recall?**
25 A  **I don't -- not that I know of.**

---

Page 72

1  Q  **Okay.  Did you as a matter of practice read**
2  **through the entire website before you submitted your**
3  **information for a potential payday loan?**
4     **MR. WILENS: Are you talking about every**
5  **loan or a particular one?**
6     **MR. PUTTERMAN: Every.  Every.**
7     **THE WITNESS: I would read the loan**
8  **agreement, but I only looked for important stuff.**
9  **Like I didn't, you know, need nobody banging on my**
10 **door, Guido banging on my door or anything like that,**
11 **you know, so I would make sure there was some kind**
12 **of -- you know, that they were legitimate somehow.**
13 **BY MR. PUTTERMAN:**
14 Q  **This is what you were looking for on the**
15 **websites?**
16 A  **Right.  Correct.**
17 Q  **Okay.**
18 A  **You know, that was the whole point.**
19 Q  **Do you recall any website you decided not to**
20 **apply through because it didn't look legitimate?**
21 A  **I can't say.  I don't know.  I mean, some**
22 **looked shady.**
23 Q  **For example, if it had been entitled Guido**
24 **Loans, Inc., you might have thought that was**
25 **questionable?**

---

Page 73

1  A  **Right.**
2  Q  Okay.
3     MR. WILENS: Would have been better off with
4  Guido.
5     THE WITNESS: Might have been.
6  BY MR. PUTTERMAN:
7  Q  Did you know that that's actually really
8  Mr. Wilens' first name?
9  A  Guido?
10 Q  Guido.
11 A  Is it?  I thought it was Jeff.  Jeffco.
12    MR. WILENS: It's Jeffco.  You're right.
13 BY MR. PUTTERMAN:
14 Q  **I am going to ask you to turn to page 14,**
15 **and about the middle of the page we start seeing a**
16 **different -- a couple different websites here.  I see**
17 **one called Sean at --**
18    **MR. WILENS: An email address.**
19 **BY MR. PUTTERMAN:**
20 Q  **Email address.  I'm sorry.**
21 **Seang@motivtech.com, M-O-T-I-V-T-E-C-H dot-com, with**
22 **address on Forest Knoll Drive.**
23 A  **Correct.**
24 Q  **Is that you?**
25 A  **Yes.**

---

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 74

1    Q   Okay.  And further down, and I suspect this
2  is you also, there are occasional entries from an
3  email, babyglowz@comcast.net.  B-A-B-Y-G-L-O-W-Z.
4    A   Correct.
5    Q   That was your business email at that time?
6    A   Right.
7    Q   Was Motivtech also a business email?
8    A   No.  It was -- I was actually working --
9  starting to do sales for a guy.  That was -- he set me
10 up with that email address.
11   Q   Okay.  Now, this is the Camel Coin entry
12 that we saw earlier, and it actually shows that you
13 apparently applied or submitted your information to a
14 website called 911paydayadvance.com.
15       Do you have any recollection of such a
16 website?
17   A   No.
18   Q   And you have no recollection --
19       MR. WILENS: I think you are looking at the
20 wrong line.
21       MR. PUTTERMAN: No, I think you maybe were
22 looking at wrong line.
23       MR. WILENS: You earlier said it was
24 cashadvance.com.
25       MR. PUTTERMAN: No, I was reading that from

---

Page 75

1  the complaint.
2        MR. WILENS: It is cashadvance.com.
3        MR. PUTTERMAN: I don't think so.
4        MR. WILENS: I guarantee you it says Guido.
5        THE WITNESS: Guido.
6        MR. WILENS: Cashadvance.com.
7        MR. PUTTERMAN: It looks like
8  911paydayadvance.com.
9        MR. WILENS: Do you have a ruler out there?
10       MR. PUTTERMAN: I am using a piece of paper,
11 so --
12       THE WITNESS: Your glasses are crooked.
13       MR. PUTTERMAN: My glasses are always
14 crooked.
15   Q   In any event, I think you indicated earlier
16 that you have no recollection of applying for a loan
17 at that time?
18   A   Correct.
19       MR. WILENS: He said he applied for lots of
20 loans but they were business loans and then he got
21 bounced down to payday loans.
22 BY MR. PUTTERMAN:
23   Q   Okay.  Now, this is dated September,
24 assuming we have the right line, September 25th, 2014,
25 and at that time, this was when you were looking for

---

Page 76

1  money to fund your business, correct?
2    A   Yes.
3    Q   Were you looking for money to help you with
4  personal expenses at all at that time?
5    A   No.
6    Q   Was there anything going on besides your
7  desire to fund the business for which you might have
8  needed personal money?
9    A   No.
10   Q   Okay.  And --
11       MR. WILENS: So it is cashadvance.com.
12       MR. PUTTERMAN: Is that what you've got?
13       MR. WILENS: Absolutely.  I guarantee it.
14 Line 1147, if you're interested, looking at the
15 spreadsheet.
16       MR. PUTTERMAN: Okay.
17   Q   And this database spreadsheet also indicates
18 that there were other submissions going on into
19 October of 2014, and then some on the next page,
20 through November and December 2014, and these are
21 actually either from the comcast.net email or the
22 babyglowz.com email.
23       So let me ask you this:  Who else had access
24 to your computer at that time?
25   A   My wife.

---

Page 77

1    Q   Okay.  Anybody else?
2    A   No.
3    Q   Okay.  Do you have any recollection at all
4  that your wife applied for any payday loans at that
5  time under your name?
6    A   No, she didn't.
7    Q   Okay.  And you did not receive any money
8  from any payday lender at that time?  You didn't pay
9  money to any payday lender at that time?
10   A   No.
11   Q   Correct?  No as to both?
12   A   No as to both.
13   Q   Okay.  Did you apply for any payday loans
14 after you first contacted Mr. Wilens about your issues
15 with Cash Yes?
16   A   No, I don't believe I did.  I was done with
17 that at that point.
18   Q   Okay.  Have you applied for any payday loans
19 at any time since you became a plaintiff in this case?
20   A   No, I wouldn't -- no, not for online payday
21 loans, absolutely not.  And I have no bank account,
22 so --
23   Q   Do you have a bank account now?
24   A   I do not.
25   Q   Okay.  How do you handle incoming checks and

---

The Souza Group
(800) 230-3376

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 78

1  things like that?
2    **A  Well, I don't have incoming checks. I don't**
3  **have authorized ACH transactions when I did have a**
4  **banking account, but -- so I do use PayPal a lot.**
5  **That's what I do.**
6    Q  Okay. That's for your business?
7    **A  Correct.**
8    Q  Okay. So you just keep money in there and
9  withdraw it if you --
10    **A  For business expenses and things like that.**
11    Q  And to what do you transfer the money when
12  you need it for business expenses?
13    **A  What do you mean? I would use a debit card**
14  **for PayPal or --**
15    Q  Got it.
16    **A  -- you know, just do the PayPal transaction.**
17    Q  That's also for your personal expenses?
18    **A  No. Some of it is I have an investor.**
19    Q  Okay.
20    **A  That's a whole 'nother -- so he regulates**
21  **that too.**
22    Q  Okay. What about, you know, your personal
23  household money and such?
24    **A  Yeah. We -- right now business is slow. My**
25  **wife just got a job at a yogurt shop. Her parents are**

---

Page 79

1  **taking care of us right now.**
2    Q  Okay. And that's just through cash or
3  whatever?
4    **A  Yeah. They pay -- they are paying our rent**
5  **and we reimburse them as --**
6    Q  Got it. Would you please turn to
7  paragraph 59, which is on page 19, and I'd just like
8  you to read that to yourself.
9    (Witness reviews document.)
10    **A  Okay.**
11    Q  Now, I am looking at the last sentence which
12  refers to spam emails, and I think you testified
13  earlier in today's deposition that at some point after
14  you obtained the Cash Yes loan you received emails
15  from time to time from MoneyMutual asking if you
16  wanted to apply for another loan; is that correct?
17    **A  Correct.**
18    Q  Okay. And did you respond to any of those
19  emails?
20    **A  No.**
21    Q  Did you apply for any further loans through
22  MoneyMutual?
23    **A  No.**
24    Q  Okay. Did you indicate on -- in response to
25  any of those emails that you did not wish to receive

---

Page 80

1  further emails from MoneyMutual?
2    **A  No.**
3    Q  Did you just delete them?
4    **A  No. I don't think I deleted -- I think I**
5  **saved them. I might have even gave Mr. Wilens one or**
6  **two. I don't remember. It's a while ago. But I know**
7  **that I kept them. Pretty important.**
8    Q  So this was after -- you received
9  these emails after you had contacted Mr. Wilens?
10    **A  Yes.**
11    Q  Okay. Would you look at paragraph 60,
12  please. Leaving aside -- I'm sorry. Just go ahead
13  and read that to yourself.
14    (Witness reviews document.)
15    **Okay.**
16    Q  Leaving aside anything you may have been
17  told by your counsel, do you have any personal
18  knowledge of any of the facts that are alleged in
19  paragraph 60?
20    **A  No.**
21    Q  Would you look at paragraph 61, please.
22    **A  Okay.**
23    Q  And if you'd read that to yourself.
24    (Witness reviews document.)
25    **A  Okay.**

---

Page 81

1    Q  Leaving aside what you may have been told by
2  your counsel, do you have any personal knowledge of
3  any of the facts alleged in paragraph 61?
4    **A  No.**
5    Q  Okay. When you did apply for payday loans
6  and you actually were able to enter into loan
7  agreements with payday lenders, did you ask any of
8  them whether they were licensed to make loans in
9  California?
10    **A  No.**
11    Q  At that time did you know anything about
12  whether or not there were licensing requirements in
13  California?
14    **A  No.**
15    Q  Was that -- was licensing an issue for you
16  at the time or was it simply a matter of obtaining
17  cash that you needed?
18    **A  Well, it was an issue because I didn't want,**
19  **like you say, Guido banging on my door or anything**
20  **like that. So it wasn't until after all this started**
21  **that I started -- looked in the beginning to find out**
22  **that they -- that it was unlicensed and that you had**
23  **to be licensed in the state.**
24    Q  Do you recall from any of the websites you
25  visited, not just MoneyMutual but other websites as

---

The Souza Group
(800) 230-3376

Gilbert v                                                   Sean Gilbert
Bank of America                                          December 1, 2015

Page 82

1   well, anything being said on any of the websites
2   concerning the licenses of lenders?
3       A    So I just looked for something that said
4   like, you know, network, trusted, you know, things
5   like that, like the OLA or, you know, that type of
6   thing. They usually had a little symbol.
7       Q    You are referring to the symbol -- to OLA,
8   to the Online Lenders Alliance, correct?
9       A    Correct. Or the CDDTL or something like
10  that.
11      Q    How did you learn about those particular
12  entities or brands?
13      A    That's who I was going to contact, after I
14  started getting harassed, to file a formal complaint.
15      Q    The OLA?
16      A    Yeah.
17      Q    Okay. And how did you -- but how did you
18  learn about the OLA?
19      A    And the FTC and all that. Just went down
20  the road, you know.
21      Q    But the OLA you know is not a government
22  agency, correct?
23      MR. WILENS: Are you asking or telling him
24  that?
25      THE WITNESS: I don't know that. I didn't

Page 83

1   know. I don't know. I just thought -- I thought they
2   were.
3   BY MR. PUTTERMAN:
4       Q    Did you actually contact the Online Lenders
5   Alliance about Cash Yes?
6       A    I can't remember. I know there was a lot of
7   agencies that I contacted.
8       Q    What agencies did you contact?
9       A    Local and abroad. So the FTC, the attorney
10  general. Actually cease and desist orders and --
11      Q    Which attorney general? California or
12  federal?
13      A    Both, I believe.
14      Q    Okay. And you obtained a copy of a cease
15  and desist order from a California -- one of the
16  California governmental authorities, correct?
17      A    Correct. They even issued one in my name.
18      Q    Do you remember which California authority
19  issued that cease and desist order in your name?
20      A    Department of Business Oversight, I think,
21  or whoever is in charge of financial lending.
22      Q    Whatever it's called now?
23      A    I've got documents on it all. I just don't
24  know off the top of my head.
25      Q    Yeah. Did you send a copy of that cease and

Page 84

1   desist order to MoneyMutual?
2       A    I did. I sent it to a place in Las Vegas.
3       Q    Do you remember who?
4       A    I don't know. I have a copy of the envelope
5   that I sent it to.
6       Q    Do you remember when?
7       A    January, February of 2013, maybe somewhere
8   in there.
9       Q    Did you hear back from whatever entity you
10  sent it to in Las Vegas?
11      A    I can't remember. I don't think so. There
12  were so many different things going on.
13      Q    Did you talk with anybody in Las Vegas about
14  the cease and desist order?
15      A    I can't remember. Like I said, I've got
16  records and documents of everything, but -- there are
17  so many phone calls.
18      Q    So many phone calls generally?
19      A    Yeah. I mean from everybody.
20      Q    Okay. Would you please read to yourself
21  paragraphs 70 through 73 that are on pages 21 and 22
22  of Exhibit 2.
23      (Witness reviews document.)
24      A    Okay.
25      Q    Leaving aside anything you may have been

Page 85

1   told by your counsel, do you have any personal
2   knowledge of any of the facts alleged in those
3   paragraphs?
4       A    No.
5       MR. PUTTERMAN: Off the record for one
6   second, please.
7       THE VIDEOGRAPHER: We are going off the
8   record. The time on the video screen is 11:57.
9       (Discussion off the record.)
10      THE VIDEOGRAPHER: This is the end of
11  disc 1. It has a run time of approximately one hour
12  and 33 minutes. The time on the video screen is
13  11:59.
14      (Lunch recess, 11:59 a.m.)
15
16
17
18
19
20
21
22
23
24
25

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 86

1   AFTERNOON SESSION                    12:43 P.M.
2                        -oOo-
3           THE VIDEOGRAPHER: This begins disc 2 in the
4   video deposition of Sean L. Gilbert on December 1,
5   2015.  The time on the video screen is 12:43.
6           MR. PUTTERMAN: Okay.  I am going to ask the
7   reporter to mark as Exhibit 52 -- 51 documents that
8   were produced on behalf of Mr. Gilbert with the
9   production numbers Gilbert 031 and Gilbert 032.
10          (Document referred to herein marked for
11          identification Exhibit No. 51)
12          EXAMINATION (Resumed)
13  BY MR. PUTTERMAN:
14      Q   Now, you mentioned in your testimony here
15  today that you ultimately were able to contact Cash
16  Yes, and you also indicated that you had sent a copy
17  of a cease and desist order that you had received from
18  the Department of Business Oversight or the Department
19  of Corporations, whatever it was called at the time.
20      A   Something like that, yeah.
21      Q   Okay.  Would you look at Exhibit 51.  And
22  you also mentioned that -- you said that you had sent
23  it to somebody in Las Vegas and that you thought you
24  had saved the envelope or copy of the envelope on
25  that, correct?

---

Page 87

1       A   Correct.
2       Q   Okay.  Exhibit 51 is a two-page document
3   with an envelope and a letter sent to the CashYes.com
4   collections department.  The letter is dated
5   January 20th, 2013.  The envelope, however, is dated
6   January 8, 2013, so it's possible these two are not
7   actually connected.
8           Let me ask you to look at the envelope.  Is
9   this envelope in your handwriting?
10      A   Yes.
11      Q   Okay.  And it's addressed to Cash Yes/Cash
12  Jar/Payday Yes at an address in Columbia, Tennessee,
13  correct?
14      A   Correct.
15      Q   Where did you get that address?
16      A   On the Internet.
17      Q   Okay.  And I see it was marked return to
18  sender.  Do you see that?
19      A   Correct.
20      Q   Do you recall what was in this envelope?
21      A   I think it was a letter that I had wrote to
22  them.
23      Q   Okay.
24      A   It's probably this same one, but I had found
25  out the address in Belize after I sent this already

---

Page 88

1   out.
2       Q   Okay.  So it was probably the same letter
3   but not addressed to Cash Yes in Belize, addressed to
4   Cash Yes in Tennessee?
5       A   Both.  So I sent this one first.
6       Q   That's what I am saying.
7       A   Yeah.  Okay.  Yes.
8       Q   In other words, a letter like the second
9   page of Exhibit 51 was included in the envelope, but
10  that one went to Tennessee and got returned to sender?
11      A   Right.
12      Q   And thereafter you sent substantively the
13  same letter but addressed to Cash Yes in Belize,
14  correct?
15      A   Correct.
16      Q   Okay.  And this is where you refer -- and
17  you refer here to having made a complaint to various
18  law enforcement agencies, correct?
19      A   That's correct.
20      Q   Now, you don't say anything about
21  having made a complaint to MoneyMutual, correct?
22      A   No.
23      Q   Okay.  And did you ever send a letter like
24  this to MoneyMutual?
25      A   No.

---

Page 89

1       Q   Okay.  Now, in the first paragraph it also
2   refers to, quote, a -- it says, quote:
3           "I/We have sent by Certified Mail, Fax,
4           E-mail, and by Phone, a copy of A Desist
5           and Refrain Order via public record,"
6           period, close quote.
7           Is that the cease and desist order that you
8   were referring to earlier in your testimony?
9       A   I am not sure if it was the one from -- that
10  was issued in my name or when that had been issued a
11  couple months before that in -- from the Department of
12  Corporations or whatever it was.
13      Q   Do you have a copy of the one that was
14  issued in your name?
15      A   I gave it to my attorney.
16          MR. PUTTERMAN: Jeff, I don't see that one
17  in the documents you produced.
18          MR. WILENS: I think he's confused.
19          MR. PUTTERMAN: You think there was just
20  one?
21          MR. WILENS: I don't think he means a cease
22  and desist letter issued by the State of California.
23  I think he means one issued by himself.
24          THE WITNESS: No, I think you've got me
25  mixed up.  I am telling you it was by the State of

---

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1  California. I got it from Kim Sophia at California
2  corporations.
3  **BY MR. PUTTERMAN:**
4  **Q**   We have a copy of a cease and desist order
5  here.
6  **A**   **Right.**
7  **Q**   Okay. But it's from -- it dates from 2010.
8  **A**   Yeah, this one -- no, it was dated around
9  this date with my name on it, and it was from Kim
10  Sophia, which I kept those emails too.
11  **MR. WILENS:** To who?
12  **THE WITNESS:** It was forwarded to Cash Yes,
13  forwarded to MoneyMutual, forwarded to -- wish I had
14  it with me.
15  **MR. PUTTERMAN:** Well, let me -- let's follow
16  up on this; okay?
17  Exhibit 52 is a document which appears to be
18  an email from Dean Haakenson, H-A-A-K-E-N-S-O-N, of
19  the Enforcement Division of the California State
20  Department of Corporations, addressed to Mr. Gilbert,
21  dated January 15th, 2013.
22  **MR. WILENS:** What page is that?
23  **MR. PUTTERMAN:** Gilbert 041.
24  (Document referred to herein marked for
25  identification Exhibit No. 52)

1  **THE WITNESS:** Thank you.
2  **MR. WILENS:** Gilbert 41 is from -- okay.
3  **MR. PUTTERMAN:** You see it.
4  **Q**   Is this an email that you received from the
5  Department of Corporations acknowledging receipt of a
6  written complaint?
7  **A**   It is.
8  **Q**   Okay. Now, it says, quote:
9  "It was received in our office on
10  January 9, 2013 and has been assigned
11  the number listed above. It has been
12  submitted to the appropriate staff for
13  review and evaluation. We will contact
14  you for additional information if we
15  determine that we need it to complete
16  that process," period, close quote.
17  And were you then contacted by somebody at
18  the Department of Corporations?
19  **A**   I was.
20  **Q**   Okay. And by whom were you contacted?
21  **A**   Sophia Kim, I believe, or Kim Sophia.
22  **Q**   S-O-P-H-I-A?
23  **A**   Yes.
24  **Q**   K-I-M?
25  **A**   I believe so, yes.

1  **Q**   Okay. And was that by email or by phone?
2  **A**   Both.
3  **Q**   And what did Ms. Sophia tell you?
4  **A**   She asked about the facts and the incident
5  that had happened.
6  **Q**   Uh-huh.
7  **A**   That's when I explained to her, and she had
8  told me some things that had already been pending
9  regarding Cash Yes and MoneyMutual, and that she
10  needed more time to investigate.
11  **Q**   Okay. Time out. Did she -- do you
12  specifically recall that she mentioned MoneyMutual or
13  just Cash Yes?
14  **A**   MoneyMutual too.
15  **Q**   Well, did your written complaint include any
16  reference to MoneyMutual?
17  **A**   It did.
18  **Q**   I don't see that here in this group of
19  documents, but we'll go through them all and see if
20  there is.
21  Did you keep a copy of your written
22  complaint to the Department of Corporations?
23  **A**   I did.
24  **Q**   Then it should have been produced here,
25  correct?

1  **A**   Should be.
2  **Q**   Okay.
3  **A**   It would be handwritten.
4  **Q**   Okay. I have not seen in these documents
5  that were produced any handwritten correspondence from
6  you to the Department of Corporations.
7  **MR. WILENS:** Was it mailed?
8  **THE WITNESS:** Yeah. I didn't mail them --
9  they wouldn't let me do it online. They had to have a
10  written --
11  **MR. WILENS:** Did you make a Xerox copy of
12  the document?
13  **THE WITNESS:** I did. It's at home.
14  **MR. WILENS:** I haven't seen it. I would
15  point out, though, that none of this is terribly
16  significant to certification issues, although it would
17  go to the merits.
18  **MR. PUTTERMAN:** Right, it would go to the
19  merits.
20  **MR. WILENS:** So we'll get it to you
21  eventually, but --
22  **MR. PUTTERMAN:** Well, no, don't get it to me
23  eventually. It was required to be produced in
24  response to this deposition notice duces tecum.
25  **MR. WILENS:** My client never gave it to me.

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 94

1     **MR. PUTTERMAN:** I understand that, but --
2     **MR. WILENS:** I asked for a lot of documents
3 at your clients' depositions --
4     **MR. PUTTERMAN:** Time out.
5     **MR. WILENS:** -- that weren't produced.
6     **MR. PUTTERMAN:** We're talking about a
7 particular document in which Mr. Gilbert states he
8 made a complaint to the Department of Corporations
9 concerning MoneyMutual; okay? Or in some way
10 mentioning MoneyMutual along with Cash Yes.
11     We obviously are entitled to and need a copy
12 of that document, and I am going to have to reserve my
13 right to, instead of concluding the deposition today,
14 adjourning the deposition until we get all the rest of
15 the documents that were responsible to the deposition
16 notice duces tecum.
17     **MR. WILENS:** Doesn't your client have it?
18     **MR. PUTTERMAN:** No.
19     **MR. WILENS:** I am sure the state would have
20 served you a copy of any complaint and asked you to
21 respond.
22     **MR. PUTTERMAN:** I am not aware of it and
23 that's why I need to see it. It should have been
24 produced now.
25     **THE WITNESS:** I've got 30 minutes. I can go

Page 95

1 home and get it.
2     **MR. WILENS:** Not to Roseville, you can't.
3     **THE WITNESS:** Why not? It took me 15
4 minutes to get here in traffic this morning.
5     **MR. WILENS:** Is there anyone home who can
6 fax it?
7     **THE WITNESS:** Well, yes, I have a fax
8 machine at home. Email. My wife doesn't know where
9 to look.
10     **MR. WILENS:** So you think you have it.
11     **THE WITNESS:** I don't think, I know.
12     **MR. WILENS:** Sean, don't argue with me. I
13 am your lawyer. Sean, do you have it?
14     **THE WITNESS:** I said I have it.
15     **MR. WILENS:** Like it's sitting out in the
16 open in a file, or you think it's going to be in some
17 folder or paper?
18     **THE WITNESS:** No, like it's sitting with all
19 the other 10,000 pages I have on top of my desk.
20     **MR. WILENS:** Well --
21 **BY MR. PUTTERMAN:**
22     Q   Are you talking about 10,000 pages that
23 relate to payday loans?
24     A   Yeah, because I did a lot of investigating
25 in the beginning when they got me fired from my job.

Page 96

1     **MR. WILENS:** We haven't produced things that
2 were not responsive to your request. You didn't ask
3 for his research on payday loans.
4     **THE WITNESS:** It's not all for Cash Yes or
5 Montel Williams, but it's --
6     **MR. PUTTERMAN:** You know, here's the deal:
7 We asked for a number of categories of documents;
8 okay? How do you know they're not responsive? You
9 haven't seen them.
10     **MR. WILENS:** I served a category list on my
11 client and told him what to look for, so it's just
12 like your depositions.
13     **MR. PUTTERMAN:** No, no, no, no, no, no.
14 Okay. He made a complaint to the Department of
15 Corporations concerning Cash Yes. That obviously
16 needs to be produced. It mentioned MoneyMutual. It
17 obviously needed to be produced for that reason as
18 well. Okay. He has said that he has a copy of an
19 envelope in which he sent something to MoneyMutual.
20 Well, that's not included in these documents. The
21 only copies of envelopes included in these documents
22 are those.
23     **MR. WILENS:** Complete your deposition as
24 best you can.
25     **THE WITNESS:** I don't think I said I sent an

Page 97

1 envelope to MoneyMutual. I said I sent something to
2 Las Vegas.
3 **BY MR. PUTTERMAN:**
4     Q   Okay. Do you remember to whom you sent it
5 in Las Vegas?
6     A   It could be -- I'm not sure.
7     Q   Do you have a copy of that envelope?
8     A   I might. I made copies of everything. I
9 have 10,000 pages.
10     Q   Are you sure?
11     A   So I'm not sure.
12     **MR. WILENS:** I don't mind visiting
13 Sacramento again.
14     **MR. PUTTERMAN:** You may have to visit
15 San Francisco the next time around.
16     **MR. WILENS:** It doesn't change the location
17 of where the deponent should go, but --
18     **MR. PUTTERMAN:** Well, the deponent may have
19 to come to San Francisco next time since the reason
20 we're going to have to adjourn the deposition is
21 because of the fact you say that you told the deponent
22 what to produce. The deponent had the deposition
23 notice duces tecum, he said he saw it, and he didn't
24 produce the documents required.
25     **MR. WILENS:** I don't think he understood

---

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

Page 98

1  that that was a particular document. I don't know if
2  you said any complaints you made to the state about
3  MoneyMutual in your list of documents.
4        MR. PUTTERMAN: Jeff, you know, please.
5        MR. WILENS: It seems to me that we should
6  just check with your clients. They may have it.
7        MR. PUTTERMAN: Client, I have not seen
8  anything like that from the client.
9        MR. WILENS: Maybe they never heard back
10  from the State of California.
11        MR. PUTTERMAN: Correct. Well, let me --
12  let me mark something else here and see how this may
13  relate.
14        Next in order?
15        THE REPORTER: 53.
16        MR. PUTTERMAN: Exhibit 53, because there is
17  one handwritten document here, but it doesn't look
18  like correspondence, but this is Gilbert -- designated
19  Gilbert 033. Maybe this will help.
20        (Document referred to herein marked for
21        identification Exhibit No. 53)
22        THE WITNESS: Thank you.
23  BY MR. PUTTERMAN:
24    Q   Can you tell us what this is?
25    A   Yes. It's a document of the times I tried

Page 99

1  to call and the communication I had with Cash Yes.
2    Q   Okay. And that's your handwriting?
3    A   Correct. From work.
4    Q   Okay. And you actually created this page,
5  because you put the heading Cashyes.com?
6    A   I put the heading on there, but the page was
7  a format or whatever.
8    Q   Okay. Did you send this to the Department
9  of Corporations?
10    A   I believe so. I'm not sure right off the
11  top of my head if this went with it, but everything
12  that I have for Cash Yes went with that complaint
13  letter to them.
14    Q   So this is not the complaint letter here?
15    A   No. This is just documentation.
16        MR. PUTTERMAN: Okay. I am going to ask the
17  reporter to mark as Exhibit 54 a group of pages from
18  Mr. Gilbert's production marked Gilbert 043 through
19  Gilbert 51.
20        (Document referred to herein marked for
21        identification Exhibit No. 54)
22        THE WITNESS: Thank you.
23  BY MR. PUTTERMAN:
24    Q   Let's go through these pages, please.
25  Mr. Gilbert.

Page 100

1    Q   Now, the first page is a fax transmission
2  report of yours?
3    A   Uh-huh.
4    Q   Okay.
5    A   Yes.
6    Q   And the fax was sent to
7  Cashyes.com/Cashjar.com, correct?
8    A   Correct.
9    Q   Okay. And where did you get that fax
10  number?
11    A   I think off the Internet, off their website
12  maybe.
13    Q   Okay. And you sent this on or about
14  January 8th, 2013, correct?
15    A   Correct.
16    Q   And it shows pages 1 through 8.
17        Now, what did you fax them on or about
18  January 8th, 2013?
19    A   My complaint that I had handwritten and all
20  the paperwork via certified mail. I'm not sure which
21  paperwork that was, but --
22    Q   This was the complaint that you sent to the
23  Department of Corporations?
24    A   I sent them a copy of that, yeah.
25    Q   Right. Okay. Did you make a copy of the

Page 101

1  entire package that you faxed to them, the entire
2  eight pages?
3    A   Yeah. This is it, isn't it?
4    Q   Well, not --
5    A   This is being -- trying to show them that
6  they didn't have -- that they couldn't collect because
7  they were harassing me so bad that they couldn't
8  collect me or they couldn't sue me or take me to jail.
9        (Court reporter interrupts for clarity of
10        the record.)
11        THE WITNESS: That they couldn't collect or
12  sue me or take me to jail because the loan was
13  illegal.
14  BY MR. PUTTERMAN:
15    Q   Okay. But it's not the complete package if
16  in fact you included a copy of your handwritten
17  complaint to the Department of Corporations, because
18  that's not included in here.
19    A   I haven't got that far yet.
20    Q   What do you mean, you haven't gotten that
21  far?
22    A   I haven't looked through this yet.
23    Q   Why don't you look through that.
24    A   I am good now.
25    Q   Your handwritten complaint to the Department

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1  of Corporations isn't in here, correct?
2     **A**  **No.**
3     **Q**  Do you know why that is?
4     **A**  **Yeah. It's sitting right on top of my desk.**
5     **Q**  Okay. Did you pull it out from this packet
6  when you were giving documents to your counsel?
7     **A**  **It's one of the first documents I ever gave**
8  **him in the beginning.**
9     **Q**  The handwritten complaint you sent to the
10 Department of Corporations. Okay. That specifically
11 mentioned MoneyMutual?
12    **A**  **Correct.**
13    **Q**  What exactly did you say about MoneyMutual?
14    **A**  **That I was referred to Cash Yes from**
15 **MoneyMutual.**
16    **Q**  Okay. Did you say anything else about
17 MoneyMutual?
18    **A**  **It was -- no. There was nothing else to**
19 **say.**
20    **Q**  Okay. That was it?
21    **A**  **I was referred to Cash Yes from -- she asked**
22 **me how I was -- I told her that that's what I put on**
23 **the thing. She said I had to write the complaint, so**
24 **I did.**
25    **Q**  Okay. And what did she say to you about

1  MoneyMutual at any time? This is Sophia Kim or Kim
2  Sophia?
3     **A**  **Yeah, whatever. She said that she needed**
4  **the document or something with my name on it from**
5  **MoneyMutual, so I sent her something.**
6     **Q**  Do you recall what you sent her?
7     **A**  **My attorney has a copy of it too, but it's**
8  **the one with -- saying, you know, welcome back for a**
9  **loan, or something like that, with all my information**
10 **on it.**
11    **Q**  That's been produced.
12    **A**  **Right.**
13    **Q**  Okay. Did she say anything to you about
14 MoneyMutual?
15    **A**  **I can't recall that part of it. I know that**
16 **she was very interested in MoneyMutual as far as --**
17 **with my name on it.**
18    **Q**  Okay. But she didn't tell you anything
19 about MoneyMutual?
20    **A**  **She didn't go into the details.**
21    **Q**  Okay. Did you complain to her about
22 MoneyMutual?
23    **A**  **I just told her that MoneyMutual is the one**
24 **that referred me and would not give me any**
25 **information.**

1     **Q**  Okay. Keep --
2  This is what, Exhibit 53 we're looking at?
3     **THE REPORTER:** 54.
4  **BY MR. PUTTERMAN:**
5     **Q**  Keep that in front of you.
6     **A**  Okay.
7     **Q**  Okay. Or actually, do you know what? Let's
8  continue with that before I mark something else so we
9  get this out of the way completely.
10 Okay. Now, look at pages 044 through 047,
11 if you would, and just read through that to yourself
12 and then I'm going to ask you to tell me what these
13 four pages are.
14 (Witness reviews document.)
15    **A**  Okay.
16    **Q**  Can you tell me what these four pages are?
17    **A**  **I think this was what I sent Cash Yes.**
18    **Q**  By fax?
19    **A**  **Fax. And this is part of the packet I think**
20 that I sent to them, like --
21    **Q**  By mail and by fax?
22    **A**  **Certified mail. Right.**
23    **Q**  Good.
24    **A**  **About their illegal collecting -- collection**
25 practices and why I didn't owe them any money at that

1  point.
2     **Q**  And -- okay. And you also state on the --
3  if you look on page Gilbert 047 --
4     **A**  Uh-huh.
5     **Q**  -- and you state in the second paragraph
6  from the end, quote:
7  "I must also inform you that I will be
8  filing complaints with the Better
9  Business Bureau, the Federal Trade
10 Commission, California Department of
11 Corporations, and the United States
12 Attorney General Office." period, close
13 quote.
14    **A**  Uh-huh.
15    **Q**  Had you actually sent your complaint to the
16 Department of Corporations at the time you wrote this?
17    **A**  **Yes. All those certified letters went out**
18 the same day.
19    **Q**  Okay. So -- and you believe that you
20 included a copy of that complaint with this package
21 that you faxed and sent by certified mail to Cash Yes?
22    **A**  I can't recall.
23    **Q**  Okay. So you are not sure now whether you
24 actually included the Department of Corporations
25 complaint in this package?

Page 106

1   **A   Yes. I'm not sure. I have to look.**
2   Q   Okay. Where would you look?
3   **A   On my desk. I was just going through all**
4   **the stuff last night.**
5   Q   Would you go back a page and -- to Gilbert
6   046, and you see there is a paragraph -- it's about
7   the second full paragraph from the bottom that starts,
8   quote, "Due to the fact."
9   **A   Uh-huh.**
10  Q   Okay. Let me just read that into the
11  record. It says, quote:
12      "Due to the fact that Internet payday
13      loan lenders must be licensed in the
14      State of California to be a legal and
15      binding contract, your company should
16      NOT," all caps, "issue loans to
17      California residents at all. I am
18      requesting that you send me your license
19      number which enables you to offer loans
20      to California residents," period, close
21      quote.
22      Okay. Now, how did you learn about
23  licensing? Was this from some of your own Internet
24  research?
25  **A   Yes.**

Page 107

1   Q   Okay. So is it correct that before you
2   actually contacted the California Department of
3   Corporations you had actually done some Internet
4   research and determined that Cash Yes needed to be
5   licensed in California?
6   **A   Correct.**
7   Q   Okay. Because this is dated January 8th
8   and -- can I see the last couple of exhibits you have
9   there, please? Thanks.
10  **A   What do you need?**
11  Q   Let me have the cover page for this exhibit
12  and let me have the last couple of exhibits you have
13  there in front of you.
14      Right. Exhibit 52 is the email from the
15  Department of Corporations stating that your written
16  complaint was received in our office on January 9th,
17  2013.
18      So you would have sent that out to the
19  Department of Corporations sometime around the couple
20  of days prior to January 9th, 2013?
21  **A   Okay. Now repeat that again.**
22  Q   Okay. The Department of Corporations in
23  Exhibit 52 stated that your -- quote, "your written
24  complaint," close quote, open quote, "was received in
25  our office on January 9, 2013," close quote.

Page 108

1       And you sent that to the Department of
2   Corporations by certified mail, correct?
3   **A   Not that, no.**
4   Q   Just by --
5   **A   Just by regular standard mail.**
6   Q   Okay. So that means you would have sent it
7   sometime within the couple of days prior to
8   January 9th, correct?
9   **A   As a matter of fact, that might have been**
10  **faxed to them. They just had to have a handwritten**
11  **copy of it but faxed.**
12  Q   Okay. Did you then fax it on January 9th,
13  2013, the date that they say they received it?
14  **A   I don't know if it was that date, but that's**
15  **the date they got back to me, but I sent everything**
16  **out at one time.**
17  Q   This is part of Exhibit 51. So you are not
18  sure you sent the written complaint along with your
19  package to Cash Yes when you faxed it and mailed it on
20  January 8th, 2013, correct?
21  **A   I believe I notified them with this packet,**
22  **but I can't remember if I sent it with or without.**
23  Q   Okay. Now, I notice also that on the first
24  page of Exhibit 54, which is that fax cover page, you
25  did not fax this to anybody else except Cash Yes/Cash

Page 109

1   Jar, correct?
2   **A   Correct.**
3   Q   Okay. Did you fax this package separately
4   to anybody else?
5   **A   I -- well, this is all the stuff that I -- I**
6   **found for, you know, the initial part. This is all**
7   **just started then, so this is just the material that I**
8   **had found for my complaint for the California**
9   **Department of Corporations.**
10  Q   You mean from your online research?
11  **A   Right, when I was looking for their phone**
12  **number.**
13      MR. WILENS: Sean, the question was did you
14  fax it to anyone else. Yes, no, or I don't remember.
15      THE WITNESS: Okay. I don't remember.
16  BY MR. PUTTERMAN:
17  Q   Pick A, B or C.
18      Okay. Returning again to page Gilbert 046
19  in Exhibit 54, you will see in bold, all caps, almost
20  down near the bottom of the page, it says, quote,
21  "CALIFORNIA DESIST AND REFRAIN ORDER," close quote,
22  and then you give an Internet link, correct?
23  **A   Correct.**
24  Q   Okay. And does this refer to a cease and
25  desist order you found concerning Cash Yes or Cash Jar

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 110

1   online?
2      A   Yes. Yes.
3      Q   This was part of your research?
4      A   Yes.
5      Q   And you actually first obtained this then
6   from your own online research, not the California
7   Department of Corporations?
8      A   I don't recall.
9      Q   Well, since your complaint was first
10  received by them on January 9th and this is
11  January 8th, would that be a fair assumption?
12     A   Yes.
13         MR. WILENS: This is from the California
14  Department of Corporations.
15         MR. PUTTERMAN: Posted on the Web.
16         MR. WILENS: Yes, but still from them.
17         MR. PUTTERMAN: Let me revise my question.
18     Q   You obtained this from your Internet
19  research, correct, as opposed to having been sent the
20  cease and desist order from -- by somebody from the
21  California Department of Corporations, correct?
22     A   Say that again. Sorry.
23     Q   The reference here to the California desist
24  and refrain order --
25     A   Okay.

---

Page 111

1      Q   -- on Gilbert 046 --
2      A   Right.
3      Q   -- that was one that you located on the Web,
4   right? Correct?
5      A   Correct.
6      Q   On the Department of Corporations website?
7      A   Correct.
8      Q   Okay. Is it correct, then, that you had not
9   been sent a copy directly by the California Department
10  of Corporations at this time?
11     A   That's correct.
12     Q   Okay. And I note in this four-page letter
13  there was no reference to MoneyMutual; is that
14  correct?
15     A   No.
16     Q   Okay. Then on Gilbert 048 through 050, and
17  they're not quite in the correct order, that's the
18  desist and refrain order that you were referring to on
19  Gilbert 046, correct?
20     A   Correct.
21     Q   And this one on Gilbert 049 is dated
22  May 24th, 2010; is that right?
23     A   That's correct.
24     Q   So this one obviously does not pertain
25  specifically to you?

---

Page 112

1      A   Not at all.
2      Q   Okay. So now my question is: Was there a
3   separate desist and refrain order that was issued by
4   the Department of California Corporations that
5   referred specifically to you?
6      A   Yes.
7      Q   And when was that issued?
8      A   I don't know the date.
9      Q   Okay. Do you recall --
10     A   April, May.
11     Q   Of?
12     A   Of 2013.
13     Q   Of 2013. Now, let me ask you this: Was
14  that a desist and refrain order in this form that
15  appears on Gilbert 48 through 50, or was the order in
16  another form and specifically addressed to Cash Yes
17  and in words, substance or effect told them simply to
18  cut it out?
19     A   And that they were fined, yeah, but they
20  went in, held the email and all that stuff.
21     Q   Was it in the form then that was on -- in 48
22  through -- Gilbert 48 through 50?
23     A   Yeah. It looked like this, but it had my
24  name and it had my problem, my complaint.
25     Q   Okay.

---

Page 113

1      A   The outcome.
2      Q   Do you have a copy of that document?
3      A   I do.
4      Q   Okay. Is there some reason why it was not
5   produced here?
6      A   I produced --
7          MR. WILENS: It's the one he is talking
8   about all the time.
9          THE WITNESS: I produced it.
10         MR. WILENS: It's the one that he says is on
11  his desk, on a folder, which he says he's produced
12  from day one.
13         MR. PUTTERMAN: To you.
14         MR. WILENS: Maybe it's my fault. I haven't
15  been able to locate it. I've gotten tons of papers
16  from --
17  BY MR. PUTTERMAN:
18     Q   This is a different thing than the customer
19  complaint because --
20     A   No, this is a complaint that was handwritten
21  to the California Department of Corporations --
22     Q   Correct. That was one thing.
23     A   -- but this is a legal order by the state
24  that was then resent to me months later saying that
25  they have been -- they didn't respond, they have these

---

The Souza Group
(800) 230-3376

## Page 114

1  amount of fines, blah, blah, blah, but the whole thing
2  was because they had to have -- she was real intent on
3  MoneyMutual within Cash Yes.
4        MR. WILENS: Can I ask him a question?
5        MR. PUTTERMAN: Go ahead.
6        MR. WILENS: Have you ever seen that order
7  pertaining to you personally on the Internet,
8  published like that one?
9        THE WITNESS: Well, no. I never looked
10 because it came in certified mail to me.
11       MR. WILENS: Well, you have -- but I am sure
12 you would have looked up all the things you could
13 find. So this is like an order for your particular
14 dispute. It wasn't a general order for all California
15 residents?
16       THE WITNESS: No. This is -- what do you
17 mean? I don't understand.
18       MR. WILENS: Okay. The thing you got about
19 Cash Jar --
20       THE WITNESS: This is to show them that you
21 guys can't do this to me, you know, that this is not
22 fair.
23 BY MR. PUTTERMAN:
24    Q   When you say "this," you are referring
25 now --

## Page 115

1    A   To the old desist -- the old --
2    Q   The 2010 --
3    A   Right.
4    Q   -- desist and refrain order?
5        THE VIDEOGRAPHER: One at a time.
6        MR. WILENS: Mr. Gilbert, the 2010 order was
7  not particular to any one person. It was issued by
8  the Department of Corporations on behalf of all the
9  California residents against this company Cash Jar.
10       Do you think that what you saw was similar
11 to that, or was it just about you personally and the
12 loan that was made to you personally?
13       THE WITNESS: I don't know the details of
14 it, like that specific.
15       MR. WILENS: I will tell you that there is
16 nothing published on the Internet like that one. The
17 2010 is published on the Internet. You found it.
18 There is another one in 2014 published on the Internet
19 about Cash Yes, but that's not particular to you;
20 okay?
21       THE WITNESS: Correct.
22       MR. WILENS: So I am thinking maybe you got
23 a personal order pertaining to your personal dispute.
24       THE WITNESS: That could be a possibility
25 because it had my name on it.

## Page 116

1        MR. WILENS: All right.
2  BY MR. PUTTERMAN:
3    Q   When you say it had your name on it, did it
4  have your name on it as somebody that it was being
5  served on or did it have -- for example, if you look
6  at Gilbert 048, did it have something on the first
7  page like this which specifically referred, however,
8  to you, or was it simply addressed to you?
9    A   No. It was -- it had my name and the
10 address and as well as in the order.
11   Q   The order itself specifically referred to
12 you?
13   A   Correct.
14   Q   Okay. And you believe you have that at
15 home?
16   A   Yes.
17   Q   Okay. Well, is there some reason that that
18 was not produced here?
19   A   I don't know. I produced it. That was like
20 the biggest thing in this whole thing when I got it.
21 was I gave -- I faxed it immediately or sent an email.
22   Q   To Mr. Wilens?
23   A   Correct. It made it sound like there was a
24 law that had just been passed in my name, is how that
25 sounded.

## Page 117

1    Q   Okay. And when you got that, to whom did
2  you send it besides Mr. Wilens?
3    A   That's it.
4    Q   You didn't send it to Cash Yes?
5    A   It was out of my hands at that point. I
6  left everything for him to take care of.
7    Q   You didn't send it to MoneyMutual?
8    A   No.
9    Q   Okay. Did that order mention MoneyMutual?
10   A   I don't recall.
11   Q   Okay. But you can lay your hands on that at
12 home?
13   A   I have the document. I just haven't read it
14 in a while. It's been a few years.
15   Q   Okay. Now, the last page of this exhibit,
16 of Exhibit 54, is a copy of -- what appears to be
17 another copy of the same envelope we looked at
18 earlier. And you see the postmark was January 8th,
19 2013, and then it shows return to sender on
20 January 12th, 2013, and you sent it to Columbia,
21 Tennessee, correct?
22   A   Correct.
23   Q   Okay. And is that -- is Exhibit 54 then the
24 package than went -- that you mailed out to Cash Yes
25 and Cash Jar in Columbia, Tennessee on January 8th,

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 118

1  2013?
2      **A   Yes and no.  I sent two.  This one went**
3  **first.**
4      Q   "This one" being what?
5      **A   The one -- Exhibit 51, the one we're talking**
6  **about.**
7      Q   Okay.
8      **A   Right?**
9      Q   Okay.
10     **A   And then I found out the address from a**
11  **different source that had the Belize address, is why**
12  **the letter is addressed to Belize.**
13     Q   Well, wait a minute, though.  The
14  envelope -- these appear to be the same envelopes.  If
15  you look at Gilbert 031 and Gilbert 051, that appears
16  to be the same envelope.
17     **A   Do I have 31?**
18         THE VIDEOGRAPHER: Don't take that apart.
19  BY MR. PUTTERMAN:
20     Q   Yes.  It's Exhibit 51.
21     **A   Okay.**
22     Q   See the envelope?
23     **A   I do.**
24     Q   Look at the envelope that's Gilbert --
25  Gilbert 51 but it's part of Exhibit 54.  It's the last

---

Page 119

1  page of Exhibit 54.
2      **A   Okay.  Gotcha.**
3      Q   Those are photocopies of the same envelope?
4      **A   Correct.**
5      Q   Okay.  Do you have any other information
6  addressed to anybody in which you sent either
7  Exhibit 54 or the cease and desist order which you are
8  stating you received -- that specifically concerned
9  you and you received from the Department of
10  Corporations sometime in the spring of 2013?
11     **A   2014 is when I received that.**
12     Q   Oh, okay.  It was not till 2014?
13     **A   Right, because I hadn't even done any of**
14  **this until January of 2013.**
15     Q   Right.
16     **A   So it was 2013 of -- okay.  Of May or April**
17  **of 2013.**
18     Q   That's what I was referring to.  Do you have
19  any copies of any other envelopes in which you sent
20  that order out to anybody?
21     **A   No.**
22     Q   That's because you already had counsel and
23  you left it with Mr. Wilens?
24     **A   Correct.**
25     Q   Okay.

---

Page 120

1      MR. WILENS: Just give me a moment here.
2      Well, I think I have an explanation maybe.
3  It's a document you already have, cease and desist
4  order against Cash Yes issued March of 2014.
5      If you look at the fax laid out there, the
6  fax, they seem to match up with Mr. Gilbert's case
7  without mentioning him by name.  Possible they sent
8  him a letter saying, you know, this is what we issued,
9  but they don't mention his name in the actual order
10  itself.
11     MR. PUTTERMAN: This was something you
12  previously produced to us in another context?
13     MR. WILENS: I think it was probably
14  produced.
15     MR. PUTTERMAN: In Pham?
16     MR. WILENS: Well, numerous times.  It was
17  attached to motions and things.  I think it was
18  attached to the complaint.  You have it.  March 28th,
19  2014 cease and desist order.
20     MR. PUTTERMAN: I don't recall it, but there
21  is something tickling me in the back of my mind that I
22  may have seen it.
23     MR. WILENS: Sophia Kim's name is on it and
24  it says that an email was sent by First Novus on
25  November 5th of 2013 to the California resident, and

---

Page 121

1  one of these documents is an email, November 5th.
2      MR. PUTTERMAN: I know from the documents
3  here that Mr. Gilbert was informed by Cash Yes that
4  the loan had been sold to First Novus.
5      MR. WILENS: There is an email from First
6  Novus dated November 5th.  Well, in this court -- in
7  this ruling or order it refers to an email sent to the
8  California resident who it doesn't actually name.
9      MR. PUTTERMAN: And who is the desist and
10  refrain order or cease and desist order directed at?
11     MR. WILENS: It's directed at Cash Yes.
12     MR. PUTTERMAN: Okay.  And it's dated when?
13     MR. WILENS: March -- what did I just say?
14  March 2014.
15     MR. PUTTERMAN: Okay.  So this is
16  March 2014, the one that Mr. Wilens is referring to.
17     MR. WILENS: Why don't we print this out so
18  you can have it.
19     MR. PUTTERMAN: I think that's a good idea.
20  Do you want to take that out to the --
21     MR. WILENS: Let me take it out there.
22     MR. PUTTERMAN: No.  Take the computer out
23  to the reception desk and see if you can print it out.
24     MR. WILENS: Well, if you have a --
25     MR. PUTTERMAN: That's the best way to do

---

Page 122

1  it.
2      MR. WILENS: I believe I can email it to
3  them and they can print it.
4      MR. PUTTERMAN: Why don't we take a short
5  break while Mr. Wilens tries to get this figured out.
6      MR. WILENS: Although if you have the entire
7  file, I'm sure you have --
8      MR. PUTTERMAN: I don't.
9      THE VIDEOGRAPHER: We are going off the
10 record.  The time on the video screen is 1300 hours
11 and 26 minutes.
12      (Recess taken, 1:26 to 1:41 p.m.)
13      THE VIDEOGRAPHER: We are back on the
14 record.  The time on the video screen is 1300 hours
15 and 41 minutes.
16      MR. PUTTERMAN: I am going to ask the
17 reporter to mark now as Exhibit 55 a document that
18 Mr. Wilens has been kind enough to have printed up
19 from the files that he has on his laptop.  It is,
20 quote, an "Order Voiding Transactions Pursuant to
21 California Financial Code Section 23060; and Citations
22 Pursuant to California Financial Code Section 23058."
23 And it's from -- it's before the Department of
24 Business Oversight of the State of California.
25

Page 123

1      (Document referred to herein marked for
2       identification Exhibit No. 55)
3      (Witness reviews document.)
4  BY MR. PUTTERMAN:
5      Q   Mr. Gilbert, do you recognize what's been
6  marked as Exhibit 55?
7      A   Yes.
8      Q   Is this the document to which you were
9  referring when you said you had received a -- an order
10 from the Department of Corporations to Cash Yes
11 pertaining to your particular case?
12     A   I believe so, yes.
13     Q   Okay.  And I see that one of the counsel
14 listed at the top with the Department of Corporations
15 is Sophia Kim.  See that?
16     A   Yes.
17     Q   That's the person with whom you were dealing
18 at the Department of Corporations, right?
19     A   Correct.
20     Q   Okay.  Now, let me ask you a couple things
21 about this.  First of all, paragraph 4 on page 2,
22 would you look at that, please.
23     A   Okay.
24     Q   Now, that refers to another desist and
25 refrain order apparently issued by the Commissioner of

Page 124

1  Business Oversight or Commissioner of Corporations,
2  whichever in effect -- was in effect at the time.  The
3  order was issued February 4th, 2013 to Cash Yes and
4  Hong Kong Partners d/b/a Cash Yes.
5      Do you see that?
6      A   Yes.
7      Q   Now, did you ever receive a copy of that
8  order from the Department of Corporations or
9  Department of Business Oversight?
10     A   I don't recall the letters that I got.  I
11 don't recall.
12     Q   Okay.  So you don't recall one way or
13 another whether you ever saw that desist and refrain
14 order?
15     A   Correct.
16     Q   Okay.  But then you did receive this one
17 dated March 28th, 2014, correct?
18     A   I don't know the exact date off the top of
19 my head, but this looks pretty close.  There was
20 another page that she sent me that had my name on it.
21     Q   Okay.  Would it have been the last page?
22     MR. WILENS: That had his name on it.
23     MR. PUTTERMAN: I know.  I don't mean -- I'm
24 sorry.
25     Q   I don't mean the last page of the exhibit.

Page 125

1  Would that have been the last page of whatever you
2  received?
3      A   I don't remember.
4      Q   Okay.  Because it sounds like a service
5  list.
6      MR. WILENS: No, it sounds like an address
7  for a letter.  I mean, it would probably be the first
8  page, I imagine.
9      MR. PUTTERMAN: Who knows.
10     Q   Now, I do have another question here and
11 that is in paragraph 6, paragraph 6 states -- does not
12 refer to -- this does not refer to the loan you
13 obtained from Cash Yes in November of 2012.
14      On paragraph 6 it states, quote:
15      "Yet, beginning in or around July 2013,
16      Cash Yes originated a deferred deposit
17      transaction with at least one California
18      resident who submitted a loan
19      application on the internet."
20     MR. WILENS: Well, I'm going to object as
21 speculative who the author of this order was referring
22 to.
23     MR. PUTTERMAN: Jeff, I am just reading from
24 the order.  That's all.
25     MR. WILENS: It said "beginning in or

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1  around," so --
2       MR. PUTTERMAN: I see what it says.
3       MR. WILENS: It doesn't mean July.
4       MR. PUTTERMAN: Jeff, I see what it says.  I
5  am just reading it.
6       MR. WILENS: Why are you asking him?
7       MR. PUTTERMAN: I haven't asked him anything
8  yet.
9       MR. WILENS: Your question would call for
10  speculation.
11       MR. PUTTERMAN: There is no question yet.
12       MR. WILENS: You asked a question.
13       MR. PUTTERMAN: I haven't asked a question.
14  I was in the middle of reading this when you
15  interrupted.
16       MR. WILENS: Only ask questions.  Don't read
17  things.
18       MR. PUTTERMAN: Jeff --
19       MR. WILENS: I thought it was a question.
20       MR. PUTTERMAN: No, no question.
21   Q   It says, quote:
22       "Yet, beginning in or around July 2013,
23       Cash Yes originated a deferred deposit
24       transaction with least one California
25       resident who submitted a loan

1       application on the internet.  In or
2       around July 2013, Cash Yes
3       electronically deposited approximately
4       $700 into the California resident's bank
5       account," period, close quote.
6       Do you see that?
7   A   Yes.
8   Q   Now, the loan we were talking about earlier
9  was November 2012; is that right?
10   A   Yes.
11   Q   Okay.  Is this different loan that you
12  obtained from Cash Yes in or around July 2013?
13       MR. WILENS: I'm going to object.  Are you
14  asking him if he got a loan or is this referring to a
15  loan he got?
16  BY MR. PUTTERMAN:
17   Q   I will ask you specifically.  Did you get
18  another loan from Cash Yes in or around July 2013?
19   A   No.
20   Q   Okay.  So this date in this order is just
21  wrong?
22       MR. WILENS: Objection.  Calls for
23  speculation as to what it's referring to, him or some
24  other person.
25

1  BY MR. PUTTERMAN:
2   Q   Well, okay.  Let's go on.
3       In paragraph -- it says, quote:
4       "In or around July 2013, Cash Yes
5       electronically deposited approximately
6       $700 into the California resident's bank
7       account.  Between July 2013 and
8       October 2013, Cash Yes electronically
9       debited interest and fees from the
10       California resident's bank account on a
11       bi-monthly basis, withdrawing a total of
12       approximately $1580," period, close
13       quote.
14       Was Cash Yes debiting money from your bank
15  account between July 2013 and October 2013?
16   A   No.
17   Q   Okay.  So this could not be referring to
18  your loan with Cash Yes, correct?
19       MR. WILENS: As phrased it's vague, but it
20  certainly doesn't match the facts as he knows it.
21       MR. PUTTERMAN: That's what I am asking, so
22  why don't you let him testify instead of you.
23       MR. WILENS: Because you asked him if it was
24  referring to his loan and that would require him to
25  guess.

1       MR. PUTTERMAN: The operative phrase is I
2  asked him, not you.
3       MR. WILENS: Your question calls for him to
4  speculate.
5       You are instructed not to speculate about
6  what it refers to.
7  BY MR. PUTTERMAN:
8   Q   Does this appear to refer to any loan that
9  you took from Cash Yes?
10   A   Yeah, I don't know.  I think they got the
11  dates wrong.
12       MR. PUTTERMAN: I am going to ask the
13  reporter to mark as Exhibit 56 -- and please keep the
14  order in front of you, Exhibit 55 -- four pages --
15  excuse me -- five -- six pages produced by Mr. Wilens
16  this morning with the handwritten designations of
17  Gilbert 087 through 092.  Those are my handwritten
18  designations, to be clear.
19       (Document referred to herein marked for
20       identification Exhibit No. 56)
21  BY MR. PUTTERMAN:
22   Q   I am going to direct your attention
23  specifically to pages 090, 091 of Exhibit 56.
24       MR. WILENS: 91?
25       MR. PUTTERMAN: 90, 91.

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 130

1      (Witness reviews document.)
2  **BY MR. PUTTERMAN:**
3    Q   And you see there are two pages that appear
4  to be printouts or screenshots from Cash Yes website?
5    **A   Uh-huh.**
6    Q   Okay.  Did you make these screenshots or
7  print out these Web pages?
8    **A   I did.**
9    Q   When did you do this?
10   **A   Yesterday.**
11   Q   Oh, okay.  So this does not date back to any
12  of the events in question?
13   **A   No.**
14   Q   What was your purpose in printing this out?
15   **A   To see if Cash Yes was still around, because**
16  **of MaxLend.**
17   Q   Because of what?
18   **A   MaxLend.**
19   Q   What is MaxLend?
20   **A   It's the -- basically Cash Yes.  I had**
21  **gotten -- same company.**
22      MR. WILENS: That's a cryptic answer for
23  you.
24      MR. PUTTERMAN: That is a cryptic answer.
25      MR. WILENS: I know the answer, but I am not

---

Page 131

1  going to speak because it's not my deposition.
2      THE WITNESS: I don't know what to do.
3  **BY MR. PUTTERMAN:**
4    Q   Did you submit an application for a loan
5  through an entity called MaxLend?
6    **A   No.**
7    Q   Okay.  So what caused the Max -- name
8  MaxLend to come to your attention?
9    **A   The fact that I was going through on**
10  **Exhibit 55 --**
11   Q   Uh-huh.
12   **A   -- and it stated that Cash Yes was referred**
13  **to as First Novus or whatever it is.  Right?**
14   Q   Uh-huh.
15   **A   And First Novus -- I remember my attorney**
16  **told me that they were the ones that took over my**
17  **loan, but it had the same phone number as Cash Yes and**
18  **the same -- that's when I clicked on First Novus and**
19  **then the lend button or whatever, and it took me to**
20  **MaxLend, which is the --**
21      MR. WILENS: So sort of Nancy Drew-type
22  investigation.
23      THE WITNESS: I like to stay on top of
24  what's going on.  That is all.
25

---

Page 132

1  **BY MR. PUTTERMAN:**
2    Q   Let's go back to Exhibit 55, if we may, and
3  take a look on page 4 -- starting on page 4.  You see
4  there is a list of citations --
5    **A   Uh-huh.**
6    Q   -- to violations of the -- of California
7  deferred deposit transaction law?
8    **A   Uh-huh.**
9    Q   Okay.  Now, all of these refer to conduct
10  undertaken by Cash Yes in or around July 2013,
11  correct?
12   **A   Correct.**
13   Q   And your only loan with Cash Yes was taken
14  in November 2012; is that your testimony?
15   **A   That's correct.**
16   Q   And the amounts specified --
17   **A   Uh-huh.**
18   Q   -- on -- in paragraph 6 of Exhibit 55 do not
19  match up with the loan that you took in November 2012,
20  correct?
21   **A   Correct.  But on paragraph 4 it states on**
22  **February 4, 2013, they issued a desist and refrain**
23  **order to Cash Yes for February -- that doesn't make**
24  **any sense.**
25   Q   Right.

---

Page 133

1    **A   That was in regards to my loan.**
2    Q   Which was in --
3    **A   Paragraph 4.  In paragraph 4, right.**
4    Q   Okay.  But when I asked you about this
5  earlier, you don't recall -- you didn't recall whether
6  you had seen a copy of that February 4, 2013 desist
7  and refrain order or not.
8      MR. WILENS: He said this looks familiar but
9  he wasn't sure when he got this.  So this is obviously
10  not necessarily referring to Exhibit 55 but this being
11  the other cease and desist order.
12      MR. PUTTERMAN: Do you realize that that
13  will make no sense on the record, what you just said?
14      MR. WILENS: The problem is that you are
15  showing a man a document and you are saying is this
16  the cease and desist order, but there is two of them.
17      So how is he supposed to know one from the
18  other?
19      MR. PUTTERMAN: Well, we could start with
20  the fact that they're two different documents.
21      MR. WILENS: But we don't have the other one
22  to compare it.  It may look identical to this except
23  for the date.
24      MR. PUTTERMAN: Yes, except for the fact
25  that he's testified that this is the one he was

---

Page 134

1  testifying about earlier, that he said he had received
2  from the Department of Corporations and that pertained
3  to his case.
4          MR. WILENS: He may have received it, but
5  this document --
6          MR. PUTTERMAN: Let's see if we can clarify
7  it with him.
8          THE WITNESS: So this is on February --
9  February 2013 order, paragraph 4.
10  BY MR. PUTTERMAN:
11  Q   Correct.
12  A   Okay. Then it goes in to reference on
13  paragraph 6 about July 2013.
14  Q   Correct.
15  A   So that's somebody else's unfortunate that
16  they're talking about.
17  Q   That's exactly what I am trying to establish
18  here with you. So this order --
19  A   There is two orders.
20  Q   Right. So this order does not pertain to
21  your circumstance, correct?
22  A   It does in paragraph 4.
23  Q   Paragraph 4 -- leaving aside paragraph 4,
24  the citations here that appear on page 4 do not refer
25  to your loan, correct?

Page 135

1  A   Citation F.
2          MR. WILENS: Refers to the earlier one.
3          MR. PUTTERMAN: It says in violation of the
4  February 2013 order; okay?
5  Q   My point is this: The citations here
6  pertain to another Cash Yes customer, correct? The
7  loan that's referenced here.
8  A   Correct.
9  Q   Okay. That's what I wanted to know.
10  A   Correct.
11  Q   Okay. Now, are you now saying that you did
12  receive an earlier order from the Department of
13  Corporations or the Department of Business Oversight,
14  whatever it was called at the time, in approximately
15  February of 2013 which pertained to your case?
16  A   I am. That's what I am saying.
17  Q   Okay. Where is that order?
18  A   Should have been produced, but I have it.
19  That's the one I have been talking about. So I have
20  that document.
21          MR. WILENS: That one is not on the Internet
22  anywhere, the February 2013 one, so I don't have it;
23  but if he did produce it, it's lost in a sea of
24  documents somewhere.
25

Page 136

1  BY MR. PUTTERMAN:
2  Q   But you still have a copy of that?
3  A   I still have it.
4  Q   Okay. So that's somewhere in the pile along
5  with the complaint you made to the --
6  A   It's not in a pile. I know where it's at.
7  Q   A file, a pile.
8  A   It's on top of my desk. My desk is half the
9  size of this.
10  Q   That's a pretty good size.
11  A   Well, got a lot of writing to do.
12  Q   Apparently. All right. So that has to be
13  produced to us, correct?
14  A   I should --
15          MR. WILENS: Are you -- is that a question
16  or --
17          MR. PUTTERMAN: That still remains to be
18  produced to us.
19          MR. WILENS: Yes. If the document exists,
20  we'll produce it.
21          THE WITNESS: Absolutely.
22  BY MR. PUTTERMAN:
23  Q   All right. Now, the February 2013 order,
24  did you send that out to anybody?
25  A   No. Just my attorney.

Page 137

1  Q   So you just gave that to Mr. Wilens and that
2  was the end of that as far as you were concerned?
3  A   Right.
4  Q   Okay. Did that order mention MoneyMutual
5  anywhere?
6  A   I want to say yes, but I can't be sure right
7  off the top of my head.
8  Q   So we need to see the order.
9  A   Yeah.
10  Q   Okay.
11  A   In fact, I think it does. It says that the
12  respondent had received a loan through MoneyMutual, so
13  yes, it does say it in there.
14  Q   Is that all --
15  A   That's based upon my testimony.
16  Q   Is that all it said in -- about MoneyMutual
17  in that order?
18  A   I don't -- it could have said more, other
19  people involved. I'm not sure.
20  Q   Okay. So we need to see that order.
21          Now, before -- is it before this
22  January 8th/January 9th activity that we see through
23  several documents that you called MoneyMutual for
24  contact information for Cash Yes?
25  A   No. It was before. It was January, right

Page 138

1  in there, in the beginning of January.
2  Q   Okay.  So that's what I am asking.
3      Did you call MoneyMutual to get -- and you
4  got the phone number before this activity that
5  occurred January 8th/January 9th, correct?
6  A   Correct.
7  Q   2013.  Okay.
8      I am next going to mark as Exhibit 57 --
9      Is that correct, Karen?
10     THE REPORTER:  Uh-huh.  Yes.
11     MR. PUTTERMAN:  So Exhibit -- that was what?
12  That was Exhibit 55.
13     THE WITNESS:  This says 57.
14     THE REPORTER:  Right, because that's the
15  number that we're on.
16     MR. PUTTERMAN:  We marked that one already.
17  Exhibit 57 is Gilbert 001 through Gilbert
18  014.
19     (Document referred to herein marked for
20  identification Exhibit No. 57)
21  BY MR. PUTTERMAN:
22  Q   Have you previously seen a copy of this
23  document?
24     (Witness reviews document.)
25  A   No.

Page 139

1  Q   Do you recognize this as the loan agreement
2  that you executed over -- using the computer with Cash
3  Yes?
4  A   Maybe it's not in the same format, but it
5  doesn't look like the same packet at all.
6  Q   Okay.  Go to Gilbert 014.
7  A   Page 014?
8  Q   Yes, Gilbert 014.  Do you see where it says
9  "Borrower Name: sean gilbert"?
10  A   Yes.
11  Q   Do you recall signing your name by typing
12  it, typing your name on a form on the computer in
13  connection with getting the Cash Yes loan?
14  A   Yes.
15  Q   Is this -- do you recall that this appears
16  to be a copy of that?
17  A   Yeah.  This whole looks different, though.
18  It's not even close.
19  Q   Not even close how?
20  A   Just the format, the way this is --
21  annual percent, all that, doesn't look the same as the
22  one I have, the original one.
23  Q   Okay.  Do you have the original one?
24  A   I produced it.
25  Q   You mean you produced it to your counsel.

Page 140

1  A   Well, yeah.  I mean, I didn't bring anything
2  with me, but --
3      MR. PUTTERMAN:  Counsel, we need a copy
4  of -- a copy of the loan agreement that Mr. Gilbert
5  presumably printed out and retained for his own
6  records.
7      MR. WILENS:  If that's the loan agreement.
8  It does -- the email version looks -- is a slightly
9  different format, but we didn't produce every version
10  of the same document.
11     MR. PUTTERMAN:  But here's the problem.  He
12  says he doesn't recognize this, okay, which makes it
13  more difficult for me to ask him questions about what
14  he remembers or doesn't, because if he doesn't
15  remember it looking like this and he remembers it
16  being in another format, we need to have that one to
17  question him about.
18     MR. WILENS:  It's on the screen when he is
19  looking at it with his eyeballs.  That's the problem.
20  BY MR. PUTTERMAN:
21  Q   Did you print it out, the original loan
22  agreement?
23  A   Yes.
24  Q   Okay.
25     MR. WILENS:  You can't print the loan

Page 141

1  agreement out.  It's on the screen.  All you can do is
2  make a -- is print the pdf they send you later.
3  BY MR. PUTTERMAN:
4  Q   Which did you print out?
5  A   I don't know.  I got a loan document.
6  That's what I have.  I don't know which version it is.
7  Q   They sent you a loan document?
8  A   Yes.
9  Q   Okay.  That presumably is what Mr. Wilens is
10  referring to when he says a pdf.  That was by email?
11  A   Yes.
12     MR. PUTTERMAN:  Okay.  Jeff, is it your
13  understanding that this is identical to one that was
14  emailed to Mr. Gilbert?
15     MR. WILENS:  It is identical in contents.
16     MR. PUTTERMAN:  Okay.  Then let's see how
17  far we can go with this one.
18  Q   Mr. Gilbert, when you got the emailed copy
19  of the loan agreement from Cash Yes, did you review
20  it?
21  A   Yes.
22  Q   Okay.  Did you read the whole thing?
23  A   I understood it.
24  Q   Okay.  Let's look at page -- at Gilbert 001
25  of Exhibit 57.  The very first paragraph, do you see

---

Page 142

1  that it refers to Cash Yes as, quote, "a lender duly
2  licensed and registered under the International
3  Financial Services Commission Act of Belize,
4  Chapter 272," period, close quote?
5      Do you see that?
6  A  Yep.
7  Q  Did you know what Belize was?
8  A  No.
9  Q  You had never heard of Belize?
10  A  No.
11  Q  Okay.  Did you -- were you curious as to
12  what Belize was?
13  A  I had no reason to, no.
14  Q  Okay.  Let's go to the next page.
15      Do you see the paragraph entitled, quote,
16  "Right to Rescind"?
17  A  I do.
18  Q  Do you see that that paragraph includes a
19  fax number?
20  A  Yes.
21  Q  And it includes an email address?
22  A  Correct.
23  Q  Okay.  Now, when did you receive the emailed
24  copy of this loan agreement from Cash Yes?
25  A  I don't remember the -- when I signed it, I

---

Page 143

1  think they just sent me a copy of it back.
2  Q  Promptly?
3  A  I wouldn't say promptly.  I'm not sure.  The
4  money might have to hit the account first, then they
5  sent it to me.
6  Q  Okay.  But within a few days or a week?
7  A  Something like that, yeah.
8  Q  Okay.  And that's when you read it?
9  A  I read it online first.
10  Q  Okay.  And you read it completely online?
11  A  Yeah.  I was at work.
12  Q  Okay.  And then you also looked at it when
13  it came to make sure the contents were the same?
14  A  No.  I just took it for granted.
15  Q  All right.  But you see that there was a fax
16  number and an email address here, correct?
17  A  Correct.
18  Q  Then why did you have to call MoneyMutual to
19  get contact information for Cash Yes?
20  A  I don't know.
21  Q  Do you have --
22  A  I figured that I would have got ahold of
23  MoneyMutual to find out about Cash Yes.  I was
24  emailing them.  They weren't getting back to me.
25  Q  Okay.  Did you try faxing them before you

---

Page 144

1  called MoneyMutual?
2  A  Faxing them what?
3      (Court reporter interrupts for clarity of
4      the record.)
5      THE WITNESS: Before I was emailing them,
6  before I called them, I was emailing Cash Yes with no
7  response.
8  BY MR. PUTTERMAN:
9  Q  Okay.  When you didn't get a response from
10  the email, did you try faxing a note to them asking
11  them to get in touch with you?
12  A  No.
13  Q  Okay.  Why not?
14  A  I don't know.  It wasn't a problem at that
15  point.
16  Q  If you were emailing them, I assume it was
17  that you were --
18  A  I was emailing my situation.
19      MR. WILENS: Hold on, Sean.  Just wait.  Let
20  him finish the question.  You are not required to fax
21  anybody anything.  Don't be defensive.
22      MR. PUTTERMAN: Stop, stop, stop.
23      MR. WILENS: But you are arguing with him
24  and --
25      MR. PUTTERMAN: I am not arguing with him.

---

Page 145

1  I am asking him questions.
2      MR. WILENS: You are arguing and he is
3  responding.
4      MR. PUTTERMAN: Jeff, that's fine.  It's
5  cross-examination, remember?
6      MR. WILENS: But the reporter is going to
7  have a problem.
8      MR. PUTTERMAN: The reporter is not having a
9  problem.  When she has a problem, she'll tell us she
10  is having a problem.
11      MR. WILENS: You just interrupted me and
12  that makes it difficult for the reporter, so please
13  wait for me to finish my statement.  Thank you.
14      MR. PUTTERMAN: You are welcome.
15  Q  Okay.  You were emailing them about your
16  circumstances, correct?
17  A  Correct.
18  Q  And the circumstances being that you were
19  not working because you had a medical problem?
20  A  Correct.
21  Q  Now, when they didn't respond to your
22  emails, did you try faxing them a letter or a note
23  about your circumstances?
24  A  Well, I had gotten a reply back eventually.
25  I don't know the time frame.  The dates.  It was not

---

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1  until I made a stink about it, that they were illegal
2  and they were burning me, that this became a problem.
3  Q   Okay.  And so the fax that we've looked at
4  before that you sent them in January of 2000 --
5  January 8th of 2014, was that the first fax you sent
6  to them?
7  A   I don't know.  That's probably
8  communication, no, on both ends.
9  Q   So there may have been communications before
10 then?
11 A   There were.  I believe so.
12 Q   All right.  And are there any of those that
13 you think you have in your file or pile?
14 A   I produced them actually.
15 Q   To Mr. Wilens?
16 A   Yes.
17 MR. WILENS: Well, I am sorry.  I missed
18 that.
19 MR. PUTTERMAN: Communications that
20 Mr. Gilbert had with Cash Yes prior to January 8th,
21 2015.
22 MR. WILENS: As far as I know, I produced
23 any email he had, and he has his notes, his phone log
24 notes.
25 MR. PUTTERMAN: The one we looked at?

1  MR. WILENS: Yes.
2  THE WITNESS: There are emails that were
3  sent from a Kari Anderson saying that she hopes I was
4  feeling better and that next thing and the other.  I
5  don't know the dates on those, if they were before or
6  after, but the loan was in October.
7  BY MR. PUTTERMAN:
8  Q   November.
9  A   November.  The loan was in November and they
10 started really making a stink in the middle of
11 December by calling my work, making threats, calling
12 my house all hours of night.  That's when I was really
13 pursuing the issue.
14 But before that I was trying to be cordial
15 with them, let them know I had been in the hospital,
16 and that's when Kari Anderson e-mailed me back, told
17 me that she hopes I was feeling better.  I have given
18 that stuff.
19 Q   We will see when we go through these.  I
20 don't recall offhand seeing any emails from Kari
21 Anderson.
22 A   It was from the info and recoveries.
23 MR. WILENS: You have that email.
24 THE WITNESS: I don't know the exact time
25 frame.

1  BY MR. PUTTERMAN:
2  Q   All right.  Getting back to the loan
3  agreement in Exhibit 57, do you see on page Gilbert
4  002 there is a heading called "Prepayment"?
5  A   Yes.
6  Q   And you see in the second line of that
7  paragraph there is a phone number, 1-866-568-1419?
8  A   Yes.
9  Q   Did you try calling them, calling Cash Yes
10 at that phone number?
11 A   That's -- yes.
12 Q   Now, so let me -- so you had the phone
13 number in the loan agreement, correct?
14 A   Appears so.
15 Q   Okay.  Now, does that refresh your
16 recollection at all as to whether you actually did
17 have to call MoneyMutual to get Cash Yes's phone
18 number?
19 A   Yes, because I didn't either have it with me
20 at the time or I didn't look for it or couldn't find
21 it, whatever.  Didn't re-download it.
22 Q   Okay.  So you called MoneyMutual.
23 A   Yes.
24 Q   You explained you needed Cash Yes's phone
25 number.  Correct?

1  A   Sure.  Yes.
2  Q   And they gave you the phone number?
3  A   Yes.
4  Q   But --
5  A   But that's all they would give me.
6  Q   Okay.  But that's basically what you wanted,
7  correct, was the contact information?
8  A   No.  I wanted an address and everything.
9  Q   They gave you the phone number?
10 A   That's all that they would do.  Right.
11 Q   Okay.  And by the way, you see that that
12 number is listed again in boldface further down on
13 that page in the paragraph that says, quote, "If you
14 cannot pay the Total Amount Owed on the Payment Due
15 Date," close quote, "you must contact us"?
16 Do you see that?
17 A   Yeah.
18 Q   And that was your situation, correct?  You
19 couldn't pay the amount due because of your medical
20 and financial circumstances, true?
21 A   Well, before that I -- yeah.  I mean, I
22 contacted them already.  The emails show it.
23 Q   Okay.  Did you -- when you -- if you
24 contacted them -- and you heard back from them in that
25 period of time or --

The Souza Group
(800) 230-3376

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

Page 150

1    **A    Yeah.**
2    Q    -- was that a period of time in which you
3    did not hear back from them by email?
4    **A    So between December and January 3rd --**
5    Q    Uh-huh.
6    **A    -- two weeks of that I was in a coma. I**
7    **didn't hear anything. There was nobody responding.**
8    **Two weeks after that. Except for the phone calls at**
9    **work and the harassing phone calls with no number to**
10   **return call, and they'd come from like a 000-0000**
11   **number on my phone.**
12   Q    Okay.
13   **A    I think at that time I was fired already at**
14   **my job, and I wasn't able to even get this document**
15   **from that forwarding address till later.**
16   Q    Now, which job were you fired from?
17   **A    New Dawn Residential.**
18   Q    That was the treatment facility?
19   **A    Correct.**
20   Q    And did they state why they were firing you?
21   **A    I have a lot of drama.**
22   Q    What do you mean by that?
23   **A    Well, I'd be in running group or something**
24   **like that with the clients and the phone would be**
25   **ringing off the hook, and she'd write messages,**

Page 151

1    **getting all stressed out during an intake, and it**
2    **created a problem.**
3    Q    Okay.
4    **A    So it was --**
5    Q    Now, did they fire you before or after you
6    had the asthma problem develop?
7    **A    After.**
8    Q    They fired you after that?
9    **A    Yeah.**
10   Q    They knew that you were in the hospital?
11   **A    Yes.**
12   Q    Okay. And were they aware -- do you know if
13   they were told that you were in a medically induced
14   coma?
15   **A    My job?**
16   Q    Yeah.
17   **A    Yeah, they knew.**
18   Q    Okay. So did they understand that you were
19   in no position, obviously, to be picking up or
20   returning calls at that point?
21   **A    Correct.**
22   Q    And they still fired you?
23   **A    Correct.**
24   Q    Okay. What was the reason that they
25   actually gave you for firing you?

Page 152

1    **A    They didn't really give me a reason. I just**
2    **was no longer a fit for their program.**
3    Q    So you don't know one way or another what
4    the actual reason was that they fired you, correct?
5    **A    After being talked to three times and a**
6    **minor write-up over phone calls, I figured that's what**
7    **it was.**
8    Q    Okay. But that's not what they told you?
9    **A    They didn't say anything. They just said**
10   **they didn't need me anymore at that time.**
11   Q    Okay. How long had you been away from the
12   job for medical reasons at that point?
13   **A    Two weeks.**
14   Q    Okay. Did you contact a lawyer about having
15   been terminated?
16   **A    I did. I went through the Department of**
17   **Labor and all that.**
18   Q    Okay. What happened?
19   **A    We settled, but it had nothing to do with**
20   **medical. Of course they're not going to admit that.**
21   Q    No, I understand. With a settlement nobody
22   admits anything.
23   **A    Well, they weren't going to admit that, but**
24   **I managed to make that up. So that's not why they**
25   **fired me. They were there at the hospital with me.**

Page 153

1    Q    Right, but my question is this: During the
2    Department of Labor proceedings during which you
3    settled, did they state the reason for which they
4    terminated you?
5    **A    No.**
6    Q    Okay.
7    **A    Well, they tried to say I gave the wrong**
8    **meds to the wrong client, is what it was.**
9    Q    Okay. So that was the stated reason that --
10   **A    That was the stated.**
11   Q    Okay. And they didn't state any other
12   reason?
13   **A    No.**
14   Q    Okay. Would you turn to page Gilbert 009 on
15   Exhibit 57. Do you see in the top boxes on that page
16   it says, "To limit our sharing," and then questions?
17   **A    Yes.**
18   Q    See it gives the same phone number twice?
19   **A    Okay.**
20   Q    Okay. And gives the website, correct?
21   **A    Okay.**
22   Q    Okay. So the point is in the loan agreement
23   itself it had the phone number in a number of places,
24   true?
25   **A    True.**

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 154

1   Q   Okay.  Do you think you just didn't think to
2   look at the loan agreement when you were trying to get
3   in touch with Cash Yes?
4      A   No.  I don't think I had the loan agreement.
5   It was still at work.
6      Q   Ah, okay.  It was on the work computer?
7      A   Well, not on the work computer.  When I
8   printed it up, it was with my folder that was stuck at
9   work.
10     Q   But you had received it by email, correct?
11     A   Correct.
12     Q   Wasn't the email available to you on your
13  home computer?
14     A   Not until after I could get New Dawn's
15  records off of it due to client and HIPAA laws.
16        (Court reporter interrupts for clarity of
17        the record.)
18        THE WITNESS: Emails that weren't pertaining
19  to clients, you know, via HIPAA laws.  So I couldn't
20  have any personal emails being forwarded back to me.
21  BY MR. PUTTERMAN:
22     Q   Okay.
23     A   So I couldn't have a copy of this then.
24     Q   Ah.  So the email to which it was sent was
25  your email at New Dawn?

---

Page 155

1      A   No.  It was my email at home, but because
2   there were records of it on the computer and they
3   seized that due to HIPAA laws make sure I wasn't
4   getting re-forwarded any clients' information with it.
5      Q   They seized your home computer?
6      A   Not the computer.  Just put a block on my
7   email address so I couldn't get forwarding.  Nothing
8   was going back and forth.  You see what I am saying?
9      Q   Nothing going back and forth between your
10  home email and your old New Dawn email?
11     A   Right.
12     Q   Okay.  But my question is this:  When the
13  agreement was emailed to you by Cash Yes, was it
14  emailed to you at your New Dawn email or at your home
15  email?
16     A   At my home email.
17     Q   Okay.  So if it was at your home email --
18  and it may be I'm confused here, so bear with me.  I'm
19  not a techy.
20     A   Okay.
21     Q   If it was mailed to you directly at your
22  home email, why couldn't you retrieve it on your home
23  email?
24     A   Because it was related to New Dawn.  I had
25  information from clients, from New Dawn, transferred,

---

Page 156

1   forwarded to the Comcast.  So therefore I had let them
2   go through every email, made sure that there was no
3   clients' information there.
4      Q   That's what I was trying to ask.
5         In other words, you did not have access to
6   your home email --
7      A   Correct.
8      Q   -- account until New Dawn went through it?
9      A   Correct.
10     Q   Thank you.  That's what I was trying to
11  figure out.  And that's why you needed to call
12  MoneyMutual to get the number?
13     A   Correct.
14     Q   Thank you.
15     A   Not a problem.
16        MR. PUTTERMAN: Why don't we take a
17  five-minute break.  That was tiring.
18        THE VIDEOGRAPHER: This is the end of
19  disc 2.  It has a run time of approximately one hour
20  and 25 minutes.  We are going off the record at 1400
21  hours and 22 minutes.
22        (Recess taken, 2:22 to 2:32 p.m.)
23        THE VIDEOGRAPHER: This begins disc 3 in the
24  video deposition of Sean L. Gilbert on December 1,
25  2015.  The time on the video screen is 1400 hours and

---

Page 157

1   32 minutes.
2         MR. PUTTERMAN: Okay.  Exhibit 58 is Gilbert
3   015 through 019.  It's entitled "Bank" -- quote, "Bank
4   of America," close quote, open quote, "Hold and
5   Transaction History."
6         (Document referred to herein marked for
7         identification Exhibit No. 58)
8         (Witness reviews document.)
9   BY MR. PUTTERMAN:
10     Q   Mr. Gilbert, have you seen this document
11  before?
12     A   Yes.
13     Q   Can you tell us what it is?
14     A   It looks like my bank statement.
15     Q   Okay.  Is it a bank statement or is it a
16  printout from the bank's website showing your
17  transactions over a certain period of time?
18     A   It's actually a printout from the bank.
19  This says for bank use.
20     Q   So you went to the bank and asked them to
21  print it out?
22     A   I did.
23     Q   When did you do that?
24     A   November -- or wait.  I'm not sure what the
25  date was.  4-2010 at any rate.  I am not sure.

---

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 158

1    Q    Well, it says the search period is
2    November 10th, 2012 through February 5th, 2013.
3         Does that refresh your recollection?
4    A    Yeah, that's right.
5    Q    So it was in early February 2013?
6    A    Yes.
7    Q    What prompted you to go to the bank to ask
8    to have this printed out?
9    A    The enormous amount of NSF fees.
10   Q    The ones that are all listed in the
11   right-hand column?
12   A    Right.
13   Q    Okay.  Now, who did the highlighting on
14   these pages?
15   A    I did.
16   Q    Okay.  Why did you highlight the particular
17   entries?
18   A    I believe it was because those were the
19   dates that I was in the hospital and I had to show
20   proof to somebody for something.
21   Q    Was it to the bank to ask them to remove the
22   NSF fees?
23   A    No, I don't believe -- I don't know.  I
24   think it could have even been for the Department of
25   Corporations, but I used one bank statement for a

---

Page 159

1    bunch of different verifications, I guess.
2    Q    Okay.  Did you ever ask the bank to remove
3    some of the NSF fees on the grounds you could not
4    access your account for a period of time because you
5    were in the hospital and for part of that time in a
6    medically induced coma?
7    A    I don't recall.  I think they might have
8    took a couple off, but I had direct deposit, so --
9    Q    Okay.  Let's look at some items here on this
10   page.
11        There is a highlighted entry for
12   December 31st, 2012, and does this show a direct
13   payment to Cash Yes?
14   A    It shows the amount that they were trying to
15   deduct.
16   Q    Okay.  And did they succeed in deducting it?
17   A    I don't know.  Doesn't look like it.
18   Q    But they did -- the bank did assess an
19   NSF/overdraft fee, correct?
20   A    They did.
21   Q    Okay.  Now, the same day, December 31st,
22   2012, there is an entry for Advance America.
23        Do you see that?
24   A    Yeah.
25   Q    Who is that?

---

Page 160

1    A    It's a brick and mortar store.
2    Q    A payday loan brick and mortar store?
3    A    Yes.
4    Q    Does this concern a payday loan that you
5    took from Advance America?
6    A    Yes.
7    Q    Okay.  Did you pay that off completely?
8    A    Yes.
9    Q    And that had nothing to do with MoneyMutual,
10   correct?
11   A    No.
12   Q    Okay.  On December 28th, 2012, there is an
13   entry for Ameriloan.  Do you see that?  A debit?
14   A    Yes.
15   Q    Who is Ameriloan?
16   A    That was an online, VI -- or yeah, online --
17   Q    Online lender?
18   A    Yeah.
19   Q    Payday lender?
20   A    Yes.
21   Q    Okay.  And you had a payday loan from
22   Ameriloan --
23   A    Yeah.
24   Q    -- at that time?
25        When did you get that?

---

Page 161

1    A    That was the VIP Loan Shop.
2         MR. WILENS:  The question was when did you
3    get it.
4         THE WITNESS:  I don't know.  I don't know.
5    It was around the same -- I don't know.  I'm not sure.
6    BY MR. PUTTERMAN:
7    Q    Further down, on December 20th, there are
8    entries for debits for both OPD and VIP Loan Shop.
9         Do you see that?
10   A    Yes.  Oh, yeah.  Okay.
11   Q    Okay.  Those both concern payday loans that
12   you took?
13   A    Yes.
14   Q    Okay.  And you see that there is -- the VIP
15   Loan Shop appears to be different from Ameriloan?
16   A    Yes.
17   Q    Okay.  So those were -- VIP Loan Shop and
18   Ameriloan were two different loans, correct?
19   A    Correct.
20   Q    And neither the OPD loan nor the VIP Loan
21   Shop loan were through MoneyMutual, correct?
22   A    Correct.
23   Q    Okay.  Do you remember any particular
24   representations that were made on the websites through
25   which you obtained those loans that actually stick in

---

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1 your mind?

2   A   **What do you mean?**

3   Q   In other words, you didn't get those through

4 MoneyMutual website?

5   A   Correct.

6   Q   You got them presumably through other

7 websites, correct?

8   A   Correct.

9   Q   Okay. Do you remember anything about --

10 specific about either of the websites you got those

11 through?

12   A   **Just the amount I could get was more than I**

13 **could get it at brick and mortar.**

14   Q   Okay. The brick and mortar amounts were

15 restricted to lower -- brick and mortar stores were

16 restricted to lower amounts?

17   A   Correct.

18   Q   Okay. You don't remember anything else

19 specific about the websites?

20   A   **They all say the same thing. I mean that**

21 **their code of conduct, their -- that was the biggest**

22 **thing. I just didn't want to be harassed, you know.**

23   Q   And the other thing was you needed to get

24 more money than was available through a brick and

25 mortar store?

1   A   **Right.**

2   Q   And then there is another Cash Yes deduction

3 or attempted deduction on December 20th, correct?

4   A   Yes.

5   Q   Okay. Do you know if that one went through

6 or not?

7   A   **It doesn't look like it.**

8   Q   Because of the NSF/overdraft fee?

9   A   Correct.

10   Q   Because the available balance history and

11 statement balance are the same?

12   A   Right.

13   Q   Okay. There is on December 14th an entry

14 for withdrawal from Action PDL.

15      Do you see that?

16   A   Yes.

17   Q   Was that another payday loan?

18   A   Yes.

19   Q   And through whom did you get that payday

20 loan?

21   A   Action.

22   Q   Okay. Is that directly from their website?

23   A   Not sure.

24   Q   But that was online, correct?

25   A   Yes.

1   Q   And then further down there is a

2 withdrawal -- excuse me -- a deposit, I should say,

3 for $250 from SGQ, Ltd.

4      Do you see that?

5   A   Yes.

6   Q   Was that a deposit from a payday lender?

7   A   Yes.

8   Q   Okay. And so that was another payday loan

9 you took out at that time?

10   A   Correct.

11   Q   So you were actually -- either had or were

12 taking out a lot of payday loans during this period

13 because of your -- the fact that you weren't working,

14 correct?

15   A   **Kind of except the problem was they were**

16 **just renewing the loans on these other ones and taking**

17 **out the bare minimum without knowing that I was**

18 **supposed to call them and say I want to pay the whole**

19 **thing.**

20      **You know, I thought that's why I gave them**

21 **my account number, because assuming I was having to**

22 **pay one, rob Peter to pay Paul, you know, pulling out**

23 **one to get the other one.**

24   Q   Got it. Down on December 7th, 2012, there

25 is a reference to a withdrawal by OPD.

1   A   Correct.

2   Q   That was another payday loan, correct?

3   A   **Yeah. It's the same one as the other OPD.**

4   Q   Right. Would you please go to page Gilbert

5 017. Do you see the third entry down is called Net

6 Spend?

7   A   Yes.

8   Q   What is that?

9   A   **It's a prepaid Visa card.**

10   Q   Okay. Further down, on December 6th, there

11 is a -- looks like a deposit from something called

12 dMobi.

13   A   Yeah.

14   Q   What is that?

15   A   **Another payday loan, I guess. That's before**

16 **that. So that's one that had been rolled over.**

17   Q   DMobi. Do you remember the full name?

18   A   **I don't. Mobile -- I don't. Mobility.**

19   Q   Mobility?

20   A   **I think so. Something like that. Payday**

21 **mobility or something.**

22   Q   Okay. And then down on November 30th --

23 excuse me -- November 29th there are a couple of

24 Ameriloan withdrawals. And that was for your

25 Ameriloan --

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1   A   Correct.
2   Q   -- payday loan, correct?
3   A   Correct.
4   Q   And on Gilbert 018 you've got a deposit from
5   OPD on November 28th, 2012, correct?
6   A   Yes.
7   Q   So that's about the time you got your payday
8   loan from OPD, correct?
9   A   That is the payday loan from OPD.
10  Q   Okay.  And on November 27th, 2012 is the
11  deposit from Cash Yes for your Cash Yes payday loan,
12  true?
13  A   True.
14  Q   $425?
15  A   Correct.
16  Q   Okay.  All right.  You can lay that aside.
17      Did you succeed at any point in stopping
18  with the withdrawals from various payday lenders?
19  A   Yes.
20  Q   How did you do that?
21  A   I closed the bank account down.
22  Q   Okay.  And so which loans were still
23  outstanding at the time or at least according to the
24  lender still outstanding at the time you closed the
25  bank account down?

1   A   I think all but like two, and that would be
2   the Advance America one.
3   Q   At the time you -- at the time you closed
4   the bank account down, the loans that were not yet
5   paid in full --
6   A   Yes.
7   Q   -- did you end up paying any of those in
8   full?
9   A   No.
10      MR. PUTTERMAN: Okay.  Exhibit --
11      What's the next one, Karen?
12      THE REPORTER: 59.
13      MR. PUTTERMAN: Exhibit 59 is page Gilbert
14  028.  Excuse me.  Gilbert 026.
15      (Document referred to herein marked for
16      identification Exhibit No. 59)
17  BY MR. PUTTERMAN:
18  Q   Did you receive this email from Cash Yes on
19  or about November 28th, 2012?
20  A   Yes.
21  Q   Okay.  Is this a copy of what you received
22  from Cash Yes at that time?
23  A   Yes.
24      MR. WILENS: What Bates was that?
25      MR. PUTTERMAN: Gilbert 026.

1   Q   Now, did you read this email when you got
2   it?
3   A   Briefly.
4   Q   Okay.  So you didn't really pay that much
5   attention to it, correct?
6   A   No.
7   Q   Okay.  Now, did you also receive any kind of
8   an email notice from MoneyMutual telling you that you
9   had been matched with Cash Yes for a loan?
10  A   I don't recall.
11  Q   Do you recall --
12  A   I recall when I called them, though, they
13  told me it was Cash Yes.
14  Q   When you called them when?
15  A   MoneyMutual, to find out what Cash Yes's
16  phone number was.
17  Q   Ah.
18  A   So that's when they confirmed it was Cash
19  Yes.
20  Q   They confirmed that your loan was with Cash
21  Yes?
22  A   Yes.
23  Q   Okay.  So they did give you a little more
24  information?
25  A   They just said your loan is through Cash

1   Yes, here's the number.
2   Q   Okay.  My question is, though:  After you
3   submitted your information through the MoneyMutual
4   website for a loan --
5   A   Uh-huh.
6   Q   -- okay, who contacted you first about the
7   fact that Cash Yes was prepared to make you a loan?
8   A   It went from the MoneyMutual website right
9   to theirs.
10  Q   Right to the Cash Yes website?
11  A   Correct.
12      MR. PUTTERMAN: Okay.  Exhibit 60 is Gilbert
13  027.
14      (Document referred to herein marked for
15      identification Exhibit No. 60)
16      THE WITNESS: Thank you.
17  BY MR. PUTTERMAN:
18  Q   Did you receive this email from Cash Yes?
19  A   I did.
20  Q   Okay.  Was this the first notice you got
21  from Cash Yes about your loan being delinquent?
22  A   I'm not sure.
23  Q   Well, do you recall anything that you got in
24  writing from Cash Yes earlier than the date here of
25  January 3rd, 2013?

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1    **A**  I got something else, but I don't know what
2  the date is on it.
3    Q  Okay.  Let me ask you this:  If you will go
4  back to Exhibit 53.  Can you find that there?  It's
5  this document here.
6    A  Okay.
7    Q  This is the record you kept of phone calls
8  from Cash Yes.
9    A  Okay.
10    Q  Do you have that in front of you?
11    A  Yes.
12    Q  Okay.  Now, does this indicate that the
13  first date you started at least recording phone calls
14  or emails was from January 8th, 2013?
15    **A**  I think this is for work.  This is where
16  they were calling at work.
17    Q  Okay.  And I note for the January 8th, 2013,
18  you also -- you state, quote:  Received email from
19  Cash Yes.  Cash Yes called me.  Faxed all paperwork.
20  Emailed all paperwork.  Certified mail all documents.
21  Sent paperwork to state of corporations, it looks
22  like.
23    **A**  Uh-huh.
24    Q  Correct?  And received email material?
25    **A**  Marked.  I marked that.

1    Q  Email marked.  Okay.
2    So this confirms that January 8th is when
3  you sent your complaint, your handwritten complaint
4  and any accompanying paperwork to the Department of
5  Corporations, correct?
6    **A**  Correct, as well as all the lenders that I
7  was sending that to.
8    Q  Okay.  None of this was sent to MoneyMutual,
9  correct?
10    **A**  No, I don't believe so.
11    Q  Okay.  January 9th, 2013, somebody called.
12  And did they hang up on you or did you hang up on
13  them?
14    **A**  No.  They -- I called them.  They hung up on
15  me.
16    Q  Cash Yes?
17    A  Yes.
18    Q  Okay.  So prior to this date you had
19  obtained the phone number from MoneyMutual, correct?
20    **A**  Yes.  Got the phone number here on the 3rd.
21    Q  You are referring now to Exhibit 60?
22    A  I am sorry.  Yes, Exhibit 60.
23    Q  Okay.  So my question is this:  You got this
24  on January 3rd.  Had you tried to contact Cash Yes
25  prior to this date?

1    A  I had.
2    Q  Okay.  So you got the phone numbers of Cash
3  Yes on this January 3rd email, Exhibit 60, true?
4    **A**  Well, it's here, but I also got it from
5  MoneyMutual before that.
6    Q  That's what I was asking you.
7    Did you get it from MoneyMutual prior to
8  January 3rd?
9    A  Yes.
10    Q  Okay.  And you tried to use the number you
11  got from MoneyMutual prior to January 3rd?
12    A  I did.
13    Q  Okay.  Okay.  Did you respond to this
14  January 3rd, 2013 email?
15    **A**  I believe so, because -- yes, I did.  I
16  think.  Once again, I can't be sure on the date --
17    Q  Okay.
18    A  -- before or after, but I know I did.
19  That's when I let them know my situation.
20    **MR. PUTTERMAN:**  Let's take a look -- let's
21  mark as Exhibit 61 Gilbert 028 and 029.
22    (Document referred to herein marked for
23  identification Exhibit No. 61)
24    **THE WITNESS:**  Thank you.
25    (Witness reviews document.)

1  **BY MR. PUTTERMAN:**
2    Q  Okay.  And did you have this email exchange
3  with Cash Yes on January 8th, 2013?
4    A  Yes.
5    Q  Okay.  Do you remember it?
6    A  I do.
7    Q  I noticed in there they made an offer of a
8  settlement if you made a payment of $425 within the
9  next 60 business days.
10    Do you see that?
11    A  Yes.
12    Q  Was that settlement offer acceptable to you?
13    A  No.
14    Q  Why not?
15    **A**  Because they were illegal and they caused so
16  much grief. I wasn't willing to play with them at that
17  time.
18    Q  You sent them the email that's at the top of
19  the first page of Exhibit 61, correct?
20    A  Yeah.
21    Q  And the court order that you are referring
22  to there was the 2010 desist and refrain order?
23    A  That is right.
24    Q  Okay.  That was the only court order of
25  which you were aware of at that time?

**Page 174**

1  A  Correct.
2     MR. WILENS: It wasn't a court order, but
3  yeah.
4     MR. PUTTERMAN: Well, not a court order.  It
5  was an order of the Department of Corporations.
6     Q  Okay.  By the time you sent this email, did
7  you know what Belize was?
8     A  By the time I sent this?
9     Q  Yeah.
10    A  I had -- I did then, yes.
11    Q  Okay.  And they also gave you a P.O. box in
12 Belize on the email from them to you, correct?
13    A  Correct.
14    Q  Okay.  So is it correct that this was
15 received after you had faxed your packet to Cash Yes?
16    A  This is in response to letting them know
17 that I was -- I had already filed a complaint or that
18 I was -- I think it was a Sunday, so it didn't go out
19 until Monday is how that worked.  8th and 9th.
20    Q  The packet that was Exhibit -- well, it says
21 January 8th was a Tuesday.
22    A  Okay.  So then it had to -- the 4th -- okay.
23 That's right.
24    Q  Your handwritten log on Exhibit 53 -- so
25 that you sent out everything on January 8th, which

**Page 175**

1  would have been a Tuesday.  So --
2     A  So Monday I put it all together and then --
3     Q  Tuesday sent --
4     A  -- Tuesday sent it out.
5     Q  Since you had faxed it to Cash Yes, you got
6  this email from them in response; is that correct?
7     A  I might have even emailed it too.
8     Q  Okay.  You don't remember?
9     A  I don't -- I was letting them know
10 everything at that point.
11    Q  Well, it says -- actually it says here on
12 Exhibit 53, quote, "Emailed all paperwork," close
13 quote.
14    A  Yeah.  I also sent them copies of it too,
15 then.
16    Q  So this email on Exhibit 61 from Cash Yes to
17 the best of your recollection was from them in
18 response to what you sent them?
19    A  Correct.
20    Q  Exhibit 54?
21    A  Right.
22    MR. PUTTERMAN: Okay.  Now, let's mark as
23 Exhibit 62 Gilbert 030.
24    (Document referred to herein marked for
25    identification Exhibit No. 62)

**Page 176**

1     THE WITNESS: Thank you.
2  BY MR. PUTTERMAN:
3     Q  Okay.  Is this the email you were referring
4  to earlier from somebody named Kari at Cash Yes?
5     A  Yes.
6     Q  Where she says, quote, "I hope you are
7  feeling better," close quote?
8     A  Correct.
9     Q  Okay.  And did you respond to this email?
10    A  Yeah.  I responded with all the rest of
11 these emails right here.  This says Tuesday,
12 January 8th, and this is the day here -- well --
13    Q  Well, on Exhibit 61, the email from Info
14 Cash Yes on January 8th was 1:31 p.m.  However, I
15 don't know which time zone that was.
16    A  And I think I was -- maybe there were two
17 departments, because one is for Info Cash Yes, one is
18 for Recoveries at Cash Yes.
19    Q  Right.  And Kari says on Exhibit 62, quote:
20 "I can only work on the past due payment
21 of $157.50.  I do not have any control
22 of your Extension payments," period,
23 close quote.
24    So you got two different emails from Cash
25 Yes, from two different departments?

**Page 177**

1     A  Correct.
2     Q  Okay.  Let me ask you this:  Did you also
3  complain at some point to the Department of
4  Corporations about Ameriloan?
5     A  Yes.
6     Q  What was your complaint about Ameriloan?
7     A  That they were harassing me and -- due to an
8  unfortunate situation I had no control over.  They
9  were just being butt-heads about it.  Being
10 butt-heads, which really --
11    Q  That's a term of art, right?
12    A  Yeah.  Well, I could have said something
13 else, but I don't know if they have that on that
14 machine.
15    Q  Yes, they do.
16    MR. WILENS: They have every word in the
17 English language.
18    THE WITNESS: Really.
19    MR. PUTTERMAN: Okay.  Exhibit --
20    THE REPORTER: 63.
21    MR. PUTTERMAN: Is Gilbert 040.
22    (Document referred to herein marked for
23    identification Exhibit No. 63)
24    MR. WILENS: Exhibit 61?
25    THE REPORTER: 63.

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

1      MR. PUTTERMAN: What are you missing?

2      MR. WILENS: I didn't scroll down far

3  enough.

4  BY MR. PUTTERMAN:

5      Q   Okay.  Was this another email that you

6  received from the Department of Corporations with a

7  case number assigned to your complaint about

8  Ameriloan?

9      A   Yes.

10     Q   Okay.  And was the Ameriloan ever paid back,

11 the Ameriloan loan ever paid back?

12     A   They squashed the loan.

13     Q   Who do you mean?  Ameriloan?

14     A   Correct.

15     Q   They canceled --

16     A   Sent me a receipt saying it was paid in

17 full.

18     Q   And that was the end of that?

19     A   Correct.

20     MR. PUTTERMAN: Next in order, Karen?

21     THE REPORTER: 64.

22     MR. PUTTERMAN: Exhibit 54 is Gilbert 055,

23 056.

24     THE REPORTER: That's 64.

25     MR. PUTTERMAN: 64.

---

1      (Document referred to herein marked for

2      identification Exhibit No. 64)

3  BY MR. PUTTERMAN:

4      Q   Have you previously seen this document?

5      A   Yes.

6      Q   Can you tell us what it is?

7      A   Bullshit.  Sorry.

8      Q   Well, leaving aside that characterization,

9  can you give us a more specific identification?

10     A   Specifically saying that my loan has been

11 sold to another -- to First Novus.

12     Q   This was -- the email was sent on

13 November 5th, 2013, correct?

14     A   Correct.

15     Q   It was just under a year after you first

16 took out the Cash Yes payday loan, correct?

17     A   Yeah.

18     Q   Okay.  Now, as I understand it from your

19 prior testimony, and of course we haven't seen the

20 document yet, but you believe that the order that we

21 saw referenced in the Department of Business

22 Oversight's order that pertained specifically to the

23 loan of another customer indicated that in early

24 February a desist and refrain order had been issued

25 against Cash Yes, and your recollection is that

---

1  pertained to your Cash Yes loan, correct?

2      A   Yes.

3      Q   Okay.  Was there to your knowledge any

4  response from Cash Yes to either you or the Department

5  of Corporations or Department of Business Oversight

6  following that February 2013 desist and refrain order?

7      A   No.  This was the next thing I heard.

8      Q   Okay.

9      A   Except from the Department of Corporations.

10     Q   Did you communicate at all with the

11 Department of Corporations to find out whether they in

12 fact were going to be able to do anything about your

13 Cash Yes loan?

14     A   No.  The letter I got was saying that they

15 resolved it on their terms as far as with fines or

16 whatever.

17     Q   Okay.  But they didn't say that they had

18 accomplished anything specifically with regard to your

19 loan?

20     A   Not necessarily, no.  I don't think so.

21     Q   Okay.  And at this point you were leaving

22 Mr. Wilens to handle these matters, correct?

23     A   Yes.

24     Q   So you didn't continue to communicate with

25 Cash Yes?

---

1      A   That's correct.

2      Q   Okay.  And did you communicate at all during

3  this period with MoneyMutual?

4      A   No.

5      Q   And you said that you determined that First

6  Novus had the same telephone number as Cash Yes?

7      A   Yes.

8      Q   And how did you determine that?

9      A   Well, look at -- I mean it's right here.  It

10 says contact was First Novus at that number, but then

11 at the bottom it's got the same number.

12     Q   Okay.  Did you try calling First Novus?

13     A   No.

14     Q   Okay.  Now, for how long did you continue to

15 get telephone calls concerning the Cash Yes loan or

16 that -- identifying themselves as being in connection

17 with the First -- with the Cash Yes loan?

18     A   The last thing I got was like an arrest

19 thing or something like that, and I think it was like

20 October of 2014, that had anything to do with Cash

21 Yes.

22     Q   Now, do you know that the thing you got

23 about an arrest pertained to the Cash Yes loan?

24     A   Do I -- what do you mean?

25     Q   Here's my question:  Were there other

---

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

Page 182

1 outstanding payday loans in the autumn of 2014 that
2 you hadn't paid?
3     A   Just the ones that we have been talking
4 about.
5     Q   But there was more than just the Cash Yes
6 loan?
7     A   Right.
8     Q   Okay.  Now, we will look at those in a
9 minute, those arrest statements or whatever they are.
10     Did they specifically refer to the Cash
11 loan?
12     A   That one did, yes.
13     MR. PUTTERMAN: Okay.  Then we will take a
14 look at that in a minute, but first I'd like to mark
15 as Exhibit --
16     Karen?
17     THE REPORTER: 65.
18     MR. PUTTERMAN: 65, Gilbert 058 through 062.
19     (Document referred to herein marked for
20     identification Exhibit No. 65)
21 BY MR. PUTTERMAN:
22     Q   Can you tell us what this is?
23     A   Yeah.  I got an email saying that I had been
24 reapproved for a loan.
25     Q   And this is it?

Page 183

1     A   This is it.  When I clicked on it, it said,
2 "Welcome back."
3     Q   Now, did you actually fill in the
4 information here or was this filled in when you got
5 it?
6     A   It was filled in on, you know, form filler,
7 whatever they got.
8     Q   So did you then actually apply for a loan in
9 response to this?
10     A   No.  I just printed it up to give to my
11 attorney.
12     Q   Okay.  And do you remember when you actually
13 got this?
14     A   Somewhere in the middle of January.  This
15 has a date on it, so --
16     Q   Oh, I see.  Down at the bottom.
17     A   One twenty -- yeah.
18     Q   Is that when you printed it up,
19 January 28th, 2013?
20     A   Correct.
21     Q   Okay.  And did you get any additional emails
22 since that time from MoneyMutual?
23     A   No.
24     Q   So this is -- is this the only one you got
25 after you applied for and obtained the loan from Cash

Page 184

1 Yes?
2     A   I'm sorry?
3     Q   Is this the only follow-up email you got
4 from MoneyMutual after you obtained the Cash Yes loan?
5     A   I am not sure.  I know that there was one
6 that they said, you know, you have been re-approved.
7 So I don't know if it's this one or another one,
8 but --
9     Q   This is the only one you copied and
10 retained?
11     A   This is -- that's it.
12     MR. PUTTERMAN: Okay.  Let's look at this
13 arrest warrant, and this is Gilbert 63 through 65 and
14 this will be Exhibit --
15     THE REPORTER: 66.
16     MR. PUTTERMAN: Not 56.  66.  Okay.
17     (Document referred to herein marked for
18     identification Exhibit No. 66)
19 BY MR. PUTTERMAN:
20     Q   When and how did you get this thing?
21     A   Came in an email.
22     Q   Okay.  I don't see any from or to.  Was
23 there a cover email with it?
24     A   I had to do it -- I think I had to -- yeah,
25 I don't know.  It was in an email, though.

Page 185

1     Q   I'm thinking that this was an attachment to
2 an email.
3     A   Maybe that's what it was.
4     Q   Okay.  Now, how do you know that this had to
5 do with the Cash Yes loan?
6     A   I don't.
7     Q   Okay.
8     A   This is -- I was forwarding anything like
9 this to the attorney.
10     Q   You mean Mr. Wilens?
11     A   Correct.
12     Q   Okay.  So we don't know who originated this
13 thing?
14     A   Correct.
15     Q   Okay.
16     MR. WILENS: Signed by judge something.
17     MR. PUTTERMAN: Yeah.  Well, I have a hunch
18 you might have trouble locating that judge.
19     THE WITNESS: I like the Photoshop.  Pretty
20 crappy.
21 BY MR. PUTTERMAN:
22     Q   Now, take a look on page Gilbert 064.
23     A   Okay.
24     Q   You see that there is -- in a box there it
25 says cashadvancedept5@gmail.com?

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

Page 186

1   A   Yes.
2   Q   You don't have any idea what that's --
3   A   No.
4   Q   Okay.  Do you recall when you actually
5   received this thing?
6   A   I don't, but I still have a copy of it.  I
7   saved a copy of it.
8   Q   With the email?
9   A   Yeah.
10   MR. PUTTERMAN:  Okay.  We need to have that
11   produced.
12   MR. WILENS:  I think you got it.
13   MR. PUTTERMAN:  You do?
14   MR. WILENS:  Yes.
15   MR. PUTTERMAN:  Okay.  And I think that what
16   Mr. Wilens is referring to is what we are going to
17   mark as Exhibit 67, which is pages Gilbert 066 and
18   067.
19       (Document referred to herein marked for
20        identification Exhibit No. 67)
21   BY MR. PUTTERMAN:
22   Q   I am going to assume, and I think I am
23   probably safe in assuming, that what's redacted out at
24   the top is the -- your forwarding email from you to
25   Mr. Wilens, correct?

Page 187

1   A   I don't have a copy, but yeah.  I mean, it's
2   all blacked out.
3   Q   Right.  All right.  Is this the email to
4   which the arrest warrant was attached?
5   A   Could have been.
6   Q   Because I notice it also comes from
7   cashadvancedept5@gmail.com.
8       Do you see that?
9   A   Yes.
10   Q   Now, it's addressed to
11   selenaacarter13@gmail.com.
12       Do you know who that is?
13   A   I don't.
14   Q   But you received this email?
15   A   I did.
16   Q   Okay.  So, for example, this could have been
17   auto forwarded by another Gmail account.
18       But you definitely received it?
19   A   Yeah.
20   Q   Okay.  I am assuming your wife is not Selena
21   Carter.
22   A   No.
23   Q   She's Mrs. Gilbert.
24   A   Ms. Debra Gilbert.
25   Q   Now, this refers to, quote, the legal

Page 188

1   proceedings issued on your docket number EVR-38924
2   with one of Cash Advance Inc. Company.
3       Now, to your knowledge, you never took --
4   obtained a loan from Cash Advance Inc. Company,
5   correct?
6   A   Correct.
7   Q   And this is dated May 22nd, 2015.
8       Okay.  I am going to ask you to go back to
9   Exhibit 50, which is that group of spreadsheets.
10   Yeah, there you go.
11   A   All right.
12   Q   And to page 14, which is the, I believe,
13   second page from the bottom.
14   A   Okay.
15   Q   And you may remember we looked at this.
16   This was that alleged loan agreement with -- or
17   alleged acquisition of a lead by Camel Coin, Inc.  As
18   Mr. Wilens pointed out, it actually was through the
19   website cashadvance.com, and this was back in -- on or
20   about September 29th, 2014.
21       Do you see that?
22   A   Yes.
23   Q   So is it correct that that's just a
24   coincidence that you went through the web -- or that
25   this shows that you as having allegedly applied for a

Page 189

1   loan through a website titled cashadvance.com and that
2   this communication, Exhibit 67, which was accompanied
3   by the so-called arrest warrant, also referred to Cash
4   Advance Inc.?
5       MR. WILENS:  I'm going to object.  That
6   calls for speculation as to what's a coincidence or
7   not.  Cash advance is a generic term.
8       MR. PUTTERMAN:  Well, if you look further
9   down on Exhibit 67, you see where it says "Note."
10   That first page.
11       MR. WILENS:  Note?
12       MR. PUTTERMAN:  Note.  It's like the last
13   paragraph at the end of the first page.
14       MR. WILENS:  Yeah.
15   BY MR. PUTTERMAN:
16   Q   And you see it refers to its parent company
17   and a group of companies called, quote, "Cash Advance
18   Related Companies," close quote.
19       Do you recognize any of the names included
20   in there?
21   A   In regards to -- no.  I mean --
22   Q   And there is actually a text number on the
23   last page and an address for Cash Advance Inc. in
24   Arlington, Virginia.
25       Do you see that?

Page 190

1   **A   Yes.**
2        MR. WILENS: There is no Cash Advance Inc.
3   in Arlington, Virginia.
4        MR. PUTTERMAN: Thank you for testifying.
5   Did you check?
6        MR. WILENS: Well, you can't ask him.
7        MR. PUTTERMAN: No. Dude, I said see where
8   it says that. I didn't ask him if he knows.
9        MR. WILENS: If you bother to read the list,
10  you will see it contains competitors of each --
11        (Court reporter interrupts for clarity of
12        the record.)
13        MR. WILENS: If you bother to read the list,
14  you will see it contains competitors of each other,
15  like Speedy Cash and Cash America International.
16        MR. PUTTERMAN: Yeah, and? Your point is?
17        I am referring to what's in this email;
18  okay? I'm certainly not vouching for the authenticity
19  of any of this.
20        MR. WILENS: He can't either. You are
21  asking him if he knows --
22        MR. PUTTERMAN: No, but that's what I asked
23  him, did he recognize any of the names, and he said
24  no. There was not even a question pending.
25        MR. WILENS: There was one pending.

Page 191

1   BY MR. PUTTERMAN:
2        Q   Okay. Did you ever try to contact this
3   supposed Cash Advance Inc., either at their address in
4   Arlington, Virginia or on this text-only number?
5        A   I don't believe so.
6        Q   Did you just send this on to Mr. Wilens?
7        A   I did.
8        Q   Have you received anything further from this
9   email account, cashadvancedept5@gmail.com?
10       A   Not sure. I haven't looked, but I get them
11  all the time. I don't know if it's from that email,
12  but similar.
13       Q   Okay. Do you have any idea or knowledge
14  concerning from whom this alleged Cash Advance Inc.
15  company obtained your email?
16       A   I have no idea.
17        MR. PUTTERMAN: Okay. Exhibit 69 -- 68 is
18  Gilbert 68 and 69.
19        (Document referred to herein marked for
20        identification Exhibit No. 68)
21        (Witness reviews document.)
22  BY MR. PUTTERMAN:
23       Q   Do you recognize this email from Payday
24  Mobility dated October 24th, 2013?
25       A   No.

Page 192

1        Q   Okay. Did you in fact get it?
2        A   I might have. I just --
3        Q   Don't remember it?
4        A   -- sent it.
5        Q   On to Mr. Wilens?
6        A   Correct.
7        Q   Is Mr. Wilens the equivalent of your
8   circular file?
9        A   I don't know what the right answer is to
10  that. I know what my files are. Just giving him a
11  hard time.
12       Q   Which is exactly what I was doing, was
13  giving him a hard time.
14        MR. WILENS: There is more circular things
15  than a trashcan.
16        MR. PUTTERMAN: I don't think we want to go
17  there. Not on the record. Yeah.
18       Q   You had a payday loan at some point from
19  Payday Mobility?
20       A   Correct.
21       Q   What happened with regard to that?
22       A   Same type of thing. I -- by then I found
23  out that -- you know, what was really going on and the
24  way that all these lenders were being so like pushy
25  and making threats. I just quit paying everybody, I

Page 193

1   refused to, and I couldn't get a bank account anyway.
2   I clicked it, closed down Bank of America, and that
3   was it.
4        Q   What ultimately happened with the Payday
5   Mobility loan?
6        A   It just went away. I sent them the same
7   type of stuff and they just squashed it.
8        Q   They stopped bothering you about it?
9        A   I think so, yeah.
10        MR. PUTTERMAN: Okay. Exhibit 69 is Gilbert
11  07 -- 071 -- excuse me. 070, 071.
12        (Document referred to herein marked for
13        identification Exhibit No. 69)
14  BY MR. PUTTERMAN:
15       Q   This was your loan agreement with OPD
16  Solutions, Inc.?
17       A   Yes.
18       Q   Okay. And you also took this out sometime
19  around -- well, in late November 2012, correct?
20       A   Correct.
21       Q   Which is almost the exact same time, I think
22  within a day of your Cash Yes --
23       A   Correct.
24       Q   -- loan. Okay.
25        And did you repay this loan?

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

1    A    No.

2    Q    Okay.  And why not?

3    A    The same reason.  I mean they were -- nobody
4    would get back to me or they were illegal at that
5    point.  I took this loan to pay Cash Yes.  That way
6    there would be money in the account and --

7    Q    But this was just a day after the Cash Yes
8    loan, correct?

9    A    Right.

10    Q    So you knew the Cash Yes loan would become
11    due before this loan was due?

12    A    Correct.

13    Q    And so you took this to have the OPD loan to
14    have money in the account to pay Cash Yes?

15    A    Correct.

16    Q    Did you use some or all of this OPD loan to
17    pay Cash Yes?

18    A    I believe they are the ones that got it and
19    some NSF fees.  I can't remember that.  There was five
20    or six days I wasn't --

21    Q    In a coma?

22    A    Yeah.  I was out of it, so -- but my wife
23    was dealing with a lot.

24    MR. PUTTERMAN: Okay.  Gilbert 072 will be
25    Exhibit 70.

1    (Document referred to herein marked for
2    identification Exhibit No. 70)

3    BY MR. PUTTERMAN:

4    Q    Did you receive this email on or about
5    January 28th, 2013?

6    A    Yeah.

7    Q    Okay.  And that was because, as you
8    understood it at least, you hadn't paid this loan?

9    A    Correct.

10    Q    Did you complain to the Department of
11    Corporations about either Payday Mobility or OPD?

12    A    Yes.

13    Q    And what happened as a result of those
14    complaints?

15    A    Some couldn't be located or verified as far
16    as certain documents or whatever they needed and then
17    other ones were -- and my response to them.  They
18    were -- they dismissed it or sent me a thing saying it
19    was paid, or it went on my credit report that it was
20    disputed and then it was taken off.

21    Q    Did you get any more or did the department
22    issue any more desist and refrain letters related to
23    any of your loans?

24    A    No.  It was just the Cash Yes one.

25    Q    Did you make any complaints concerning any

1    of these loans or lenders to MoneyMutual?

2    A    No.

3    Q    Okay.  And in fact you hadn't obtained
4    either the Payday Mobility loan or the OPD loan
5    through MoneyMutual, correct?

6    A    I'm sorry?  No, I didn't.

7    Q    And you knew MoneyMutual was not a lender
8    itself, true?

9    A    Correct.

10    Q    Did -- to your knowledge, did MoneyMutual --
11    once Cash Yes got in touch with you and sent you a
12    loan agreement over the Internet and so on, do you
13    know if MoneyMutual was copied on that?

14    A    Copied?

15    Q    In other words, when they emailed you
16    something, did they show a cc line to MoneyMutual?

17    A    I don't know.

18    MR. PUTTERMAN: Okay.  Exhibit 71 is Gilbert
19    073 through 075.

20    (Document referred to herein marked for
21    identification Exhibit No. 71)

22    (Witness reviews document.)

23    BY MR. PUTTERMAN:

24    Q    Did you receive this letter on or about
25    January 18th, 2013 from National Credit Adjusters?

1    A    Yes.

2    Q    Did you review it at the time?

3    A    Vaguely.

4    Q    Okay.  And this refers to the OPD loan,
5    correct?

6    A    Correct.

7    Q    Okay.  Now, was there anything to which you
8    objected which you know was done by National Credit
9    Adjusters?

10    A    What do you mean?

11    Q    In other words, you know you've complained
12    about harassing phone calls and things like that
13    related to some of the loans.

14    A    Correct.

15    Q    Okay.  Did you receive harassing phone calls
16    from National Credit Adjusters?

17    A    I don't -- I don't think so.  I don't
18    recall.

19    Q    Okay.

20    A    I don't think so.

21    Q    In fact, you see on the last page they
22    actually included a scam alert.

23    Do you see that?

24    A    Yeah.

25    Q    Did you read that?

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

---

Page 198

1    A   Yes.
2    Q   Okay.  So did anybody try to call you with a
3  Middle Eastern and/or Indian accent at any point to
4  try and claim that you owed money on a loan?
5    A   Maybe a couple times.
6        I do remember something specific about the
7  OPD and all these other ones is that they were an
8  Indian tribe, so that's why the Department of
9  Corporations couldn't pursue further at that point.
10   Q   Okay.  So that refreshed your recollection
11  in that regard?
12   A   Correct.  Kansas is what did it.
13       MR. WILENS: That's just his recollection,
14  for what it's worth.
15       MR. PUTTERMAN: Yeah.
16   Q   You recall being informed by the Department
17  of Corporations, as to at least some loans, that the
18  loans -- that the lenders were affiliated with Indian
19  tribes and so the Department of Corporations did not
20  have jurisdiction?
21   A   They were were actively pursuing it, but
22  there was nothing they could do at this time.
23   Q   Right at that time?
24   A   But Cash Yes and the other ones are the ones
25  that they could help me out with.

---

Page 199

1        MR. PUTTERMAN: Exhibit 72 is Gilbert 76 and
2  77.
3        (Document referred to herein marked for
4        identification Exhibit No. 72)
5        (Witness reviews document.)
6  BY MR. PUTTERMAN:
7    Q   Okay.  Do you recognize these two pages?
8    A   Yes.
9    Q   These concerned your loan with SGQ
10  Processing, correct?
11   A   Correct.
12   Q   And you took this out on or about
13  December 13th, 2012, correct?
14   A   Correct.
15   Q   What was your purpose in taking out this
16  loan?
17   A   I think we -- I don't recall, but something
18  was going on evidently.
19   Q   Okay.  This loan was for $250, correct?
20   A   Correct.
21   Q   And this loan was not paid in full either,
22  correct?
23   A   I'm not sure.  I don't think so.  I think a
24  payment was made to them, though.
25   Q   Okay.  But it was not paid in full because

---

Page 200

1  at that point -- at some point thereafter you stopped
2  paying all of these loans?
3    A   I know there were a couple that I paid off.
4    Q   Okay.  You are just not sure?
5    A   I am not sure which ones right off the top
6  of my head.
7        MR. PUTTERMAN: Okay.  Exhibit 73 is Gilbert
8  078, 079.
9        (Document referred to herein marked for
10       identification Exhibit No. 73)
11       (Witness reviews document.)
12  BY MR. PUTTERMAN:
13   Q   Okay.  Do these refresh your recollection
14  that the loan from SGQ Processing was also sent for
15  collection?
16   A   Yes.
17   Q   It went to this National Credit Adjusters?
18   A   Yes.
19   Q   Okay.  And you will note that it says on the
20  first line of the second page, quote:
21       "This letter is to inform you that
22       National Credit Adjusters, LLC (NCA) has
23       purchased the above referenced account;
24       we are not collecting for SGQ
25       Processing," period, close quote.

---

Page 201

1        Did you see that when you read the letter?
2    A   Yes.
3    Q   Okay.  Did you understand what that meant?
4    A   Yes.
5    Q   That they were acting on their own?
6        (Court reporter interrupts for clarity of
7        the record.)
8        MR. WILENS: Assuming that they even exist
9  as their own.
10       MR. PUTTERMAN: Yes.
11       MR. WILENS: Go ahead and answer the
12  question.
13       THE WITNESS: Yeah.  I mean I did -- sure.
14  BY MR. PUTTERMAN:
15   Q   Okay.  If you look back on Exhibit 71,
16  National Credit Adjusters made the same statement with
17  regard to the OPD Solutions loan.
18       Do you see that?
19   A   Yes.
20   Q   Okay.  Now, neither of these loans were
21  obtained through MoneyMutual, correct?
22   A   No.
23   Q   No, I am not correct or --
24   A   No, they weren't through MoneyMutual.
25       MR. PUTTERMAN: Exhibit 74 is Gilbert 080.

---

Page 202

1      (Document referred to herein marked for
2      identification Exhibit No. 74)
3  BY MR. PUTTERMAN:
4      Q    Did you receive a loan from United Cash
5  Loans?
6      A    I didn't, no.
7      Q    Okay.  You applied for one?
8      A    No.  This is to somebody else.
9      Q    Oh, yes.  Charles Cali?
10     A    That was a co-worker of mine.
11     Q    How did you get this?
12     A    He was being harassed himself --
13     Q    Uh-huh.
14     A    -- and so I told him what was going on at
15 the time --
16     Q    Uh-huh.
17     A    -- and so he went that route with it.  So I
18 forwarded it to Mr. Wilens.
19     Q    Okay.  So you don't know anything specific
20 about what happened with regard to Mr. Cali?
21     A    No.  I just --
22     MR. PUTTERMAN: And Gilbert 81 is
23 Exhibit 75.
24     (Document referred to herein marked for
25     identification Exhibit No. 75)

Page 203

1  BY MR. PUTTERMAN:
2      Q    This was actually something that Mr. Cali
3  received from MoneyMutual, correct?
4      A    I guess, yeah.
5      Q    Not you?
6      A    No.
7      Q    Did he pass this on to you?
8      A    Yeah.  He wanted me to give it to the
9  attorney.
10     Q    Okay.  And you did that?
11     A    Yes.
12     MR. PUTTERMAN: Okay.  Exhibit 76 is Gilbert
13 082 through 086.
14     (Document referred to herein marked for
15     identification Exhibit No. 76)
16 BY MR. PUTTERMAN:
17     Q    Can you tell us what this is?
18     A    These are all of the -- the lenders that
19 were -- had been found out to be illegal at this time.
20 That was for Charles.
21     Q    Okay.  And these were all affiliated with
22 MTE Financial Services?
23     A    I guess that's what it says.  This was just
24 for --
25     Q    And you notice it refers to Miami Nation

Page 204

1  Enterprises.  Do you see that on the first page?
2      A    Yeah.
3      Q    So these were all related to an Indian
4  tribe, correct?
5      A    Yeah.
6      Q    Okay.  You can lay that aside.
7          Now, when you -- after you spoke to
8  MoneyMutual and you were told to submit your
9  information through the MoneyMutual website, you went
10 to the MoneyMutual website, correct?
11     A    Correct.
12     Q    Okay.  And did you go right to the page
13 which included the -- on which you could enter your
14 information or did you read through the website?
15     A    I looked at the first page.  I can't
16 remember if it was on the same page or not.
17     Q    Okay.  You looked at the first page of the
18 website?
19     A    Correct.
20     Q    What do you remember from that?
21     A    Montel, you know, standing there just like
22 he was in the commercial.  The OLA on the bottom.
23     Q    The OLA emblem?
24     A    Correct.  And then some other ones or
25 whatever.  And then I think it was a thing about

Page 205

1  predatory, something like that.  They obey U.S. laws,
2  whatever, for collection purposes.  I don't have to
3  worry about Guido-type thing.
4      Q    That's going to become a term of art in this
5  case after your deposition.  We can maybe turn it into
6  a verb like being Guidoed.
7      A    Yeah.
8      MR. WILENS: There is already a name.  It's
9  called loansharking.
10     THE WITNESS: Pretty much.  I just didn't
11 want anything to pass around my family and my job in
12 this.  That's exactly what happened.
13 BY MR. PUTTERMAN:
14     Q    And did you ever call MoneyMutual to
15 complain that -- about the collection practices that
16 were apparently being engaged in by Cash Yes or any
17 other lender?
18     A    Well, the same conversation that I had with
19 them about trying to find out the phone number.  They
20 were so short with me about everything.  They wouldn't
21 give any kind of information.  Until I got snotty
22 with them, that that's when they finally gave me the
23 phone number and that was it.
24         So I never pursued MoneyMutual anymore
25 because they straight told me that they were the

Gilbert v
Bank of America

Sean Gilbert
December 1, 2015

Page 206

1  middleman, that they didn't make the loan. They just
2  referred it.
3      Q    Did you specifically ask them during that
4  call, is there a procedure for me to make a complaint?
5      A    No.
6      Q    Do you remember anything else about the
7  website, the first page of the website, when you
8  looked at it?
9      A    Just the part that stuck out that -- you
10 know, about the lending laws, that they followed all
11 and that their network of lenders were -- you know,
12 that they gave them an extensive application process
13 and that they could revoke, suspend at any time. So
14 that made me feel comfortable.
15     Q    Did you --
16     A    So they could be held accountable if
17 something was to go wrong.
18     Q    Okay. Did you read beyond the first page of
19 the website?
20     A    I don't know. Maybe. I mean probably. I
21 started filling my information. I think it was all in
22 one, big old page. Just scroll down.
23     Q    Anything else at all you remember from the
24 website? Anything.
25     A    Well, just Montel said you can trust me, you

Page 207

1  know, I've -- I know all about -- you can trust our
2  network of lenders, I vouch for them. Basically, I
3  have been dealing -- we, us, that type of thing. Just
4  like what's been going on. I mean, there was just one
5  on the other night. So I am -- that's why I went for
6  it.
7      Q    Now, the only loan that you ever got through
8  MoneyMutual, the MoneyMutual website, was the Cash Yes
9  loan, correct?
10     A    Correct.
11     Q    And the other ones you got were all from
12 other websites, correct?
13     A    Correct.
14     Q    And none of them featured Montel Williams?
15     A    No, not that I know of.
16     Q    None of them were an exact duplicate or
17 anything like that of the MoneyMutual website?
18     A    No.
19     Q    Okay. And you remember that it referred to
20 following the laws and regulations with regard to
21 collections and so on?
22     A    Correct.
23     Q    Okay.
24     A    Strict screening process.
25     MR. PUTTERMAN: All right. I don't have

Page 208

1  anything further for this witness at this time.
2      EXAMINATION
3  BY MR. WILENS:
4      Q    I do. Mr. Gilbert, if you had known that
5  Cash Yes was a criminal and illegal lender, would you
6  have used MoneyMutual to take out a loan with them?
7      A    No.
8      MR. PUTTERMAN: Objection. You have to
9  pause for a minute, allow --
10     THE WITNESS: Sorry.
11     MR. PUTTERMAN: -- allow me to make my
12 objection.
13     Objection. Argumentative. Leading. Lacks
14 foundation.
15     MR. WILENS: You got the answer?
16 Thank you. No further questions.
17     MR. PUTTERMAN: Okay. Now, we're just
18 adjourning the deposition for now because we are
19 pending a further production of documents which we
20 know will include the handwritten letter complaining
21 to the Department of Corporations which will include
22 the February 2013 order from the Department of
23 Corporations and may include other documents as well.
24     I am going to ask you, Mr. Gilbert, through
25 your counsel here that you and your counsel make a

Page 209

1  thorough search of the records you have and produce
2  all additional records that are responsive to the
3  deposition notice duces tecum, and we will then have
4  to reschedule your deposition for sometime later this
5  month.
6      Are you going to be around generally in
7  December?
8      MR. WILENS: Could I say something first?
9      MR. PUTTERMAN: Yes.
10     MR. WILENS: Thank you.
11     Number one, I don't agree to reschedule his
12 deposition.
13     Number two, we haven't agreed to produce
14 anything. We said we'd look for the documents which
15 he thinks exist but may or may not exist, and we will
16 send them to you. You can decide what you want to do
17 with them at that -- at this time. There is no
18 possibility of another deposition this month. My
19 schedule does not permit it. And I don't see why you
20 would need it. It's not relevant to anything that's
21 urgent right now.
22     MR. PUTTERMAN: That depends on what's
23 produced. Right now we have pretty clear
24 noncompliance, and I don't know whether that's because
25 Mr. Gilbert failed to provide something to you or he