UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

SEAN L. GILBERT, *et al.*,

    Plaintiff,

v.

MONEY MUTUAL, LLC, *et al.*,

    Defendants.

Case No. 13-cv-01171-JSW (LB)

**DISCOVERY ORDER**

[Re: ECF Nos. 294, 308, 314]

## INTRODUCTION

The plaintiffs in this case challenge payday loans that they allege were illegal primarily because the lenders were unlicensed.[1] The moving defendants[2] want discovery and a deposition from the plaintiffs' counsel about a possible consulting agreement that (they assert) poses a conflict and makes him unsuitable to represent the class.[3] Because document discovery and the plaintiffs' counsel's declaration illuminate the issue sufficiently to allow the defendants to file a motion to disqualify class counsel, the court denies the motion.

---

[1] *See* Fifth Amendment Complaint — ECF No. 256. Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] The moving defendants are MoneyMutual, Selling Source, PartnerWeekly, Glenn McKay, Brian Rauch, John Hashman, Douglas Tulley, Samuel Humphreys, and Anthony Irby (collectively, the "MoneyMutual defendants") and Montel Williams. (Motion — ECF No. 308 at 2.)

[3] Motion — ECF No. 308 at 4-5; Supplemental Memorandum — ECF No. 294; Discovery Brief — ECF No. 314.

ORDER (No. 13-cv-01171-JSW (LB))

# STATEMENT

On December 10, 2015, the moving defendants' counsel attended a dinner in Las Vegas with an attorney named Tim Muir, who represents Scott Tucker and entities affiliated with Mr. Tucker.[4] The U.S. Attorney for the Southern District of New York charged Mr. Tucker (and Mr. Muir) with operating an unlawful Internet payday lending enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), and The Truth in Lending Act ("TILA"), 15 U.S.C. § 1611, and the Federal Trade Commission ("FTC") charged him civilly based on the same conduct with violations of the FTC Act, 15 U.S.C. § 45(a), TILA's disclosure requirements (implemented in 12 C.F.R. § 1026), and the Electronic Fund Transfer Act, 15 U.S.C. § 1693(k)(1) (implemented in 12 C.F.R. § 1005.10(e)(1)).[5] Mr. Muir told the defendants' counsel about a consulting arrangement with the plaintiffs' class counsel, Jeffrey Wilens:

> During the course of the dinner, Mr. Muir informed me that Jeffrey Wilens, counsel for the class in this action, had entered into a consulting agreement with Mr. Tucker or one of his entities (the actual party involved was not identified by Mr. Muir). This occurred in the context of a telephone call I had with Mr. Muir approximately a year to a year-and-a-half prior to the dinner, during which Mr. Muir had spoken with me about the possibility of entering into such an agreement with Mr. Wilens and said that Mr. Wilens had approached him. According to Mr. Muir, the purpose of this agreement was to create an attorney-client relationship between Mr. Wilens and Mr. Tucker's payday lending operation that would prevent Mr. Wilens from naming Mr. Tucker's businesses as defendants in litigation.[6]

The defendants' counsel asked Mr. Wilens during a March 4, 2016 "meeting whether he 'had a consulting or services agreement with any tribal lenders.'"[7] He first responded, "no," and then continued, "'there was one under discussion' with Scott Tucker' but 'it didn't go forward.' Without further prompting, Mr. Wilens added, 'there was nothing wrong with it because the decision already had been made not to go forward against any tribal lenders.'"[8] "Mr. Wilens then continued, in apparent seriousness, 'Why? Would you want to retain me?' He then went on to say

---

[4] Putterman Decl. — ECF No. 308-1, ¶ 2.

[5] *United States v. Scott Tucker and Timothy Muir*, No. 16cr0091 (S.D.N.Y.); *Federal Trade Comm'n v. AMG Servs. et al.*, No. 2:12-cv-00536 (S.D.N.Y. April 2, 2016). The court takes judicial notice of the fact of these public-record documents (but not the factual allegations in them).

[6] Putterman Decl. — ECF No. 308-1, ¶ 2.

[7] *Id.* ¶ 2.

[8] *Id.* ¶ 3.

United States District Court
Northern District of California

'if we were to do such a thing' we would need to avoid the conflict with the class. [The defendants' counsel] then responded that [their] clients were not looking to retain Mr. Wilens."[9]

In a call on April 6, 2016, after the defendants filed this motion, Mr. Wilens told the defendants' counsel that

> he had never spoken directly with either Tim Muir or Scott Tucker, but that he actually had gone through two other attorneys. He suggested that [the moving defendants' counsel] contact these attorneys, whom Mr. Wilens claimed would corroborate the propriety of Mr. Wilens'[s] conduct. One of the attorneys was Conly Schulte, Esq., a Colorado attorney.[10]

Mr. Schulte represented several tribes and tribally owned entities in two cases involving online payday lending; Mr. Wilens represented the named plaintiff in one case, *Colbert v. SFS Inc.*, No. RG12657429 (Cal. Sup. Ct.) (filed in 2012).[11] Mr. Schulte describes his dealings with Mr. Wilens:

> 3. The claims by the named plaintiff against the tribal client I represented in the *Colbert* case were court-ordered to arbitration, where they ultimately settled in May 2015. In November 2015, I settled two other claims against my clients involving persons represented by Mr. Wilens.
>
> 4. Shortly thereafter, on November 13, 2015, I received an email from Mr. Wilens asking if I "would be interested in having a phone conversation to follow up on some discussions initially raised with [a lawyer that formerly represented other defendants in a tribal lending case]." . . . [The email is attached.]
>
> 5. I spoke with Mr. Wilens over the telephone later that month, and he told me about a legal article he had found asserting that in certain situations it could be ethical for a party to enter into a consulting agreement with an opposing attorney in order to create a conflict of interest that would prevent the opposing attorney from bringing an action against that party in the future.
>
> 6. Shortly after the call, on November 30, 2015, Mr. Wilens forwarded to me the article he had referred to during the telephone call. The article, written by two attorneys with Arnold & Porter LLP, was titled "Ethical Limitations on Attempting to Prevent or Restrict an Attorney from Bringing Future Claims as Part of a Settlement Agreement." Mr. Wilens forwarded the article as a PDF attachment that had been named, "Article on hiring lawyers as consultant to create conflict on future cases.pdf." . . . [The article is attached.]
>
> 7. Mr. Wilens asked whether my clients would be interested in entering into a consulting agreement with the Lakeshore Law Center and the Spencer Law firm. I requested that Mr. Wilens provide draft agreement terms. . . . [The proposed consulting

---

[9] *Id.* ¶ 4.

[10] Snyder Decl. — ECF No. 294-1, ¶ 4.

[11] Schulte Decl. — ECF No. 294-3, ¶ 2.

agreement is attached.] The terms proposed by Mr. Wilens were unacceptable, and no agreement was reached.[12]

The article by the Arnold and Porter lawyers discusses consulting agreements with plaintiffs' lawyers to foreclose future litigation from plaintiffs' lawyers against clients.[13] Mr. Wilens's draft consulting agreement provides for a $250,000 nonrefundable retainer payable over 15 months, hourly fees, and this paragraph titled "Conflicts":

> You [Mr. Wilens] acknowledge that accepting this Agreement and the payments hereunder and representing the Company may limit your ability to represent other clients. You agree not to represent any other client with any interest adverse to the Company during the term of this Agreement. You further agree not to represent any other client with any interest adverse to the Company in any matter with respect to which you obtained confidential information of the Company that is related to the Company's or the other client's claims or defenses in that matter. You acknowledge that, absent clear and convincing evidence to the contrary, it will not be possible for you to represent an individual in an action against the Company based on a payday loan that the Company made about the individual because the Company will have provided you confidential information material to its past, present, and future lending practices, which practices would be material to such an adverse representation. You represent that you have not (a) advised anyone (other than the individuals you represented in prior claims against the Company, and other than the statements previously on your website before the Effective Date that were directed to the general public) to sue the Company or (b) referred anyone whom you believed might have a claim against the Company to any other attorney.
>
> **Under no circumstances would this attorney-client relationship with Company be deemed to render you ethically or legally unable to represent clients with claims against other payday lenders or payday lending companies such as Selling Source and MoneyMutual.**[14]

Reginald Steer and Danielle Ginty are outside counsel to David Johnson, a defendant who successfully moved to compel arbitration.[15] According to Mr. Steer, on May 8, 2015, Ms. Ginty spoke to Mr. Wilens about his proposals for settlement; "one of the proposals Mr. Wilens raised was one that he said he 'could not discuss', but that [ Mr. Steer] would know what he meant. [Mr. Steer] did not know at the time what Mr. Wilens was referring to[, ] did not ask Mr. Wilens to clarify his proposal, and [] did not discuss it further with him."[16] The import of this is that Mr.

---

[12] *Id.* ¶¶ 3-7.

[13] Ex. B, ECF No. 294-3 at 29.

[14] Ex. C, ECF No. 294-3 at 43-48 (emphasis in the original).

[15] 4/8/2015 Order — ECF No. 186; Steer Decl. — ECF No. 294-2, ¶ 1; Ginty Decl. — ECF No. 294-5, ¶ 1.

[16] Steer Decl. — ECF No. 294-2, ¶ 2.

Wilens was raising the same proposal of a side consulting deal. Ms. Ginty describes her conversation with Mr. Wilens as follows: "When describing this proposal, Mr. Wilens stated that in another case, the defendants wanted to retain him after settlement. He stated that he researched the issue extensively and determined that this could not be done because the settlement could not include or imply any side agreements between him and the defendants. Mr. Wilens stated that, nonetheless, 'attorneys can be hired by anyone at any time.'"[17]

The moving defendants point to Mr. Wilens's filing of serial arbitrations in an attempt to create leverage for settlement and incentives to enter into a consulting agreement with him to cut off his ability to file future arbitration claims against them.[18] For example, after the district judge granted the Rare Moon defendants' motion to compel arbitration, Mr. Wilens filed arbitration cases against the Rare Moon defendants and others on behalf of some of the named plaintiffs and other class members from the class list.[19] On September 8, 2015, the Rare Moon defendants resolved all of the arbitration cases that Mr. Wilens filed.[20] In September or October 2015, Mr. Wilens called counsel for the Rare Moon defendants; counsel for defendants describes the conversation as follows:

> 6. During this telephone conversation, Mr. Wilens stated that he would not be filing arbitration cases against my clients for a period of time as he would be utilizing the resources that were contacting potential claimants to pursue other matters. Further, Mr. Wilens stated that if my clients wanted to avoid him filing future arbitration cases, which he stated he intended to do at some future date, then either I or my clients should know what to do. I told Mr. Wilens that I did not know what he was talking about and he told me to talk to Reginald Steer, counsel for the Cane Bay Defendants in this lawsuit, and that Mr. Steer would know to what Mr. Wilens was referring. I did not understand at the time what Mr. Wilens was suggesting.
>
> 7. My clients in the AAA [arbitration] cases have not entered into a consulting agreement with Mr. Wilens.

---

[17] Ginty Decl. — ECF No. 294-5, ¶ 2.

[18] Snyder Decl. — ECF No. 294-1, ¶ 5; Croker Decl. — ECF No. 294-4, ¶¶ 3, 6. The moving defendants assert that Mr. Wilens is misusing documents that are designated "Highly Confidential" to find clients to file arbitration claims against defendant Cash Yes. (Snyder Decl. — ECF No. 294-1, ¶ 5.) Mr. Wilens denies this, and the court addressed the issue in its discovery order at ECF No. 313, finding that it could not conclude that Mr. Wilens violated the protective order.

[19] Croker Decl. — ECF No. 294-4, ¶ 3.

[20] *Id.* ¶ 4.

> 8. On or about November 9, 2015, Mr. Wilens filed the first arbitration case with AAA that he had filed since my clients resolved the previously filed AAA cases.
>
> 9. Since November 2015 to present, Mr. Wilens has filed over 100 cases with AAA against my clients [the Rare Moon defendants] on behalf of claimants.[21]

Mr. Wilens filed a declaration generally explaining his actions. For example, in the *Colbert* case, he describes how the case moved to arbitration and that the ultimate result became predictable: "there would be no class relief but Colbert would prevail on her individual claims;" the parties thus settled this case and the Clark case (also ordered to arbitration) case in May 2015.[22] He was retained by others, and he settled their claims; the result was that by the end of November 2015, he settled all of his clients' claims against the defendants SFS and Mr. Tucker.[23] He confirms his conversation with Mr. Schulte, counsel for SFS, and his emailing of the Arnold & Porter article and the consulting-agreement exemplar, which he emailed at Mr. Schulte's request.[24] He declares that the discussions never proceeded beyond that point, and there never was a consulting agreement.[25] He then states the following:

> 10. Although Defendants imply that there may have been some kind of "deal" in connection with the October 2013 amendment, that is completely untrue. That decision had absolutely nothing to do with any "deal" Wilens had with Tucker or any other tribal lender, because there was no deal, consummated or even contemplated.
>
> 11. Putterman's declaration (Doc. 263-1) states that Timothy Muir told him (apparently over an excessive number of cocktails) that "Jeffrey Wilens, counsel for the class in this action, had entered into a consulting agreement with Mr. Tucker or one of his entities (the actual party involved was not identified by Mr. Muir)." That statement is completely false. No such consulting agreement had been entered into as of December 2015 (or ever).
>
> 12. In addition, in that declaration Putterman also claims Muir told him that 12-18 months before December 2015 (i.e., June 2014 to December 2014), Wilens had approached him (Muir) and proposed a consulting agreement so as to create an "attorney-client relationship between Mr. Wilens and Mr. Tucker's payday lending operation that would prevent Mr. Wilens from naming Mr. Tucker's businesses as defendants in litigation." Again, this is lie or Putterman has misquoted Muir.

---

[21] *Id.* ¶¶ 5-9.

[22] Wilens Decl. — ECF No. 297-1, ¶¶ 3-6.

[23] *Id.* ¶¶ 7-8.

[24] *Id.* ¶ 9.

[25] *Id.* ¶¶ 9-10.

> 13.  To the contrary, the Colbert class action was still being prosecuted either in court or in arbitration against SFS well into <u>March 2015</u>. Moreover, I have had no communications with Muir regarding that topic (or anything else to the best of my recollection).[26]

He confirms that he spoke with Ms. Ginty but asserts that he "pressed [her] to consider a class[-]action settlement and some specific numbers were discussed. [He] did not propose any consulting agreement but to the contrary told Ginty <u>very clearly</u> that [he] would not discuss any unethical proposals with her and gave her one such example of an unethical proposal (which is the one cited by Ginty in her declaration)."[27]

He confirms that he spoke with Mr. Croker on November 9, 2015, pressing him "to consider a class[-]action settlement and propos[ing] some numbers for classwide payment."[28] He has no record of a phone call in September or October about Mr. Croker's "'knowing what to do.'"[29] He did email Mr. Croker on November 5, 2015, saying that he was

> "gearing up to file new arbitration cases against Rare Moon" and proposed a process by which the statute of limitations would be tolled so that Rare Moon could be given advanced notice of the proposed filings and a chance to verify the loan was funded. There were a number of phone calls and emails in September and October 2015 but they concerned various arbitration claims that were being finalized for settlement, so to the extent Mr. Croker refers to a time frame between when all pending arbitration cases were resolved and before new cases were filed, that would be November 2015 not September or October 2015.[30]

His declaration concludes:

> 16.  Mr. Putterman claims the Ginty, Steer and Croker declarations prove that I was approaching counsel for payday lenders who loaned money to the Gilbert class members (i.e., Cash Yes and Rare Moon lenders) in order to "solicit agreements which would prohibit him from representing clients in arbitrations directly related to the claims he is asserting in this action on their behalf." <u>That never happened</u>. At no time did I propose to any of those counsel that I would abandon class members' arbitration claims in exchange for some sort of agreement whereby I would be hired by those payday lenders. With respect to the Gilbert class members' claims against those payday lenders, the only offers which have been made, involve either a class action settlement or settlement of individual claimants (depending on the status of the particular cases).

---

[26] *Id.* ¶¶ 10-13 (emphasis in original).

[27] *Id.* ¶ 14 (emphasis in original).

[28] *Id.* ¶ 15.

[29] *Id.*

[30] *Id.*

ORDER (No. 13-cv-01171-JSW (LB))           7

17. Defendants claim that according to my own words, I have been "going around offering to sell out hundreds if not thousands of" class members or clients, "by offering to enter into agreements for large sums of money to not represent them in arbitrations. . . ." That is a flat out lie by Mr. Putterman as evident from the complete absence of any evidence. Much to the contrary, I have hammered the defendants with many arbitration clams, leading them perhaps to discover the arbitration clauses were a double-edged sword. Mr. Putterman is also well aware I have achieved important victories in this case and exposed his clients in depositions where they were forced to admit under oath they promoted unlicensed and illegal lenders while professing ignorance at the same time. This motion and Mr. Putterman's allegations are nothing more than an attempt to derail a freight train.[31]

## ANALYSIS

When they filed their motion, the moving defendants knew only of the possible arrangement with Mr. Tucker and sought discovery — documents and a deposition — about it.[32] Then, through a meet-and-confer process after they filed their motion, they learned about Mr. Schulte and obtained Mr. Wilens's correspondence with him, including a draft consulting agreement.[33] Their argument is that if Mr. Wilens entered into a forbearance agreement with Mr. Tucker, then "it creates a clear conflict of interest between Mr. Wilens and the class[] to the extent that he may have disregarded claims held by potential class members in favor of his own pecuniary interests."[34] The defendants assert that a conflict calls into question Mr. Wilens's adequacy as class counsel and that "even contemplating such an agreement might call into question his adequacy as class counsel."[35] In particular, they argue that by proposing to enter into an agreement with Mr. Tucker, he knew that Mr. Tucker and his companies "might possibly be invested in lenders alleged to be part of the RICO conspiracy at issue here, or material witnesses to the claims and defenses (for instance when MoneyMutual defended the allegations that they attempted to 'conceal' their involvement with Mr. Tucker)."[36] "Mr. Wilens knew he potentially was agreeing to

---

[31] *Id.* ¶¶ 16-17 (emphasis in original).

[32] Motion, ECF No. 308 at 4.

[33] Supplemental Memorandum — ECF No. 294 at 2, 6; Snyder Decl. — ECF No. 294-1, ¶¶ 2-4; Schulte Decl. – ECF No. 294-3, ¶ 7, Ex. C.

[34] *Id.* at 3-4.

[35] *Id.* at 4.

[36] Joint Letter Brief — ECF No. 314 at 2.

ORDER (No. 13-cv-01171-JSW (LB)) 8

1  make deals with persons that very well could be involved in the alleged illegal payday loans at

2  issue, or material witnesses thereto."[37]

3  Rule 26(b)(1) of the Federal Rules of Civil Procedure describes the basic scope of discovery

4  — *i.e.,* what information parties can rightly demand from one another:

> Parties may obtain discovery regarding any nonprivileged matter that is **relevant** to any party's claim or defense and **proportional to the needs of the case**, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b).[38]

If a party seeks relevant information that is proportional to the needs of the case, that party may depose "any person" under Rule 30(a)(1), and there is no express prohibition against deposing an attorney of record in a case. *See Graff v. Hunt & Henriques*, No. C 08–0908 JF (PVT), 2008 WL 2854517, at *1 (N.D. Cal. July 23, 2008). Still, "[t]he Supreme Court . . . alluded to a presumption that trial counsel should not be forced to testify because doing so compromises the standards of the legal profession." *Nocal, Inc. v. Sabercat Ventures, Inc.*, No. C 04–0240 PJH (JL), 2004 WL 3174427 (N.D. Cal., Nov. 15, 2004) (citing *Hickman v. Taylor*, 329 U.S. 495, 513 (1947)); *accord Mustang Mktg., Inc. v. Chevron Prods. Co.*, No. SA CV 02–485 DOC (MLGx), 2006 WL 5105559, at *3 (C.D. Cal. Feb. 28, 2006). For this reason, attorney depositions even for fact discovery generally are allowed only when the discovery cannot be obtained from another place. *Graff*, 2008 WL 2854517, at *1 (citing *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986)).

The *Shelton* court explained that attorney depositions should be permitted only where the party seeking the deposition shows that 1) no other means exist to obtain the information, 2)

---

[37] *Id.*

[38] The main text sets out the current version of Rule 26(b), which was amended effective December 1, 2015. "[I]t is well established that a court generally applies the law in effect at the time of its decision, and that if the law changes, . . . the . . . court applies the new rule." *Lambert v. Blodgett*, 393 F.3d 943, 973 n. 21 (9th Cir. 2004) (citing *Thorpe v. Durham Hous. Auth.*, 393 U.S. 268, 281 (1969)).

1  the information sought is relevant and nonprivileged, and 3) the information is crucial to the
2  preparation of the case. 805 F.2d at 1327. District courts in this district generally recognize
3  *Shelton* as the leading case on attorney depositions on matters relating to the pending case.
4  *See, e.g., S.E.C. v. Jasper*, No. C07-06122 JW (HRL), 2009 WL 1457755, at *3 (N.D. Cal.
5  May 26, 2009); *Fausto v. Credigy Servs. Corp.*, No. C 07–05658, 2008 WL 4793467, at *1 n.2
6  (N.D. Cal. Nov. 3, 2008); *Graff*, 2008 WL 2854517 at *1; *see also Nocal*, 2004 WL 3174427;
7  *accord ATS Prods. v. Champion Fiberglass, Inc.*, No. 13-cv-02403-SI (DMR), 2015 U.S. Dist.
8  LEXIS 74015, at *8 (N.D. Cal. June 8, 2015). The parties agree; both apply *Shelton* in their
9  analysis.[39]

That said, *Shelton* is meant to protect against deposing an attorney regarding a pending case in part because that might lead to disclosure of litigation strategy. *ATS*, 2015 U.S. Dist. LEXIS 74015, at *13 (citing *Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 729-30 (8th Cir. 2002)). It was not intended to block discovery of "relevant information uniquely known by [the plaintiff's] attorneys about prior terminated litigation, the substance of which is central to the pending case." *Pamida*, 281 F.3d at 731; *see also In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 72 (2nd Cir. 2003) (applying a more flexible standard and considering various factors, including the need to depose the lawyer, the lawyer's connection to the discovery, the risk of encountering privilege and work product, and the extent of discovery already conducted).[40]

---

[39] Joint Discovery Letter — ECF No. 314 at 3; Opposition — ECF No. 297 at 4; Reply — ECF No. 307 at 5-8.

[40] In *Pamida*, a patentholder sued Pamida for selling shoes that infringed her patent; Pamida rejected the patentholder's early settlement offer and instead engaged in costly litigation that ultimately resulted in a settlement. 281 F.3d at 728. Before the case settled, Pamida sued its manufacturer Dynasty for indemnification. *Id.* Pamida's lawyers were the same in both lawsuits. *Id.* at 728-29. The court allowed discovery into Pamida's notice to Dynasty and the reasonableness of fees; the court held that the issue should be evaluated under Rule 26 and that Pamida waived any claims of attorney-client privilege or work product by filing its lawsuit. *Id.* at 730-31. Similarly, the *ATS* court applied Rule 26 when considering whether to allow the deposition of a party's attorney who had percipient information from a prior concluded settlement negotiation that was relevant to the pending trade-secrets case. 2015 U.S. Dist. LEXIS 74015, at *18-*19. The court disallowed the deposition based on burden and the availability of information from other sources but said that it would permit the deposition if ATS called its attorney as a trial witness. *Id.* at *20-*21.

1  The issue is whether the moving defendants ought to get discovery from Mr. Wilens (documents and a deposition) about his negotiations in an unrelated case that implicate whether he violated California ethical rules and thus might be disqualified from representing the class here. Mr. Wilens's earlier cases involved different defendants than the defendants in this case. And more to the point, Mr. Wilens — in sworn declaration — denied making any deal. He says that Mr. Muir's statements are false. He voluntarily disclosed all information to the defendants and points out that they are free to raise their arguments about conflict to the assigned district judge.[41] He asserts that a deposition serves no purpose other than to harass.[42]

The court denies the motion. The moving parties have not established that they have no other means to obtain documents; indeed, their motion shows they have done so. Moreover, Mr. Wilens generally cooperated with the defendants and tried to reduce their concerns by providing them with information. The defendants' arguments now mainly are that they don't believe Mr. Wilens and are entitled to depose him in aid of a motion to disqualify him, not only about the Tucker arrangement, but also about any other similar offers or arrangements that Mr. Wilens proposed in this or other cases or situations.[43] Whatever purpose a deposition might serve, Mr. Wilens's declaration covers that territory. He confirmed at the hearing that he had not entered into or proposed similar arrangements. Much more practically, the moving defendants have the information that they need to bring a motion to disqualify Mr. Wilens as class counsel. To the extent that they disagree with his characterization of their interaction, they are able to offer their own declarations to rebut his.

## CONCLUSION

The court denies the motion. This disposes of ECF Nos. 294, 308, and 314.

**IT IS SO ORDERED.**

Dated: June 9, 2016

LAUREL BEELER
United States Magistrate Judge

---

[41] Opposition — ECF No. 297 at 10.
[42] *Id.*
[43] Joint Letter — ECF No. 314 at 2.